FILED LAL
APR 1 9 2005
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAWRENCE P. ORGAN, | ) |
| Plaintiff, | ) 05C 2317 |
| v. | ) JUDGE ZAGEL |
| MARC BYRON, BEN KAAK and CATHERINE BARBARO, | ) |
| Defendants. | ) MAGISTRATE JUDGE DENLOW |

## COMPLAINT

Plaintiff, Lawrence P. Organ, by and through his attorneys, Jack L. Haan, James J. Eccleston and Henry N. Novoselsky of Shaheen, Novoselsky, Staat, Filipowski, & Eccleston, P.C., for his Complaint against the Defendants, Marc Byron, Ben Kaak, and Catherine Barbaro, states and alleges as follows:

*Introduction.*

On January 21, 2002, plaintiff Lawrence P. Organ agreed to sell his 54.1% membership interest in his company, Customs Offers LLC, to Mosaic Group, Inc. in a merger transaction between the companies. In exchange for his security interest, Mr. Organ was to receive both Mosaic stock and cash over three years, with Mr. Organ's consideration totaling a maximum of $27.1 million dollars.

Undisclosed to Mr. Organ, however, were critical, adverse facts relating to Mosaic's business and financial future. One of Mosaic's primary assets, a contract with AT&T Wireless, was terminated in approximately September, 2001. The terminated AT&T contract not only foretold the loss of Mosaic's business opportunities, revenue and working capital going forward,

1

but also triggered Mosaic's obligation to repay AT&T for previously paid commissions to Mosaic for customers obtained under the AT&T contract.

The defendants, Marc Byron, Ben Kaak and Catherine Barbaro, knew of the terminated AT&T contract and impending financial consequences, yet never disclosed the truth to Mr. Organ or his representatives during their solicitations and numerous discussions with him and other Custom Offers membership interest holders prior to closing. As officers of Mosaic who participated in and aided in the exchange of the securities in the merger transaction, each of these defendants is personally liable for the loss suffered by Mr. Organ pursuant to the Illinois Securities Law of 1953.

With this Complaint, Mr. Organ seeks rescission of the securities transaction, monetary damages against the defendants in the sum of $27,100,000, an award of his reasonable attorney's fees, accrued statutory interest, and costs.

### *Mr. Organ Agrees to Sell His Membership Interest in Custom Offers LLC in Exchange for Stock in Mosaic Group Inc. and Cash.*

1. Plaintiff, Lawrence P. Organ ("Organ"), is and at all relevant times was a citizen of the State of Illinois. Mr. Organ is currently the founder and Chief Executive Officer of ConsumerBase LLC ("ConsumerBase"), a company located in Evanston, Illinois which is involved in the business of delivering customized direct marketing solutions.

2. Prior to January 24, 2002, Mr. Organ was the founding member and Chief Executive Officer of Custom Offers LLC, an Illinois limited liability company ("Custom Offers"), which operated from its business location in Evanston, Illinois. Mr. Organ was the owner of a membership interest in Custom Offers, owning approximately 54.21% of the outstanding membership interest.

3. On January 21, 2002, Mr. Organ and the other owners of membership interests of

2

Custom Offers agreed to sell their membership interests of Custom Offers to Mosaic Group, Inc. ("Mosaic"), a corporation organized under the laws of the Province of Ontario, Canada, in exchange for stock of Mosaic and cash.

4.  Mosaic was involved at that time in the business of providing independent marketing solutions in Canada, the USA and the United Kingdom. Mosaic's head office was located in Toronto, Ontario.

5.  Defendant, Marc Byron ("Mr. Byron"), is and at all relevant times was a citizen of the State of New Jersey. Defendant Mr. Byron was at all material times a director and officer of Mosaic, and held the position of Chief Executive Officer. Mr. Byron participated in and aided in the solicitation of Mr. Organ for the merger transaction with Mosaic.

6.  Defendant, Ben Kaak ("Mr. Kaak"), is and at all relevant times was a citizen of the Province of Ontario, Canada. Defendant Mr. Kaak was at all material times an officer of Mosaic and held the position of Executive Vice President and Chief Financial Officer of Mosaic. Mr. Kaak was responsible for the ongoing financial operations and corporate development activities of Mosaic, including the transaction by which it acquired Custom Offers. Mr. Kaak participated in and aided in the solicitation of Mr. Organ and other Custom Offers membership interest holders for the merger transaction with Mosaic.

7.  Defendant, Catherine Barbaro ("Ms. Barbaro"), is and at all relevant times was a citizen of the Province of Ontario, Canada. Defendant Ms. Barbaro was at all material times an officer of Mosaic and held the position of Vice President Legal and Corporate Secretary. Ms. Barbaro was responsible for all of Mosaic's legal affairs including all corporate transactions undertaken by Mosaic, including the transaction by which it acquired Custom Offers. Ms. Barbaro participated in and aided in the solicitation of Mr. Organ and other Custom Offers

membership interest holders for the merger transaction with Mosaic.

### *Jurisdiction and Venue.*

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Mr. Organ shares no common citizenship with any of the Defendants and because the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000 specified in 28 U.S.C. § 1332.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391 (a) because a substantial part of the events giving rise to the cause of action alleged below against the Defendants occurred within this District.

### *Mosaic's Wireless Contract With AT&T, and its Accompanying Churn Chargeback.*

10. On December 14, 2000, Mosaic acquired Paradigm Direct LLC ("Paradigm"), a Delaware limited liability company. As a result of the Paradigm acquisition, Paradigm became a wholly-owned, indirect subsidiary of Mosaic.

11. Paradigm's primary business venture was an exclusive agreement with AT&T Wireless ("AT&T") to actively source new customers for AT&T's products throughout the United States. Under the terms of the AT&T contract, Paradigm provided an inducement to new customers in the form of a new cellular telephone if the customer signed on and remained with AT&T's service for a period of six months (the "AT&T Contract").

12. Under the terms of the AT&T Contract, Mosaic was required to refund to AT&T commission paid to Mosaic for customers acquired by Mosaic who did not remain on the AT&T network for a period of six months (the "Churn Chargeback").

13. Mosaic benefited from the fact that AT&T would prepay, on a cash basis, the entire new customer acquisition commission in advance, and Mosaic would only repay the Churn

4

Chargeback if and when the customer subsequently left the AT&T network in a future reporting period.

14. While the AT&T Contract was the most significant component of Mosaic's overall financial performance and a significant component of Paradigm's adjusted earnings for its 2000 and 2001 fiscal years, there was virtually no mention of the significance of the AT&T Contract in the Mosaic 2000 annual report or any of the Mosaic fiscal 2001 quarterly reports.

15. The AT&T Contract was terminated in or about September 2001.

16. With the termination of the AT&T Contract a) Mosaic lost the benefit of the prepayment of the new customer acquisition commissions, with a resulting negative impact on Mosaic's working capital position; b) Mosaic lost a material source of revenue and working capital that severely impaired the ongoing operations and valuation of Mosaic; and c) Mosaic became obligated to make substantial cash payments to AT&T as a result of the Churn Chargeback.

### *Mosaic's Offer to Merge With Custom Offers.*

17. In or about November 2001, Mosaic, through Mr. Byron, and Custom Offers, through Mr. Organ, entered into preliminary discussions regarding a potential merger between Mosaic and Custom Offers (the "Merger Agreement").

18. The proposed merger involved Custom Offers merging with a company wholly owned by Mosaic. The initial consideration to be paid to Custom Offers was $300,000 in cash, and $5,700,000 in the form of shares of common stock of Mosaic (together, the "Initial Consideration").

19. In addition to the Initial Consideration, Mr. Organ and the other owners of membership interests in Custom Offers were paid $4,000,000 in additional shares of common

stock because the business earned trailing twelve month adjusted profit before tax ("PBT") of at least $2,000,000 by December 31, 2002 (the "Interim Contingent Consideration"); b) 2002 Contingent Consideration; and c) 2003 Contingent Consideration.

20. By virtue of Mr. Organ's 54.21% ownership of the membership interest in Custom Offers, Mr. Organ was entitled to maximum consideration in the transaction in an amount of approximately $27,100,000.

### *The Defendants' Knowledge of the Terminated AT&T Contract and Resulting Churn Chargeback Prior to the Custom Offers Merger.*

21. The Defendants each engaged in a course of conduct with regard to the contemplated merger transaction which presented a deceptive and misleading picture of Mosaic's business condition and financial performance for 2001.

22. Each of the Defendants knew or ought to have known in or about September 2001 that the AT&T Contract was terminated and that the Churn Chargeback existed.

23. As Chief Executive Officer, Mr. Byron was knowledgeable about the financial affairs of Mosaic, including the status of the terminated AT&T Contract and the existence of the Churn Chargeback.

24. Mr. Byron, as an officer of Mosaic, participated in and aided in the merger transaction. Mr. Byron made a personal solicitation of Mr. Organ in Illinois to discuss the contemplated transaction preceding the execution of the Merger Agreement. In addition, Mr. Byron participated in numerous telephone solicitations and discussions with Mr. Organ and other Custom Offers representatives during discussions leading to the Merger Agreement.

25. As Chief Financial Officer, and as the person responsible for the ongoing financial operations of Mosaic, Mr. Kaak was knowledgeable about the financial affairs of Mosaic, including the status of the terminated AT&T Contract and the existence of the Churn

Chargeback.

26. Mr. Kaak, as an officer of Mosaic, participated in and aided in the merger transaction not only by making numerous telephone calls to owners of membership interests of Custom Offers regarding the potential merger transaction, but also by making a personal solicitation in Illinois by presenting and soliciting agreement to the contemplated merger transaction by Mr. Organ and all of Custom Offers' employees who owned membership interests in Custom Offers.

27. As Vice President Legal and Corporate Secretary and corporate legal counsel, and being responsible for the legality of corporate transactions at Mosaic, Ms. Barbaro was knowledgeable about the status of the terminated AT&T Contract and the existence of the Churn Chargeback.

28. Ms. Barbaro, as an officer of Mosaic, participated in and aided in the merger transaction by making numerous telephone calls to owners of membership interests of Custom Offers soliciting and furthering agreement to the potential merger transaction by Mr. Organ and other owners of membership interests of Custom Offers.

### *The Defendants' Failures to Disclose the Terminated AT&T Contract or the Existence of the Churn Chargeback.*

29. Each of the Defendants made representations in which they omitted stating material facts that were required to be stated or that were necessary to make representations regarding Mosaic's financial affairs not deceptive or misleading to Mr. Organ. Specifically, the Defendants failed to state the following:

    a) that the AT&T Contract had been terminated in or about September, 2001; and

    b) that the Churn Chargeback existed, and its consequences.

30. Each of the Defendants knew or ought to have known at the time of the merger

7

discussions between Mosaic and Custom Offers that the termination of the AT&T Contract would result in:

    a)     a material portion of Paradigm and Mosaic's previous fiscal year's revenue and earnings being lost going forward;

    b)     the loss of a critical portion of Mosaic's working capital funding as Mosaic would no longer benefit from the advance payment of AT&T customer acquisition commissions; and

    c)     an obligation to make substantial cash payments to AT&T as a result of the Churn Chargeback.

31.     Prior to closing, Mr. Organ requested financial statements and information regarding Mosaic's financial affairs and condition that was not publicly available. However, Mosaic refused to provide the requested information at any time prior to closing.

32.     Accordingly, Mr. Organ relied on the publicly disclosed financial information on Mosaic when assessing whether to move forward with the merger transaction and whether his consideration for the transaction was fair value.

33.     The fact that the AT&T Contract had been terminated, and the fact that the Churn Chargeback existed and its consequences, was not publicly available information at any time prior to Mr. Organ's agreement to the Merger Agreement.

34.     The Defendants' statements and accompanying omissions to state material facts were intended to induce, and did induce, Mr. Organ to agree to and enter into the Merger Agreement.

35.     Mr. Organ reasonably relied on Mosaic's public financial information when assessing whether the consideration for the Merger Agreement, in pertinent part, stock of Mosaic's, was fair value and whether the price per share was adequate.

8

### *Without Knowledge of the Terminated AT&T Contract or the Existence of the Churn Chargeback, Mr. Organ Agrees to the Merger Transaction, Exchanging his Membership Interest for Mosaic Stock and Cash.*

36. In reasonable reliance on the representations made by the defendants, Mr. Organ entered into a Merger Agreement with Mosaic on January 21, 2002. As consideration for selling his membership interest in Custom Offers to Mosaic, Mr. Organ accepted common shares of Mosaic believing the common shares reflected the publicly disclosed and fairly represented value of the ongoing operations of Mosaic.

37. Unknown to Mr. Organ, the statements and representations of the Defendants were deceptive and untrue in the following particulars:

    a) the AT&T Contract had been terminated in or about September, 2001;

    b) as a result of the termination of the AT&T Contract, Mosaic became charged with an obligation to make substantial payments to AT&T as a result of the Churn Chargeback;

    c) the overall economic health and continued viability of Mosaic was substantially compromised by the cancellation of the AT&T Contract.

38. Under the procedures adopted by Mosaic in its fiscal reporting, the Churn Chargeback experienced every quarter was, in fact, masked as an offset to new AT&T revenue so long as the new AT&T business was being recognized. The full amount of the Churn Chargeback was not fully disclosed until after a settlement between Mosaic and AT&T was reached on the Churn Chargeback issue sometime in the third quarter of 2002.

39. By failing to disclose the loss of the AT&T Contract and existence and consequences of the Churn Chargeback prior to the execution of the Merger Agreement, the Defendants misrepresented the financial well-being of Mosaic and, in turn, misrepresented the value of the stock of Mosaic and other consideration to be received by Mr. Organ, pursuant to the Merger Agreement.

40. Mr. Organ first became aware of the termination of the AT&T Contract after the Merger Agreement had been completed and first became aware of the existence of the Churn Chargeback and Mosaic's accounting treatment of the Churn Chargeback some time in mid-2004.

41 Had Mr. Organ been aware of the status of the terminated AT&T Contract or been aware of the existence of the Churn Chargeback prior to closing, Mr. Organ would not have entered into the Merger Agreement.

### *Mr. Organ Suffers Monetary Damages in the Amount of $27,100,000.*

42. In or about May 2002, Mosaic announced its fiscal 2002 first quarter results. Mosaic lost CAD $8.2 million.[1] A significant portion of this financial loss was attributable to the loss of CAD $40.9 million in revenues and CAD $4.5 million in cash flow, as experienced in the same quarter fiscal 2001, from the terminated AT&T Contract.

43. In August 2002, Mosaic announced its second quarter financial results. Mosaic incurred a loss of CAD $5.2 million from continued operations. The most significant contributor to this loss was the elimination of CAD $57.6 million in revenue and CAD $7.1 million in cash flow, experienced in the comparable period in fiscal 2001, as a result of the termination of the AT&T Contract.

44. In November 2002, Mosaic issued its third quarter results. In the quarter, Mosaic experienced a loss of CAD $39.5 million. One of the most significant contributors to this loss was a settlement charge of CAD $10.2 million relating to the terminated AT&T Contract and the absence of revenues of CAD $41.3 million from the AT&T Contract as experienced in the same quarter in fiscal 2001. In these financial results, Mosaic indicated that it was in breach of several of its debt covenants and there was a pending liquidity crisis for the company.

---

[1] "CAD" refers to the amount of money as expressed in Canadian dollars.

45. As a result of entering into the Merger Agreement and accepting an artificially inflated value of Mosaic common stock, Mr. Organ suffered damages in the amount of $27.1 million.

### *Defendant's Violations of the Illinois Securities Law of 1953.*

46. Section 12 of the Illinois Securities Law of 1953 ("ISL"), 815 ILCS 5/12, states, in pertinent part for this Complaint, as follows:

"§ 12. Violation. It shall be a violation of the provisions of this Act for any person:...

    F.    To engage in any transaction, practice or course of business in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof.

    G.    To obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading...

    I.    To employ any device, scheme or artifice to defraud in connection with the sale or purchase of any security, directly or indirectly.

47. The Defendants' actions as alleged above violated Sections F, G and I of the ISL.

48. Mr. Organ would not have agreed to and proceeded with the Merger Agreement had any of the Defendants disclosed, and not omitted or otherwise concealed, the facts regarding the termination of the AT&T Contract and the existence and consequences of the Churn Chargeback.

49. Mr. Organ was damaged by the alleged misrepresentations and omissions of fact by the Defendants.

50. As a result of Defendants' aforesaid violations of the ISL, Mr. Organ suffered damages in the amount of approximately $27,100,000.

11

51.　On or about March 3, 2005, Mr. Organ obtained knowledge for the first time that he had a right to rescind the merger transaction pursuant to the ISL because of the Defendants' wrongful conduct in violation of §12 of the ISL.

52.　On March 31, 2005, Mr. Organ, through his attorney, sent to each Defendant by certified mail, return receipt requested, a written notice of his election of the remedy of rescission pursuant to Section 13 of the ISL.

WHEREFORE, the Plaintiff, Lawrence P. Organ, requests that the Court grant judgment against the Defendants, Marc Byron, Ben Kaak, and Catherine Barbaro, in an amount of $27,100,000, plus reasonable attorney's fees, costs and all other available and applicable relief pursuant to the Illinois Securities Law of 1953, plus any further relief the Court deems equitable and just.

Plaintiff,
LAWRENCE P. ORGAN,

By: _____
One of His Attorneys

Jack L. Haan
James J. Eccleston
Henry N. Novoselsky
Shaheen, Novoselsky, Staat, Filipowski & Eccleston, P.C.
20 North Wacker Drive, Suite 2900
Chicago, IL 60606
(312) 621-4400
(312) 621-0268 (facsimile)

12