this case because the forum selection clause names a foreign location rather than a U.S. venue, and thus a 12(b)(3) venue analysis may be less applicable than a contractual analysis. And, LLC argues, all the necessary information is apparent from the pleadings because the contract containing the clause was attached to Plaintiff's petition. As noted, the Fifth Circuit has not expressly held that a Rule 12(b)(6) motion can never be an appropriate procedural vehicle, and thus it may be possible to consider a forum selection clause argument via a 12(b)(6) motion in the appropriate circumstances. However, because Plaintiff argues that the forum selection clause was procured by fraud, the Court must look beyond the pleadings to determine whether the clause is enforceable, thus going beyond the permissible scope of a 12(b)(6) motion. Accordingly, a 12(b)(6) motion is not an effective procedural vehicle in this case.

Defendant's failure to bring its motion to dismiss under 12(b)(3) is not fatal to its argument, however. Rule 12(b)(3) requires that an objection to venue must be raised either by a pre-answer motion to dismiss or in a responsive pleading. A Rule 12(b)(6) motion, in contrast, may be raised post-answer, including during trial on the merits. Fed. R. Civ. P. 12(h)(2). Defendant's venue argument was raised in its first responsive pleading, as required for a 12(b)(3) motion. Accordingly, this Court will treat the motion as one brought under Rule 12(b)(3). See *Mitsui & Co., Inc. v. M/V Mira*, 1996 WL 444193, at *1 (E.D.La. Aug.7, 1996) ("A motion to dismiss premised on the enforcement of a forum selection clause will be treated as a 12(b)(3).") (citing *Arguetta v. Banco Mexico*, 87 F.3d 320, 324 (9th Cir.1996)), *aff'd*, 111 F.3d 33 (5th Cir.1997).

Plaintiff's reliance on *Albany Ins. Co. v. Almacenadora Somex, S.A.*, 5 F.3d 907 (5th Cir.1992), to support its waiver argument is misplaced. In that case, the Court held the defendant's forum-selection-clause argument waived because, though the defendant moved to dismiss pursuant to Rule 12(b)(3), the defendant "chose not to expound upon its improper venue claim beyond simply stating that venue was improper." Accordingly, when the defendant attempted to raise improper venue based on the forum selection clause in its second motion, the Court held the argument waived. In contrast, Defendant LLC has raised venue and extensively argued the basis for dismissal based on the forum selection clause in its first responsive pleading. Accordingly, Defendant's failure to expressly bring its motion to dismiss based on the forum selection

clause as a motion under 12(b)(3) does not result in waiver.

**B. Does the Forum Selection Clause Apply?**
**\*5** The court must next determine whether the clause applies to the types of claims asserted by ADS. The Joint Venture Agreement was entered into between LLC, as managing partner, and ADS, as contributing partner, "to market and promote the project known as LA CANASTA." The purpose of the Agreement was stated as: "The Managing Partner and Contributing Partner shall join efforts and resources to distribute and market the LA CANASTA project, which is made a part of this agreement as schedule A hereto." The effective term of the agreement was to be five years. Clause 23, entitled "Applicable Law and Forum Selection," states: "To resolve any dispute arising in connection with the interpretation or performance of this agreement, the parties submit unconditionally to the laws and jurisdiction of the competent courts of law sitting in Mexico City, expressly waiving any other forum to which they may be entitled by reason of their present or future domiciles." Because the parties expressly waived any other forum, the forum selection clause is exclusive and mandatory. Plaintiff's claims arise "in connection with the interpretation or performance of" the agreement, and thus fall within the scope of the forum selection clause.

**C. Should the clause be enforced?**
The proper law to apply to questions regarding the enforceability of forum selection clauses is federal, whether jurisdiction be based on diversity, federal question, or a combination of the two. *Haynsworth v. The Corporation*, 121 F.3d 956, 962 (5th Cir.1997). Courts must presumptively enforce forum selection clauses in international transactions out of concern for comity and to promote international trade and commerce. *Id.* The Fifth Circuit has consistently followed this rule. *Id.* The presumption of enforceability may be overcome, however, by a clear showing that the clause is " 'unreasonable' under the circumstances." *Id.* at 963 (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972)). Unreasonableness potentially exists where (1) the incorporation of the forum selection clause into the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement "will for all practical purposes be deprived of his day in court" because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the forum selection clause would

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 1862631 (W.D.Tex.)
(Cite as: 2005 WL 1862631 (W.D.Tex.))

contravene a strong public policy of the forum state. *Haynsworth,* 121 F.3d at 963 (citing *Carnival Cruise Lines,* 499 U.S. at 595; *The Bremen,* 407 U.S. at 12-13, 15, 18). The party resisting enforcement on these grounds bears a "heavy burden of proof." *Id.* (citing *The Bremen,* 407 U.S. at 17).

### 1. Fraud

Plaintiff first argues that the clause should not be enforced because it was procured as a result of fraud. Fraud may invalidate a forum selection clause, but only if the inclusion of that clause, as opposed to the signing of the entire contract, was the product of fraud. As the Supreme Court explained in *Scherk v. Alberto-Culver,* 417 U.S. 506, 519 n. 14, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), the concern it had expressed in *M/S Bremen* regarding enforcing such clauses in suits alleging fraud "does not mean that any time a dispute arising out of a transaction is based upon an allegation of fraud ... the clause is unenforceable. Rather, it means that an arbitration or forum-selection clause in a contract is not enforceable if the inclusion of that clause in the contract was the product of fraud or coercion." Thus, the mere allegation of fraudulent conduct does not suspend operation of a forum selection clause. Rather, the proper inquiry is whether the forum selection clause is the result of fraud in the inducement of the forum selection clause itself. *See Afram Carriers, Inc. v. Moeykens,* 145 F.3d 298, 302 n. 3 (5th Cir.1998) (party claiming fraud must show that inclusion of forum selection clause itself, not the entire agreement, was a product of fraud).

**\*6** ADS states that the basis for its claims "can be summed up by stating that Donnelley and Lito Color fraudulently induced ADS into signing an agreement to develop a program called La Canasta." Plaintiff's Response (docket no. 12) at 1. Plaintiff alleges that, despite the fact that all negotiations had been with Donnelley representatives, "Donnelley employees presented ADS with a contract involving a company named Lito Color. In fact, this was the first time that ADS became aware of Lito Color. However, at all times, Donnelley employees assured ADS that they were contracting with Donnelley. Based on the above assurances, ADS signed the agreement believing that the contractual relationship was with Donnelley." ADS further alleges that, "during the entire negotiation process, Buzali and Arcos assured ADS that they were contracting with Donnelley and that Donnelley would take care of ADS if any problems arose. In fact, as the negotiations relate to the foreign forum selection clause, to ease ADS's concerns about this clause, Donnelley represented to ADS that it

would not seek to enforce such a provision. Rather, Donnelley again made the assurances that ADS would be taken care of if something went wrong." After the contract was signed, Plaintiff asserts that it began questioning Donnelley's commitment to the contract and took action to determine the status of the contract by contacting Donnelley, but Donnelley failed to reply. ADS then contacted Donnelley at its corporate office in Chicago to see if it was going to honor the contract, and someone from Donnelley stated they would investigate and get back to ADS. After some time, ADS received correspondence from Donnelley indicating that it was not going to honor the contract. Further, ADS asserts, "Buzali mockingly stated to an ADS employee that 'you will have to come to Mexico to enforce this contract. You'll never see anything." ' ADS eventually brought this suit.

Plaintiff's allegations concerning fraudulent inducement with regard to the entire contract will not suspend operation of the forum selection clause contained therein. Thus, Plaintiff's allegations that Donnelley assured ADS that it was contracting with Donnelley and that Donnelley would "take care of" ADS if something went wrong, which go to the Plaintiff's fraudulent inducement to sign the contract argument, are insufficient to invalidate the clause. However, ADS also makes one allegation specific to the forum selection clause-- that Donnelley assured ADS that despite its inclusion in the contract, the forum selection clause would not be enforced. Thus, the relevant inquiry is whether this allegation is sufficient to suspend operation of the forum selection clause on the basis of fraud.

LLC argues that ADS's contention that it was induced by fraud into agreeing to the Mexico City forum selection clause is not supported by evidence meeting the "heavy burden" requirement, and "indeed is so unsupported by evidence that the contention must be summarily disregarded." Defendant complains that ADS "offers only the uncorroborated affidavit of Jim Schell" and dismisses ADS's argument that Donnelley represented to ADS that it would not seek enforcement of the clause on the basis that Donnelley was not a party to the Agreement. Further, relying on *Town North National Bank v. Broaddus,* 569 S.W.2d 489 (Tex.1978) and *Manetti-Farrow, Inc. v. Gucci America, Inc.,* 858 F.2d 509, 514 (9th Cir.1988), LLC argues that the parol evidence rule precludes the very evidence offered by ADS in the absence of a showing by ADS that it was somehow duped into signing the agreement by some kind of trickery or artifice. LLC argues that "ADS's vague suggestion that some unnamed Donnelley

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 1862631 (W.D.Tex.)
(Cite as: 2005 WL 1862631 (W.D.Tex.))

agent may have stated that the forum selection clause would not be enforced is insufficient under the parol evidence rule to warrant discarding the forum selection clause on grounds of fraud."

**\*7** The parol evidence rule excludes evidence of a prior or contemporaneous oral agreement between the parties to a written contract if such evidence changes or contradicts the terms of a written contract. However, under Texas law, parties challenging contracts as fraudulently induced may rely on evidence of oral promises or agreements to support their claims. *Dunbar Medical Sys., Inc. v. Gammex, Inc.,* 216 F.3d 441, 452 (5th Cir.2000) (citing *Santos v. Mid-Continent Refrigerator Co.,* 471 S.W.2d 568, 569 (Tex.1971) (per curiam) ("The parol evidence rule will not prevent proof of fraud or mutual mistake.")). To prove fraudulent inducement, a party must show: (1) a false material representation; (2) known to be false or made without knowledge of the truth; (3) which was intended to be acted upon; (4) was relied upon; and (5) caused injury. *Formosa Plastics Corp. USA v. Presidio Eng'rs,* 960 S.W.2d 41, 47-48 (Tex.1998).

While *Manetti-Farrow* recognizes that the parol evidence rule generally precludes introduction of evidence that preceded the contract formation to show that the parties intended something other than what is stated in the written contract, it is not particularly instructive in this case since there was no allegation of fraud. The Texas Supreme Court's decision in *Broaddus* involved the question whether "in a suit by one not a holder in due course against the maker of a promissory note, the parol evidence rule prohibits the admission of extrinsic evidence showing that the maker was induced to sign the note by the payee's representations that the maker would not incur liability on the note." *Broaddus,* 569 S.W.2d at 491. The Court held that the mere representation by a payee to the maker that the maker will not be liable on the note does not constitute fraud in the inducement so as to be an exception to the parol evidence rule. Rather, extrinsic evidence is permissible to show fraud in the inducement of a note only upon a showing of some type of trickery, artifice, or device employed by the payee in addition to the showing that the payee represented to the maker he would not be liable on the note. *Id.* at 493. Though *Broaddus* is somewhat analogous to the present case, some lower Texas courts have concluded that it is limited to the promissory note context. *See, e.g., JBV, Inc. v. Barkey,* 1997 WL 420785 (Tex.App.--Austin 1997, pet. denied) (listing cases). The Fifth Circuit also has recognized a distinction between negotiable instrument cases and other contracts: "Texas grants an exception to this [parol evidence] bar when a party seeks to offer parol evidence to show fraud in the inducement to enter into a contract. We note, however, that 'the exception is narrower when the contract is a promissory note.' " *FDIC v. Wallace,* 975 F.2d 227, 229 & 230 n. 5 (5th Cir.1992) (applying the *Broaddus* rule in all negotiable instrument cases, and noting that lower Texas courts are split as to whether the trickery requirement applies to all contract cases or is limited to those in which the contract is a promissory note). [FN4]

> FN4. Donnelley argues that "Plaintiff cannot use parol evidence to make the forum selection [clause] mean exactly the *opposite* of what it says. Indeed, avoiding such an absurd and unjust result is precisely why the parol evidence rule exists." *Donnelley's Reply (docket no. 17)* at 4 (emphasis in original). However, Plaintiff is not seeking to offer parol evidence to construe the forum selection clause, which would be barred by the parol evidence rule. To the contrary, Plaintiff seeks to offer extrinsic evidence to show that it was induced into agreeing to the clause by fraud, a clear exception to the parol evidence rule, and that the fraud renders the forum selection clause void. Though there may be some tension in the application of the parol evidence rule and the fraud exception, Texas courts have consistently permitted extrinsic evidence of oral representations when a party contends that it was induced to enter a contract or agree to specific provisions due to fraud.

**\*8** However, the reasoning underlying the *Broaddus* decision emphasizes that contractual terms should not be disregarded based merely on one party's alleged assurance that the provision will not be enforced. If the parties had agreed not to enforce a provision in a contract, they could have stricken the provision from the contract. In a similar vein, in *DRC Parts & Accessories, LLC v. VM Motori, SPA,* 112 S.W.3d 854 (Tex.App.--Houston [14th Dist.] 2003, pet. denied), the Fourteenth Court of Appeals, sitting en banc, has held that reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law:
This principle is also dictated by policy and practical considerations. If written contracts are to serve a purpose under the law, relative to oral

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 1862631 (W.D.Tex.)
(Cite as: 2005 WL 1862631 (W.D.Tex.))

agreements, it is to provide greater certainty regarding what the terms of the transaction are and that those terms will be binding, thereby lessening the potential for error, misfortune, and dispute.

By contrast, the approach advocated by DRC and the dissent would, in effect, create a contractual relationship that is governed by its written contract only to the extent it does not contradict a previous oral agreement between the parties. This is because a party's exercise of a right under the written contract, which is contrary to the oral agreement, would subject that party to a fraudulent inducement claim based on the oral agreement. In that event, however, the party who entered into the written contract while relying on a contrary oral agreement would have thereby itself entered into the written contract with an intent not to perform it. Thus, in order to show its reliance on the oral agreement to sustain its own fraudulent inducement claim, that party would necessarily prove that it was guilty of fraudulent inducement as well.

The essential issue, then, is not whether that party's evidence of the contrary oral agreement is admissible or sufficient to prove that agreement, but instead whether the law will deem such reliance to be justified and thereby favor that party to the detriment of the other contracting party, which has at least declared its intent in the contract and sought to abide by its terms. Because such an approach would defeat the ability of written contracts to provide certainty and avoid dispute, the prevailing rule, recited above, is instead that a party who enters into a written contract while relying on a contrary oral agreement does so at its peril and is not rewarded with a claim for fraudulent inducement when the other party seeks to invoke its rights under the contract.

In this case, therefore, even assuming DRC's evidence to be admissible and sufficient to show its actual reliance on a contrary oral agreement, that reliance could not, as a matter of law, have been justified.

*Id.* at 858-59. Although the alleged representation by Donnelley that it would not seek to enforce the clause is not directly contrary to a provision in the contract in the sense that was present in *DRC,* in which the contract said "non-exclusive" and the plaintiff alleged that it had been told it would have exclusive rights, the reasoning is analogous. If ADS entered into the contract, which expressly stated the parties' intention to waive the right to bring suit in any forum other than Mexico City, while relying on the representations of Donnelley that such a provision would not be enforced, that reliance would not be reasonable as a matter of law.

*9 The Court has located two cases that lend some support to Plaintiff's position, but finds them to be distinguishable. In *Great Earth Companies, Inc. v. Simons,* 288 F.3d 878 (6th Cir.2002), the court held there was "no question that Great Earth fraudulently induced the Simonses to agree to the arbitral forum selection clause contained in Article 15.3, which provides that arbitration of disputes take place in New York." *Id.* at 890. The Southern District of New York had concluded that the Simonses had shown that the agreement to arbitrate outside of Michigan was induced by fraud, finding that Great Earth had fraudulently induced the Simonses to agree to the forum selection clause by knowingly misrepresenting in the Offering Circular that it would not seek arbitration outside of Michigan. The Offering Circular contained disclosures required by the Federal Trade Commission and the State of Michigan, and was accompanied by a sample franchise agreement. One of the disclosures contained in the Offering Circular, entitled an "Addendum for Michigan Franchisees," stated: "THE STATE OF MICHIGAN PROHIBITS CERTAIN UNFAIR PROVISIONS THAT ARE SOMETIMES IN [F]RANCHISE DOCUMENTS. IF ANY OF THE FOLLOWING PROVISIONS ARE IN THESE FRANCHISE DOCUMENTS, THE PROVISIONS ARE VOID AND CANNOT BE ENFORCED AGAINST YOU. .... (f) A provision requiring that arbitration or litigation be conducted outside this state." However, the Franchise Agreement did contain a provision requiring disputes to be arbitrated in New York. The Simonses argued that this statement was a knowing misrepresentation, because Great Earth knew at the time that it would attempt to enforce the Agreement's forum selection clause in the event of a dispute, notwithstanding its statement in the Offering Circular. Richard Simons testified at the hearing and stated that it was his understanding at the time he signed the Agreement that disputes would be arbitrated in Michigan. Although somewhat analogous, the plaintiffs' evidence supporting its fraudulent inducement claim was more substantial than in the present case. Presumably, the franchise agreement was a form agreement, the terms of which could be altered by particular state laws, and it could be reasonable for a party to rely on representations that state law trumped a provision in the form. In this case, however, the contract was not a form document, but was negotiable by the parties, and there was no representation concerning any controlling and contrary state law.

In *Pearcy Marine, Inc. v. Seacor Marine, Inc.,* 847

F.Supp. 57 (S.D.Tex.1993), the district court found fraud and/or overreaching:

> The Plaintiff not only alleges that the Defendants fraudulently induced the contract and then refused to perform, but also that the Defendants fraudulently induced the Plaintiff to agree to the High Court of Justice as the exclusive forum. The Plaintiff alleges that most maritime towing agreements between American shippers contain American choice of forum clauses and, indeed, that the three previous international charters between the parties stipulated an American forum. Nevertheless, the Defendants, after conducting an exhaustive and intimate study of the Plaintiff's books, records, and operations, for some reason elected to inject an English choice of forum clause into the instant contract. Furthermore, when the Plaintiff objected to this clause, the Defendants gave oral assurances of their intent to perform, essentially telling the Plaintiff not to worry about it. In the Court's mind these circumstances constitute, if not fraud, then certainly overreaching. The Plaintiff, strapped for cash, its deadline for fulfilling its obligations to the U.S. Military rapidly approaching, and possessing few or no alternatives to the instant contract to fulfill those obligations, had no choice but to accede to the English forum.

**\*10** *Id.* at 59-60. The court in that case did not conduct any analysis specific to its fraud finding, and it appears that the party inserting the clause took advantage of the plaintiff's financial situation to inject a clause that would make it more difficult for plaintiff to recover should litigation arise. As noted below, there is no such evidence of overreaching or coercion in this case.

Plaintiff's only allegation specific to the forum selection clause is the representation by an unnamed person at Donnelley that the forum selection clause in the agreement would not be enforced. Plaintiff has offered no evidence or even argument that, at the time this alleged statement was made, Donnelley intended not to fulfill its promise. Moreover, even assuming Donnelley did not intend to honor the alleged statement, reliance by ADS on the statement was not reasonable as a matter of law. Accordingly, ADS has failed to show that it was fraudulently induced into agreeing to the forum selection clause.

### 2. Overreaching

Plaintiff argues that the forum selection clause was not a freely negotiated agreement between parties of relatively equal bargaining power because Donnelley/Lito Color is part of the Donnelley Companies, a Fortune 500 company, while ADS is a small startup company created in 2001 by a small group of individuals "who were far less sophisticated." Plaintiffs assert that "[c]learly, Donnelley/Lito Color took advantage of ADS's lack of sophistication by inducing ADS to sign the agreement with the forum selection clause based on the assurances that such clause would not be enforced. ADS, taking Donnelley/Lito Color at its word and knowing that Donnelley was a multibillion dollar company with a track record of proven success, signed the agreement with the forum selection clause. As a result, the disputed forum selection clause should be invalidated because of Donnelley/Lito Color's fraud in creating the clause and the unequal bargaining power exhibited by a Fortune 500 company over a small startup like ADS."

Although the Supreme Court has not expressly defined "overreaching," the Fifth Circuit has articulated the following definition: "Overreaching is that which results from an inequality of bargaining power or other circumstances in which there is an absence of meaningful choice on the part of one of the parties." *Haynsworth, 121 F.3d at 965 n. 17.* In *The Bremen,* a case involving an agreement between a Houston corporation and a German corporation that contained a forum selection clause that set venue in the courts of England, the Supreme Court stated, "The choice of that forum was made in an arm's length negotiation by experienced and sophisticated businessmen, and absent some compelling and countervailing reason it should be honored by the parties and enforced by the courts. *The Bremen,* 407 U.S. at 12.

LLC argues that ADS's claims of overreaching must be rejected. LLC points out that the Supreme Court and the Fifth Circuit have consistently upheld forum selection clauses between parties of unequal size and bargaining power. Moreover, LLC argues, the evidence does not support the contention that ADS was an unsophisticated party given Schell's affidavit testimony regarding the sophisticated nature of the negotiations and contemplated business dealings, as well as the background of ADS's principals.

**\*11** According to the submitted evidence, Jim Schell, the President of ADS, was the former Vice President of SBC before ADS, and had taken ADS, a national and international marketing company, public. Dub Doyal, the CEO of ADS, also had previous business experience as the former owner of the largest print and direct mail company in San Antonio. Further, the evidence indicates that the contract was the product of voluntary, arm's-length

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

negotiation, and Plaintiff was free to walk away from the contract. Certainly, Plaintiff's principals were aware of the clause, the language of which was clear and hard to ignore, and of its consequences, and could have insisted that the clause be stricken rather than simply trusting in Donnelley's proven track record and assurances. The mere fact that Plaintiff is a small corporation whereas Defendant Donnelley is a Fortune 500 company does not establish that Plaintiff did not have equal bargaining power in the contract negotiations, and Plaintiff has offered no other evidence to support its claim of overreaching. *See Int'l Software Sys. v. Amplicon, Inc.*, 77 F.3d 112, 116 (5th Cir.1996) (rejecting plaintiff's "David versus Goliath" argument that it was a small company with only twenty employees as "unconvincing"). In light of the evidence and applicable precedent, the Court concludes that Plaintiff has failed to meet its burden to establish that the clause should not be enforced because it was the product of overreaching by either Donnelley or LLC.

### 3. Right to Jury Trial

ADS argues that it requested a trial by jury in its original petition, but Mexican courts will not allow this case to be tried by a jury. Accordingly, ADS asserts that the clause should be void as against public policy. ADS relies on *DHX, Inc. v. Allianz Agf Mat,* 2002 WL 31421952 (C.D.Cal.2002), and unpublished decision that has not been cited by any other court. Although recognizing the Supreme Court's decision in *The Bremen,* the court in *DHX* agreed with the party's argument that a forum selection clause designating England as the forum could not be enforced because doing so would deprive the plaintiff of its statutory and constitutional right to a jury trial.

In reaching its conclusion, the court relied on *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* 515 U.S. 528, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995). In *Vimar Seguros,* the Court considered whether a foreign arbitration clause designating Japan in a bill of lading was invalid under COGSA (the Carriage of Goods by Sea Act) because it lessens liability in the sense that COGSA prohibits. The Court held that foreign arbitration clauses in bills of lading are not invalid under COGSA in all circumstances. In reaching its holding, the Court rejected the plaintiff's argument that the increased costs and inconvenience associated with the foreign arbitration would lessen liability. It also rejected the argument that there was no guarantee that the foreign arbitrators would apply COGSA, which provides that the terms of a bill of lading may not relieve the carrier of the obligations

or diminish the legal duties specified by the Act. The Court found this argument premature, because it was still unknown what law the arbitrator would apply, and in any event the district court retained jurisdiction and could ensure at the award-enforcement stage that the legitimate interest of the enforcement of the laws had been addressed. The Court stated, however, "[w]ere there no subsequent opportunity for review and were we persuaded that 'the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies ..., we would have little hesitation in condemning the agreement as against public policy." *Id.* at 540.

*12 In *DHX,* the court rejected the argument that the forum selection clause designating England as the forum for a dispute between an insured and its insurer implicitly waived the plaintiff's right to jury trial. The court noted that "DHX initially made a jury demand in its state court pleadings, and the insurance contract between the parties does not contain a jury waiver provision. Accordingly, this Court finds that DHX did not waive its right to a jury." The court continued: "[W]hile this Court recognizes that the *Bremen* decision presumptively validates forum selection clauses, Allianz has been unable to provide the court any post-*Sky Reefer* case law in support of its argument. It is clear that the agreement's choice of law and the choice of forum clauses work together to deprive DHX of its constitutional and statutory right to a trial by jury. Accordingly, under *Sky Reefer,* this Court must invalidate clause 25 of the agreement between the parties, and deny Allianz's motion to dismiss this case."

This Court declines to follow *DHX. Sky Reefer* involved rights under COGSA and did not concern the right to jury trial. Until the Supreme Court overrules it, *The Bremen* remains good law, and the Court has not found any other federal case in which a court has invalidated a foreign forum selection clause because the forum did not provide a jury trial. Moreover, it is not against public policy under either federal or Texas law for a party to waive its right to a jury. *See, e.g., Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974) (allowing parties to contract for foreign arbitration); *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 131 (Tex.2004) ("Public policy that permits parties to waive trial altogether surely does not forbid waiver of trial by jury."). To invalidate all forum selection clauses that designate forums that do not provide for a jury trial would implicate many of the comity concerns raised by the Supreme Court in *The Bremen*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and other cases concerning international agreements. Further, Plaintiff's argument that being deprived of its right to jury trial will "for all practical purposes ... prevent ADS from having its day in court" is wholly unconvincing, for such a conclusion would presumptively invalidate all bench trials and arbitration clauses.

In addition, to the extent Plaintiff is implicitly [FN5] arguing that it did not knowingly waive its right to jury trial, the Court rejects that argument as well. Although the forum selection clause in this case did not specifically state that the parties would waive their right to jury trial, it would have been naive for Plaintiff to assume that Mexican courts and Mexican law provide all the same rights and procedures as the United States and Texas do. Cf. *Haynsworth,* 121 F.3d at 967-68 ("The sophisticated individuals entering into these agreements are hardly so naive as to believe that by choosing only a foreign forum and not the law to be applied therein, they thereby retain some inalienable privilege of litigating their disputes under American law."). Surely the fact that Mexico might not provide a jury was foreseeable to Plaintiff, and Plaintiff voluntarily entered the contract to choose Mexico City as the forum and Mexican law as the governing law, with all the attendant rights and procedures of the Mexican forum. Thus, Plaintiff waived the right to a jury trial under federal or state law when it entered into the contract designating Mexico City and Mexican law. The fact that Plaintiff demanded a jury in its state court petition, an act that occurred after the contract was entered, is irrelevant to whether Plaintiff waived its right to jury trial when it entered the contract.

> FN5. The Court concludes that Plaintiff has not argued that it did not knowingly waive its right to jury trial, but because that conclusion was essential to the district court's holding in *DHX,* the Court will address it.

*13 As a district court in the Northern District of Texas has held in the context of an arbitration agreement: "The Seventh Amendment right to a trial by jury is necessarily incident to, and predicated upon the right to a federal judicial forum. Thus, a valid arbitration provision, which waives the right to resolve a dispute through litigation in a judicial forum, implicitly waives the attendant right to a jury trial. Therefore, the Seventh Amendment is not implicated by a contractual provision that precludes access to an Article III forum." *Marsh v. First USA Bank, N.A.,* 103 F.Supp.2d 909, 921 (N.D.Tex.2000);

see also *Cooper v. MRM Investment Co.,* 367 F.3d 493, 503 (6 th Cir.2004) (same); *Bank One, N.A. v. Coates,* 125 F.Supp.2d 819, 834 (S.D.Miss.2001), *aff'd,* 34 Fed. Appx. 964 (5th Cir.2002) (same). The Fifth Circuit agreed with similar reasoning in *American Heritage Life Insurance Co. v. Orr,* 294 F.3d 702, 710 (5th Cir.2002): "The Seventh Amendment right to a trial by jury is limited by a valid arbitration provision that waives the right to resolve a dispute through litigation in a judicial forum. We concur with the following reasoning: The Seventh Amendment does not confer the right to a trial, but only the right to have a jury hear the case once it is determined that the litigation should proceed before a court. If the claims are properly before an arbitral forum pursuant to an arbitration agreement, the jury trial right vanishes." Though the Fifth Circuit's language refers to litigation before a court, it should reasonably be limited to litigation before a United States court. Thus, once it is determined that a party has agreed to litigate in a foreign forum that does not provide a jury trial, the jury trial right vanishes.

Accordingly, when ADS agreed to a foreign forum, it implicitly waived its right to a jury trial under federal or state law, and those rights are therefore not implicated. The Court will not invalidate the forum selection clause on this basis.

#### 4. Connection to the Parties

ADS argues that the clause is unreasonable and should not be enforced because the selected forum has no connection with any party. LLC is located in San Juan del Rio, Queretero, Mexico, while ADS is located in San Antonio, Texas. Thus, ADS contends, neither party to the contract has a connection to Mexico City. ADS asserts that simply stating that the forum selected is Mexico and one of the parties is from Mexico is an over generalization. Otherwise, it contends, any location in the United States would be a suitable forum for disputes in which any party was a United States resident.

Defendant responds that LLC is headquartered in the city of San Juan del Rio in the state of Queretero, and it has a sales office in Mexico City. Reasonableness requires only that one of the parties have "a connection" to the contractual choice of forum, and ADS has not shown that LLC has no connection to Mexico City. LLC's sales office provides it with a strong business presence in Mexico City, and is a meaningful connection to the forum selected by the parties. In addition, LLC argues, Mexico City is a more appropriate forum for resolving international

business disputes than the local courts elsewhere in Mexico, such as the place where LLC is headquartered. Finally, the agreement expressly states that it was ratified and signed by both parties in Mexico City, and the agreement expressly contemplated projects between ADS and LLC that were to take place in and around Mexico City, likely from LLC's sales office. It is disingenuous for ADS to argue that the parties and the subject of the dispute do not have substantial and meaningful connections to the selected forum sufficient for the courts of Mexico City to hear this dispute.

*14 The Court concludes that Mexico City has a meaningful connection to the contract and this dispute to render it a reasonable forum. According to the evidence submitted by Plaintiff, the contract was to be performed in Mexico, and Mexico City was one of five cities proposed for the initial stage of the program. Defendant LLC is headquartered in Mexico and has a sales office in Mexico City. Plaintiff does not argue that Mexico City is so gravely inconvenient or unrelated to the controversy so as to render the clause unreasonable. "[W]here it can be said with reasonable assurance that at the time they entered the contract, the parties to a freely negotiated private international commercial agreement contemplated the claimed inconvenience, it is difficult to see why any such claim of inconvenience should be heard to render the forum clause inconvenient." *The Bremen,* 407 U.S. at 15. In short, Plaintiff has not satisfied its "heavy burden of proof" to demonstrate that Mexico City is a gravely inconvenient or unreasonable forum, and any inconvenience associated with litigating this case in Mexico City was clearly foreseeable at the time of contracting. *Id.* at 17-18 (absent showing that trial in the contractual forum will be so gravely difficult and inconvenient that party will for all practical purposes be deprived of its day in court, there is no basis for concluding that it would be unfair, unjust, or unreasonable to hold that party to its contract).

### 5. Lack of Adequate Remedy

Plaintiff last argues that in a Mexican civil suit, many of ADS's causes of action and damages are not recognized. For example, Plaintiff asserts that, in Mexico, there is no single business enterprise or alter ego theory, and a plaintiff cannot obtain contractual consequential damages or tort-related punitive damages. Because ADS will be deprived of its remedies, it argues that the forum selection clause should not be enforced.

In *InterAmerican Trade Corp. v. Compahnhia*

*Fabricadora de Pecas,* 973 F.2d 487 (6th Cir.1992), the Sixth Circuit rejected similar arguments with regard to a forum selection clause designating Brazil as the forum. Although the plaintiff argued that litigation in Brazil would, as a practical matter, bar its claim because no jury trial was available, the judicial process is slow, trial by depositions is not permitted, the plaintiff would have to deposit in excess of $2.2 million as security, and judgment is generally awarded in cruzeiros, the court noted that these matters were all known or foreseeable at the time of contracting, that the Brazilian courts are fully competent, and though litigation may be more inconvenient, it would not be unjust.

Moreover, in *Haynsworth v. The Corporation,* the Fifth Circuit noted that the Supreme Court in *Scherk* "roundly rejected the notion that a forum selection clause can be circumvented by a party's asserting the unavailability of American remedies." *Haynsworth,* 121 F.3d at 967. The Fifth Circuit noted that "[t]he view that every foreign forum's remedies must duplicate those available under American law would render all forum selection clauses worthless and would severely hinder Americans' ability to participate in international commerce." *Id.* at 969. Because Plaintiff argues only that it will not have the same remedies as are available in an American forum and has not argued or demonstrated that the remedies afforded under Mexican law are so inadequate as to essentially deprive it of its day in court, the Court rejects ADS's argument that the clause is unenforceable for lack of an adequate remedy.

### Donnelley's Motion to Dismiss

*15 Donnelley also moves to dismiss on the basis of the forum selection clause. [FN6] Without citing any authority, Donnelley contends that, even though it is not a signatory to the agreement, it may enforce the forum selection clause because "if any claim against Donnelley based on the agreement is proper anywhere, it is proper only in Mexico City, Mexico." Donnelley Motion to Dismiss at 2-3. Donnelley further notes that, "[b]ecause Donnelley is not a signatory or participant to the Agreement, ADS is attempting to hold Donnelley liable for ADS's alleged damages through the single business enterprise and alter ego theories."

> FN6. Because Donnelley has asserted Rule 12(b)(3) as a basis for its motion, Plaintiff's waiver argument is inapplicable to Donnelley's motion to dismiss.

Some circuits have held that a nonsignatory to a

contract containing a forum selection clause may enforce the clause if the nonsignatory is "closely related" to a signatory or the alleged conduct is closely related to the contractual relationship. *See, e .g., Lipcon v. Underwriters at Lloyd's, London,* 148 F.3d 1285, 1299 (11th Cir.1998) ("In order to bind a non-party to a forum selection clause, the party must be 'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound."); *Freitsch v. Refco,* 56 F.3d 825, 827 (7th Cir.1995) ("[C]ourts in this country ... enforce forum selection clauses in favor of non-parties 'closely related' to a signatory."); *Manetti-Farrow, Inc. v. Gucci Am., Inc.,* 858 F.2d 509, 514 n. 5 (9th Cir.1988) (allowing nonsignatories to enforce clause when the alleged conduct of the non-parties is so closely related to the contractual relationship that the forum selection clause applies to all defendants). Some district courts in this circuit have also followed this approach. *See, e.g., Tex. Source Group, Inc. v. CCH, Inc.,* 967 F.Supp. 234 (S.D.Tex.1997); *see also D.B., Inc. v. Nat'l Admin. Solutions Corp.,* 2004 WL 865842 (N.D.Tex.2004); *Babine Marine LLC v. Argo,* 2000 WL 1372992 at *3 (E.D.La.2000).

Although the Court has not found any Fifth Circuit case that specifically addresses whether a nonsignatory to a contract may enforce a forum selection clause therein, the Fifth Circuit has addressed whether a nonsignatory to a contract may enforce an arbitration clause. *See Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524 (5th Cir.2000). In *Grigson,* the Fifth Circuit stated that, under the doctrine of equitable estoppel, a nonsignatory may compel arbitration in two circumstances: (1) when a signatory to a written agreement must rely on the terms of the written agreement in asserting its claims against the nonsignatory, or (2) when a signatory to the contract raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. *Id.* at 527 (adopting the test formulated by the Eleventh Circuit in *MS Dealer Serv. Corp. v. Franklin,* 177 F.3d 942, 947 (11th Cir.1999)); *see also Westmoreland v. Sadoux,* 299 F.3d 462, 467, 465 (5th Cir.2002) ("We have sustained orders compelling persons who have agreed to arbitrate disputes when the party invoking the clause is a nonsignatory, but only when the party ordered to arbitrate has agreed to arbitrate disputes arising out of a contract and is suing in reliance upon that contract."). The Court has also recognized that arbitration clauses are a subset of forum selection clauses and has noted that "there is very little difference between the two." *Haynsworth,* 121 F.3d

at 963. Further, as in the context of arbitration clauses, to allow a party to "have it both ways" by asserting claims intertwined with the agreement but denying the forum selection clause's applicability would "fly in the face of fairness."

*16 Under either the "closely related" or the *Grigson* tests, Donnelley may enforce the forum selection clause. Each of the claims alleged against Donnelley and the underlying allegations are within the scope of the forum selection clause. Further, under Plaintiff's own allegations, Donnelley and LLC are "closely related." Plaintiff alleges both single business enterprise and alter ego as bases for holding Donnelley and LLC jointly and severally liable. Further, Plaintiff treats Donnelley and LLC as virtually indistinguishable, often referring to them both simply as "Defendant." All of Donnelley's alleged conduct is closely related to the contractual relationship between the parties. Accordingly, applying the "closely related" test, Donnelley may enforce the forum selection clause.

Under the first *Grigson* test, when each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement such that arbitration is appropriate. Here, each of Plaintiff's claims against Donnelley makes reference to or presumes the existence of the written agreement, and thus the claims arise out of and relate directly to the contract such that the claims should be subject to the forum selection clause. Under the second *Grigson* test, when a signatory to the contract raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. Most of Plaintiff's allegations relate solely to Donnelley or fail to distinguish between Donnelley and LLC, but each of the allegations is also dependent upon the conduct of LLC, without which there would have been no contractual relationship.

Accordingly, the Court concludes that Donnelley may also enforce the forum selection clause contained in the contract.

### Conclusion

LLC's Motion to Dismiss (docket no. 6) is GRANTED. Defendant Donnelley's Motion to Dismiss (docket no. 5) is GRANTED. This case is DISMISSED in its entirety, and all other pending motions (including specifically docket nos. 25 and 26) are DISMISSED AS MOOT.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 1862631 (W.D.Tex.)
**(Cite as: 2005 WL 1862631 (W.D.Tex.))**

Slip Copy, 2005 WL 1862631 (W.D.Tex.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT D

## Westlaw.

Not Reported in F.Supp.2d                                                                                 Page 1
Not Reported in F.Supp.2d, 2003 WL 22882137 (S.D.N.Y.)
**(Cite as: 2003 WL 22882137 (S.D.N.Y.))**

# H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
NANOPIERCE TECHNOLOGIES, INC., Plaintiff,
v.
SOUTHRIDGE CAPITAL MANAGEMENT LLC,
Dan Pickett, Patricia E. Singer, Thomson
Kernaghan & Co., Ltd., and Harvest Court LLC,
Defendants.
HARVEST COURT LLC, Counterclaim Plaintiff,
v.
NANOPIERCE TECHNOLOGIES, INC., Paul H.
Metzinger, Christina Skousen, Barry
Honig, Kristi Kampmann, Dr. Herbert Neuhaus,
Gemini Investments, Ltd., Stanley
Richards, Timothy Solomon, H. Glenn Bagwell,
Dunlap Industries Limited, Turbo
International Ltd., Peter Coker, Martin Christen,
Robert Shaw, M. Albert
Capote, Cayman National Trust Ltd., and Cayman
National (Nominees) Ltd.,
Counterclaim Defendants.
**No. 02 Civ. 0767(LBS).**

Dec. 4, 2003.

**Background:** Company brought action against, inter
alia, investor, alleging breach of stock purchase
agreement and violations of state and federal
securities laws. Investor asserted counterclaim
against company's chief financial officer (CFO),
alleging that she signed false and misleading
registration statement in violation of Securities Act.
Officer moved to dismiss.

**Holdings:** The District Court, Sand, J., held that:

(1) to state claim, investor was not required to
identify particular statements in registration materials
that were alleged to be false and misleading;

(2) investor stated claims for alleged violations of
Act;

(3) whether registration statement was rendered
false and misleading by omissions in background
information about corporation's president and chief
executive officer (CEO) could not be decided on

motion to dismiss;

(4) CFO was bound by forum selection clause in
stock purchase agreement; and

(5) forum selection clause applied to investor's
counterclaim against CFO.
Motion denied.

West Headnotes

**[1] Securities Regulation** ⬤⟶25.18
349Bk25.18 Most Cited Cases

**[1] Securities Regulation** ⬤⟶25.25
349Bk25.25 Most Cited Cases
Fraud was not element of claim that corporation's
chief financial officer (CFO) violated Securities Act
by signing false and misleading registration
statement, and therefore investor asserting claim was
not required to identify particular statements in
registration materials that were alleged to be false
and misleading. Securities Act of 1933, § 11, 15
U.S.C.A. § 77k; Fed.Rules Civ.Proc.Rule 8, 28
U.S.C.A.

**[2] Securities Regulation** ⬤⟶25.18
349Bk25.18 Most Cited Cases
In alleging violation of Securities Act, investor could
not rely on events that took place following effective
date of allegedly false and misleading registration
statement to show that disclosures made by statement
were misrepresentations at the time they were made.
Securities Act of 1933, § 11, 15 U.S.C.A. § 77k.

**[3] Securities Regulation** ⬤⟶25.18
349Bk25.18 Most Cited Cases
Investor's claim that corporation's chief financial
officer (CFO) violated Securities Act by signing false
and misleading registration materials was supported
by allegations that registration statement falsely
represented that certain company was sole owner of
10,000,000 warrants, while resolution purportedly
adopted by corporation listed several other entities as
holders of warrants supposedly owned exclusively by
company, given absence of evidence that investor
was, or should have been, aware of language in
financing agreement between corporation and
company indicating that company's name would be
used to refer both to company and other entities listed
on resolution as
warrant holders. Securities Act of 1933, § 11, 15

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 2
Not Reported in F.Supp.2d, 2003 WL 22882137 (S.D.N.Y.)
**(Cite as: 2003 WL 22882137 (S.D.N.Y.))**

U.S.C.A. § 77k; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[4] Securities Regulation ⬤⇝25.18**
349Bk25.18 Most Cited Cases
Investor's complaint asserted claim against corporation's chief financial officer (CFO) for alleged violation of Securities Act when investor alleged that registration supplement signed by CFO falsely represented intention of company which was represented to be sole owner of 10,000,000 warrants to abide by agreement not to transfer any of those warrant shares for one year from investor's closing date, and that corporation knew, before filing registration materials, that it would issue warrant shares to entities other than company, which thus would be unable to abide by terms of agreement. Securities Act of 1933, § 11, 15 U.S.C.A. § 77k; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[5] Securities Regulation ⬤⇝25.18**
349Bk25.18 Most Cited Cases
Alleged omissions in background information about corporation's president and chief executive officer (CEO) contained in document filed by corporation with Securities and Exchange Commission (SEC) could form basis for investor's claims that corporation's chief financial officer (CFO) violated Securities Act by signing registration statement containing false and misleading statements, inasmuch as prospectus supplement that was signed by CFO and part of corporation's registration materials expressly incorporated document by reference. Securities Act of 1933, § 11, 15 U.S.C.A. § 77k; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[6] Federal Civil Procedure ⬤⇝1831**
170Ak1831 Most Cited Cases
Whether registration statement signed by corporation's chief financial officer (CFO) was rendered false and misleading due to alleged omissions in background information provided about corporation's president and chief executive officer (CEO) in document incorporated by reference into registration statement could not be decided on motion to dismiss, given factual dispute about whether alleged omissions were material and thus whether corporation and CFO had duty to disclose omitted information. Securities Act of 1933, § 11, 15 U.S.C.A. § 77k; 17 C.F.R. § § 228.401, 229.401, 230.408; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[7] Contracts ⬤⇝206**

95k206 Most Cited Cases
Corporation's chief financial officer (CFO) was bound by forum selection clause in stock purchase agreement between corporation and investor, for purposes of establishing personal jurisdiction and venue with respect to investor's claims alleging that CFO violated Securities Act, even though CFO was not party to agreement, inasmuch as CFO was sufficiently "closely related" to transaction to make it foreseeable that she would be bound by clause. Securities Act of 1933, § 11, 15 U.S.C.A. § 77k; Fed.Rules Civ.Proc.Rule 12(b)(2, 3), 28 U.S.C.A.

**[8] Contracts ⬤⇝206**
95k206 Most Cited Cases
Although perhaps not directly connected to stock purchase agreement between corporation and investor, counterclaim in which investor alleged that corporation's chief financial officer (CFO) violated Securities Act by signing registration statement containing materially false and misleading statements and omissions was integrally related to investor's allegations that corporation and others fraudulently induced investor to enter into agreement, and thus fell within scope of agreement's forum selection clause, which included "any dispute hereunder or in connection herewith," thereby defeating CFO's challenges to personal jurisdiction and venue. Securities Act of 1933, § 11, 15 U.S.C.A. § 77k; Fed.Rules Civ.Proc.Rule 12(b)(2, 3), 28 U.S.C.A.

*MEMORANDUM AND ORDER*

SAND, J.

I. Introduction

*1 This motion arises as part of litigation concerning an October 2000 stock purchase agreement ("Purchase Agreement") between Nanopierce Technologies ("NPCT") and Harvest Court. Familiarity with the facts of the case is assumed. *See Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC,* 2003 WL 21507294 (S.D.N.Y. June 30, 2003); *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC,* 2002 WL 31819207 (S.D.N.Y. Oct.10, 2002). In particular, this Memorandum and Order addresses Harvest Court's Counterclaim against Kristi Kampmann ("Kampmann"), which alleges that, as an officer of NPCT, Kampmann signed a registration statement that contained false and misleading assertions and omitted material facts in violation of Section 11 of the Securities Act of 1933. Kampmann now moves to dismiss the Counterclaim against her pursuant to Fed.R.Civ.P. 12(b)(2), 12(b)(3), and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-08602-JF    Document 22-20    Filed 02/22/2005    Page 47 of 66

Not Reported in F.Supp.2d                                                                                          Page 3
Not Reported in F.Supp.2d, 2003 WL 22882137 (S.D.N.Y.)
**(Cite as: 2003 WL 22882137 (S.D.N.Y.))**

12(b)(6).

II. Discussion

*A. Failure to State a Claim*

A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) will be granted "only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Automated Salvage Transport, Inc. v. Wheelabrator Envtl. Sys., Inc.,* 155 F.3d 59, 67 (2d Cir.1998) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)) (internal quotation marks omitted). On such a motion, the Court must accept as true all factual allegations contained in the Complaint, and draw all inferences therefrom in favor of the plaintiff. *Grandon v. Merrill Lynch & Co., Inc.,* 147 F.3d 184, 188 (2d Cir.1998).

Harvest Court alleges that Kampmann violated Section 11(1) of the Securities Act, which states:
  In case any part of the registration statement, when such part became effective, contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may ... sue -
  (1) every person who signed the registration statement.
15 U.S.C.A. § 77k(a).

According to the complaint, "the shares of NPCT common stock sold by NPCT to Harvest Court on October 20, 2000 were registered with the SEC pursuant to a Prospectus dated October 20, 2000, and a 'shelf' registration statement dated May 25, 2000. The reset shares of NPCT stock also purchased by Harvest Court were registered with the SEC pursuant to a Prospectus statement dated March 12, 2001." (Countercls.¶ 199). Together, Harvest Court refers to all three documents as the "Registration Statement." (*Id.*).

Harvest Court alleges that the Registration Statement contained materially false and misleading information, including representations that Gemini Investments, Ltd. ("Gemini") was the sole owner of 10 million warrants, and that Gemini would not transfer any of those warrant shares for one year from the Harvest Court closing date. (Countercls.¶ 200). In addition, Harvest Court alleges that the registration

statements omitted material information, including the existence of SEC injunctions against NPCT's Chief Executive Officer, Paul Metzinger, and breaches of the lock-up agreement signed by NPCT and Gemini for Harvest Court's benefit on October 20, 2000. (*Id.*). Harvest Court asserts that Kampmann violated Section 11 when she signed the above-referenced Registration Statement containing these alleged misrepresentations and omissions. (Countercls.¶ 201).

*1. Alleged False and Misleading Statements Regarding the Gemini Warrants*

**\*2** [1] Kampmann first argues that Harvest Court fails to state a claim under Section 11 because it does not identify in the registration materials the particular statements alleged to be false and misleading. (Countercl. Def.'s Mem. Supp. M. Dismiss at 12). Harvest Court need not do so. *See Bernstein v. Crazy Eddie, Inc.,* 702 F.Supp. 962, 973 (E.D.N.Y.1988), *vacated in part on other grounds by,* 714 F.Supp. 1285 (E.D.N.Y.1989) ("Plaintiffs have not identified particular allegedly false sentences and words in the registration statements. But section 11 does not require them to do so."). Because fraud is not an element of a Section 11 claim, pleadings under that Section are governed exclusively by Fed.R.Civ.P. 8. *In re Initial Pub. Offering Secs. Litig.,* 241 F.Supp.2d 281, 296 (S.D.N.Y.2003). That Rule requires nothing more than " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (citations omitted). Harvest Court's Counterclaims satisfy this minimal requirement. (*See* Countercls. ¶¶ 80, 82, 199-200).

[2] Second, Kampmann contends that Harvest Court fails to state a claim under Section 11 because none of the statements contained within the registration materials concerning the Gemini warrants were false or misleading when made. (Countercl. Def.'s Mem. Supp. Mot. Dismiss at 12). The alleged misrepresentations appeared in NPCT's October 20, 2000 Prospectus Supplement, which reads in relevant part:
  "This offering includes ... warrants to purchase 10,000,000 shares of our common stock (the "Gemini warrants") to be issued *directly to* Gemini Investments, Ltd."
  (October 20, 2000 Prospectus Supplement to May 25, 2000 Prospectus, Declaration of Caryn G. Mazin, Ex. D, at S-2) (emphasis added).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Supplement further states that:

"The Gemini warrants offered by us to Gemini Investments, Ltd. entitle the holder to purchase up to 10,000,000 shares of our common stock at an exercise price per share of $0.25 at any time commencing on October 20, 2000 and ending at 5:00 p.m. eastern time on October 20, 2005.... Gemini Investments Ltd. has informed us that it intends to immediately exercise the Gemini warrants, and it has also agreed not to sell any shares of our common stock issuable upon the exercise of the Gemini warrants until October 20, 2001."

(October 20, 2000 Prospectus Supplement to May 25, 2000 Prospectus, Declaration of Caryn G. Mazin, Ex. D, at S-4).

On October 20, 2000, at the time the above disclosures were made, Gemini *was* entitled to purchase as many as 10,000,000 shares of NPCT's common stock as stated above. In fact, Harvest Court's own pleadings acknowledge that "[a]s it had agreed, Gemini did exercise *all* 10 million warrants on or about October 20, 2000 at the time of the Harvest Court closing." (Countercls.¶ 83) (emphasis added). The allegation that NPCT subsequently breached the lock-up agreement by issuing some of the warrant shares to entities other than Gemini, (Countercls.¶ 80), does not mean that the disclosure was false when made. Harvest Court may not rely on events that took place *following* the effective date of the registration statement to show that the disclosures contained within it were misrepresentations at the time they were made. *See e.g., Nelson v. Paramount Communications, Inc.,* 872 F.Supp. 1242, 1246 (S.D.N.Y.1995) ("While events subsequent to the date of the registration statement may have been material, Section 11 by its own terms is limited to material omissions in parts of registration statements that were misleading 'when such part[s] became effective." ').

**\*3** [3] Looking, then, only to those allegations involving events that occurred *before* October 20, 2000, the Court finds the alleged October 19, 2000 resolution adopted by NPCT's board of directors, which lists Neptune, Centurion, Aurora and Pisces as holders of the warrants supposedly owned exclusively by Gemini, sufficient to defeat the motion to dismiss. (Countercls. ¶ 91). Although Kampmann contends that an October 2, 2000 financing agreement between NPCT and Gemini specifically stated that the word "Gemini" would be used to refer to Gemini Investments, Ltd. plus the other entities mentioned above (Countercl. Def.'s

Reply Mem. Supp. M. Dismiss at 7-8; Countercls., Ex. C ¶ 3), there is presently no evidence that Harvest Court was aware or should have been aware of the language in that agreement. As a result, the Court declines to dismiss Harvest Court's claim with respect to alleged misrepresentations regarding Gemini's ownership of the warrant rights.

[4] It follows from that conclusion that Harvest Court has sufficiently pled its allegation that the Registration Supplement falsely represented Gemini's intention to abide by the lock-up agreement. The Supplement signed by Kampmann stated that Gemini had "agreed not to sell any shares of our common stock issuable upon the exercise of the Gemini warrants until October 20, 2001." (October 20, 2000 Prospectus Supplement to May 25, 2000 Prospectus, Declaration of Caryn G. Mazin, Ex. D, at S-4).

Gemini had in fact so agreed, as reflected in the lock-up agreement of October 20, 2000. (Countercls. ¶ 68 & Ex. B). The fact that Gemini allegedly violated the terms of the lock-up agreement at some later date does not render NPCT's statement false at the time it was made. Nonetheless, the board resolution described above supports Harvest Court's allegation that NPCT knew before October 20, 2000 that it would issue shares to entities other than Gemini and that Gemini therefore could not abide by the terms of the lock-up agreement.

### 2. Alleged Omissions Regarding Metzinger's Background

[5] Harvest Court also alleges that the registration statement signed by Kampmann contained false and misleading statements regarding Metzinger's background. (Countercls.¶ 200). Those alleged misrepresentations appeared in NPCT's Form 10-KSB, filed with the SEC on September 28, 1999, which read:

PAUL H. METZINGER. Mr. Metzinger was President and Chief Executive Officer of the Company from February 26, 1998 to May 6, 1998 and has served in that capacity from December 1, 1998 to the present. He has been a director of the Company since February 26, 1998. Mr. Metzinger has been the Chief Financial Officer of the Company since January 1, 1999. In addition, he serves as the President and Chief Executive Officer and a Director of Intercell Corporation. Prior to becoming a director and officer of the Company, Mr. Metzinger served as Intercell's General Counsel and practiced securities law in Denver, Colorado for over 32 years. Mr. Metzinger

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-08023-JJF   Document 22-20   Filed 02/22/2005   Page 16 of 33

Not Reported in F.Supp.2d                                                                          Page 5
Not Reported in F.Supp.2d, 2003 WL 22882137 (S.D.N.Y.)
(Cite as: 2003 WL 22882137 (S.D.N.Y.))

received his J.D. in 1967 from Creighton University Law School and his L.L.M. from Georgetown University in 1969.
*4 (Countercls.¶ 61).

Harvest Court alleges that this paragraph misrepresents Metzinger's professional record because it fails to disclose that Intercell Corporation went bankrupt during his tenure and that, following SEC allegations of securities fraud in the late 1980s, Metzinger submitted to a consent decree permanently enjoining him from committing further securities violations and temporarily barring him from practicing before the SEC. (Countercls.¶¶ 62-64).

Kampmann contends that the alleged omissions "cannot form the basis of any claims against [her] because there is no allegation that [she] signed the 10- KSB form, and because a 10-KSB is not a registration statement." (Countercl. Def.'s Mem. Supp. M. Dismiss at 17). The Court finds this argument unpersuasive because the Prospectus Supplement signed by Kampmann expressly incorporated by reference the "Annual Report on Form 10-KSB for the fiscal year ended June 30, 1999 that was filed with the S.E.C. on September 28, 1999." (Declaration of Caryn G. Mazin, Ex. D, at S-5). Compare Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co., Inc., 794 F.Supp. 1265, 1286 (S.D.N.Y.1992) (finding that there was no explicit incorporation by reference as required by 17 C.F.R. § 230.411(d)).

[6] Kampmann also argues that the Registration Statement she signed is not actionable under Section 11 because NPCT (and therefore Kampmann) had no duty to disclose the omitted information. (Countercl. Def.'s Mem. Supp. Motion Dismiss at 15). Generally, to state a claim under Section 11, "plaintiff must allege that the defendants had a legal obligation to disclose the allegedly omitted information." In re Merrill Lynch & Co., 2003 U.S. Dist. Lexis 11113, at *9 (S.D.N.Y. July 2, 2003) (citing In re Ultrafem Inc. Securities Litigation, 91 F.Supp.2d 678, 699 (S.D.N.Y.2000)). Here, Kampmann notes, the relevant SEC regulations require the registrant to disclose violations of federal or state securities or commodities law only if the finding of fault occurred during the past five years. (Countercl. Def.'s Mem. Supp. M. Dismiss at 15-16 (citing 17 C.F.R. § 228.401; 17 C.F.R. § 229.401)). Thus, she argues, NPCT did not have a duty to disclose the existence of the 12-year-old SEC injunction against Metzinger. (Countercl. Def.'s Mem. Supp. M. Dismiss at 15).

Kampmann's position is unconvincing. "When a corporation does make a disclosure - whether it be voluntary or required - there is a duty to make it complete and accurate." Glazer v. Formica Corp., 964 F.2d 149, 157 (2d Cir.1992) (quoting Roeder v. Alpha Indus., 814 F.2d 22, 26 (1st Cir.1987)) (internal quotation marks omitted) (emphasis added). The SEC's general regulations reflect this principle, providing that "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading." 17 CFR § 230.408. See also Disclosure Concerning Legal Proceedings Involving Management, Promoters, Control Persons and Others, S.E.C. Release No. 34,923, 1994 WL 597383, at * 28 n. 109 ("[I]nformation regarding events occurring outside the five-year period may be material and should be disclosed."); Demaria v. Andersen, 318 F.3d 170, 180 (2d Cir.2003) ("Although Regulation S-X specifically sets forth circumstances under which stale financial information must be updated with interim data, see 17 C.F.R. § 210.3-12, it is not the only operative SEC regulation.... Accordingly, in evaluating whether defendants were under a duty to disclose interim financial information in the prospectus, we must determine whether the March 1999 information was material in light of the financial information already disclosed to investors.") (citing 17 C.F.R. § 230.408; In re N2K Inc. Secs. Litig., 82 F.Supp.2d 204, 207-08 (S.D.N.Y.2000)).

*5 Therefore, to determine whether Kampmann had a duty to disclose Intercell's bankruptcy and Metzinger's consent decree depends upon whether those facts represent material information. As noted previously by this Court, "[m]ateriality is a mixed question of law and fact," and "a complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Nanopierce, 2003 WL 21507294, at *5 (quoting Ganino v. Citizens Utils. Co., 228 F.3d 154, 162 (2d Cir.2000) (quoting Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir.1985) (internal quotation marks omitted; alteration in original)). Accordingly, the Court declines to dismiss Harvest Court's Counterclaim on the ground that Kampmann had no duty to disclose the allegedly material information concerning Metzinger's background.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22882137 (S.D.N.Y.)
(Cite as: 2003 WL 22882137 (S.D.N.Y.))

*B. Personal Jurisdiction and Venue*

[7] Kampmann also moves to dismiss Harvest Court's Counterclaim for lack of personal jurisdiction and improper venue. (Countercl. Def.'s Mem. Supp. M. Dismiss at 6-10). Harvest Court argues that its claim against Kampmann is covered by the Forum Selection Clause contained within the Purchase Agreement signed by Harvest Court and NPCT in October 2000. (Countercl. Pl.'s Mem. Opp'n M. Dismiss at 10-11). That clause reads, in pertinent part, that the parties submit to the "exclusive jurisdiction of the state and federal courts sitting in the City of New York, borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein...." (Countercls., Ex. A, at 11).

Kampmann argues that the clause does not apply to her because she was not a party to the Purchase Agreement. (Countercl. Def.'s Reply Mem. Supp. M. Dismiss at 2). "In order to bind a non-party to a forum selection clause, the party must be 'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound." *Lipcon v. Underwriters at Lloyd's, London,* 148 F.3d 1285, 1299 (11th Cir.1998) (quoting *Hugel v. Corporation of Lloyd's,* 999 F.2d 206, 209 (7th Cir.1993) (quoting *Manetti-Farrow, Inc. v. Gucci Am., Inc.,* 858 F.2d 509, 514 n. 5 (9th Cir.1988)); see also *Direct Mail Production Services Ltd. v. MBNA Corp.,* 2000 WL 1277597, at *5 (S.D.N.Y. Sept.7, 2000) ("The MBNA companies were sufficiently 'closely related' that it was 'foreseeable' that they would be bound ..."). As noted by the Ninth Circuit in *Manetti-Farrow,* "a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses." *Manetti-Farrow,* 858 F.2d at 514 n. 5. Further, "[w]hile it may be true that third-party beneficiaries to a contract would, by definition, satisfy the 'closely related' and 'foreseeability' requirements, a third-party beneficiary status is not required." *Hugel,* 999 F.2d at 209-10 n. 7.

*6 Here, the Court is satisfied that Kampmann, as Chief Financial Officer, was "closely related" to NPCT's transaction with Harvest Court such that it was foreseeable that she would be bound by the Forum Selection Clause in the Purchase Agreement. *See e.g., Roby v. Corporation of Lloyd's,* 996 F.2d 1353 (2d Cir.1993) (finding that the "complaints against the individual Chairs are completely dependent on the complaints against the [principals] ... [and] arise [ ] out of the same misconduct charged

against the [principals]"); *Cinema Laser Technology, Inc. v. Hampson,* 1991 WL 90913, at *3 (D.N.J. May 30, 1991) ("Defendants might also argue that it would be unfair to apply the forum selection clause to individuals who were not parties to the Joint Venture Agreement, such as Sweatt, Berkowitz and McCurdy. However, these individuals were all directors of Hampson's corporation, Digital, who was a party.").

[8] Kampmann contends that, even if she is bound by the Forum Selection Clause, the counterclaim brought against her does not arise under or relate to the Purchase Agreement, and therefore falls outside the scope of the Clause. (Countercl. Def.'s Reply Mem. Supp. M. Dismiss at 2). The Court disagrees. Harvest Court alleges that Kampmann signed a registration statement containing materially false and misleading statements and omissions. Although this claim may not be directly connected to the Purchase Agreement, it is integrally related to Harvest Court's allegations that NPCT and others fraudulently induced Harvest Court to enter into that contract. *See Roby,* 996 F.2d at 1361 (concluding that forum selection clauses applicable to claims "arising out of" contractual relationships were "not restricted to pure breaches of the contracts containing the clauses" but also governed related securities and antitrust claims). The Counterclaim against Kampmann therefore falls within the broad language of the Forum Selection Clause, which includes "any dispute hereunder or in connection herewith."

III. Conclusion

For the reasons stated above, the motion to dismiss is DENIED. The suspension of discovery heretofore imposed by the Court is hereby lifted.

SO ORDERED.

Not Reported in F.Supp.2d, 2003 WL 22882137 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:02cv00767 (Docket) (Jan. 31, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT E

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22205615 (D.Conn.)
(Cite as: 2003 WL 22205615 (D.Conn.))

Page 1

**c**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
BOWMONT CORPORATION, Plaintiff,
v.
KROMBACHER BRAUEREI BERNHARD GMBH
& CO. Defendant.
**No. Civ.A.3:02 CV 1969(C.**

Sept. 8, 2003.

Alexandra B. Stevens, Cummings & Lockwood,
Stamford, CT, Barry T. Meek, Jennifer A. Minear,
Michael J. Lockerby, Hunton & Williams,
Richmond, VA, William H. Bright, Jr., Cummings &
Lockwood, Hartford, CT, for Plaintiff.

Debra Bogo-Ernst, Diane J. Romza-Kurtz, Thomas
A. Lidbury, Mayer, Brown, Rowe & Maw LLP,
Chicago, IL, Steven M. Greenspan, Day, Berry &
Howard, Hartford, CT, for Defendant.

*RULING ON MOTION FOR PRELIMINARY
INJUNCTION*

DRONEY, J.

*1 Pending is the plaintiff's Motion for Preliminary
Injunction [Doc. # 7]. This is an action in which the
plaintiff, Bowmont Corporation ("Bowmont") alleges
that the defendant, Krombacher Brauerei Bernhard
Gmbh & Company ("Krombacher"), breached a
contract under which Bowmont was to be the
exclusive distributor of Krombacher Beer in the
eastern United States. Bowmont seeks a preliminary
injunction to compel Krombacher to continue
performing pursuant to the agreement. For the
reasons that follow, the motion is DENIED.

Following the hearing on the plaintiff's motion, the
Court makes the following findings of fact and
conclusions of law.

*FINDINGS OF FACT*

Bowmont is a licensed beer importer and distributor
with its headquarters in Westport, Connecticut.

Krombacher is a German company with its principal
place of business in Krombach, Germany. [FN1]
Krombacher is the brewer of Krombacher Pils Beer
("Krombacher Beer"), currently the most popular
beer in Germany.

> FN1. The Court has jurisdiction pursuant to
> 28 U.S.C. § 1332(a)(2), as the parties are
> "citizens of a State and citizens or subjects
> of a foreign state" and the amount in
> controversy exceeds $75,000.

On September 1, 2000, Bowmont and Krombacher
executed a written agreement under which Bowmont
was to have exclusive importation and distribution
rights for Krombacher beer in 36 states (the "2000
Agreement"). As contemplated by the 2000
Agreement, the parties also executed a retainer
agreement (the "Retainer Agreement") under which
Krombacher agreed to pay Bowmont specified
amounts for marketing and promotions; the amounts
paid by Krombacher pursuant to the Retainer
Agreement were to be based on the volume of
Krombacher Beer purchased by Bowmont. The 2000
Agreement also set volume goals for Bowmont's
distribution of Krombacher beer. The 2000
Agreement set an initial three-year term, which
would automatically renew for a second three-year
term, unless Bowmont decided to terminate the
agreement after the first term. Krombacher also had
the right to terminate the 2000 Agreement following
the initial three-year term, but only if Bowmont failed
to meet the stated distribution goals. The 2000
Agreement also included a forum selection clause
designating Frankfurt, Germany as "the jurisdiction
for all disputes arising from this agreement ..."

The relationship between the parties went smoothly
for the first few months after the 2000 Agreement
was executed. For example, in February 2001,
Krombacher agreed to expand the exclusive
distribution territory from 36 states to include the
entire United States. However, by late 2001, the
parties' relationship began to deteriorate. Bowmont
claimed that Krombacher had failed to provide the
proper packaging for U.S. distribution as
contemplated by the 2000 Agreement. The parties
also had disputes regarding billing; both parties
claimed that the other owed it money, and
Krombacher denied Bowmont's request to convert
some of its billing statements from German Marks to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Euros.

On April 9, 2002, Bowmont and Krombacher representatives met at Bowmont's offices in Westport, Connecticut. At the meeting the parties agreed they should terminate the 2000 Agreement and the Retainer Agreement. They negotiated terms for a new agreement. Having agreed in principle on a number of terms of a new agreement, the parties agreed that Krombacher would later provide a written draft of the new agreement for Bowmont's consideration. There was no agreement as to all the material or essential terms of a new agreement on April 9, 2002 and both parties then understood that a new agreement would not be in place until executed in writing. Krombacher provided a signed draft to Bowmont on June 28, 2003. However, Bowmont objected to several of the provisions included in that draft and the parties continued their negotiations as to those provisions. Krombacher continued to ship Krombacher Beer to Bowmont after the April 9, 2002 meeting, and after sending the draft of the new agreement on June 28, 2003.

**\*2** Further disputes regarding outstanding invoices resulted in Krombacher's refusal to continue shipments of Krombacher Beer to Bowmont. In October, 2002, Krombacher sent a letter to Bowmont indicating that it was terminating the 2000 Agreement and making a demand for monies owed by Bowmont under that agreement. Bowmont then filed this action, alleging that Krombacher's refusal to make further shipments constituted a breach of the new agreement negotiated on April 9, 2002, and filed the pending motion for preliminary injunction.

### CONCLUSIONS OF LAW
*I. Standard for Preliminary Injunctive Relief*

The Second Circuit has cautioned that preliminary injunctive relief "is an extraordinary and drastic remedy which should not be routinely granted." *Buffalo Forge Co. v. Ampco-Pittsburgh Corp.,* 638 F.2d 568, 569 (2d Cir.1981) (internal quotation marks omitted). Entry of a preliminary injunction is appropriate where the party seeking the injunction establishes: (a) the injunction is necessary to prevent irreparable harm, and (b) either (i) likelihood of success on the merits, or (ii) sufficiently serious questions going to the merits of the claim as to make it fair ground for litigation, and a balance of the hardships tips decidedly in favor of the movant. *See, e.g., Able v. United States,* 44 F.3d 128, 130 (2d Cir.1995). Thus, the first part of the standard-irreparable harm-must always be met, but the party

seeking an injunction may satisfy the second prong by establishing *either* a likelihood of success or sufficiently serious questions going to the merits and a balance of hardships in its favor. Thus, here, the Court must consider whether Bowmont would suffer irreparable harm in the absence of a preliminary injunction. If so, the Court must then consider whether Bowmont is likely to succeed on the merits *or* whether Bowmont has raised sufficiently serious questions as to the merits, and the balance of hardships tips in favor of Bowmont.

*II. Irreparable Harm*

In *Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27 (2d Cir.1995), the Second Circuit considered the circumstances under which the loss of a single product line could constitute irreparable harm for purposes of a preliminary injunction. The Court reasoned that, in the typical situation where money damages can be readily calculated, there is usually no irreparable harm. However, the Court noted that if the calculation of damages would be speculative, or if the discontinuance of the product would result in the discontinuance of the business, preliminary injunctive relief may be appropriate:

> We believe that the governing principle is as follows. Where the availability of a product is essential to the life of the business or increases business of the plaintiff beyond sales of that product--for example, by attracting customers who make purchases of other goods while buying the product in question--the damages caused by loss of the product will be far more difficult to quantify than where sales of one of many products is the sole loss. In such cases, injunctive relief is appropriate. This rule is necessary to avoid the unfairness of denying an injunction to a plaintiff on the ground that money damages are available, only to confront the plaintiff at a trial on the merits with the rule that damages must be based on more than speculation. Where the loss of a product with a sales record will not affect other aspects of a business, a plaintiff can generally prove damages on a basis other than speculation. Where the loss of a product will cause the destruction of a business itself or indeterminate losses in other business, the availability of money damages may be a hollow promise and a preliminary injunction appropriate.

**\*3** *Id.* at 38. Here, there was no evidence that it would be difficult or impossible to calculate the damages caused by Krombacher's refusal to continue shipment of Krombacher Beer to Bowmont (although Bowmont has argued that it will also suffer a loss of business goodwill). For example, there has been no

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22205615 (D.Conn.)
(Cite as: 2003 WL 22205615 (D.Conn.))

Page 3

showing that the loss of Krombacher Beer will impede Bowmont's sale of other products. However, the Court finds that, if preliminary relief is not granted, it is likely that "the loss of [Krombacher Beer] will cause the destruction of [Bowmont]," *id.* at 38. In 2002, sales of Krombacher Beer constituted nearly 100% of Bowmont's sales. As a result, the loss of the Krombacher account could well result in the destruction of Bowmont's business. Therefore, the Court finds that Bowmont has satisfied the "irreparable harm" standard for obtaining a preliminary injunction.

## II. Likelihood of Success/Serious Questions Going to the Merits

As stated above, in order for a preliminary injunction to issue, Bowmont must demonstrate, in addition to its showing of irreparable harm, that it is likely to succeed on the merits or that there are sufficiently serious questions going to the merits and the balance of hardships tips in its favor. *See Able,* 44 F.3d at 130.

### A. Likelihood of Success on the Merits

Bowmont has not demonstrated that it is likely it will succeed on the merits of its claim. With regard to Bowmont's claim that Krombacher's conduct has violated the agreement reached at the April 9, 2002 meeting, Bowmont has not shown that it is likely it will be able to overcome Krombacher's statute of frauds defense. The Court finds, based on the evidence presented at the preliminary injunction hearing, that the parties contemplated memorializing the agreement in writing before it became binding, and the parties were unable to agree on a final version of the written agreement. The alleged contract-an agreement regarding the distribution of Krombacher Beer in the United States-is within the statute of frauds, because it is a contract for the sale of goods that exceeded $500. *See* Conn. Gen.Stat. § 42-2-201. [FN2]

> FN2. The parties do not dispute that the Connecticut Statute of Frauds is the relevant choice of law for this issue.

Moreover, any alleged performance by Krombacher, by filing orders for Krombacher Beer after the April 9, 2002 meeting, is insufficient to take the contract out of the statute of frauds under the theory of "part performance." Part performance of a contract can only satisfy the statute of frauds in situations where there is no other reasonable explanation for the

party's "part performance" other than the existence of a valid agreement. *See, e.g., LeVesque Builders, Inc. v. Hoerle,* 49 Conn.App. 751, 756, 717 A.2d 252 (1998) ("The acts [taking a contract out of the statute of frauds] must also be of such a character that they can be naturally and reasonably accounted for in no other way than the existence of some contract in relation to the subject matter in dispute ...") (citing *McNeil v. Riccio,* 45 Conn.App. 466, 470, 696 A.2d 1050 (1997)). Here, the Court finds that there is "natural and reasonable" explanation for the alleged part performance by Krombacher: the continued performance of the 2000 Agreement.

*\*4* Bowmont has not claimed in its motion papers that it is entitled to relief under the 2000 Agreement; its request for a preliminary injunction is limited to the alleged 2002 oral agreement discussed above. However, the Court notes that, even if Bowmont had asserted a cause of action under the 2000 Agreement, it would be unlikely that Bowmont could prevail on such a claim. The 2000 Agreement contained a forum selection clause designating Germany as the situs for the resolution of disputes under the contract. Forum selection clauses "are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 10, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972); *see also Carnival Cruise Lines v. Shute,* 499 U.S. 585, 593-95, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991) (holding that even a "nonnegotiated forum selection clause" is enforceable if it is reasonable, not gained through fraud or done to discourage legitimate claims.) Of course, Bowmont's principal argument against the application of the forum selection clause is that "this action does not arise out of the 2000[A]greement.... Krombacher does not and cannot allege that the [alleged 2002 Agreement] contained a choice of law or choice of forum provision." *See* Reply Mem. in Supp. of Bowmont's Mot. for Prelim. Inj., at 8. However, as stated above, due to the application of the statute of frauds, Bowmont is unlikely to prevail on the basis of an alleged oral agreement reached at the April 9, 2002 meeting.

Bowmont claims that, even if the Court applies the 2000 Agreement and its forum selection clause, "Bowmont's Connecticut statutory and common-law claims [counts 2 thorough 5 of the complaint] would not be subject to that provision." However, as several courts have noted, allowing a party to avoid a forum selection clause by pleading related statutory and/or tort claims would violate the public policy supporting forum selection clauses. *See, e.g., Roby v.*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22205615 (D.Conn.)
**(Cite as: 2003 WL 22205615 (D.Conn.))**

Page 4

*Corporation of Lloyd's,* 996 F.2d 1353, 1360 (2d Cir.1993) ("It defies reason to suggest that a plaintiff may circumvent forum selection and arbitration clauses merely by stating claims under laws not recognized by the forum selected in the agreement."); *Crescent Int'l. Inc. v. Avatar Communities, Inc.,* 857 F.2d 943, 944 (3d Cir.1988) ("[P]leading alternate non-contractual theories is not alone enough to avoid a forum selection clause if the claims asserted arise out of the contractual relation and implicate the contract's terms.").

While there is a general presumption in favor of the enforceability of forum selection clauses, that presumption can be overcome by a "clear showing" that the clause is unreasonable. *See M/S Bremen,* 407 U.S. at 15. "A clause can be unreasonable if: 1) its incorporation into the agreement was the product of fraud or overreaching; 2) the complaining party will be deprived of its day in court due to the grave inconvenience of the selected forum; 3) the chosen law is manifestly unfair so as to deprive plaintiff of a remedy; or 4) the clause is in contravention of a strong public policy of the forum state." *Central National-Gottesman, Inc. v. M.V. "Gertrude Oldendorff,* 204 F.Supp.2d 675, 678 (S.D.N.Y.2002) (citing *Roby,* 996 F.2d at 1363). Bowmont has not asserted that the forum selection clause in the 2000 Agreement is unreasonable for reasons one through three above. Rather, as noted above, Bowmont's defense to the forum selection clause is simply that the 2000 Agreement which contained it was no longer operative. Bowmont has, however, asserted a cause of action under the Connecticut Franchise Act, which may be read broadly as asserting that the application of a forum selection clause is "in contravention of a strong public policy" of the state of Connecticut, as some courts have suggested that forum selection clauses might be inapplicable to contracts that fall under the Act. *See Contractors Home Appliance, Inc. v. Clarke Distribution Corp.,* 196 F.Supp.2d 174, 176-77 (D.Conn.2002) (considering possibility that forum selection clause is invalidated by the Connecticut Franchise Act's mandate that "any waiver of the rights of a franchisee under § § 42-133f or 42-133g which is contained in any franchise agreement entered into or amended on or after June 12, 1975, shall be void.") (citing Conn.Gen.Stat. S 49-133(f)).

**\*5** Here, however, Bowmont has also not demonstrated that it is likely that it will prevail on its claim that the Franchise Act is implicated by the 2000 Agreement. Connecticut General Statute § 42-133e(b) defines "franchise" as an oral or written

agreement or arrangement in which:

> (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor, ... and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate....

While there is no precise formula as to what meets the first part of the test for determining a franchise relationship under § 42-133e of a "marketing plan or system prescribed in substantial part by a franchisor," *see id.* at 834; *Chem-Tek, Inc. v. General Motors Corp.,* 816 F.Supp. 123, 129 (D.Conn.1993); *Sorisio v. Lenox, Inc.,* 701 F.Supp. 950, 960 (D.Conn.1988), *aff'd,* 863 F.2d 195 (2d cir.1988), the Connecticut Supreme Court and U.S. District Court in Connecticut have generally applied the factors outlined in *Consumers Petroleum of Connecticut, Inc. v. Duhan,* 38 Conn.Supp. 495, 452 A.2d 123 (Conn.Supp.1982), to determine this issue. *See Hartford Elec. Supply Co. v. Allen-Bradley Co., Inc.,* 250 Conn. 334, 736 A.2d 824, 834 (Conn.1999); *Ackley v. Gulf Oil Corp.,* 726 F.Supp. 353, 365 (D.Conn.1989); *Aurigemma v. Arco Petroleum Prods. Co.,* 698 F.Supp. 1035, 1038-39 (D.Conn.1988); *McKeown Distributors Inc., v. Gyp-Crete Corp.,* 618 F.Supp. 632, 642 (D.Conn.1985). Those factors include the level of control the putative franchisor had over the putative franchisee's: "(1) hours and days of operation; (2) advertising; (3) lighting; (4) employee uniforms; (5) prices; (6) trading stamps; (7) hiring; (8) sales quotas; and 9) management training." *Hartford Elec. Supply Co.,* 736 A.2d at 834 (citing *Petroleum,* 452 A.2d at 125). Courts have also looked at whether the franchisor provided the franchisee with financial support, audited its books, or inspected its premises. *See id.*

The Court finds that insufficient evidence showing a "level of control" indicative of a franchise has been presented. For example, Krombacher did not dictate Bowmont's hours of operation, its pricing, or its hiring practices. It did not issue Bowmont employee uniforms or provide management training. Krombacher did not provide Bowmont financial support or audit its books. While Krombacher did agree to provide Bowmont money for advertising pursuant to the Retainer Agreement, it did not exert any control over how those funds were to be utilized. The only franchise factor that is arguably present is a "sales quota" in the 2000 Agreement. However, that

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22205615 (D.Conn.)
(Cite as: 2003 WL 22205615 (D.Conn.))

is insufficient alone or in combination with the other evidence to make it likely that Bowmont will prevail on the merits. The evidence supports Krombacher's position that the 2000 Agreement did not create a franchise. [FN3]

> FN3. The Court need not consider the second part of the franchise analysis-whether the operation of the putative franchisee's business is "substantially associated" with the putative franchisor's commercial symbol-because in order to prevail Bowmont would have to demonstrate that it would likely succeed as to both prongs of the franchise analysis. As noted above, the Court finds that it is unlikely that Bowmont will succeed as to the first prong of the test.

*6 Also, Bowmont has not shown that it is likely it would prevail on its claim under the Connecticut Unfair Trade Practices Act ("CUTPA"). Conn. Gen.Stat. § 42-110a, et seq. A breach of contract, without more, cannot support a CUTPA violation. Langer, Morgan and Belt, in their Connecticut Unfair Trade Practices Act, Vol. 1, at § 4.3, pp. 114 et seq. contain an excellent discussion of this problem. The law in this area is summed up at page 116 where it is said: "A number of lower court decisions have held that a simple breach of contract does not violate CUTPA ... The difficulty has been in describing what conduct in addition to the breach is necessary to establish a CUTPA violation. A standard that a number of superior court decisions have used to describe unfairness is that the claimant must plead and prove 'substantial aggravating circumstances attending the breach." ' See Foley v.. Huntiunton Co., CV87-246 145S, 1994 Lexus 765 (J.D. Fairfield), for latter proposition; for cases supporting proposition that simple breach of contract claim cannot support CUTPA claim. See Emlee Eciuip. Leasing Corp. v. Waterbury Transmission, Inc., 41 Conn.Supp. 575, 595 A.2d 951 (1991). See also Boulevard Associates v. Sovereign Hotels, Inc., 72 F.3d 1029, 1039 (C.A.2, 1995), interpreting CUTPA. Ford v. Barnes, No. CV98-0548082, 2000 WL 33182059, at *9 (July 12, 2000 Conn.Super..). See also Smithfield Assoc., LLC v. Tolland Bank, No. 124551, 2003 WL 431670, at * (Feb. 3, 2003 Conn.Super..) ("A breach of contract, even if intentional, does not violate CUTPA unless the claimant shows substantial aggravating circumstances surrounding the breach.") (citing Foley ). Here, as noted above, it is unlikely that Bowmont

will be able to prevail on its breach of contract claim. Moreover, Bowmont has not submitted evidence suggesting that there were "substantial aggravating circumstances" attending any alleged breach of contract by Krombacher. Thus, because it has not shown that it will likely prevail on its breach of contract claim or that there were aggravating circumstances surrounding any alleged breach, Bowmont has not shown that it will likely prevail on its CUTPA claim.

Thus, Bowmont has failed to demonstrate a likelihood of success on the merits as it has not demonstrated that 1) it is likely that it can overcome Krombacher's statute of frauds defense as to the alleged oral agreement formed in April 2002, that 2) it is likely that if the Court applied the 2000 Agreement it could overcome that agreement's forum selection clause, or that 3) Krombacher has engaged in activity that violates CUTPA.

*B. Serious Questions Going to the Merits*

As an alternative to demonstrating a likelihood of success on the merits, Bowmont is still entitled to a preliminary injunction if it can demonstrate that there are "sufficiently serious questions going to the merits of the claim as to make it fair ground for litigation, and a balance of the hardships tips decidedly" in its favor. See, e.g., Able, 44 F.3d at 130.

*7 However, "[a]s discussed above, [the Court has] found that [Bowmont] failed to demonstrate any possibility of success on the merits, let alone probability. [The Court finds], therefore, ... [Bowmont has] failed to raise sufficiently serious questions going to the merits to make them fair ground for litigation." Blum v. Schlegel, 18 F.3d 1005, 1016 (2d Cir.1994). Furthermore, "[b]ecause a movant for preliminary injunction must demonstrate both sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping in his or her favor" and because this Court has determined that Bowmont has not demonstrated that there are serious questions going to the merits, "it is unnecessary for [this Court] to review the district court's determination on the balance of hardships." Id. [FN4]

> FN4. Bowmont did not pursue its counts for tortious interference of contract and violation of the Connecticut Liquor Control Act in its post-hearing memorandum. See Pl.'s Post-Hearing Mem. in Supp. of Mot. for Preliminary Injunction [Doc. # 51].

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22205615 (D.Conn.)
**(Cite as: 2003 WL 22205615 (D.Conn.))**

*CONCLUSION*

For the forgoing reasons, the plaintiff's Motion for Preliminary Injunction [Doc. # 7] is DENIED.

Not Reported in F.Supp.2d, 2003 WL 22205615 (D.Conn.)

**Motions, Pleadings and Filings (Back to top)**

• _____3:02CV01969_____(Docket)
(Nov. 06, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT F

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2003 WL 22284207 (N.D.Ill.)
**(Cite as: 2003 WL 22284207 (N.D.Ill.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.
PENN, L.L.C., Plaintiff,
v.
NEW EDGE NETWORK, INC., Defendant.
**No. 03 C 5496.**

Oct. 3, 2003.

*MEMORANDUM OPINION AND ORDER*

CONLON, J.

*1 In this diversity action, Penn, LLC (Penn Media) sues New Edge Network, Inc. (New Edge) for tortious interference with prospective business relations, tortious interference with economic advantage, and fraud. New Edge responds with this motion to dismiss for lack of personal jurisdiction and improper venue pursuant to Fed.R.Civ.P. 12(b)(2) and 12(b)(3).

BACKGROUND
New Edge is a national business broadband service provider headquartered in Vancouver, Washington. New Edge provides, among other things, area networks and dedicated high-speed internet access to small businesses and entrepreneurs. Penn Media is an online media and publishing company based in the south suburbs of Chicago. In the Spring of 2002, Penn Media approached New Edge about securing T3 internet services for its business. Penn Media's business depended on its ability to use this internet access to send and receive high volumes of email. To that end, the parties entered into a service agreement in July 2002. New Edge agreed to provide Penn Media with email and internet access for purposes of sending commercial email and advertising. New Edge drafted the agreement, which contained a forum selection clause providing:

"This agreement shall be governed by, construed under, and enforced in accordance with, the laws of the State of Washington without reference to its choice of law principles. For any action or suit to

enforce any right or remedy of this agreement, (except for actions to enter or collect on judgments) the parties consent to exclusive jurisdiction and venue in Clark County, Washington...."

(Motion to Dismiss, Ex. B at ¶ 15.) The agreement incorporated by reference a modified version of New Edge's Acceptable Use Policy ("AUP"), which establishes limitations on Penn Media's internet usage and purports to give New Edge the right to unilaterally halt Penn Media's internet use if it violates those limitations. (*Id.* at ¶ 11.)

In February 2003, New Edge unilaterally terminated Penn Media's internet services. Penn Media filed a two-count complaint in the Circuit Court of Cook County claiming that New Edge interfered with its expected business relationships and that New Edge committed fraud. New Edge responded with this motion to dismiss, arguing that it lacks sufficient contacts with Illinois to confer personal jurisdiction, and in any event, that Penn Media had agreed to litigate the service agreement exclusively in Clark County, Washington. The issue before this court is whether the forum selection clause applies to Penn Media's tort and fraud actions.

DISCUSSION
New Edge moves to dismiss Penn Media's complaint for improper venue based on the forum selection clause in the service agreement. A motion to dismiss for improper venue based on a forum selection clause is properly brought under Rule 12(b)(3). *See Frietsch v. Refco, Inc.,* 56 F.3d 825, 830 (7th Cir.1995); *Weidner Comm. Inc. v. H.R.H. Prince Bandar Al Faisal,* 859 F.2d 1302, 1306 (7th Cir.1988); *Chapman v. Norwegian Cruise Line Ltd.,* No. 01 C 50004, 2001 WL 910102, *1 (N.D.Ill. July 6, 2001).* Penn Media bears the burden of establishing that it has chosen the proper venue and that the forum selection clause is inapplicable. *See Fasti USA v. Fasti Farrag & Stipsits GMBH,* No. 02 C 8191, 2003 WL 1581472, *2 (N.D.Ill. March 26, 2003).* To that end, consideration of the contract attached to New Edge's motion to dismiss is proper because Penn Media referred to the agreement in its complaint and it is central to Penn Media's contention that venue is proper. *See Albany Bank & Trust Co. v. Exxon Mobil Corp.,* 310 F.3d 969, 971 (7th Cir.2002).

*2 Contractual forum selection clauses are *prima*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22284207 (N.D.Ill.)
**(Cite as: 2003 WL 22284207 (N.D.Ill.))**

*facie* valid and should be enforced like any other contractual provision unless they are unreasonable or the product of fraud or undue influence. *See Northwestern Nat'l Ins. Co. v. Donovan,* 916 F.2d 372, 375-76 (7th Cir.1990); *Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 92 S.Ct. 1907 (1972). Penn Media does not argue that the forum selection clause is unenforceable on *Bremen* grounds. It contends that the forum selection clause was drafted narrowly and expressly limited to contract disputes, and therefore does not encompass tort and fraud claims.

Penn Media argues that the phrase "any right or remedy of this agreement" has a narrow meaning, applying only to contract claims. This is an interpretation that language and case law do not support. The provision is limited in application to actions relating to the enforcement of rights or remedies of the contract. The core of the tortious interference claim involves Penn Media's right to service under the agreement and New Edge's right to terminate the agreement. The fraudulent representations at issue are all contractual provisions of the contract. *See Sompo Japan Ins., Inc. v. Alarm Detection Systems,* No. 03 C 2322, 2003 WL 21877615, *2 (N.D.Ill. Aug. 6, 2003) (forum selection clause providing "should any portion of this contract have to be legally enforced" applied to tort action). "All disputes the resolution of which arguably depend upon the construction of an agreement 'arise out of' that agreement" for purposes of a forum selection clause. [FN1] *Omron Healthcare, Inc. v. Maclaren Exps., Ltd.,* 28 F.3d 600, 603 (7th Cir.1994); *American Patriot Ins. Agency, Inc. v. Mutual Risk Management, Ltd.,* 248 F.Supp.2d 779, 785 (N.D.Ill.2003); *Sompo Japan Ins., Inc.,* 2003 WL 21877615 at *2 ("Allegations of common law tort theories based upon contractual obligations, although sounding in tort rather than contract, are nonetheless defined by the contract").

> FN1. *Omron Healthcare* cautions against a "but-for" understanding of language referring to a "disputes arising out of" agreement. *See* 28 F.3d at 600. In this case, the agreement is narrower than an "arising out of" agreement. Nonetheless, the suit is still controlled by the forum selection clause because it involves the enforcement of rights and remedies under the contract.

Penn Media argues that its tortious interference and fraud claims do not require application or interpretation of the service agreement. The tortious interference claim alleges that New Edge frustrated

Penn Media's expected advertising sales by terminating its internet service. This claim is intimately related to the service agreement and the rights New Edge may have to cancel service pursuant to the AUP incorporated into the contract. Whether New Edge purposefully interfered with Penn Media's business necessarily involves a determination of whether New Edge was authorized under the service agreement to terminate Penn Media's internet service. If enforcement of a provision in the service agreement is clearly a defense to a claim, that claim involves a right or remedy under the contract and should fall within the scope of the forum selection clause. *See Omron Healthcare,* 28 F.3d at 603; *Manetti-Farrow, Inc. v. Gucci America,* 858 F.2d 509, 514 (9th Cir.1988); *American Patriot Ins. Agency,* 248 F.Supp.2d at 785; *Reproductive Surgery & Medicine, P.C. v. OSF Healthcare System, OSF,* No. 03 CV 0634 DFH, 2003 WL 21852554, *1-2; *Pendleton Enterprises, Inc. v. Iams Co.,* 851 F.Supp. 1503, 1505 (D.Utah 1994). Otherwise, a clever party could simply avoid its contractual obligations through sophistry.

**\*3** Similarly, Penn Media contends that New Edge fraudulently induced it to enter the service agreement by promising its business activities came within the scope of New Edge's AUP. Penn Media argues that resolution of this claim does not require application or interpretation of the service agreement because New Edge's statements "would be false regardless of what the service agreement says, and even if the service agreement did not exist." (Opposition Brief at 9.) However, resolution of the fraud claim requires the court to consider the enforcement of rights and remedies under the service agreement, as well as the meaning of the AUP. *See American Patriot Ins. Agency,* 248 F.Supp.2d at 785 (alleged fraud and misrepresentations occurred because the agreement was in place). Penn Media concedes that the AUP purports to grant New Edge both the unilateral right to change the terms of the AUP and to terminate service without informing Penn Media. At the heart of the fraud claim are issues regarding what New Edge promised to Penn Media and what Penn Media knew before it acted. These issues cannot be resolved without interpreting and applying the service agreement. *See OSF Healthcare,* 2003 WL 21852554 at *1-2; *See Fasti USA,* 2003 WL 1581472 at *2.

The forum selection clause applies whenever an action or suit seeks to enforce rights or remedies under the service agreement. Disposition of Penn Media's tort and fraud claims requires determinations of rights and remedies under the service agreement.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22284207 (N.D.Ill.)
**(Cite as: 2003 WL 22284207 (N.D.Ill.))**

Page 3

New Edge and Penn Media freely contracted to litigate their disputes in Clark County, Washington. This court will hold them to their bargain.

CONCLUSION

Penn Media fails to establish that the forum selection clause contained in its agreement with New Edge is inapplicable to its tortious interference and fraud claims. Both claims involve extensive interpretation and application of the service agreement and the AUP before they can be resolved. Accordingly, venue is improper in the Northern District of Illinois.

Not Reported in F.Supp.2d, 2003 WL 22284207 (N.D.Ill.)

**Motions, Pleadings and Filings (Back to top)**

• 2003 WL 23927785 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Motion to Dismiss (Sep. 17, 2003)

• 2003 WL 23927783 (Trial Motion, Memorandum and Affidavit) Memorandum in Opposition to Defendant's Motion to Dismiss (Sep. 15, 2003)

• 1:03CV05496 (Docket) (Aug. 07, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT G

Westlaw.

Slip Copy                                                Page 1
Slip Copy, 2005 WL 1651172 (N.D.Ill.)
**(Cite as: 2005 WL 1651172 (N.D.Ill.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.
Alexander J. VLADOFF, Plaintiff,
v.
George F. CHAPLIN and Blanche Chaplin,
Defendants.
**No. 04 C 5872.**

July 1, 2005.
Daniel P. Soso, Edward R. Vrdolyak, Ltd.,, Nicholas
Geanopoulos, The Vrdolyak Law Group LLC,
Chicago, IL, for Plaintiff.

Jamie L. Kittel, Bruce Farrel Dorn & Associates,
Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

GUZMÁN, J.

**\*1** Alexander Vladoff ("Vladoff") filed this personal
injury lawsuit against George and Blanch Chaplin
("Chaplins") for negligence. The case is before the
Court on defendants' Federal Rule of Civil Procedure
("Rule") 12(b)(2) motion to dismiss, or alternatively,
to transfer venue. For the reasons provided in this
Memorandum Opinion and Order, the motion to
dismiss is granted.

*The Legal Standard*
On a Rule 12(b)(2) motion to dismiss for lack of
personal jurisdiction, the plaintiff has the burden to
make a *prima facie* showing that personal jurisdiction
exists. *See Neuman v. Florabelle Flowers, Inc.,* 15
F.3d 721, 724 (7th Cir.1994). In deciding this motion,
we resolve any factual disputes in Vladoff's favor.
*Saylor v. Dyniewski, 836 F.2d 341, 342 (7th
Cir.1988).*

*Factual Background*
On September 9, 2002, Vladoff was injured while
getting out of a pool at the Chaplins' home in
Greenfield, Indiana. (Compl.¶ ¶ 5-7.) The pool
ladder broke while Vladoff was attempting to climb
from the deck to ground level, and Vladoff sustained

injuries from the fall. (*Id.* ¶ ¶ 8-11.) Vladoff claims
the Chaplins were negligent in failing to maintain,
repair or alter the pool deck and ladder. (*Id.* ¶ 13.)

On September 8, 2004, Vladoff, a citizen of Illinois,
filed this lawsuit against the Chaplins, citizens of
Indiana, in this Court. (*Id.* ¶ 2.). The statute of
limitations on Vladoff's claim expired the following
day.

*Discussion*
Federal courts sitting in diversity may exercise
personal jurisdiction over nonresident defendants
only if a forum-state court would have such
jurisdiction. *Hyatt Int'l Corp. v. Coco,* 302 F.3d 707,
713 (7th Cir.2002). Illinois courts can " 'exercise
jurisdiction on any ... basis now or hereafter
permitted by the Illinois Constitution and the
Constitution of the United States." ' *Id.* at 714
(quoting 735 ILL. COMP. STAT. 5/2-209(c)). The
state and federal jurisdiction standards are not
meaningfully different. The exercise of jurisdiction
comports with the Illinois Constitution if "it is fair,
just, and reasonable to require a nonresident
defendant to defend an action in Illinois, considering
the quality and nature of the defendant's acts which
occur in Illinois or which affect interests located in
Illinois." *Rollins v. Ellwood,* 141 Ill.2d 244, 152
Ill.Dec. 384, 565 N.E.2d 1302, 1316 (Ill.1990). The
exercise of jurisdiction comports with the Federal
Constitution if the non-resident defendant has
"purposefully avail[ed][him]self of the privilege of
conducting activities" in the forum state such that he
"should reasonably anticipate being haled into court
there." *Burger King v. Rudzewicz,* 471 U.S. 462, 474,
475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1980) (citation
omitted).

Vladoff has not alleged that the Chaplins have had
any contact at all with Illinois, let alone the kind of
contacts that would cause them to anticipate
defending a suit here. On the contrary, Vladoff
alleges that the Chaplins are residents of Indiana and
that this suit arises from a tort that occurred on their
Indiana property. (Compl.¶ ¶ 2, 5-13.) Accordingly,
this Court cannot constitutionally exercise personal
jurisdiction over the Chaplins.

**\*2** The next question is whether the case should be
dismissed or transferred pursuant to 28 U.S.C. §
1406 or 28 U.S.C. § 1631. The former statute

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

permits the Court to transfer a case to the proper venue if the transfer is "in the interest of justice." *See* 28 U.S.C. § 1406(a). [FN1] The latter statute permits the Court to transfer a case when it lacks jurisdiction and the transfer "is in the interest of justice." *See* 28 U.S.C. § 1631. Thus, both statutes hinge the transfer decision on "the interest of justice."

> FN1. A case can be transferred pursuant to that statute, even if the transferring court does not have personal jurisdiction over the defendants. *Goldlawr, Inc. v. Heiman,* 369 U.S. 463, 466, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962).

Vladoff argues that a transfer is in the interest of justice because the statute of limitations on his claim has now expired. According to the Supreme Court, the interest of justice may require transfer, rather than dismissal, when a plaintiff mistakenly files suit in the wrong district and the statute of limitations expires before the mistake is discovered. *Goldlawr,* 369 U.S. at 467. Whether the interest of justice requires a transfer in any case, however, depends on the nature of the filing error. When the error is reasonable, transfer may be appropriate. *Id.* ("If by reason of the uncertainties of proper venue a mistake is made, ... 'the interest of justice' may require that the complaint not be dismissed but rather be transferred ...."); *see Coté v. Wadel,* 796 F.2d 981, 985 (7th Cir.1986) ("If [plaintiff's] mistake were one easy to commit, the penalty [of dismissal] might be so disproportionate to the wrong that it would have to be reversed...."). When the error is obvious, however, dismissal is appropriate. *Coté,* 796 F.2d at 985 (upholding district court's decision not to transfer case though limitations period had expired because filing suit in Wisconsin when neither the cause of action nor the defendants had any relationship with that state was an "elementary" mistake).

The Seventh Circuit's decision in *Saylor v. Dyniewski,* 836 F.2d 341 (7th Cir.1988) is illustrative. The plaintiffs in *Saylor* filed suit in this Court against Indiana residents to recover for injuries they sustained in a car accident that occurred in Indiana. *Id.* at 341. After determining that it lacked jurisdiction over the defendants, the district court dismissed the suit, rather than transferring it. *Id.* at 342. Plaintiffs appealed, arguing that the interest of justice mandated a transfer because the statute of limitations on their claim had expired. *Id.* at 345.

The Seventh Circuit disagreed. In the court's view, plaintiffs had committed an " 'elementary' " error

when they filed suit in Illinois rather than "fil[ing] a protective suit in a forum where personal jurisdiction was assured." *Id.* (quoting *Coté,* 796 F.2d at 985). Because plaintiffs had "gambled their case on an extremely dubious theory of personal jurisdiction," the fact that the limitations period had expired did not require a transfer. *Id.*

The court reached a similar conclusion in *Brown v. Grimm,* 624 F.2d 58 (7th Cir.1980) (per curiam). The plaintiff in that case filed a personal injury action in this Court against an Indiana resident arising out of an accident that occurred in Indiana. *Id.* at 59. Instead of transferring the case, the district court dismissed it for lack of personal jurisdiction, though the limitations period had run. *Id.*

*3 On appeal, the Seventh Circuit declined plaintiff's invitation to "hold that a transfer is all but required [when] ... refiling and adjudication on the merits is unavailable because of the running of the statute of limitations." *Id.* Because plaintiff had "asserted absolutely no basis for personal jurisdiction over [the defendant]" in his complaint and had "blatant[ly] disregard[ed] ... the elementary principles of *in personam* jurisdiction," the court upheld the dismissal. *Id.*

Vladoff, like the plaintiffs in *Saylor* and *Brown,* made an obvious and fundamental error when he filed this suit in Illinois rather than Indiana. Given the fact that the Chaplins are Indiana residents, who are not alleged to have any contact with Illinois, and Vladoff was injured at their Indiana home, Vladoff should have known that this Court could not exercise personal jurisdiction over them. Because his decision to file suit in Illinois rather than Indiana was wholly unreasonable, the Court will exercise its discretion to dismiss the case rather than transfer it.

Dismissal may seem harsh but, as our court of appeals has noted, "[t]he proper penalty for obvious mistakes that impose costs on opposing parties and on the judicial system is a heavy one." *Coté,* 796 F.2d at 985. "[P]laintiffs ... must determine where [they] can get personal jurisdiction over the defendant before, not after, the statute of limitations runs," *id.,* and if they fail to do so, we will not "subordinate the interests of future defendants and the courts in competent choices of venue to the interests of the present plaintiffs in escaping the costs of their counsel's mistakes." *Saylor,* 836 F.2d at 345.

*Conclusion*
For the reasons set forth above, defendants' motion

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to dismiss [doc. no. 3] is granted. This case is hereby terminated.

 SO ORDERED.

 Slip Copy, 2005 WL 1651172 (N.D.Ill.)

 **Motions, Pleadings and Filings (Back to top)**

• 2004 WL 2256495 (Trial Pleading) Complaint at Law (Sep. 08, 2004)

•                1:04cv05872               (Docket) (Sep. 08, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, J. Scott Humphrey, an attorney, do hereby certify that I have caused a true and correct copy of the foregoing Defendants' Reply Brief in Support of Their Motion to Dismiss to be served upon the following, by depositing a copy of same in the U.S. Mail, postage prepaid, on this 23rd day of August, 2005:

> Jack L. Haan
> James J. Eccleston
> Henry N. Novoselsky
> 20 North Wacker Drive – Suite 2900
> Chicago, IL 60606

J. Scott Humphrey

2