# EXHIBIT A

MOSAIC GROUP INC.,

CUSTOM OFFERS HOLDING COMPANY,

CUSTOM OFFERS ACQUISITION CORP.,

CUSTOM OFFERS LLC,

LAWRENCE P. ORGAN,

MICHAEL A. ORGAN

AND

THE OTHER EQUITY HOLDERS OF CUSTOM OFFERS LLC NAMED IN THE
SIGNATURE PAGES HERETO

# MERGER AGREEMENT

Dated as of January 21, 2002

# TABLE OF CONTENTS

ARTICLE I.  THE MERGER ................................................................................................... 2
1.1  The Merger ...................................................................................................................... 2
1.2  Effects of the Merger; Allocation Statement ................................................................. 2
1.3  Closing ............................................................................................................................ 2
ARTICLE II.  CONVERSION AND EXCHANGE OF MEMBERSHIP INTERESTS AND OPTION
INTERESTS ..................................................................................................................... 3
2.1  Initial Consideration ...................................................................................................... 3
2.2  Quick Closing Bonus ..................................................................................................... 3
2.3  Interim Contingent Consideration ................................................................................. 5
2.4  2002 Contingent Consideration ..................................................................................... 5
2.5  2003 Contingent Consideration ..................................................................................... 7
2.6  Maximum Consideration ................................................................................................ 9
2.7  Lockup ............................................................................................................................ 11
2.8  Changes in Capitalization .............................................................................................. 11
2.9  Escrow ............................................................................................................................ 12
2.10  Withholding Rights ...................................................................................................... 12
2.11  No Fractional Shares .................................................................................................... 13
2.12  Purchased Data ............................................................................................................. 13
ARTICLE III.  REPRESENTATIONS AND WARRANTIES OF CUSTOM OFFERS, LARRY ORGAN
AND MICHAEL ORGAN ................................................................................................. 14
3.1  Organization, Standing and Power; Subsidiaries .......................................................... 14
3.2  Capital Structure ............................................................................................................ 14
3.3  Authority ........................................................................................................................ 15
3.4  Compliance with Laws and Other Instruments; Non-Contravention ............................ 15
3.5  Technology and Intellectual Property Rights ................................................................. 16
3.6  Financial Statements; Business Information .................................................................. 17
3.7  Taxes .............................................................................................................................. 18
3.8  Absence of Certain Changes and Events ....................................................................... 20
3.9  Real Property .................................................................................................................. 22
3.10  Personal Property ......................................................................................................... 24
3.11  Certain Transactions .................................................................................................... 24
3.12  Litigation and Other Proceedings ............................................................................... 25
3.13  No Defaults ................................................................................................................... 25
3.14  Major Contracts ........................................................................................................... 25
3.15  Material Reductions ..................................................................................................... 26
3.16  Insurance and Banking Facilities ................................................................................ 27
3.17  Employees .................................................................................................................... 27
3.18  Employee Benefit Plans ............................................................................................... 27
3.19  Certain Agreements ...................................................................................................... 28
3.20  Guarantees and Suretyships ......................................................................................... 30
3.21  Brokers and Finders ..................................................................................................... 30
3.22  Certain Payments ......................................................................................................... 30
3.23  Environmental Matters ................................................................................................. 30
3.24  Enforceability of Contracts, etc. .................................................................................. 30
3.25  Disclosure ..................................................................................................................... 31
3.26  Customers; Effect of Transaction ................................................................................ 31
3.27  Toplander Corporation ................................................................................................. 32

3.28 Reliance. ....................................................................................................... 32

ARTICLE IV.  REPRESENTATIONS AND WARRANTIES OF THE EQUITY HOLDERS .................. 32

ARTICLE V.  REPRESENTATIONS AND WARRANTIES OF CANADIAN PARENT, OPCO AND
MERGER SUB ....................................................................................................... 34

5.1 Organization. ................................................................................................... 34
5.2 Authority ......................................................................................................... 35
5.4 Canadian Parent Shares .................................................................................. 36
5.5 Canadian Parent Reports and Financial Statements ........................................ 36
5.6 Brokers ............................................................................................................ 37
5.7 Cash Consideration .......................................................................................... 37
5.8 Interim Operations of Merger Sub ................................................................... 37
5.9 Shareholder Approval ..................................................................................... 37
5.10 Reporting Issuer ............................................................................................ 37

ARTICLE VI.  COVENANTS OF CUSTOM OFFERS AND THE EQUITY HOLDERS ..................... 37

6.1 Conduct of Business in Ordinary Course ......................................................... 37
6.2 Dividends, Issuance of, or Changes in Securities ........................................... 38
6.3 Governing Documents ..................................................................................... 39
6.4 No Acquisitions ............................................................................................... 39
6.5 No Dispositions ............................................................................................... 39
6.6 Indebtedness ................................................................................................... 39
6.7 Compensation .................................................................................................. 39
6.8 Claims .............................................................................................................. 39
6.9 Access to Properties and Records .................................................................... 40
6.10 Breach of Representations and Warranties. .................................................... 40
6.11 Consents. ........................................................................................................ 40
6.12 Equity Holders ............................................................................................... 40
6.13 Exclusivity; Acquisition Proposals ................................................................ 40
6.14 Notice of Events ............................................................................................ 41
6.15 Reasonable Best Efforts. ................................................................................ 41
6.16 Insurance ........................................................................................................ 41

ARTICLE VII.  COVENANTS OF CANADIAN PARENT, OPCO AND MERGER SUB ................ 41

7.1 Breach of Representations and Warranties ...................................................... 41
7.2 Consents. ......................................................................................................... 42
7.3 Reasonable Best Efforts ................................................................................... 42
7.4 Listing of Canadian Parent Shares .................................................................. 42

ARTICLE VIII.  ADDITIONAL AGREEMENTS ....................................................................... 42

8.1 Legal Conditions to the Merger. ...................................................................... 42
8.2 Employee Benefits ........................................................................................... 42
8.3 Expenses .......................................................................................................... 43
8.4 Tax Returns; Tax Cooperation ......................................................................... 43
8.5 Additional Agreements .................................................................................... 45
8.6 Public Announcements ..................................................................................... 45
8.7 Phantom Stock Plan ......................................................................................... 45
8.8 Management of the Custom Offers Business .................................................... 46
8.9 Non-Solicitation .............................................................................................. 47

ARTICLE IX.  CONDITIONS PRECEDENT ............................................................................ 49

9.1 Conditions to Each Party's Obligation to Effect the Merger ........................... 49
9.2 Conditions of Obligations of Canadian Parent, OpCo and Merger Sub .......... 49

9.3  Conditions of Obligation of Custom Offers. ................................................. 52

**ARTICLE X.  INDEMNIFICATION** ................................................................. 52

10.1  Canadian Parent Indemnification ................................................................. 52
10.2  Interest Holders Indemnification ................................................................. 53
10.3  Notification ........................................................................................ 54
10.4  Limitation of Indemnification ..................................................................... 55
10.5  Tax Contests ....................................................................................... 56
10.6  Minimum Losses of Mosaic Indemnified Party ..................................................... 56
10.7  Maximum Indemnification by Equity Holders ....................................................... 56
10.8  Minimum Losses of Equity Holder Indemnified Party ............................................... 57
10.9  Maximum Indemnification by Canadian Parent ...................................................... 57
10.10  Right to Set-Off .................................................................................. 57
10.11  Equity Holder Representative ...................................................................... 57
10.12  Binding Effect .................................................................................... 59

**ARTICLE XI.  TERMINATION** ..................................................................... 59

11.1  Mutual Agreement ................................................................................... 59
11.2  Termination by Canadian Parent .................................................................... 59
11.3  Termination by Custom Offers ...................................................................... 59
11.4  Outside Date ....................................................................................... 60
11.5  Effect of Termination ............................................................................. 60

**ARTICLE XII.  MISCELLANEOUS** .................................................................. 60

12.1  Entire Agreement ................................................................................... 60
12.2  Governing Law; Consent to Jurisdiction ............................................................ 60
12.3  Arbitration ........................................................................................ 61
12.4  Notices ............................................................................................ 62
12.5  Severability ....................................................................................... 63
12.6  Assignment ......................................................................................... 63
12.7  Counterparts ....................................................................................... 63
12.8  Amendment .......................................................................................... 63
12.9  Extension, Waiver. ................................................................................. 63
12.10  Interpretation ..................................................................................... 64
12.11  Other Remedies; Specific Performance .............................................................. 64
12.12  Currency ........................................................................................... 64

**EXHIBITS**

EXHIBIT 1.1        --    Certificates of Merger
EXHIBIT 1.2(b)     --    Allocation Statement
EXHIBIT 2.1(a)(1)  --    Accredited Investor Representation Letter
EXHIBIT 2.1(a)(2)  --    Allocation of Initial Consideration
EXHIBIT 2.1(c)(2)  --    Closing Custom Offers Payment Certificate
EXHIBIT 2.1(d)     --    Allocation of Retained Earnings
EXHIBIT 2.2        --    Allocation of Quick Closing Bonus
EXHIBIT 2.3(b)     --    Custom Offers Salary, Bonus and Other Compensation Market Levels
EXHIBIT 2.3(e)(1)  --    Allocation of Interim Contingent Consideration
EXHIBIT 2.4(f)     --    Allocation of 2002 Contingent Consideration
EXHIBIT 2.5(f)     --    Allocation of 2003 Contingent Consideration
EXHIBIT 2.7(a)     --    Management Lockup Agreement
EXHIBIT 2.7(b)     --    Employee Lockup Agreement
EXHIBIT 2.9(a)     --    Escrow Agreement

EXHIBIT 3.6        --    Financial Statements
EXHIBIT 9.2(e)     --    Form of Organ Employment Agreement
EXHIBIT 9.2(f)     --    Opinion of Levun, Goodman & Cohen
EXHIBIT 9.2(l)     --    Form of Non-Disclosure and Assignment of Developments Agreement
EXHIBIT 9.2(m)     --    Form of Non-Competition, Non-Disclosure and Assignment of Developments
                         Agreement
EXHIBIT 9.3(c)(1) --     Opinion of Testa, Hurwitz & Thibeault, LLP
EXHIBIT 9.2(c)(2) --     Opinion of Fraser Milner Casgrain LLP

GAJONES6012/1.2238973-3

MERGER AGREEMENT

MERGER AGREEMENT, dated as of January 21, 2002 (this "Agreement"), by and among Mosaic Group Inc., a corporation organized under the laws of the Province of Ontario ("Canadian Parent"); Custom Offers Holding Company, a Delaware corporation and an indirect, wholly-owned subsidiary of Canadian Parent ("OpCo"); Custom Offers Acquisition Corp., a Delaware corporation and a direct, wholly-owned subsidiary of OpCo ("Merger Sub"); Custom Offers LLC, an Illinois limited liability company ("Custom Offers"); Lawrence P. Organ, an individual resident in the State of Illinois and interest holder of Custom Offers ("Larry Organ"); Michael A. Organ, an individual resident in the State of Illinois and interest holder of Custom Offers ("Michael Organ"); the other undersigned interest holders of Custom Offers (collectively with Larry Organ and Michael Organ, the "Interest Holders"); and the undersigned option holders of Custom Offers (the "Option Holders", and collectively with the Interest Holders, the "Equity Holders"):

WHEREAS, the Interest Holders own 100% of the issued and outstanding membership interests ("Membership Interests") of Custom Offers and the Option Holders hold all of the issued and outstanding options to purchase membership interests ("Option Interests", and collectively with the Membership Interests, the "Equity Interests") of Custom Offers;

WHEREAS, the Board of Directors of each of Canadian Parent, OpCo and Merger Sub and the Manager of Custom Offers deems it advisable and in the best interests of their respective shareholders or Interest Holders to consummate the merger, on the terms and subject to the conditions set forth herein, of Merger Sub with and into Custom Offers in which Custom Offers would survive the merger and become a wholly-owned subsidiary of OpCo, all in accordance with the laws of the State of Delaware ("Delaware Law") and the State of Illinois ("Illinois Law") (the "Merger") and, in furtherance thereof, have approved the Merger and this Agreement;

WHEREAS, the Manager of Custom Offers has (a) determined that the consideration to be paid to the Equity Holders for their Membership Interests or Option Interests in Custom Offers in the Merger is fair to and in the best interests of such Equity Holders and (b) recommended to such Equity Holders that they approve the Merger and this Agreement;

WHEREAS, for United States ("U.S.") federal income tax purposes, it is intended that the Merger will be a taxable purchase by OpCo of all of the Equity Interests of Custom Offers (and a deemed purchase of the assets of Custom Offers) under the provisions of the Internal Revenue Code of 1986, as amended (the "Code"), and the rules and regulations promulgated thereunder;

WHEREAS, OpCo and Larry Organ will enter into an agreement (the "Organ Employment Agreement") pursuant to which Larry Organ will agree, among other things, to continue his employment with OpCo after the Effective Time, not to solicit employees or

customers of Canadian Parent or its affiliates and not to compete with the business of Canadian Parent or its affiliates; and

WHEREAS, Canadian Parent intends to merge Custom Offers with and into OpCo immediately after the Effective Time (as defined in Section 1.1).

NOW THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I

## THE MERGER

1.1    The Merger.  Subject to the terms and conditions hereof, and in accordance with Delaware Law and Illinois Law, Merger Sub will be merged with and into Custom Offers.  A Delaware Certificate of Merger and Illinois Articles of Merger substantially in the form(s) attached hereto as EXHIBIT 1.1 (the "Certificates of Merger") and any other documents required by Delaware Law and Illinois Law (collectively with the Certificates of Merger, the "Merger Documents") will be duly prepared, executed and acknowledged by Custom Offers and Merger Sub and thereafter delivered to the Secretary of State of the State of Delaware and the Secretary of State of the State of Illinois for filing in accordance with Delaware Law and Illinois Law contemporaneously with the Closing (as defined in Section 1.3).  The Merger will become effective at such time as the Merger Documents have been filed with and accepted by the Secretary of State of the State of Delaware and the Secretary of State of the State of Illinois (the "Effective Time").  Following the Merger, Custom Offers will continue as the surviving entity of the Merger (the "Surviving Entity") under the laws of the State of Illinois, and the separate corporate existence of Merger Sub will cease.

1.2    Effects of the Merger; Allocation Statement.

(a)    At and after the Effective Time, (i) the Merger will have all of the effects provided by the Certificates of Merger and applicable law, (ii) the directors of Merger Sub will be the managers of the Surviving Entity, to hold office in accordance with the operating agreement of the Surviving Entity, (iii) the officers of Custom Offers will be the operating officers of the Surviving Entity, to hold office in accordance with the operating agreement of the Surviving Entity and (iv) OpCo shall be the sole member of the Surviving Entity and shall hold all outstanding membership interests, ownership interests or other equity interests of the Surviving Entity, or rights to acquire the same.

(b)    OpCo, Custom Offers and the Equity Holders hereby agree to the allocation statement set forth on EXHIBIT 1.2(b) (the "Allocation Statement"), setting forth the value of the assets and liabilities of Custom Offers.  OpCo, Custom Offers and the Equity Holders agree to report an allocation of the Merger Consideration (as defined below) among such assets and liabilities in a manner entirely consistent with the Allocation Statement and agree to act in accordance therewith in the preparation and filing of all tax returns (including, as

- 2 -

applicable and without limitation, filing Form 8594 (if required) with their United States income tax return, as the case may be, for the taxable year that includes the date of the Closing and subsequent years) and in the course of any tax audit, tax review or tax litigation relating thereto. OpCo, Custom Offers and the Equity Holders agree to notify each other if any Tax authority proposes any adjustments relating to such returns.

1.3   Closing.  The closing of the Merger contemplated by this Agreement (the "Closing") will take place as soon as practicable (but no more than three (3) business days) after satisfaction or waiver of the last to be fulfilled of the conditions set forth in Article IX (the "Closing Date"), but in no event later than February 28, 2002 at the offices of Testa, Hurwitz & Thibeault, LLP in Boston, Massachusetts, unless another date or place is agreed to in writing by Canadian Parent and Custom Offers.  If all of the conditions set forth in Article IX hereof are determined to be satisfied (or duly waived) at the Closing, concurrently with the Closing the parties hereto will cause the Merger to be consummated by the filing of the Merger Documents with the Secretary of State of the State of Delaware and the Secretary of State of the State of Illinois. The Closing will be deemed to have concluded at the Effective Time.

## ARTICLE II

## CONVERSION AND EXCHANGE OF MEMBERSHIP INTERESTS AND OPTION INTERESTS

2.1   Initial Consideration.  At the Closing,

(a)   Subject to the provisions of Section 2.9, all of the Membership Interests and all of the Option Interests outstanding immediately prior to the Effective Time will automatically, by virtue of the Merger and without any action on the part of the holder thereof, be converted into:

(i)   an aggregate of $300,000 in cash (the "Initial Cash Consideration")

*plus*

(ii)   a maximum of the number of common shares, no par value per share, of Canadian Parent ("Canadian Parent Shares") that could be purchased with $5,700,000, valued for such purpose at a per share price determined in accordance with Section 2.1(b) and as adjusted in accordance with Section 2.1(c); provided, however, that the number of Canadian Parent Shares so determined shall be rounded down to the nearest whole number in the event that a fractional share or scrip would otherwise be issuable on such basis (the "Initial Share Consideration" and, collectively with the Initial Cash Consideration, the "Initial Consideration"); the Initial Share Consideration to be paid to the Equity Holders by Canadian Parent at the direction of OpCo and the Initial Cash Consideration to be paid to the Equity Holders directly by OpCo;

provided, however, that each Equity Holder shall have delivered to Canadian Parent an accredited investor representation letter in the form attached as EXHIBIT 2.1(a)(1) (the

-3-

"Accredited Investor Letter") representing that such Equity Holder is or is not an "accredited investor" within the meaning of Rule 501 under the Securities Act of 1933, as amended (the "Securities Act"). The Initial Cash Consideration and the Initial Share Consideration each shall be allocated among the Interest Holders and Option Holders based on the percentages set forth on EXHIBIT 2.1(a)(2).

(b)     The number of Canadian Parent Shares to be issued in respect of the Initial Share Consideration shall be determined by dividing the dollar value of the Initial Share Consideration by the weighted average trading price of the Canadian Parent Shares on the Toronto Stock Exchange (the "TSE") (converted into U.S. dollars based upon the noon spot rate reported by the Bank of Canada on the business day prior to the date of this Agreement) for the fifteen (15) consecutive trading days on the TSE immediately preceding the date of this Agreement (the "Initial Share Price").

(c)     The Initial Share Consideration shall be reduced by (A) the amount of term debt (including any unpaid interest) of Custom Offers outstanding on the Closing Date, *plus* (B) any costs and expenses relating to or incurred in connection with the Merger paid by Custom Offers and not the Equity Holders (collectively, the "Closing Custom Offers Payment"). Five (5) business days prior to the expected Closing Date, the chief financial officer of Custom Offers shall deliver to Canadian Parent a certificate setting forth the estimated Closing Custom Offers Payments in the form set forth on EXHIBIT 2.1(c) (the "Closing Custom Offers Payment Certificate"). The Closing Custom Offers Payment Certificate shall include all supporting details reasonably necessary for Canadian Parent to understand the calculation of amount of the Closing Custom Offers Payment and, in addition, the Closing Custom Offers Payment Certificate shall have attached to it a "payoff" letter from the lenders of Custom Offers' term debt as of the expected Closing Date. As of the date hereof, Closing Custom Offers Payment is estimated to be $110,000. If Canadian Parent does not agree with the amount of Closing Custom Offers Payment as shown on the Closing Custom Offers Payment Certificate, the parties shall work together in good faith to resolve the dispute and agree on the amount of Closing Custom Offers Payment by the day prior to the expected Closing Date. Any amount of term debt or Merger costs and expenses constituting Closing Custom Offers Payment (and not included in the Closing Custom Offers Payment amount as of the Closing) discovered by OpCo after the Closing Date and prior to the date of any payment of Retained Earnings (as defined below) to certain of the Equity Holders pursuant to Section 2.1(d) shall be deducted from and set-off against any such future payment[s] of Retained Earnings by OpCo to such Equity Holders.

(d)     Subject to the last sentence of Section 2.1(c) above and this Section 2.1(d), on the first business day of each of March, April, May, June, July and August 2002, OpCo shall pay to certain of the Equity Holders set forth on EXHIBIT 2.1(d) in six equal installments, in cash, an aggregate of $1,165,675 ("Retained Earnings") representing the amount, if any, of retained earnings of Custom Offers as of December 31, 2001 in excess of any distributions (the "Distributions") of contributed capital of Custom Offers to the Interest Holders prior to the Closing Date. The Retained Earnings shall be allocated among the such Equity Holders based on the percentages set forth on EXHIBIT 2.1(d). If prior to the date of any payment of Retained Earnings to the Equity Holders pursuant to this Section 2.1(d) Canadian Parent shall determine in

- 4 -

good faith that the Retained Earnings amount set forth in the first sentence of this Section 2.1(d) was in excess of the actual amount of retained earnings of Custom Offers (net of the Distributions) as of December 31, 2001 (such difference, the "Retained Earnings Shortfall"), Canadian Parent shall give written notice of the Retained Earnings Shortfall to the Equity Holder Representative and OpCo shall deduct from and set-off against any such future payment[s] of Retained Earnings to the Equity Holders the amount of the Retained Earnings Shortfall.

(e)    The Equity Holder Representative shall have a period of five (5) business days after determination of the Retained Earnings Shortfall to present in writing to Canadian Parent notice of any objections to the determination of such Retained Earnings Shortfall. If the Equity Holder Representative does not object to the determination of the Retained Earnings Shortfall within such five (5) business day period, it shall be final and binding on the parties hereto. If the Equity Holder Representative objects in writing to the determination of within the five (5) business day period, Canadian Parent and the Equity Holder Representative shall negotiate in good faith and use their best efforts to resolve such dispute. If the parties fail to agree within five (5) business days after the delivery of the notice, then the disputed items shall be resolved by Pricewaterhouse Coopers LLP or such other public accounting firm chosen by Canadian Parent and mutually acceptable to Canadian Parent and the Equity Holder Representative, other than the OpCo Accountants (the "Accounting Referee"). The Accounting Referee shall resolve the dispute within five (5) business days of having the disputed items referred to it. The determination of the Retained Earnings Shortfall as revised by the Accounting Referee shall be final and binding on the parties. The cost, fees and expenses of the Accounting Referee shall be shared equally by Canadian Parent and the Equity Holders.

2.2    Quick Closing Bonus. If this Agreement is executed by the parties on or prior to January 21, 2002, OpCo shall pay to the Equity Holders on the Closing Date, in addition to the Initial Consideration set forth in Section 2.1, an aggregate of $50,000 in cash (the "Quick Closing Bonus"). The Quick Closing Bonus shall be allocated among the Interest Holders and Option Holders based on the percentages set forth on EXHIBIT 2.2.

2.3    Interim Contingent Consideration.

(a)    If the Custom Offers business earns Trailing Twelve Month Adjusted PBT (as defined below) of at least $2,000,000 by December 31, 2002, OpCo shall cause Canadian Parent to pay to the Equity Holders an aggregate of $4,000,000 in cash or Canadian Parent Shares (the "Interim Contingent Consideration"). If Custom Offers has earned Trailing Twelve Month Adjusted PBT of at least $2,000,000 by the last day of the month immediately preceding the month in which the Closing takes place, the Interim Contingent Consideration shall be due and payable to the Equity Holders on the Closing Date. If OpCo earns Trailing Twelve Month Adjusted PBT of at least $2,000,000 by the last day of any month in calendar year 2002 after the Closing Date, the Interim Contingent Consideration shall be due and payable to the Equity Holders within 30 days of the last day of such month (the "Interim Contingent Consideration Payment Date"). If OpCo has not earned Trailing Twelve Month Adjusted PBT of at least $2,000,000 by December 31, 2002, the Interim Contingent Consideration shall be $0 and no payments of cash or Canadian Parent Shares shall be due the Equity Holders as Interim

Contingent Consideration.  If the Interim Contingent Consideration is not due and payable as of the Closing Date, then, as promptly as practicable following the last day of each month ending after the Closing Date during calendar year 2002, OpCo will deliver to the Equity Holder Representative (as defined in Section 10.11) a schedule (an "Adjusted PBT Schedule") calculating and setting forth the amount of Trailing Twelve Month Adjusted PBT of OpCo as of the last day of such month; provided, however, that once OpCo has earned Trailing Twelve Month Adjusted PBT of at least $2,000,000, OpCo shall no longer be obligated to prepare and deliver the Adjusted PBT Schedule to the Equity Holder Representative.

(b)    "Trailing Twelve Month Adjusted PBT" shall mean as of the last day of any month the aggregate amount of Adjusted PBT of the Custom Offers business for the prior twelve month period (or such shorter period beginning on the date of formation of Custom Offers as evidenced by the filing of the Articles of Organization of Custom Offers with the Secretary of State of the State of Illinois, the "LLC Formation Date") ending on the last day of such month (including the operations of Custom Offers prior to the Closing Date).  "Adjusted PBT" means profit before taxes, *minus* unusual and other one-time gains or capital gains other than gains that are generated in the ordinary course of the trade or business of Custom Offers and which are not likely to adversely affect the business, financial condition, properties, intellectual property rights, results of operations, assets or prospects of the Custom Offers business ("Ordinary Course Gains"), *minus* any future minority interest, *minus* any amounts required to adjust below market salaries, bonuses and other compensation of employees of Custom Offers or its successor, OpCo, to market levels (provided, however that the parties agree that the compensation levels set forth on EXHIBIT 2.3(b) are presently market levels), *plus* any interest expense, charges or other expenses payable to Canadian Parent or any of its affiliates resulting solely from tax structure of Canadian Parent or any of its affiliates, *plus* any interest, charges or other expenses (including goodwill and non-compete/non-solicit amortization) relating to or resulting from the Merger allocated to OpCo by Canadian Parent or any of its affiliates (other than audit fees and expenses allocated in accordance with the terms of this Agreement), *plus* any amounts deducted as compensation expense or charge arising out of and in connection with any payments of Merger Consideration to the Equity Holders pursuant to this Agreement.  Adjusted PBT shall be determined in accordance with Section 2.12 of this Agreement and U.S. generally accepted accounting principles ("U.S. GAAP") prudently applied and on a basis consistent with Canadian Parent's current accounting policies and practices.

(c)    The Equity Holder Representative shall have a period of five (5) business days after the delivery of any Adjusted PBT Schedule to present in writing to Canadian Parent notice of any objections the Equity Holder Representative may have to the determination of Trailing Twelve Month Adjusted PBT.  If the Equity Holder Representative does not object to the determination of such Trailing Twelve Month Adjusted PBT within such five (5) business day period, it shall be final and binding on the parties hereto.

(d)    If the Equity Holder Representative objects in writing to the determination of Trailing Twelve Month Adjusted PBT within the five (5) business day period, Canadian Parent and the Equity Holder Representative shall negotiate in good faith and use their best efforts to resolve such dispute.  If the parties fail to agree within five (5) business days after the

- 6 -

delivery of the notice, then the disputed items shall be resolved by the Accounting Referee. The Accounting Referee shall resolve the dispute within five (5) business days of having the disputed items referred to it. The determination of such Trailing Twelve Month Adjusted PBT as revised by the Accounting Referee shall be final and binding on the parties. The cost, fees and expenses of the Accounting Referee shall be shared equally by Canadian Parent and the Equity Holders.

(e)     Subject to the provisions of Section 2.10, the Interim Contingent Consideration shall be payable, in whole or in part, at the option of OpCo, in cash or Canadian Parent Shares. The Interim Contingent Consideration shall be allocated among the Interest Holders and the Option Holders based on the percentages set forth on EXHIBIT 2.3(e)(1). In addition, OpCo shall not be obligated to pay all or any portion of the Interim Contingent Consideration until each Interest Holder and Option Holder has delivered the Accredited Investor Letter described in Section 2.1(a).

(f)     If OpCo elects to pay or cause Canadian Parent to pay some or all of the Interim Contingent Consideration in Canadian Parent Shares and the Interim Contingent Consideration is due and payable as of the Closing Date or becomes due and payable 30 days following the last day of February 2002, then the number of Canadian Parent Shares to be issued in respect of such Interim Contingent Consideration shall be determined by dividing the dollar value of the Interim Contingent Consideration to be paid in Canadian Parent Shares by the Initial Share Price. If OpCo elects to pay or cause Canadian Parent to pay some or all of the Interim Contingent Consideration in Canadian Parent Shares and the Interim Contingent Consideration becomes due and payable 30 days following the last day of any month in calendar year beginning after the Closing Date, then the number of Canadian Parent Shares to be issued in respect of such Interim Contingent Consideration shall be determined by dividing the dollar value of the Interim Contingent Consideration to be paid in Canadian Parent Shares by the greater of (i) the weighted average trading price of the Canadian Parent Shares on the TSE (converted into U.S. dollars based upon the noon spot rate reported by the Bank of Canada on the business day immediately preceding the Interim Contingent Consideration Payment Date) for the fifteen (15) consecutive trading days on the TSE immediately preceding the Interim Contingent Consideration Payment Date and (ii) US$1.80 (the "Minimum Share Price").

2.4     2002 Contingent Consideration.

(a)     As promptly as practicable following December 31, 2002 but in any event prior to March 1, 2003, Canadian Parent will cause the public accounting firm of Ernst & Young LLP or such other public accounting firm appointed by Canadian Parent (the "OpCo Accountants") to conduct an audit and deliver an audit opinion on the consolidated balance sheet of OpCo as of December 31, 2002, and related income statement, cash flow statement and statement of stockholders' equity of OpCo for the year ended December 31, 2002 (the "Audited 2002 Financial Statements"). The cost of the audit shall be borne by OpCo. Canadian Parent will cause the audit opinion and report of the OpCo Accountants on the Audited 2002 Financial Statements and a determination of 2002 Adjusted PBT (as defined below) to be delivered to the Interest Holders. Canadian Parent shall prepare the Audited 2002 Financial Statements and such Audited 2002 Financial Statements shall fairly present, in all material respects, the financial

position of OpCo as of December 31, 2002 and shall be prepared in accordance with U.S. GAAP, applied on a consistent basis with Canadian Parent's current accounting policies and practices.

(b)    "2002 Adjusted PBT" means, for the twelve month period ending December 31, 2002, with respect to OpCo, profit before taxes, *minus* unusual and other one-time gains or capital gains other than Ordinary Course Gains, *minus* any future minority interest, *minus* any amounts required to adjust below market salaries, bonuses and other compensation of employees of Custom Offers to market levels (provided, however that the parties agree that the compensation levels set forth on EXHIBIT 2.3(b) are presently market levels), *plus* any interest expense, charges or other expenses payable to Canadian Parent or any of its affiliates resulting solely from tax structure of Canadian Parent or any of its affiliates, *plus* any interest, charges or other expenses (including goodwill and non-compete/non-solicit amortization) relating to or resulting from the Merger allocated to OpCo by Canadian Parent or any of its affiliates (other than audit fees and expenses allocated in accordance with the terms of this Agreement), *plus* any amounts deducted as compensation expense or charge arising out of and in connection with any payments of Merger Consideration to the Equity Holders pursuant to this Agreement, all as derived from the Audited 2002 Financial Statements. 2002 Adjusted PBT shall be determined in accordance with Section 2.12 of this Agreement and U.S. GAAP prudently applied and on a basis consistent with Canadian Parent's current accounting policies and practices.

(c)    The Equity Holder Representative shall have a period of ten (10) business days after the delivery of the Audited 2002 Financial Statements and the determination of 2002 Adjusted PBT to present in writing to Canadian Parent notice of any objections the Equity Holder Representative may have to the Audited 2002 Financial Statements or the determination of 2002 Adjusted PBT. If the Equity Holder Representative does not object to the Audited 2002 Financial Statements or the determination of 2002 Adjusted PBT within such ten (10) business day period, they shall be final and binding on the parties hereto.

(d)    If the Equity Holder Representative objects in writing to the Audited 2002 Financial Statements or the determination of 2002 Adjusted PBT within the ten (10) business day period, Canadian Parent and the Equity Holder Representative shall negotiate in good faith and use their best efforts to resolve such dispute. If the parties fail to agree within five (5) business days after the delivery of the notice, then the disputed items shall be resolved by the Accounting Referee. The Accounting Referee shall resolve the dispute within five (5) business days of having the disputed items referred to it. The Audited 2002 Financial Statements and the determination of 2002 Adjusted PBT as revised by the Accounting Referee shall be final and binding on the parties. The cost, fees and expenses of the Accounting Referee shall be shared equally by Canadian Parent and the Equity Holders.

(e)    Subject to the provisions of Section 2.6, on or before April 1, 2003 (the "2002 Contingent Consideration Payment Date"), OpCo shall pay or cause Canadian Parent to pay to the Equity Holders an amount equal to:

(i)    the result of (x) the aggregate of 5 times 2002 Adjusted PBT for amounts of 2002 Adjusted PBT up to $6,000,000, *plus* 2.5 times any 2002 Adjusted

- 8 -

PBT in excess of $6,000,000, *less* the Initial Consideration, *less* the Interim Contingent Consideration, if any, (such sum, the "2002 Base Amount") *multiplied by* (y) 80%, if the 2002 Base Amount is greater than 0; or

    (ii)    $0, if the 2002 Base Amount is less than or equal to 0 (such amount, the "2002 Contingent Consideration").

    (f)    Subject to the provisions of Section 2.10, the 2002 Contingent Consideration shall be payable at the option of OpCo in cash or Canadian Parent Shares; provided, however that at least 20% of the 2002 Contingent Consideration shall be payable in cash up to a maximum of $10,000,000. The 2002 Contingent Consideration shall be allocated among the Interest Holders and Option Holders based on the percentages set forth on EXHIBIT 2.4(f). In addition, OpCo shall not be obligated to pay all or any portion of the 2002 Contingent Consideration until each Equity Holder has delivered the Accredited Investor Letter described in Section 2.1(a).

    (g)    If OpCo elects to pay or cause Canadian Parent to pay any part of the 2002 Contingent Consideration in Canadian Parent Shares, then the number of Canadian Parent Shares to be issued in respect of such amount of 2002 Contingent Consideration shall be determined by dividing the dollar value of such amount of 2002 Contingent Consideration by the greater of (i) the weighted average trading price of the Canadian Parent Shares on the TSE (converted into U.S. dollars based upon the noon spot rate reported by the Bank of Canada on the business day immediately preceding the 2002 Contingent Consideration Payment Date) for the fifteen (15) consecutive trading days on the TSE immediately preceding the 2002 Contingent Consideration Payment Date and (ii) the Minimum Share Price.

2.5    2003 Contingent Consideration.

    (a)    As promptly as practicable following December 31, 2003 but in any event prior to March 1, 2004, Canadian Parent will cause the OpCo Accountants to conduct an audit and deliver an audit opinion on the consolidated balance sheet of OpCo as of December 31, 2003, and related income statement, cash flow statement and statement of stockholders' equity of OpCo for the year ended December 31, 2003 (the "Audited 2003 Financial Statements"). The cost of the audit shall be borne by OpCo. Canadian Parent will cause the audit opinion and report of the OpCo Accountants on the Audited 2003 Financial Statements and a determination of 2003 Adjusted PBT (as defined below) and 2002/2003 Average Adjusted PBT (as defined below) to be delivered to the Interest Holders. Canadian Parent shall prepare the Audited 2003 Financial Statements and such Audited 2003 Financial Statements shall fairly present, in all material respects, the financial position of OpCo as of December 31, 2003 and shall be prepared in accordance with U.S. GAAP, applied on a consistent basis with Canadian Parent's current accounting policies and practices.

    (b)    "2003 Adjusted PBT" means, for the twelve month period ending December 31, 2003, with respect to OpCo, profit before taxes, *minus* unusual and other one-time gains or capital gains other than Ordinary Course Gains, *minus* any future minority interest,

*minus* any amounts required to adjust below market salaries, bonuses and other compensation of employees of Custom Offers to market levels (provided, however that the parties agree that the compensation levels set forth on EXHIBIT 2.3(b) are presently market levels), *plus* any interest expense, charges or other expenses payable to Canadian Parent or any of its affiliates resulting solely from tax structure of Canadian Parent or any of its affiliates, *plus* any interest, charges or other expenses (including goodwill and non-compete/non-solicit amortization) relating to or resulting from the Merger allocated to OpCo by Canadian Parent or any of its affiliates (other than audit fees and expenses allocated in accordance with the terms of this Agreement), *plus* any amounts deducted as compensation expense or charge arising out of and in connection with any payments of Merger Consideration to the Equity Holders pursuant to this Agreement, all as derived from the Audited 2003 Financial Statements. "2002/2003 Average Adjusted PBT" means the sum of 2002 Adjusted PBT and 2003 Adjusted PBT *divided by* two. 2003 Adjusted PBT shall be determined in accordance with Section 2.12 of this Agreement and U.S. GAAP prudently applied and on a basis consistent with Canadian Parent's current accounting policies and practices.

(c)     The Equity Holder Representative shall have a period of ten (10) business days after the delivery of the Audited 2003 Financial Statements and the determination of 2003 Adjusted PBT and 2002/2003 Average Adjusted PBT to present in writing to Canadian Parent notice of any objections the Equity Holder Representative may have to the Audited 2003 Financial Statements or the determination of 2003 Adjusted PBT and 2002/2003 Average Adjusted PBT. If the Equity Holder Representative does not object to the Audited 2003 Financial Statements or the determination of 2003 Adjusted PBT and 2002/2003 Average Adjusted PBT within such ten (10) business day period, they shall be final and binding on the parties hereto.

(d)     If the Equity Holder Representative objects in writing to the Audited 2003 Financial Statements or the determination of 2003 Adjusted PBT and 2002/2003 Average Adjusted PBT within the ten (10) business day period, Canadian Parent and the Equity Holder Representative shall negotiate in good faith and use their best efforts to resolve such dispute. If the parties fail to agree within five (5) business days after the delivery of the notice, then the disputed items shall be resolved by the Accounting Referee. The Accounting Referee shall resolve the dispute within five (5) business days of having the disputed items referred to it. The Audited 2003 Financial Statements and the determination of 2003 Adjusted PBT and 2002/2003 Average Adjusted PBT as revised by the Accounting Referee shall be final and binding on the parties. The cost, fees and expenses of the Accounting Referee shall be shared equally by Canadian Parent and the Equity Holders.

(e)     Subject to the provisions of Section 2.6, on or before April 1, 2004 (the "2003 Contingent Consideration Payment Date"), OpCo shall pay or cause Canadian Parent to pay to the Equity Holders an amount equal to:

(i)     the aggregate of 5 times 2002/2003 Average Adjusted PBT for amounts of 2002/2003 Average Adjusted PBT up to $6,000,000, *plus* 2.5 times any 2002/2003 Average Adjusted PBT in excess of $6,000,000, *less* the Initial Consideration, *less* the

- 10 -

Interim Contingent Consideration, if any, *less* the 2002 Contingent Consideration, if any, (collectively, the "2003 Base Amount"), if the 2003 Base Amount is greater than 0; or

(ii)     $0, if the 2003 Base Amount is less than or equal to 0 (such amount, the "2003 Contingent Consideration" and, together with the Initial Consideration, the Quick Closing Bonus, if any, the Interim Contingent Consideration, if any, and the 2002 Contingent Consideration, if any, the "Merger Consideration").

(f)     Subject to the provisions of Section 2.10, the 2003 Contingent Consideration shall be payable at the option of OpCo in cash or Canadian Parent Shares; provided, however that at least 20% of the 2003 Contingent Consideration shall be payable in cash up to a maximum of $10,000,000 *minus* any cash paid as part of the 2002 Contingent Consideration. The 2003 Contingent Consideration shall be allocated among the Interest Holders and Option Holders based on the percentages set forth on EXHIBIT 2.5(f). In addition, OpCo shall not be obligated to pay all or any portion of the 2003 Contingent Consideration until each Equity Holder has delivered the Accredited Investor Letter described in Section 2.1(a).

(g)     If OpCo elects to pay or cause Canadian Parent to pay any part of the 2003 Contingent Consideration in Canadian Parent Shares, then the number of Canadian Parent Shares to be issued in respect of such amount of 2003 Contingent Consideration shall be determined by dividing the dollar value of such amount of 2003 Contingent Consideration by the greater of (i) the weighted average trading price of the Canadian Parent Shares on the TSE (converted into U.S. dollars based upon the noon spot rate reported by the Bank of Canada on the business day immediately preceding the 2003 Contingent Consideration Payment Date) for the fifteen (15) consecutive trading days on the TSE immediately preceding the 2003 Contingent Consideration Payment Date and (ii) the Minimum Share Price.

2.6     Maximum Consideration. Notwithstanding any other provision of this Agreement to the contrary, the aggregate amount of Merger Consideration to be paid to the Equity Holders shall not exceed $49,999,999.

2.7     Lockup. All Canadian Parent Shares issued to the Interest Holders and the Option Holders, as part of the Initial Share Consideration, Interim Contingent Consideration, 2002 Contingent Consideration or 2003 Contingent Consideration shall be subject to a 20-day contractual lockup period, beginning on the date of issuance (the "Lockup Period"). The lockup agreements implementing the lockup, substantially in the forms attached hereto as EXHIBIT 2.7(a) (the "Management Lockup Agreement"), to be executed by each Interest Holder and Option Holder entitled to a percentage of the 2002 Contingent Consideration or 2003 Contingent Consideration as set forth on EXHIBIT 2.4(f) and EXHIBIT 2.5(f) on each date of any issuance of Canadian Parent Shares to such Interest Holder or Option Holder, and EXHIBIT 2.7(b) (the "Employee Lockup Agreement"), to be executed by each Option Holder not executing the Management Lockup Agreement on each date of any issuance of Canadian Parent Shares to such Option Holder, will provide that, during the Lockup Period, each Equity Holder will not (i) offer to sell, contract to sell, transfer or otherwise dispose of, directly or indirectly, any Canadian Parent Shares, any options, rights or warrants to purchase any Canadian Parent Shares (including

any stock appreciation right, or similar right, or similar right with an exercise or conversion privilege at a price related to, or derived from, the market price of the Canadian Parent Shares) or any securities convertible into or exchangeable for Canadian Parent Shares owned directly by such Equity Holder or with respect to which such Equity Holder has the power of disposition (including, without limitation, Canadian Parent Shares which such Equity Holder may be deemed to beneficially own in accordance with the rules and regulations promulgated under the U.S. Securities Exchange Act of 1934, as amended); or (ii) engage in any hedging transactions with respect to the Canadian Parent Shares that may have an impact on the market price of Canadian Parent Shares; provided, however that, with respect to the Interest Holders and certain Option Holders, the Management Lockup Agreement will provide that the Lockup Period for subsection 2.7(ii) transactions shall extend to April 1, 2004. Stop transfer instructions will be entered with Canadian Parent's transfer agent against the transfer of Canadian Parent Shares issued or issuable to the Equity Holders and appropriate restrictive legends will be placed on the certificates representing the Canadian Parent Shares.

2.8    Changes in Capitalization.  In the event Canadian Parent changes (or establishes a record date for changing) the number of Canadian Parent Shares issued and outstanding after the Closing Date as a result of a stock split, stock dividend, recapitalization, subdivision, reclassification, combination, exchange of shares or similar transaction with respect to the outstanding Canadian Parent Shares or in the event Canadian Parent Shares are converted or exchanged as a result of any consolidation or merger to which Canadian Parent is a party (other than a merger in which Canadian Parent is the continuing corporation and which does not result in any reclassification of, or change in, outstanding Canadian Parent Shares), and the record date or the closing date, as the case may be, therefor shall be prior to the 2003 Contingent Consideration Payment Date, the Initial Share Price and the Minimum Share Price shall be appropriately adjusted to reflect such stock split, stock dividend, recapitalization, subdivision, reclassification, combination, exchange of shares or similar transaction or future issuances of Canadian Parent Shares as Merger Consideration shall be appropriately converted or exchanged to reflect such consolidation or merger.

2.9    Escrow.

(a)    On the Closing Date, $3,000,000 of Canadian Parent Shares comprising part of the Initial Share Consideration (the "Initial Escrow Shares") payable to the Interest Holders shall be deposited and held in escrow by State Street Bank and Trust Company (the "Escrow Agent") in accordance with the Escrow Agreement attached hereto as EXHIBIT 2.9(a) (the "Escrow Agreement").  On the Interim Contingent Consideration Payment Date or, if no Interim Contingent Consideration becomes due and payable pursuant to Section 2.3(a), on the 2002 Contingent Consideration Payment Date, $2,000,000 of Canadian Parent Shares comprising part of the Interim Contingent Consideration or 2002 Contingent Consideration, as the case may be, payable to the Equity Holders (the "Additional Escrow Shares" and, along with the Initial Escrow Shares, the "Escrow Shares") shall be deposited and held in escrow by the Escrow Agent in accordance with the Escrow Agreement to secure (i) payment of any liquidated damages owing and payable to OpCo or Canadian Parent by Larry Organ under the Organ Employment Agreement and (ii) any indemnification claims by any Mosaic Indemnified Party (as defined in

Section 10.2) resulting from or arising in connection with any breach of the representations and warranties set forth in Section 3.27 and Article IV(j) or any Toplander Claim (as defined in Section 10.2(b)(v)). The Escrow Shares shall be released on January 1, 2004 (the "Escrow Release Date") in accordance with the terms of the Escrow Agreement. The Initial Escrow Shares and the Additional Escrow Shares to be deposited and held in escrow pursuant to this Section 2.9(a) shall be deposited in escrow by the Interest Holders in proportion to the Membership Interests in Custom Offers held by each such Interest Holder as of the Closing Date.

(b)    If Canadian Parent fraudulently or gross negligently refuses to consent to the release any Escrow Shares to the Interest Holders upon the Escrow Release Date or seeks to have any Escrow Shares released from escrow and returned to Canadian Parent, Canadian Parent will pay the Interest Holders punitive damages in the amount of One Million Dollars ($1,000,000.00) (the "Punitive Damages Payment"). The Punitive Damages Payment shall be paid to the Interest Holders by Canadian Parent in cash in proportion to the amounts held in escrow by each of the Interest Holders.

(c)    The adoption of this Agreement by each of the Interest Holders will also constitute his approval of the terms and provisions of the Escrow Agreement, which is an integral term of the Merger.

2.10    Withholding Rights. Canadian Parent (or any of its affiliates) shall be entitled to deduct and withhold from the consideration otherwise payable to any Option Holder pursuant to this Agreement or as part of the transactions contemplated herein, and shall deduct and withhold from the consideration otherwise payable to the Option Holders, such amounts as may be required to be deducted and withheld with respect to the making of such payment under the Code, or under any provision of state, local or non-U.S. Tax law. To the extent that amounts are so withheld and paid over to the appropriate Tax authority, OpCo (or an affiliate, as appropriate) will be treated as though it paid to the Equity Holder an appropriate amount of the type of consideration otherwise payable pursuant to this Agreement.

2.11    No Fractional Shares. No certificates or scrip for fractional Canadian Parent Shares will be issued to any Equity Holder, no stock split or dividend will be paid in respect of any fractional share interest in Canadian Parent Shares, and no such fractional share interest will entitle the owner thereof to vote or to any rights of or as a shareholder of Canadian Parent. Any fractional Canadian Parent Share amounts payable to the Equity Holders as Merger Consideration pursuant to this Article II shall be rounded down to the nearest whole number.

2.12    Purchased Data. For purposes of the determination of Retained Earnings and Trailing Twelve Month Adjusted PBT, the parties agree that purchased data elements (as set forth in the Financial Statements defined in Section 3.6, "Purchased Data") shall be amortized over an 18 month period. For purposes of the determination of 2002 Adjusted PBT and 2003 Adjusted PBT, the parties agree that Purchased Data shall be amortized over an 18 month period subject to the review and approval of the OpCo Accountants; provided, however, in no event shall Purchased Data be amortized over any period less than 12 months.

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF CUSTOM OFFERS, LARRY ORGAN AND MICHAEL ORGAN

Except as set forth in the disclosure schedule of Custom Offers dated as of the date hereof and delivered herewith to Canadian Parent (the "Custom Offers Disclosure Schedule") which identifies the section and subsection to which each disclosure therein relates, Custom Offers, Larry Organ and Michael Organ, jointly and severally, represents and warrants to Canadian Parent, OpCo and Merger Sub as follows:

3.1    Organization, Standing and Power; Subsidiaries.

(a)    Custom Offers is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Illinois, has all requisite limited liability company powers and authority to own, lease and operate its properties and to carry on its businesses as now being conducted and as proposed to be conducted, and is duly qualified as a foreign limited liability company and in good standing to do business in each jurisdiction in which a failure to so qualify, individually or in the aggregate, would have a Material Adverse Effect.

(b)    As used in this Agreement, "Material Adverse Effect" with respect to any Person (as defined below) means any change, effect or circumstance that individually, or when taken together with all other such changes, effects or circumstances that have occurred prior to the date of determination of the Material Adverse Effect, is or could reasonably be expected to be materially adverse to the business, financial condition, properties, intellectual property rights, results of operations, assets or prospects of such Person. In this Agreement, "Person" means any natural person, corporation, partnership, limited liability company, joint venture or other entity.

(c)    Custom Offers has delivered to Canadian Parent complete and correct copies of the operating agreement, articles or certificate of incorporation, articles of organization, bylaws and/or other primary charter and organizational documents ("Charter Documents") of Custom Offers, in each case as amended to the date hereof and no action has been taken or authorized to amend any of such documents. The minute books, complete and correct copies of which have been delivered to Canadian Parent, contain correct and complete records of all material proceedings and actions taken at all meetings of, or effected by written consent of, the Interest Holders of Custom Offers and its Manager. Section 3.1 of the Custom Offers Disclosure Schedule contains a complete and correct list of the officers and managers of Custom Offers.

(d)    Custom Offers has never owned, nor does it currently own, directly or indirectly, any capital stock or other equity securities of any corporation or have direct or indirect equity or ownership interest in any partnership, limited liability company, joint venture or other entity.

- 14 -

3.2     Capital Structure.

(a)     Section 3.2 of the Custom Offers Disclosure Schedule sets forth all holders of Membership Interests, Option Interests or other equity, ownership or membership interests of Custom Offers and the number of and type of such interests owned.  Other than the Option Interests, Custom Offers does not have any options, warrants, calls, conversion rights, commitments, agreements, contracts, understandings, restrictions, arrangements or rights of any character to which Custom Offers is a party or by which Custom Offers may be bound obligating Custom Offers to issue, deliver or sell, or cause to be issued, delivered or sold, additional Membership Interests, Option Interests or other equity, ownership or membership interests of Custom Offers, or obligating Custom Offers to grant, extend, or enter into any such option, warrant, call, conversion right, conversion payment, commitment, agreement, contract, understanding, restriction, arrangement or right.

(b)     All outstanding Membership Interests are validly issued, fully paid, nonassessable and not subject to any preemptive rights or to any agreement to which Custom Offers is a party or by which Custom Offers may be bound.  Custom Offers does not have outstanding any bonds, debentures, notes or other indebtedness the holders of which (i) have the right to vote (or convertible or exercisable into securities having the right to vote) with holders of Membership Interests on any matter ("Custom Offers Voting Debt") or (ii) are or will become entitled to receive any payment as a result of the execution of this Agreement or the completion of the transactions contemplated hereby.

3.3     Authority.  The execution, delivery and performance of this Agreement and all other agreements contemplated hereby have been duly authorized by all necessary action of the Manager of Custom Offers, and if the Closing shall occur, shall have been duly authorized by all necessary action of the Equity Holders of Custom Offers.  Certified copies of the resolutions adopted by the Manager of Custom Offers and its Equity Holders approving this Agreement, all other agreements contemplated hereby, and the Merger have been or will be provided to Canadian Parent prior to the Closing.  Custom Offers has duly and validly executed and delivered this Agreement and has, or prior to Closing will have, duly and validly executed and delivered all other agreements contemplated hereby, and each of this Agreement and such other agreements constitutes a valid, binding and enforceable obligation of Custom Offers in accordance with its terms.

3.4     Compliance with Laws and Other Instruments; Non-Contravention.  Custom Offers holds, and at all times has held, all licenses, permits and authorizations from all Governmental Entities (as defined below) necessary for the lawful conduct of its business pursuant to all applicable statutes, laws, ordinances, rules and regulations of all such Governmental Entities having jurisdiction over it or any part of its operations, excepting, however, when such failure to hold (either individually or in the aggregate would not have a Material Adverse Effect.  There are no violations or claimed violations known by Custom Offers of any such license, permit or authorization or any such statute, law, ordinance, rule or regulation.  Neither the execution, delivery or performance of this Agreement and all other agreements contemplated hereby, nor the consummation of the Merger or any other transaction

- 15 -

described herein, does or will, after the giving of notice, or the lapse of time, or otherwise, conflict with, result in a breach of, or constitute a default under, the Charter Documents of Custom Offers or any federal, foreign, state or local court or administrative order or process, statute, law, ordinance, rule or regulation, or any contract, agreement or commitment to which Custom Offers is a party, or under which Custom Offers is obligated, or by which Custom Offers or any of the rights, properties or assets of Custom Offers are subject or bound; result in the creation of any security interest, lien, charge, restriction, claim, encumbrance or assessment of any nature whatsover ("Lien") upon, or otherwise adversely affect, any of the rights, properties or assets of Custom Offers; terminate, amend or modify, or give any party the right to terminate, amend, modify, abandon or refuse to perform or comply with, any contract, agreement or commitment to which Custom Offers is a party, or under which Custom Offers is obligated, or by which Custom Offers or any of the rights, properties or assets of Custom Offers are subject or bound; or accelerate, postpone or modify, or give any party the right to accelerate, postpone or modify, the time within which, or the terms and conditions under which, any liabilities, duties or obligations are to be satisfied or performed, or any rights or benefits are to be received, under any contract, agreement or commitment to which Custom Offers is a party, or under which Custom Offers may be obligated, or by which Custom Offers or any of the rights, properties or assets of Custom Offers are subject or bound. Section 3.4 of the Custom Offers Disclosure Schedule sets forth each agreement, contract or other instrument binding upon Custom Offers requiring a notice or consent (by its terms or as a result of any conflict or other contravention required to be disclosed in the Custom Offers Disclosure Schedule pursuant to the preceding provisions of this Section 3.4) as a result of the execution, delivery or performance of this Agreement and all other agreements contemplated hereby or the consummation of the Merger or any other transaction described herein (each such notice or consent, a "Consent"). No consent, approval, order, or authorization of or registration, declaration, or filing with or exemption (also a "Consent") by, any court, administrative agency or commission or other governmental authority or instrumentality, whether domestic or foreign (each a "Governmental Entity") is required by or with respect to Custom Offers in connection with the execution, delivery or performance of this Agreement and all other agreements contemplated hereby or the consummation of the Merger or any other transaction described herein, except for such filings as may be required to comply with federal, state or Canadian securities laws.

3.5    Technology and Intellectual Property Rights.

(a)    Custom Offers owns, free and clear of any Liens, or is licensed or otherwise possesses legally enforceable rights to use all patents, trademarks, trade names, service marks, domain names, database rights, supplier lists, customer lists, copyrights, and any applications therefor, maskworks, net lists, schematics, technology, know-how, trade secrets, inventory, ideas, algorithms, processes, computer software programs or applications (in both source code and object code form), and tangible or intangible proprietary information or material ("Intellectual Property") that are used in the business of Custom Offers as currently conducted or as planned to be conducted ("Custom Offers Intellectual Property"). Custom Offers has not (i) licensed any of the Custom Offers Intellectual Property in source code form to any party or (ii) entered into any exclusive agreements relating to or granted any joint ownership rights with respect to the Custom Offers Intellectual Property. Custom Offers is not obligated to pay to any third party any

royalties or other continuing payment obligations in respect of Third Party Intellectual Property Rights (as defined below).   Custom Offers Intellectual Property contains no "open source" components.

(b)    Section 3.5(b)(1) of the Custom Offers Disclosure Schedule lists all patents and patent applications and all registered and unregistered trademarks, trade names and service marks, registered copyrights and maskworks owned by Custom Offers, including the jurisdictions in which each such Custom Offers Intellectual Property right has been issued or registered or in which any application for such issuance and registration has been filed. Section 3.5(b)(2) of the Custom Offers Disclosure Schedule lists all material licenses, sublicenses and other agreements as to which Custom Offers is a party and pursuant to which any person other than Custom Offers is authorized to use any Custom Offers Intellectual Property. Section 3.5(b)(3) of the Custom Offers Disclosure Schedule lists all licenses, sublicenses and other agreements as to which Custom Offers is a party and pursuant to which Custom Offers is authorized to use any third party patents, trademarks or copyrights, including software ("Third Party Intellectual Property Rights") which are incorporated in, are, or form a part of any product material to Custom Offers' business, other than commercially available, off-the-shelf software.

(c)    Without limiting the generality of this Section 3.5: (i) Section 3.5(c) of the Custom Offers Disclosure Schedule lists all of the domain names of Custom Offers' sites (collectively, the "Websites") on the World Wide Web, all of which have been duly registered with all required authorities (the "Domain Names"), and Custom Offers is the sole and exclusive owner of and possesses all rights necessary to use the Domain Names; (ii) Custom Offers has the sole and exclusive right to operate the Websites and to use, market, develop, sell, license, display, distribute, publish and transmit all information, content, software and other materials available at the Websites; (iii) none of the Websites, Custom Offers' operation thereof, the Domain Names or any of the information, content, software or other materials available at any Website infringes upon, violates or constitutes a misappropriation of any intellectual property or other right of any other person or entity or of any applicable law or regulation; (iv) no other person has any interest in, or right or claim to, any Website or any part thereof; and (v) Custom Offers has duly registered with all required authorities the Domain Names, and is the sole and exclusive owner of and possesses all rights necessary to use the Domain Names.

(d)    To the knowledge of Custom Offers, there is no unauthorized use, disclosure, infringement or misappropriation of any Custom Offers Intellectual Property, or any Third Party Intellectual Property Right to the extent licensed by or through Custom Offers, by any third party, including any employee or former employee of Custom Offers.  Custom Offers has not entered into any agreement to indemnify any other person against any charge of infringement of any Custom Offers Intellectual Property, other than indemnification provisions contained in purchase orders, distribution agreements, supplier contracts, customer contracts, license agreements and sublicense agreements arising in the Ordinary Course of Business.

(e)    Custom Offers is not, and will not be, as a result of the execution and delivery of this Agreement or the performance of its obligations under this Agreement, in breach of any

- 17 -

GAJONES6012/1.2238973-3

license, sublicense or other agreement relating to the Custom Offers Intellectual Property or Third Party Intellectual Property Rights.

(f)    All patents, trademarks, service marks and copyrights held by Custom Offers are valid and subsisting. Custom Offers (i) has not been sued in any suit, action or proceeding, or received any notice or, to Custom Offers' knowledge, threat, which involves a claim of infringement of any patents, trademarks, service marks, copyrights or violation of any trade secret or other intellectual property right of any third party and (ii) has not brought any action, suit or proceeding for infringement of Custom Offers Intellectual Property or breach of any license or agreement involving Custom Offers Intellectual Property against any third party. The manufacture, marketing, licensing or sale of Custom Offers' products does not infringe any patent, trademark, service mark, copyright, trade secret or other intellectual property right of any third party.

(g)    Custom Offers has secured from all consultants and employees who contributed to the creation or development of Custom Offers Intellectual Property valid written assignments of the rights to such contributions.

(h)    Custom Offers has taken reasonable measures consistent with industry practice to protect and preserve the confidentiality of all non-public Custom Offers Intellectual Property ("Confidential Information"). All authorized use, disclosure or appropriation of Confidential Information owned by Custom Offers by or to a third party has been pursuant to the terms of a written agreement between Custom Offers and such third party. All use, disclosure or appropriation of Confidential Information not owned by Custom Offers has been pursuant to the terms of a written agreement between Custom Offers and the owner of such Confidential Information, or is otherwise lawful.

3.6    Financial Statements; Business Information.

(a)    Custom Offers has delivered to Canadian Parent an unaudited balance sheet (the "Balance Sheet") as of December 31, 2001 (the "Balance Sheet Date") and unaudited statement of income and cash flows for the period beginning on the LLC Formation Date and ending on December 31, 2001 (such balance sheet and statements of income and cash flows are collectively referred to as the "Financial Statements" and are attached hereto as EXHIBIT 3.6). The Financial Statements: (i) are in accordance with the books and records of Custom Offers; (ii) present fairly, in all material respects, the financial position of Custom Offers as of the date indicated and the results of its operations and cash flows for such period; and (iii) have been prepared in accordance with U.S. GAAP consistently applied (subject to the absence of footnote disclosure and to year-end adjustments, which will not be material either individually or in the aggregate, and except as described in the Section 3.6 of the Custom Offers Disclosure Schedule). As of the Balance Sheet Date, there were no material liabilities, claims or obligations of any nature, whether accrued, absolute, contingent, anticipated or otherwise, whether due or to become due, that are not shown or provided for either in the Balance Sheet or Section 3.6 of the Custom Offers Disclosure Schedule, and since the Balance Sheet Date, Custom Offers has incurred no liabilities, claims or obligations of any nature, whether accrued, absolute, contingent,

GAJONES6012/1.2238973-3