anticipated or otherwise and except for liabilities incurred by Custom Offers in connection with the preparation and execution of this Agreement and the consummation of the transactions contemplated herein. There is no basis for any assertion against Custom Offers of any material liability, claim or obligation of any nature that is not fully reflected or adequately reserved against in the Balance Sheet or Section 3.6 of the Custom Offers Disclosure Schedule.

    (b)    All of the accounts, notes and other receivables which are reflected in the Balance Sheet were acquired in the Ordinary Course of Business; and, except to the extent reserved against in the Balance Sheet, all of the accounts, notes and other receivables which are reflected therein have been collected in full, or are good and collectible, in the Ordinary Course of Business; and all of the accounts, notes and other receivables which have been acquired by Custom Offers since the Balance Sheet Date were acquired in the Ordinary Course of Business and have been collected in full, or are good and collectible, subject to an appropriate reserve determined in a manner consistent with past practices of Custom Offers, in the Ordinary Course of Business. No accounts, notes or other receivables are contingent upon the performance by Custom Offers of any obligation or contract. No Person has any Lien on any of such receivables and no agreement for deduction or discount has been made with respect thereto.

    (c)    The business information previously prepared by Custom Offers and delivered to Canadian Parent was prepared in good faith, based on assumptions Custom Offers deems reasonable. Custom Offers has no knowledge of any fact or information that would lead it to believe that the business information and related assumptions are incorrect or misleading in any material respect.

    (d)    Except as set forth or reflected on the Financial Statements (or specifically described in the notes thereto), Custom Offers has no material liabilities or obligations of any nature (whether accrued, absolute, contingent, unasserted or otherwise) except for liabilities and obligations incurred since the date of the Balance Sheet in the Ordinary Course of Business.

3.7    Taxes.

    (a)    The term "Taxes" as used herein means all federal, state, local and non-U.S. income, alternative or add-on minimum, estimated, gross income, gross receipts, sales, use, ad valorem, value-added, transfer, franchise, capital profits, lease, service, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental and windfall profit taxes, customs duties and other taxes, governmental fees and other like assessments and charges of any kind whatsoever (including any liability for Taxes of another Person imposed by reason of transferee or successor liability, by contract, or otherwise), together with all interest, penalties, additions to tax and additional amounts with respect thereto, and the term "Tax" means any one of the foregoing Taxes. The term "Tax Returns" as used herein means all returns, declarations, reports, claims for refund, information statements and other documents relating to Taxes, including all schedules and attachments thereto, and including all amendments thereof, and the term "Tax Return" means any one of the foregoing Tax Returns.

    (b)    Custom Offers has timely filed all Tax Returns required to be filed on or before the date hereof and will timely file all Tax Returns required to be filed for periods ending

on or before the Closing Date. Custom Offers has timely paid all Taxes due and payable and will timely pay all Taxes which become due for periods ending on or before the Closing Date (whether or not shown or required to be shown on such Tax Returns), including, without limitation, all Taxes which Custom Offers is obligated to collect or withhold from or with respect to amounts or items paid or furnished (or to be paid or furnished) to employees, independent contractors, Interest Holders, Option Holders, creditors and other parties. Each of the Interest Holders has timely paid and will timely pay all of his Taxes that relate to the income, assets, or business of Custom Offers. All Tax Returns filed by Custom Offers were and will be complete and correct in all respects, and such Tax Returns correctly reflect the facts regarding the income, business, assets, operations, activities, status and other matters of Custom Offers and any other information required to be shown thereon. None of the Tax Returns filed or Taxes payable by Custom Offers (or by the Interest Holders as they relate to the income, assets, or business of Custom Offers) has been the subject of an audit, action, suit, proceeding, claim, examination, deficiency or assessment by any Governmental Entity, and no such audit, action, suit, proceeding, claim, examination, deficiency or assessment is currently pending or, to the knowledge of Custom Offers or the Interest Holders, threatened. Custom Offers does not have any liability for the Taxes of any Person (other than Custom Offers) as a transferee or successor, or by contract, or otherwise. Custom Offers is not the beneficiary of any extension of time within which to file any Tax Return, and Custom Offers has not waived any statute of limitation with respect to any Tax or agreed to any extension of time with respect to a Tax assessment or deficiency. All material elections with respect to Taxes affecting Custom Offers, as of the date hereof, are set forth in the Financial Statements or in Section 3.7 of the Custom Offers Disclosure Schedule. None of the Tax Returns filed by Custom Offers contains a disclosure statement under former Section 6661 of the Code or Section 6662 of the Code (or any similar provision of state, local or foreign Tax law). Custom Offers is not a party to any Tax sharing agreement or similar arrangement (including but not limited to, an indemnification agreement or arrangement). None of Canadian Parent, OpCo or Merger Sub shall (i) be or become liable for any Taxes of Custom Offers, any affiliate of Custom Offers, any Equity Holder of Custom Offers, any affiliate of an Equity Holder or any predecessor-in-interest of Custom Offers by reason of transferee or successor liability or otherwise (except for Taxes of Custom Offers attributable entirely to periods (or partial periods) beginning after the Closing Date); or (ii) incur any withholding Tax liability by reason of this Agreement or the transactions contemplated hereby.

      (c)     Custom Offers has not agreed to make any adjustment under Section 481(a) of the Code (or any corresponding provision of state, local or foreign law) by reason of a change in accounting method or otherwise, and Custom Offers will not be required to make any such adjustment as a result of the transactions contemplated by this Agreement. Custom Offers has not had a permanent establishment in any non-U.S. jurisdiction, as defined in any applicable Tax treaty or convention between the United States and such non-U.S. jurisdiction. No portion of the Merger Consideration is subject to the Tax withholding provisions of Section 3406 of the Code, or of Subchapter A of Chapter 3 of the Code or of any other provision of law. No claim has ever been made by any Governmental Entity in a jurisdiction where Custom Offers does not file Tax Returns that it is or may be subject to Tax in that jurisdiction. Except as disclosed in Section 3.7 of the Custom Offers Disclosure Schedule, none of the outstanding Equity Interests of Custom Offers is subject to a "substantial risk of forfeiture"

within the meaning of Section 83 of the Code. With respect to those individuals having an Equity Interest of Custom Offers that is subject to a "substantial risk of forfeiture" within the meaning of Section 83(b) of the Code, (i) such individuals have filed elections pursuant to Section 83(b) of the Code, copies of which have been provided to Canadian Parent and its counsel, (ii) such individuals are properly classified as partners of Custom Offers for U.S. federal income tax purposes and (iii) such individuals (other than Michael Organ) provided services to Custom Offers solely as independent contractors and are not nor have they ever been employees of Custom Offers.

(d)     There are no liens for Taxes (other than for ad valorem Taxes not yet due and payable) upon the assets of Custom Offers. The unpaid Taxes of Custom Offers (whether or not yet payable) attributable to any period (or partial period) ending on or before the Closing Date did not, as of the Balance Sheet Date, exceed the reserve for actual Taxes (as opposed to any reserve for deferred Taxes established to reflect timing differences between book and Tax income) as shown on the Balance Sheet, and will not exceed such reserve as adjusted for the passage of time through the Closing Date in accordance with the reasonable past custom and practice of Custom Offers in filing its Tax returns. Custom Offers will not incur and has not incurred any liability for Taxes from the Balance Sheet Date through the Closing Date other than in the ordinary course of business and consistent with reasonable past practice. Custom Offers is not a party to any joint venture, partnership, limited liability company or other arrangement or contract which could be treated as a partnership for U.S. federal income tax purposes.

(e)     None of the interest in Custom Offers or assets held by Custom Offers constitutes or has constituted a "United States real property interest" within the meaning of Section 897(c) of the Code. Custom Offers does not own any interest in real property. Custom Offers will not be required to include in a taxable period (or partial period) beginning on or after the Closing Date taxable income attributable to income that accrued in a prior taxable period that was not recognized in any prior taxable period as a result of the installment method of accounting, the completed contract method of accounting, the long-term contract method of accounting, the cash method of accounting or Section 481 of the Code or any comparable provision of any other Tax law or for any other reason. Custom Offers does not own, directly or indirectly, any interests in an entity that has been or would be treated as a "passive foreign investment company" within the meaning of Section 1297 of the Code. Section 3.7 of the Custom Offers Disclosure Schedule sets forth each state, local, or non-U.S. jurisdiction in which Custom Offers (i) files, is required, or has been required to file a Tax Return relating to non-U.S., state, or local Taxes or (ii) is or has been liable for any Taxes on a "nexus" or similar basis at any time.

(f)     Custom Offers is and has been classified as a partnership since the LLC Formation Date for Tax purposes and has never made any elections, by Internal Revenue Service Form 8832 or otherwise, to be treated as a corporation for Tax purposes.

3.8     Absence of Certain Changes and Events. Since the LLC Formation Date, Custom Offers' business has been conducted in the Ordinary Course of Business and there has not been:

- 21 -

(a)    Any event, occurrence, development or state of circumstances or facts (or combination thereof) that has or could reasonably be expected to have a Material Adverse Effect;

(b)    Any transaction involving $10,000 or more entered into by Custom Offers other than in the ordinary course of business and consistent with past practice ("Ordinary Course of Business");

(c)    Any loss of or damage to any of the properties of Custom Offers due to fire or other casualty or other loss, whether or not insured, amounting to more than $10,000 in the aggregate;

(d)    Any declaration, setting aside or payment of any dividend or other distribution (whether in cash, stock or property) with respect to any Membership Interests or Option Interests in Custom Offers, or any purchase, repurchase, redemption, retirement or other acquisition by Custom Offers of any Membership Interest, Option Interests or other securities of, or other equity or ownership interests in, Custom Offers;

(e)    Any discharge or satisfaction of any Lien or payment or satisfaction of any obligation or liability (whether absolute, accrued, contingent or otherwise and whether due or to become due) other than current liabilities shown on the Balance Sheet and current liabilities incurred since the Balance Sheet Date in the Ordinary Course of Business;

(f)    Any change in the Charter Documents of Custom Offers or any amendment of any term of any outstanding security of Custom Offers;

(g)    Any incurrence, assumption or guarantee by Custom Offers of any indebtedness for borrowed money other than in the Ordinary Course of Business.

(h)    Any creation or assumption by Custom Offers of any Lien on any asset;

(i)    Any making of any loan, advance or capital contributions to, or investment in, any Person;

(j)    Any sale, lease, pledge, transfer or other disposition of any material capital asset;

(k)    Any material transaction or commitment made, or any material contract or agreement entered into, by Custom Offers relating to its assets or business (including the acquisition or disposition of any assets) or any relinquishment by Custom Offers of any contract or other right, including but not limited to any Custom Offers Intellectual Property Right;

(l)    Any (A) grant of or increase in any severance or termination pay to any director, manager or employee of Custom Offers, (B) entering into of any employment, severance, management, consulting, deferred compensation or other similar agreement (or any amendment to any such existing agreement) with any manager, officer or employee of Custom Offers, (C) change in benefits payable under existing severance or termination pay policies or

employment, severance, management, consulting or other similar agreements, (D) change in compensation, bonus or other benefits payable to managers, officers or employees of Custom Offers or (E) change in the payment or accrual policy with respect to any of the foregoing;

(m)     Any labor dispute or any activity or proceeding by a labor union or representative thereof to organize any employees of Custom Offers, or any lockouts, strikes, slowdowns, work stoppages or threats thereof by or with respect to any employees of Custom Offers;

(n)     Any notes or accounts receivable or portions thereof written off by Custom Offers as uncollectible in an aggregate amount exceeding $10,000.

(o)     Any split, combination or reclassification of any of Custom Offers' Membership Interests, Option Interests or other equity, ownership or membership interests, or any issuance, authorization of any issuance or sale of any Membership Interests, Option Interests or other equity, ownership or membership interests, stock, bonds, phantom stock interest or other securities of which Custom Offers is the issuer, or the grant, issuance or change of any units, stock options, warrants, or other rights to purchase securities of Custom Offers or phantom stock interests in Custom Offers;

(p)     Any cancellation of any debts or claims or waiver of any rights of substantial value in an aggregate amount exceeding $10,000;

(q)     Any sale, assignment or transfer of any Custom Offers Intellectual Property or other similar assets, including licenses therefor;

(r)     Any capital expenditures, or commitment to make any capital expenditures, for additions to property, plant or equipment in an aggregate amount exceeding $10,000;

(s)     Payment of any amounts to, or liability incurred to or in respect of, or sale of any properties or assets (real, personal or mixed, tangible or intangible) to, or any transaction or any agreement or arrangement with, any corporation or business in which Custom Offers or any of its officers or managers, or any "affiliate" or "associate" (as such terms are defined in the rules and regulations promulgated under the Securities Act) of any such Person, has any direct or indirect ownership interests;

(t)     Any change in accounting methods, principles or practices by Custom Offers, except insofar as may have been required by a change in U.S. GAAP;

(u)     The making of any Tax election that, individually or in the aggregate, could reasonably be expected to materially affect the Tax liabilities or Tax attributes of Custom Offers, or the entering into of any settlement or compromise with respect to any Tax liability; or

(v)     Any agreement undertaking or commitment to do any of the foregoing.

3.9    Real Property.  All real property leases, subleases and occupancy agreements as to which Custom Offers is a party and any amendments or modifications thereof (i) are listed in Section 3.9 of the Custom Offers Disclosure Schedule (each a "Lease" and collectively, the "Leases"), and (ii) are valid, in full force and effect and enforceable, and there are no existing defaults on the part of Custom Offers.  Custom Offers has not received or given notice of default or claimed default with respect to any Lease, nor is there any event that with notice or lapse of time, or both, would constitute a default on the part of Custom Offers or any landlord thereunder. In addition, copies of any non-disturbance agreements which relate to any of the Leases are listed in Section 3.9 of the Custom Offers Disclosure Schedule.  All rent and other sums and charges payable by Custom Offers under each Lease have been paid through the date hereof and shall be paid by Custom Offers through the Closing.  The premises demised under each of the Leases and the improvements, equipment and fixtures therein are in good operating condition and repair.  To the knowledge of Custom Offers, the premises demised under each of the Leases (i) is in compliance with all applicable laws, (ii) is not subject to any official complaint or notice of violation of any applicable zoning ordinance or building code, (iii) is not subject to any use or occupancy restriction, and (iv) is not subject to and pending or threatened condemnation proceeding.  Custom Offers does not own, or have options to purchase, any real property.

3.10    Personal Property.  Custom Offers has good and marketable title, free and clear of all title defects and Liens (including, without limitation, leases, chattel mortgages, conditional sale contracts, purchase money security interests, collateral security arrangements and other title or interest-retaining agreements) to all inventory, receivables, furniture, machinery, equipment and other personal property, tangible or otherwise, reflected on the Balance Sheet or used in Custom Offers' business, except for acquisitions and dispositions since the Balance Sheet Date in the Ordinary Course of Business.  Section 3.10 of the Custom Offers Disclosure Schedule lists (i) all computer equipment and (ii) all other personal property, in each case having a depreciated book value of $10,000 or more, which are used by Custom Offers in the conduct of its business, and all such equipment and property, in the aggregate, is in good operating condition and repair, reasonable wear and tear excepted.  There is no asset used or required by Custom Offers in the conduct of its business as presently operated which is not either owned by it or licensed or leased to it.

3.11    Certain Transactions.  Except for (a) relationships with Custom Offers as an officer, manager, or employee thereof (and compensation by Custom Offers in consideration of such services) and (b) relationships with Custom Offers as Interest Holders therein, none of the manager, officers, Interest Holders of Custom Offers, or any member of any of their families, or any corporation, partnership, limited liability company, joint venture or other entity whatsoever in which they hold an interest, is presently a party to, or was a party to during the year preceding the date of this Agreement, any transaction, or series of similar transactions, with Custom Offers, including, without limitation, any contract, agreement, or other arrangement (i) providing for the furnishing of services to or by, (ii) providing for rental of real or personal property to or from, or (iii) otherwise requiring payments to or from, any such Person or any other Person in which any such Person has or had a 5%-or-more interest (as a stockholder, member, partner, beneficiary, or otherwise) or is or was a manager, director, officer, member, employee, or trustee.  None of Custom Offers' officers or managers has any interest in any property, real or personal, tangible or

intangible, including inventions, copyrights, trademarks, or trade names, used in or pertaining to the business of Custom Offers, or any supplier, distributor, or customer of Custom Offers, except for the normal rights of a member, and except for rights under existing employee benefit plans.

3.12    Litigation and Other Proceedings. There is no action, suit, claim, investigation or proceeding (or any basis therefor known to Custom Offers) pending against or, to the knowledge of Custom Offers, threatened against Custom Offers or its properties and assets before any court or arbitrator or any Governmental Entity. Except as set forth on Section 3.12 of the Custom Offers Disclosure Schedule, there is no litigation pending or, to the knowledge of Custom Offers, threatened against any officer or manager or employee relating to Custom Offers or its business. Neither Custom Offers nor any officer or manager of Custom Offers is subject to any order, writ, judgment, decree, or injunction entered into in any lawsuit or proceeding or issued by any Governmental Entity. The foregoing sentences include, without limiting their generality, actions pending or threatened (or any basis therefor) involving the prior employment or engagement of any of Custom Offers' officers, managers or employees or their use in connection with Custom Offers' business of any information or techniques proprietary to any of their former employers or to any other Person.

3.13    No Defaults. Custom Offers is not, nor has Custom Offers received notice that it would be with the passage of time, in default or violation of any term, condition, or provision of (i) the Charter Documents; (ii) any judgment, decree, or order applicable to Custom Offers; or (iii) any loan or credit agreement, note, bond, mortgage, indenture, contract, agreement, lease, license, or other instrument to which Custom Offers is now a party or by which it or any of its properties or assets may be bound.

3.14    Major Contracts. Custom Offers is not a party to or subject to:

(a)    Any union contract, or any employment contract or arrangement (other than "at-will" employment arrangements) providing for future compensation, written or oral, with any officer, consultant, manager, or employee;

(b)    Any plan or contract or arrangement, written or oral, providing for bonuses, pensions, deferred compensation, retirement payments, profit-sharing or the like;

(c)    Any joint venture contract or arrangement or any other agreement which has involved or is expected to involve a sharing of profits;

(d)    Any OEM agreement, reseller or distribution agreement, volume purchase agreement, corporate end user sales or service agreement, reproduction or replication agreement in which the amount involved exceeds annually, or is expected to exceed in the aggregate over the life of the contract, $10,000 or pursuant to which Custom Offers has granted or received most favored nation pricing provisions, or exclusive marketing, production, publishing or distribution rights related to any product, group of products or territory;

(e)    Any lease for real or personal property in which the amount of payments which Custom Offers is required to make on an annual basis exceeds $10,000;

- 25 -

(f)     Any agreement, license, franchise, permit, indenture, or authorization which has not been terminated or performed in its entirety and not renewed which may be, by its terms, terminated, impaired, or adversely affected by reason of the execution of this Agreement and all other agreements contemplated hereby, the consummation of the Merger, or the consummation of the other transactions contemplated hereby or thereby;

(g)     Except for trade indebtedness incurred in the Ordinary Course of Business, any instrument evidencing or related in any way to indebtedness incurred in the acquisition of companies or other entities or indebtedness for borrowed money by way of direct loan, sale of debt securities, purchase money obligation, conditional sale, guarantee, or otherwise which individually is in the amount of $10,000 or more;

(h)     Any license agreement, either as licensor or licensee (excluding nonexclusive hardware and software licenses granted to distributors or end-users and commercially available in-licensed software applications);

(i)     Any contract or agreement containing covenants purporting to limit Custom Offers' freedom to compete in any line of business in any geographic area;

(j)     Any customer contract or agreement; or

(k)     Any contract or agreement or group of related contracts or agreements, not elsewhere specifically disclosed pursuant to this Agreement, involving the payment or receipt by Custom Offers of more than $10,000 in the aggregate.

All contracts, arrangements, plans, agreements, leases, licenses, franchises, permits, indentures, authorizations, instruments and other commitments which are listed in the Custom Offers Disclosure Schedule pursuant to this Section 3.14 are valid and in full force and effect and Custom Offers has not, nor, to the knowledge of Custom Offers, has any other party thereto, breached any material provisions of, or entered into default in any material respect under the terms thereof. Custom Offers has not amended, modified or terminated the terms of the contracts or agreements referred to in this Section 3.14 unless such amendment, modification or termination was in the Ordinary Course of Business and Custom Offers has provided Canadian Parent with written notification of such.

3.15     Material Reductions. To Custom Offers' knowledge, none of the parties to any of the contracts identified in the Custom Offers Disclosure Schedule pursuant to Section 3.14 have terminated, or, to the knowledge of Custom Offers, in any way expressed to Custom Offers an intent to reduce or terminate the amount of its business with Custom Offers in the future.

3.16     Insurance and Banking Facilities. Section 3.16 of the Custom Offers Disclosure Schedule contains a complete and correct list of (i) all contracts of insurance or indemnity of Custom Offers in force at the date of this Agreement (including name of insurer or indemnitor, agent, annual premium, coverage, deductible amounts and expiration date) and (ii) the names and locations of all banks in which Custom Offers has accounts or safe deposit boxes, the designation of each such account and safe deposit box, and the names of all persons authorized to draw on or

- 26 -

have access to each such account and safe deposit box. All premiums and other payments due from Custom Offers with respect to any such contracts of insurance or indemnity have been paid, and Custom Offers does not know of any fact, act, or failure to act which has or might cause any such contract to be canceled or terminated. All known claims for insurance or indemnity have been presented.

3.17    Employees. Section 3.17 of the Custom Offers Disclosure Schedule sets forth a list of (a) the names, titles, salaries and all other compensation of all salaried employees, consultants and independent contractors of Custom Offers (such term meaning permanent and temporary, full-time and part-time employees) and (b) the wage rates for non-salaried employees, consultants and independent contractors of Custom Offers (by classification). Section 3.17 of the Custom Offers Disclosure Schedule also sets forth a list of all employees that have been terminated since the LLC Formation Date. Any persons engaged by Custom Offers as independent contractors, rather than employees, have been properly classified as such and have been so engaged in accordance with all applicable federal, foreign, state or local laws. No employee has stated to Custom Offers that such employee intends to resign or retire as a result of the transactions contemplated by this Agreement or otherwise within six (6) months after the Closing Date. Hours worked by and payments made to employees of Custom Offers have not been in violation of the Fair Labor Standards Act or any other applicable federal, foreign, state or local laws dealing with such matters. Custom Offers is not and never has been engaged in any dispute or litigation with an employee or former employee regarding matters pertaining to intellectual property or assignment of inventions. Custom Offers has never been and, to the knowledge of Custom Offers, is not now subject to a union organizing effort. Custom Offers does not have any written contract of employment or other employment, severance or similar agreement with any of its employees or any established policy or practice relating thereto, and all of its employees are employees-at-will. Custom Offers is not a party to any pending, or to Custom Offers' knowledge, threatened, labor dispute. Custom Offers has complied in all respects with all applicable federal, state and local laws, ordinances, rules and regulations and requirements relating to the employment of labor, including but not limited to the provisions thereof relating to wages, hours, collective bargaining and ensuring equality of opportunity for employment and advancement of minorities and women. There are no claims pending, or, to the knowledge of Custom Offers, threatened to be brought, in any court or administrative agency by any former or current Company employees for compensation, pending severance benefits, vacation time, vacation pay or pension benefits, or any other claim threatened or pending in any court or administrative agency from any current or former employee or any other Person arising out of Custom Offers' status as employer, whether in the form of claims for employment discrimination, harassment, unfair labor practices, grievances, wrongful discharge, or otherwise (collectively, such claims are hereinafter referred to as "Employment Claims"). There is no basis for any Employment Claims which have not been brought or threatened to be brought pursuant to the previous sentence.

3.18    Employee Benefit Plans.

(a)    Schedule 3.18 of the Custom Offers Disclosure Schedule lists each Employee Benefit Plan (within the meaning of Section 3(3) of the Employee Retirement Income

Security Act of 1974, as amended ("ERISA")) and each Benefit Arrangement including any plan, contract, arrangement or policy (written or oral) providing for severance benefits, insurance coverage (including any self-insured arrangements), workers' compensation, disability benefits, supplemental unemployment benefits, vacation benefits, retirement benefits or for deferred compensation, profit-sharing, bonuses, stock options, stock appreciation rights or other forms of incentive compensation or post-retirement insurance, compensation or benefits that is maintained or contributed to by Custom Offers, or any entity that would be considered to be under common control with Custom Offers under Section 414 of the Code (each an "ERISA Affiliate"). Copies or descriptions of all Employee Benefit Plans and Benefit Arrangements, the three most recently filed Forms 5500 and accurate summary plan descriptions have been made available or furnished to Canadian Parent.

(b)     Each Employee Benefit Plan which is intended to be qualified under Section 401(a) of the Code is so qualified and has been so qualified during the period from its adoption to date, and each trust forming a part thereof is exempt from tax pursuant to Section 501(a) of the Code. Custom Offers has furnished to Canadian Parent copies of the most recent Internal Revenue Service determination letters with respect to each such Employee Benefit Plan. Each Employee Benefit Plan and Benefit Arrangement has been maintained in compliance with its terms and with the applicable requirements prescribed by any and all statutes, orders, rules and regulations, including but not limited to ERISA and the Code. No "prohibited transaction," as defined in Section 406 of ERISA or Section 4975 of the Code, has occurred with respect to any Employee Benefit Plan.

(c)     Neither Custom Offers nor any ERISA Affiliate maintains or has ever maintained or contributed to any "multiemployer plan" as defined in Section 3(37) of ERISA, a "multiple employer plan" within the meaning of Section 413 of the Code, or any Employee Benefit Plan subject to Title IV of ERISA.

(d)     All contributions and payments accrued under each Employee Benefit Plan and Benefit Arrangement, determined in accordance with prior funding and accrual practices, as adjusted to include proportional accruals for the period ending on the Closing Date, will be discharged and paid on or prior to the Closing Date. There has been no amendment to, written interpretation of or announcement (whether or not written) by Custom Offers or any of its ERISA Affiliates relating to, or change in employee participation or coverage under, any Employee Benefit Plan or Benefit Arrangement that would increase materially the expense of maintaining such Employee Benefit Plan or Benefit Arrangement above the level of the expense incurred in respect thereof for the fiscal year ended prior to the date hereof. There are no pending or anticipated claims against or otherwise involving any Employee Benefit Plan or Benefit Arrangement and no suit, action or other litigation (excluding claims for benefits incurred in the ordinary course) has been brought against or with respect to any Employee Benefit Plan or Benefit Arrangement.

(e)     With respect to the employees and former employees of Custom Offers, there are no employee post-retirement health plans or life insurance in effect, except as required by Section 4980B of the Code or, if applicable, state law. No tax under Section 4980B or

Section 4980D of the Code (or applicable state law governing continuation health coverage) has been incurred in respect of any Employee Benefit Plan that is a group health plan, as defined in Section 5000(b)(1) of the Code.

(f)     No employee of Custom Offers will become entitled to any material bonus, retirement, severance or similar benefit or enhanced benefit solely as a result of the transactions contemplated hereby.

(g)     No provision of this Section 3.18 shall create any third party beneficiary or other rights in any employee or former employee (including any beneficiary or dependent thereof) of Custom Offers in respect of continued employment (or resumed employment) with Custom Offers and no provision of this Section 3.18 shall create any such rights in any Persons in respect of any benefits that may be provided, directly or indirectly, under any Employee Benefit Plan or Benefit Arrangement or any plan or arrangement that may be established by Canadian Parent or any of its affiliates. No provision of this Agreement shall constitute a limitation on rights to amend, modify or terminate after the Closing Date any Employee Benefit Plan or Benefit Arrangement.

3.19     Certain Agreements.     Except as contemplated by this Agreement, neither the execution and delivery of this Agreement and all other agreements contemplated hereby, nor the consummation of the transactions contemplated hereby will: (i) result in any payment by Custom Offers (including, without limitation, severance, unemployment compensation, parachute payment, bonus or otherwise) becoming due to any manager, employee, or independent contractor of Custom Offers under any plan, agreement, or otherwise, (ii) increase any benefits otherwise payable under any plan or agreement or (iii) result in the acceleration of the time of payment or vesting of any such benefits.

3.20     Guarantees and Suretyships.     Custom Offers has no powers of attorney outstanding and Custom Offers has no material obligations or liabilities (absolute or contingent) as guarantor, surety, cosigner, endorser, co-maker, indemnitor, or otherwise respecting the obligations or liabilities of any Person.

3.21     Brokers and Finders. Neither Custom Offers nor any of its Equity Holders has retained any broker, finder, or investment banker in connection with this Agreement or any of the transactions contemplated by this Agreement, nor does or will Custom Offers owe any fee or other amount to any broker, finder, or investment banker in connection with this Agreement or the transactions contemplated by this Agreement.

3.22     Certain Payments.     Neither Custom Offers, nor to the knowledge of Custom Offers, any Person acting on behalf of Custom Offers has, directly or indirectly, on behalf of or with respect to Custom Offers: (i) made an unreported political contribution, (ii) made or received any payment which was not legal to make or receive, (iii) engaged in any material transaction or made or received any material payment which was not properly recorded on the books of Custom Offers, (iv) created or used any "off-book" bank or cash account or "slush

- 29 -

fund," or (v) engaged in any conduct constituting a violation of the Foreign Corrupt Practices Act of 1977.

3.23    Environmental Matters. Custom Offers has complied with all federal, state and local laws (including, without limitation, case law, rules, regulations, orders, judgments, decrees, permits, licenses and governmental approvals) which are intended to protect the environment and/or human health or safety (collectively, "Environmental Laws"). Custom Offers has not handled, generated, used, stored, transported or disposed of any material, substance or waste which is regulated by Environmental Laws ("Hazardous Materials"). There is not now, nor has there ever been, any underground storage tank or asbestos on any real property owned, operated or leased by Custom Offers. Custom Offers has not conducted, nor is it aware of, any environmental investigations, studies, audits, tests, reviews or analyses; the purpose of which was to discover, identify, or otherwise characterize the condition of the soil, groundwater, air or the presence of Hazardous Materials at any real property owned, operated or leased by Custom Offers. There are no "Environmental Liabilities". For purposes of this Agreement, "Environmental Liabilities" are any claims, demands, or liabilities under Environmental Laws which (i) arise out of or in any way relate to Custom Offers' operations or activities, or any real property at any time owned, operated or leased by Custom Offers, or any member's use or ownership thereof, whether vested or unvested, contingent or fixed, actual or potential, and (ii) arise from or relate to actions occurring (including any failure to act) or conditions existing on or before the Closing Date.

3.24    Enforceability of Contracts, etc.

(a)    No Person that is a party to any contract, agreement, commitment or plan to which Custom Offers is a party has a valid defense, on account of non-performance or malfeasance by Custom Offers, which would make any such contracts, agreement, commitment or plan not valid and binding upon or enforceable against such parties in accordance with their terms, except to the extent such enforceability may be subject to or limited by bankruptcy, insolvency, reorganization, arrangement or similar laws affecting the rights of creditors generally and usual equity principles.

(b)    Neither Custom Offers, nor, to the knowledge of Custom Offers, any other Person, is in breach or violation of, or default under, any material contract, agreement, arrangement, commitment or plan to which Custom Offers is a party, and no event or action has occurred, is pending, or, to the knowledge of Custom Offers, is threatened, which, after the giving of notice, or the lapse of time, or otherwise, would constitute a breach or a default by Custom Offers or, to the knowledge of Custom Offers, any other Person, under any material contract, agreement, arrangement, commitment or plan to which Custom Offers is a party.

3.25    Disclosure. Neither the representations or warranties made by Custom Offers or the Equity Holders in this Agreement, nor the Custom Offers Disclosure Schedule or any other certificate executed and delivered by Custom Offers or the Equity Holders pursuant to this Agreement, when taken together, contains any untrue statement of a material fact, or omits to

- 30 -

GAJONES6012/1.2238973-3

state a material fact necessary to make the statements or facts contained herein or therein not misleading in light of the circumstances under which they were furnished.

3.26    Customers; Effect of Transaction.

(a)    Since the LLC Formation Date, Custom Offers has not had any customer to whom it made more than 10% of its sales. Since the Balance Sheet Date, there has not been (i) any material adverse change in the business relationship of Custom Offers with any of the parties to any of the contracts identified in Section 3.14 of the Custom Offers Disclosure Schedule or any of its customers or (ii) any change in any material term (including credit terms) of the sales agreements or related agreements with any such customer. Since the LLC Formation Date, Custom Offers has not received any customer complaints concerning its products and services, nor has it ever had any of its products returned by a purchaser thereof, other than complaints and returns in the Ordinary Course of Business.

(b)    No creditor, supplier, employee, client or other customer or other person having a material business relationship with Custom Offers has informed any officer or manager of Custom Offers orally or in writing or has informed Custom Offers in writing that such Person intends to materially change the relationship because of the transactions contemplated by this Agreement.

3.27    Toplander Corporation.    Neither the execution, delivery or performance of this Agreement and all other agreements contemplated hereby, nor the consummation of the Merger or any other transaction described herein or therein, nor the operation of Custom Offers' business as currently conducted or as currently planned to be conducted, does or will, after the giving of notice, or the lapse of time, or otherwise, conflict with, result in a breach of, or constitute a default under, any agreement between Larry Organ, Custom Offers or any employee of Custom Offers and Toplander Corporation, its predecessors, successors and assigns ("Toplander"), or otherwise infringe upon any of the Intellectual Property or Intellectual Property rights of Toplander, or result in or constitute any other violation of law. Neither Custom Offers nor any officer, managers or employee of Custom Offers nor, to the knowledge of Custom Offers, any agent acting on Custom Offers' behalf has used or is using, in connection with the operation of Custom Offers' business, any Intellectual Property of, or information or technology proprietary to, Toplander. Custom Offers and Larry Organ warrant and represent that there is no basis for any demand, action, suit, claim, investigation or proceeding by Toplander against Custom Offers or its properties and assets before any court, arbitrator or Governmental Entity. The foregoing sentences include, without limiting their generality, any basis for any actions arising out of or relating to the prior employment or engagement of any of Custom Offers' officers, managers, employees or, to the knowledge of Custom Offers, agents by Toplander or their use in connection with Custom Offers' business of any information or techniques proprietary to Toplander.

3.28    Reliance.    The foregoing representations and warranties are made by Custom Offers and the Equity Holders with the knowledge and expectation that Canadian Parent, OpCo and Merger Sub are placing reliance thereon.

- 31 -

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF THE EQUITY HOLDERS

Each Equity Holder severally represents and warrants to Canadian Parent, OpCo and Merger Sub as follows:

(a)    Such Equity Holder is the lawful owner of the Equity Interests to be exchanged for the Merger Consideration pursuant to this Agreement and has, and on the Closing Date will have, good and clear title to such Equity Interests, free of all Liens.

(b)    Such Equity Holder has, and on the Closing Date will have, full legal right, power and authority to enter into this Agreement. Such Equity Holder has, and on the Closing Date will have, full legal right, power and authority to sell and deliver the Equity Interests owned by him, her or it in the manner provided herein. Such Equity Holder has duly and validly executed this Agreement and has, or prior to the Closing, will have duly and validly executed and delivered all other agreements contemplated hereby, and each of this Agreement and such other agreements constitutes a valid, binding and enforceable obligation of such Equity Holder in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws of general application affecting the enforcement of creditors' rights.

(c)    The execution, delivery and performance of this Agreement and the other agreements contemplated hereby by such Equity Holder, and the consummation of the transactions contemplated hereby or thereby, will not require, on the part of such Equity Holder, any consent, approval, authorization or other order of, or any filing with, any Governmental Entity, or under any contract, agreement or commitment to which such Equity Holder or is a party or by which such Equity Holder or property of such Equity Holder is bound, and will not constitute a violation on the part of such Equity Holder of any law, administrative regulation or ruling or court decree, or any contract, agreement or commitment, applicable to such Equity Holder or property of such Equity Holder.

(d)    There is no action, suit, investigation or proceeding (or any basis therefor) pending against or, to the knowledge of the Equity Holder, threatened against or affecting, the Equity Holder or any of its respective properties before any court or arbitrator or any governmental body, agency, official or authority that in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement.

(e)    Such Equity Holder (i) has such knowledge, sophistication and experience in business and financial matters that it is capable of evaluating the merits and risks of an investment in Canadian Parent Shares, (ii) fully understands the nature, scope and duration of the limitations on transfer contained in this Agreement or contemplated hereby and under applicable securities laws and (iii) can bear the economic risk of an investment in Canadian Parent Shares and can afford a complete loss of such investment.

GAJONES6012/1.2238973-3

- 32 -

(f)    Such Equity Holder has had an adequate opportunity to ask questions and receive answers from the officers of Canadian Parent concerning any and all matters relating to the transactions described herein.  Such Equity Holder has asked any and all questions in the nature described in the preceding sentence and all questions have been answered to his or its satisfaction.  Such Equity Holder acknowledges that the officers of Canadian Parent have not assured, guaranteed or otherwise led any Equity Holder to expect any particular level of performance in the market value or other value of Canadian Parent Shares.

(g)    Such Equity Holder further represents, warrants, acknowledges and agrees that it is acquiring Canadian Parent Shares under this Agreement for its own account, and not on behalf of other persons, and for investment and not with a view to the resale or distribution of all or any part of such Canadian Parent Shares and will not resell such Canadian Parent Shares except in accordance and in compliance with all applicable securities laws.

(h)    Such Equity Holder further represents, warrants, acknowledges and agrees that it is making an investment decision based solely on its review of the Canadian Parent Reports (as defined below) and the terms of this Agreement, and is not relying, and has not relied, upon anything outside of the immediately aforementioned sources in making its investment decision.

(i)    Such Equity Holder understands that no Canadian provincial or United States federal or state agency or any other government or governmental agency has passed upon or made any recommendation or endorsement of Canadian Parent Shares.

(j)    Neither the execution, delivery or performance of this Agreement by such Equity Holder and all other agreements contemplated hereby, nor the consummation of the Merger or any other transaction described herein or therein, nor the operation of Custom Offers' business as currently conducted or as currently planned to be conducted, does or will, after the giving of notice, or the lapse of time, or otherwise, conflict with, result in a breach of, or constitute a default under, any agreement between such Equity Holder and Toplander, or, to the knowledge of such Equity Holder, otherwise infringe upon any of the Intellectual Property or Intellectual Property rights of Toplander, or, to the knowledge of such Equity Holder, result in or constitute any other violation of law.  Such Equity Holder has not used and is not using, in connection with the operation of Custom Offers' business, any Intellectual Property of, or information or technology proprietary to, Toplander.  Such Equity Holder warrants and represents that, to such Equity Holder's knowledge, there is no basis for any demand, action, suit, claim, investigation or proceeding by Toplander against Custom Offers or its properties and assets before any court, arbitrator or Governmental Entity.  The foregoing sentences include, without limiting their generality, any basis for any actions arising out of or relating to the prior employment or engagement of any of Custom Offers' officers, managers, employees or, to the knowledge of such Equity Holder, agents by Toplander or their use in connection with Custom Offers' business of any information or techniques proprietary to Toplander.

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF CANADIAN PARENT,
OPCO AND MERGER SUB

Except as set forth in the disclosure schedule of Canadian Parent dated as of the date hereof and delivered herewith to Custom Offers (the "Canadian Parent Disclosure Schedule") which identifies the section and subsection to which each disclosure therein relates, Canadian Parent, OpCo and Merger Sub jointly and severally represent and warrant to Custom Offers as follows:

5.1    Organization. Each of Canadian Parent, OpCo and Merger Sub is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation and has all requisite corporate power and authority to own, lease and otherwise hold and operate its assets and to carry on its business as now being conducted.

5.2    Authority. Each of Canadian Parent, OpCo and Merger Sub has the requisite corporate power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement and the consummation by Canadian Parent, OpCo and Merger Sub of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of Canadian Parent, OpCo and Merger Sub and no other corporate proceedings on the part of Canadian Parent, OpCo and Merger Sub are necessary to authorize this Agreement or to consummate the transactions contemplated hereby. This Agreement has been duly executed and delivered by Canadian Parent, OpCo and Merger Sub and, when executed and delivered by Custom Offers, constitutes a legal, valid and binding obligation of each of Canadian Parent, OpCo and Merger Sub, enforceable against Canadian Parent, OpCo and Merger Sub in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws of general application affecting the enforcement of creditors' rights.

5.3    Noncontravention. The execution and delivery of this Agreement does not, and the consummation of the transactions contemplated by this Agreement and compliance with provisions of this Agreement will not, conflict with, or result in any violation of, or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or result in the creation of any Lien in or upon any of the properties or assets of Canadian Parent, OpCo or Merger Sub under, any provision of (i) the charter or by-laws of Canadian Parent, OpCo or Merger Sub, (ii) any material contract applicable to Canadian Parent, OpCo or Merger Sub or their respective properties or assets or (iii) subject to the governmental filings and other matters referred to in the following sentence, any (A) law or (B) order, in each case, applicable to Canadian Parent, OpCo or Merger Sub or their respective properties or assets, other than, in the case of clauses (ii) and (iii), any such conflicts, violations, defaults, rights, losses or Liens that individually or in the aggregate could not reasonably be expected to impair in any material respect the ability of Canadian Parent, OpCo or Merger Sub to perform its obligations under this Agreement or prevent or materially delay the consummation of any of the transactions

- 34 -

contemplated by this Agreement. No consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity is required by or with respect to Canadian Parent, OpCo or Merger Sub in connection with the execution and delivery of this Agreement by Canadian Parent, OpCo or Merger Sub or the consummation by Canadian Parent, OpCo or Merger Sub of the Merger or the other transactions contemplated by this Agreement, except for (i) the consent of the TSE and such filings as may be required to comply with federal, state and Canadian securities laws, and (ii) such other consents, approvals, orders, authorizations, registrations, declarations and filings the failure of which to be obtained or made individually or in the aggregate could not reasonably be expected to impair in any material respect the ability of Canadian Parent, OpCo or Merger Sub to perform its obligations under this Agreement or prevent or materially delay the consummation of any of the transactions contemplated by this Agreement.

5.4    Canadian Parent Shares.

(a)    The issued and outstanding Canadian Parent Shares are listed and posted for trading on the TSE. No order has been issued by the Ontario Securities Commission or the TSE or any other competent authority ceasing or suspending trading of any of the issued and outstanding Canadian Parent Shares and no proceedings or investigations for such purpose are to the knowledge of the Canadian Parent, pending or threatened.

(b)    The Canadian Parent Shares forming part of the Initial Share Consideration payable on the Closing Date will be validly issued to the Equity Holders as fully paid and non-assessable shares in the capital of the Canadian Parent and, if issued in accordance with the terms of this Agreement, the Canadian Parent Shares forming part of the Interim Contingent Consideration, the 2002 Contingent Consideration and the 2003 Contingent Consideration, respectively, will be issued as fully paid and non-assessable shares in the capital of the Canadian Parent. Such Canadian Parent Shares issued as part of the Merger Consideration, when issued in accordance with this Agreement, shall be (i) free and clear of all Liens imposed by or through Canadian Parent, other than those described in Section 2.7 hereof, set forth in the Organ Employment Agreement or set forth in those certain Liquidated Damages Agreements between OpCo and certain of the Option Holders and (ii) accepted for listing on the TSE.

5.5    Canadian Parent Reports and Financial Statements.

(a)    Canadian Parent has been a reporting issuer under the Securities Act (Ontario) since October 17, 1995 and is not on the list of defaulting reporting issuers maintained under the Securities Act (Ontario). Canadian Parent has filed all required reports since October 17, 1995, and the documents filed by or on behalf of Canadian Parent with the TSE and the Ontario Securities Commission (the "Canadian Parent Reports") at the time of their filing complied, in all material respects, with the requirements of the Securities Act (Ontario) pursuant to which those documents were filed and all the information and statements contained therein were at the respective times of filing thereof true and correct, contained no misrepresentation (as defined in the Securities Act (Ontario)) and constitute full, true and plain disclosure of all

material facts relating to Canadian Parent and its subsidiaries, taken as a whole, as required by the Securities Act (Ontario); and

(b)    The financial statements of Canadian Parent included in the Canadian Parent Reports have been prepared in accordance with Canadian generally accepted accounting principles consistently applied throughout the periods indicated (except as otherwise noted therein) and fairly present the consolidated financial position of Canadian Parent and its consolidated subsidiaries as of the date thereof and the consolidated results of operations and cash flows of Canadian Parent and its consolidated subsidiaries for the periods then ended (except that the unaudited financial statements do not contain all of the required footnotes and are subject to normal recurring year end adjustments which adjustments will not be material in amount or effect). Since January 1, 2001, there has been no change in Canadian Parent's accounting policies, except as described in the notes to the financial statements of Canadian Parent.

5.6    Brokers. No broker, investment banker, financial advisor or other person is entitled to any broker's, finder's, financial advisor's or similar fee or commission, in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Canadian Parent.

5.7    Cash Consideration. Canadian Parent has or will have, on or prior to the date that any cash payment is due, the cash necessary for OpCo to pay the cash portion of the Merger Consideration.

5.8    Interim Operations of Merger Sub. Merger Sub was formed solely for the purpose of engaging in the transactions contemplated hereby, has engaged in no other business activities and has conducted its operations only as contemplated hereby.

5.9    Shareholder Approval. The issuances of Canadian Parent Shares as part of the Merger Consideration pursuant to Sections 2.1, 2.3, 2.4 or 2.5 do not require the approval of Canadian Parent's shareholders and do not trigger the application of Canadian Parent's Shareholders Rights Plan dated as of March 15, 2001.

5.10    Reporting Issuer. The Canadian Parent is a "reporting issuer" or the equivalent thereof for the purposes of Canadian securities laws in the provinces of British Columbia, Alberta, Manitoba, Ontario, Saskatchewan, New Brunswick, Nova Scotia, Newfoundland, Prince Edward Island and Quebec and is not currently in default of any requirements in relation to that designation.

## ARTICLE VI

## COVENANTS OF CUSTOM OFFERS AND THE EQUITY HOLDERS

During the period from the date of this Agreement (except as otherwise indicated) and continuing until the earlier of the termination of this Agreement or the Closing Date, each of

GAJONES6012/1.2238973-3

Custom Offers and the Equity Holders agree (except as expressly contemplated by this Agreement or otherwise permitted with Canadian Parent's prior written consent):

6.1     Conduct of Business in Ordinary Course.     Custom Offers will carry on its business in the ordinary course in substantially the same manner as heretofore conducted and, to the extent consistent with such business, use all reasonable best efforts consistent with past practice and policies to preserve intact its present business organization, keep available the services of its present consultants and employees and preserve its relationships with customers, suppliers and distributors and others having business dealings with it. Custom Offers will confer on a regular and frequent basis with representatives of Canadian Parent to report operational matters of a material nature and to report the general status of the ongoing operations of the business of Custom Offers. The foregoing notwithstanding, Custom Offers will not:

(a)     enter into any material commitment or transaction, including but not limited to any purchase of assets (other than raw materials, supplies or cash equivalents) for a purchase price in excess of $5,000;

(b)     grant any bonus, severance or termination pay to any officer, manager, independent contractor or employee of Custom Offers except as expressly contemplated pursuant to Section 8.7;

(c)     hire any employee or independent contractor;

(d)     enter into or amend any agreements pursuant to which any other party is granted support, service, marketing or publishing rights or is granted distribution rights of any type or scope with respect to any products of Custom Offers;

(e)     enter into or terminate any contracts, arrangements, plans, agreements, leases, licenses, franchises, permits, indentures, authorizations, instruments, or commitments, or amend or otherwise change in any material respect the terms thereof in a manner adverse to Custom Offers;

(f)     commence a lawsuit other than: (i) for the routine collection of bills, (ii) in such cases where Custom Offers in good faith determines that failure to commence suit would result in a material impairment of a valuable aspect of Custom Offers' business; *provided, that* Custom Offers consults with Canadian Parent prior to filing such suit, or (iii) for a breach of this Agreement or any agreement related hereto;

(g)     modify in any material respect existing discounts or other terms and conditions with dealers, distributors and other resellers of Custom Offers' products or services in a manner adverse to Custom Offers;

(h)     terminate any of the employees listed on Section 6.1(h) of the Custom Offers Disclosure Schedule;

(i)     take any action which would make any representation or warranty in this Agreement untrue or incorrect, as if made as of such time; or

(j)     agree in writing or otherwise to take any of the foregoing actions.

6.2     <u>Dividends, Distributions, Issuance of, or Changes in Securities</u>.  Custom Offers will not:  (i) declare or pay any dividends on or make other distributions to its Equity Holders (whether in cash, additional ownership, equity or other membership interests or property) except as expressly contemplated pursuant to Section 2.1(d); (ii) issue, deliver, sell, or authorize, propose, or agree to, or commit to the issuance, delivery, or sale of any additional ownership, equity or other membership interests, any Custom Offers Voting Debt or any securities convertible into its membership, equity or ownership interests, any options, warrants, calls, conversion rights, commitments, agreements, contracts, understandings, restrictions, arrangements or rights of any character obligating Custom Offers to issue any such securities, Custom Offers Voting Debt or other convertible securities except as expressly contemplated pursuant to Section 8.7 or Section 6.3; (iii) split, combine or reclassify any of its membership, equity or ownership interests or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for membership, equity or ownership interests except as expressly contemplated pursuant to Section 8.7; (iv) repurchase or otherwise acquire, directly or indirectly, any membership, equity or ownership interests, phantom stock interests, options or warrants related thereto except as expressly contemplated pursuant to Section 8.7; or (v) propose any of the foregoing.

6.3     <u>Governing Documents</u>.  Other than to admit Lowell D. Kraff, Brian B. Boorstein and Gidon Y. Cohen as members (the "New Members"), Custom Offers will not amend its Charter Documents.

6.4     <u>No Acquisitions</u>.  Custom Offers will not authorize, recommend, propose or announce an intention to authorize, recommend or propose, or enter into a letter of intent (whether or not binding), an agreement in principle or an agreement with respect to any merger, consolidation or business combination (other than the Merger), or any acquisition of assets or securities of any business, corporation, partnership, joint venture, association or other entity or division thereof.

6.5     <u>No Dispositions</u>.  Custom Offers will not sell, lease, license, transfer, mortgage, encumber or otherwise dispose of any of its material assets or cancel, release, or assign any material indebtedness or claim, except in the Ordinary Course of Business.

6.6     <u>Indebtedness</u>.  Custom Offers will not incur any indebtedness for borrowed money by way of direct loan, sale of debt securities, purchase money obligation, conditional sale, guarantee or otherwise.

6.7     <u>Compensation</u>.  Custom Offers will not adopt or amend, or modify in any material respect, any Employee Benefit Plan or other benefit plan or pay any pension or retirement allowance not required by any existing Employee Benefit Plan or other benefit plan.  Custom Offers will not enter into or modify any employment or severance contracts, increase the salaries,

- 38 -

wage rates or fringe benefits of its officers, managers or employees or pay bonuses or other remuneration except for current salaries, severance and other remuneration for which Custom Offers is obligated under arrangements existing prior to the Balance Sheet Date to which Custom Offers is a party and which have been disclosed in Custom Offers Disclosure Schedule or as expressly contemplated in Section 8.7.

6.8    Claims.  Custom Offers will not settle any claim, action or proceeding, except in the Ordinary Course of Business.

6.9    Access to Properties and Records.  Custom Offers will give Canadian Parent and its representatives full access during reasonable business hours to its senior management, senior technical personnel, premises, properties, contracts, commitments, books, records and affairs, and will provide Canadian Parent with such financial, technical and operating data and other information pertaining to its business as Canadian Parent may request.  With Custom Offers' prior consent, which will not be unreasonably withheld, Canadian Parent will be entitled in conjunction with Custom Offers personnel to make appropriate inquiries of third parties in the course of its investigation.

6.10    Breach of Representations and Warranties.  Custom Offers will not take any action that would cause or constitute a breach of any of the representations and warranties set forth in Article III or that would cause any of such representations and warranties to be inaccurate in any material respect or that would constitute a breach of any of its other obligations under this Agreement.  In the event of, and promptly after becoming aware of, the occurrence of or the pending or threatened occurrence of any event that would cause or constitute such a breach or inaccuracy, Custom Offers will give detailed notice thereof to Canadian Parent and will use its reasonable best efforts to prevent or remedy promptly such breach or inaccuracy.

6.11    Consents.  Custom Offers will promptly apply for or otherwise seek and use reasonable best efforts to obtain, all Consents, and make all filings with Governmental Entities, required with respect to the consummation of the Merger.

6.12    Equity Holders.  Each of the Equity Holders hereby approves this Agreement and the transactions contemplated hereby, in each case, in accordance with the Charter Documents.

6.13    Exclusivity; Acquisition Proposals.  Unless and until this Agreement will have been terminated by either party pursuant to Article XI hereof and thereafter subject to Section 11.5, neither Custom Offers nor any of the Equity Holders will (and each will use its best efforts to ensure that none of its officers, managers, agents, representatives or affiliates) take or cause or permit any Person to take, directly or indirectly, any of the following actions with any party other than Canadian Parent and its designees: (i) solicit, initiate, seek, entertain, encourage or support any inquiry, proposal or offer from, furnish any information to, or participate in any negotiations with, any third party regarding any acquisition of Custom Offers, or any acquisition of a material portion of Custom Offers' business, assets or Equity Interests, including the grant of any licenses to any Custom Offers Intellectual Property other than licenses in the Ordinary Course of Business whether by merger, consolidation, other business combination, purchase of assets, tender or exchange offer or otherwise (each of the foregoing, an "Acquisition Transaction"), (ii)

- 39 -

disclose, in connection with an Acquisition Transaction (however preliminary), any information not customarily disclosed to any Person other than Canadian Parent or its representatives concerning Custom Offers' business or properties or afford to any Person other than Canadian Parent or its representatives access to its properties, books, or records, except in the Ordinary Course of Business and as required by law or pursuant to a governmental request for information, (iii) enter into or execute any agreement relating to an Acquisition Transaction, or (iv) make or authorize any public statement, recommendation or solicitation in support of any Acquisition Transaction or any offer or proposal relating to an Acquisition Transaction other than with respect to the Merger. In the event that Custom Offers is contacted by any third party expressing an interest in discussing an Acquisition Transaction (however preliminary), Custom Offers will promptly (and in no event more than 24 hours later) notify Canadian Parent of such contact, the identity of the party so contacting Custom Offers and details of such contract including the terms of an Acquisition Transaction.

6.14    Notice of Events.  Throughout the period between the date of this Agreement and the Closing, Custom Offers will promptly advise and consult with Canadian Parent regarding any and all material events and developments concerning its financial position, results of operations, assets, liabilities or business or any of the items or matters concerning Custom Offers covered by the representations, warranties and covenants of Custom Offers and the Equity Holders contained in this Agreement.

6.15    Reasonable Best Efforts.  Custom Offers and each of the Equity Holders will use their reasonable best efforts to effectuate the transactions contemplated hereby and to fulfill and cause to be fulfilled the conditions to Closing under this Agreement.

6.16    Insurance.  Custom Offers will use its reasonable best efforts to maintain in force at the Closing Date policies of insurance of the same character and coverage as those described in Custom Offers Disclosure Schedule, and Custom Offers will promptly notify Canadian Parent in writing of any changes in such insurance coverage occurring prior to the Closing Date.

## ARTICLE VII

## COVENANTS OF CANADIAN PARENT, OPCO AND MERGER SUB

During the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement or the Closing Date (or such later date where so indicated), Canadian Parent, OpCo and Merger Sub agree (except as expressly contemplated by this Agreement or with Custom Offers' prior written consent):

7.1    Breach of Representations and Warranties.  Neither Canadian Parent, OpCo nor Merger Sub will take any action which would cause or constitute a breach of any of the representations and warranties set forth in Article V or which would cause any of such representations and warranties to be inaccurate in any material respect.  In the event of, and promptly after becoming aware of, the occurrence of or the pending or threatened occurrence of any event which would cause or constitute such a breach or inaccuracy, Canadian Parent will

- 40 -

give detailed notice thereof to Custom Offers and will use its reasonable best efforts to prevent or remedy promptly such breach or inaccuracy.

7.2    Consents.  Canadian Parent will promptly apply for or otherwise seek, and use its reasonable best efforts to obtain, all consents and approvals, and make all regulatory filings, required with respect to the consummation of the Merger and issuance of the Canadian Parent Shares including, without limitation, any required consent of the TSE and such filings as may be required to comply with federal, state and Canadian securities laws.

7.3    Reasonable Best Efforts.  Each of Canadian Parent, OpCo and Merger Sub will use its reasonable best efforts to effectuate the transactions contemplated hereby and to fulfill and cause to be fulfilled the conditions to Closing under this Agreement.

7.4    Listing of Canadian Parent Shares.  Canadian Parent will use its reasonable best efforts to obtain conditional listing approval on the TSE of the Canadian Parent Shares issuable from time to time under this Agreement, in each case prior to the time of issuance thereof.

ARTICLE VIII

ADDITIONAL AGREEMENTS

In addition to the foregoing, Canadian Parent, OpCo, Merger Sub, Custom Offers and the Interest Holders and, to the extent expressly applicable, the Option Holders each agree to take the following actions after the execution of this Agreement:

8.1    Legal Conditions to the Merger.  Each of Canadian Parent, OpCo, Merger Sub, Custom Offers, the Interest Holders and the Option Holders will use all reasonable best efforts to take actions necessary to comply promptly with all legal requirements which may be imposed on it with respect to the Merger.  Each of Canadian Parent, OpCo, Merger Sub, Custom Offers, the Interest Holders and the Option Holders will use all reasonable best efforts to take all actions to obtain (and to cooperate with the other parties in obtaining) any consent required to be obtained or made by Custom Offers, OpCo, Merger Sub or Canadian Parent in connection with the Merger, or the taking of any action contemplated thereby or by this Agreement.

8.2    Employee Benefits.  Nothing contained herein will be considered as requiring Custom Offers or Canadian Parent or OpCo to continue any specific plan or benefit, or to confer upon any employee, beneficiary, dependent, legal representative or collective bargaining agent of such employee any right or remedy of any nature or kind whatsoever under or by reason of this Agreement, including without limitation any right to employment or to continued employment for any specified period, at any specified location or under any specified job category, except as specifically provided for in an offer letter or other agreement of employment.  It is specifically understood that continued employment with Custom Offers or employment with Canadian Parent or OpCo is not offered or implied for any other employees of Custom Offers and any continuation of employment with Custom Offers or OpCo after the Closing will be at will except as specifically provided otherwise in an offer letter or other agreement of employment.

- 41 -

GAJONES6012/1.2238973-3

8.3     Expenses.   Whether or not the Merger is consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including investment banking, legal and accounting expenses, will be paid by the party incurring such expense; provided, however, that the Interest Holders and the Option Holders shall pay any and all of such expenses incurred by them and the Interest Holders shall pay any and all of such expenses incurred by Custom Offers, in each case in the event the Merger is consummated.

8.4     Tax Returns; Tax Cooperation.

(a)     . The parties acknowledge and agree that transactions described in this Agreement constitute a taxable purchase of the assets of Custom Offers for federal income tax purposes and the termination of Custom Offers as of the close of business on the Closing Date. The Equity Holder Representative shall timely file or cause to be timely filed all Tax Returns required to be filed by Custom Offers that are due to be filed after the Closing Date with respect to periods ending on or before the Closing Date ("Post-Signing Returns"). Such Post-Signing Returns shall be filed at no cost or expense to Canadian Parent or any of its affiliates and in a manner that is consistent with reasonable past practice and that is not reasonably likely to defer income to a taxable period (or partial period) that ends after the Closing Date or to accelerate deductions to a taxable period (or partial period) that ends on or before the Closing Date. Before filing any Post-Signing Returns, the Equity Holder Representative shall provide a copy thereof to Canadian Parent and provide it twenty (20) days to comment on and consent to such Post-Signing Returns (which such consent shall not be unreasonably withheld). The Interest Holders shall timely pay all Taxes due and payable in respect of any Post-Signing Returns. Custom Offers, the Interest Holders and the Option Holders agree to furnish or cause to be furnished, upon request, as promptly as practicable, such information and assistance as is reasonably necessary for the filing of all Tax Returns, making any election related to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax Return.

(b)     All property taxes and similar ad valorem obligations, if any, levied with respect to the assets of Custom Offers for a taxable period which includes (but does not end on) the Closing Date (collectively, the "Apportioned Obligations") shall be apportioned between the Interest Holders, on the one hand, and OpCo, on the other hand, as of the Closing Date based on the number of days of such taxable period included in the Pre-Closing Tax Period (as defined below) and the number of days of such taxable period included in the Post-Closing Tax Period (as defined below). Each Interest Holder and Option Holder shall be jointly and severally liable for the proportionate amount of such taxes that is attributable to the Pre-Closing Tax Period to the extent Custom Offers had not as of the Closing Date established adequate reserves for the payment thereof. Within 90 days after the Closing, OpCo shall present a statement to the Equity Holder Representative setting forth the amount of reimbursement to which OpCo is entitled under this Section 8.4 together with such supporting evidence as is reasonably necessary to calculate the proration amount. The amount by which the proration amount exceeds established reserves shall be paid by the Interest Holders and Option Holders to OpCo ten days after delivery of such statement. Thereafter, OpCo shall notify the Equity Holder Representative upon receipt of any bill for property taxes relating to the assets of Custom Offers, part or all of which is

- 42 -

attributable to the Pre-Closing Tax Period.  The Interest Holders and the Option Holders shall also remit prior to the due date of assessment to OpCo payment for the proportionate amount of such bill that is attributable to the Pre-Closing Tax Period to the extent Custom Offers had not as of the Closing Date established adequate reserves for the payment thereof.  If OpCo shall thereafter make a payment for which it is entitled to reimbursement under this Section 8.4, the Interest Holders and the Option Holders shall make such reimbursement promptly but in no event later than 30 days after the presentation of a statement setting forth the amount of reimbursement to which OpCo is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement.  Any payment required under this Section 8.4 and not made within ten days of delivery of the statement shall bear interest at the rate per annum determined, from time to time, in accordance with the tax code of the relevant taxing authority for each day until paid.  "Post-Closing Tax Period" means any Tax period (or portion thereof) ending on or after the Closing Date. "Pre-Closing Tax Period" means any Tax period (or portion thereof) ending on or before the close of business on the Closing Date.

(c)     Any transfer, documentary, sales, use or other Taxes assessed upon or with respect to any constructive transfer of the securities or assets of Custom Offers to OpCo or in connection with the other transactions contemplated by this Agreement and any recording or filing fees with respect thereto shall be the responsibility of the Interest Holders and the Option Holders, jointly and severally.  At OpCo's discretion, the amount paid to any Person pursuant to this Agreement will be reduced by the amount of Taxes payable by such Person pursuant to this Section 8.4(c).  Any amounts so withheld will be promptly remitted to the appropriate taxing authority.

(d)     Custom Offers will timely pay all Taxes due and payable, whether in respect of Tax Returns for any Tax period ending on or before the Closing Date or otherwise.

(e)     Custom Offers shall accrue a reserve in its books and records and financial statements in accordance with reasonable past practice for all Taxes payable by Custom Offers for which no Post-Signing Return or payment is due prior to the Effective Time.

(f)     Prior to the Closing Date, Custom Offers shall promptly notify Canadian Parent of any suit, claim, action, investigation, proceeding or audit (collectively, "Actions") pending against or with respect to Custom Offers or any of its subsidiaries in respect of any Tax. Custom Offers shall not settle or compromise any such Action without Canadian Parent's prior written consent.

(g)     Prior to the Closing Date, Custom Offers (i) shall not make or change any material Tax election, amend any Tax Return or change any method of reporting income, deductions, or other items except with the approval of OpCo or Canadian Parent and (ii) shall not take any other action (or fail to take any other action) in respect of Taxes, in each case, if such action (or failure to take action) could reasonably be expected to have the effect of increasing the Tax liability of OpCo or any of its affiliates (including, after the Closing Date, Custom Offers) with respect to a taxable period (or partial period) that ends after the Closing Date.

- 43 -