(h)    Any and all existing Tax sharing agreements or arrangements between Custom Offers and any other party shall be terminated as of the Closing Date. After such date, Custom Offers shall have no obligations thereunder.

(i)    Custom Offers shall deliver to OpCo at or prior to the Closing a certificate, substantially in form set forth in United States Treasury Regulations Section 1445-2(b)(2).

(j)    Each Equity Holder hereby acknowledges, covenants and agrees to indemnify and hold harmless the Canadian Parent or any of its affiliates and any other Person who would be treated as a withholding agent or who would otherwise be responsible for any Tax in connection with the receipt of Canadian Parent Shares from and against any liability for any such withholding or other Tax.

8.5    Additional Agreements. In case at any time after the Closing Date any further action is reasonably necessary or desirable to carry out the purposes of this Agreement or to vest OpCo with full title to all properties, assets, rights, approvals, immunities and franchises of Custom Offers, the proper officers and directors of each entity which is a party to this Agreement will take all such necessary action.

8.6    Public Announcements. Neither Canadian Parent, Custom Offers nor any of the Equity Holders will disseminate any press release or other announcement concerning this Agreement or the transactions contemplated herein to any third party (except to the directors, officers and employees of the parties to this Agreement whose direct involvement is necessary for the consummation of the transactions contemplated under this Agreement, to the attorneys, advisors and accountants of the parties hereto, or except as Canadian Parent determines in good faith to be required by applicable law) without the prior written agreement of Canadian Parent and Custom Offers.

8.7    Phantom Stock Plan. On or prior to the Closing Date, Custom Offers shall enter in agreements with each of its employees and consultants who were offered the right to participate in Custom Offers' Employee Participation Plan and Employee Participation Agreement (the "Plan") granting to such Person in exchange for any Plan interest or other right to purchase a membership interest in Custom Offers such Person may have, such agreements to be in form and substance reasonably acceptable to Canadian Parent (the "Option Agreements"). In addition, on or prior to the Closing Date, Custom Offers shall obtain from each of its employees an agreement, in form and substance reasonably acceptable to Canadian Parent (each, a "Release Agreement"), releasing Custom Offers, Canadian Parent, OpCo and Merger Sub from any and all claims such employee may have arising under or in connection with the Plan and terminating each such Person's interest in the Plan and any rights such Person may have to Membership Interests or other equity interests in Custom Offers under the Plan.

8.8    Management of the Custom Offers Business. Immediately after the Closing Date, Custom Offers will be merged with and into OpCo with OpCo surviving the merger as a wholly owned subsidiary of Mosaic Performance Solutions, Inc. After the Closing Date (a) and until December 31, 2003, the Custom Offers business will be operated by OpCo as a stand alone

business unit within the Performance Solutions business unit of Canadian Parent (b) and until December 31, 2003, the assets, properties, rights, employees and businesses of OpCo will not be commingled with or transferred (other than in the ordinary course of business on an arms' length basis) to Canadian Parent or any of its affiliates, (c) and until December 31, 2003, the president of OpCo will report directly to the chief executive officer or president of Mosaic Performance Solutions, Inc., (d) and until December 31, 2003, Canadian Parent will not, directly or indirectly, require OpCo to pay or declare any dividends or distribute any assets (other than participation in cash management or other such programs of Canadian Parent pursuant to Section 8.8(e)) to Canadian Parent or one of its affiliates, (e) and until December 31, 2003, if Canadian Parent requires OpCo to participate in Canadian Parent's cash management or other programs and, in connection therewith, requires OpCo to distribute cash to Canadian Parent or one of its affiliates, then for purposes of the computation of Trailing Twelve Month Adjusted PBT, 2002 Adjusted PBT and 2003 Adjusted PBT, an amount equal to the cash so distributed (but not reinvested in OpCo), multiplied by an annual interest charge at the London Interbank Offered Rate ("LIBOR"), calculated monthly using the 90 day LIBOR rate effective on the first day of each month, shall be added to the calculation of such Adjusted PBT amounts (reinvested cash shall mean capital contributed by Canadian Parent or one of its affiliates to OpCo by way of a capital contribution, loan or combination thereof), (f) and until December 31, 2003, from the amounts of cash distributed by OpCo pursuant to Section 8.8(e), Canadian Parent will make available to OpCo up to $5,000,000 to meet the reasonable needs of OpCo's operations and if Canadian Parent or one of its affiliates contributes cash to OpCo under this Section 8.8(f), then for purposes of the computation of Trailing Twelve Month Adjusted PBT, 2002 Adjusted PBT and 2003 Adjusted PBT, an amount equal to the cash so contributed, multiplied by an annual interest charge at LIBOR up to the amount of cash distributed (but not reinvested in OpCo) pursuant to Section 8.8(e) and on any excess amount at LIBOR plus 2%, calculated monthly using the 90 day LIBOR rate effective on the first day of each month, shall be deducted from the calculation of such Adjusted PBT amounts, (g) and until December 31, 2003, Canadian Parent or any of its affiliates will not take any action that will cause OpCo to recognize any losses or incur any expenses outside of OpCo's Ordinary Course of Business (unless required by U.S. GAAP or Canadian Parent's accounting policies) or, alternatively, will add back all such losses to Trailing Twelve Month Adjusted PBT, 2002 Adjusted PBT and 2003 Adjusted PBT, if applicable, and (h) and until December 31, 2003, Canadian Parent or any of its affiliates will not take any action with respect to OpCo that will materially and adversely affect OpCo's ability to achieve the Adjusted PBT targets described in Sections 2.3, 2.4 and 2.5 or, if Canadian Parent takes any such action, appropriate adjustments will be made to the Adjusted PBT calculations and Canadian Parent and the Equity Holder Representative will agree on such adjustments, acting in good faith. All material decisions regarding the operations of OpCo in the ordinary course of business will be made by the operating officers of OpCo, after consultation with Canadian Parent; provided, however that if OpCo has negative quarterly Adjusted PBT (determined in accordance and consistent with the definitions of 2002 Adjusted PBT, 2003 Adjusted PBT and this Section 8.8) for two consecutive quarters or for any two quarters during any trailing four quarterly period beginning on or after January 1, 2002, then all subsequent decisions regarding the operations of OpCo in the ordinary course of business will be made by the directors of OpCo after consultation with the operating officers of Canadian Parent. All decisions regarding the operations of OpCo outside of the ordinary course of business will be made by the directors of OpCo after

consultation with the operating officers of Canadian Parent and OpCo in accordance with Canadian Parent's policies and procedures on such matters as in effect from time to time; provided, however that the selection, appointment and timing of any successor to Larry Organ as president of OpCo and the employment of a senior financial officer for OpCo shall be upon the mutual agreement of the directors of OpCo and Larry Organ (if Larry Organ is the president of OpCo), which selections and appointments and the timing thereof shall not be unreasonably delayed or resisted by Larry Organ. In addition, after the Closing Date and until December 31, 2003, Canadian Parent will not make any allocations of management fees or other corporate overhead of a general and non-specific nature to OpCo; provided, however that Canadian Parent may allocate to OpCo a fair and reasonable charge, consistent with charges to other affiliates of Canadian Parent, for payroll, administrative, accounting or other services provided to OpCo by Canadian Parent or its affiliates or for insurance, software licensing, audit, travel or other company wide expenses paid for by Canadian Parent.

   8.9    Non-Solicitation.

   (a)         Each Equity Holder, other than the New Members, agrees that for a period of three (3) full years from the date hereof, neither on his own behalf or on behalf of any Competing Enterprise, directly or indirectly, for the purpose of Engaging in Competition, shall he:

      (i)    approach, solicit, endeavor to solicit or gain the custom of, canvass, accept business from, or otherwise do business or communicate with or interfere with any Person (a "Restricted Person") that:

         (A)    is a customer, supplier, licensee, sales representative, distributor, dealer, manufacturer, vendor, consultant, or other similar business relation of Custom Offers as of or after the Closing Date;

         (B)    was a customer, supplier, licensee, sales representative, distributor, dealer, manufacturer, vendor, consultant, or other similar business relation of Custom Offers at any time within twelve (12) months prior to the Closing Date; or

         (C)    has received an oral or written proposal or submission as a prospective customer, supplier, licensee, sales representative, distributor, dealer, manufacturer, vendor, consultant, or other similar business relation from Custom Offers at any time within six (6) months prior to the Closing Date and with whom such Person has had contact with or serviced in any manner during his or her employment with the Company or whose identity was learned by such Person through his or her employment with the Company; provided, however, that this subsection (iii) shall be applicable only to those Persons who have been employees of Custom Offers.

      (ii)    hire, solicit, induce, or attempt to induce any Person who is then in the employ of Custom Offers or OpCo to leave the employ of, or terminate his, her or its

contractual relationship with Custom Offers or OpCo or in any way interfere with the relationship between Custom Offers or OpCo, or in any way interfere with the relationship between Canadian Parent or any of its affiliates and any employee or independent contractor thereof, or employ or attempt to employ directly or through another entity any such Person in an activity which constitutes Engaging in Competition or approach any such employee or independent contractor for any of the foregoing purposes.

(b)     For purposes of this Agreement, the term "Competing Enterprise" shall mean any Person in North America or in any foreign jurisdiction in which Custom Offers operates on the Closing Date, in each case which is engaged or endeavoring to engage in direct or database marketing solutions or is engaged or endeavoring to engage in any other line of business in which Custom Offers is involved or engaged in as of the date of the Closing.

(c)     For purposes of this Agreement the phrase "Engage or Engaging in Competition" shall mean to own, manage, operate, join, control, be employed or retained by or participate in the ownership, management, operation or control of or be connected in any manner, including, but not limited to, holding the positions of shareholder, director, officer, manager, consultant, independent contractor, employee, partner or investor in or receiving any financial remuneration, directly or indirectly, from, any Competing Enterprise; provided, however, that the ownership of less than 1% of the equity securities of any publicly traded company will not by itself constitute Engage or Engaging in Competition.

(d)     If any provision contained in this Section 8.9 shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Section 8.9, but this Section 8.9 shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. It is the intention of the parties that if any of the restrictions or covenants contained herein is held to cover a geographic area or to be for a length of time which is not permitted by applicable law, or in any way construed to be too broad or to any extent invalid, such provision shall not be construed to be null, void and of no effect, but to the extent such provision would be valid or enforceable under applicable law, a court of competent jurisdiction shall construe and interpret or reform this Section 8.9 to provide for a covenant having the maximum enforceable geographic area, time period and other provisions (not greater than those contained herein) as shall be valid and enforceable under such applicable law. Each Equity Holder acknowledge that Canadian Parent would be irreparably harmed by any breach of this Section 8.9 and that there would be no adequate remedy at law or in damages to compensate Canadian Parent for any such breach. Each Equity Holder agree that Canadian Parent shall be entitled to injunctive relief requiring specific performance by each Equity Holder of this Section 8.9, and each Equity Holder consent to the entry thereof.

## ARTICLE IX

## CONDITIONS PRECEDENT

9.1    <u>Conditions to Each Party's Obligation to Effect the Merger</u>.    The respective obligations of each party to effect the Merger will be subject to the satisfaction prior to the Closing Date of the following conditions:

(a)    <u>Interest Holders</u>.    This Agreement and the Merger shall have been approved and adopted by the requisite vote of the Equity Holders under the Charter Documents.

(b)    <u>No Injunctions or Restraints; Illegality</u>.    No temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other legal or regulatory restraint or prohibition preventing the consummation of the Merger shall be in effect, nor shall any proceeding brought by an administrative agency or commission or other governmental authority or instrumentality, domestic or foreign, seeking any of the foregoing be pending; nor shall there be any action taken, or any statute, rule, regulation or order enacted, entered, enforced or deemed applicable to the Merger, which makes the consummation of the Merger illegal or prevents or prohibits the Merger.    In the event an injunction or other order shall have been issued, each party agrees to use is reasonable diligent efforts to have such injunction or other order lifted.

(c)    <u>Governmental Approval</u>.    Canadian Parent, Custom Offers, OpCo and Merger Sub shall have timely obtained from each Governmental Entity all approvals, waivers and consents, if any, necessary for consummation of or in connection with the Merger and the transactions contemplated hereby, including such approvals, waivers and consents as may be required under Canadian law, the Securities Act and under state Blue Sky laws.

9.2    <u>Conditions of Obligations of Canadian Parent, OpCo and Merger Sub</u>.    The obligations of Canadian Parent, OpCo and Merger Sub to effect the Merger are subject to the satisfaction of the following conditions unless waived by Canadian Parent:

(a)    <u>Representations and Warranties of Custom Offers and the Equity Holders</u>. The representations and warranties of Custom Offers and the Equity Holders set forth in this Agreement which are qualified as to materiality shall have been true and correct, and the representations and warranties of Custom Offers and the Equity Holders which are not qualified as to materiality shall have been true and correct in all material respects, in each case, as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date, except to the extent any such representation or warranty expressly speaks of a particular date, in which case it shall be true and correct as of such date.    Canadian Parent, OpCo and Merger Sub shall have received a certificate signed by or on behalf of each of the Equity Holders and by the chief executive officer and the chief financial officer of Custom Offers to such effect on the Closing Date.

(b)    <u>Performance of Obligations of Custom Offers and the Equity Holders</u>. Custom Offers and the Equity Holders will have performed and complied in all material respects

all agreements, covenants, obligations and conditions required to be performed and complied by them under this Agreement prior to the Closing Date and Canadian Parent, OpCo and Merger Sub shall have received a certificate signed by each of the Equity Holders and by the chief executive officer and the chief financial officer of Custom Offers to such effect on the Closing Date.

        (c)     <u>No Material Adverse Change</u>. There shall not have occurred any Material Adverse Effect.

        (d)     <u>Escrow Agreement</u>. Canadian Parent will have received from each Interest Holder a duly executed Escrow Agreement and the Escrow Agreement shall be in full force and effect.

        (e)     <u>Organ Employment Agreement</u>. Larry Organ will have executed the Organ Employment Agreement in substantially the form attached as EXHIBIT 9.2(e).

        (f)     <u>Opinion of Counsel</u>. Canadian Parent will have received an opinion dated as of the Closing Date of Levun, Goodman & Cohen, special counsel to Custom Offers, substantially in the form attached as EXHIBIT 9.2(f).

        (g)     <u>Consents</u>. Canadian Parent will have received duly executed copies of all Consents specified in Section 9.2(g) of the Custom Offers Disclosure Schedule.

        (h)     <u>Payment of Expenses</u>. Canadian Parent shall have received written evidence satisfactory to it that the Equity Holders have paid all costs and expenses incurred by them or by Custom Offers in connection with this Agreement and the transactions contemplated hereby, including investment banking, legal and accounting expenses.

        (i)     <u>Closing Custom Offers Payment</u>. Canadian Parent shall have received the Closing Custom Offers Payment Certificate and shall have agreed with the amount of Closing Custom Offers Payment shown on such certificate.

        (j)     <u>Tax Good Standings</u>. Custom Offers shall have delivered to Canadian Parent all Tax good standing and other clearance certificates or similar documents which are required by any Tax authority in any jurisdiction in which Custom Offers is required to file Tax returns or pay Tax to relieve Canadian Parent or OpCo from any Tax liability or any obligations to withhold any portion of any consideration payable by reason of this Agreement or the transactions contemplated hereby.

        (k)     <u>Proceedings Satisfactory</u>. All proceedings to be taken by Custom Offers in connection with the transactions contemplated hereby and all documents incident thereto will be satisfactory in form and substance to Canadian Parent and its counsel, and Canadian Parent and its counsel will have received all such counterpart originals or certified or other copies of such documents as they reasonably may request.

(l)     Non-Disclosure and Assignment of Developments Agreements. Canadian Parent shall have received duly executed copies of Non-Disclosure and Assignment of Developments Agreements, substantially in the form attached hereto as EXHIBIT 9.2(1), from each Person set forth in Section 9.2(l) of the Custom Offers Disclosure Schedule.

(m)     Non-Competition, Non-Disclosure and Assignment of Developments Agreements. Canadian Parent shall have received duly executed copies of Non-Competition, Non-Disclosure and Assignment of Developments Agreements, substantially in the form attached hereto as EXHIBIT 9.2(m), from the following Persons: Sammy Rhein, Richard Jeffrey Tindell, Derek Bates, Jeff Zweben, Russ Effrig, Jon Dennis, Jennifer Liginski, Shelley Schoeneman, Christine Link-Wardawy and Adam Perrone.

(n)     Option Agreements. Canadian Parent shall have received duly executed copies of Option Agreements from each Person set forth in Section 9.2(n) of the Custom Offers Disclosure Schedule.

(o)     Release Agreements. Canadian Parent shall have received duly executed copies of Release Agreements from all employees and consultants of Custom Offers.

(p)     Consent of NW Interest Holders and NW Unit Holders. Pursuant to Section 2.3(a)(iv) of the Amended and Restated Merger Agreement dated as of December 14, 2000 by and among Canadian Parent and the other parties thereto, as amended by Amendment No. 1 dated as of January 25, 2001 and by Amendment No. 2 dated as of November 6, 2001 (the "Paradigm Merger Agreement"), Canadian shall have received the consent of a majority of the NW Interest Holders (as defined in the Paradigm Merger Agreement) and the NW Unit Holders (as defined in the Paradigm Merger Agreement) to the Merger.

(q)     Lender Consent. Canadian Parent shall have received the consent of its lending syndicate to the Merger.

(r)     Canadian Parent shall have received duly executed copies of valid written assignments, satisfactory in form and substance to Canadian Parent and its counsel, of the ownership rights of any Person other than Custom Offers in and to any Custom Offers Intellectual Property, Websites and Domain Names.

9.3     Conditions of Obligation of Custom Offers. The obligation of Custom Offers and the Equity Holders to effect the Merger is subject to the satisfaction of the following conditions unless waived by Custom Offers:

(a)     Representations and Warranties of Canadian Parent. The representations and warranties of Canadian Parent, OpCo and Merger Sub set forth in this Agreement which are qualified as to materiality shall have been true and correct, and the representations and warranties of Canadian Parent, OpCo and Merger Sub which are not qualified as to materiality shall have been true and correct in all material respects, in each case, as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date, except to the extent any such representation or warranty expressly speaks as of a particular date, in which case it shall be true

and correct as of such date. Custom Offers shall have received a certificate signed on behalf of Canadian Parent by a duly authorized officer of Canadian Parent to such effect.

     (b)   Performance of Obligations of Canadian Parent, OpCo and Merger Sub. Canadian Parent, OpCo and Merger Sub will have performed and complied in all material respects all agreements, covenants, obligations and conditions required to be performed or complied by them under this Agreement prior to the Closing Date, and Custom Offers will have received a certificate signed on behalf of Canadian Parent by a duly authorized officer of Canadian Parent to such effect.

     (c)   Opinions of Counsel. Custom Offers will have received an opinion dated as of the Closing Date of Testa, Hurwitz & Thibeault, LLP, U.S. counsel to Canadian Parent, substantially in the form attached as EXHIBIT 9.3(c)(1), and an opinion dated as of the Closing Date of Fraser Milner Casgrain LLP, Canadian counsel to Canadian Parent, substantially in the form attached as EXHIBIT 9.3(c)(2).

     (d)   Listing of Canadian Parent Shares. The Canadian Parent Shares issuable from time to time under this Agreement will have been conditionally approved for listing on the TSE subject to standard and usual listing conditions of the TSE.

## ARTICLE X

## INDEMNIFICATION

     10.1   Canadian Parent Indemnification. Canadian Parent shall indemnify, defend and hold harmless each Equity Holder and their respective affiliates, officers, directors, agents, employees, subsidiaries, partners, members and controlling persons (each, an "Equity Holder Indemnified Party") to the fullest extent permitted by law from and against any and all damages, losses, liabilities, costs and expenses (including reasonable expenses of investigation and reasonable attorney's fees and disbursements in connection with any claim, action, suit or proceeding) (collectively, "Losses") incurred or suffered by any Equity Holder Indemnified Party occasioned or caused by, resulting from or arising out of (i) any inaccuracy (or alleged inaccuracy) in or breach (or alleged breach) of any representation or warranty of Canadian Parent, OpCo or Merger Sub set forth in this Agreement or any certificate or other writing delivered pursuant hereto or in connection herewith, (ii) any failure (or alleged failure) by Canadian Parent, OpCo or Merger Sub to perform any of its or their obligations, covenants or agreement set forth in this Agreement or any certificate or other writing delivered pursuant hereto or in connection herewith, and (iii) any conduct by Canadian Parent, OpCo or Merger Sub which constitutes fraud, willful misconduct or malfeasance; provided, however, that Canadian Parent shall not be liable under this Section 10.1 to an Equity Holder Indemnified Party to the extent that it is finally judicially determined that such Losses occasioned or caused by, resulting from or arising out of (x) any misrepresentation or any breach of any warranty, obligation, covenant or other agreement by such Equity Holder Indemnified Party contained in this Agreement or (y) any conduct by such Equity Holder Indemnified Party which constitutes fraud, willful misconduct or malfeasance. In connection with the obligation of Canadian Parent to

indemnify an Equity Holder Indemnified Party for expenses as set forth above and subject to the limitations set forth in Section 10.4, Canadian Parent shall, upon presentation of appropriate invoices containing reasonable detail, reimburse each such Equity Holder Indemnified Party for all such expenses (including reasonable expenses of investigation and reasonable attorney's fees and disbursements in connection with any claim, action, suit or proceeding) as they are incurred by such Indemnified Party.

10.2    Interest Holders Indemnification.

(a)    Each Equity Holder shall, severally and not jointly, indemnify, defend and hold harmless Canadian Parent, OpCo, Merger Sub and Custom Offers and their respective affiliates, officers, directors, agents, employees, subsidiaries, partners, stockholders, members and controlling persons (each, a "Mosaic Indemnified Party") to the fullest extent permitted by law from and against any and all Losses incurred or suffered by any Mosaic Indemnified Party occasioned or caused by, resulting from or arising out of (i) any inaccuracy (or alleged inaccuracy) in or breach (or alleged breach) of any representation or warranty of such Equity Holder set forth in Article IV of this Agreement or any certificate or other writing delivered pursuant hereto or in connection herewith, (ii) any failure (or alleged failure) by such Equity Holder to perform any of its obligations, covenants or agreement set forth in this Agreement or any certificate or other writing delivered pursuant hereto or in connection herewith (other than the Organ Employment Agreement with respect to the Equity Holders other than Larry Organ), (iii) any conduct by such Equity Holder which constitutes fraud, willful misconduct or malfeasance; provided, however, that such Equity Holder shall not be liable under this Section 10.2(a) to a Mosaic Indemnified Party to the extent that it is finally judicially determined that such Losses occasioned or caused by, resulting from or arising out of (x) any misrepresentation or any breach of any warranty, obligation, covenant or other agreement by such Mosaic Indemnified Party contained in this Agreement or (y) any conduct by such Mosaic Indemnified Party which constitutes fraud, willful misconduct or malfeasance.

(b)    Each Interest Holder shall, jointly and severally, indemnify, defend and hold harmless each of the Mosaic Indemnified Parties to the fullest extent permitted by law from and against any and all Losses incurred or suffered by any Mosaic Indemnified Party occasioned or caused by, resulting from or arising out of (i) any inaccuracy (or alleged inaccuracy) in or breach (or alleged breach) of any representation or warranty of Custom Offers or of such Interest Holder or the Interest Holders that is made jointly and severally with Custom Offers, set forth in Article III of this Agreement or any certificate or other writing delivered pursuant hereto or in connection herewith, (ii) any failure (or alleged failure) by Custom Offers or any Equity Holder to perform any of its obligations, covenants or agreements set forth in this Agreement or any certificate or other writing delivered pursuant hereto or in connection herewith (including, without limitation, the Organ Employment Agreement), (iii) any conduct by Custom Offers which constitutes fraud, willful misconduct or malfeasance, (iv) any failure by Custom Offers to satisfy all obligations of Custom Offers under the Plan and to terminate all rights of its employees and consultants to Membership Interests or other equity interests in Custom Offers under the Plan prior to the Closing Date in accordance with Section 8.7 and (v) any demand, action, suit, claim, investigation or proceeding brought by Toplander against Custom Offers,

- 52 -

OpCo as the successor to Custom Offers, Mosaic or any affiliate of Mosaic or any of their properties and assets (a "Toplander Claim"); provided, however, that the Interest Holders shall not be liable under this Section 10.2(b) to a Mosaic Indemnified Party to the extent that it is finally judicially determined that such Losses occasioned or caused by, resulting from or arising out of (x) any misrepresentation or any breach of any warranty, obligation, covenant or other agreement by such Mosaic Indemnified Party contained in this Agreement or (y) any conduct by a Mosaic Indemnified Party which constitutes fraud, willful misconduct or malfeasance.

(c)     In connection with the obligation of an Equity Holder to indemnify a Mosaic Indemnified Party for expenses as set forth above and subject to the limitations set forth in Section 10.4, such Equity Holder shall, upon presentation of appropriate invoices containing reasonable detail, reimburse each such Mosaic Indemnified Party for all such expenses (including reasonable expenses of investigation and reasonable attorney's fees and disbursements, in connection with any claim, action, suit or proceeding) as they are incurred by such Indemnified Party.

10.3    Notification. Each Equity Holder Indemnified Party or Mosaic Indemnified Party (each an "Indemnified Party") shall, promptly after the receipt of notice of the commencement of any action, investigation, claim or other proceeding against such Indemnified Party in respect of which indemnity may be sought under this Article X, notify the Equity Holder Representative or Canadian Parent, as the case may be (each an "Indemnifying Party") in writing of the commencement thereof. The omission of any Indemnified Party to so notify an Indemnifying Party of any such action shall not relieve an Indemnifying Party from any liability which it may have to such Indemnified Party (a) other than pursuant to this Article X or (b) under this Article X unless, and only to the extent that, such omission results in an Indemnifying Party's forfeiture of substantive rights or defenses. In case any such action, claim or other proceeding shall be brought against any Indemnified Party, and it shall notify an Indemnifying Party of the commencement thereof, an Indemnifying Party shall be entitled to assume the defense thereof at its own expense, with counsel satisfactory to such Indemnified Party in its reasonable judgment; provided, however, that any Indemnified Party may, at its own expense, retain separate counsel to participate in such defense at its own expense. Notwithstanding the foregoing, in any action, claim or proceeding in which both an Indemnifying Party, on the one hand, and an Indemnified Party, on the other hand, are, or are reasonably likely to become, a party, such Indemnified Party shall have the right to employ separate counsel and to control its own defense of such action, claim or proceeding if, in the reasonable opinion of counsel to such Indemnified Party, a conflict or potential conflict exists between an Indemnifying Party, on the one hand, and such Indemnified Party, on the other hand, that would make such separate representation advisable; provided, however, that the Indemnifying Party shall not be liable for the fees and expenses of more than one counsel to all Indemnified Parties. Each Indemnifying Party agrees that it will not, without the prior written consent of the Indemnified Party, settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding relating to the matters contemplated hereby (if any Indemnified Party is a party thereto or has been actually threatened to be made a party thereto) unless such settlement, compromise or consent includes an unconditional release of each Indemnified Party from all liability arising or that may arise out of such claim, action or proceeding. An Indemnifying Party shall not be liable for any settlement of

- 53 -

any claim, action or proceeding effected against an Indemnified Party without the written consent of such Indemnifying Party, which consent shall not be unreasonably withheld. The rights accorded to an Indemnified Party hereunder shall be in addition to any rights that such Indemnified Party may have at common law, by separate agreement or otherwise; provided, however, that notwithstanding the foregoing or anything to the contrary contained in this Agreement, nothing in this Article X should restrict or limit any rights that any Indemnified Party may have to seek equitable relief. In the event that an Indemnified Party has received indemnification pursuant to this Article X and it is subsequently determined upon final judicial resolution of any action that such indemnification relates to Losses which arose or resulted from the gross negligence of the Indemnified Party, the Indemnified Party shall have an obligation to immediately reimburse the Indemnifying Party for all such indemnification paid to the Indemnified Party which relates to the Losses which arose or resulted from the gross negligence of the Indemnified Party.

10.4    Limitation of Indemnification.  Notwithstanding anything to the contrary in this Agreement, the obligations of the parties hereto for indemnification under this Article X for misrepresentations and breaches of warranty shall terminate on December 31, 2003, except (i) as to matters as to which any Indemnified Party has made a claim for indemnity or given written notice of a possible claim for indemnity on or prior to such date, which shall survive the expiration of such period until such claim is finally resolved and any obligations with respect thereto are fully satisfied; (ii) with respect to any claim for indemnification (x) pursuant to Section 10.2(b)(i) for any misrepresentation or breach of a representation or warranty under Sections 3.5, 3.7, 3.12, 3.18, 3.23 or 3.27 of this Agreement or (y) pursuant to Section 10.2(a)(i) for any misrepresentation or breach of a representation or warranty under Article IV(j) of this Agreement or (z) pursuant to Section 10.2(b)(i) for any misrepresentation or breach of a representation, warranty or covenant relating to Taxes, which shall terminate six months after the expiration of the relevant federal, state, local or non-U.S. statute of limitations except as to matters as to which any Indemnified Party has made a claim for indemnification or given written notice of a possible claim for indemnification on or prior to such date in which case the right to indemnification with respect thereto shall survive the expiration of such period until such claim is finally resolved and any obligations with respect thereto are fully satisfied; (iii) with respect to any claim for indemnification pursuant to Section 10.2(a) (other than any claim for misrepresentation or breach of a representation or warranty under Article IV(j) of this Agreement) or pursuant to Section 10.2(b)(i) for any misrepresentation or breach of warranty under Sections 3.1, 3.2 or 3.3 of this Agreement or pursuant to Section 10.2(b)(iv), which shall survive the Closing indefinitely.

10.5    Tax Contests.  Notwithstanding any of the foregoing, and except as set forth below in this Section 10.5, OpCo or an OpCo affiliate of OpCo's choice shall have the sole responsibility for all Tax audits and other proceedings with respect to any Tax Return filed or required to be filed by Custom Offers or OpCo or any of their affiliates or any asserted Tax liability of Custom Offers or OpCo or any of their affiliates. OpCo shall promptly notify the Equity Holder Representative of any proposed adjustment to a Custom Offers Tax Return with respect to any taxable period that may result in an indemnification obligation or an increased liability for Taxes of any Equity Holder (a "Notification"). The Equity Holder Representative

- 54 -

shall have the right to control any court or administrative proceeding relating solely to a Custom Offers Tax Return or Returns with respect to which the Equity Holders have an indemnification obligation or would suffer increased Tax liability, <u>provided</u> that the Equity Holder Representative shall not agree to any settlement without the prior written consent of OpCo (which consent shall not be unreasonably withheld), and the Equity Holder Representative shall not have the right to control a proceeding if OpCo or Canadian Parent reasonably determines that such proceeding could have a material and adverse effect on Canadian Parent, OpCo or any affiliate of Canadian Parent. The Equity Holder Representative will be considered to have taken control of such proceeding if and only if he notifies OpCo within thirty (30) days of receiving a Notification. OpCo shall have the right to participate in any such proceeding at its own cost and, if no such notification by the Equity Holder Representative is given to OpCo, to control any such proceeding.

     10.6   <u>Minimum Losses of Mosaic Indemnified Party</u>.  A Mosaic Indemnified Party shall not have any right to obtain indemnification pursuant to Section 10.2(b)(i) for any inaccuracy in or breach of a representation or warranty under Article III of this Agreement (other than Sections 3.1-3.3, 3.7, 3.18 or 3.27) until aggregate Losses of all Mosaic Indemnified Parties resulting from inaccuracies in or breaches of representations and warranties under Article III of this Agreement (other than Sections 3.1-3.3, 3.7, 3.18 or 3.27) exceed $100,000, after which time any and all Losses, including the first $100,000 of Losses, shall be recoverable in accordance with the terms hereof.

     10.7   <u>Maximum Indemnification by Equity Holders</u>.  The Mosaic Indemnified Parties shall not have any right to seek or obtain indemnification pursuant to Section 10.2(a)(i) for any misrepresentation or breach of a representation or warranty under Article IV(j) and Section 10.2(b) from any Equity Holder (other than Larry Organ) to the extent that the total amounts paid, directly or indirectly, by such Equity Holder in respect of indemnification claims pursuant to Section 10.2(a)(i) for any misrepresentation or breach of a representation or warranty under Article IV(j) and Section 10.2(b) would exceed the aggregate amount of Merger Consideration received, directly or indirectly, by such Equity Holder pursuant to Sections 2.1, 2.2, 2.3, 2.4 and 2.5 hereof (valued as of the date such Merger Consideration is deemed paid to such Equity Holder hereunder). The Mosaic Indemnified Parties shall not have any right to seek or obtain indemnification pursuant to Section 10.2(b) from Larry Organ to the extent that the total amounts paid, directly or indirectly, by Larry Organ in respect of indemnification claims pursuant to Section 10.2(b) would exceed the aggregate amount of Merger Consideration received, directly or indirectly, by all Equity Holders pursuant to Sections 2.1, 2.2, 2.3, 2.4 and 2.5 hereof (valued as of the date such Merger Consideration is deemed paid to such Equity Holders hereunder). In addition to the foregoing limitations, the Mosaic Indemnified Parties shall not have any right to seek or obtain indemnification pursuant to Section 10.2(a)(i) for any misrepresentation or breach of a representation or warranty under Article IV(j) and Section 10.2(b) from any Equity Holder to the extent that the total amounts paid, directly or indirectly, by all Equity Holders in respect of indemnification claims pursuant to Section 10.2(a)(i) for any misrepresentation or breach of a representation or warranty under Article IV(j) and Section 10.2(b) would exceed the aggregate amount of Merger Consideration received, directly or indirectly, by all Equity Holders pursuant to Sections 2.1, 2.2, 2.3, 2.4 and 2.5 hereof (valued as of the date such Merger Consideration is

deemed paid to such Equity Holders hereunder).

10.8    Minimum Losses of Equity Holder Indemnified Party.    An Equity Holder Indemnified Party shall not have any right to obtain indemnification pursuant to Section 10.1(a)(i) for any inaccuracy in or breach of a representation or warranty under Article V of this Agreement (other than Sections 5.1-5.3 and 5.7) until the aggregate Losses of all Equity Holder Indemnified Parties resulting from inaccuracies in or breaches of representations and warranties under Article V of this Agreement (other than Sections 5.1-5.3 and 5.7) exceed $100,000, after which time any and all Losses, including the first $100,000 of Losses, shall be recoverable in accordance with the terms hereof.

10.9    Maximum Indemnification by Canadian Parent.    All Equity Holder Indemnified Parties, collectively, shall have no rights to seek or obtain indemnification pursuant to Section 10.1 of this Agreement from Canadian Parent to the extent that the total amounts paid, directly or indirectly, by Canadian Parent in respect of indemnification claims pursuant to Section 10.1 would exceed as of the date of the final resolution of such claim an amount equal to $35,000,000 less the aggregate amount of Merger Consideration (valued as of the date of the payment of such Merger Consideration to the Equity Holders hereunder) paid, directly or indirectly, by Canadian Parent to all Equity Holders pursuant to Sections 2.1, 2.2, 2.3, 2.4 and 2.5 hereof.

10.10    Right to Set-Off.    The parties hereby agree that payments under this Article X by the Equity Holders with respect to claims for indemnification by any Mosaic Indemnified Party pursuant to this Article X may be deducted from and set-off against any amounts of the Merger Consideration remaining due and payable to the Equity Holders by OpCo pursuant to Article II and shall be treated as adjustments to the aggregate amount of the Merger Consideration.

10.11    Equity Holder Representative.

(a)    In order to administer the transactions contemplated by this Agreement, including the indemnification obligations of the Equity Holders under this Article X and the calculations set forth in Article II hereof, the Equity Holders hereby designate and appoint Larry Organ as their representative for purposes of this Agreement and as attorney-in-fact and agent for and on behalf of each Equity Holder (in such capacity, the "Equity Holder Representative").

(b)    Each Equity Holder hereby authorizes the Equity Holder Representative to represent the Equity Holder, and its successors, with respect to all matters arising under this Agreement, including without limitation, (i) to take all action necessary in connection with the indemnification obligations of the Equity Holders under this Article X, including the defense or settlement of any claims and the making of payments with respect thereto, (ii) to give and receive all notices required to be given under this Agreement, and (iii) to take any and all additional action as is contemplated to be taken by or on behalf of the Equity Holders by the Equity Holder Representative pursuant to this Agreement. The Equity Holder Representative shall send copies of notices it receives to the applicable Equity Holder.

(c)    In the event that Larry Organ or any substitute Equity Holder

Representative dies, becomes unable to perform his responsibilities as Equity Holder Representative or resigns from such position, the Equity Holders shall select another representative to fill such vacancy and such substituted Equity Holder Representative shall be deemed to be the Equity Holder Representative for all purposes of this Agreement. Any substitute Equity Holder Representative shall be selected by the majority vote of the Interest Holders based upon their percentage ownership of the Membership Interests of Custom Offers as of the Closing Date.

(d)     All decisions and actions by the Equity Holder Representative, including without limitation any agreement between the Equity Holder Representative or Canadian Parent relating to indemnification obligations of the Equity Holders under this Article X, including the defense or settlement of any claims and the making of payments with respect hereto, shall be binding upon all of the Equity Holders, and no Equity Holders shall have the right to object, dissent, protest or otherwise contest the same. The Equity Holder Representative shall incur no liability to the Equity Holders with respect to any action taken or suffered by the Equity Holder Representative in reliance upon any notice, direction, instruction, consent, statement or other documents believed by him to be genuinely and duly authorized, nor for any other action or inaction with respect to the indemnification obligations of the Equity Holders under this Article X, including the defense or settlement of any claims and the making of payments with respect thereto, except to the extent resulting from the Equity Holder Representative's own willful misconduct or gross negligence. The Equity Holder Representative may, in all questions arising under this Agreement rely on the advice of counsel, and for anything done, omitted or suffered in good faith by the Equity Holder Representative shall not be liable to the Equity Holders.

(e)     Canadian Parent shall be able to rely conclusively on the instructions and decisions of the Equity Holder Representative with respect to the indemnification obligations of the Equity Holders under this Article X, including the defense or settlement of any claims or the making of payments with respect thereto, or as to any other actions required or permitted to be taken by the Equity Holder Representative hereunder, and no party hereunder shall have any cause of action against Canadian Parent to the extent Canadian Parent has relied upon the instructions or decisions of the Equity Holder Representative.

(f)     The Equity Holders acknowledge and agree that the Equity Holder Representative may incur reasonable costs and expenses on behalf of the Equity Holders in their capacity as Equity Holder Representative ("Representative Expenses"). Each of the Equity Holders agrees to pay the Equity Holder Representative, promptly upon demand by the Equity Holder Representative therefor, its portion of any Representative Expenses, provided that no Equity Holder shall be required to pay, in the aggregate, Representative Expenses in an amount in excess of the consideration allocated to such Equity Holder.

(g)     The Equity Holder Representative shall not have the authority to represent any Equity Holder with respect to any matter arising under Section 10.2(a) of this Agreement.

10.12  Binding Effect.  The indemnification obligations contained in this Article X are an integral part of this Agreement and the Merger in the absence of which the Indemnified Parties would not have entered into this Agreement.

## ARTICLE XI

## TERMINATION

11.1  Mutual Agreement.  This Agreement may be terminated at any time prior to the Closing by the written consent of Canadian Parent and Custom Offers.

11.2  Termination by Canadian Parent.  This Agreement may be terminated by Canadian Parent (*provided that* it is not then in material breach of any representation, warranty, covenant or agreement contained in this Agreement) alone, by means of written notice to Custom Offers, if there has been (i) a material breach by Custom Offers or an Equity Holder of any representation, warranty, covenant or agreement set forth in this Agreement or other ancillary agreements, which breach would result in a failure to satisfy the closing conditions contained in Section 9.2 and has not been cured within five (5) business days following receipt by Custom Offers of notice of such breach or (ii) in the event of a Material Adverse Effect.

11.3  Termination by Custom Offers.  This Agreement may be terminated by Custom Offers (*provided that* it is not then in material breach of any representation, warranty, covenant or agreement contained in this Agreement) alone, by means of written notice to Canadian Parent, if there has been a material breach by Canadian Parent of any representation, warranty, covenant or agreement set forth in the Agreement or other ancillary agreements, which breach would result in a failure to satisfy the closing conditions contained in Section 9.3 and has not been cured within five (5) business days following receipt by Canadian Parent of notice of such breach.

11.4  Outside Date.  This Agreement may be terminated by Canadian Parent alone or by Custom Offers alone by means of written notice if the Closing does not occur on or prior to February 28, 2002; provided, however, that the right to terminate this Agreement pursuant to the preceding clause will not be available to any party whose failure to fulfill any obligation under this Agreement has been a significant cause of, or resulted in, the failure of the Closing to occur on or before such date.

11.5  Effect of Termination.  In the event of termination of this Agreement by either Custom Offers or Canadian Parent as provided in this Article, this Agreement will forthwith become void and have no effect, and there will be no liability or obligation on the part of Canadian Parent, Custom Offers, OpCo, Merger Sub, the Equity Holders or their respective officers, directors or managers, except that (i) the provisions of Sections 8.3, 8.6, 11.5 and 12.2 will survive any such termination and abandonment, and (ii) no party will be released or relieved from any liability arising from the willful breach by such party prior to termination of any of its representations, warranties, covenants or agreements as set forth in this Agreement.

ARTICLE XII

MISCELLANEOUS

12.1    <u>Entire Agreement</u>.  This Agreement, including the exhibits, schedules and other agreements delivered pursuant to this Agreement contain all of the terms and conditions agreed upon by the parties relating to the subject matter of this Agreement and supersede all prior agreements, negotiations, correspondence, undertakings and communications of the parties, whether oral or written, respecting that subject matter.

12.2    <u>Governing Law; Consent to Jurisdiction</u>.  The Merger will be governed by Delaware Law to the extent applicable, and all other aspects of this Agreement will be governed by the internal laws of the State of Delaware.  Legal proceedings relating to this Agreement, the agreements executed in connection with this Agreement or the transactions contemplated hereby or thereby may be commenced only in the state or federal courts in Delaware.  Each of the parties hereby consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.  The foregoing provisions will not be construed to preclude any party from bringing a counter-claim in any action or proceeding properly commenced in accordance with the foregoing provisions. Process in any such action or proceeding may be served on any party anywhere in the world. Notwithstanding the foregoing, any dispute relating to a claim under the Escrow Agreement will be resolved in accordance with the arbitration provisions of the Escrow Agreement.

12.3    <u>Arbitration</u>.

(a)    Subject to the provisions of Section 12.3(c) and Section 12.11, any and all disputes arising under or affecting this Agreement shall be resolved exclusively by confidential arbitration pursuant to the rules of the American Arbitration Association then in effect for that Association in Delaware or such other location as may be agreed by the parties.  Each of the parties shall designate one arbitrator and the two arbitrators so designated shall select a third arbitrator.  Among the remedies available to them, the arbitrators shall be authorized to order the specific performance of provisions of this Agreement.  The judgment upon award of the arbitrators shall be final and binding and may be enforced in any court of competent jurisdiction in the United States and each of the parties hereto unconditionally submits to the jurisdiction of such court for the purpose of any proceeding seeking such enforcement.  Subject to the provisions of Sections 12.3(c) and 12.11, the procedure described in this Section 12.3 shall be the exclusive means of resolving disputes arising under or affecting this Agreement.

(b)    All papers, documents or evidence, whether written or oral, filed with or presented to the panel of arbitrators shall be deemed by the parties and by the arbitrators to be confidential information.  No party or arbitrator shall disclose in whole or in part to any other person any such confidential information submitted in connection with the arbitration proceedings, except to the extent reasonably necessary to assist counsel in the arbitration or preparation for arbitration of the dispute.  Confidential information may be disclosed (i) to attorneys, (ii) to parties, and (iii) to outside experts requested by either party's counsel to furnish

- 59 -

technical or expert services or to give testimony at the arbitration proceedings, subject, in the case of such experts, to execution of a legally binding written statement that such expert is fully familiar with the terms of this Section 12.3(b), agrees to comply with the confidentiality terms of this Section 12.3(b) and will not use any confidential information disclosed to such expert for personal or business advantage.

(c)    The parties hereto further acknowledge that any breach of this Agreement may result in irreparable harm to the other party. Accordingly, nothing in this Agreement shall be construed to prohibit any party, pursuant to Section 12.11 hereof or on a preliminary basis in aid of arbitration from instituting proceedings for injunctive or other provisional or interim relief in any court having jurisdiction over the parties and the subject matter of the dispute, to obtain specific performance of the provisions of this Agreement, to enjoin activities in violation of the provisions of this Agreement, or as necessary to protect such party's name, confidential or proprietary information, trade secrets, know-how or any other proprietary rights.

(d)    Except where clearly prevented by the area in dispute, both parties agree to continue performing their respective obligations under this Agreement while the dispute is being resolved.

(e)    All costs and expenses incurred in connection with the arbitration procedures set forth in this Section 12.3 shall be shared equally by Canadian Parent and the Equity Holders.

12.4    Notices.    All notices, requests, demands or other communications which are required or may be given pursuant to the terms of this Agreement will be in writing and will be deemed to have been duly given: (i) on the date of delivery if personally delivered by hand, (ii) upon the third day after such notice is deposited in the United States mail, if mailed by registered or certified mail, postage prepaid, return receipt requested, (iii) upon the date scheduled for delivery after such notice is sent by a nationally recognized overnight express courier or (iv) by fax upon written confirmation (including the automatic confirmation that is received from the recipient's fax machine) of receipt by the recipient of such notice:

If to Canadian Parent, OpCo or          Mosaic Group Inc.
Merger Sub:                             469 A. King Street West
                                        Toronto, Ontario, Canada
                                        M5V 3M4
                                        Attention: Chief Financial Officer
                                        Telephone No.: (416) 813-0995
                                        Fax No.: (416) 813-0970

<u>With a copy to:</u>

Testa, Hurwitz & Thibeault, LLP
125 High Street
Boston, Massachusetts 02110
Attention:  Jocelyn M. Arel, Esq.
Telephone No.: (617) 248-7000
Fax No.: (617) 248-7100

<u>If to Custom Offers or an Equity Holder:</u>     Custom Offers LLC
1880 Oak Avenue
2nd Floor
Evanston, Illinois 60201
Attention:  Chief Executive Officer
Telephone No.: (847) 864-3900
Fax No.: (847) 864-9016

<u>With a copy to:</u>

Levun, Goodman & Cohen
500 Skokie Boulevard
Suite 650
Northbrook, Illinois 60062
Attention:  Michael J. Cohen, Esq.
Telephone No.: (847) 509-7700
Fax No.: (847) 509-7709

Such addresses may be changed, from time to time, by means of a notice given in the manner provided in this Section 12.4.

12.5     <u>Severability</u>.  If any provision of this Agreement is held to be unenforceable for any reason, it will be modified rather than voided, if possible, in order to achieve the intent of the parties to this Agreement to the extent possible.  In any event, all other provisions of this Agreement will be deemed valid and enforceable to the full extent.

12.6     <u>Assignment</u>.  No party to this Agreement may assign, by operation of law or otherwise, all or any portion of its rights, obligations, or liabilities under this Agreement without the prior written consent of Custom Offers and Canadian Parent, which consent may be withheld in the absolute discretion of the party asked to grant such consent.  Any attempted assignment by Canadian Parent, on the one hand, or by Custom Offers, on the other hand, in violation of this Section 12.6 will be voidable and will entitle Custom Offers or Canadian Parent, respectively, to terminate this Agreement at its option.

GAJONES6012/1.2238973-3

12.7    Counterparts.  This Agreement may be executed in two or more partially or fully executed counterparts each of which will be deemed an original and will bind the signatory, but all of which together will constitute but one and the same instrument.  The execution and delivery of a Signature Page to Merger Agreement in the form annexed to this Agreement, including a facsimile copy of the actual signature, by any party hereto who will have been furnished the final form of this Agreement will constitute the execution and delivery of this Agreement by such party.

12.8    Amendment.  At any time prior to the Closing, this Agreement may not be amended except by an instrument in writing executed by Custom Offers, each of the Equity Holders and Canadian Parent.  After the Closing, this Agreement may not be amended except by an instrument in writing executed by the Equity Holder Representative and Canadian Parent.

12.9    Extension, Waiver.  At any time prior to the Closing, any party hereto may, to the extent legally allowed: (i) extend the time for the performance of any of the obligations or other acts of any other party hereto to the party extending such time, (ii) waive any inaccuracies in the representations and warranties made to such party contained herein or in any document delivered pursuant hereto, and (iii) waive compliance with any of the agreements, covenants or conditions for the benefit of such party contained herein.    After the Closing, the Equity Holder Representative, on behalf of Custom Offers and each of the Equity Holders (each, a "Represented Party"), to the extent legally allowed: (i) extend the time for the performance of any of the obligations or other acts of any other party hereto to any Represented Party extending such time, (ii) waive any inaccuracies in the representations and warranties made to any Represented Party contained herein or in any document delivered pursuant hereto, and (iii) waive compliance with any of the agreements, covenants or conditions for the benefit of any Represented Party contained herein.  Any agreement on the part of a party hereto to any such extension or waiver will be valid only if set forth in an instrument in writing signed on behalf of such party.

12.10    Interpretation.  When a reference is made in this Agreement to Sections, Exhibits or Schedules, such reference will be to a Section, Exhibit or Schedule to this Agreement unless otherwise indicated.  The words "include," "includes," and "including" when used therein will be deemed in each case to be followed by the words "without limitation."  The table of contents, index to defined terms, and headings contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement.

12.11    Other Remedies; Specific Performance.  Any and all remedies herein expressly conferred upon a party will be deemed cumulative and not exclusive of any other remedy conferred hereby, or by law or equity upon such party, and the exercise by a party of any one remedy will not preclude the exercise of any other remedy.  The parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of the United States or any state having jurisdiction, this being in addition to any other remedy to which they are entitled at law or in equity.

- 62 -

12.12   <u>Currency</u>  All dollar amounts referred to in this Agreement are expressed in U.S. dollars.


*(The remainder of this page has  been left blank intentionally.)*

*Signature Page to*
*Merger Agreement*

IN WITNESS WHEREOF, Canadian Parent, OpCo, Merger Sub, Custom Offers and the Equity Holders have executed this Agreement as of the date first written above.

MOSAIC GROUP INC.

By:_____

Name:_____

Title:_____


CUSTOM OFFERS HOLDING COMPANY

By:_____

Name:_____

Title:_____


CUSTOM OFFERS ACQUISITION CORP.

By:_____

Name:_____

Title:_____


CUSTOM OFFERS LLC

By: Organ Brothers, Inc.,
     its Manager

By:_____

Name:_____

Title:_____

*Signature Page to*
*Merger Agreement*

IN WITNESS WHEREOF, Canadian Parent, OpCo, Merger Sub, Custom Offers and the Equity Holders have executed this Agreement as of the date first written above.

MOSAIC GROUP INC.

By:_____
    Name:_____
    Title:_____


CUSTOM OFFERS HOLDING
COMPANY

By:_____
    Name:_____
    Title:_____


CUSTOM OFFERS ACQUISITION CORP.

By:_____
    Name:_____
    Title:_____


CUSTOM OFFERS LLC

By: Organ Brothers, Inc.,
    its Manager

By:_____
    Name:_____
    Title:_____

GAJONES6012/1.2238973-3

*Signature Page to*
*Merger Agreement*

**INTEREST HOLDERS:**

_____
Lawrence P. Organ

_____
Michael A. Organ

_____
Lowell D. Kraff

_____
Brian B. Boorstein

_____
Gidon Y. Cohen

**EQUITY HOLDERS:**

_____
Sammy Rhein

_____
Richard Jeffrey Tindell

_____
Derek Bates

*Signature Page to*
*Merger Agreement*

**INTEREST HOLDERS:**

_____
Lawrence P. Organ

_____
Michael A. Organ

_____
Lowell D. Kraff

_____
Brian B. Boorstein

_____
Gidon Y. Cohen

**EQUITY HOLDERS:**

_____
Sammy Rhein

_____
Richard Jeffrey Tindell

_____
Derek Bates

- 65 -

*Signature Page to*
*Merger Agreement*

**INTEREST HOLDERS:**

_____
Lawrence P. Organ

_____
Michael A. Organ

_____
Lowell D. Kraff

_____
Brian B. Boorstein

_____
Gidon Y. Cohen

**EQUITY HOLDERS:**

_____
Sammy Rhein

_____
Richard Jeffrey Tindell

_____
Derek Bates

- 65 -

GAJONES6012/1.2238973-3

*Signature Page to*
*Merger Agreement*

**INTEREST HOLDERS:**

_____
Lawrence P. Organ

_____
Michael A. Organ

_____
Lowell D. Kraff

_____
Brian B. Boorstein

_____
Gidon Y. Cohen

**EQUITY HOLDERS:**

_____
Sammy Rhein

_____
Richard Jeffrey Tindell

_____
Derek Bates

GAJONES6012/1.2238973-3

*Signature Page to*
*Merger Agreement*

**INTEREST HOLDERS:**

_____

Lawrence P. Organ

_____

Michael A. Organ

_____

Lowell D. Kraff

_____

Brian B. Boorstein

_____

Gidon Y. Cohen

**EQUITY HOLDERS:**

_____

Sammy Rhein

_____

Richard Jeffrey Tindell

_____

Derek Bates

GAJONES6012/1.2238973-3

*Signature Page to*
*Merger Agreement*

**INTEREST HOLDERS:**

_____
Lawrence P. Organ

_____
Michael A. Organ

_____
Lowell D. Kraff

_____
Brian B. Boorstein

_____
Gidon Y. Cohen

**EQUITY HOLDERS:**

_____
Sammy Rhein

_____
Richard Jeffrey Tindell

_____
Derek Bates

GAJONES6012/1.2238973-3

*Signature Page to
Merger Agreement*

_____
Jeff Zweben

_____
Russ Effrig

_____
Jon Dennis

_____
Jennifer Liginski

_____
Shelley Schoeneman

_____
Christine Link-Wardawy

_____
Adam Perrone

_____
Daren Becker

_____
Rachel Begelman

_____
Amy Brooks

- 65 -

*Signature Page to*
*Merger Agreement*

---
Jeff Zweben

---
Russ Bhing

---
Jon Dennis

---
Jennifer Liginski

---
Shelley Schoeneman

---
Christine Link-Wardawy

---
Adam Perrone

---
Daren Becker

---
Rachel Begelman

---
Amy Brooks

GAJONES6012/1.2238973-3

*Signature Page to*
*Merger Agreement*

_____
Jeff Zweben


_____
Russ Effing

_____
Jon Dennis


_____
Jennifer Liginski


_____
Shelley Schoeneman


_____
Christine Link-Wardawy


_____
Adam Petrone


_____
Daren Becker


_____
Rachel Begelman


_____
Amy Brooks

- 64 -

*Signature Page to*
*Merger Agreement*

_____
Jeff Zweben

_____
Russ Effrig

_____
Jon Dennis

_____
Jennifer Liginski

_____
Shelley Schoeneman

_____
Christine Link-Wardawy

_____
Adam Perrone

_____
Daren Becker

_____
Rachel Begelman

_____
Amy Brooks

*Signature Page to*
*Merger Agreement*

_____
Jeff Zweben

_____
Russ Effrig

_____
Jon Dennis

_____
Jennifer Liginski

_____
Shelley Schoeneman

_____
Christine Link-Wardawy

_____
Adam Perrone

_____
Daren Becker

_____
Rachel Begelman

_____
Amy Brooks

*Signature Page to
Merger Agreement*

_____
Jeff Zweben

_____
Russ Effrig

_____
Jon Dennis

_____
Jennifer Liginski

_____
Shelley Schoeneman

_____
Christine Link-Wardawy

_____
Adam Perrone

_____
Daren Becker

_____
Rachel Begelman

_____
Amy Brooks

*Signature Page to*
*Merger Agreement*

_____

Jeff Zweben


_____

Russ Effrig


_____

Jon Dennis


_____

Jennifer Liginski


_____

Shelley Schoeneman


_____

Christine Link-Wardawy

_____

Adam Perrone


_____

Daren Becker


_____

Rachel Begelman


_____

Amy Brooks

*Signature Page to*
*Merger Agreement*

_____
Jeff Zweben

_____
Russ Effrig

_____
Jon Dennis

_____
Jennifer Liginski

_____
Shelley Schoeneman

_____
Christine Link-Wardawy

_____
Adam Perrone

*Daren M. Becker*
_____
Daren Becker

_____
Rachel Begelman

_____
Amy Brooks

- 65 -

*Signature Page to*
*Merger Agreement*

_____
Jeff Zweben

_____
Russ Effrig

_____
Jon Dennis

_____
Jennifer Liginski

_____
Shelley Schoeneman

_____
Christine Link-Wardawy

_____
Adam Perrone

_____
Daren Becker

_____
Rachel Begelman

_____
Amy Brooks

- 65 -

*Signature Page to*
*Merger Agreement*

_____

Jeff Zweben

_____

Russ Effrig

_____

Jon Dennis

_____

Jennifer Liginski

_____

Shelley Schoeneman

_____

Christine Link-Wardawy

_____

Adam Perrone

_____

Daren Becker

_____

Rachel Begelman

_____

Amy Brooks

*Signature Page to*
*Merger Agreement*

_____
Andrew Cheyne

_____
Keri Hillemeyer

_____
Natalie Keder

_____
Scott MacFarlane

_____
Michael MacRunnel

_____
Stacey Taylor

GAJONES6012/1.2238973-3

*Signature Page to*
*Merger Agreement*

_____
Andrew Cheyne


_____
Keri Hillemeyer

_____
Natalie Keder

_____
Scott MacFarlane

_____
Michael MacRunnel

_____
Stacey Taylor

*Signature Page to*
*Merger Agreement*

_____
Andrew Cheyne

_____
Keri Hillemeyer

_____
Natalie Keder

_____
Scott MacFarlane

_____
Michael MacRunnel

_____
Stacey Taylor

GAJONES6012/1.2238973-3

*Signature Page to*
*Merger Agreement*

_____
Andrew Cheyne


_____
Keri Hillemeyer


_____
Natalie Keder

_____
Scott MacFarlane


_____
Michael MacRunnel


_____
Stacey Taylor

*Signature Page to*
*Merger Agreement*

_____
Andrew Cheyne


_____
Keri Hillemeyer


_____
Natalie Keder


_____
Scott MacFarlane


_____
Michael MacRunnel


_____
Stacey Taylor

*Signature Page to*
*Merger Agreement*

_____
Andrew Cheyne


_____
Keri Hillemeyer


_____
Natalie Keder


_____
Scott MacFarlane


_____
Michael MacRunnel

*Stacey Taylor*
Stacey Taylor