# EXHIBIT 3

Westlaw.

2006 WL 73440                                                    Page 1

--- F.3d ----, 2006 WL 73440 (3rd Cir.(N.J.))

**(Cite as: 2006 WL 73440 (3rd Cir.(N.J.)))**

**H**

**Briefs and Other Related Documents**

United States Court of Appeals,
Third Circuit.
Patricia BENAK, on behalf of ALLIANCE
PREMIER GROWTH FUND,
v.
ALLIANCE CAPITAL MANAGEMENT L.P.;
John D. Carifa; Alfred Harrison; Mark D.
Gersten; Ruth Block; David H. Dievler; John H.
Dobkin; William H. Foul, Jr.;
James M. Hester; Clifford L. Michel; Donald J.
Robinson.
No. 05-1070.

Submitted Under Third Circuit LAR 34.1(a) Nov.
18, 2005.
Opinion Filed: Jan. 13, 2006.

**Background:** Mutual fund investors sued mutual
fund advisers alleging securities fraud. After
transfer and consolidation of claims, 279 F.Supp.2d
228, the United States District Court for the District
of New Jersey, Jose L. Linares, J., 349 F.Supp.2d
882, dismissed complaint. Investors appealed.

**Holding:** The Court of Appeals, Barry, Circuit
Judge, held that investors' claims were untimely.
Affirmed.

West Headnotes

**[1] Federal Civil Procedure ☞1754**
170Ak1754 Most Cited Cases
Statute of limitations defense is affirmative one, and
in order to undergird dismissal, must appear on face
of complaint.

**[2] Limitation of Actions ☞100(6)**
241k100(6) Most Cited Cases

One-year period for filing securities fraud complaint
begins to run when plaintiffs discovered or in
exercise of reasonable diligence should have
discovered basis for their claim against defendant.
Securities Exchange Act of 1934, § 9(e), 15
U.S.C.A. § 78i(e).

**[3] Limitation of Actions ☞100(11)**
241k100(11) Most Cited Cases
In assessing limitations defense in securities fraud
action, whether plaintiffs, in exercise of reasonable
diligence, should have known of basis for their
claims depends on whether they had sufficient
information of possible wrongdoing to place them
on inquiry notice or to excite storm warnings of
culpable activity. Securities Exchange Act of 1934,
§ 9(e), 15 U.S.C.A. § 78i(e).

**[4] Limitation of Actions ☞100(12)**
241k100(12) Most Cited Cases
Plaintiffs asserting securities fraud claim cannot
avoid time bar simply by claiming they lacked
knowledge of details or narrow aspects of alleged
fraud. Securities Exchange Act of 1934, § 9(e), 15
U.S.C.A. § 78i(e).

**[5] Limitation of Actions ☞195(5)**
241k195(5) Most Cited Cases
Once defendants establish storm warnings in
pressing their affirmative limitations defense in
securities fraud action, burden shifts to plaintiffs to
show that they exercised reasonable due diligence
and yet were unable to discover their injuries.
Securities Exchange Act of 1934, § 9(e), 15
U.S.C.A. § 78i(e).

**[6] Limitation of Actions ☞100(11)**
241k100(11) Most Cited Cases
If plaintiffs asserting securities fraud claim have not
shown reasonable due diligence, knowledge they
would have acquired through investigation is
imputed to them in determining when statute of
limitations began to run. Securities Exchange Act

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2006 WL 73440 (3rd Cir.(N.J.))

**(Cite as: 2006 WL 73440 (3rd Cir.(N.J.)))**

of 1934, § 9(e), 15 U.S.C.A. § 78i(e).

**[7] Limitation of Actions** ☞100(12)
241k100(12) Most Cited Cases
Statutory period for mutual fund investors to assert securities fraud claims against mutual fund advisors accrued upon publication of news accounts of fund's losses as result of highly-publicized bankruptcy of company in which fund had heavily invested. Securities Exchange Act of 1934, § 9(e), 15 U.S.C.A. § 78i(e).

James Bonner, Shalov, Stone & Bonner, New York, NY, for Appellants Patrick J. Goggins, Laura H. Goggins, and Fred B. Voigt.

Mark A. Kirsch, James F. Moyle, Jason A. D'Angelo, Clifford Chance US, New York, N.Y. and Herbert J. Stern, Stern & Kilcullen, Roseland, NJ, for Appellees Alliance Cap. Mgmt., John D. Carifa, Alfred Harrison, and Mark D. Gersten.

G. Stewart Webb, Jr., Venable, Baltimore, MD and John L. Hardiman, Sullivan & Cromwell, New York, NY, for Appellees Alliance Premier Growth Fund, Ruth Block, David H. Dievler, John H. Dobkin, William H. Foulk, Jr., James M. Hester, Clifford L. Michel, and Donald J. Robinson.

Before BARRY and AMBRO, Circuit Judges, and POLLAK, [FN*] District Judge.

OPINION OF THE COURT

BARRY, Circuit Judge.

**\*1** Appellees--Alliance Capital Management L.P. ("Alliance Capital"), which was the investment advisor to the Alliance Premier Growth Fund, Inc. (the "Fund"); Alfred Harrison, the premier portfolio manager of the Fund; and a number of former directors and officers of the Fund--and appellants, shareholders in the Fund from October 30, 2000 through November 29, 2001 (the "Class Period"), are before us on appellants' appeal of the District Court's dismissal of their complaint on statute of limitations grounds. We will affirm.

**I. Background**

During the Class Period, the Fund--a long term capital growth fund--held and continued to purchase shares of Enron stock. As of November 30, 2000, the Fund held $157,536,750 worth of Enron stock, as indicated in the Fund's 2000 annual report to the SEC. (Amended Class Action Compl. ("Am.Compl.") ¶ 73, A89.) Over the course of the next six months, the Fund acquired an additional 4,765,800 shares. Apparently, no Fund report issued between the May 31, 2001 semi-annual report and Enron's bankruptcy. During that time period, however, concerns about Enron's solvency began to be discussed publicly.

In their amended class action complaint of December 8, 2003, appellants referenced numerous news accounts beginning as early as September of 2000 and accelerating in the late summer and early fall of 2001 regarding Enron's financial health and accounting practices. [FN1] The end of October and beginning of November brought more specific accounts of trouble at Enron. [FN2] Concern continued to heighten as November waned, [FN3] particularly focused around a proposed acquisition of Enron by Dynegy that fell through in late November. [FN4] Throughout this period, Alliance's internal analysts gave voice to these concerns. [FN5]

Enron finally collapsed, filing for bankruptcy on December 2, 2001. In the days immediately following that filing, reports of investors surprised by the collapse and the losses they sustained pervaded the media. [FN6] Of particular relevance here, Alliance's large stake in Enron was referenced and Fund portfolio manager Harrison was quoted regarding Enron's demise. [FN7]

Moreover, in the week following Enron's collapse, *The New York Times* reported a potential conflict of interest of an Alliance insider, Frank Savage, who was on the boards of both Alliance and Enron during the relevant period of time. [FN8] The same day that the *Times* article appeared, Patricia Benak filed a complaint (the "Benak complaint") against Alliance in the U.S. District Court for District of New Jersey, alleging Investment Company Act claims. [FN9] The complaint in the litigation now

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2006 WL 73440 (3rd Cir.(N.J.))

**(Cite as: 2006 WL 73440 (3rd Cir.(N.J.)))**

before us was initially filed on December 13, 2002--more than a year after the Enron bankruptcy and the Benak complaint-- in the U.S. District Court for the Southern District of New York by Patrick and Laura Goggins (the "Goggins complaint"), and was transferred to the District of New Jersey on August 13, 2003. The factual basis of the Goggins complaint, as subsequently amended, closely tracks that of the Benak complaint.

**\*2** According to the Goggins complaint, in October and November 2001, as the reports of Enron's worsening financial state increased, appellees continued to invest in the company. [FN10] As already noted, media coverage around and after Enron's fall included reference to Alliance's holdings in Enron, and either explicitly or implicitly referenced Alliance's losses. [FN11] Alliance's continued investment up until Enron's bitter end, despite the negative news accounts and communications to and by analysts at Alliance manifesting concern about Enron's solvency, [FN12] was the basis for appellants' §§ 11 and 12 claims. [FN13] Appellants argue that the Fund's publicized claims regarding the type of investment strategies employed and companies invested in were materially misleading in light of the Fund's continued and increasing stake in Enron in the autumn of 2001.

Appellees pointed to the same reports of Enron's financial state to assert their affirmative defense that appellants were on inquiry notice prior to December 13, 2001--one year before the December 13, 2002 filing of the initial Goggins complaint. They also point to the December 7, 2001 filing of the Benak complaint. In response, appellants argue that information critical to their complaint was not available until after December 13, 2001, in particular, that they had no way of knowing what Alliance's Enron holdings were until they received the Fund's report early in 2002. They also cite a Senate report published in the summer of 2002 that revealed important information about potential relevant conflicts at Alliance, although they did not reference that report in their initial complaint.

The District Court dismissed the Goggins

complaint on December 10, 2004. Its opinion reviewed the newspaper accounts and public information cited in the complaint, as well as additional newspaper articles submitted by appellees, and concluded that this information, along with knowledge that the Fund held Enron shares prior to the bankruptcy filing, was more than sufficient to place appellants on inquiry notice prior to December 13, 2001. The Court also referenced the Benak complaint, noting that its early filing was somewhat probative of the information that was available to reasonable investors at the time.

## II. Jurisdiction and Standard of Review

We have jurisdiction under 28 U.S.C. § 1291. The District Court dismissed the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Our review of that dismissal, therefore, is plenary. *See Gallo v. City of Philadelphia*, 161 F.3d 217, 221 (3d Cir.1998). We must accept as true all allegations in the complaint and draw all reasonable inferences from those facts in the light most favorable to plaintiffs--here, appellants. *Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir.1989). The dismissal must be upheld "if it appears to a certainty that no relief could be granted under any set of facts which could be proved." *D.P. Enters., Inc. v. Bucks County Community College*, 725 F.2d 943, 944 (3d Cir.1984). We need not, however, credit "bald assertions" or "legal conclusions." *Evancho v. Fisher*, 423 F.3d 347, 351 (3d Cir.2005).

## III. Analysis

**\*3** [1] There is no dispute that the relevant statute of limitations for appellants' claims is "one year after discovery of the facts constituting the violation and within three years after such violation." 15 U.S.C. § 78i(e). [FN14] Appellants filed the initial Goggins complaint on December 13, 2002. The relevant date, therefore, for evaluating appellants' notice of their claims is December 13, 2001.

[2][3][4] In dismissing the amended class action complaint, the District Court applied an inquiry notice standard. In *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314 (3d Cir.2002), we made it clear that "[t]o the extent a securities fraud plaintiff was on inquiry

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2006 WL 73440 (3rd Cir.(N.J.))

**(Cite as: 2006 WL 73440 (3rd Cir.(N.J.)))**

notice of the basis for claims more than one year prior to bringing the action, his or her claim is subsequently time-barred by the requisite statute of limitations." *Id.* at 1325. "[T]he one-year period begins to run when the plaintiffs 'discovered or in the exercise of reasonable diligence should have discovered the basis for their claim' against the defendant." *Id.* (quoting *Gruber v. Price Waterhouse,* 697 F.Supp. 859, 863 (E.D.Pa.1988)).

Whether the plaintiffs, in the exercise of reasonable diligence, should have known of the basis for their claims depends on whether they had "sufficient information of possible wrongdoing to place them on 'inquiry notice' or to excite 'storm warnings' of culpable activity." *Id.* (adding that the "test for 'storm warnings is an objective one, based on whether a "reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning" ' ") (citations omitted); *see In re Daimlerchrysler AG Sec. Litig.,* 269 F.Supp.2d 508, 513 (D.Del.2003). Plaintiffs cannot avoid the time bar simply by claiming they lacked knowledge "of the details or 'narrow aspects' of the alleged fraud." *NAHC,* 306 F.3d at 1326 (quoting *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 975 F.Supp. 584, 599 (D.N.J.1997)). Rather, the clock starts when they " 'should have discovered the general fraudulent scheme.' " *Id.* (quoting *Prudential,* 975 F.Supp. at 599); *see Mathews v. Kidder, Peabody & Co., Inc.,* 260 F.3d 239, 252 (3d Cir.2001) ("[I]nvestors are presumed to have read prospectuses, quarterly reports, and other information related to their investments."); *In re Initial Public Offering Sec. Litig.,* 341 F.Supp.2d 328, 345 (S.D.N.Y.2004) ("A plaintiff in a securities fraud case 'is charged with knowledge of publicly available news articles and analyst's reports to the extent that they constitute storm warnings sufficient to trigger inquiry notice.' ") (citation omitted).

[5][6] Once defendants establish "storm warnings" in pressing their affirmative defense, "the burden shifts to the plaintiffs to show that they exercised reasonable due diligence and yet were unable to discover their injuries." *Mathews,* 260 F.3d at 252; *see DaimlerChrysler,* 269 F.Supp.2d at 513.

"Whether the plaintiffs exercised reasonable diligence is both a subjective and objective inquiry." *DaimlerChrysler,* 269 F.Supp.2d at 513 (citing *Mathews,* 260 F.3d at 252). If they have not shown such diligence, the knowledge they would have acquired through investigation is imputed to them. *See NAHC,* 306 F.3d at 1326 (" 'Once on inquiry notice, plaintiffs have a duty to exercise reasonable diligence to uncover the basis for their claims, and are held to have constructive notice of all facts that could have been learned through diligent investigation during the limitations period.' ") (quoting *Gruber,* 697 F.Supp. at 864). In reviewing the application of the inquiry notice standard in *NAHC,* we quoted the finding below that the plaintiffs "were at least on inquiry notice of their claims ... and, in the exercise of reasonable diligence, *should have* discovered the basis for the claims within one year." *Id.* (emphasis added). Plaintiffs cannot, *post hoc,* excuse a failure to inquire by demonstrating the difficulty they would have had attaining relevant information. *See id.* at 1327 ("This Court has previously held that 'excusing Appellant's lack of inquiry because, in retrospect, reasonable diligence would not have uncovered their injury ... would, in effect, discourage investigation.") (quoting *Mathews,* 260 F.3d at 252 n. 16). Therefore, "if storm warnings existed, and the [a]ppellants chose not to investigate, we will deem them on inquiry notice of their claims." *Mathews,* 260 F.3d at 252 n. 16.

**\*4** The District Court compared this case to *NAHC* and determined that inquiry notice was clearly established prior to December 13, 2001 [FN15] and that nothing in the complaint demonstrated reasonably diligent efforts to investigate the claims. Although, for the reasons discussed below, this case does not so neatly fit into the paradigm outlined by *NAHC,* we agree that appellants were on inquiry notice of their claims more than one year prior to filing suit.

Undergirding the inquiry notice analysis is the assumption that a plaintiff either was or should have been able, in the exercise of reasonable diligence, to file an adequately pled securities fraud complaint as of an earlier date. In the case of a direct

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 73440

--- F.3d ----, 2006 WL 73440 (3rd Cir.(N.J.))

**(Cite as: 2006 WL 73440 (3rd Cir.(N.J.)))**

investor--who one would assume has or can be deemed to have consistent knowledge of his or her securities holdings--the storm warning analysis becomes relatively simple. Upon reading news reports regarding the financial woes of a particular company and speculation regarding the management of that company, a direct investor immediately has reason for concern. Moreover, in being responsible for his or her own investments, a direct investor has greater motivation--and therefore, one would assume, be more likely--to stay informed. Upon receiving such information and inquiring further regarding the accuracy of that information, a direct investor--again, knowing the amount and nature of his or her holdings--could file suit almost immediately.

The mutual fund investor is somewhat different. By its very nature, a mutual fund permits an investor to pass along the responsibility for maintaining consistent knowledge of the condition of different companies. Fund investors may have little idea at any one time in what securities their money is invested, a benefit for which they have paid. Appellants, for example, received a report on a semi-annual basis and counsel represented to the District Court that an investor could not receive information on the Fund's holdings between such reports. Appellants' claims are about Alliance's misdeeds and only secondarily about Enron's. *See Lentell v. Merrill Lynch & Co. Inc.,* 396 F.3d 161, 169 (2d Cir.2005) ("Storm warnings in the form of *company-specific* information probative of fraud will trigger a duty to investigate.") (emphasis added). Accordingly, a mutual fund investor who sees numerous stories about troubles at his or her *fund* is more akin to a direct investor confronted with reports about a company in which he or she is invested.

Appellees, as one would expect, see things differently. They seize on appellants' citations to numerous news articles regarding Enron in the months leading up to the bankruptcy, claiming that the publicity placed them on sufficient notice of their claims long before December 13, 2001. [FN16] The question of knowledge in the context of this case, however, is not symmetrical. Appellees are

mutual fund advisers who are responsible for making investment choices on behalf of the Fund's investors. Appellants make a compelling argument that, as "passive" mutual fund investors, they cannot be held to the same notice standards as the appellees entrusted with their money.

*5 In our estimation, the earliest a reasonable mutual fund investor would have been on inquiry notice is at the time of, or in the days immediately following, the Enron bankruptcy filing. The articles leading up to the bankruptcy primarily report the difficulty analysts were having determining what was happening at the company. Speculation should not be given the same weight as reports of objective wrongdoing. *See Berry v. Valence Tech., Inc.,* 175 F.3d 699, 704 (9th Cir.1999) ("A press article's general skepticism about a company's future prospects is not sufficient to excite inquiry into the specific possibility of fraud."). Where, as here, the "bulk of the articles ... generally consisted of rampant speculation," *DaimlerChrysler,* 269 F.Supp.2d at 515, a court should give them less weight in the analysis. Interpreting speculation and weighing its relevance is one of the important reasons for having a fund manager.

News reports are not given weight by courts in a vacuum, but rather have significance in cases where "investors are presumed to have read prospectuses, quarterly reports, and other information related to their investments." *Mathews,* 260 F.3d at 252. [FN17] Here, those materials would be those issued by Alliance, not Enron. Therefore, in refining an approach to the storm warnings analysis in the mutual fund setting, there should be a distinction drawn between news reports regarding a primary investment vehicle--here, the Fund--and those concerning a secondary relationship--Fund resources flowing to Enron. *See Lentell,* 396 F.3d at 169 ("Pleading with sufficient particularity may be especially difficult with claims against a 'secondary' or 'tertiary' wrongdoer (as opposed to an issuer or its officers and directors).."); *Levitt v. Bear Stearns & Co., Inc.,* 340 F.3d 94, 103 (2d Cir.2003).

As of the date of the bankruptcy, for the reasons already explained, a Fund investor would have to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2006 WL 73440 (3rd Cir.(N.J.))

**(Cite as: 2006 WL 73440 (3rd Cir.(N.J.)))**

take an additional step to determine whether he or she was injured by Enron's collapse. There is a difference, in our view, between storm warnings showing that a company is in trouble and public reports regarding a fund's holdings that would enable one to know whether he or she is invested in the troubled company (a fact a direct investor always would be deemed to know). *See Mathews,* 260 F.3d at 251 ("[I]n most securities fraud actions, the plaintiffs' injuries are inextricably intertwined with defendants' misrepresentations. Discovery of one leads almost immediately to discovery of the other."). [FN18] In short, the reasonable mutual fund investor arguably has less reason to monitor the health of companies in which he or she is invested and is less likely to have accurate contemporaneous information regarding where his or her money is invested. Both of these distinguishing features inform the inquiry notice analysis here, where we are not confronted with "a fraud that can be apprehended 'simply by examining ... financial statements and media coverage' of the issuers." *Lentell,* 396 F.3d at 169 (citations omitted).

*6 [7] Where, as here, however, the knowledge gap is bridged by media accounts noting the mutual fund's holdings in the defunct company, notice is triggered. Accordingly, although we cannot say that inquiry notice was triggered as a matter of law prior to Enron's bankruptcy, appellants were surely on notice shortly thereafter. Therefore, despite our refining of the analysis, we reach the same conclusion as reached by the District Court. The combination of appellants' knowledge that Alliance had Enron holdings as of the prior summer, the news reports regarding Enron in the fall of 2001, the company's highly-publicized bankruptcy, the publicity in the immediate aftermath of the bankruptcy referencing Alliance's Enron-related losses, [FN19] and the filing of the Benak complaint [FN20] placed appellants on inquiry notice prior to December 13, 2001.

### IV. Conclusion
The December 10, 2004 order of the District Court will be affirmed.

FN* The Honorable Louis H. Pollak,

District Judge, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

FN1. *See* Am. Compl. ¶ 328 (citing a September 20, 2000 *Wall Street Journal* article questioning an accounting practice of Enron); ¶ 346 ("[T]he public criticism of Enron's financial reporting intensified dramatically following the time Alliance initiated its investment in Enron."); ¶¶ 348- 50 ("One prominent article that placed Defendants on notice of Enron's unduly aggressive accounting was a March 5, 2001 article in *Fortune*"); ¶¶ 355-57 (a May 9, 2001 report on *TheStreet.com*); ¶ 359 (a July 20, 2001 article in *TheStreet.com*); ¶ 370 (an August 15, 2001 *Business Week Online* article about the departure of Skilling); ¶ 371 (an August 15, 2001 report by *Off Wall Street* ); ¶ 372 (an August 29, 2001 *New York Times* article); ¶ 373 (an August 30, 2001 article in *TheStreet.com*); ¶ 374 (a September 9, 2001 *New York Times* article); ¶ 375 (a September 17, 2001 *Fortune* article); ¶ 377 (an October 1, 2001 article in *Fortune* ); ¶ 380-81 (an October 16, 2001 *TheStreet.com* article); ¶¶ 383, 386-87 (articles on October 17, 18, and 19, 2001 in *The Wall Street Journal*); ¶¶ 395, 398 (*TheStreet.com* on October 22, 2001); ¶ 407 (*Wall Street Journal* reports on October 23 that the SEC had begun an inquiry into Enron and its relationships with partnerships overseen by Fastow); ¶¶ 408, 411 (*New York Times* articles on October 23 and 25); ¶ 416 (an October 26, 2001 *Wall Street Journal* article).

FN2. *See* Am. Compl. ¶¶ 417, 418, 420, 424, 426, 427, 428, 434, 435, 436, 438, 441.
In addition to press coverage, Standard & Poor lowered Enron's credit rating on November 1, 2001, stating that [t]he company's financial flexibility has

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2006 WL 73440 (3rd Cir.(N.J.))

**(Cite as: 2006 WL 73440 (3rd Cir.(N.J.)))**

continued to diminish. This crisis in investor confidence can be traced, in Standard & Poor's view, directly to the company's inability to calm investors that are unsure about the strength of Enron's core energy marketing business and the viability of the company's plan to restore its credit profile.
(Am.Compl.¶ 425, A182.)

FN3. *See, e.g.,* Am. Compl. ¶¶ 444, 447.

FN4. *See id.* ¶¶ 446, 453 ("On November 28, 2001, Dynegy cancelled its proposed merger with Enron, thereby making a bankruptcy filing inevitable.").

FN5. *See, e.g., id.* ¶¶ 448-51.

FN6. *See, e.g.,* A780 (*Washington Post* published article on December 2, 2001 under headline "At Enron, the Fall Came Quickly; Complexity, Partnerships Kept Problems From Public View"); A816 ( *International Herald Tribune* article on December 10, 2001 entitled "What to Learn From the Fall of Enron, a Firm that Fooled So Many").

FN7. *See* A642 (December 4, 2001 Dow Jones News Service article noting that Harrison "defended his optimism" and "remained bullish on Enron even after Dynegy Inc. (DYN) proposed to acquire it early last month"); A648 (*Wall Street Journal* reports on December 5, 2001 that "Harrison ... acknowledged that, in retrospect, he missed some warning signs. 'Nobody except very smart short sellers dug into all the footnotes that might have been there.' "); A786 (Dow Jones News Service reports on December 4 that Harrison "admitted he had missed repeated signs of trouble at Enron Corp. and kept adding to his already hefty holding in the company until shortly before its collapse became unavoidable"); A787.

FN8. *See* A801 (December 7, 2001 *New York Times* article).

FN9. The Benak case, "a consolidated action comprising six derivative lawsuits filed on behalf of the Fund against Alliance Capital," (transfer order, A57), was later dismissed for the insufficiency of its legal claims.

FN10. *See* Am. Compl. ¶ 421, A181 ("Harrison's response to this torrent of negative news regarding Enron: he caused the Fund to expend an additional $78,828,905 to purchase Enron shares between October 22, 2001 and October 30, 2001."); ¶ 443 ("Even this obvious train wreck did not deter Harrison from purchasing Enron stock. Between November 13, 2001 and November 19, 2001, he caused the Fund to waste an additional $43,706,333.56 purchasing Enron common stock.").

FN11. *See, e.g.,* A762 (*The Wall Street Journal* reports that, based on the September 30, 2001 filing, the Fund's stake had dropped in value by about $445 million through November 28, 2001); *see also* A805.

FN12. *See, e.g.,* Am. Comp. ¶ 422.

FN13. *See id.* ¶ 456 ("Shamefully, only on November 30, 2001, when Enron's bankruptcy was a foregone conclusion, did the Fund sell *any* of its Enron Stock.") (emphasis in original).

FN14. A statute of limitations defense is an affirmative one, and in order to undergird a dismissal, must appear on the face of the complaint. "A complaint showing that the governing statute of limitations has run on the plaintiff's claim for relief is the most common situation in which the affirmative defense appears on the face of the pleading and provides a basis for a motion to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 73440                                                                 Page 8

--- F.3d ----, 2006 WL 73440 (3rd Cir.(N.J.))

**(Cite as: 2006 WL 73440 (3rd Cir.(N.J.)))**

dismiss under Rule 12(b)(6)...." Charles Alan Wright and Arthur R. Miller, 5B Federal Practice and Procedure § 1357 at 714 (2004).

FN15. We review the District Court's decision to take judicial notice of certain facts for abuse of discretion. *NAHC,* 306 F.3d at 1323. We see no basis to upset the District Court's decision to take judicial notice of newspaper articles supplied by appellees. The inquiry notice analysis is an objective one. Whether appellants read the articles or were aware of them is immaterial. They serve only to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true. *Cf. In re Merrill Lynch & Co. Research Reports Sec. Litig.,* 289 F.Supp.2d 416, 425 n. 15 (S.D.N.Y.2003) ("The Court may take judicial notice of newspaper articles for the fact of their publication without transforming the motion into one for summary judgment."). Their publication is "not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned." Fed.R.Evid. 201(b)(2); *see Heliotrope Gen., Inc. v. Ford Motor Co.,* 189 F.3d 971, 981 n. 18 (9th Cir.1999) ("We take judicial notice that the market was aware of the information contained in news articles submitted by the defendants.").

FN16. It is worth noting that appellants' potential knowledge of Fund holdings in Enron--something relied on by appellees in making their inquiry notice argument--could actually *delay* inquiry notice. If appellants did know that the Fund was continuing to acquire Enron stock, that itself could be interpreted, in light of what the Fund told them about their investment strategy, as a reassuring statement. *See id.* ("Reassurances can dissipate apparent storm warnings 'if an investor of ordinary intelligence would reasonably rely on them to allay the investor's concerns.' "). Once Enron goes bankrupt, things of course change.

FN17. We have been careful not to look at the articles from the perspective of what we now know about Enron. Enron, after all, had yet to become *Enron.* What we have since learned should not obscure the fact that many persons were surprised by Enron's fall.

FN18. This observation was made in the context of contrasting many RICO cases from the typical case arising out of securities fraud. *Mathews,* 260 F.3d at 251.

FN19. "[T]here was ample evidence in the public domain that the Fund was losing hundreds of millions of dollars as a result of its ill-considered Enron investment. As discussed, articles in the Wall Street Journal, the Houston Chronicle, the San Francisco Chronicle, and the New York Post reported that the Fund had incurred paper losses ranging from $445 million to over $1 billion...." (District Ct. Op. at 11, A45).

FN20. We need not assess the factual sufficiency of that complaint, nor whether its substance is appropriately considered in making an objective inquiry. It simply serves, as the post-bankruptcy articles about Alliance's holdings serve, as a public event connecting the downfall of Enron with Alliance's investment strategies. *See Initial Public Offering,* 341 F.Supp.2d at 349 ("The filing of related lawsuits can suffice to put plaintiffs on inquiry notice, where the alleged fraud is similar.").

--- F.3d ----, 2006 WL 73440 (3rd Cir.(N.J.))

**Briefs and Other Related Documents (Back to top)**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 73440                                                                                    Page 9

--- F.3d ----, 2006 WL 73440 (3rd Cir.(N.J.))

**(Cite as: 2006 WL 73440 (3rd Cir.(N.J.)))**

• 05-1070 (Docket) (Jan. 11, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

Westlaw.

Not Reported in F.Supp., 1987 WL 17495 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
FEDERAL DEPOSIT INSURANCE
CORPORATION, a federal corporation, Plaintiff,
v.
W.R. GRACE & COMPANY, a Connecticut
corporation, Grace Petroleum Corporation, a
Delaware corporation Sourgasco II Corporation, a
Delaware corporation, Defendants.
**No. 84 C 5031.**

September 21, 1987.

MEMORANDUM OPINION AND ORDER

LEINENWEBER, District Judge.

BACKGROUND [FN1]

*1 This case involves allegations of fraud in
inducing a loan from the Continental Illinois
National Bank ('Bank'). The Federal Deposit
Insurance Corporation, as successor in interest to
the Bank, brings this suit against W.R. Grace &
Company ('Grace'), Grace Petroleum Corporation (
'GPC') and Sourgasco II Corporation.

In 1980 defendant Grace, through its subsidiary
GPC, secured a production payment loan for the
purpose of acquiring interests in certain oil and gas
properties from Centex Corporation ('Centex').
An intermediary not-for-profit organization called
the Leadership Foundation ('Leadership') was
established to facilitate the loan. GPC conveyed the
production payment it acquired from Centex to
Leadership and the Bank made a loan to Leadership
which was secured by a mortgage of the production
payment. Leadership subsequently executed a note
and mortgage and deed in trust and assignment to
the Bank. The non-recourse loan was in the amount
of seventy-five million dollars and was structured so

that repayment of the principal would come entirely
from the production of the property. In recovering
its principal the bank was to be entitled to the lesser
of two amounts: the principal amount or the value
of the properties' production.

The oil and gas wells have proven to be dry and
plaintiff has no prospect of repayment of the
principal from the production of the property.
Plaintiff alleges that defendants knew that the
properties had no value as gas-producing properties
yet insisted on proceeding with the loan.

Plaintiff has filed an eight-count complaint alleging
violations of federal securities law; violations of the
state securities laws of Illinois, Texas and
Oklahoma; common law fraud and conspiracy to
defraud; violations of the Texas Business and
Commerce Code; and breach of warranty; and has
asked for imposition of a constructive trust. The
cause is before the court on defendants' motion for
summary judgment. For the reasons stated herein,
the motion is granted in part and denied in part.

DISCUSSION

I. Federal Securities Law

In Count I of its complaint plaintiff alleges that the
production payment and the seventy-five million
dollar non-recourse note transferred by Grace to the
Bank each constitutes a security as defined by
federal securities law and that defendants have
acted in violation of Sections 12(2) and 17(a) of the
1933 Securities Act, 15 U.S.C. §§ 77e, 77a; Section
10(b) of the 1934 Act, 15 U.S.C. § 78j; and SEC
Rule 10b-5. [FN2] It is appropriate to consider this
issue on a motion for summary judgment.
Cocklereece v. Moran, 532 F. Supp. 519, 525
(E.D.Mo. 1982).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                           Page 2

Not Reported in F.Supp., 1987 WL 17495 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

### A. Investment Contract

In their motion for summary judgment defendants argue, inter alia, that the production payment and note do not constitute securities under federal law. In the second amended complaint plaintiff uses the following language in describing the instruments as securities:
'The production payment and the $75 million non-recourse note transferred by Grace to the Bank each constitutes a 'security' as that term is defined under Section 2(1) of the 1933 Act, 15 U.S.C. § 77b(1), and Section 3(10) of the 1934 Act, 15 U.S.C. § 78c(10). The transaction among Grace and the Bank, and other participants in the drilling and exploration ventures relating to the Deep Gas Properties, constitutes an investment by the Bank in a common enterprise with the expectation of profits to come principally, if not solely, from the managerial efforts of others that were given full control of operations.' (second amended complaint at 14)

*2 This language suggests that plaintiff is only contending that the instruments involved are investment contracts.'[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

SEC v. Howey Co., 328 U.S. 293, 299 (1986). In order for an investment contract to exist each prong of the Howey test must be satisfied.

The first element of the test requires the distinction of investments from commercial transactions. Kansas State Bank v. Citizens Bank, 737 F.2d 1490, 1495 (8th Cir. 1984). If a bank or other commercial lender makes a loan to finance business transactions and takes a note in return, the parties could not be said to have participated in a securities transaction. Hussinger v. Rockford Business Credits, Inc., 745 F.2d 484, 493 (7th Cir. 1984). The Seventh Circuit has held that in resolving the

commercial/consumer-investment issue emphasis should be placed on the economic realities of the transaction. Emisco Industries, Inc. v. Pro's, Inc., 543 F.2d 38, 40 (1976). Although use of this test was restricted by the Supreme Court in Landreth Timber Co. v. Landreth, 105 S.Ct. 2297, 2304-05 (1985), Landreth leaves open this test in cases involving unusual instruments not easily characterized as securities. Id. at 2304. Landreth further points out 'that the economic reality test was designed to determine whether a particular instrument is an 'investment contract.'' Id. at 2305. The court finds that the economic realities of the instant case indicate that the transaction was indeed a commercial loan-the Bank is in the business of making loans, the parties treated the transaction as a loan, the deal was structured as a loan and the relevant documents described it as such, the interest rate was set at a fixed percentage over the prime rate, and the impetus for the transaction apparently came from the borrower.

Accordingly, the court finds plaintiff has failed to meet the first requirement of the Howey test.

The second prong of the test requires that there be a common venture. With regard to this requirement the Seventh Circuit 'has strictly adhered to a ' horizontal' test of common enterprise, under which multiple investors must pool their investments and receive pro rata profits.' Stenger v. R.H. Love Galleries, Inc., 741 F.2d 144, 146 (7th Cir. 1984). In the instant case there are no allegations of a pooling of funds or a sharing of profits with other investors and there are no facts alleged from which any such inference could be drawn. Plaintiff therefore fails to meet this element of the Howey test as well. [FN3]

Plaintiff must next show that it had a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. ' Profit, however, does not mean any return beyond principal. Rather, it is profit of the type typically associated with investment. This includes 'capital appreciation resulting from the development of the initial investment . . . or a participation in earnings resulting from the use of investors' funds. . . .' United Housing Foundation, Inc. v. Forman, 421

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 3

Not Reported in F.Supp., 1987 WL 17495 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

U.S. 852, 853 (1975); <u>Canadian Imperial Bank of Commerce U. Fingland</u>, 615 F.2d 465, 469 (7th Cir. 1980). In the instant case the bank had no prospect of capital appreciation. The most it could have expected to recover from any increase in the value of the wells was the full amount of the principal plus the stated interest. Although the argument might be made that the production payment structure of the loan constituted a participation in earnings, the extent of such 'participation' by plaintiff would be limited to the principal amount, just as it would under a recourse loan. Repayment of the interest, which was stated as a fixed amount over the prime rate, was in no way dependent on earnings resulting from the use of investors' funds but was to be repaid regardless of earnings. Therefore plaintiff has also failed the third prong of the <u>Howey</u> test.

*3 Under theses circumstances, where plaintiff has failed to meet the <u>Howey</u> standards, the court will find that no security exists in the form of an investment contract.

### B. Fractional Undivided Interest in Oil or Gas Rights

In its brief in opposition to the motion for summary judgment plaintiff first raised the argument that the production payment represents a 'fractional undivided interest in oil, gas or other mineral rights' as is also included in the definition of a security. This definition is intended to include 'only that form of splitting up of mineral interests which had been most utilized for speculative purposes.' <u>S.E.C. v. Joiner Corp.</u>, 320 U.S. 344, 352 (1943). Such an interest arises when a lessee of mineral rights sells part [FN4] of his interest in the rights in order to finance the development of the minerals. <u>Penturelli v. Spector, Cohen, Gadon & Rosen</u>, 779 F.2d 160, 165 (3rd. Cir. 1985). Fractionalized undivided working interests 'give the investor rights to a percentage of the actual minerals 'worked ' from the lease or the proceeds therefrom and are subject to at least part of the expense of development, operation or maintenance.' <u>Id.</u> at 160.

The instant case involves the mortgage from

Leadership to the Bank of its entire interest for a potentially limited period of time, that is, until repayment of the principal. It does not involve the right to a fractional share or a specific percentage of the proceeds so as to constitute that form of splitting up of mineral interests most utilized for speculative purposes. Therefore the production payment does not constitute a fractional undivided interest in the oil and gas rights. [FN5]

Since neither an investment contract nor a fractional undivided interest in oil and gas rights have been found to exist under federal securities law, summary judgment will be granted as to Count I. [FN6]

### II. Illinois Securities Law

In Count II of the complaint plaintiff alleges violations of the Illinois securities laws. The definition of a security under Illinois law (Ill.Rev.Stat., ch.121-1/2, § 137.2-1) is essentially identical to that found in the federal statues. Illinois courts attempt to apply Illinois securities law consistently with federal securities law. <u>See, Witter v. Buchanan</u>, 476 N.E.2d 1123, 1132, 132 Ill.App.3d 273 (1985). One difference, however, is that the Illinois courts have permitted vertical commonality and do not require a pooling of investors in order for an investment contract to exist under state securities law. <u>Ronnett v. American Breeding Herds, Inc.</u>, 464 N.E.2d 1201, 1204-05; <u>Anderson v. Grand Bahama Development Co.</u>, 384 N.E.2d 981 (1979). Assuming arguendo that sufficient vertical commonality exists, the production payment still does not meet the <u>Howey</u> test in that no investment or profits have been shown.

Illinois law also contemplates that a fractional undivided interest in oil or gas rights would ' entitle[ ] plaintiffs to a fractional share of the proceeds from any sale of any oil [or gas].' <u>Witter</u>, 476 N.E.2d at 1133. The court has previously discussed the inability of plaintiff to meet the requirements of fractional undivided interests in oil and gas rights under federal law. In conformance with its ruling under federal law, the court finds that the production payment and note underlying the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1987 WL 17495 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Page 4

loan do not constitute securities under Illinois law. [FN7] Accordingly, summary judgment is granted as to Count II.

### III. Choice of Law

**\*4** In Counts III, IV and VI of the complaint plaintiff alleges violations of Oklahoma and Texas law. In the motion for summary judgment defendants argue that the parties included choice of law provisions in the loan documents, designating that Illinois law should govern the contracts. Under such circumstances this circuit applies the law of the forum state to determine whether such provisions should apply. Int'l. Administrators v. Life Ins. Co. of No. America, 753 F.2d 133, 1377 (7th Cir. 1985). Illinois law provides that ' [g]enerally, the law applicable to a contract is that which the parties intended . . . when that intent is expressed, it should be followed.' Hofeld v. Nationwide Life Ins. Co., 322 N.E.2d 454, 458 (1975). In the instant case the parties have expressed the intent that Illinois law should govern in the loan documents.

Plaintiff argues that where fraud is alleged a choice of law agreement contained in a fraudulently induced underlying contract should not be honored. However the court finds persuasive the rulings of other courts that have considered the enforcement of clauses where fraud has been alleged in the underlying contract. See, Hoffman v. Burroughs Corp., 571 F. Supp. 545 (N.D. Ill. 1982). In such cases the disputed clause is unenforceable only if ' the inclusion of that clause in the contract was the product of fraud or coercion.' Scherk v. Alberto-Culver Co., 417 U.S. 506, 519 n.14 (1974). Here no fraud as to the inclusion of the clause in the contract has been alleged. Therefore the court will enforce the choice of law clauses and summary judgment will be granted as to Counts III, IV and VI, which purport to bring claims under the laws of states other than Illinois.

### IV. Common Law Fraud and Conspiracy to Defraud

In Count V of the complaint plaintiff alleges

common law fraud and conspiracy to defraud. In light of our previous rulings as to the securities claims, the fraud claim now constitutes the bulk of plaintiff's case. Plaintiff contends that defendants intentionally and recklessly made material omissions and misrepresentations with the intention of inducing the Bank to transfer funds to defendants. Defendants argue that it had no obligation to disclose the condition of the wells since the loan agreement was binding at the time defendants discovered the condition of the well. The court finds that there are genuine issues of material fact as to the binding nature of the loan agreements and the intent of defendants to mislead the Bank. Under these circumstances summary judgment will be denied as to Count V.

### V. Breach of Warranties and Representations

Count VII of the complaint alleges breach of warranty. Plaintiff argues that defendants have breached warranties and representations made in the mortgage deed of trust and assignment as to whether there is any threatened or pending litigation affecting the properties in question. Plaintiff contends that a non-waiver agreement between Grace and Centex, entered into after Grace learned that the wells were unproductive, indicated that the parties were considering litigation. According to plaintiff this constituted 'threatened' litigation. The court disagrees with this analysis. Under the circumstances described by plaintiff no suit would have been threatened against the Grace properties but against Centex. Accordingly, summary judgment will be granted as to Count VII.

### VI. Constructive Trust

**\*5** In Count VIII of the complaint plaintiff requests imposition of a constructive trust with regard to the amounts received by GPC from Centex pursuant to the settlement agreement between them. Since a constructive trust will be imposed only where there is wrongdoing on the part of the legal owner of the property in question, see, Commodities Futures Trading Commission v. Heritage Capital Advisory Services, Ltd., No. 86-2763, slip op. at 3 (7th Cir.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 5

Not Reported in F.Supp., 1987 WL 17495 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

June 22, 1987), the court will reserve judgment on the constructive trust count until after a decision is made by the jury as to the alleged wrongdoing.

CONCLUSION

The motion for summary judgment is granted as to Counts I, II, III, IV, VI and VII and denied as to Counts V and VIII.

IT IS SO ORDERED.

> FN1 In this order the court will only briefly summarize the facts. For any further elaboration of the facts the court will adopt the statement of facts set forth by plaintiff in its brief in opposition to the motion.

> FN2 Under the Securities Act of 1933, 15 U.S.C. § 77b(1), a security is defined as follows:

'When used in this subchapter, unless the context otherwise requires-
(1) The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilegee on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.'
The 1934 Act, 15 U.S.C. 78c(10) provides essentially the same definition:
'(10) The term 'security' means any note, stock,

treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

> FN3 Plaintiff points to John Hopkins University v. Hutton, 422 F.2d 1124 (4th Cir. 1970), in which a production payment was found to be an investment contract. John Hopkins, however, involved a pooling of investors and did not involve the investment in securities under the guise of a bank loan.

> FN4 'If the seller transfers the whole of what he owns, there can be no creation of a fractional undivided interest in oil and gas, and this is so even though what he sold was a fractional interest therein.' Woodward v. Wright, 266 F.2d 108, 112 (10th Cir. 1959).

> FN5 In its brief in opposition to the motion for summary judgment (at p.46), plaintiff parenthetically indicates that the production payment may constitute evidence of indebtedness. The test of evidence of indebtedness has also been subject to the commercial/investment distinction. Cocklereece v. Moran, 532 F.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 6

Not Reported in F.Supp., 1987 WL 17495 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Supp. 519, 528-29 (E.D.Mo. 1982). As has been discussed in the context of the investment contract, the court is unwilling to find that the documents underlying the commercial loan are securities.

FN6  Defendants also contend that plaintiff's claim under Section 12(2) of the 1933 Act is barred by the statute of limitations and that plaintiff has no private right of action under Section 17(a) of the 1933 Act. Because of the ruling on the securities issue, the court will decline to address these defenses.

FN7  Defendants also contend that plaintiff failed to tender notice of recission and that this claim is barred by the statute of limitations. Because of its court's ruling on the securities issue, the court will decline to address these limitations issues which raise questions of fact as to when the Bank knew of the alleged fraud.

N.D.Ill., 1987.
Federal Deposit Ins. Corp. v. W.R. Grace & Co.
Not Reported in F.Supp., 1987 WL 17495 (N.D.Ill.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1

Not Reported in F.Supp.2d, 2000 WL 1672327 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
GLOBAL ENTERTAINMENT, INC. Plaintiff,
v.
NEW YORK TELEPHONE COMPANY, Nynex
Corporation, Telesector Resources Group Inc, and
Does 1 through 100, inclusive, Defendants.
**No. 00 Civ. 2959(SHS).**

Nov. 6, 2000.

*Opinion and Order*

STEIN, J.

*1 This diversity action arises out of a contract dispute between a business offering adult pay-per-call services and its telephone company. Plaintiff Global Entertainment, Inc. is suing New York Telephone Company ("NYT"), NYNEX Corporation, and Telesector Resources Group, Inc. ( "TRG") for breach of contract, conversion, breach of agency, breach of fiduciary duty, and violation of section 349(a) of New York General Business Law. Defendants have moved, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss the entire complaint for failure to state a claim upon which relief can be granted. They make four main arguments: (1) plaintiff failed to file its suit within the relevant statute of limitations period, (2) plaintiff cannot maintain a breach of contract claim because it failed to allege both its own performance and a breach by defendants, (3) as a matter of law, the facts alleged by plaintiff do not support claims for conversion, breach of agency, breach of fiduciary duty, and violation of section 349(a) N.Y. Gen. Bus. L., (4) defendants Nynex and TRG must be dismissed from the suit because they were not parties to the contract and engaged in no activity relevant to the claims. Global opposes the motion and seeks leave to amend the complaint to add a cause of action for money had and received.

For the reasons set forth below, defendants' motion to dismiss all claims except for breach of contract is granted with prejudice and the motion to dismiss the breach of contract claim is granted without prejudice; however, plaintiff must amend its breach of contract claim within 30 days of this order. In addition, the motion to dismiss Nynex and TRG as defendants is granted, and plaintiff's motion to amend the complaint to add a claim for money had and received is denied.

## I. BACKGROUND

According to the complaint, Global contracted with NYT to receive six New York telephone lines for the purpose of running an adult telephone pay-per-call service in June of 1996. NYT paid Global the revenue generated by the six lines for the months of July, August and September of 1996. (Compl.¶ 26.) However, on or about November 13, Barry Spiegel, the manager of Global, learned that NYT did not wire the revenues for October, which totaled approximately $10,244.50. (Compl.¶ 27.) Spiegel claims this failure to pay caused Global to go out of business. (Compl.¶ 33.)

Global claims that the reason NYT did not wire the October revenues was that Spiegel, as an individual, owed money to NYT on a separate telephone account. (Compl.¶ 14-16.) The written contract allows NYT to charge Global for these calls. (Compl.Ex. A, § 12.) However, Global alleges that Spiegel and NYT worked out a pay-back agreement which specifically stated that NYT would not charge Global's lines for the debts owed by Spiegel. (Compl.¶ 14-16, Ex. B.)

Global filed this action in Los Angeles Superior Court on November 12, 1999. Defendants then removed the case to the U.S. District Court for the Central District of California on the basis of diversity. The action was subsequently transferred to the Southern District of New York pursuant to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2

Not Reported in F.Supp.2d, 2000 WL 1672327 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

stipulation.

## II. DISCUSSION

### A. Standard of review and evidence considered

**\*2** In reviewing a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), a court merely assesses the legal feasibility of the complaint, and does not weigh the evidence that may be offered at trial. *Festa v. Local 3, Int'l Bhd. of Elec. Workers,* 905 F.2d 35, 37 (2d Cir.1990); *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). All factual allegations in the complaint must be accepted as true, and the complaint must be viewed in the light most favorable to the plaintiff. *LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991); *Bayer Corp. v. Smithkline Beecham PLC,* 1996 WL 34164 (S.D.N.Y. Jan. 29, 1996). A motion to dismiss should not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Walker v. City of N.Y.,* 974 F.2d 293, 298 (2d Cir.1992) (quoting *Ricciuti v. N.Y. City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991)). [FN1]

> FN1. Defendants urge this Court to consider on this motion a letter dated November 26, 1996 sent by Spiegel to defendants' attorneys. Because the letter is neither attached to the complaint nor incorporated by reference, nor integral to plaintiff's claim, it will not be considered. *See Paulemon v. Tobin,* 30 F.3d 307, 308-09 (2d Cir.1994); *Rent Stabilization Ass'n v. Dinkins,* 5 F.3d 591, 593-94 (2d Cir.1993); *Samuels v. Air Transport Local 504,* 992 F.2d 12, 15 (2d Cir.1993); *Cf. International Audiotext Network, Inc. v. AT & T,* 62 F.3d 69, 72 (2d Cir.1995); *Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2nd Cir.1991); *R.H. Damon & Co., Inc. v. Softkey Software Prod., Inc.,* 811 F.Supp. 986, 989 (S.D.N.Y.1993).

### B. Choice of law for all claims

A federal court sitting in diversity - as here - applies state substantive law. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64 (1938). California's choice-of-laws rules govern what substantive law to apply, because this action was originally filed in a California court. *Ferens v. John Deere Co.,* 494 U.S. 516 (1990); *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487 (1941). [FN2] According to those rules, New York law should apply to both the contract and tort claims.

> FN2. As noted above, this action was transferred to the Southern District of New York from the Central District of California. If it were transferred pursuant to 28 U.S.C. § 1404(a) "for the convenience of parties and witnesses, in the interest of justice," the transferee court must apply the choice of law rules of the state in which the transferor court sits - in this case, California. *Ferens,* 494 U.S. at 521-32; *Van Dusen v. Barrack,* 376 U.S. 612, 626-40 (1964). If, however, this action were transferred pursuant to 28 U.S.C. § 1406(a) for improper venue, then the transferee court must apply the choice of law rules of the state in which it sits - in this case, New York. *See Chaiken v. Publishing Corp.,* 119 F.3d 1018, 1030 (2d Cir.1997); *Levy v. Pyramid Co.,* 871 F.2d 9, 10 (2d Cir.1989); *Martin v. Stokes,* 623 F.2d 469, 472 (6th Cir.1980). *See generally* 17 *Moore's Federal Practice,* § 124.30[2][a]-[c] (Matthew Bender 3d ed.2000).
> Here the Stipulation to Transfer does not specify whether this case was transferred to New York pursuant to section 1404 or section 1406. The Court assumes, arguendo, that it was transferred pursuant to section 1404. However, even if this were a transfer pursuant to section 1406, New York's choice of law rules would achieve the same result - application of New York substantive law and New York statute of limitations periods -because: (1)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1672327 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

the choice of law clause provides that New York law applies to the contract, (2) the alleged torts arising from the withholding of payment occurred in New York, and (3) both parties cited New York law to apply to the tort claims. *See* N.Y. U.C.C. § 1-105(1) (McKinney 2000); *PC COM, Inc. v. Proteon, Inc.,* 946 F.Supp. 1125, 1129 (S.D.N.Y.1996) (pursuant to New York choice of law principles, contractual selection of governing law is generally determinative so long as chosen state has sufficient contacts with transaction, absent fraud or violation of public policy); *see also Krock v. Lipsay,* 97 F.3d 640, 645 (2d Cir.1996) (the law of the jurisdiction having the greatest interest in the litigation should be applied to tort claims); *Wm. Passalaqua Builders, Inc. v. Resnick Developers South, Inc.,* 933 F.2d 131, 137 (2d Cir.1991) (parties may consent by their conduct to the law to be applied); *Stafford v. International Harvester Co.,* 668 F.2d 142, 147 (2d Cir.1981) (statute of limitations).

The agreement between Global and NYT contains a choice of law provision which states, "[t]his Agreement shall be governed by and interpreted according to the laws of the State of New York." (Compl. Ex. A § 16.I.) California courts greatly favor enforcement of choice of law provisions as long as the chosen law is "substantially relat[ed] to the parties or their transaction" and is not contrary to a fundamental public policy of California. *Nedlloyd Lines v. Superior Court of San Mateo County,* 3 Cal.4th 459, 464-66 (Cal.1992) *citing Consul Ltd. v. Solide Enterprises, Inc.,* 802 F.2d 1143, 1146-47 (9th Cir.1986). In this case, New York is "substantially related" to the transaction because Global contracted with a New York company to use New York telephone numbers to run its business. (Compl.¶¶ 1-9.) Moreover, there is no claim that New York contract law is contrary to a fundamental public policy of California. Thus, New York contract law applies to the breach of contract claim.

In regard to the tort claims, California courts favor

applying the choice of law clause in the governing contract to tort claims "arising from or related to" the contract. *Nedlloyd Lines,* 3 Cal.4th at 468. In this case, the withholding of funds due to Global, which forms the basis of Global's tort claims, is directly related to the contract. Thus, New York law applies to all claims in this litigation.

## C. Statute of limitations

Defendants contend that Global failed to meet the relevant statute of limitations period for all claims because the California court where the action was originally filed lacked personal jurisdiction over defendants. The Court finds that the complaint cannot be dismissed as time-barred at this stage of the proceedings because defendants failed to prove that California lacked personal jurisdiction.

**\*3** California courts generally apply California's statute of limitations period to claims filed there because California considers the statute of limitations to be procedural. *Zellmenr v. Acme Brewing Co.,* 184 F.2d 940 (C.A.1950). However, California has a borrowing statute. Pursuant to this statute, if the claim would be time-barred in the forum where the cause of action arose, California would bar the claim as well. West's Ann.Cal.C.C.P. § 361. Therefore, if Global's claims were time-barred pursuant to New York law at the time Global filed this action in California, this Court must dismiss the claims as well. [FN3]

> FN3. Defendants do not argue that the claims were time-barred pursuant to California's statue of limitations period.

According to the complaint, NYT failed to wire the revenues due to Global "on or about November 13, 1996." (Compl.¶ 27.) Global filed this complaint in Los Angeles Superior Court on Nov. 12, 1999, almost three years later. In New York, claims for conversion and breach of fiduciary duty have a three-year statute of limitations period. *Davidson v. Fasanella,* 269 A.D.2d 351, 351, 702 N.Y.S.2d 384, 385 (2d Dep't 2000) *citing* N.Y. CPLR § 214[3] (conversion); *Yatter v. William Morris*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1672327 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

*Agency, Inc.,* 256 A.D.2d 260, 261, 682 N.Y.S.2d 198, 199 (1st Dep't 1998) (a three-year period for breach of fiduciary duty applies when money damages are sought). The parties dispute the statute of limitations period applicable to the breach of contract and agency claims; however, both concede that it is at least three years. Therefore, as long as the case was properly filed in Los Angeles, plaintiff met the New York statute of limitations requirements for all claims.

According to the stipulation to transfer this case from California to New York, defendants preserved the right to argue that the statute of limitations expired based on lack of personal jurisdiction in California. (Stip. to Trans. ¶ 2.) However, the stipulation does not provide that personal jurisdiction was in fact improper in California. Therefore, in order for defendants to prevail on their statute of limitations defense, they must also prove that jurisdiction was improper in California. *See Ocean Accident & Guaranty Corp. v. Rubin,* 73 F.2d 157, 166 (9th Cir.1934) (holding that the burden of proving an affirmative defense rests on the defendant); *Katz v. Goodyear Tire and Rubber Co.,* 737 F.2d 238, 243 (2d Cir.1984) ("Where the statute of limitations is an affirmative defense, the party asserting the defense must prove the elements of that defense."). Defendants fail to do this in their moving papers; thus their motion to dismiss all claims based on expiration of the statute of limitations is denied. [FN4]

> FN4. Defendants also contend that Spiegel's November 26 letter proves that the failure to wire the revenue occurred before November 13, 1996. However, in the letter, Spiegel says he became aware of the failure on or about November 13. Therefore, even if the letter were to be considered in the Court's review of the motion, it is not dispositive on this point.

### D. Breach of contract

In order to plead a claim for breach of contract, the plaintiff must allege simply (1) the terms of an existing contract, including valid consideration, (2)

performance on the part of the plaintiff, (3) breach by the defendant, and (4) the damages sustained due to the breach. *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525, (2d Cir.1994); *Tagare v. Nynex Network Systems Co.,* 921 F.Supp. 1146, 1149 (S.D.N.Y.1996). *See generally* 22A N.Y. Jur.2d Contract § 432 (1996). Defendants contend that Global has failed to fulfill the second and third elements.

**\*4** When pleading a claim for the breach of an express contract, the complaint must contain an allegation that the plaintiff actually performed its obligations under the contract. *R.H. Damon & Co.,* 811 F.Supp. at 991. Global did not specifically plead that it performed the required services pursuant to the contract to generate the revenue due to its phone lines, although it implicitly did so by alleging that NYT owed Global $10,244.50 for calls made to Global's phone lines. (Compl.¶ 27.) Despite this pleading infirmity, in the interest of doing substantial justice, the Court will allow plaintiff 30 days from the date of this order to amend its complaint to add an allegation that it has performed all of its obligations under the contract. *See S.O. Textiles Co. v. A & E Products Group,* 18 F.Supp.2d 232 (E.D.N.Y.1998). Therefore, the breach of contract claim is dismissed without prejudice.

Defendants also urge that Spiegel's failure to pay debts incurred on his individual phone line should be construed as Global's failure to perform. However, even if Spiegel can be viewed as the " alter ego" of Global, his failure to perform on a different contract is not relevant to Global's performance on the contract at issue. Therefore, defendants' motion to dismiss on these grounds is denied as well.

Global adequately pleaded breach by NYT. The contract provides that NYT was obligated to pay Global for calls placed to Global's lines. (Compl. Ex A § 12.) Global alleges that it did not receive this payment for the month of October 1996. (Compl.¶ 27.) Accordingly, Global has adequately alleged that NYT breached the contract by failing to pay.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1672327 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Defendants contend that, nonetheless, Global has not adequately pled that NYT breached the contract because Global admits that NYT could withhold the October revenues pursuant to section twelve of the contract. (Def. Reply. Mem. at 2-4.) Although Global does admit that NYT was entitled to withhold revenue, it alleges that: (1) agents of NYT and Nynex promised that NYT would not exercise this option, and (2) the amount withheld by NYT was too large.

Despite defendants' contentions, Global's claims are consistent with the facts pled in the complaint. The complaint states that NYT claims Spiegel owes an individual debt to NYT and that Spiegel disputes the debt. (Compl.¶¶ 14, 15.) The complaint does not specify whether he disputes the entire debt or just a portion of the debt. In Global's memorandum, Global clarifies that Spiegel merely disputes a portion of the debt and that NYT overcharged Global for that debt. FN5 (Pl. Mem. at 3.) Therefore, the claim will not be dismissed on these grounds.

> FN5. Defendants' argument that Spiegel recognized his debt of $38,400 for test calls in the November 26 letter is misleading. (Def. Mem. at 5.) The letter also provides, "[a]s these test calls were done with the full knowledge and consent of NYNEX Collection and Infofone Departments the balance needed to be reduced." (Wagner Aff. Ex. A.) Thus, even if the court considered the letter in its motion to dismiss, it would support Global's version of the facts.

Defendants fail to address Global's assertion that NYT agents promised not to charge Global for Spiegel's debts. Therefore, plaintiff has at a minimum pleaded a valid modification to the right-of-set-off clause of the contract.

In sum, the breach of contract claim is dismissed without prejudice. Plaintiff has 30 days to amend its complaint to plead its own performance pursuant to the contract.

### E. Conversion

*5 Global fails to state a valid claim for conversion. To state a conversion claim, the plaintiff must allege that (1) it had legal ownership or an immediate superior right of possession to specific identifiable personal property, and (2) defendants exercised unauthorized dominion over the property to the exclusion of the plaintiff's rights. *Shams v. Fisher,* 107 F.Supp.2d 266, 282 (S .D.N.Y.2000); *Vigilant Ins. Co. of America v. Housing Auth. of the City of El Paso, Texas,* 87 N.Y.2d 36, 44, 637 N.Y.S.2d 342, 347 (N . Y.1995); *Aetna Casualty & Surety Co. v. Glass,* 75 A.D.2d 786, 786, 428 N.Y.S.2d 246, 246 (1st Dep't 1980). New York does recognize a claim for conversion of money; however, the money must come from a "specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question ." *High View Fund, L.P. v. Hall,* 27 F.Supp.2d 420, 429 (S.D.N.Y.1998). Essentially the money must be capable of being described or identified in the same way as a chattel. *Id.* Furthermore, a plaintiff cannot make out a conversion claim when it is merely alleging that defendants owed plaintiff money pursuant to a contract between the parties. *Interstate Adjusters v. First Fidelity Bank,* 251 A.D.2d 232, 234, 675 N.Y.S.2d 42, 44 (1st Dep't 1998).

Here, Global merely alleges that NYT owed it money for telephone calls made to Global's lines. This obligation arose out of the written contract between the parties. Global does not identify any specific fund from which NYT was to pay Global. Therefore, Global's conversion claim must be dismissed with prejudice.

### F. Money had and received

Plaintiff's request to amend the pleadings to include a claim for money had and received is denied. Leave to amend a complaint pursuant to Fed.R.Civ.P. 15 should not be granted if the proposed amendment is futile. *Jones v. New York State Div, of Military and Naval Affairs,* 166 F.3d 45, 50 (2d Cir.1999); *Smith v. Kessner,* 183 F.R.D. 373, 374 (S.D.N.Y.1998) *citing Foman v. Davis,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1672327 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

371 U.S. 178, 182 (1962). An amendment is considered futile if the proposed amended pleading fails to state a claim. *Smith,* 183 F.R.D. at 374 *citing McNally v. Yarnall,* 764 F.Supp. 853, 855 (S.D.N.Y.1991). In this case, Global cannot make out a claim for money had and received.

An action for money had and received is a contract implied in law. "It is an obligation which the law creates in the absence of agreement when one party possesses money that in equity and good conscience he ought not to retain and that belongs to another." *Parsa v. State,* 64 N.Y.2d 143, 149, 485 N.Y.S.2d 27, 29 (1984). However, if the parties have an express agreement regarding the money, then a claim for money had and received cannot exist. *Matarese v. Moore-McCormack Lines, Inc.,* 158 F.2d 631, 634 (2d Cir.1946); *Batac Dev't Corp. v. B & R Consultants, Inc.,* 1999 WL 76873, at *5-6 (S.D.N.Y. Feb. 16, 1999); *Teachers Ins. and Annuity Ass'n v. Wometco Enters., Inc.,* 833 F.Supp. 344, 349 n. 9 (S.D.N.Y.1993); *Lancaster Towers Assocs., L.P. v. Assessor of Town of Lancaster,* 259 A.D.2d 1001, 1001, 688 N.Y.S.2d 300, 300 (4th Dep't 1999).

*6 Here, the express contract between Global and NYT creates the obligation for NYT to pay Global. Therefore, Global cannot use the implied contract theory of money had and received to recover upon a contractual obligation.

G. Breach of agency

Plaintiff's breach of agency claim must be dismissed as well because the relationship between Global and NYT was not that of principal and agent. In order to create an agency relationship, the agent must consent to act subject to the principal's direction and control, and the principal must consent to exercising control over the agent. *In re Shulman Transport Enters., Inc.,* 744 F.2d 293, 295 (2d Cir.1984); *Old Republic Ins. Co., v. Hansa World Cargo Service, Inc.,* 51 F.Supp.2d 457, 471 (S.D.N.Y.1999). This contract expressly negates any control by one party over the other. (Compl. Ex. A § 16.E at 17. ("Each party has and hereby retains the right to exercise full control of and

supervision over its own performance of the obligations under this Agreement and retains full control over the employment, direction, compensation and discharge of all employee assisting in the performance of such obligation.")) Furthermore, Global pleads no facts which support its position that NYT consented to act subject to Global's control, or actually acted subject to Global's control. Therefore, NYT cannot be an express agent of Global.

Nor does an implied or apparent agency exist. Those types of agency relationships arise in completely different factual scenarios than the relationship presented in this case. In an implied or apparent agency case, the issue is whether a principal is liable to a third party for a contract or representation made by the alleged "agent." *See, e.g., Old Republic Ins.,* 51 F.Supp.2d at 471-75; *Cubby, Inc. v. Compuserve, Inc.,* 776 F.Supp. 135, 142-43 (S.D.N.Y.1991); *Ahn v. Rooney, Pace, Inc.,* 624 F.Supp. 368, 370-71 (S.D.N.Y.1985). In this case, no third party is involved. The alleged breach took place between two parties who expressly knew, by contract, that there was no agency relationship. Therefore, Global cannot maintain a breach of agency claim on theories of implied or apparent agency. The claim is dismissed with prejudice.

H. Breach of fiduciary duty

Plaintiff's breach of fiduciary duty claim must be dismissed as well because Global cannot show anything more than an arm's length business relationship between it and NYT. A fiduciary relationship does not exist when the parties have an ordinary business relationship. *Grumman Allied industries, Inc. v. Rohr Industries, Inc.,* 748 F.2d 729, 738-39 (2d Cir.1984); *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d 112, 122 (2d Cir.1984); *Teachers Ins.,* 833 F.Supp. at 350; *Par Plumbing Co ., Inc. v. Engelhard Corp.,* 256 A.D.2d 124, 124, 681 N.Y.S.2d 280 (1st Dep't 1998). It is true that NYT counted calls, billed callers and collected revenue on Global's behalf, but these are duties owed pursuant to the contract, not because of any special relationship. A fiduciary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1672327 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

duty must be separate and beyond any contractual duties. *Savage Records Group, N.V. v. Jones,* 247 A.D.2d 274, 274, 667 N.Y.S.2d 906, 906 (1st Dept.1998). The duties alleged here are no more expansive than the duties owed to ratepayers by public utilities, which does not give rise to a fiduciary relationship. *See County of Suffolk v. Long Island Lighting Co.,* 728 F.2d 52, 53 (2d Cir.1984).

*7 Global also alleges that it relied on the representation by a Nynex manager that NYT would not withhold revenue from Global. However, arm's length commercial transactions do not create a fiduciary duty even when the plaintiff alleges that he relied on the defendant. *See Compania Sud-America de Vapores, S.A. v. IBJ Schroder Bank and Trust Co.,* 785 F.Supp. 411, 425-27 (S.D.N.Y.1992) (finding no fiduciary duty even though plaintiff claimed that it relied on defendant due to business relationship of fifty years). For these reasons, Global's claim for breach of fiduciary duty is dismissed with prejudice.

### I. General Business Law Section 349

A claim for violation of New York's General Business Law § 349 does not apply in the context of a commercial dispute between two businesses. *S.Q.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp.,* 84 F.3d 629, 636 (2d Cir.1996); *New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 320, 639 N.Y.S.2d 283, 290 (1995). Therefore, this claim is dismissed with prejudice.

### J. Defendants Nynex and TRG

The only claim left against Nynex and TRG is the breach of contract claim. This claim is dismissed with prejudice against these two defendants because neither was a signatory to the contract. A contract cannot bind a non-party unless the contract was signed by the party's agent, the contract was assigned to the party, or the signatory is in fact the "alter ego" of the party. *International Customs Assocs., Inc. v. Ford Motor Co.,* 893 F.Supp. 1251, 1255-56 (S.D.N.Y.1995) *citing Abraham Zion*

*Corp. v. Lebow,* 761 F.2d 93, 103 (2d Cir.1985) (agency); *Crabtree v. Tristar Automotive Group., Inc.,* 776 F.Supp. 155, 156 (S.D.N.Y.1991) (assignment); *Campo v. 1st Nationwide Bank,* 857 F.Supp. 264, 271-72 (E.D.N.Y.1994) (alter ego). There are no such allegations here. Indeed the only relevant allegations are that Nynex is the parent corporation of NYT, and TRG is a "service affiliate" or "subsidiary" of NYT or Nynex. (Compl.¶ 8) Accordingly, both Nynex and TRG are dismissed as parties.

### III. CONCLUSION

For the reasons set forth above, defendants' motion to dismiss all claims except for breach of contract is granted with prejudice and the motion to dismiss the breach of contract claim is granted without prejudice; however, plaintiff must amend its breach of contract claim within 30 days of this order. In addition, the motion to dismiss Nynex and TRG as defendants is granted, and plaintiff's motion to amend the complaint to add a claim for money had and received is denied.

S.D.N.Y.,2000.
Global Entertainment, Inc. v. New York Telephone Co.
Not Reported in F.Supp.2d, 2000 WL 1672327 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:00cv02959 (Docket) (Apr. 18, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.