# EXHIBIT 6

Westlaw.

Not Reported in F.Supp.2d                                                      Page 1

Not Reported in F.Supp.2d, 2003 WL 21640376 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Randall E. HILL, III, Plaintiff,
v.
UNITED STATES DEPARTMENT OF JUSTICE,
et al., Defendants.
**No. Civ.A. 02-250 GMS.**

July 7, 2003.

*MEMORANDUM AND ORDER*

SLEET, J.

## I. INTRODUCTION

*1 On April 4, 2002, the plaintiff, Randall E. Hill,
III ("Hill"), acting *pro se*, filed the above-captioned
action against numerous defendants, including the
United States Department of Justice, ex-girlfriends,
his former lawyer, and various other people and
entities who came into contact with him in the late
1980s and early 1990s. In essence, he alleges that
these defendants knew he was committing illegal
acts, and because they did not stop him, he was "
entrapped" and subsequently prosecuted.

Presently before the court are the United States' and
Edmund Lyons' ("Lyons") motions to dismiss. For
the following reasons, the court will grant both
motions to dismiss and will also dismiss the action
against each of the remaining defendants. [FN1]

> FN1. A review of the docket report reveals
> that Hill has failed to timely serve several
> of the defendants. The court will not,
> however, afford Hill an opportunity to
> effectuate proper service in light of its
> determination that the underlying action
> cannot be maintained.

## II. STANDARD OF REVIEW

The purpose of a motion to dismiss is to test the
sufficiency of a complaint, not to resolve disputed
facts or decide the merits of the case. *See Kost v.
Kozakiewicz,* 1 F.3d 183 (3d Cir.1993). Thus, in
deciding a motion to dismiss pursuant to Rule
12(b)(6) of the Federal Rules of Civil Procedure,
the court must "accept as true the facts alleged in
the complaint and all reasonable inferences that can
be drawn from them." *Markowitz v. Northeast Land
Co.,* 906 F.2d 100, 103 (3d Cir.1990). In particular,
the court looks to "whether sufficient facts are
pleaded to determine that the complaint is not
frivolous, and to provide defendants with adequate
notice to frame an answer." *Colburn v. Upper
Darby Tp.,* 838 F.2d 663, 666 (3d Cir.1988).
However, the court need not "credit a complaint's '
bald assertions' or 'legal conclusions' when
deciding a motion to dismiss." *Morse v. Lower
Merion Sch. Dist.,* 132 F.3d 902, 906 (3rd Cir.1997)
. The court will only dismiss a complaint if " 'it is
clear that no relief could be granted under any set of
facts that could be proved consistent with the
allegations." ' *H.J. Inc. v. Northwestern Bell Tel.
Co.,* 492 U.S. 229, 249-50 (1989) (quoting *Hishon
v. King & Spalding,* 467 U.S. 69, 73 (1984)). Thus,
in order to prevail, a moving party must show "
beyond doubt that the plaintiff can prove no set of
facts in support of his claim [that] would entitle him
to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46
(1957).

## III. BACKGROUND

In his complaint, Hill alleges that the United States
Attorney's Office violated laws, regulations, and
ethical standards in contravention of the due
process clause during his criminal prosecution for
embezzlement. [FN2] He also claims that numerous
other defendants violated his civil rights in
connection with his prior criminal prosecution.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                       Page 2

Not Reported in F.Supp.2d, 2003 WL 21640376 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

> FN2. While it is not clear from the complaint, it appears that the criminal prosecution to which Hill refers is *United States v. Hill,* 88-cr-10 (JJF).

Hill characterizes the illegal activity for which he was prosecuted as "cashing checks." He argues that the prosecutor knew, or should have known, of his actions from the time he deposited the first check. According to Hill, because so many people knew of his activities, his drug addiction, and the subsequent criminal investigation, they each had a duty to stop him before he was prosecuted. As supporting evidence for this theory, Hill points out that bank cameras videotaped him depositing the first check. Thus, each subsequent time he deposited a check, he was "entrapped" because nobody stopped him. He also appears to be asserting a malpractice claim against his former attorney, Lyons, on the grounds that Lyons failed to advise him that the United States could have stopped his illegal activity earlier but chose not to.

*2 He further states that he was interrogated without being advised of his rights, and without representation, by both the police and bank security. Additionally, although he does not identify any particular sealed documents, he states that he was not told about such documents. Accordingly, he alleges that he is innocent of any crime, and was " railroaded." Following his conviction, Hill spent eighteen months of a five-year sentence in Robert F. Kennedy Center, Morgantown, West Virginia.[FN3]

> FN3. This prison is more properly identified as the Bureau of Prisons Facility, FCI Morgantown.

Once incarcerated, Hill alleges that no one at FCI Morgantown would come forward with the "new evidence" in his criminal case.[FN4] This also led to his entrapment. Finally, he contends that police officers impermissibly questioned him about his drug dealer's murder while he was incarcerated.

> FN4. It is unclear to what "new evidence" Hill refers.

Hill was released from FCI Morgantown in 1991.

## IV. DISCUSSION [FN5]

> FN5. The court recognizes that Hill has filed two motions for appointment of counsel. While the court would normally consider those motions prior to addressing a motion to dismiss, the court finds for the reasons stated below that the appointment of counsel would be futile in this case. It will, therefore, dismiss the motions as moot.

### A. Hill's Criminal Conviction

The crux of Hill's complaint is that he is innocent of any criminal wrongdoing and intends to use this lawsuit to clear his name. *See* Complaint (D.I.21) at 1, 2, 3, 5, 38. For the following reasons, however, the court holds that Hill is barred from bringing a civil action to overturn a criminal conviction or sentence.

With respect to suits challenging actions leading to arrest and conviction, the Supreme Court's decision in *Heck v. Humphrey* is dispositive. 512 U.S. 477 (1994). In that case, the Court held that,
in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a plaintiff must prove ... that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.

*Id.* at 486-87. The Court continued, "a claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983." *Id.* at 487. Thus, a plaintiff who cannot show that his conviction or sentence was "reversed, expunged, invalidated, or impugned" has "no cause of action." *Id.* at 489. In considering whether a claim for damages bears a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 3

Not Reported in F.Supp.2d, 2003 WL 21640376 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

relationship to the prior conviction or sentence which has not been invalidated, the court must consider whether a judgment in favor the plaintiff would necessarily imply the invalidity of his conviction or sentence. *See id.* at 487.

Here, as the court noted earlier, Hill expressly proclaims his innocence and asks the court to overturn his conviction and grant him a new trial. *See* Complaint (D.I.21) at 3, 10. However, as he has not alleged that his criminal conviction has been reversed, expunged, or invalidated, he has failed to state a claim.

### B. Statute of Limitations

Additionally, the court concludes that Hill's complaint is barred by the applicable statute of limitations. The timeliness of a Section 1983 action must be determined in accordance with the relevant state limitations period for personal injury actions. [FN6] *See Wilson v. Garcia,* 471 U.S. 261, 279 (1985). In this case then, the timeliness issue turns on Delaware's two year personal injury statute of limitations. *See* 10 Del C. § 8119; *see also Carr v. Dewey Beach,* 730 F.Supp. 591 (D.Del.1990). The period begins to run when the injury is sustained, not when the full extent of the injury is known. *See Chrisco v. Schafran,* 525 F.Supp. 613 (D.Del.1981).

> FN6. Furthermore, with respect to Hill's allegations against Lyons, even were the court to construe his complaint as alleging a state law breach of contract action, the statute of limitations for contractual actions in Delaware is three years. *See* 10 Del. C. § 8106.

**\*3** Although state law determines the applicable limitations period, federal law determines the date of accrual. *See Deary v. Three Unnamed Police Officers,* 746 F.2d 185, 197, n. 16 (3d Cir.1984). Accordingly, the Third Circuit Court of Appeals has held that a claim accrues when a plaintiff knows or has reason to know of the injury which was the basis for his cause of action. *See id.*

In the present case, Hill's complaint details a litany of alleged harms beginning in 1983 and continuing through his release from incarceration in 1991. Specifically, he focuses on his May 1988 conviction and his actions leading up to that conviction. However, if Hill had, in fact, been entrapped at that time, knowing himself to be innocent of the crime for which he was convicted, the two year statute of limitations has clearly passed. He further states that he served eighteen months of a five year sentence. Thus, it has been more than ten years since he was released from prison. Even if he could not have discovered these alleged facts while incarcerated, his time would have accrued, at the latest, upon his release from prison in 1991. Therefore, even giving Hill the benefit of a generous interpretation of his accrual date, his claims are well beyond the two year statute of limitations and must be dismissed. [FN7]

> FN7. Additionally, with regard to the federal defendants, under the Federal Tort Claims Act, a plaintiff must file a federal agency claim within two years after such claim accrues prior to bringing a lawsuit. *See* 28 U.S.C. §§ 2401(a), (b) and 2675(a). Hill does not allege that he filed a claim with the agency whose activities gave rise to the claim. This failure to file further defeats Hill's lawsuit against the United States and its agencies. *See Bialowas v.. United States,* 443 F.2d 1047, 1050 (3d Cir.1971) (noting that courts lack jurisdiction if a proper claim is not made).

### C. Sovereign Immunity

As an additional ground for dismissing the United States from this action, the court notes that Hill's complaint is barred as to these defendants by the doctrine of sovereign immunity.

The United States, as a sovereign, is immune from suit except as it consents to be sued. The terms of the consent frame the parameters of a federal court's jurisdiction to entertain suits brought against the sovereign. *See FDIC v. Meyer,* 510 U.S. 471, 475 (1994). A waiver of sovereign immunity cannot be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4

Not Reported in F.Supp.2d, 2003 WL 21640376 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

implied, but must be construed strictly in favor of the government and not enlarged beyond the statutory language authorizing it. *See Jaffee v. United States,* 592 F.2d 712, 717 (3d Cir.1979). If a waiver exists, it must be found in the statute giving rise to the cause of action. *See id.* at 718.

The Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq* ., defines the limits of the federal government's waiver of sovereign immunity and provides, in part that, "the United States shall be liable, respecting the provisions of this title relating to tort claims...." 28 U.S.C. § 2674. The FTCA further affords the exclusive remedy for injuries " arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment...." *See* 28 U.S.C. § 2679(b)(1).

In the present case, the court must conclude that Hill has not properly alleged the elements of any tort. As best as can be discerned from his complaint, he is alleging entrapment. Entrapment, however, provides a legal defense to defendants in connection with criminal charges against them which negates the intent to commit the crime. *See e.g. Mathews v. United States,* 485 U.S. 58, 62-63 (1988). Additionally, to the extent that Hill intends to show that he was entrapped in order to allege a constitutional due process violation for purposes of an FTCA claim, such an argument must also fail because the United States has not waived its sovereign immunity as to constitutional tort suits.[FN8] *See Jaffee,* 592 F.2d at 715-718.

> FN8. The court will assume *arguendo* that Hill's claims do in fact rise to the level of a constitutional tort. To the extent that his claim is better interpreted as one for false imprisonment, false arrest, abuse of process, or malicious prosecution, these claims are exempted from the coverage of the FTCA. *See* 28 U.S.C. § 2680(h). Although such claims may be brought against "law enforcement officers," Assistant United States Attorneys acting within the scope of their prosecutorial duties are not considered "law enforcement

officers" for the purpose of that limited coverage. *See e.g. Imbler v. Pachtman,* 424 U.S. 409, 430-31 (1976).

**\*4** For these reasons, the court concludes that Hill's complaint is barred as to the United States on sovereign immunity grounds as well.

## V. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:
1. The United States' Motion to Dismiss (D.I.51) is GRANTED;
2. Lyon's Motion to Dismiss (D.I.63) is GRANTED;
3. Each of the defendants in the above-captioned action is dismissed;
4. Hill's Motion for Appointment of Counsel (D.I.47) is dismissed as MOOT;
5. Hill's Renewed Motion for Appointment of Counsel (D.I.57) is dismissed as MOOT;
6. Hill's Motion for All Documents to be Unsealed by the New Castle County Police (D.I.48) is declared MOOT;
7. Hill's Motion for Pre-Discovery Material (D.I.50) is declared MOOT;
8. Hill's Motion for Leave to View All Documents (D.I.56) is declared MOOT; and
9. The Clerk of the Court is directed to close this case.

D.Del.,2003.
Hill v. U.S. Dept. of Justice
Not Reported in F.Supp.2d, 2003 WL 21640376 (D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 7

Westlaw.

Not Reported in A.2d                                                                    Page 1

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

**H**

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
In re DEAN WITTER PARTNERSHIP
LITIGATION
**No. CIV. A. 14816.**

July 17, 1998.

Pamela S. Tikellis, Esquire, and Robert J. Kriner,
Jr., Esquire, of Chimicles, Jacobsen & Tikellis,
Wilmington, Delaware; of Counsel: Nicholas E.
Chimicles, Esquire, Denise Davis Schwartzman,
Esquire, Francis J. Farina, Esquire, and M.
Katherine Meermans, Esquire, of Chimicles,
Jacobsen & Tikellis, Haverford, Pennsylvania,
Attorneys for Plaintiffs.
Kenneth J. Nachbar, Esquire, of Morris, Nichols,
Arsht & Tunnell, Wilmington, Delaware; of
Counsel: Martin London, Esquire, Richard A. Rosen
, Esquire, Robert N. Kravitz, Esquire, and Tracy
Anbinder Baron, Esquire, of Paul, Weiss, Rifkind,
Wharton & Garrison, New York, New York,
Attorneys for Defendants.

MEMORANDUM OPINION

CHANDLER, Chancellor.
*1 Investors, owners of interests in numerous real
estate limited partnerships, seek an accounting and
damages from general partners and financial
advisors for breaches of the fiduciary duties of care,
loyalty and candor. Information available to the
investors long before these lawsuits were instituted
put the investors on notice of the wrongs about
which they now complain. Therefore, all of the
investors' claims are barred by operation of the
applicable statute of limitations.

I. BACKGROUND

This action is a consolidation of several actions
brought by plaintiff investors against defendants
Dean Witter, Discover & Co. ("Dean Witter
Discover"), Dean Witter Reynolds, Inc. ("Dean
Witter Reynolds"), Dean Witter Realty, Inc. ("Dean
Witter Realty") (collectively "Dean Witter"), the
managing and associate general partners of seven
Dean Witter real estate limited partnerships, and
Tempo-GP, Inc. ("Tempo-GP"), the general partner
of Dean Witter/Coldwell Banker Tax Exempt
Mortgage Fund, L.P. ("Tax Exempt Mortgage Fund
"). [FN1]

> FN1. An Order of Consolidation dated
> August 16, 1996, consolidated three
> actions filed in the Court of Chancery-
> *Segel v. Dean Witter, Discover & Co.,*
> C.A. No. 14816 (filed Feb. 6, 1996);
> *Schectman v. Dean Witter, Discover & Co.,*
> C.A. No. 14829 (filed Feb. 9, 1996);
> *Dosky v. Dean Witter, Discover & Co.,*
> C.A. No. 14838 (filed Feb. 15, 1996)-and
> added to the consolidated action plaintiffs
> from two other suits, one pending in the
> Southern District of New York-*Grigsby v.
> Dean Witter Reynolds, Inc.,* S.D .N.Y.,
> No. 96 Civ. 4064(LAP) (originally filed
> Dec. 27, 1995)-and one pending in the
> District of Maryland-*Young v. Dean
> Witter, Discover & Co.,* C.A. No.
> H-96-1139 (D.Md.) (originally filed Feb.
> 6, 1996). *See* Order of Consolidation
> (Aug. 16, 1996) (Docket No. 9).

Plaintiffs are customers of Dean Witter Reynolds,
who between 1984 and 1989, purchased from Dean
Witter Reynolds units of the following limited
partnerships: Dean Witter Realty Income
Partnership I, L.P. ("Income I"); Dean Witter
Realty Income Partnership II, L.P. ("Income II");
Dean Witter Realty Yield Income Partnership III,
L.P. ("Income III"); Dean Witter Realty Income
Partnership IV, L.P. ("Income IV"); Dean Witter

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                      Page 2

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
(Cite as: Not Reported in A.2d)

Realty Yield Plus, L.P. ("Yield Plus"); Dean Witter Realty Yield Plus II, L.P. ("Yield Plus II"); Dean Witter Realty Growth Properties, L.P. ("Growth Properties"); and Falcon Classic Cable Income Properties, L.P. ("Falcon Classic Cable"). [FN2] With the exception of Falcon Classic Cable, each of these Partnerships is a wholly-owned direct or indirect subsidiary of Dean Witter and is organized in the State of Delaware.

> FN2. These limited partnerships will be referred to collectively as the "Partnerships." The Partnerships bearing the Dean Witter name, i.e., all of the defendant partnerships except Falcon Classic Cable, will also be referred to as the "Proprietary Partnerships." All of the Proprietary Partnerships are real estate limited partnerships.

Defendant Dean Witter Discover, a Delaware corporation, is a publicly-held financial services company providing credit and investment products. Defendant Dean Witter Reynolds, a Delaware corporation, is a broker-dealer and member of the New York Stock Exchange and other major securities, futures and options exchanges in the United States. Dean Witter Reynolds operates the securities business of Dean Witter Discover and acted as the offeror and/or underwriter for the sale of the Partnerships to plaintiffs. Dean Witter Reynolds also organized the Proprietary Partnerships that it sold to plaintiffs and acted as the exclusive selling agent for Falcon Classic Cable, which it did not sponsor.

Defendant Dean Witter Realty, a Delaware corporation, is a wholly-owned subsidiary of Dean Witter Discover. Dean Witter Realty is responsible for the creation, marketing and oversight of the Proprietary Partnerships. It is also the parent of the Delaware corporate subsidiaries formed to serve as the managing general partners of the Proprietary Partnerships. These corporate subsidiaries are, in turn, the general partners of the Delaware limited partnerships or corporations formed to serve as the associate general partners of the Proprietary Partnerships. [FN3] Officers and employees of Dean

Witter Realty served as officers and employees of these general partners. Dean Witter Realty was in charge of the day-to-day operations of each of the general partners of the Proprietary Partnerships.

> FN3. Managing and associate general partners will be referred to collectively as the "general partners."

*2 Defendants Dean Witter Realty Income Properties I Inc. and Dean Witter Realty Income Associates I, L.P. are the managing and associate general partners, respectively, of Income I. Defendants Dean Witter Realty Income Properties II Inc. and Dean Witter Realty Income Associates II, L.P. are the managing and associate general partners, respectively, of Income II. Defendants Dean Witter Realty Income Properties III Inc. and Dean Witter Realty Income Associates III, L.P. are the managing and associate general partners, respectively, of Income III. Defendants Dean Witter Realty Fourth Income Properties Inc. and Dean Witter Realty Income Associates IV, L.P. are the managing and associate general partners, respectively, of Income IV. Defendants Dean Witter Realty Yield Plus Inc. and Dean Witter Realty Yield Plus Associates, L.P. are the managing and associate general partners, respectively, of Yield Plus. Defendants Dean Witter Realty Yield Plus II Inc. and Dean Witter Realty Yield Plus Associates II, L.P. are the managing and associate general partners, respectively, of Yield Plus II. Defendants Dean Witter Realty Growth Properties Inc. and Dean Witter Realty Growth Associates, L.P. are the managing and associate general partners, respectively, of Growth Properties.

In addition, plaintiffs named as defendants Dean Witter Realty Income Associates I Inc. and Dean Witter Realty Income Associates II Inc.-the general partners of the associate general partners of Income I and Income II, respectively. Each of these defendant general partners is a Dean Witter affiliate, or wholly-owned direct or indirect subsidiary, organized in Delaware.

Defendant Tempo-GP, a Delaware corporation, was originally owned jointly by a Dean Witter Discover

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

subsidiary and Coldwell Banker Commercial Group, Inc. Today, Tempo-GP is a wholly-owned subsidiary of Dean Witter Discover. Tempo-GP is the general partner of the Tax Exempt Mortgage Fund and directed and controlled its activities. [FN4]

> FN4. In their Amended Complaint, none of the plaintiffs claims to have purchased units of the Tax Exempt Mortgage Fund. As such, plaintiffs do not have standing to assert any claims with respect to that fund or its general partner, Tempo-GP. *See Alabama By-Products Corp. v. Cede & Co.,* Del.Supr., 657 A.2d 254, 264 (1995).

Plaintiffs purport to bring this action on behalf of all persons and entities who purchased units of the Partnerships sold by or through Dean Witter Reynolds or other selling agents affiliated with Dean Witter from 1984 through the present. [FN5] Plaintiffs allege that defendants breached their fiduciary duties in connection with the Partnerships organized, sold and operated by defendants, in which plaintiffs invested. Among other things, plaintiffs allege that defendants breached the duties of loyalty, candor and care they owed to plaintiffs as their fiduciaries. Plaintiffs complain that they relied-to their detriment-upon the good faith of defendants in their roles as fiduciaries, as general partners, financial advisors and agents, and as officers and directors of the general partners. According to plaintiffs, defendants' breaches have caused plaintiffs to suffer the losses of substantial portions of their investments and have failed to realize the income, liquidity and security in their investments as promised them by defendants. [FN6]

> FN5. First Consolidated and Amended Class Action Complaint ¶ 37 (Docket No. 10) [hereinafter *Complaint* ]. All further references to "plaintiffs" shall include the named plaintiffs as well as the purported class of plaintiffs.

> FN6. Complaint ¶ 3.

*3 Plaintiffs assert that Dean Witter sold the

Partnerships through uniform sales materials that promoted sale of the Partnerships at the expense of candor. Specifically, plaintiffs claim that defendants misrepresented or failed to disclose to them at the time of purchase the nature of the risks involved in investing in the Partnerships, that defendants misrepresented or failed to disclose the financial condition of the Partnerships in order to conceal losses, mismanagement, fraud and self-dealing, and that defendants misled plaintiffs into believing that Dean Witter was recommending and selecting investments that presented low risk and were suitable for retirement accounts. [FN7] Plaintiffs further allege that although Dean Witter represented to plaintiffs that it would maintain a relationship with the Partnerships and oversee their operation, [FN8] Dean Witter failed to supervise the Partnerships in the plaintiff investors' best interests.

> FN7. Pls.' Memo. in Opp. to Defs.' Motion to Dismiss at 6 (Docket No. 32) [hereinafter *Pls.' Memo. in Opposition* ].

> FN8. Complaint ¶ 25.

Plaintiffs insist that defendants were instead engaging in a systematic scheme designed to organize, sell and operate high risk, speculative limited partnerships in order to enrich themselves at the expense of plaintiff investors. According to plaintiffs, once defendants obtained investment capital from plaintiffs, defendants used the capital to purchase underperforming or failing investments owned by Dean Witter affiliates or to refinance underperforming loans owed to Dean Witter affiliates. Plaintiffs further allege that defendants channeled Partnership funds into faltering projects owned by earlier-formed Partnerships, to create the illusion of financial health for those Partnerships and to aid in marketing new ones. [FN9]

> FN9. Pls.' Memo. in Opposition at 2.

Defendants filed a motion to dismiss on December 10, 1996. [FN10] The motion cites several grounds for dismissal, including: (1) that the claims are time-barred; (2) that plaintiffs' allegations fail to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 4

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
(Cite as: Not Reported in A.2d)

state a claim; and (3) that plaintiffs have improperly brought this action as a direct, rather than derivative, action. The parties briefed the motion, presented oral argument to the Court, and conducted a supplemental round of briefing specifically addressing the statute of limitations issue. As explained below, I agree with defendants that the applicable statute of limitations bars plaintiffs' claims. [FN11] Thus, plaintiffs' claims must be dismissed for failure to file within the statutory period.

> FN10. Defs.' Memo. in Support of Motion to Dismiss (Docket No. 21) [hereinafter *Defs.' Motion to Dismiss* ].

> FN11. Because I have determined that defendants' claim of time-bar is dispositive, I need not address the other grounds offered by defendants in their motion to dismiss.

## II. LEGAL STANDARD

There is clear legal precedent in Delaware for granting a motion to dismiss on the ground that a plaintiff's claims are barred by operation of the statute of limitations. [FN12] This is so even in equity. Although statutes of limitation do not generally apply directly in equity, equity follows the law and will apply a statute of limitations by analogy in appropriate circumstances. [FN13] Moreover, it is "well settled that where the complaint itself alleges facts that show that the complaint is filed too late, the matter may be raised by [a] motion to dismiss." [FN14]

> FN12. *Boeing Co. v. Shrontz,* Del. Ch., C.A. No. 11273, Berger, V . C. (Apr. 20, 1992) (dismissing breach of fiduciary duty claims on grounds of time-bar); *Halpern v. Barran,* Del. Ch., 313 A.2d 139 (1973) (same).

> FN13. *Kahn v. Seaboard Corp.,* Del. Ch., 625 A.2d 269, 271 (1993). *See also United States Cellular Inv. Co. v. Bell Atlantic*

*Mobile Sys., Inc.,* Del.Supr., 677 A.2d 497 (1996) ("Absent some unusual circumstances, a court of equity will deny a plaintiff relief when suit is brought after the analogous statutory period.").

> FN14. *Seaboard,* 625 A.2d at 277 (dismissing, with permission to replead, complaint in equity on statute of limitations grounds).

**\*4** In evaluating a motion to dismiss, I am required to assume the truthfulness of all well-pleaded (*i.e.,* nonconclusory) allegations of the complaint for purposes of the motion. [FN15] I am also required to draw from the complaint all inferences or conclusions of fact that may reasonably be drawn from the specific facts alleged therein. [FN16] Conclusions asserted in the complaint, however, will only be accepted as true if there are specific allegations of fact to support them. [FN17] In the end, I may only dismiss the Amended Complaint if it is clear that plaintiffs will not be entitled to relief under any set of facts that could be proven based on the allegations of the complaint. [FN18]

> FN15. *Loudon v. Archer-Daniels-Midland Co.,* Del.Supr., C.A. No. 88, 1996, at 11-12, Veasey, C.J. (Sept. 17, 1997) (en banc); *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 & n. 6 (1988).

> FN16. *Id.*

> FN17. *In re Santa Fe Pac. Shareholders Litig.,* Del.Supr., 669 A.2d 59, 65-66 (1995); *Grobow,* 539 A.2d at 187 & n. 6.

> FN18. Ct. Ch. R. 12(b)(6); *Rabkin v. Philip A. Hunt Chem. Corp.,* Del.Supr., 498 A.2d 1099, 1105 (1985); *Litman v. Prudential-Bache Properties, Inc.,* Del. Ch., C.A. No. 12137, at 4-5, Chandler, V.C. (Jan. 14, 1994), *aff'd,* Del.Supr., 642 A.2d 837 (1994).
> Plaintiffs cite *Snyder v. Butcher & Co.,* Del.Super., C.A. No. 91C-04-289, Goldstein, J. (Sept. 15, 1992), for the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 5

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
(Cite as: Not Reported in A.2d)

proposition that it is improper for a court to grant a motion to dismiss on statute of limitations grounds whenever the complaint alleges fraudulent concealment as part of its claims. Plaintiffs, however, misread *Snyder*. *Snyder* stated that granting a motion to dismiss on statute of limitations grounds would be inappropriate where a plaintiff has "*successfully pled* fraudulent concealment." *Id* . at 9 (emphasis added). Where a plaintiff has successfully alleged a claim of fraudulent concealment "the affirmative statute of limitations defense turns on a question of fact," rendering a summary disposal inappropriate. *Id. Snyder* does nothing, however, to alter the general rule that when it is clear from the face of the complaint that the statute of limitations bars a plaintiff's claims, despite an allegation of fraudulent concealment, dismissal is still appropriate. *See Boeing Co. v. Shrontz,* op. at 4-5 (dismissing breach of fiduciary duty claims on statute of limitations grounds, despite allegation of fraudulent self-dealing). *See also Shockley v. Dyer,* Del.Supr., 456 A.2d 798, 799 (1983) (affirming grant of summary judgment, despite plaintiff's allegation of fraudulent concealment, where viewing the facts in a light most favorable to plaintiffs, "it becomes clear that by an exercise of due diligence plaintiff could have discovered her rights.").

### III. ANALYSIS

#### A. Statute of Limitations

It is well-settled under Delaware law that a three-year statute of limitations applies to claims for breach of fiduciary duty. [FN19] With the exception of the Falcon Classic Cable claim, which was a brand new claim as of the filing of the Amended Complaint on October 7, 1996, plaintiffs filed their pre-consolidation complaints on February 6, 9 & 15, 1996, alleging breaches of fiduciary duty by Dean Witter and the general partners of the Partnerships. [FN20] Applying the three-year statute of limitations, any claim that accrued prior to February 6, 1993 (or prior to October 7, 1993, with respect to the Falcon Classic Cable claim) is barred by operation of the statute. If, however, plaintiffs' cause of action accrued on or after February 6, 1993 (or October 7, 1993, with respect to the Falcon Classic claim), then the claims are timely and can proceed.

> FN19. 10 *Del. C.* § 8106; *Dofflemyer v. W.F. Hall Printing Co.,* D. Del., 558 F.Supp. 372, 379 (1983) (applying Delaware law).

> FN20. Under the Order of Consolidation, all documents previously filed and served in the cases consolidated by the Order were deemed filed, served and part of the record in the consolidated action. Only the three Court of Chancery cases were consolidated by that Order. The earliest of these cases-*Segel*-was filed February 6, 1996. Thus, February 6, 1996, is the earliest operative date for statute of limitations purposes. *See* Order of Consolidation ¶¶ 1, 9.

#### B. Time of Accrual

The general law in Delaware is that the statute of limitations begins to run, *i.e.,* the cause of action accrues, at the time of the alleged wrongful act, even if the plaintiff is ignorant of the cause of action. [FN21] Plaintiffs here complain of two different types of injuries. First, they allege that Dean Witter violated its fiduciary duties in the marketing and sale of the Partnerships. Second, plaintiffs allege that defendants [FN22] committed post-offering breaches of their fiduciary duties in connection with the management and oversight of the Partnerships.

> FN21. *David B. Lilly Co. v. Fisher,* D. Del., 18 F.3d 1112, 1117 (1994); *Isaacson, Stolper & Co. v. Artisan's Sav. Bank,* Del.Supr., 330 A.2d 130, 132 (1974)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

> FN22. Plaintiffs do not allege post-offering mismanagement with respect to Falcon Classic Cable. Complaint ¶¶ 266-68.

Plaintiffs allege that defendants breached their fiduciary duties in recommending and selling to plaintiffs Partnerships that would never (and could never) achieve their promised objectives. Accepting this allegation as true, plaintiffs' injuries occurred *when they purchased* their Partnership interests as a result of defendants' alleged misrepresentations. [FN23] Thus, plaintiffs' cause of action accrued when they invested in the allegedly fraudulent Partnerships. The Partnerships at issue were marketed and sold to the plaintiffs in the mid-to-late 1980s. The last of these sales was completed by the end of 1989. [FN24] Thus, with respect to the marketing and sale of the Partnerships, plaintiffs' cause of action accrued no later than year-end 1989. Absent tolling of the statute of limitations, these claims became stale at the end of 1992-years before plaintiffs filed their Amended Complaint.

> FN23. *Seidel v. Lee*, D. Del., C.A. No. 93-494-JJF, at 16, Farnen, C.J. (Dec. 30, 1996) (applying Delaware law) (fiduciary duty claim accrues when breach accomplished). *See also In re Merrill Lynch Ltd. Partnerships Litig.*, S.D.N.Y., No. 95 Civ. 10657(MBM), at 11-20 (Aug. 26, 1997) (applying federal RICO law, which has same standard for statute of limitations accrual).

> FN24. Complaint ¶¶ 9-23.

**\*5** With respect to the allegations of post-offering breaches arising out of the management and oversight of the Partnerships, plaintiffs allege that defendants operated the Partnerships to benefit themselves at the expense of the investors. Among other things, plaintiffs complain that Partnership real estate investments were chosen solely for the purpose of benefiting other Dean Witter affiliates and that the Partnerships paid excessive commissions and fees. For each Partnership, these

alleged violations of fiduciary duty began-and plaintiffs consequently began to suffer injury-shortly after each Partnership was formed. The Amended Complaint is replete with allegations of injudicious mortgage loans and unwarranted management commissions throughout the mid-to-late 1980s. [FN25] Thus, as with the marketing and sales claims, plaintiffs' cause of action regarding the alleged post-offering breaches accrued no later than year-end 1989. [FN26] Plaintiffs filed their complaint on February 6, 1996-well past the expiration of the three-year limitations period. *Absent tolling,* therefore, all of plaintiffs' claims fall outside the statutory period and would be time-barred.

> FN25. *See, e.g.,* Complaint ¶¶ 91-121 (Yield Plus), ¶¶ 129-35 (Yield Plus II), ¶¶ 136-46 (Yield Plus & Yield Plus II), ¶¶ 156-79 (Growth Properties), ¶¶ 193-98 (Income I), ¶¶ 209-16 (Income II), ¶¶ 233-39 (Income II, III & IV).

> FN26. *Dofflemyer,* 558 F.Supp. at 379 (fiduciary duty claim accrues at time of breach).

### C. Tolling

Plaintiffs allege that their claims are timely because the statute of limitations was tolled until January 26, 1996, when an article in the *Wall Street Journal* [FN27] -reporting that the Securities and Exchange Commission ("SEC") was negotiating with Dean Witter Reynolds and two other brokerage firms concerning their limited partnership sales practices during the 1980s and that a settlement fund might be established-first put them on notice of their potential claims. [FN28] Plaintiffs assert three separate theories to support a tolling of the statute of limitations in this case: (1) inherently unknowable injuries; (2) fraudulent concealment; and (3) equitable tolling. Each of these doctrines permits tolling of the limitations period where the facts underlying a claim were so hidden that a reasonable plaintiff could not timely discover them. [FN29]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

FN27. This article will be referred to as the "*Wall Street Journal*" article" or the "article."

FN28. Pls.' Memo. in Opposition at 9.

FN29. *See, e.g., Playtex, Inc. v. Columbia Casualty,* Del.Super., C.A. No. 88C-MR-233, at 7, Del Pesco, J. (Sept. 20, 1993) ("Ignorance of the facts supporting a cause of action will not toll the statute, absent some special consideration such as ' inherently unknowable' injuries or fraudulent concealment.").

Under the doctrine of inherently unknowable injuries, the running of the statute of limitations is tolled while the discovery of the existence of a cause of action is a practical impossibility. [FN30] For the limitations period to be tolled under this doctrine, there must have been no observable or objective factors to put a party on notice of an injury, and plaintiffs must show that they were blamelessly ignorant of the act or omission and the injury. [FN31] Often, plaintiffs can establish "blameless ignorance" by showing justifiable reliance on a professional or expert whom they have no ostensible reason to suspect of deception. [FN32] This doctrine tolls the limitations period until a plaintiff had "reason to know" that a wrong has been committed. [FN33]

FN30. *Ruger v. Funk,* Del.Super., C.A. No. 93C-04-210, at 5-6, Lee, J. (Jan. 22, 1996).

FN31. *Seidel,* op. at 17.

FN32. *See, e.g., Isaacson,* 330 A.2d at 133-34 (applying "discovery rule" in light of relationship of "confidence and reliance by plaintiff on the expertise of defendant").

FN33. *Pack & Process, Inc. v. Celotex Corp.,* Del.Super., 503 A.2d 646, 650 (1985).

The statute of limitations will also be tolled if a defendant engaged in fraudulent concealment of the facts necessary to put a plaintiff on notice of the truth. [FN34] Unlike the doctrine of inherently unknowable injuries, fraudulent concealment requires an affirmative act of concealment by a defendant-an "actual artifice" that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry. [FN35] "Mere ignorance of the facts by a plaintiff, where there has been no such concealment, is no obstacle to operation of the statute [of limitations]." [FN36] Where there has been fraudulent concealment from a plaintiff, the statute is suspended until his rights are discovered or until they could have been discovered by the exercise of reasonable diligence. [FN37]

FN34. *Litman,* op. at 8.

FN35. *Halpern,* 313 A.2d at 143.

FN36. *Id.*

FN37. *Id.*

**\*6** Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary. [FN38] Underlying this doctrine is the idea that "even an attentive and diligent [investor] relying, in complete propriety, upon the good faith of [fiduciaries] may be completely ignorant of transactions that ... constitute self-interested acts injurious to the [Partnership]." [FN39] This doctrine tolls the limitations period until an investor knew or had reason to know of the facts constituting the wrong. [FN40]

FN38. *Yaw v. Talley,* Del. Ch., C.A. No. 12882, at 10, Jacobs, V.C. (March 7, 1994) (Fiduciaries who benefit personally from their wrongdoing, especially as a result of fraudulent self-dealing, will not be afforded the protection of the statute of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 8

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

limitations.).

FN39. *Seaboard,* 625 A.2d at 275-76 (Given the fiduciary duties that the law imposes on corporate directors, stockholders are entitled to rely on the good faith of the directors when they act with respect to the corporation's property or processes.).

FN40. *In re Maxxam, Inc./Federated Dev. Shareholders Litig.,* Del. Ch., 659 A.2d 760, 769 (Feb. 13, 1995).

As the party asserting that tolling applies, plaintiffs bear the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled. [FN41] Significantly, if the limitations period is tolled under any of these theories, it is tolled *only until* the plaintiff discovers (or exercising reasonable diligence should have discovered) his injury. [FN42] Thus, the limitations period begins to run when the plaintiff is *objectively* aware of the facts giving rise to the wrong, *i.e.,* on inquiry notice. [FN43] Accordingly, for plaintiffs to establish that this action was filed in a timely manner, under any one of these theories, they must convince the Court that they were *not* on inquiry notice of their claims before February 6, 1993 (or before October 7, 1993, with respect to the Falcon Classic Cable claim). [FN44]

FN41. *United States Cellular,* 677 A.2d at 504; *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, at 35, Allen, C. (Nov. 21, 1995).

FN42. *In re ML-Lee Acquisition Fund II, L.P. Litig.,* D. Del., 848 F.Supp. 527, 554 (1994) (inherently unknowable injuries); *United States Cellular,* 677 A.2d at 503 (equitable tolling); *Litman,* op. at 8 (fraudulent concealment).

FN43. *See Seidel,* op. at 16-17 (inherently unknowable injuries: statute tolled until such time as persons of ordinary intelligence and prudence would have facts

sufficient to place them on inquiry notice of an injury); *Seaboard,* 625 A.2d at 275 (equitable tolling: statute of limitations does not run against plaintiff until he knows or has reason to know facts alleged to give rise to wrong); *Halpern,* 313 A.2d at 143 (fraudulent concealment: running of statute suspended only until plaintiff's rights are discovered or would have been discovered by exercise of reasonable diligence). *See also Nardo v. Guido DeAscanis & Sons, Inc.,* Del.Super., 254 A.2d 254, 256 (1969) (standard for length of tolling is the same for fraudulent concealment, equitable tolling and inherently unknowable torts).

FN44. Where the tolling of the statute of limitations turns on controverted issues of fact, a pre-discovery dismissal of the claim would be inappropriate. *See, e.g., In re Asbestos Litig.,* Del.Super., 673 A.2d 159, 163 (1996) (only when the record is uncontroverted that plaintiff "discovered" his injury more than [three] years prior to filing his suit is summary judgment appropriate). However, when it is clear from the face of the complaint (and the documents incorporated by reference in it) that plaintiffs' tolling theories fail even to raise a legitimate doubt about the time the claims accrued, dismissal is appropriate if the claims were filed after the applicable limitations period expired. Plaintiffs cite *In re Maxxam* for the proposition that "a defendant should not be permitted to use the statute of limitations as a shield where the defendant possesses information critical to the existence of an actionable claim of wrongdoing and prevents the plaintiff from discovering that information in a timely fashion." *In re Maxxam, Inc./Federated Dev. Shareholders Litig.,* Del. Ch., C.A. Nos. 12111 & 12353, at 13, Jacobs, V.C. (June 21, 1995). The danger is in dismissing an action prematurely when plaintiffs do not yet have access to the information they need to state their claims fully. Here, it is clear to the Court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 9

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
(Cite as: Not Reported in A.2d)

that all of the necessary information was not only publicly available, but already in plaintiffs' hands at least as far back as 1990-an entirely different situation than the one presented to the *In re Maxxam* Court.

### D. Were Plaintiffs on Inquiry Notice?

Defendants contend it is clear that, based on the allegations of the Amended Complaint, plaintiffs cannot under any circumstances show that the statute of limitations was tolled for the length of time necessary to render their action timely. First, defendants note that the very facts pleaded in the Amended Complaint demonstrate that plaintiffs were on inquiry notice of defendants' alleged wrongful conduct long before February 6, 1993 (or October 7, 1993, with respect to the Falcon Classic Cable claim). Second, defendants point out that other Partnership investors filed lawsuits against Dean Witter Reynolds alleging breach of fiduciary duty in connection with the same Proprietary Partnerships *before* the *Wall Street Journal* article was published. [FN45] That fact, defendants argue, shows conclusively that the existence of the claims was not beyond the grasp of the reasonably diligent investor. Finally, defendants make the practical argument that the *Wall Street Journal* article, touted by plaintiffs as their clarion call, could not possibly have provided the "essential missing information" that plaintiffs assert. The article simply did not disclose any information about Dean Witter's sales practices, nor did it identify any limited partnerships by name.

FN45. *See, e.g., Grigsby v. Dean Witter Reynolds Inc.,* Cal.Super. Ct., C.A. No. 695777 (filed Dec. 27, 1995) (asserting claims with respect to the Proprietary Partnerships); *McCoy v. Dean Witter Reynolds, Inc.,* E.D. Tenn., C.A. No. 94-5779 (regarding demand for arbitration filed Dec. 28, 1989, asserting claims with respect to Income I & II); *Eno v. Dean Witter Reynolds, Inc.,* N.Y. Sup.Ct., Index No. 127300/95 (regarding demand for arbitration filed May 25, 1994, asserting

claims with respect to Income II).

Defendants emphasize that the allegations of wrongful conduct asserted in the Amended Complaint are based on events that all occurred in the mid-to-late 1980s. Moreover, every fact cited by plaintiffs in the Amended Complaint comes from disclosures in documents that were either provided to plaintiffs contemporaneously with the wrongful conduct now being alleged or publicly available Securities Exchange Commission ("SEC") filings made by the Partnerships. [FN46] As a matter of law, defendants assert, disclosures in any of those documents-the sole source of plaintiffs' allegations-were sufficient to place plaintiffs on inquiry notice of their claims long before February 6, 1993.

FN46. According to defendants, investors in each Partnership received from Dean Witter a prospectus (and all applicable supplements), annual and quarterly reports, and periodic "property profiles" describing properties in which the Partnership had invested. Each Partnership also filed with the SEC (and made available to investors on request) reports on Form 10-K, reports on Form 10-Q, and reports on Form 8-K. Defs.' Motion to Dismiss at 7-8. The Court may properly consider the contents of the *Wall Street Journal* article, Partnership prospectuses, property profiles, customer account statements, quarterly and annual reports and SEC filings in considering this motion to dismiss, because by expressly referring to and so heavily relying on these documents in the Amended Complaint, plaintiffs have incorporated them by reference into the Amended Complaint. *Glaser v. Norris,* Del. Ch., C.A. No. 9583, at 9 n. 1, Chandler, V.C. (Jan. 6, 1992).

*7 Although the information they now use to support their allegations was publicly available at the time of the alleged wrongs, plaintiffs claim that they were prevented from discovering defendants' wrongful conduct prior to January 26, 1996, as a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 10

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
(Cite as: Not Reported in A.2d)

result of defendants' misrepresentations regarding the health of their Partnership investments. Until reading the *Wall Street Journal* article, plaintiffs assert that they relied-and were entitled to rely-on defendants' assurances that the Partnerships' properties were performing better than comparable properties, that the Partnerships' losses were only temporary, and that those losses were not caused by any wrongful conduct on the part of defendants. In fact, the Partnerships' losses were accompanied by an overall real estate market decline. It was the publication of the article, plaintiffs contend, that first alerted them to their potential claims, *i.e.,* to the idea that their investment losses were the result of defendants' wrongful conduct rather than a general downturn in the real estate market. And it was not until, *after reading the article,* plaintiffs hired a consulting expert, who sifted through "more than 300 publicly-filed documents," that plaintiffs were able to reconstruct the Partnerships and actually discover defendants' wrongful conduct. [FN47] Accordingly, plaintiffs argue they were not on inquiry notice until January 26, 1996 and, therefore, that is the date the statute of limitations began to run.

FN47. Pls.' Memo. in Opposition at 3.

As noted above, the limitations period is tolled until such time that persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, *if pursued,* would lead to the discovery of the injury. [FN48] Inquiry notice does *not* require *actual* discovery of the reason for the injury. Nor does it require plaintiffs' awareness of all of the aspects of the alleged wrongful conduct. Rather, the statute of limitations begins to run when plaintiffs should have discovered the general fraudulent scheme. [FN49] Thus, the critical inquiry for purposes of this motion to dismiss is: were plaintiffs *entitled to rely* on defendants' representations for as long as they did, *i.e.,* up until publication of the January 26, 1996, *Wall Street Journal* article, or were they on inquiry notice before that date? [FN50]

FN48. *In re ML-Lee Acquisition Fund II,*

*L.P. Litig.,* 848 F.Supp. at 554 (defendants' misrepresentations were unknowable until publication of the Annual Report disclosing particular investment and its lack of success).

FN49. *McCoy v. Goldberg,* S.D.N.Y., 748 F.Supp. 146, 158 (1990) (statutory period does not await plaintiffs' leisurely discovery of the full details of the alleged scheme) (internal citations omitted). Although plaintiffs suggest that their claims were "unknowable" because it required an expert to uncover defendants' alleged wrongdoing, that argument is without merit. It may in fact have taken an expert to unravel the entire scheme alleged by plaintiffs. But having all of the facts necessary to articulate the wrong is *not* required. Rather, "[o]nce a plaintiff is in possession of facts sufficient to make him suspicious, or that ought to make him suspicious, he is deemed to be on inquiry notice." *Harner v. Prudential Secs. Inc.,* E.D. Mich., 785 F.Supp. 626, 633 (1992) (citations omitted), *aff'd,* 6th Cir., 35 F.3d 565 (1994).

FN50. Defendants assert that when plaintiffs read the article, they responded by doing what they could have done several years earlier-they read the public documents and hired an expert to review them. Defs.' Motion to Dismiss at 15-16.

The Partnerships sustained steady losses from the outset. Plaintiffs allege that defendants purposely put them off the trail of inquiry by notifying them of these losses, while at the same time reassuring plaintiffs that the Partnerships were returning profits. [FN51] For example, plaintiffs "received regular distributions, falsely reassuring [them] regarding the financial condition of their investments." [FN52] In reliance on the fiduciary duties owed by defendants, plaintiffs assert that they "had no reason to go behind Defendants' campaign of misinformation" to discover the true source of the Partnership losses. [FN53]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 11

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

FN51. *See, e.g.,* Income III, 1990 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (Dec. 10, 1996), Ex. 6-C (Docket No. 25) ("1990 was a difficult and disappointing year for real estate investments in general.... Fortunately, due to the high quality of its properties and size of its portfolio, the Partnership has been able to avoid the worst of the[ ] problems.... The cash distribution paid during the 1990 fiscal year was ... an annualized return of 6.25%.").

FN52. Pls.' Memo. in Opposition at 51.

FN53. *Id.* at 48.

*8 Plaintiffs specifically complain that the annual reports concealed the fact that these consistent cash distributions were actually a return of investors' capital rather than a "return on investment." [FN54] Pointing to the 1990 Annual Report for the Yield Plus II Partnership as an example, plaintiffs assert that they could not have known that Partnership capital was being impaired, in light of the statement that the "distribution ... was an annualized return on investment of 7.5%." [FN55] But in the same annual report, three pages away on page four, is a chart showing clearly that the partners' capital had declined from the previous year. Moreover, from a chart on page six, it is apparent from even the most cursory glance that the amount of the cash distributions for the year 1990 far exceeded the Partnership's net income for the same year. These charts are not, as plaintiffs suggest, hard to understand, nor are they buried at the back of a thick report. The typical annual report for the Partnerships is no more than fifteen pages in length. While the distributions were maintained at a fairly high level, looking beyond the language on the first page of these annual reports, the fact that the distributions are consistently greater than the Partnership income *should have alerted* plaintiffs to the fact that something was amiss.

FN54. *See, e.g.,* Pls.' Memo. in Opposition at 7, 23-24, 26-28, 51.

FN55. Yield Plus II, 1990 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (Dec. 10, 1996), Ex. 2-D (Docket No. 23).

Plaintiffs seek refuge in the proposition that where the statute of limitations inquiry involves claims of self-dealing by a fiduciary, "[t]he emphasis is upon the protection of the beneficiary of the fiduciary duty, so long as she is reasonably attentive to her interests, albeit trusting." [FN56] Accordingly, plaintiffs assert, the fiduciary relationship between plaintiffs and defendants in this case entitled plaintiffs to rely upon the presumed good faith and loyalty of defendants. Plaintiffs correctly point out that beneficiaries are entitled to trust their fiduciaries . [FN57] As a result, reasonable reliance on the competence and good faith of those who have assumed a legal responsibility toward a plaintiff can be sufficient to toll the running of the statute of limitations. [FN58] But, the trusting plaintiff still must be *reasonably attentive* to his interests. *"[B]eneficiaries should not put on blinders to such obvious signals as publicly filed documents, annual and quarterly reports, proxy statements, and SEC filings."* [FN59] Thus, even where defendant is a fiduciary, a plaintiff is on inquiry notice when the information underlying plaintiff's claim is readily available. [FN60]

FN56. *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, at 37, Allen, C. (Nov. 21, 1995).

FN57. *See, e.g., Borden v. Sinskey,* 3d Cir., 530 F.2d 478, 489, n. 10 (1976) (" Shareholders have no duty to search a corporation's records for evidence of misconduct on the part of corporate officers and directors. Rather, they are entitled to assume that those standing in a fiduciary relationship to them will be faithful to their charge.").

FN58. *Seaboard,* 625 A.2d at 275.

FN59. *Seidel,* op. at 18 (emphasis added).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                       Page 12

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
(Cite as: Not Reported in A.2d)

FN60. *Id.* (rejecting plaintiff's inherently unknowable tolling argument because "the public documents, which form the basis of many of Plaintiff's claims, could have provided Plaintiff with adequate notice of an alleged misconduct by Defendants."). In the instant case, the public documents provide the basis for *all* of plaintiffs' claims. *See also In re USACafes, L.P. Litig.,* Del. Ch., C.A. No. 11146, 18 Del. J. Corp. L. 1204, 1213 (1993) ("[I]nterest holders need not delve aggressively into the internal affairs of a ... limited partnership in order to assure that a non-public, self-dealing transaction is not foreclosed from attack by limitations, but when facts are disclosed that give rise to inquiry, an applicable statute of limitations will require timely action to preserve rights.").

It is not too much to ask investors to read beyond the first page of an annual report, to read past the rosy forecasts and actually look at the cold, hard figures provided to them. Had plaintiffs bothered, for example, to read past the first page of the 1989 Annual Report for Income II-a document that was delivered to investors by mid-1990 at the latest-they would have been alarmed. [FN61] Although large distributions were being made, with a quick glance it is clear that the amount of these distributions far exceeded the "net income" figure. [FN62] In fact, the figures show the amount of the "partners' capital" steadily declining from 1986 to 1989. [FN63] Yet, the first page of this annual report states so optimistically: "The cash distribution paid for the 1989 fiscal year [constituted] an annualized return of 7%." This blatant contradiction should have been a "red flag" to any investor-and should have prompted an inquiry by plaintiffs into the health of their investments. [FN64]

FN61. Income II, 1989 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (July 11, 1997), Ex. C (Docket No. 52).

FN62. For the fiscal year 1989, the Income

II Partnership shows a net income figure of $7,043,996 and cash distributions of $13,768,450. *Id.* at 7.

FN63. *Id.*

FN64. *In re Prudential Sec. Inc. L.P. Litig.,* S.D.N.Y., 930 F.Supp. 68, 76 (1996) (" Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of that fraud will be imputed to him.").

*9 The presence of this inherently contradictory information in each Partnership's annual report starting in the late 1980s for the earlier Partnerships and its appearance in all of the Partnerships by 1990 compels the conclusion that plaintiffs were not reasonably attentive to their investment interests. [FN65] Plaintiffs were not entitled to sit idly by, blindly relying on defendants' assurances, when the documents and disclosures plaintiffs received regularly were so suggestive of mismanagement. [FN66] Whether accompanied by optimistic projections or not, these discrepancies alone were sufficient notice of wrongdoing to prompt inquiry into the Partnerships. Upon receipt for each Partnership of the first annual report revealing cash distributions in excess of net income, plaintiffs were on inquiry notice of their claims. [FN67]

FN65. *See, e.g.,* Income I, 1989 Annual Report, Ex. A; Income II, 1989 Annual Report, Ex. C; Income III, 1989 Annual Report, Ex. L; Income IV, 1989 Annual Report, Ex. M; Growth Properties, 1989 Annual Report, Ex. D (attachments to the Affidavit of Ronald J. DiPietro (July 11, 1997) (Docket No. 52)); Yield Plus, 1989 Annual Report, Ex. 1-D; Yield Plus II, 1990 Annual Report, Ex. 2-D (attachments to Affidavit of Ronald J. DiPietro (Dec. 10, 1996) (Docket No. 23)); Falcon Classic Cable, 1990 Annual Report, Ex. B

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

(attachment to Affidavit of Mary Lou Frick (Dec. 10, 1996) (Docket No. 26)).

FN66. *See, e.g., Playtex, Inc. v. Columbia Casualty,* Del.Super., C.A. No. 88C-MR-233, at 7, Del Pesco, J. (Sept. 20, 1993) ("inherently unknowable" theory of tolling did not apply where a "wealth of information regarding [the cause of action] was generally available" when the fraud occurred); *Halpern,* 313 A.2d at 143 (statute is tolled only for the "period of fraudulent concealment").

FN67. *See Ruger v. Funk,* op. at 6 (" Actual discovery commences the running of the statute; so will any change in circumstances that renders the injury no longer inherently unknowable, or the ignorance of the party-plaintiff no longer blameless.").

The Amended Complaint also alleges that such "deceptive" cash distributions were used to promote the sale of later Partnerships, and the purchasers of the later Partnerships would have no reason to review the financial information/materials for the earlier Partnerships. Assuming this is true, it still should have been obvious to the investors soon after receiving their annual reports that the cash distributions *they* were receiving were inflated and not reflective of actual earnings. Perhaps for one year, this would not raise too much concern, but certainly after the second or third straight year of cash distributions that far exceeded Partnership income, accompanied by a commensurate decline in partners' capital, plaintiffs should have been aware that the cash distributions they were receiving were not the result of investment gains-and that they were most likely duped into purchasing the Partnerships in the first place. The inherent contradiction between the distributions-described in these annual reports as "annualized returns"-and the declining partners' capital and net income lower than the distributions should have

caused plaintiffs to question whether the touted cash distributions of the earlier partnerships were truly indicative of profits. That is inquiry notice. *Queen Anne Pier Condominium Council v. Raley,* Del.Super., C.A. No. 85C-JA10, at 8, Lee, J. (Jan. 26, 1988) (inquiry notice means the existence of facts sufficient to put person of ordinary intelligence and prudence on inquiry which, *if pursued,* would lead to the discovery).

IV. CONCLUSION

On the basis of this record, I conclude that the information in the annual reports alone should have provided plaintiffs with adequate notice of any alleged misconduct by defendants. [FN68] Based on the facts alleged in the Amended Complaint, drawing all inferences in favor of plaintiffs, I conclude that plaintiffs were clearly on inquiry notice of their claims long before February 6, 1993 (or before October 7, 1993, with regard to the Falcon Classic Cable claim). [FN69] The limitations period for this cause of action is three years. Plaintiffs' February 1996 filing (the earliest of plaintiffs' filings) comes *more* than three years after they were placed on inquiry notice. For these reasons, I grant defendants' motion to dismiss on the ground that the plaintiffs' claims are time-barred by operation of the statute of limitations. [FN70]

FN68. Although I conclude that the glaring inconsistencies contained in the annual reports were sufficient, in and of themselves, to place plaintiffs on inquiry notice of their potential causes of action, those discrepancies were not the only indications plaintiffs had of their potential claims. I need not address them in substance (as I find the material in the annual reports dispositive on the issue), but I am inclined to agree with defendants' other assertions of plaintiffs' inquiry notice: (1) that plaintiffs were on notice no later than 1992, when defendants changed the format of their monthly account statements to reflect the true, rather than

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

par, value of the Partnerships. *See In re Prudential Sec. Inc. L.P. Litig.,* 930 F.Supp. at 76-77; (2) that some investors in the Partnerships did manage to file lawsuits against the very same limited partnerships *before* January 26, 1996, suggests the alleged wrongful conduct was detectable by the average investor; and (3) that the *Wall Street Journal* article neither disclosed any concrete information about sales practices or the investments in question, nor mentioned by name the limited partnership defendants in this case, thus raising a serous doubt as to how the article alone could have prompted such an inquiry.

FN69. *Cf. Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, Allen, C. (Nov. 21, 1995) (motion to dismiss denied because issue of plaintiffs' inquiry notice was in dispute).

FN70. Plaintiffs' request, in the alternative, to amend their Amended Complaint is hereby denied. No amendment would cure the fatal flaw in plaintiffs' current Amended Complaint-that it was filed too late. *Glaser v. Norris,* Del. Ch., C.A. No. 9538, at 30-31, Chandler, V.C. (Jan. 6, 1992) ("A court should deny leave to amend a complaint when the amendment would be futile due to the insufficiency of the proposed amendment.")

IT IS SO ORDERED.

Del.Ch.,1998.
In re Dean Witter Partnership Litigation
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 8

Westlaw.

Not Reported in F.Supp.2d                                      Page 1

Not Reported in F.Supp.2d, 2002 WL 32332375 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
KANEMATSU CORPORATION, Plaintiff,
v.
ADVANCED MATERIALS LANXIDE, LLC, and
Lanxide Technology Company, L .P., Defendants.
**No. Civ.A. 01-190-JJF.**

Sept. 30, 2002.

Michael F. Bonkowski, and Mark Minuti, of Saul
Ewing, LLP, Wilmington, Delaware. Diane L.
Gibson, Joseph A. Meckes, and Nathan Lane, III, of
Squire, Sanders & Dempsey LLP, San Francisco,
California, for Plaintiff, of counsel.
Collins J. Seitz, Jr., Arthur G. Connolly, III, and
Christos T. Adamopoulos, of Connolly, Bove,
Lodge & Hutz, Wilmington, Delaware, for
Defendants.

*MEMORANDUM OPINION*

FARNAN, J.
**\*1** Presently before the Court is a Motion to
Dismiss (D.I.5) filed by Defendants Advanced
Materials Lanxide, LLC, and Lanxide Technology
Company, L.P. (collectively "Defendants" and
individually "AML" and "LTC"). For the reasons
discussed below, Defendants' Motion (D.I.5) will be
granted.

*BACKGROUND*

I. Factual Background

A. Introduction

The present action stems from a series of business

arrangements entered into between Plaintiff
Kanematsu Corporation ("Kanematsu"), a
corporation organized and existing under the laws
of Japan with its principal place of business in
Tokyo, Japan, and Lanxide Corporation ("Lanxide"
), a Delaware corporation engaged in the
development, manufacture and licensing of various
inorganic composites. (D.I. 1 at 1, 2). Through its
activities, Lanxide allegedly acquired several
hundred patents for its technology in over 40
countries, including the United States and Japan.
(D.I. 1 at 3). In an effort to manage this global
intellectual property portfolio, Lanxide established
LTC, a Delaware limited partnership in which
Lanxide was both the general partner and the sole
stock holder of the limited partner, LTC Capital,
Inc. (D.I. 1 at 3).

B. The Relationship Between Kanematsu and
Lanxide

1. *The Joint Venture Agreement*

On April 24, 1992, Lanxide entered into a joint
venture agreement with Kanematsu in order to
commercialize Lanxide's technology in Japan ("
Joint Venture Agreement"). (D.I.1, Ex. A). This
agreement established a Japanese corporation,
Lanxide Kabushiki Kaisha ("Lanxide KK"),
through which Lanxide's technology for the
manufacture, use and sale of its products would be
licensed in Japan. (D.I. 1 at 3). On May 28, 1992,
Lanxide and LTC entered into a license agreement
with Lanxide KK ("LKK License"), granting
Lanxide KK technology rights in consideration for
royalty payments to Lanxide. (D.I.1, Ex. B).

2. *Kanematsu's Loan to Lanxide*

On April 24, 1994, Kanematsu loaned Lanxide ten
million dollars, pursuant to a Loan and Security

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 32332375 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Agreement ("Loan Agreement"). (D.I.7, Ex. D). The Loan Agreement provided that Lanxide would pledge its stock in Lanxide KK to Kanematsu and granted Kanematsu a security interest in Lanxide's personalty. (D.I. 1 at 4; D.I. 7, Ex.D).

### 3. The AKN Sublicense

In 1996, Kanematsu entered into a separate joint venture agreement with two other corporations to form AKN Corporation ("AKN"), a Japanese company. (D.I. 1 at 4). On November 11, 1996, Lanxide KK granted AKN a sublicense ("AKN Sublicense") to utilize Lanxide technology in the manufacturing of ceramic reinforced brake components in Japan. In return, Lanxide received an initial fee of four million dollars and a four percent royalty ("AKN Royalty") based on AKN's quarterly net sales. (D.I. 1 at 4; D.I. 1, Ex. C).

### 4. The Second Amendment to the Joint Venture Agreement

On November 1, 1997, Kanematsu and Lanxide agreed to amend the Joint Venture Agreement (" Second Amendment"). (D.I. 1, Ex. A at 103-105). Specifically, the Second Amendment alters the LKK License royalty schedule set forth in Section 12.2(b) of the Joint Venture Agreement. (D.I. 1, Ex. A at 103). As amended, the section reads as follows:
*2 [12.2(b)(i) ] In consideration for Kanematsu entering into the Loan and Security Agreement with Lanxide dated April 24, 1994, Kanematsu shall receive from Lanxide an amount equal to 48% of the royalties paid to Lanxide pursuant to [the LKK License]....
[12.2(b)(ii) ] Notwithstanding the provisions of [the above] hereto and in substitution therefor, beginning upon the Amendment Date and continuing until Kanematsu shall have received an aggregate amount of $1,384,615, Kanematsu shall receive from Lanxide an amount equal to 100% of the royalties paid to Lanxide pursuant to [the LKK License]; thereafter the provisions of Section 12.2(b)(i) shall have full force and effect.

(D.I. 1, Ex. A at 103-104).

### 5. LTC's Japanese Patents

On June 26, 1998, Lanxide, LTC, and Kanematsu entered into an agreement relating to LTC's Japanese Patents ("June 26 Agreement"). (D.I.1, Ex. E). In relevant part, the June 26 Agreement provides:
1.1. In order to secure payment to [Kanematsu] by Lanxide of any remaining balance of the $10 Million loan obligation outstanding (the "Balance") ... Lanxide hereby grants to [Kanematsu] a first and prior security interest in all of LTC's Japanese patents and patent applications filed....
1.2. Lanxide and LTC hereby represent and warrant to [Kanematsu] that they have all requisite authority to grant this security interest.
1.3. Lanxide hereby agrees to apply not less than 50% of the proceeds from any license fee that is payable to Lanxide or LTC pursuant to any licence granted by LTC in Japan following the Effective Date (the "Future Fees") to the Balance....

(D.I.1, Ex. E).

### 6. The July 10, 1998 Agreement

Lanxide and Kanematsu entered into a further agreement in July of 1998 ("July 10 Agreement"), which reaffirmed Lanxide's obligation under the Loan Agreement and established a repayment schedule. (D.I.1, Ex. D). Section Nine of the July 10 Agreement, in relevant part, provides:
In addition to the repayment of the Principal [of the Loan Agreement], Lanxide hereby acknowledges and agrees that payment of the first U.S. $1,384,615 of royalties received from Lanxide KK in connection with [the AKN Royalty] in accordance with 12.2.(b)(ii) of the Second Amendment ... shall be paid to [Kanematsu]. This payment shall be made by Lanxide KK on behalf of Lanxide directly to [Kanematsu]....

(D.I. 1, Ex. D at 5).

### C. The Lanxide Bankruptcy

On January 15, 1999, Lanxide filed a voluntary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                     Page 3

Not Reported in F.Supp.2d, 2002 WL 32332375 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

petition for relief under Chapter Seven of Title Eleven of the United States Bankruptcy Code. (D.I. 1 at 6). Subsequently, the Chapter Seven trustee (" Trustee") negotiated an agreement ("Purchase and Sale Agreement") with Metek Metallverarbeitungsellschaft mbH ("Metek"), a German corporation, for the sale of substantially all of the assets of Lanxide. (D.I. 1 at 7; D.I. 7, Ex. A). On July 30, 1999, the United States Bankruptcy Court for the District of Delaware issued an order (" July 30 Order") allowing the Trustee to sell substantially all of Lanxide's assets to Metek. *In re Lanxide Corporation,* Case No. 99-91-PJW. (D.I.7, Ex. B). The settlement authorized by the July 30 Order provided for the sale and purchase of Lanxide's assets "free and clear of all liens, claims, security interests, encumbrances or changes of any kind or nature." (D.I. 7, Ex. A at 2). Shortly thereafter, AML was formed pursuant to a joint venture between Metek and others, whereby Metek assigned its rights in the Lanxide bankruptcy estate to AML. (D.I. 1 at 7).

**\*3** On August 19, 1999, the Bankruptcy Court issued an Order approving the Trustee's assumption and assignment of certain license agreements and other contracts ("Assumption Order"). (D.I.7, Ex. C). Among the contracts assigned by the Trustee to AML in the Assumption Order were Lanxide's rights in the LKK License and the AKN Royalty. (D.I. 7, Ex. C at Ex. A).

### D. Kanematsu's Proof of Claim

On February 22, 1999, Kanematsu filed a secured claim against the Lanxide estate in the amount of $8,604,838.52, reflecting the remaining balance arising out of the Loan Agreement and subsequent agreements between Kanematsu and Lanxide. (D.I. 1 at 8). Thereafter, the Trustee and Kanematsu agreed to settle Kanematsu's secured claim, and, on December 9, 1999, the Bankruptcy Court entered a Stipulation and Order Settling Secured Claim (" December 9 Order"). (D.I.7, Ex. K). In pertinent part, the December 9 Order provides that the bankruptcy sale proceeds are to be allocated to Kanematsu as follows:
Fifty percent (50%) of the sales proceeds

($975,000.00) shall be payable to Kanematsu as payment in full for its secured claim in the Kanematsu collateral, without prejudice to Kanematsu's right to assert an unsecured deficiency claim, for the remaining balance due under its proof of claim.

(D.I. 7, Ex. K at 3).

### II. Procedural History

Kanematsu commenced this action on March 23, 2001. (D.I.1). In its Complaint, Kanematsu seeks declaratory relief against two separate Defendants.

In Count One, Kanematsu alleges it received an assignment of royalty rights from Lanxide before Lanxide went into bankruptcy. AML, the purchaser of Lanxide's assets, disputes Kanematsu's royalty rights under the LKK License, and Kanematsu seeks declaratory relief against AML.

In Count Two, Kanematsu alleges that LTC granted Kanematsu security rights in certain patents to secure a debt owed by Lanxide. LTC denies any obligation under the contract based on Lanxide's bankruptcy, and Kanematsu seeks declaratory relief against LTC.

Defendants filed the instant Motion to Dismiss (D.I.5) pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).

### *DISCUSSION*

#### I. Standard of Review

A motion to dismiss under Rule 12(b)(1) is a challenge to the subject matter jurisdiction of the presiding court. Fed.R.Civ.P. 12(b)(1). Before determining the merits of the case, a district court must determine whether it has subject matter jurisdiction. *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 94-95 (1998). Where challenged, the party asserting subject matter jurisdiction has the burden of proving its existence.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 4

Not Reported in F.Supp.2d, 2002 WL 32332375 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

*Mortenson v. First Federal Sav. and Loan Ass'n,* 549 F.2d 884 (3d Cir.1977). When analyzing a facial attack to subject matter jurisdiction, the court will construe a plaintiff's allegations as true, and will not look beyond the face of the complaint to determine jurisdiction. *Mortenson,* 549 F.2d at 891.

When a court analyzes a motion to dismiss brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the factual allegations of the complaint must also be accepted as true. *Langford v. City of Atlantic City,* 235 F.3d 845, 847 (3d Cir.2000). The Court must draw all reasonable inferences in favor of the non-moving party. *Id.* In sum, a complaint must be dismissed under Rule 12(b)(6) if it is clear that "no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984).

### II. Kanematsu's Objections to Defendants' Evidence

**\*4** Defendants attached various contracts relating to the Lanxide bankruptcy and the Loan Agreement to their Motion. Kanematsu contends the attached documents are outside the scope of the pleadings and thus the instant Motion to Dismiss must be treated as a motion for summary judgment. (D.I.7).

Where matters outside the scope of the pleadings are presented in support of a motion to dismiss, the motion "shall be treated as one for summary judgment and disposed of as provided in Rule 56." Fed.R.Civ.P. 12(b). However, when the documents attached to a defendant's motion have been relied upon by the plaintiff in its complaint, the motion to dismiss need not be treated as a motion for summary judgment. *In re Rockefeller Center Properties Securities Litigation,* 184 F.3d 280, 287 (3d Cir.1999). Where the plaintiff has relied on the documents at issue, the plaintiff cannot complain he or she lacked notice, and the prejudice the rule is intended to prevent is not present. *Id.* at 287.

After reviewing the parties' contentions and the applicable law on this issue, the Court concludes that Kanematsu's objection to the introduction of materials relating to the Lanxide bankruptcy is

without merit. In its Complaint, Kanematsu has relied upon the Bankruptcy Court's Orders in formulating its cause of action. Thus, the Bankruptcy Court's Orders fall within the *Rockefeller* exception. [FN1]

> FN1. Consequently, the documents relating to the Lanxide bankruptcy are also relevant, as their relation to Kanematsu's contractual interests make their examination necessary to properly adjudicate Kanematsu's allegation that its rights are not affected by Lanxide's insolvency.

Kanematsu further contends that several of the supporting documents submitted by Defendants are irrelevant and therefore inadmissible. (D.I. 13 at 2). Specifically, Kanematsu objects to the introduction of various agreements (D.I.7, Exs.E-G) between Kanematsu and Lanxide relating to Kanematsu's security interests in Lanxide's tangible property, contending that they neither challenge nor contradict any allegations contained in the complaint. (D.I. 13 at 2).

Under the Federal Rules of Evidence, irrelevant evidence is inadmissible. Fed.R.Evid. 402. Relevant evidence is that which has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence. Fed.R.Evid. 401.

After review of the parties' contentions and applicable law on this issue, the Court concludes that the documents relating to Kanematsu's security interest in Lanxide's personalty will be excluded from the Court's consideration. The Defendants failed to show both that Kanematsu relied on these documents in their Complaint and that the documents are relevant to the question before the Court.

In sum, the Court concludes that Exhibits A, B, C, D, J, and K of the Certification of Arthur G. Connolly (D.I.7) are within the scope of the pleadings and relevant. However, exhibits E, F, G,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 5

Not Reported in F.Supp.2d, 2002 WL 32332375 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

H, and I will be excluded as irrelevant.

### III. Defendants' Rule 12(b)(1) Motion

Defendants contend that since the July 30 Order provides that the Bankruptcy Court "shall retain jurisdiction over the parties for the purpose of enforcing this Order and the [Purchase and Sale] Agreement," this Court lacks subject matter jurisdiction and should, therefore, dismiss Kanematsu's action. (D.I. 6 at 12). Kanematsu responds that it has properly alleged the elements of diversity jurisdiction, which the Defendants have not challenged. (D .I. 14 at 25). Moreover, Kanematsu asserts that this action involves parties and assets that were never subject to the Bankruptcy Court's jurisdiction, and, therefore, the Bankruptcy Court could not have retained jurisdiction. *Id.* In the alternative, Kanematsu contends that this Court and the Bankruptcy Court have concurrent jurisdiction. *Id.*

*5 The District Courts of the United States have " original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of a State and citizens or subjects of a foreign state...." 28 U.S.C. § 1332(a). Kanematsu alleges that there is an amount in controversy of at least $100,000 (D.I.1, ¶ 4) and that the parties are diverse. (D.I.1, ¶ 1-2). Kanematsu also alleges that its claims have not been previously adjudicated in another proceeding. (D.I.1, ¶ 8).

Construing the Plaintiff's allegations as true, the Court concludes that this action is within its subject matter jurisdiction. The Plaintiff has alleged facts sufficient to satisfy the diversity jurisdiction requirements and has alleged that the claims at issue have not been adjudicated in another proceeding. Thus, Defendants' argument that the Bankruptcy Court has retained jurisdiction over this case is without merit.

### IV. Defendants' Rule 12(b)(6) Motion

### A. The AKN Royalty

Defendants contend that Kanematsu has failed to state a claim upon which relief may be granted because Kanematsu's alleged rights to the AKN Royalties were extinguished by the Assumption Order of August 19, 1999. Kanematsu counters that Lanxide absolutely assigned the AKN Royalties to Kanematsu prior to seeking bankruptcy protection, and thus, the AKN Royalties were not included in the bankruptcy estate. Consequently, Kanematsu asserts that the Bankruptcy Court's Assumption Order could not have extinguished its right to the AKN Royalties.

The issue presented is whether Lanxide assigned the AKN Royalties to Kanematsu prior to seeking bankruptcy protection. In determining whether a transaction should be considered an assignment, courts look to whether the "obligee manifests an intention to transfer present ownership of the right." *Western United Life Assur. Co. v. Hayden,* 64 F.3d 833, 838 (3d Cir.1995). Here, the documents relevant to the AKN Royalty transaction are the Second Amendment to the Joint Venture Agreement and the July 10 Agreement. (D.I. 1, Ex. A & D).

The Second Amendment states that "[i]n consideration for Kanematsu entering into the Loan . .. Agreement ... Kanematsu shall receive from Lanxide *an amount equal to* 48% of the royalties paid to Lanxide pursuant to ... the [L]KK License." (D.I. 1, Ex. A at 103) (emphasis added). Rather than assigning the AKN Royalty to Kanematsu, this clause simply sets the loan repayment schedule according to Lanxide's profit receipts from future AKN Royalties. Therefore, the Court concludes that the Second Amendment does not express any intent on the part of Lanxide to transfer ownership of the AKN Royalties.

The July 10 Agreement provides that "Lanxide ... agrees that payment of the first U.S. $1,384,615 of [AKN] royalties received from Lanxide KK ... shall be paid to [Kanematsu]. This payment shall be made by Lanxide KK on behalf of Lanxide directly to [Kanematsu]...." (D.I. 1, Ex. D at 5). This clause pledges future AKN Royalties to Kanematsu to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 6

Not Reported in F.Supp.2d, 2002 WL 32332375 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

further secure Lanxide's debt to Kanematsu. The language indicates that Lanxide KK will pay Kanematsu directly, but also clearly states that such payments are "on behalf of Lanxide." No assignment, divestiture of title, or transfer of ownership is indicated. Consequently, the Court concludes that Lanxide did not express any intent to transfer ownership in the July 10 Agreement

*6 After reviewing the parties' contentions, the relevant facts, and the applicable law on this issue, the Court concludes that no assignment of the AKN Royalty took place in either the Second Amendment or the July 10 Agreement because neither contained an expression of intent to transfer ownership. Given the relationship between Lanxide and Kanematsu, *i.e.,* debtor and creditor, these contracts reflect Kanematsu's attempts to protect itself in the event of a default by Lanxide. Therefore, the Court concludes that the AKN Royalty was not assigned to Kanematsu prior to Lanxide's bankruptcy and thus it passed free and clear to AML pursuant to the Assumption Order. Accordingly, as to the AKN Royalty, Kanematsu has failed to state a claim upon which relief may be granted. [FN2]

> FN2. Because the Court concludes that the AKN Royalty was not assigned, the Court need not reach Defendants' contentions regarding an alleged lack of consideration in the Second Amendment.

### B. LTC's Contractual Obligations

The June 26 Agreement sets forth the rights and obligations of the parties in the LTC Japanese Patents. (D.I.1, Ex. E). In the June 26 Agreement, Lanxide granted Kanematsu a "security interest in all of LTC's Japanese patents" to secure payment of the Kanematsu loan to Lanxide. (D.I.1, Ex. E, ¶ 1.1).

Defendants contend that Kanematsu has no surviving right to the LTC Japanese Patents. (D.I. 6 at 19). In support of this proposition, Defendants contend that the June 26 Agreement conveyed a security interest that was extinguished by the discharge of Lanxide's debt to Kanematsu (D.I. 18

at 12; D.I. 26 at 8), that Lanxide was the sole grantor of the security interest in the June 26 Agreement (D.I. 18 at 13; D.I. 26 at 8), and that the December 9 Order bars Plaintiff's action because it settled Kanematsu's proof of claim as to Lanxide's debt to Kanematsu (D.I. 18 at 5).

Kanematsu counters that LTC's contractual obligations are unaffected by the Lanxide bankruptcy since LTC was a party to the June 26 Agreement. (D.I. 14 at 23; D.I. 25 at 9). Kanematsu also contends that although AML received an equity interest in LTC when it purchased Lanxide's assets, the purchase did not convey any of LTC's actual assets. [FN3] (D.I. 14 at 23). Thus, Kanematsu argues that the Assumption Order conveying Lanxide's assets to AML free and clear of any liens does not preclude Kanematsu's claim directly against LTC's assets, *i.e.,* the LTC Patents. *Id.*

> FN3. As previously mentioned, Lanxide was general partner and sole owner of LTC.

A security interest is defined by the Uniform Commercial Code as "an interest in personal property which secures payment or performance of an obligation." 6 Del. C. § 1-201(37). The United States Bankruptcy Code defines a security interest as a lien created by an agreement. 11 U.S.C. § 101(51). Additionally, where the underlying debt is extinguished, the security interest supporting that debt is also extinguished. *In re Spiniak,* 221 B.R. 732, 735 (W.D.Mich.1998); *In re Doty,* 104 B.R. 133, 137 (Bank.S.D.Iowa 1989) ("... a claim may exist without a lien, but a lien cannot exist without a claim").

The plain language of the June 26 Agreement indicates that it created a security interest in the LTC Patents to secure Lanxide's underlying debt to Kanematsu. Upon accepting the settlement of its secured claim in the December 9 Order, Kanematsu expressly recognized that this debt had been extinguished. Accordingly, Kanematsu's security interest supporting the debt was also extinguished.

*7 The Court therefore concludes that because Lanxide's debt to Kanematsu was extinguished by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 7

Not Reported in F.Supp.2d, 2002 WL 32332375 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

the December 9 Order, the attendant security interest granted by Lanxide to Kanematsu embodied in the June 26 Agreement was also terminated. As a result, Kanematsu cannot as a matter of law claim rights in LTC's Japanese patents, and therefore has failed to state a claim upon which relief may be granted.


### III. Conclusion

For the reasons discussed above, Defendants' Motion to Dismiss (D .I. 5) will be granted.

An appropriate Order will be entered.

D.Del.,2002.
Kanematsu Corp. v. Advanced Materials Lanxide, LLC
Not Reported in F.Supp.2d, 2002 WL 32332375 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:01CV00190 (Docket) (Mar. 23, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.