# EXHIBIT 9

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County
Gerald KATELL and Desert Equities, Inc., Plaintiffs,
v.
MORGAN STANLEY GROUP, INC.; Morgan Stanley & Co. Incorporated; Cigna Corp.; Morgan Stanley Leveraged Equity Fund, L.P.; Cigna Capital Advisors, Inc.; Cigna Leveraged Capital Fund, Inc.; Morgan Stanley Leveraged Capital Fund, Inc.; SIBV/MS Holdings, Inc.; Jefferson Smurfit Corp.; Container Corporation of America; Silgan Holdings Inc.; Silgan Corporation; Donald P. Brennan and Alan E. Goldberg, Defendants.
**CIV.A. No. 12343.**

Submitted: Nov. 2, 1992.
Decided Jan. 14, 1993.

Joseph A. Rosenthal of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Harold E. Kohn, and Joanne Zack of Kohn, Nast & Graf, P.C., Philadelphia, PA, (Elwood S. Kendrick, Law Office of Elwood S. Kendrick, Inc., and Nancy Miller Bennett, Los Angeles, of Counsel), for plaintiffs.

A. Gilchrist Sparks, III, and David G. Thunhorst of Morris, Nichols, Arsht & Tunnell, Wilmington (Lewis A. Kaplan, Allan J. Arffa, and John N. Gevertz of Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of Counsel), for defendants Morgan Stanley Group Inc., Morgan Stanley & Co. Inc., Morgan Stanley Leveraged Capital Fund, Inc., The Morgan Stanley Leveraged Equity Fund, L.P., Donald P. Brennan and Alan E. Goldberg.

Peter J. Walsh, of Bayard, Handelman & Murdoch, P.A., Wilmington (Marc P. Cherno, and Jane Wasman of Fried, Frank, Shriver & Jacobson, New York City, of Counsel), for defendants CIGNA Corporation, CIGNA Capital Advisers, Inc. and CIGNA Leveraged Capital Fund, Inc.

Kevin G. Abrams of Richards, Layton & Finger, Wilmington (Thomas A. Reynolds III, David B. Love, and Frank H. Langrock of Winston & Strawn, Chicago, Il., of Counsel), for defendants SIBV/MS Holdings, Inc., Jefferson Smurfit Corp. and Container Corp. of America.

Allen M. Terrell, Jr. of Richards, Layton & Finger, Wilmington (Kenneth M. Kramer, Michael W. Jahnke and James R. Warnot, Jr. of Shearman & Sterling, New York City, of Counsel), for defendants Silgan Holdings, Inc. and Silgan Corp.

MEMORANDUM OPINION

CHANDLER, Vice Chancellor.

*1 The plaintiffs, Gerald Katell and Desert Equities, Inc., are two limited partners in the Morgan Stanley Leveraged Equity Fund, L.P., ("the Fund" or "the Partnership"), a Delaware limited partnership involved in leveraged buyouts. They allege that the defendants, Morgan Stanley Group, Inc. ("Morgan Stanley Group"), the CIGNA Corporation ("CIGNA "), and certain others involved in the Fund, acted improperly by allowing the Partnership to sell off investments in Container Corporations of America ( "CCA") and Silgan Corporation ("Silgan") at unfairly low prices. The plaintiffs bring these claims individually or, in the event that the Court determines such claims must be brought derivatively, for all limited partners in the Fund.

Defendants have moved to dismiss the amended complaint under Chancery Court Rule 12(b)(6) for failure to state a claim. This is my decision on defendants' motion.

## I. BACKGROUND

Both plaintiffs became limited partners of the Fund in 1985. Gerald L. Katell ("Katell"), a resident and citizen of California, became a limited partner by committing to invest $2 million in leveraged investments in the Partnership. At about the same

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

time, Duane Roberts ("Roberts") made a $2.5 million capital commitment to the Fund, which he later increased to $3 million. He has assigned his interest to plaintiff Desert Equities, Inc. ("Desert Equities"). Plaintiff Desert Equities has its principal place of business in California and is incorporated in Nevada. Roberts is its sole owner.

The Fund was organized in 1985 under Delaware law as a partnership involved in equity investments, especially in acquiring leveraged investment transactions (leveraged buy-outs or LBOs). The Fund has two general partners: defendant Morgan Stanley Leveraged Capital Fund, Inc. ("Morgan Capital"), a wholly-owned subsidiary of defendant Morgan Stanley Group, the managing general partner; and defendant CIGNA Leveraged Capital Fund, Inc. ("CIGNA Capital"), an affiliate of defendant CIGNA. [FN1] All Partnership investment decisions require the agreement of both general partners. Defendants' Exhibit ("Def.Exh.") 1 at 20.

FN1. CIGNA Capital is a wholly-owned subsidiary of CIGNA Capital Advisors, Inc., which is in turn a wholly-owned subsidiary of defendant CIGNA.

The Fund acquired interests in seven corporations and has sold its interests in five of them. Plaintiffs' charges involve the investments sold in two of the corporations, the Silgan and CCA interests. Plaintiffs charge that defendant Morgan Stanley Group stood on both sides of the transactions and received fees as middleman as well.

## II. THE CHALLENGED TRANSACTIONS

### A. *Silgan*

Silgan is a major manufacturer and distributor of steel, aluminum and plastic containers. In 1987, the Fund purchased over three million shares of Silgan Class B common stock, totalling approximately 23.6% ownership. Prior to the purchase, Katell and Roberts made capital contributions to the Fund, pursuant to instructions from the Fund, of $50,199 and $76,715 respectively.

In 1989, Silgan became a wholly-owned subsidiary of Silgan Holdings. All of the Class B stock of Silgan Holdings, representing 47.2% of the company, is owned by Morgan Stanley Leveraged Equity Fund II ("Fund II"), a Delaware limited partnership with one general partner. That one partner is a wholly-owned subsidiary of defendant Morgan Stanley Group.

*2 The Fund's Class B Silgan stock was sold for $6.50 per share, giving plaintiffs returns of approximately $598,000 for Katell and $914,000 for Roberts. Plaintiffs assert that $6.50 per share was grossly unfair and inadequate based on a number of analyses: 1) because the total purchase price ($88 million) was dwarfed by the amount of money Silgan Holdings raised in debentures by pledging Silgan's assets ($120 million); 2) because Morgan Stanley was acting with self-interest, generating fees from the transaction and from management; 3) because the equity was worth more than its valuation due to its continuing financial success; 4) because the merger was timed to occur before promising benefits and profits could come to plaintiffs; and 5) because a fairness opinion provided by the investment banking firm of William Blair & Co. ("Blair") was flawed. The fairness opinion, plaintiffs assert, did not consider Silgan's purchase of new businesses and, thus, underestimated Silgan's value.

It is evident that plaintiffs profited greatly from the Silgan sale. They assert, however, that they did not profit as much as they were entitled to, due to the actions of defendants.

### B. *CCA*

The second transaction involved CCA and defendant Jefferson Smurfit Corporation ("JSC"). CCA and JSC are large producers of paperboard, packaging products and newsprint. In 1986, JSC was interested in CCA and wished to join with the Partnership to acquire CCA. JSC bought half of the common stock of CCA and the Fund invested $6 million for an additional 30% of the common

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

stock. Katell and Roberts made capital contributions of $212,831 and $325,650 respectively, pursuant to instructions from the Fund, prior to this purchase.

The individual limited partners were then offered the opportunity to co-invest on a *pro rata* basis in an additional 10% of CCA stock, for $2 million. Katell and Roberts each accepted this opportunity, investing an additional $70,000 and $108,000 respectively, to obtain these *pro rata* shares.

Plaintiffs argue that they were denied the opportunity to purchase their *pro rata* shares of the remaining 10% controlled by the Morgan Stanley Group. Defendants claim the remaining 10% was set aside for "the Lenders," or "parties who were providing debt financing for the transaction," and that Morgan Stanley retained any shares offered to, but rejected by, the partners or the Lenders.

In 1989, a new entity known as SIBV/MS Holdings, Inc. ("SIBV/MS") was formed, the equity ownership of which was divided equally between JSC's parent company, Smurfit International, B.V. ("SIBV") and an affiliate of Morgan Stanley. [FN2] SIBV/MS acquired the entire equity interest in JSC in this transaction. The CCA shares that had been controlled by Morgan Stanley were sold to SIBV/MS. These shares were the Fund's CCA stock, the CCA stock co-invested individually by the limited partners, and the CCA stock owned by the Lenders and/or the Morgan Stanley Group. Following the sale each plaintiff received distributions representing his share of the proceeds, $8,556,000 to Katell and $13,091,000 to Desert Equities, not including the proceeds from each plaintiff's co-investments. The plaintiffs claim the sales price for the 1989 CCA sale was unfair.

FN2. The affiliate was the Morgan Stanley Leveraged Equity Fund II, L.P. ("Fund II").

*3 Prior to the 1989 sale, Smith, Barney, Harris Upham & Co., Inc. ("Smith Barney") performed an analysis of the transaction and delivered a fairness opinion to the Fund. Smith Barney valued the CCA equity at $1 billion in an opinion dated August 30, 1989. Plaintiffs claim that this opinion was flawed. They argue that the equity value was based on the fair market value of a publicly traded stock rather than a *private market* value, which would have been higher, and that the cost included no acquisition premium. Plaintiffs also provide other instances of valuation which they claim demonstrates that Smith Barney's fairness opinion was flawed. [FN3]

FN3. These instances included a 1986 asset liquidation value, an EDBIT percentage analysis, and a replacement values analysis, three factors sometimes used in valuations.

III. THE PRESENT ACTION

As a result of these allegedly illegal transactions, plaintiffs have brought suit here against a number of defendants. [FN4] The defendants can be divided into five groups. They are:

FN4. Plaintiffs have previously brought the claims asserted in the original complaint of this action in two actions begun in New York State courts in 1990. Those actions were consolidated and dismissed on the ground of *forum non conveniens*.

1. *The Morgan Stanley defendants.* They include the Morgan Stanley Group; its subsidiaries, Morgan Capital and Morgan Stanley; and Donald P. Brennan and Alan E. Goldberg, who are managing Directors of Morgan Stanley and who are alleged to have served in various roles with the Partnership;
2. *The CIGNA-related defendants.* They include CIGNA and its two subsidiaries, CIGNA Capital Advisors, Inc. and CIGNA Capital;
3. *The Smurfit defendants,* JSC and CCA;
4. *The Silgan defendants,* Silgan and Silgan Holdings;
5. *SIBV/MS.*

Plaintiffs argue that a) as a result of breaches of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fiduciary duty and negligence by the Fund and its General Partners and directors, and acts by their aiders and abettors, the amount received by plaintiffs on the sale of their Silgan and CCA stock owned through the Fund was grossly unfair and inadequate; b) as a result of breaches of fiduciary duty and negligence by the Fund and its General Partners and directors, and acts by their aiders and abettors, the amount received by plaintiffs on the sale of their CCA stock co-invested with the Morgan Stanley Group was grossly unfair and inadequate; and c) as a result of a breach by the General Partners of the section of the Partnership Agreement giving plaintiffs a right of first refusal to purchase excess CCA stock controlled by Morgan Stanley Group, plaintiffs individually suffered damages.

IV. INDIVIDUAL CLAIMS

Under Delaware corporation law, to bring an individual action as a shareholder a plaintiff must allege either an injury separate and distinct from other shareholders or a wrong involving a contractual right. *Moran v. Household Int'l, Inc.*, Del.Ch., 490 A.2d 1059, *aff'd,* Del.Supr., 500 A.2d 1346 (1985). If a plaintiff cannot show either factor, his claims are derivative.

Partnership law similarly provides an express derivative remedy in 6 *Del.C.* § 17-1001 *et. seq.* (1990 Cum.Supp.). Therefore, it follows that the test for an individual claim under partnership law should follow *Moran.* This conclusion was articulated recently in *Litman v. Prudential-Bache Properties, Inc.*, Del.Ch., C.A. No. 12137, Chandler, V.C., slip op. (Feb. 13, 1992). I stated in *Litman,* which concerned a partnership:

*4 The distinction between derivative and individual actions rests upon the party being *directly* injured by the alleged wrongdoing.... That is, " [f]or a plaintiff to bring an individual action, he must be injured *directly* or *independently* of the corporation [or partnership].

*Id.* at 7, quoting *Kramer v. Western Pac. Indus., Inc.*, Del.Supr., 546 A.2d 348, 351 (1988) (emphasis in original).

Plaintiffs argue that because they made and received payments individually in their capital accounts, and the amount of their payments was directly related to the amount of money which they paid into the Fund (the payments are "directly traceable"), that they then must have an individual right of action. They insist that their claims are analogous to those of a client complaining about sales by its broker. I disagree. Actually, the wrongs of which the plaintiffs complain are not wrongs inflicted upon them alone. Nor do the wrongs affect any particular right that plaintiffs assert. Rather, the plaintiffs' claim, in my view, concerns an indirect injury visited upon them as well as all other limited partners as a result of the wrong done to the Partnership. *Cf. Elster v. American Airlines, Inc.*, Del.Ch., 100 A.2d 219, 222 (1958).

Plaintiffs rely mistakenly on *In re Radiology Associates, Inc.*, Del.Ch., C.A. No. 9001, Chandler, V.C., slip op. (May 16, 1990). They misinterpret a narrow holding that a loan to a controlling shareholder involving a decrease in dividends could be characterized as an individual action. *Id.*, slip op. at 35. However, the narrow holding in that case does not support plaintiffs' proposition; on the contrary, *In re Radiology* held that claims of breach of fiduciary duty (such as those here) were in fact *derivative.* "The record contains no evidence that either loan injured [the plaintiff] in a manner separate and distinct from any injury to Radiology and its shareholders." *Id.* at 33. The passage plaintiffs rely upon concerned decreased dividends to only *one* limited partner. That is not the case here; nor have plaintiffs alleged a similar situation.

Furthermore, I recently reaffirmed the rule that claims such as those raised by the plaintiffs here are derivative in nature. *See Litman,* slip op. at 8-9, Feb. 13, 1992. As in *Litman,* plaintiffs here assert that defendants directly injured their distribution rights, but "plaintiffs' true argument is that the alleged misconduct resulted in diminished income to the Partnership ..." *Litman,* slip op. at 8.

Plaintiffs attempt to distinguish this result by pointing out that limited partners may, in some circumstances, be excused from particular

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

investments. This argument also fails. The plaintiffs do not allege that any limited partner was in fact excused from investing in either the CCA or Silgan deal. Specific factual allegations are a necessary part of demonstrating the need to depart from the derivative remedy. Plaintiffs must demonstrate that a derivative claim will not serve the best interests of justice to all parties. Considerations of fairness and judicial economy require that an action to redress a wrong to a limited partnership be litigated derivatively, so that it may be resolved once and for all in a single lawsuit. The result is binding on the partnership and precludes any other limited partner from bringing the same claim. *See, e.g., Cramer v. Gen. Tel. & Elec. Corp.*, 582 F.2d 259, 267 (3d Cir.1978), *cert. denied,* 439 U.S. 1129 (1979). Here, plaintiffs' allegations do not sufficiently demonstrate the need for an individual right of action. Plaintiffs therefore have no individual claim for money damages where, as here, their complaint is that a general partner caused the Partnership to dispose of its assets at inadequate prices.

V. DERIVATIVE CLAIMS

***5** Plaintiffs' amended complaint alternatively seeks to bring their claims of inadequate returns derivatively on behalf of the Partnership. In a derivative action, a plaintiff must either make a demand on the general partners to redress the alleged wrong or demonstrate that such demand would be futile. In that regard, a limited partner must "set forth with particularity the effort, if any, of the plaintiff to secure the initiation of the action by a general partner or the reasons for not making the effort." 6 *Del.C.* § 17-1003 (1990 Cum.Supp.) A derivative action must be brought only "if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed." *Id.,* § 17-1001.

Plaintiffs claim that they are excused from making a demand upon the general partners due to the general partners' self-interest. Following the demand excused analysis in our corporation law, *see Litman v. Prudential-Bache Properties, Inc.,* Del.Ch., C.A. No. 12137, Chandler, V.C. (Jan. 4, 1993), slip op. at 4-5, the test for determining demand futility is (1) whether threshold presumptions of director disinterest or independence are rebutted by well-pleaded facts; and, if not, (2) whether the complaint pleads particularized facts sufficient to create a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment. *Levine v. Smith,* Del.Supr., 591 A.2d 194, 205 (1991). *See also Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 815 (1984).

In regard to the first prong of the *Aronson* test, plaintiffs allege with particularity that the first partner, Morgan Stanley Group, cannot be presumed to be disinterested. Morgan Stanley Group was not only involved in the Silgan and CCA transaction as the seller, but had affiliates involved as buyers, namely the Fund II and Morgan Capital. Therefore, the Morgan Stanley Group is presumed interested, since it allegedly appeared on both sides of the transaction and collected middleman transaction fees.

Plaintiffs, however, do not allege that CIGNA was interested. They rather imply that CIGNA lacked independence. They imply CIGNA lacked independence because Morgan Stanley retained the power to veto any action of the Fund. The veto power is defined in the Fund Agreement:

Notwithstanding anything to the contrary contained in this Agreement ... neither General Partner shall, except when acting together with the other General Partner, be deemed to control the Partnership or have the right to make determinations ... (vi) as to the initiation, conduct or settlement of legal actions on behalf of the Partnership ...

Def.Exh. 1 at 20. Thus, plaintiffs argue, even if CIGNA determined that a claim was meritorious, it could not prosecute the claim because it could not control the Partnership. Defendants, not surprisingly, argue that CIGNA is independent.

***6** Even assuming that CIGNA is independent, however, one of two partners (50% of the Partnership) does not satisfy the first prong of the *Aronson* test. Consequently, neither the interested nor disinterested party could constitute a majority of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the board. Both sides claim this fact helps their argument. Plaintiffs rely on a passage in *Aronson* stating a "majority consisting of disinterested directors" must approve a transaction to be presumed disinterested. *Aronson,* 473 A.2d at 812. Defendants, on the other hand, rely on the more recent *Levine* case, which holds that showing demand futility requires showing a lack of independence or financial interest of a majority of board members. *Levine v. Smith,* 591 A.2d at 205.
I adopt the former approach, considering that the supposedly independent partner is unable to act on claims made upon the general partners without the agreement of the interested one. Accordingly, demand is excused under the first prong of the *Aronson* test. Therefore I will not dismiss plaintiffs' derivative claims that the amounts received by the limited partners regarding the Silgan and CCA sales were grossly unfair and inadequate.

VI. CLAIMS MADE AS CO-INVESTORS

The *pro rata* shares in which plaintiffs co-invested were offered to each individual limited partner, but were not purchased individually. Instead, the shares were purchased and held in a Delaware trust with the Morgan Stanley Group as trustee. (Amended Complaint ¶ 54). The trust was terminated in 1989 when the CCA stock was sold.

Plaintiffs allege that the trust was directly controlled by the Partnership, due to the trustee's obligation to vote its shares in the same manner as the Partnership and the Fund's Partnership Agreement. [FN5] Even assuming *arguendo* that direct control existed, this fact does not give rise to any duty owed by the trust to plaintiffs. Plaintiffs gave Morgan Capital "all rights and powers of an absolute owner and holder of such shares" in the trustee agreement. Def.Exh. 3 at 4. Therefore, plaintiffs contracted away their rights as to the shares held by the trustee. Plaintiffs argue in essence that this contract should be ignored because "the Fund defendants breached the duties they owed to plaintiffs through an abuse of their positions in the Fund." Plaintiffs fail to provide any convincing rationale for overlooking the contractual rights which they, as sophisticated investors, agreed upon. Therefore, plaintiffs have failed to state a claim upon which relief may be granted with respect to the shares of CCA held in trust.

FN5. The Voting Trust Agreement, reproduced as Def.Exh. 3 at 14, states "the Trustee shall vote the stock subject to this Agreement in the same manner as the stock held by MS Equity is voted."

VII. RIGHT OF FIRST REFUSAL

Plaintiffs claim that the general partners breached a contractual obligation and a fiduciary duty to the limited partners by offering certain CCA stock to others without first offering this stock to the limited partners. Defendants argue that these claims are time barred and, alternatively, that the claims are precluded by explicit provisions in the Partnership Agreement.

*7 The stock in question is the remaining 10%, or 2000 shares, of CCA Class B common stock which defendants set aside for the Lenders in 1986. Morgan Stanley retained those shares not sold to Lenders. The Agreement states that each limited partner should receive a "right of first refusal to contribute a portion of the Excess Amount" over the aggregate amount to be invested by the Partnership in any leveraged investment. Def.Exh. 1 at 35, § 5.2(b).

Plaintiffs claim the failure to offer a right of first refusal was a breach of the Partnership Agreement and the general partners' fiduciary duty. Defendants, on the other hand, claim that plaintiffs' right of first refusal is discretionary. I cannot determine by the facts before me whether the right of first refusal is mandatory, and whether it was breached. Even assuming *arguendo* that the right exists however, the claim is time barred.

The events involved in the right of first refusal claims occurred in September 1986. Amended Complaint ¶¶ 42-44. The claims were first raised before the New York courts in 1990; the claims were alleged to have been served on Morgan

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Stanley on September 25, 1990, and on CIGNA on October 2, 1990. Amended Complaint ¶ 91. The New York litigation was dismissed on *forum non conveniens* grounds. The present action was begun on November 6, 1991.

Delaware has a statute of limitations which applies to claims such as these which arose outside the State of Delaware. 10 *Del.C.* § 8121. (Claims which arise within the State are also subject to a three-year statute of limitations, as codified in 10 *Del.C.* § 8106.) Delaware's choice of law provision dictates that an action cannot be brought in a Delaware court "after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose ..." 10 *Del.C.* § 8121. This statute effectively limits the time period to three years at the longest, since a Delaware court must choose the shorter of either our own or another jurisdiction's law. Plaintiffs' first claims were asserted well after the three year time limit had expired. Plaintiffs' arguments that I should consider New York's six year limitation lack merit. Our statutory law expressly provides that Courts choose the *shorter* limit when such issues arise. Although this Court is one of equity, not required to strictly adhere to statutory limitation periods, these periods do provide guidance.

As plaintiffs note, in matters of equity statutes of limitation are not necessarily controlling, though in usual circumstances they are given great weight. *Adams v. Jankouskas,* Del.Supr, 452 A.2d 148, 157 (1982). Delaware courts have long recognized that legal statutes of limitations are not automatically applied in cases of equity. *Bovay v. H.M. Byllesby & Co.,* Del.Supr., 38 A.2d 808, 820 (1944). In cases of equity, courts apply a narrow exception to " extraordinary cases which involve, as a minimum, allegations of fraudulent self-dealing" which have personally benefitted the fiduciary. *Halpern v. Barran,* Del.Ch., 313 A.2d 139, 142 (1973). Plaintiffs claim that defendants committed a " serious breach of trust" by asserting the position that no right of first refusal exists. Whether this assertion rises to the level of a serious breach of trust or not, it certainly fails as an "extraordinary case" involving "fraudulent self-dealing." *Id.*

***8** Plaintiffs further argue that I should not take guidance from Delaware's borrowing statute because doing so would confer an undeserved benefit on defendants. They contend that the New York case was dismissed because of the pendency of related litigation in Delaware. They state:

The purpose of Delaware's borrowing statute is to prevent non-resident plaintiffs from forum shopping for a longer Delaware statute of limitations. That interest is not implicated here since it was defendants that sought the Delaware forum. *See Pack v. Beech Aircraft Corp.,* Del.Supr., 132 A.2d 54, 57 (1957).

Plaintiffs' Brief at 35, n. 8. I do not agree that an inequity results from utilizing the Delaware statute guidelines in this case. On the contrary, if plaintiffs were able to avail themselves of a longer statute of limitations simply because they brought a previous case in another jurisdiction, inequity would arise in deferring to the longer statute. Furthermore, this holding could increase the threat of different plaintiffs filing suits in multiple jurisdictions in order to avail themselves of longer statutes of limitations. Plaintiffs' claims as to the right of first refusal are time barred.

## VIII. AIDING AND ABETTING CLAIMS

A plaintiff must allege three elements, aside from damages, to state a claim for aiding and abetting a breach of fiduciary duty: 1) the existence of a fiduciary relationship, 2) a breach of the fiduciary's duty, and 3) a knowing participation in that breach by the defendants who are not fiduciaries. *Endervelt v. Nostalgia Network, Inc.,* Del.Ch., C.A. No. 11415, Chandler, V.C., slip op. at 10 (July 23, 1991); *Weinberger v. Rio Grande Indus., Inc.,* Del.Ch., 519 A.2d 116, 131 (1986). Here, it is admitted that the defendant Morgan Stanley had a fiduciary relationship with plaintiffs, and plaintiffs have alleged a breach of that duty in regard to the CCA and Silgan claims. The plaintiffs must now allege knowing participation by the non-fiduciary defendants.

The plaintiffs assert that I can infer knowledge that the participation was wrong to an alleged aider and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

abetter here. The standard, as I stated in *Lewis v. Leaseway Transportation Corp.*, Del.Ch., C.A. No. 8720, Chandler, V.C. (May 16, 1990), is that I will not infer knowledge "unless the action comprising the purported breach is 'inherently wrongful.' " *Lewis,* slip op. at 17. Plaintiffs' contentions that the Morgan defendants' acts of "using blatantly deficient fairness opinions to justify sales of assets in two transactions in which they stood on both sides " are not sufficient in this regard. Plaintiffs' allegations do state a claim against defendants; they do not allege, however, inherently wrongful conduct.

Furthermore, as stated earlier, plaintiffs were aware (at least constructively) that the Morgan defendants would be involved on both sides of many deals. Defendants were not even required to obtain fairness opinions in the transactions, deficient or otherwise. Therefore, the plaintiffs have failed to allege facts from which it can reasonably be inferred that any of the defendants other than the general partners of the Fund played any role in the general partners' decision to sell the CCA or Silgan assets. Consequently, the aiding and abetting claims fail, and will be dismissed.

## IX. CONCLUSION

*9 Plaintiffs' individual claims are dismissed for failure to state a cognizable claim for which I can grant relief. Similarly, their claims as to aiding and abetting are dismissed. Plaintiffs' right of first refusal claims are also dismissed as time barred. Plaintiffs' derivative claims, on the other hand, are not dismissed since I have determined that plaintiffs' demand requirement is excused.

IT IS SO ORDERED.

Del.Ch.,1993.
Katell v. Morgan Stanley Group, Inc.
Not Reported in A.2d, 1993 WL 10871 (Del.Ch.), Fed. Sec. L. Rep. P 97,437

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 10

C
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.
KRONOS PRODUCTS, INC., Plaintiff/Counter-Defendant,
v.
SASIB BAKERY NORTH AMERICA, INC., Defendant/Counter-Plaintiff.
**No. 00 C 670.**

June 14, 2002.

*MEMORANDUM OPINION*

KOCORAS, J.
*1 This matter comes before the court on a motion for summary judgment by Defendant Sasib Bakery North America ("Sasib"). For the reasons set forth below, the motion is granted in part and denied in part.

BACKGROUND

Plaintiff Kronos Products, Inc. ("Kronos") is a baking and food product company located in Chicago, Illinois. Sasib is a manufacturer of commercial baking equipment whose principal place of business is in Plano, Texas. In 1997, Kronos and Sasib began negotiating a contract for a custom-designed oven and production line that would allow Kronos to produce pita bread 7 inches in diameter for a large commercial account. To fulfill the customer's needs, Kronos had to be able to produce a minimum of 25,000 pitas per hour of production. Sasib convinced Kronos that their equipment would allow Kronos to produce the pita breads in the desired quantities.

The oven and production line were to be separately manufactured by different divisions of Sasib and then assembled into an integrated system at Kronos's Chicago plant. Because of the separate fabrication, the agreements as to the two components were memorialized in two separate contracts. Both incorporated several pages of boilerplate language entitled "General Terms and Conditions" after laying out the specifications that applied individually to the particular piece of equipment. The contracts both provided that Kronos would pay 90% of the contract price before installation and the remaining 10% at final commissioning or 60 days after arrival at the dock for the production line and upon acceptance of installation or 60 days from the date of shipment for the oven.

Shortly after the final products were installed at the Chicago facility, Kronos began to experience problems with the system. The parties disagree on the exact extent of the difficulties Kronos encountered, but there is no dispute that Sasib was required to replace or modify several parts soon after the oven and line were installed. According to Kronos, the equipment never produced 25,000 pitas of acceptable quality per hour; the shape of the finished product was compromised at that level of production, and oftentimes the pitas did not bake evenly or brown properly. In an attempt to remedy the latter issue, Sasib employees advised Kronos to increase the baking temperature from 600°F to 800° F. The added heat severely damaged several parts of the oven.

Ten months after the first use of the equipment, Kronos advised Sasib that the final 10% payment would not be made until Sasib made the equipment produce acceptable quantities of marketable pitas. Sasib made no further repairs or modifications, and Kronos filed suit, alleging breach of contract, breach of warranty, negligence, and a claim under the Illinois Consumer Fraud Act. In response, Sasib filed a counterclaim for the outstanding 10% of the contract price. Sasib now moves for partial summary judgment of certain issues raised by the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

complaint as well as complete summary judgment of their counterclaim.

LEGAL STANDARD

*2 Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548 (1986). The burden then shifts to the nonmoving party to show through specific evidence that a triable issue of fact remains on issues on which the nonmovant bears the burden of proof at trial. *Id.* The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence. *Id.* The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. *Bay v. Cassens Transport Co.,* 212 F.3d 969, 972 (7th Cir.2000). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Insolia v. Philip Morris, Inc.,* 216 F.3d 596, 599 (7th Cir.2000); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

DISCUSSION

Choice of Law

Sasib first seeks summary judgment of the enforceability of the contractual choice of Texas law. Following the analysis set forth in § 187 of the Restatement (Second) of Conflict of Laws, Illinois courts recognize and enforce choice-of-law provisions unless the state chosen does not have a substantial relationship to the parties or the transaction and the choice has no other reasonable basis or the application of the chosen law would undermine a fundamental policy of another state with a materially greater interest in the underlying dispute. *Newell Co. v. Petersen,* 758 N.E.2d 903, 922 (Ill.App.Ct.2001). Kronos makes no contention that application of Texas laws would undermine Illinois public policy. Instead, they focus their attack only on whether Texas has a substantial relationship to the parties or the transaction. Their arguments are unconvincing; not only was Texas the state to which payments were sent and the location of many of the persons with whom Kronos had dealings in the course of the transaction, it was also Sasib's principal place of business at the time of the negotiations, the formation of the contract, and the parties' performance. As such, Texas bore a strong and substantial relationship to Sasib and the transaction, and the contractual choice of Texas law is valid and enforceable here. *See Int'l Surplus Lines Ins. Co. v. Pioneer Life Ins. Co. of Illinois,* 568 N.E.2d 9, 13-15 (Ill.App.Ct.1990).

Products Other Than 7-Inch Pitas

Sasib's next ground for summary judgment revolves around their contention that Kronos is limited to seeking damages for the inability of the equipment to produce the required amount of 7-inch pitas per hour. Kronos argues that the contract reference to 7-inch pitas simply established a relative standard that could then be adjusted for any bread product Kronos chose to manufacture with the equipment, thus allowing them to seek damages for any underperformance of the equipment with regard to products of other shapes or sizes. They point to several places within the contract that pertain to the adjustability of certain components of the line and urge that they necessitate the conclusion that Kronos could bake whatever it wanted to with the equipment, and Sasib is liable for any inability or underability of the equipment to do so. Their interpretation is too sweeping, and it is inconsistent with the express specifications of weight, capacity, and diameter given at the outset of the production line contract. In addition, there is nothing inconsistent about a fixed-size bread product and adjustable thickness of machine parts; at some point in the process, the dough must rise, and if the machine cannot accommodate different thicknesses,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the product would be ruined in during the baking process. As such, we conclude that the contract contemplated only the production of 7-inch pitas with the baking equipment, and Kronos is correspondingly limited to seeking damages only with regard to the system's ability to produce the allotted number of 7-inch pitas per hour.

Allowable Remedies

*3 The next challenge Sasib mounts to Kronos's cause of action centers around the availability of certain remedies. Kronos contends that the guarantee given in the production line contract is an express warranty that the equipment would produce a minimum of 25,000 pitas of acceptable quality per hour for 12 months after the system was installed. In their view, this guarantee provides protection above and beyond that given in the warranty included in the General Terms and Conditions, which covers only material and workmanship.

Sasib insists that the guarantee is merely a reiteration of the protections given in the general warranty, but to give the section that construction would make it superfluous. Their interpretation would mean that the guarantee within the order confirmation merely restates what the warranty in the general conditions already lay out-that material and workmanship on the production line are guaranteed for one year. This construction would render the express guarantee meaningless, an unacceptable result. *Kelly-Coppedge v. Highlands Ins. Co.,* 980 S.W.2d 462, 464 (Tex.1998). We therefore reject Sasib's proffered interpretation of the effect of the guarantee.

Kronos admits, as they must, that the contract contains a limitation of liability that states " Notwithstanding anything in the Contract to the contrary, whether such liability is a result of a breach of contract, a breach of warranty, or otherwise, Seller's liability is exclusively limited to the repair or replacement, at its sole option and within a reasonable time and delivery schedule, of defective or nonconforming Seller Equipment, and in no event shall Seller be liable to Purchaser for any punitive, incidental or consequential damages (as defined in section 2-715 of the Uniform Commercial Code), including but not limited to, damages resulting from injury to the Equipment, or from loss of use of the Equipment or other assets of Purchaser, loss of time or loss of profits or income." However, they argue that the remedy specified in the contract fails of its essential purpose because Sasib, despite numerous attempts to repair and modify the equipment to address defects, was not able to make the oven and line conform to the performance criteria specified within the contract. They contend that the machinery, even if it was completely repaired or replaced, would never perform its intended function, and the repair or replacement remedy is therefore meaningless. They point to Tex. Bus. & Comm.Code § 2.719(b) to support their assertion that under these circumstances, an exclusive remedy gives way to allow an aggrieved party to seek any of the host of other relief that would otherwise be available.

It is true that a failure of the essential purpose of an exclusive remedy can render void a limitation of liability. *See, e.g., Metro Nat'l Corp. v. Dunham-Bush, Inc.,* 984 F.Supp. 538, 560 (S.D.Tex.1997); *Nation Enterprises, Inc. v. Enersyst, Inc.,* 749 F.Supp. 1506, 1514 (N.D.Ill.1990)(interpreting Texas law). Kronos argues that a failure of the essential purpose of the exclusive remedy necessarily negates the waiver in the next sentence. Some support exists for this argument, especially in cases involving consumer transactions between parties with unequal bargaining power. *See, e.g., Cooley v. Big Horn Harvestore Systems, Inc.,* 813 P.2d 736, 747-48 (Colo.1991); *Fiorito Bros. Inc. v. Fruehauf Corp.,* 747 F.2d 1309, 1314 (9th Cir.1984) (construing Washington law); *Murray v. Holiday Rambler,* 265 N.W.2d 513, 526 (Wis.1978). There is also authority for the contrary position, particularly in cases involving commercial transactions between sophisticated parties. The view expressed is that a waiver of consequential or other damages operates independently of a limitation of remedies. *See, e.g., Rheem Mfg. Co. v. Phelps Heating & Air Conditioning,* 746 N.E.2d 941, 947-52 (Ind.2001); *Laidlaw Transp. Inc. v. Helena Chemical,* 680 N.Y.S.2d 365, 367 (N.Y.App.Div.1998); *Schurtz v.. BMW of N. Am.,* 814 P.2d 1108, 1112-14 (Utah

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1991); *Canal Elec. Co. v. Westinghouse Elec. Corp.*, 548 N.E.2d 182, 184-85 (Mass.1990); *Kearney & Trecker Corp. v. Master Engraving Co.*, 527 A.2d 429, 437 (N.J.1987); *Johnson v. John Deere Co.*, 306 N.W.2d 231, 238 (S.Dak.1981).

*4 In light of the allegations by Kronos that the specific and essential object of the contract was never achieved, that is, the oven and line failed to produce pita bread 7 inches in diameter at the minimum rate of 25,000 pitas per hour of production specified within the oven contract, coupled with Sasib's failure to make adequate repairs or modifications to permit the essential object of the contract to be achieved, failure of the essential purpose of an exclusive remedy voids a limitation of liability.

In other words, Kronos claims it would be deprived entirely of the bargained-for performance by Sasib under the contract both in the first instance and their later failure to supply the remedy that Sasib promised if the original line failed. With no remedy whatsoever for both the initial breach and the failure to cure the breach, Kronos is left with nothing. Consequently, we decline to hold that the contractual waiver of punitive, consequential, and incidental damages is enforceable at this stage of the case.

Tort-Based Claims

Sasib further contends that the portions of Kronos's complaint that are based in negligence, specifically Count V, are not actionable because the loss they suffered as well as the nature of their injury sounds in contract, not tort. In *Southwestern Bell Telephone Co. v. DeLanney*, the Texas Supreme Court confirmed that if the duty underlying a claim of negligence arises solely from a contractual relationship, an aggrieved party's only course of action is a claim for breach of contract, not a tort action. 809 S.W.2d at 494-95. Although the rule is often stated in terms of an injury separate from those suffered under the contract, the Court has emphasized that the nature of the duty is the proper focus of inquiry. *Formosa Plastics Corp. v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41, 46 (1998) (allowing a fraudulent inducement claim to survive in a breach of contract action because the duty to refrain from fraud arose from Texas common law, not parties' contract). In cases where the facts supporting the tort and contract claims are identical and the losses sought for both claims revolve around recovery of the expected benefit of the bargain, the claim sounds only in contract and the analysis set forth in *DeLanney* controls. *Facciolla v. Linbeck Constr. Corp.*, 968 S .W.2d 435, 448-49 (Tex.App.1998). In this case, the duties upon which Kronos rests its allegations of negligence spring directly from the contract, and the losses they seek are indistinguishable from those sought under their breach of contract and breach of warranty counts. As such, the negligence claims cannot stand, and Kronos is limited to seeking relief through their breach of contract and warranty actions.

Voiding of Warranties

With respect to Kronos's claims for breach of warranty, Sasib argues that all warranties were voided by Kronos's failure to pay the final 10% of the purchase price when it became due. They ignore the fact, however, that the requirement of lack of default is included only with respect to the warranties given in the General Terms and Conditions sections of the two contracts. The five prerequisites listed for those warranties are not given in connection with the guarantee in the production line contract. A question of fact therefore arises as to the effect, if any, of Kronos's failure to pay the full purchase price at the specified time upon any warranty created by the language of the guarantee. Accordingly, Sasib's argument that Kronos's actions voided any warranty available under the contracts fails and summary judgment of that issue is denied.

ICFA Claim

*5 Count VI of Kronos's complaint contains a claim based on the Illinois Consumer Fraud Act ("ICFA" ). Sasib moves for summary judgment on this count, arguing that the choice of Texas law to govern and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

control the contract in all respects prevents Kronos from bringing a claim rooted solely in an Illinois statute. However, several courts have held that a contractual choice of law bars actions brought under another state's law unless it can be shown that the choice of law is otherwise invalid. *See Potomac Leasing Co. v. Chuck's Pub, Inc.*, 509 N.E.2d 751, 759 (Ill.App.Ct.1987) (eliminating ICFA claim in the face of a valid contractual provision choosing Michigan law); *see also, e.g., Janice Doty Unlimited, Inc. v. Stoecker,* 697 F.Supp. 1016, 1019-20 (N.D.Ill.1988) (dismissing ICFA claim where contract specified it would be governed by Georgia law). Kronos contends that the claim survives because it is based on representations that took place before the contract was formed and thus could not have arisen "under the contract." However, this position was directly addressed and rejected by the court in *Janice Doty.* 697 F.Supp. at 1020, *citing Hofeld v. Nationwide Life Ins.,* 322 N.E.2d 454 (Ill.1975). Accordingly, the contractual choice of Texas law bars the claim under the ICFA in Count VI, and Sasib is entitled to summary judgment of that count.

Sasib's Counterclaim

Finally, Sasib moves for summary judgment of their counterclaim for the outstanding 10% of the contract price. Kronos claims that their obligation to pay the final installment was eliminated by Sasib's alleged breach of their contractual duties. Because questions of material fact exist as to claimed breaches of the contract by Sasib, along with what appropriate remedies may exist should such breaches be proven, it is not appropriate to grant summary judgment to Sasib with respect to its counterclaim for the outstanding 10% of the contract price. That motion is accordingly denied.

CONCLUSION

Based on the foregoing analysis, Sasib's motion for summary judgment is denied in part and granted in part.

N.D.Ill.,2002.

Kronos Products, Inc. v. Sasib Bakery North America, Inc.
Not Reported in F.Supp.2d, 2002 WL 1308637 (N.D.Ill.)

Briefs and Other Related Documents (Back to top)

• 2002 WL 32741695 (Trial Motion, Memorandum and Affidavit) Defendant's Reply in Support of Its Motion for Summary Judgment (May. 22, 2002)
• 2002 WL 32741697 (Trial Motion, Memorandum and Affidavit) Defendant's Response to Plaintiff's Rule 56.1(b)(3)(B) Statement (May. 22, 2002)
• 2002 WL 32741693 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to the Defendant's Motion for Summary Judgment (Apr. 23, 2002)
• 2002 WL 32741691 (Trial Pleading) Amended Answer to Amended Complaint (Mar. 14, 2002)
• 1:00CV00670 (Docket) (Feb. 02, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 11

Briefs and Other Related Documents
Only the Westlaw citation is currently available.

United States District Court,D. Delaware.
Daniel L. MOORE, Plaintiff,
v.
STATE of Delaware; Department of Correction; Stanley Taylor; Robert Snyder; Sheresse Brewington-Carr; Raphael Williams; Perry Phelps; Michael Costello; and other nameless employees at MPCJF and DCCOE, Defendants.
**No. Civ.A.04-1396 JJF.**

July 27, 2005.

Daniel L. Moore, New Castle, Delaware, Plaintiff pro se.
Richard W. Hubbard, Deputy Attorney General, Wilmington, Delaware, for Defendants.

*MEMORANDUM OPINION*

FARNAN, J.
*1 Presently before the Court is a Motion To Dismiss (D.I.9) filed by Defendants, and a Motion To Amend (D.I.17) filed by Plaintiff, Daniel L. Moore. For the reasons discussed, the Motion To Dismiss (D .I. 9) will be granted and the Motion To Amend (D.I.17) will be denied.

BACKGROUND

Mr. Moore was incarcerated in Gander Hill Prison in the state of Delaware from 1997 until his release in January 1999. On October 27, 2004, Mr. Moore filed a Complaint alleging that in March 1997 the Delaware Department of Corrections ("DDOC") " activated" him and placed him "online", whereby he was subjected to experimentation by way of classified and unclassified electronic technology in violation of his Eighth Amendment rights. Specifically, Mr. Moore alleges that the DDOC subjected him to behavioral modifications without first obtaining his informed consent. The behavioral modifications Mr. Moore complains of include:

choking sensation, pain on bones and teeth, bubbles moving on genitals, amplified heartbeat, artificially induced diarrhea, artificially induced tinnitus, unnatural gas expulsions, gritty substances thrown on face in eyes and head, laser use (heat, burns, cutting feelings), false dreams, hair-like object brushing face, stings on head and body (emphasis on genitals), wet feelings on body and clothing, biting sensations on body, feeling of being castrated, genitals being squeezed and jerked, drilling sensations on head and teeth, object forced up rectum, forced eye blinking, muscles twitching uncontrollably, sounds (bells, chains, voices, etc,), smells varying form sweet to nauseous, forced erections, pressure on eye sockets and eardrums, vibrations on head, and beams of light.

(D.I.1, Ex. F.) Further, Mr. Moore alleges that others can hear his thoughts, and that he is subject to "overt and covert verbal harassment by total strangers and others saying the same things that were said" by guards, inmates, and other workers within the prison where Mr. Moore was incarcerated. (D.I. 1 at 9.) Mr. Moore alleges that such experimentation continues at the present time, although Mr. Moore was released from the custody of the DDOC in January 1999. Mr. Moore seeks $1,000,000 in compensatory and $1,500,000 in punitive damages, among other monetary relief. FN1

FN1. In 1999, Mr. Moore filed a similar Complaint against Correctional Medical Services and Prison Health Services, two medical providers that treat inmates at DDOC prisons. (*Daniel L. Moore v. Correctional Medical Services, et al.,* C.A. No. 99-158, Farnan, J. (March 12, 1999)). Mr. Moore was proceeding *in forma pauperis* in the 1999 action, and the Court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

dismissed Mr. Moore's 1999 Complaint as legally frivolous pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b)(1).

On December 17, 2004, Defendants in the present action filed a Motion To Dismiss (D.I.9) pursuant to Federal Rule of Civil Procedure 12(b)(6).

On April 15, 2005, Mr. Moore filed a Motion To Amend (D.I.17) seeking to amend his Complaint by adding claims for "character assassination, defamation of character, slander, verbal harassment and mental distress," and to recover an additional $1,000,000 in damages. (D.I.17.)

DISCUSSION

II. Motion To Dismiss Filed By Defendants

When a court analyzes a motion to dismiss brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, it must accept the factual allegations of the Complaint as true. *Langford v. City of Atlantic City,* 235 F.3d 845, 847 (3d Cir.2000). The court must draw all reasonable inferences in favor of the nonmoving party. *Id. Pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers and can only be dismissed for failure to state a claim if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ' *Estelle v. Gamble,* 429 U.S. 97, 106 (1976) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

*2 By its Motion, Defendants contend that, given the allegation of the Complaint, it fails to state any facts supporting a claim for relief or any legal theories supporting a claims for relief and must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants also contend that Mr. Moore has failed to show how the defendants participated in, personally directed, or acquiesced in the events that Mr. Moore claims deprived him of his constitutional rights. Further, Defendants claim that Mr. Moore's § 1983 claims are absolutely barred by the two-year limitation period set forth in the applicable statute of limitations, 10 Del.Code § 8119.

After reviewing Mr. Moore's Complaint, the Court concludes that Mr. Moore's § 1983 claim is based on facts that provide no basis for the granting of relief by the court. *Cf. Shane v. Fauver,* 213 F.3d 113, 117 (3d Cir.2000). Accordingly, the Court will dismiss the Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

II. Motion To Amend Filed By Mr. Moore

Although Mr. Moore must obtain leave of the Court in order to amend his pleadings, that leave "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). However, a court will deny leave to amend if such amendment would be futile. *Cowell v. Palmer Township,* 263 F.3d 286, 296 (3d Cir.2001) (*citing Maio v. Aetna, Inc.,* 221 F.3d 472 (3d Cir.2000)).

The claims Mr. Moore seeks to add depend on the same factual bases as the original § 1983 claim. Thus, the Court concludes that Mr. Moore's amendment would be futile because it does not cure the frivolous nature of Mr. Moore's original Complaint. Accordingly, the Court will deny the Motion To Amend (D.I.17).

CONCLUSION

For the reasons discussed, the Court will grant the Motion To Dismiss (D.I.9) filed by Defendants and deny the Motion To Amend (D .I. 17) filed by Mr. Moore.

An appropriate order will be entered.

*ORDER*

At Wilmington this *27* day of July 2005, for the reasons set forth in the Memorandum Opinion issued this date;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IT IS HEREBY ORDERED that:

1) The Motion To Dismiss (D.I.9) filed by Defendants is *GRANTED;*

2) The Motion To Amend (D.I.17) filed by Plaintiff Daniel L. Moore is *DENIED.*

D.Del.,2005.
Moore v. Delaware
Slip Copy, 2005 WL 1799947 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:04CV01396 (Docket) (Oct. 27, 2004)
• 2004 WL 3543304 (Trial Motion, Memorandum and Affidavit) Memorandum Opinion (Jan. 01, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 12

H
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.
PLAYTEX, INC.
v.
COLUMBIA CASUALTY.
Submitted: Sept. 10, 1993.
Decided: Sept. 20, 1993.

Walter L. Pepperman, II, Irving Morris, Kevin Gross, Stephen P. Casarino, Nancy E. Chrissinger.

DEL PESCO, Judge.
*1 Plaintiffs Playtex FP, Inc., et al. ("Playtex") have moved for partial summary judgment on defendant Columbia Casualty Company's (" Columbia") Counterclaims and affirmative defenses grounded in fraud and misrepresentation. In addition, Playtex seeks summary judgment on the defense that the losses at issue are not occurrences under the terms of the primary policy.

I. FRAUD/MISREPRESENTATION ISSUES

The specific components of the fraud claim are set forth in Columbia's counterclaim. Paragraph 99, which includes a representative statement of the claim, alleges [FN1]:

> FN1. The counterclaim also alleges that these false material misrepresentations and omissions of material fact were made with knowledge of their falsity or made with reckless indifference to the truth, that they were made with an intent to induce Columbia to act in reliance thereon, and that Columbia acted in justifiable reliance on the misrepresentations and has been damaged as a result of such reliance. The counterclaim further alleges that ESMARK and PLAYTEX breached their duty of ordinary care when they negligently misrepresented the matters set forth in the insurance specifications. Additionally, the counterclaim alleges that the actions taken by ESMARK and PLAYTEX constitute a breach of the insurance contract to refrain from concealing or misrepresenting any material fact or circumstance concerning the insurance provided.

99. At the time ESMARK and PLAYTEX through James [the insurance broker] sought and secured the Policy from COLUMBIA, ESMARK and PLAYTEX: (a) deliberately failed to disclose to Columbia the full facts concerning the relationship between the PLAYTEX Tampons and TSS; (b) deliberately failed to disclose in the Specifications the procuring of the Recall Insurance Policies ...; (c) deliberately failed to disclose the increased deductibility provision in the Second Recall Insurance Policy over the deductibility provision in the First Recall Insurance Policy ...; (d) deliberately failed to disclose the "distinct problems " James encountered "with the placement of the ... coverage" of the Second Recall Insurance Policy ...; (e) deliberately failed to disclose the unlikelihood that ESMARK and PLAYTEX could secure Recall Insurance covering the withdrawal of the PLAYTEX Tampons from the market which would cover ESMARK and PLAYTEX after the expiration of the Second Recall Insurance Policy ... ;(f) deliberately failed to disclose the likelihood ESMARK and PLAYTEX would withdraw the PLAYTEX Tampons from the market in the policy year of the Second Recall Insurance Policy, i.e., in the period May 1, 1984, through April 30, 1985, a portion of which period coincided with the first seven months (i.e., October 1, 1984, through April 30, 1985) of the Policy ESMARK and PLAYTEX through James sought COLUMBIA to issue, in order to collect the money from the insurance carriers on the Second Recall Insurance Policy to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

avoid the adverse effect on ESMARK's "earnings per share" from the withdrawal of the PLAYTEX Tampons from the market ...; (g) deliberately failed to disclose PLAYTEX's intent since 1983 to withdraw the PLAYTEX Tampons from the market . ..; and (h) deliberately failed to disclose the fact the Specifications was [sic] materially false and misleading in their material omissions and misrepresentations....

The 1984 specifications contained the following general comment regarding Toxic Shock Syndrome:
TOXIC SHOCK SYNDROME
*Toxic Shock Syndrome (TSS) is a rare disease caused by a bacteria called staphyloccus aureus.*
Although this bacteria has been known for many years and is found naturally somewhere on the bodies of most people, it is believed by many scientists that TSS is caused by a new strain of bacteria which is producing toxins that have never been identified before.
*2 It has been reported that between 5% and 15% of women carry staphyloccus aureus as part of the natural flora of their vaginas. Several scientists claim to have isolated the TSS toxin. They are now working to try to confirm this and to develop a cure for the disease.
Recent reports from the CDC indicate that approximately 83% of all TSS ever reported have occurred in menstruating females. In 1982, the number of non-menstrual cases was approximately 22%. Cases have also been reported in menstruating women who use pads rather than tampons. Estimates of the incidence rate of TSS vary between 6 and 17 cases per 100,000 menstruating women per year.
In late June of 1980, United States Centers for Disease Control (CDC) announced that they had found a statistical association between tampon use and TSS. Since that time, the State Health Departments of Utah, Wisconsin and the Tri-State area of Minnesota, Wisconsin and Iowa issued reports reaching similar conclusions. Subsequent evaluation by experts and consultants has shown that there were several substantial errors in all of the studies that have rendered them scientifically invalid.
Some scientists claim that TSS primarily affects younger women; however, women of all ages have had TSS. Some scientists also claim that there is a greater risk of contracting TSS by use of tampons that are made with higher absorbent materials, but all types and all brands of tampons have been reported to be associated. The CDC continues to disagree that there is any increased risk of TSS with increased absorbency of tampons. Certain microbiologists claim to have found that certain tampons with increased absorbency increase the amount of TSS toxin production. This matter is still under investigation. Most often, a TSS patient will require a limited hospital stay of one to two weeks and most women recover fully. The death rate among cases when first reported was approximately 10%; however, there has been a declining mortality rate (approximately 5% in 1983), as well as a steadily declining number of reported cases.

The specifications then describe the fact that claims are handled through national coordinating counsel.
They note that approximately 599 lawsuits had been brought against Playtex as of May 31, 1984. The specifications break down the distribution of claims by year: Pre-79 through the 83-84 policy year.
They offer an analysis regarding the disposition of the cases filed and provide a summary of the outcome of the three cases that had been tried. The specifications explain the TSS reporting procedure and the reserving procedure which is handled independently through Crawford & Company. A copy of the package label and warning used prior to the effective date of the FDA mandatory wording is provided, as well a copy of the label and warning mandated by the FDA and in use at the time the specifications were submitted. The specifications then describe over 50 cases still open which involve TSS claims with a characterization of the injury including death and brain damage.

*3 The 1985 specifications contain, *inter alia,* the following information:
*Product Withdrawal and Reformulation*
In April 1985, Playtex eliminated polyacrylate from its tampons in an effort to eliminate any controversy that might exist associated with the use of this fiber in Playtex Tampons. A recent scientific study by researchers at Harvard University Medical School

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

concluded that polyacrylate, a high-absorbency tampon material, may, under laboratory conditions, govern the relationship between tampons and the production of a toxin identified with TSS. The Harvard study and the decision in the *O'Gilvie* case discussed below were the primary reasons for the decision to eliminate polyacrylate.

A voluntary exchange program was initiated to replace all polyacrylate tampons, in wholesale and retail channels of distribution and in the possession of consumers, with new Playtex Tampons made with regular rayon. By changing the fiber, it resulted in a reduction of approximately 30% in absorbency for Playtex Super and Super Plus Tampons (Playtex Regular Tampons have been made with regular rayon since 1984).

We enclose for underwriters review and information (at the end of this section), a copy of the March 29, 1985 FDA Talk Paper issued, by the Agency, immediately after the Playtex product withdrawal announcement.

The discussion of the O'Gilvie case is, in part, as follows:

In January and February, 1985, the most recent Playtex TSS case, *O'Gilvie* (1983) was tried in Federal District Court in Wichita, Kansas. This case involved the death of a 21 year old mother of two where the diagnosis of TSS was not disputed.

The case resulted in a verdict in favor of plaintiff and against Playtex in the amount of $1.25 million compensatory damages, after a 20% reduction for medical malpractice by the treating physician, and $10 million punitive damages. The jury based its verdict on findings that Playtex Super Deodorant Tampons being used by O'Gilvie at the time of her death contributed to the cause of TSS and created increased risk which was not adequately disclosed in the warnings.

Columbia has provided affidavits from experts who say that the representations in the 1984 specifications are misleading and inaccurate with regard to the relationship between TSS and tampon use.

Columbia's underwriter, Richard S.W. White, has submitted an affidavit in which he states that he did not read the specifications related to TSS in 1985.

It is undisputed that Mr. Stein, Esmark's insurance agent, ultimately placed comprehensive general liability excess coverage with Columbia excluding TSS coverage for Playtex.

Playtex's first argument is that the statute of limitations bars the counterclaim.

Delaware has a three-year "accrual" statute of limitations for fraud. 10 *Del.C.* § 8106. This statute applies to counterclaims seeking affirmative relief. *DiNorscia v. Tibbett,* Del.Super., 124 A.2d 715 (1956). A cause of action for fraud accrues when the fraud is successfully perpetrated. *Tobacco & Allied Stocks v. Transamerica Corp.,* D.Del., 143 F.Supp. 323, 328 (1956), *aff'd,* 3d Cir., 244 F.2d 902 (1957). Columbia claims that Playtex's fraud induced the issuance of a policy effective October 1, 1984. Thus, unless tolled, the statute of limitations on Columbia's claim of fraudulent inducement expired on October 1, 1987.

***4** Ignorance of the facts supporting a cause of action will not toll the statute, absent some special consideration such as "inherently unknowable" injuries or fraudulent concealment. *See, e.g., Mastellone v. Argo Oil Corp.,* Del.Supr., 82 A.2d 379 (1951); *Freedman v. Beneficial Corp.,* D.Del., 406 F.Supp. 917 (1975); *Halpern v. Barran,* Del.Ch., 313 A.2d 139 (1973). The burden of showing that the statute should be tolled rests with the party asserting the tolling. *Freedman v. Beneficial Corp.,* D.Del., 406 F.Supp. 917 (1975).

A wealth of information regarding TSS was generally available in 1984. Consequently, there is no basis to conclude that the information about the relationship between TSS and tampons was inherently unknowable to Columbia. Columbia did not ask Playtex to complete an application. Columbia did not ask for additional information. Indeed, Columbia acknowledges that no attempt was made to develop information beyond that provided in the 1984 specifications. Therefore, that basis for tolling the statute of limitations has no application.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The second way to toll the statute of limitations is through a showing that there has been fraudulent concealment of the facts necessary to put a party on notice of the truth.

In *Bradley v. Maryland Casualty Co.,* D.Del., 563 F.Supp. 602 (1983), Judge Latchum quoted then-Chancellor Duffy's outline of the law of Delaware concerning fraudulent concealment as a basis for tolling the statute of limitations as follows:
Fraudulent concealment of a cause of action is an independent ground for tolling a statute of limitations. Where there has been fraudulent concealment from a plaintiff, the statute is suspended only until his rights are discovered *or until they could have been discovered by the exercise of reasonable diligence.* Fraudulent concealment requires that something affirmative be done by a defendant, *some "actual artifice" which prevents a plaintiff from gaining knowledge of the facts or some misrepresentation which is intended to put the plaintiff off the trail of inquiry.* Mere ignorance of the facts by a plaintiff, where there has been no such concealment, is no obstacle to operation of the statute.

Quoting *Halpern v. Barran,* 313 A.2d at 143 (emphasis supplied). *See also Shockley v. Dyer,* Del.Supr., 456 A.2d 798 (1983).

Columbia argues that it had no duty to inquire into possible fraud and misrepresentations by Playtex until, at the earliest, April 3, 1987, when it received notice of a potential TSS claim from Playtex. In support of that contention, it relies on *Borden v. Paul Revere Life Ins. Co.,* 1st Cir., 935 F.2d 370 (1991), in which the Court held that it was reasonable for the insurer not to discover misrepresentations on the insured's application before coverage was sought, noting:
In the case at bar, the jury could well have found that Revere [the insurer] exercised reasonable diligence when scrutinizing the results of Borden's medical questionnaire. The completed form did not mention, or even hint at, Borden's serious back problems. An insurance company cannot routinely be expected to prove a negative, that is, to verify the undisclosed medical history of every applicant.
Here, Revere had no cause to suspect that, in answering the questionnaire, Borden was whitewashing his past. At least until Borden sued, Revere had no overwhelming incentive to go behind his unequivocal representations about the state of his health.

***5** *Id.* at 376.

*Borden* involves a man who secured disability insurance, then suffered an injury which left him disabled. He sought benefits. The insurer believed that the nature of his work had been improperly described on the initial application as more managerial than it actually was. During discovery, the insurer learned that Borden had suffered a prior back injury. After a trial, the Court was asked to determine whether the statute of limitations barred Borden's claim. The Court found that the prior back complaint was inherently unknowable in view of the information provided on the application. The statute of limitations applied.

*Borden* does not stand for the proposition that no duty of inquiry arises until there is a claim. *Borden* is distinguishable. Unlike Playtex's specifications which give much more than a passing reference to TSS claims, Borden made no mention of back problems in response to questions on an application designed to elicit such information.

Columbia relies on *Bradley v. Maryland Casualty Co.,* 563 F.Supp. at 607 for the proposition that " Mere suspicion or rumor ... will not put a plaintiff on [inquiry] notice." In *Bradley* there was evidence that the insurer of a man entitled to receive workmen's compensations benefits was actively concealing the fact that he was entitled to receive certain additional benefits for nursing services.
The Court found that there was an issue of material fact which prevented a determination as a matter of law as to whether or not the plaintiffs failed to exercise due diligence in discovering the fraudulent concealment.

*Bradley* is analogous. The evidence available to Columbia with regard to TSS was concrete.
Claims were being paid and had been paid for a period of several years. Substantial losses were being handled by a national coordinating counsel

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and by an independent insurance adjuster. The fact that there was a product recall and a substantial punitive damages verdict was revealed in 1985. A plan to insure TSS cases and then initiate a recall was not suggested.

Columbia also notes that due diligence is not required "in the abstract:"
The requirement of diligence is only meaningful ... when facts exist that would excite the inquiry of a reasonable person.... Due diligence is not required in the abstract. Plaintiffs are not under a duty continually to scout around to uncover claims which they have no reason to suspect they might have.

*In re Coordinated Pretrial Proceedings,* C.D.Cal., 782 F.Supp. 487, 497-98 (1991). *Coordinated Pretrial* involved an anti-trust claim in which a statute of limitations defense was asserted. The plaintiffs alleged that the defendants had fraudulently concealed their price fixing conspiracy. In the context of a summary judgement motion, the court held that although the underlying facts were essentially undisputed, there were factual issues as to the inferences to be drawn from the facts. Summary judgment was denied.

*6 Columbia alleges that the 1984 specifications were misleading. It argues that the information supplied, when combined with the custom and practice in the industry regarding an insured's obligation to give full and fair disclosure, was calculated to take Columbia "off the trail of inquiry" regarding the risks associated with TSS claims. If there is evidence of a secret plan to recall the tampons, it would constitute a misrepresentation, material in nature, sufficient to raise a factual issue which would preclude summary judgment.

The key evidence in support of the alleged misrepresentation comes from Michael Liles. Columbia discovered Michael Liles when it learned of a consulting agreement between Liles and Playtex which occurred after the commencement of this litigation. Liles and his "bubble document" [FN2] have been the subject of discussion in prior opinions. *Playtex, Inc. v. Columbia Casualty,* C.A. No. 88C-MR-233, Del Pesco, J. (July 10, 1992), Letter Op. at 8-11. For purposes of deciding whether to require the production of privileged documents, the Court determined on July 10, 1992, that Columbia had not made "a showing of a factual basis of fraudulent activity adequate to support a good faith belief by a reasonable person that the documents sought will prove a fraud." *Id.* at 11. However, that holding, in the context of a discovery dispute, does not represent a factual finding on the merits. The conclusion that the privileged documents would not likely prove a fraud does not mean that a fraud cannot be proven at trial. Therefore, law of the case does not apply.

FN2. The document is often referred to as the "bubble document" because its text allegedly refers to bursting the bubble of another plaintiffs' attorney, Mark Hutton, as to the reason for the Playtex P-2 tampon recall.

Playtex argues that Columbia has no evidence of a fraud without the Liles evidence and the Liles evidence is inadmissible.

First, it's important to distinguish between the two components of the Liles evidence: the "bubble document" and the consulting agreement.

Liles claims that the punitive damages theory he developed in the context of liability claims against Playtex-that the tampon recall of 1985 was not the result of the *O'Gilvie* case but rather a plan that had been developed in 1983-was validated by a document he saw at the Playtex depository ("bubble document"). He further claims that he requested a copy of the "bubble document," but that it was never provided to him. Such a document, depending on its author, could be evidence of a misrepresentation.

The second component of the Liles evidence is the fact that Playtex entered into a consulting agreement with Liles which took him out of TSS litigation. Columbia seeks to present "Liles' testimony concerning *all* of Playtex's conduct that culminated in its extraordinary $500,000 payoff." Columbia seeks to prove that Playtex was seeking to silence Liles to keep him from talking to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

insurance companies.

The first issue is the admissibility of the content of the "bubble document." If it could be shown to be an admission, it would not be hearsay. However, Liles cannot identify the Bates number, the author, the box, the recipient, or even say for certain that the "bubble document" was written by a Playtex employee. The best Liles can offer is that the author has a name like "fettucini." The document is not an admission because Columbia cannot establish that the conditions of Delaware Uniform Rule of Evidence ("DURE") 801(d)(2)(C) or (D) have been met. *See, e.g., Reese v. Montgomery & Co., Inc.,* Del.Super., C.A. No. 79A-AU1, Tease, J. (Mar. 1, 1981); *Carden v. Westinghouse Elec. Corp.,* 3d Cir., 850 F.2d 996 (1988); *Miller v. Keating,* 3d Cir., 754 F.2d 507 (1985) (utterance of unidentified declarant not admissible under F.R.E. 803(2)). On this record, the document does not contain an admission.

*7 If the document is hearsay, it can be admitted only if some exception applies. Columbia argues that the content of the document should be admitted because it is not offered for the truth of the matter asserted but rather to prove the effect of Liles' discovery of the document upon Playtex. However, it is clear that the content is offered to prove the truth of the matter asserted and that his knowledge of the undisclosed plan had further consequences.

Columbia argues that the content of the "bubble document" is admissible because Playtex has destroyed the document or otherwise made it unavailable. In support of this assertion, Columbia relies on spoliation cases in which the destruction of a relevant and admissible document was conceded. Here, the destruction is denied; indeed, the very existence of the document and the alleged request for a copy are denied. The spoliation rule has no application until there is a factual foundation that there has been a destruction of evidence, and that it was intentional and in bad faith. Such an conclusion is not supported by the present record. *See, e.g., State v. Langlet,* Iowa, 283 N.W.2d 330, 335-36 (1979); *Moore v. General Motors Corp.,* Mo.Ct.App., 558 S.W.2d 720, 736 (1977) (must have *prima facie* showing of fraud, deceit or bad faith).

The alleged content of the "bubble document" is not admissible because it is hearsay and does not fall within any applicable exception.

The second part of the Liles evidence relates to Liles' testimony that he told Playtex's attorneys that he had seen a document that validated his theory of a 1983 recall plan and the consulting agreement followed. Columbia seeks to prove that Playtex was attempting to hide information from its insurers (information which shows that Playtex was aware of the unique TSS risks posed by its tampons), had a secret plan to protect itself from those risks, had implemented a recall, and had defrauded its insurers as part of that course of conduct. All such evidence is relevant; the inferences to be drawn from the evidence are left to the fact finder.

There is a factual issue sufficient to preclude summary judgment on the fraud/misrepresentation counterclaim.

Playtex argues that summary judgment is appropriate on the affirmative defense of misrepresentation because it is clear that there could be no justifiable reliance on the specifications when so much information regarding TSS was available from other sources. If Columbia's case were limited to the face of the specifications, Playtex's argument would be persuasive. While it may be assumed, arguendo, that Columbia could develop information about TSS beyond that provided in the specifications, the fact is that a planned recall of a product, if there were such a plan, could be highly material to both a liability carrier and a recall carrier. Therefore, the same factual issue precludes summary judgment on the justifiable reliance argument.

## II. NEGLIGENT MISREPRESENTATION

*8 Playtex seeks summary judgment on Columbia's claim for negligent misrepresentation. Two arguments are presented. The first, which is similar to Playtex's other fraud and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

misrepresentation claims, is that there is no justifiable reliance. This argument is rejected for the same reason as previously set forth in connection with the fraud claim.

Secondly, Playtex argues that there is no cognizable claim of negligent misrepresentation under Delaware law for a commercial relationship of this type, citing *Danforth v. Acorn Structures, Inc.*, Del.Super., C.A. No. 90C-JN-30, Herlihy, J. (Nov. 22, 1991), *affirmed and remanded,* Del.Supr., 608 A.2d 1194 (1992). *Danforth* considers the application of Section 552 of the Restatement (Second) of Torts [FN3] to a custom design agreement which contained defective plans to build a house and a home building package. The Court held that § 552 did not apply:

> FN3. Section 552 states as follows:
> Information Negligently Supplied for the Guidance of Others
> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
> (3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Thus, it is clear that in order to invoke a cause of action under negligent misrepresentation involving § 552, the plaintiff must show that the defendant supplied the information to the plaintiff for use in business transactions with third parties. In other words, the information must be used in a transaction not involving the defendant.
Danforth's claim fails on this ground alone. He did not and does not claim that he took Acorn's information in the agreement and in *any way* used that with a third party.... Accordingly, on this ground, Danforth's negligent misrepresentation claim must fail. *Id* at 4.

Columbia asks this Court to reject the holding in *Danforth,* and to apply § 552 to this insurance contract transaction. It is clear that § 552 contemplates that the advice given by the alleged tortfeasor be relied upon by the injured party in a transaction with a third party. That is the context in which negligent misrepresentation has been permitted in other Delaware cases. *Hodges v. Smith,* Del.Super., 517 A.2d 299 (1986); *Guardian Construction Co. v. Tetra Tech Richardson, Inc.*, Del.Super., 583 A.2d 1378 (1990).

*Danforth* properly sets forth the law in Delaware. Playtex's motion for summary judgment on the negligent misrepresentation claim is GRANTED.

## III. "STEIN FRAUD" ISSUE

Playtex argues that it is entitled to summary judgment on Columbia's allegation that Phillip Stein, an insurance broker acting on behalf of Esmark, told Richard White, a Columbia underwriter, that if the first layer of insurance was a fronting policy, the policy would contain a per occurrence policy limit of one million dollars, with total liability under the policy limited to seven million dollars in the aggregate. Stein also allegedly represented that the policy would contain a one million dollar maintenance deductible for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

each and every occurrence, without limit ("Stein fraud" issue).

Playtex denies that the maintenance deductible was ever intended or represented to be nonaggregating.

This Court has previously had occasion to consider the intent of the maintenance deductible. *Playtex FP, Inc. v. Columbia Casualty Co.,* C.A. No. 88C-MR-233, Del Pesco, J. (Dec. 9, 1991) (ORDER). That opinion concluded:
*9 [T]he intent of Esmark, Northwestern and Mission for the Northwestern policy to be an articulation of Esmark's self-insured retention. Therefore the Mission policy attaches after Esmark has paid $1 mill per occurrence to an aggregate of $7 million for toxic shock losses. *Id* at 26.

The same opinion notes that although Columbia's intent was not controlling, no factual determination as to Columbia's intent was made.

At this juncture, the Court is asked to dismiss the Stein fraud portion of Columbia's counterclaim because the Mission policy which was delivered to White clearly indicated there was no nonaggregating deductible. The law is clear that the purpose of placing the terms of insurance coverage in writing and delivering the policy representing the contractual undertaking of the issuer to the insured is so the insured will know the scope of the coverage provided. *Kaufman v. C.L. McCabe & Sons, Inc.,* Del.Supr., 603 A.2d 831 (1992). It is a logical corollary that an excess insurer that follows form to a primary carrier must read a policy that it has agreed to underwrite and cannot claim that the absence of a provision was unknown or unknowable.

Summary judgment on the grounds that Columbia cannot show justifiable reliance on the alleged promises of Stein need not be reached. The fact that the Mission policy was delivered to Columbia at about the time coverage commenced justifies the entry of summary judgment on the grounds that this claim was asserted beyond the statute of limitations. 10 *Del.C.* § 8106.

Playtex's motion for summary judgment on the Stein fraud issue is GRANTED.

## IV. "OCCURRENCE" LANGUAGE

Playtex seeks summary judgment on Columbia's defense that coverage is precluded as not being an " occurrence" within the scope of the policy.

The Mission policy, to which Columbia follows form, agrees:
to indemnity the insured for all sums which the insured shall be obligated to pay by reason of liability ... on account of: 1. personal injury, ... caused by or arising out of an occurrence....

The policy further states:
The term "occurrence" applicable to personal injury and property damage means an accident or a happening or an event, or continuous or repeated exposure to conditions, which results in personal injury or property damage, neither expected nor intended from the standpoint of the insured against whom the resulting claim is presented.

This policy is an "occurrence" policy. Under an " occurrence" policy, "the insured is indemnified for acts or occurrences which take place within the policy period ..." *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.,* 3d Cir., 676 F.2d 56, 59 (1982). The insurer's duty to indemnify the insured is triggered by a determination that fortuitous [FN4] bodily injury or property damage occurred during the policy period.

FN4. [A] fortuitous event is an event which, so far as the parties to the contract are aware, is dependent on chance.... The thrust of the definition is that the occurrence be unplanned and unintentional in nature. Restatement of Contracts § 291 comment a (1932). *See Peters Township School District v. Hartford Accident & Indem. Co.,* 3d Cir., 833 F.2d 32 (1987) (adopting Restatement definition).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

It is a general rule that one cannot obtain insurance for those losses which are not fortuitous, in other words, for those losses of which the insured knows, plans, intends, or is aware. *See, e.g., Intermetal Mexicana v. Insurance Co. of North America,* 3d Cir., 866 F.2d 71 (1989) ("The fortuity doctrine arises from the basic concept that insurance covers risks, rather than losses that were planned, intended, or anticipated by the insured."); *Bartholomew v. Appalachian Ins. Co.,* 1st Cir., 655 F.2d 27, 29 (1981) ( "The concept of insurance is that the parties, in effect, wager against the occurrence or non-occurrence of a specified event; the carrier insures against a risk, not a certainty."). It has been held to be contrary to public policy for an insurance company to knowingly assume the burden of a loss that occurred prior to making the contract. *Burch v. Commonwealth County Mutual Ins. Co.,* Tex., 450 S.W.2d 838, 840 (1970).

*10 In determining whether an insured's claims are fortuitous, the court must determine whether the insured attempted to insure itself against *known losses* or merely against *known risks.* There can be no liability insurance coverage for those *losses* that the insured knew about when the policy was issued. On the other hand, insurance may provide financial protection against those *risks* which may someday occur. "Knowledge of a risk is not the same as knowledge of a loss." *Liberty Mutual Insurance Co. v. SCA Services, Inc.,* Mass.Super.Ct., No. 88-6575 (Oct. 12, 1989).

Playtex is seeking indemnification only for claims that occurred after the inception date of the policy.

The Mission policy, which mirrors standard comprehensive general liability policies, requires that a loss be neither "expected" nor "intended" from the standpoint of the insured. The district court in *New Castle II,* construed the "neither expected nor intended" language in the "occurrence" clause to bar coverage only if, before the policy period begins, "there is evidence ... indicating a *substantial probability* that a loss will occur." *New Castle County v. Hartford Accid. & Indem. Co.,* D.Del., 685 F.Supp. 1321, 1330 (1988) (emphasis added).

Columbia argues that proof of Playtex's recklessness is sufficient to establish a "substantial probability" of losses, and therefore its losses are not covered "occurrences" under the policy. Columbia relies on the *New Castle County* case to support its argument. Columbia's reliance is misplaced. In *New Castle County,* the loss which eventually occurred, groundwater contamination resulting from the operation of a landfill, was in progress before the policy period began. It is well established that losses in progress are not occurrences. *Summers v. Harris,* 5th Cir., 573 F.2d 869 (1978); *See also Stonewall Insurance Company v. National Gypsum Co.,* S.D.N.Y., C.A. No. 86 Civ. 9671, Bernikow, U.S. Mag. (Dec. 31, 1991), 1991 WL 320046, at *9. Mere foreseeability of potential losses is not enough. *U.S. Fire Ins. Co. v. CNA Ins. Co,* Ill.App.Ct., 572 N.E.2d 1124, 1130 (1991). In fact, insurance is obtained to protect against mishaps that are expected. *See City of Johnstown v. Bankers Standard Ins. Co.,* 2d Cir., 877 F.2d 1146, 1150 (1989). Both Playtex and Columbia anticipated that there would be claims during the 1984-85 policy year. However, it is not disputed that although the risk was known, the specific individuals who would be asserting such claims and experiencing such losses and the specific nature of the losses were not known or knowable at the time the policy incepted. *Stonewall Insurance Company v. National Gypsum Co.,* 1991 WL 320046, at *10-11. Nor was it possible for Playtex to know the kind or extent of the subsequent losses. *U.S. Fire Ins. Co. v. CNA Ins. Co.,* 572 N.E.2d at 1130.

Playtex's motion for summary judgment on the occurrence defense is GRANTED.

Del.Super.,1993.
Playtex, Inc. v. Columbia Cas.
Not Reported in A.2d, 1993 WL 390469 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.