# EXHIBIT 15

Westlaw.

Not Reported in A.2d                                                                 Page 1

Not Reported in A.2d, 2005 WL 1654343 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**H**
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware.
READING INTERNATIONAL, INC., and Citadel
Cinemas, Inc., (successor in interest to FA, Inc.),
Plaintiffs,
v.
Richard ST. FRANCIS, Defendant.
**No. Civ.A.02C-1-02223 SC.**

Submitted Dec. 16, 2004.
Decided June 17, 2005.

Richard R. Wier, Jr., Frederick L. Cottrell, III,
Anne Shea Gaza, pro se.

ORDER

DEL PESCO, J.
**\*1** The defendants' Motion to Dismiss, treated here
as a Motion for Summary Judgment, having been
briefed and argued, and supplemental papers having
been submitted, it appears that:

1. The plaintiffs' claims are based on allegations
that their purchase of certain equipment in late 1996
was procured by fraud in that the value of the
equipment was not as represented. In October 2002,
plaintiffs filed a lawsuit against the corporate
entities involved in the transaction, Equipment
Leasing Associates 1995-VI Limited Partnership;
TransCapital Corp.; TransCapital Computer Corp.;
and Murray, Devine & Company ("First Action").
This second action, filed in July 2004, charges
Richard St. Francis ("St.Francis") with personal
liability arising from the equipment purchase
transaction. Since the filing of this Motion to
Dismiss, the two actions have been consolidated
and recently two individuals, the corporate owners,
have been added pursuant to the relation back
provisions of Rule 15(c).

2. While initially presented as a Motion to Dismiss,
this motion is converted to one for Summary
Judgment pursuant to Rule 56 as matters outside the
pleadings have been presented. As such, it must be
denied if there are any issues of material fact. [FN1]

FN1. Superior Court Civil Rule 12(b).

3. The applicable statute of limitations is 10 *Del. C.*
§ 8106 which provides a limitations period for fraud
that expires three (3) years from the time of accrual.
A cause of action for fraud accrues at the time the
fraud is perpetrated. [FN2]

FN2. *State ex re. Brad v. Pettinaro
Enterprises,* 870 A.2d 513, 531
(Del.Ch.2005).

4. The allegations in the Complaint set forth a cause
of action which was completed in 1996, at the time
the equipment was purchased. Thus, this action,
commenced in July 2004, is barred unless there is
an exception to the application of the three (3) year
statute of limitations. Plaintiff argues that that
statute of limitations is tolled because St. Francis
intentionally concealed material facts.

5. The plaintiffs' complaint carefully describes the
chronological sequence of the events involving the
equipment. The purchase was in 1997. In January
1999, the Internal Revenue Service ("IRS") made
an Information Document Request concerning the
transaction. [FN3] Then in March 2001, the IRS
made additional requests for information, focusing
on the actual number of computers . [FN4]

FN3. Amended Complaint, paragraph 28,
p. 10

FN4. Amended Complaint, paragraphs 30
and 31, page 11.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 1654343 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

6. The complaint goes on to identify the point in time when the plaintiffs' predecessor, FA, sought to confirm the original value of the computer, the inference being that the IRS investigation required assurance in this regard:

33. On or about March 4, 2001, FA [predecessor corporation to Plaintiffs] asked Robert Jones [a Vice President of Murray Devine, the appraiser retained by plaintiff to verify the value of the computers] to check the consistency of the data contained in Francis' Memorandum against the conclusions reached in Murray Devine's appraisal as to the market value of the Equipment in December 1996, and the residual values of the Equipment in the years 1997-2001. In addition, FA requested that Robert Jones provide the [IRS] with a "unit based valuation of the portfolio," in order to allay any concerns the IRS might have regarding the methodology that Murray Devine had used to appraise the value of the Equipment. [FN5]

> FN5. Amended Complaint, paragraph 33, page 11-12.

*2 7. The allegations make it clear that Plaintiffs predecessor was on notice as of March 2001, that there was a need to be concerned about the valuation of the computers. Such an inquiry demonstrates that there were facts enough to raise a suspicion. When that occurs, the party is on notice for purposes of the statute of limitations. [FN6]

> FN6. *Becker v. Hamada, Inc.,* 455 A.2d 353, 356 (Del.1982). *See also In Re Dean Witter Partnership Litigation,* 1998 Del. Ch. LEXIS 133 (Del.Ch.).

8. At the first deposition of St. Francis, taken December 15, 2003, he was asked whether he told the Murray Devine agent, Robert Jones, the original cost of the computer equipment. He responded: " No. Because I didn't know that." [FN7] At his second deposition taken June 30, 2004, he responded: "I don't recall actually having said that, but based upon all the documentation that I see with handwritten notes and things, I must have." [FN8]

> FN7. Deposition of Richard St. Francis taken December 15, 2003, p. 65

> FN8. Deposition of Richard St. Francis taken June 30, 2004, p. 36.

9. Plaintiffs argument for tolling the statute of limitations is expressed as follows:

"[T]his Court should consider that in a deposition taken on December 15, 2003, St. Francis *denied* that he had ever provided the "original cost" information to the appraiser. Yet, in a second deposition taken on June 30, 2004, he totally changed his testimony on this crucial fact and admitted that he was the one who had told the appraiser that the original cost of the equipment was $100 million. Likewise, St. Francis had also concealed the fact that *he knew* that the original cost of the equipment was *far less* than $100 million and that the fair market value of the Equipment was *far less* that the $40 million dollars reflected in the critical appraisal. [FN9]

> FN9. Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss, p. 4.

10. Defendant argues that the testimony is not inconsistent, and that the role of St. Francis in the transaction at issue has been known from the time defendant had in its possession facts sufficient to raise suspicion, which occurred no later than March 2001.

11. Plaintiffs have been candid with the Court with regard to the objective in suing St. Francis who was paid between $400,000 and $500,000 as a result of this one transaction. Plaintiff believes that the corporate entity from which the computer equipment was purchased has no assets; that it was created for this transaction only; and that it is judgment proof. Thus, it now seeks to bring in St. Francis in his individual capacity to enhance its chances of collecting on a judgment.

12. Inconsistent statements, if indeed St. Francis' statements are inconsistent, are the fodder for trials.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 3

Not Reported in A.2d, 2005 WL 1654343 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

The statute of limitations would be eviscerated if it ran only from the point when a witness gives [allegedly] incriminating testimony. The circumstances presented here demonstrate that the statute of limitations commenced running no later than March 2001, the point in time when Plaintiff's predecessor had a factual basis to suspect a problem with this transaction. The testimony of St. Francis does not justify a tolling of the statute of limitations, his role in the deal having been known from the beginning.

WHEREFORE, the Motion for Summary Judgment as to the defense of statute of limitations, the action against St. Francis is dismissed.

**\*3** IT IS SO ORDERED.

Del.Super.,2005.
Reading Intern., Inc. v. St. Francis
Not Reported in A.2d, 2005 WL 1654343 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 16

Westlaw.

Not Reported in A.2d                                                      Page 1

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
(Cite as: Not Reported in A.2d)

▷
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
VGS, INC., Plaintiff,
v.
David CASTIEL, Virtual Geosatellite Holdings,
Inc., and Ellipso, Inc., Defendants,
VIRTUAL GEOSATELLITE HOLDINGS, INC.,
and Ellipso, Inc., Counterclaim Plaintiffs,
andVIRTUAL GEOSATELLITE, LLC,
Counterclaim Plaintiff-Intervenor,
v.
VGS, INC., Peter D. Sahagen, Thomas Quinn, Neel
Howard, and Sahagen Satellite Technology Group,
LLC, Counterclaim Defendants.
No. C.A. 17995.

Submitted Jan. 21, 2003.
Decided Feb. 28, 2003.
As Revised March 10, 2003.

Thomas R. Hunt, Jr., Morris, Nichols, Arsht &
Tunnell, Wilmington, Delaware; William H.
Jeffress, Jr., Jamie Steven Kilbergi, Baker Botts,
L.L.P., Washington, D.C., for
Defendant-Counterclaim Plaintiffs David Castiel,
Virtual Geosatellite Holdings, Inc. and Ellipso, Inc.,
and Counterclaim Plaintiff-Intervenor Virtual
Geosatellite LLC.
Brian A. Sullivan, Werb & Sullivan, Wilmington,
Delaware; William A. Brewer, III, Daniel F. Perez,
Thomas M. Corea, Bickel & Brewer, Dallas, Texas,
for Counterclaim Defendants and
Reply-Counterclaim Plaintiffs SST Global
Technology LLC and Peter D. Sahagen.

*MEMORANDUM OPINION*

LAMB, Vice Chancellor.

I.

**\*1** This action arises out of a long-standing dispute
principally between two people, and the companies
they control. This tale first began when Peter
Sahagen attempted to wrest control of a limited
liability company, through the effectuation of
merger, from David Castiel, the company's founder.
Sahagen then sought a declaratory judgment from
this court that the merger was valid. In June 2000,
the court held a trial which resulted in the merger
being rescinded. Castiel and his affiliates filed a
counterclaim against Sahagen and Tom Quinn in
that action alleging a breach of their duty of loyalty.
Sahagen and his affiliates then filed an eleven count
cross-counterclaim against Castiel and his affiliates
alleging, among other things, that Castiel
fraudulently induced Sahagen into investing with
Castiel, and that Sahagen and his affiliates have
breached several fiduciary duties that were owed
directly to Sahagen or to the companies he invested
in. The first trial did not resolve the counterclaim or
the cross-counterclaim.

Summary judgment must be granted in favor of
Castiel and his affiliates on all but one of the
cross-counterclaims. Claims for fraudulent
inducement and negligent misrepresentation (as
well as claims of aiding and abetting those
violations) are precluded for two reasons. First, an
integration clause in the agreements at issue,
combined with the sophistication of the parties and
opportunities to conduct due diligence, precludes
Sahagen from arguing that non-warranted
statements can amount to fraudulent inducement or
negligent misrepresentation. Second, the one
statement that was warranted in the agreements at
issue was true and accurate when it was made. Thus
there can be no fraud or negligent misrepresentation.

All but one of Sahagen's claims that Castiel and
various of his affiliates breached their fiduciary
duties must fail. These fiduciary duty claims are
derivative in nature and there has been no demand
made on the board of the limited liability company.
Further, Sahagen has failed to demonstrate how

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

demand would have been futile.

Finally, summary judgment must be granted, in part, in favor of Castiel and his affiliates on their counterclaim that Sahagen and Quinn breached their fiduciary duty of loyalty. This result is dictated by the "law of the case" doctrine, and it will avoid the need to re-litigate previously litigated issues.

## II.

### A. *Background*

On January 6, 1999, David Castiel formed Virtual Geosatellite, LLC ("Virtual Geo") pursuant to the Delaware Limited Liability Company Act. As originally constituted, the sole member of Virtual Geo was Virtual Geosatellite Holdings, Inc. ("VGHI"). On January 8, 1999, Ellipso, Inc. joined Virtual Geo as a member. Finally, on January 29, 1999, Sahagen Satellite Technology Group, LLC (now known as Sahagen Satellite Technology Global, LLC or "SST Global") was added as a third member. [FN1]

> FN1. The relations between these various parties have been contentious for some time. In particular, there has already been a trial in the Court of Chancery to litigate claims related to a purported merger that was intended to wrest control of Virtual Geo from Castiel. For a more thorough discussion of those events *see VGS, Inc. v. Castiel,* 2000 WL 1277372 (Del.Ch. Aug.31, 2000), *aff'd,* 781 A.2d 696 (Del.2001) (TABLE).

Pursuant to Virtual Geo's Second Amended and Restated Limited Liability Company Agreement (the "LLC Agreement"), VGHI received 660 LLC units (representing 63.46% of the total equity in Virtual Geo), SST Global received 260 LLC units (representing 25%), and Ellipso received 120 LLC units (representing 11.54%). SST Global, which is controlled by Peter Sahagen, contributed the only cash received by Virtual Geo-$5 million. VGHI and

Ellipso, both of which are controlled by Castiel, contributed certain licensed intellectual property.

**\*2** Virtual Geo's stated purpose was "to construct, launch and operate a global fixed satellite service system employing nongeostationary satellites in subgeosynchronous elliptical orbits, developing the related [ground] segment and offering the related communication services." [FN2] That system, known as "Virtual Geo," was intended to provide technological advantages believed to be unique among its competitors in the broadband satellite market. Nonetheless, Virtual Geo was a high-risk business venture.

> FN2. LLC Agreement § 4.01(a).

Management of Virtual Geo was vested in a Board of Managers. The LLC Agreement established a three-person Board of Managers consisting of Castiel (the Chairman, appointed by VGHI), Sahagen (the Vice Chairman of Finance, appointed by SST Global), and Tom Quinn (the Secretary, appointed by VGHI).

### B. *Sahagen's Investment In Ellipso And Virtual Geo*

Sahagen is a "prolific investor" in the technology sector. Sahagen met Castiel through Sahagen's attorney, and after a series of meetings with Castiel and Ellipso's in-house counsel, Sahagen was invited to invest in Virtual Geo and Ellipso. Sahagen then conducted due diligence on Virtual Geo and Ellipso, including hiring a "technical expert" and consulting with his lawyers. Sahagen, through Neel Howard (SST Global's Rule 30(b)(6) representative), had extensive discussions with employees of Ellipso.

Castiel allegedly made several representations to Sahagen during the course of negotiations. Specifically, Castiel allegedly represented that:
• Ellipso had the antenna technology and capability to employ a worldwide two-way television system;
• Ellipso was in full compliance with the FCC regarding its license, and that no further requirements needed to be met;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

• Ellipso's license with the FCC was in full force and effect;

• Ellipso's license with the FCC was not subject to any limitations, defenses, or contingencies which might subject it to revocation or cancellation;

• one of Castiel's affiliated entities, Mobile Communications Holdings, Inc. ("MCHI"), had entered into a binding contract with Boeing Company for construction of the first two satellite systems that were to be part of Ellipso's system;

• MCHI and Ellipso were in full compliance with the construction progress milestones and certification schedules established by the FCC in issuing the license;

• MCHI had made substantial progress with respect to the deployment of its satellite system and, in connection therewith, MCHI had received a commitment from Boeing to invest $300 million of its own funds in deploying the system;

• SST Global's investment was going to be used only as a bridge until Ellipso and Virtual Geo received a substantial investment from Boeing;

• any funds invested in Virtual GEO would be used for, and devoted exclusively to, the business of Virtual Geo;

• Sahagen's investments would be used prudently, economically, efficiently, and in a manner designed to best achieve Ellipso's and Virtual Geo's business objectives; and

*3 • Castiel would hire a number of persons with impeccable credentials in the satellite and communications industries to manage and operate Virtual Geo.

Neel Howard testified, however, that he was aware of an antenna problem at Ellipso prior to Sahagen's investment in Ellipso. [FN3] Howard also testified that Castiel had a long history of promising investors that he would bring in new management and then refusing to do so. [FN4] Howard told Sahagen about this prior to Sahagen's investment. [FN5]

FN3. Castiel Parties Op. Br., Ex. B ("SST Global Dep.") at 78.

FN4. *Id.* at 60, 63, 68-70.

FN5. *Id.*

C. *Ellipso's Financial Condition Deteriorates*

During its existence, Ellipso raised between $75 million and $100 million in investment capital, over $60 million of which had been contributed before the formation of Virtual Geo. By January 1, 1999, Ellipso still had over $15 million in cash on its balance sheet. By December 31, 1999, however, Ellipso and its subsidiary, MCHI had just over $2 million in cash. As of March 31, 2000, Ellipso's financial condition had further deteriorated and its cash had declined to under $350,000 while its liabilities totaled over $360,000. Moreover, Ellipso was losing employees at a rapid rate during this period.

D. *Castiel Uses Virtual Geo's Cash For Ellipso*

On May 4, 1999, Virtual Geo's Board of Managers approved a cost-sharing arrangement with Ellipso. At that meeting, the Board authorized an agreement whereby Ellipso would "loan" employees to Virtual Geo at the cost of $50,000 per month for six months.

On June 11, 1999, Castiel, acting in his capacity as CEO of both Ellipso and Virtual Geo, executed a cost-sharing Services Agreement between Ellipso and Virtual Geo. The Services Agreement provided for monthly payments from Virtual Geo to Ellipso of $48,748 through December 31, 1999. Essentially, the Services Agreement extended the previously approved cost-sharing arrangement for an additional six months.

On April 19, 2000, Castiel, in his capacity as CEO of Ellipso and Virtual Geo, executed Amendment No. 1 to the Services Agreement. The Amendment was backdated to December 17, 1999. Amendment No. 1 retroactively increased the fees to $100,000 per month for the period January 1 through May 31, 1999. It also retroactively increased to $130,000 per month the fee for the period June 1 through December 31, 1999. Finally, the Amendment increased the fee for the period January 1, 2000 going forward to $156,145 per month. Although the Ellipso Board was presented with, and then

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

approved, a resolution to extend the Services Agreement into 2000, neither the extension to, nor amendment of, the Services Agreement was presented to Virtual Geo's Board for consideration.

In addition to amending the cost-sharing arrangement on a number of occasions, Castiel also determined the salary allocations for Ellipso's employees. A number of witnesses (all of whom are former or current employees of Ellipso/MCHI), testified that Castiel misallocated the time they actually spent working on Virtual Geo matters. [FN6] Further, Castiel may have charged Virtual Geo for Ellipso employees who never worked on Virtual Geo matters. [FN7]

> FN6. *See* Tr. 82-84, 87-89 (Naughton); Tr. 171-72 (Incidardi); Tr. 690 (Howard); and Tr. 1296-97 (Blott). Citations to "Tr. __" refer to transcripts from the trial held before then-Vice Chancellor Steele on June 15 through June 23, 2000 that resulted in the opinion referred to in note 1, *supra.*

> FN7. *See* Tr. 690 (Howard) ("I can't imagine that you're talking more than four or five employees, six, maybe, at the most, that would be doing any kind of work on Virtual Geo"); Tr. 125 (Lincoln) ("What he gave me was a list of probably 20 people that were working on Virtual Geo, at least according to the list; and there were only five, six people that had done anything for the project").

### E. *Virtual Geo Struggles From Its Inception*

**\*4** As of December 31, 1999, Virtual Geo's current assets amounted to approximately $3 million, and losses for the year ended December 31, 1999 totaled almost $2.2 million. Four months later, Virtual Geo's current assets had declined by almost $500,000. Losses for the four months ended April 30, 2000 were approximately $1.5 million. Further, during the four months ended April 30, 2000, the "amounts due Ellipso" purportedly rose from $78,275 to $1,108,230, and "member's capital" fell

from $2,969,316 to $1,497,351.

As Virtual Geo was expending cash at a rapid rate, prospects for obtaining additional capital became increasingly dim. Virtual Geo's last draft business plan, dated January 20, 2000, stated that SST Global's initial $5 million investment in the first quarter of 1999 was merely "seed capital." Such "seed capital" was not expected to carry Virtual Geo through the year 2000. The business plan, therefore, called for a pre-licensing round of venture capital financing in the amount of $25 million sometime between the fourth quarter of 1999 and year-end 2000. Virtual Geo was unsuccessful in obtaining this financing.

### F. *Castiel Reneges On His Agreement To Secure Professional Management*

Castiel represented on several occasions that he would hire a number of persons with impeccable credentials in the satellite and communications industries to run Virtual Geo. [FN8] In the fall of 1999, Sahagen introduced a highly qualified management team to Virtual Geo. It became known as the "Dream Team" and consisted primarily of Air Force Lieutenant General Kenneth Minihan, a former director of the National Security Agency and the Defense Intelligence Agency, and Alf Andreassen, who was the former director of Bell Labs and President of AT & T Global Solutions. Virtual Geo's Board of Managers was optimistic about the prospects of hiring such qualified individuals.

> FN8. *See* Tr. 848-49 (Sahagen) ("Q. Did Mr.-Doctor Castiel make any promises with respect to what he would do in that regard, concerning the management? A. Absolutely.... He said that he would go about locating just what I said, experienced management in the satellite business. He used the word [sic] 'big names,' meaning people who were accomplished, who had the contacts, had the credibility, had the background to raise billions of dollars for this kind of project);

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

*see also* Tr. 651 (Howard).

After some negotiations, Castiel and Minihan reached agreement on almost every issue, including Castiel's plan for transitioning management control from Castiel to Minihan's team as it accomplished certain milestones, such as bringing a "major" investor to Virtual Geo. Castiel, however, subsequently began to have second thoughts about giving up control of Virtual Geo's operations. Jill Stern, General Counsel for Ellipso and Virtual Geo, drafted a contract so as not to include the progressive change of control issue that Castiel and Stern knew was a condition precedent to the Minihan team's agreement to join Virtual Geo. Unwilling to join Virtual Geo without such a provision in the contract, Minihan chose not to become part of Virtual Geo's management team.

### G. The FCC Declares Ellipso's License To Be Null And Void

On or about June 30, 1997, Ellipso, through MHCI, became fully licensed by the FCC to launch and operate a complex satellite system (the "1997 License"). Based on the 1997 License, Ellipso was authorized to launch and operate a 16-satellite "Big LEO" system to provide two-way voice and data communications to customers equipped with mobile earth-station transceivers.

**\*5** The International Bureau granted the license over objections from several petitioners who argued that MCHI's license application should be denied for failure to show that it had access to funds sufficient to cover the cost of constructing the proposed system and operating it. The International Bureau granted MCHI's request for a waiver of such a requirement, but stressed that the license was conditioned on adherence to a construction progress-milestone schedule requiring that the system be constructed and put into service in a timely manner. The International Bureau stated that it would "carefully monitor [MCHI's] progress toward implementation," and would "not hesitate to cancel the license should it fail without justification to meet the milestone schedule." [FN9]

FN9. *In re Mobile Communications Holdings, Inc.,* DA 01-1315, at 1 (F.C.C. May 31, 2001).

The license order prescribed the following milestone schedule: begin construction of at least two of MCHI's authorized satellites by July 1998; begin construction of the other satellites by July 2000; complete construction of the first two satellites by July 2001; and complete a fully operational system by July 2003. The license order provided that unless the schedule is extended for good cause, "this authorization will become null and void in the event that the licensee fails to meet [this] progress schedule." [FN10]

FN10. *Id.* at 2.

Under the FCC's rules, each Big LEO licensee must file a statement within ten days of a progress milestone date specified in its license, either certifying that it has met the milestone requirement or giving notice that it has failed to meet it. To comply with this requirement, MCHI filed an affidavit on June 22, 1998, stating that it had met its July 1998 milestone by entering into a non-contingent contract with Boeing for construction of two satellites. In an affidavit filed on July 31, 2000, MCHI stated that "MCHI has entered into a binding, non-contingent contract with Teledyne Brown Engineering, Inc. relating to the construction of the satellites consistent with the milestones and technical specifications set forth in MCHI's [license order]." [FN11]

FN11. *Id.*

By Memorandum Opinion and Order dated May 31, 2001, the FCC rendered null and void the 1997 License. [FN12] The FCC concluded that Ellipso did not meet the milestone requirement to commence construction of all 16 satellites by the end of July 2000. The FCC found that the Boeing contract was not a non-contingent construction contract because the parties had adopted amendments that essentially nullified the contract. Specifically, on June 30, 1999, MCHI executed a third amendment to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Boeing contract, providing that Boeing could not perform any work thereafter except as subsequently authorized in writing by MCHI. [FN13] The FCC found that MCHI did not issue any work authorizations between then and October 12, 2000. The FCC then determined that between June 30, 1999 and October 12, 2000 Boeing was under no contractual duty to perform satellite construction for MCHI. [FN14]

FN12. *Id.* at 2-3.

FN13. *Id.*

FN14. *See id.* at 3.

Based in part on these facts, the FCC concluded that MCHI did not meet the milestone requirement to commence construction of all of its proposed satellites by the end of July 2000. [FN15] The FCC stated that to meet a milestone deadline for commencement of satellite construction, a licensee relying on others to perform the required work must enter into a binding contract for construction of the satellites that is not subject to material contingencies that remain unresolved as of the deadline. [FN16] The FCC found that MCHI was not a party to a non-contingent contract for construction of 16 satellites at the end of July 2000 or at any other times prior to October 12, 2000. [FN17] In fact, the FCC found that MCHI's "contract with Boeing for construction of two satellites was essentially abrogated on June 30, 1999." [FN18]

FN15. The FCC also determined that the contract with Teledyne Brown on which MCHI predicated its second milestone certification did not require Teledyne Brown to build or deliver satellites for MCHI. Although Teledyne Brown is involved in the aerospace industry, it does not manufacture or construct satellites. The FCC determined that the contract only engaged Teledyne Brown to provide consulting and managerial services in three successive phases. Further, the FCC found that the work schedule specified in the

contract with Teledyne Brown was merely tentative because MCHI reserved the right to add to, change, or delete the work to be performed by Teledyne Brown and alter the times for performance. The FCC also noted that Teledyne Brown was to consult with MCHI in advance of each calendar quarter as to what work to perform in that period, and MCHI would not be liable for payment for any work performed without such prior approval. *See id.* All of these events, however, occurred well after Sahagen's investment in Ellipso.

FN16. *Id.* at 4.

FN17. *Id.*

FN18. *Id.*

### III.

**\*6** The original complaint in this action was brought by VGS, Inc. against Castiel, Ellipso, and VGHI seeking a declaratory judgment that a purported merger between VGS, Inc. and Virtual Geo was valid. Ellipso and VGHI then filed a counterclaim against VGS, Inc., Sahagen, Howard, Quinn and SST Global that alleged, among other things, that Sahagen and Quinn breached their fiduciary duty of loyalty. [FN19]

FN19. *See, e.g., VGS, Inc.,* 2000 WL 1277372 for more details surrounding this transaction.

Ellipso, VGHI and counterclaim-plaintiff-intervener Virtual Geo (together with Castiel and MCHI, the " Castiel Parties") have moved for summary judgment on Count II of their original counterclaim, which seeks a finding that Sahagen and Quinn have breached their fiduciary duty of loyalty. [FN20]

FN20. Although this court has previously entered judgment in favor of Castiel, VGHI, Ellipso and Virtual Geo, that trial only resolved the corporate governance

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 7

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

issue. *See generally VGS, Inc.,* 2000 WL 1277372. The Castiel Parties still maintained duty of loyalty claims against Sahagen and Quinn.

Peter Sahagen and SST Global (collectively the "Sahagen Parties") then filed a cross-counterclaim against the Castiel Parties to recover their investment and to obtain an award of damages on behalf of Virtual Geo. [FN21] The Castiel Parties moved for summary judgment in their favor on the cross-counterclaims of the Sahagen Parties.

> FN21. The Sahagen Parties moved to amend, for a second time, their complaint in October of 2000. This court granted in part and denied in part their motion on October 26, 2001. Since that time, the Sahagen Parties have not re-filed the Second Amended Complaint in its approved form. Rather, the Sahagen Parties have filed Second Amended Counterclaims. For the sake of this motion, this court will treat the Second Amended Counterclaims as the most current set of claims against the Castiel Parties. In addition, although this opinion refers to the parties collectively as the Sahagen Parties and the Castiel Parties, it should be noted that the Sahagen Parties' "counterclaims" are not being asserted against Virtual Geo.
> The Sahagen Parties also previously filed many of these same claims under a different caption on April 19, 2000 (the "17997 action"). This court has taken the position that the 17997 action has been consolidated with the 17995 action.

There are eleven separate cross-counterclaims asserted by the Sahagen Parties. Counts I and X (which essentially replicate each other) allege common law fraud against the Castiel Parties based on statements and omissions made by Castiel, Ellipso, and VGHI. Counts II and XI (which essentially replicate each other) allege negligent misrepresentation against the Castiel Parties based on the same alleged statements and omissions in Counts I and X. Count V is a claim of civil

conspiracy against the Castiel Parties based on the same fraud alleged in Counts I and X.

Count III of the Sahagen Parties' cross-counterclaims attempts to allege a direct claim against Castiel for a breach of his fiduciary duties of loyalty and care. This claim is largely based on an assertion of waste and mismanagement. Count IV alleges that the remaining Castiel Parties aided and abetted Castiel's breach of fiduciary duties. Count VIII asserts a derivative claim by the Sahagen Parties on behalf of Virtual Geo for breaches of fiduciary duties by the Castiel Parties. Count IX alleges a derivative claim by the Sahagen Parties on behalf of Ellipso against Castiel for breaches of fiduciary duty. The Castiel Parties have not briefed Count IX, yet they still move for summary judgment on that Count. Due to this lack of briefing, however, the court will not grant the Castiel Parties' motion for summary judgment on Count IX.

The final two Counts of the Sahagen Parties' cross-counterclaim are for a "constructive trust" (Count VI) and injunctive relief against the Castiel Parties (Count VII). These "Counts" are remedies, not causes of action, and thus do not provide an independent basis for recovery. Moreover, the Sahagen Parties already attempted to enjoin the Castiel Parties from expending any of Virtual Geo's funds, and this court denied that motion. [FN22] Thus the court will grant summary judgment in favor of the Castiel Parties on these Counts.

> FN22. *See* Ruling on Pls.' Mot. For Prelim. Injunction, Lamb, V.C ., (Sept. 13, 2000).

IV.

*7 Under Delaware law, summary judgment may be granted only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. [FN23] When considering a motion for summary judgment, the facts must be viewed in the light most favorable to the non-moving party, and the moving party has the burden of demonstrating that no material question of fact exists. [FN24] "When a moving party has properly supported its motion, however, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

non-moving party must submit admissible evidence sufficient to generate a factual issue for trial or suffer an adverse judgment." [FN25]

> FN23. *See Burkhart v. Davies,* 602 A.2d 56, 59 (Del.1991), *cert. denied,* 504 U.S. 912, 112 S.Ct. 1946, 118 L.Ed.2d 551 (1992).

> FN24. *See Tanzer v. Int'l General Indus., Inc.,* 402 A.2d 382, 385 (Del.1979).

> FN25. *Id.;* Ch. Ct. R. 56(e).

**V.**

*A. The Sahagen Parties Are Not Entitled To A Trial On Their Fraud And Misrepresentation Claims*

In Counts I and X of their cross-counterclaims (which essentially replicate each other), the Sahagen Parties allege that they were fraudulently induced into investing in Virtual Geo and Ellipso based on several representations made by Castiel, Ellipso, and MCHI. Specifically, Castiel purportedly induced Sahagen's investment by: (1) representing that he would hire new management if Sahagen invested in Ellipso and Virtual Geo; (2) representing that there were no problems with Ellipso's antenna technology; (3) misrepresenting the status of Ellipso's FCC license; and (4) misrepresenting his intentions with respect to how he planned to use the money Sahagen invested in Virtual Geo. To establish a claim for fraud, the Sahagen Parties must demonstrate the following: "a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." [FN26]

> FN26. *Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970-71 (2d Cir.1987). The court will apply New York law to the Sahagen Parties' substantive claims made in connection with a Unit Purchase Agreement and Stock Purchase Agreement

that are at issue in this suit. *See* note 29, *infra.*

On January 29, 1999, Sahagen, on behalf of SST Global, entered into a Stock Purchase Agreement with Ellipso. That same day, Sahagen, on behalf of SST Global, entered into a Unit Purchase Agreement with Virtual Geo. The Castiel Parties argue that the explicit language of those Agreements prevents the Sahagen Parties from pursuing a fraud in the inducement allegation as a matter of law. [FN27] For example, as part of the Stock Purchase Agreement, Ellipso made numerous representations and warranties to Sahagen. Moreover, Section 2.14 of that Agreement states:

> FN27. This argument applies to all of the alleged fraudulent statements except for those relating to Ellipso's FCC license, which was specifically warranted in the Stock Purchase Agreement. *See* Castiel Parties Reply Br., Ex. A. § 2.07.

[Ellipso] makes and has made no representations or warranties, express or implied, except as set forth in this Agreement. No representation or warranty of [Ellipso] shall be deemed to be made or enlarged as a result of disclosures made or information provided by [Ellipso] to [Sahagen] during the course of [Sahagen's] "due diligence" investigation of [Ellipso] or the Subsidiaries. [FN28]

> FN28. *Id.* at § 2.14. Identical language is contained in the January 29, 1999 Unit Purchase Agreement between SST Global and Virtual Geo. *See* Castiel Parties Reply Br., Ex. B. § 2.14.

Finally, Section 10.03 is an integration clause whereby Sahagen agreed that the terms of the written Agreement constituted the sole understandings of the parties. Specifically, the provision states:
This Agreement (including the Disclosure Schedule, which is incorporated herein by this reference) and the Related Agreements constitute the sole understanding of the parties with respect to the

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

subject matter thereof. Matters disclosed by Seller to Buyer pursuant to any Section of this Agreement shall be deemed to be disclosed with respect to all sections of this Agreement. [FN29]

FN29. *Id.* at § 10.03. Identical language is contained in the January 29, 1999 Unit Purchase Agreement between SST Global and Virtual Geo. *See* Castiel Parties Reply Br., Ex. B. § 10.03. Section 10.11 of both Agreements provides that New York law is the controlling law "for any litigation arising out of or relating to thus Agreement and transactions contemplated hereby...." In addition, New York has a substantial relationship to the Agreements because Sahagen resided in New York at the time he negotiated and executed the Agreements. Moreover, aspects of the Agreements were actually negotiated in New York. Because under Delaware law the parties' choice of law governing their contract should be respected as long as the law of that state and the parties have some relation to that state, New York law must govern the interpretation of the Agreements. *See Wilmington Trust Co. v. Wilmington Trust Co.,* 24 A.2d 309, 313 (Del.1942).

The law governing the Agreements also governs the effect, if any, that the Agreements may have on claims for fraud and negligent misrepresentation. *See* Restatement (Second) of Conflicts of Laws § 201 cmt. (a), (c) (1971) ("(a) Under the rule of this section, questions involving the effect of a misrepresentation, duress, undue influence and mistake upon a contract are determined by the law chosen by the parties, if they have made an effective choice .... (c) The fact that a contract was entered into by reason of misrepresentation, undue influence or mistake does not necessarily means [sic] that a choice-of-law provision contained therein will be denied effect. This will be done if the misrepresentation, undue

influence or mistake was responsible for the complainant's adherence to the provision"); *see also Turtur v. Rothschild Registry Int'l, Inc.,* 26 F.3d 304, 309 (2d Cir.1994) (holding that a choice of law clause applying New York law was sufficiently broad to encompass tort and contract claims when the agreement covered any controversy "arising out of or relating to" that agreement); *Woodling v. The Garrett Corp.,* 813 F.2d 543, 552 (2d Cir.1987) (applying section 201 of the Restatement (Second) of Conflicts of Laws in recognizing that the validity and enforceability of a release are matters of substance).

**\*8** Usually under New York law, general provisions such as the ones at issue in this case do not preclude claims for fraud in the inducement. [FN30] This general law, however, does not apply when (1) the transaction at issue is a multi-million dollar transaction executed following negotiations with sophisticated parties and, (2) the complaining party has the opportunity to discover information that would make reliance on such representations unreasonable. [FN31]

FN30. *See Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597, 598-99 (N.Y.1959) (holding that "the parol evidence rule is not a bar to showing the fraud ... despite an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made"); *Mfrs. Hanover Trust Co. v. Yanakas,* 7 F.3d 310, 315 (2d Cir.1993) (holding that when a contract specifically disclaims existence of or reliance upon certain representations, plaintiff cannot later claim fraudulent inducement based on reliance on those representations).

FN31. *In re Cinar Corp. Sec. Litig.,* 186 F.Supp.2d 279, 314 (E.D.N.Y.2002); *Emergent Capital Inv. Mgt., LLC v. Stonepath Group, Inc.,* 165 F.Supp.2d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 10

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

615, 622-23 (S.D.N.Y.2001).

*1. The Parties To The Stock Purchase Agreement And Unit Purchase Agreement Were Sophisticated Parties Engaged In A Multi-Million Dollar Transaction*

The general rule articulated by *Danann Realty Corp.* does not apply to multi-million dollar transactions involving sophisticated parties. In *Emergent Capital,* the plaintiff claimed fraud, following a $2 million stock purchase, with respect to an oral representation about the size of a future stock offering. The plaintiff was a limited liability company, 90% of which was owned by two individuals employed by Wall Street firms and familiar with the securities market. [FN32] Despite the use of a general integration clause and a representations and warranties clause that did not specifically mention the future offering, the court found that the fraud claim was barred. [FN33] The court specifically relied on the "sophistication and knowledge of the parties" and noted that the plaintiff's initial investment was "a multi-million dollar transaction executed following negotiations between sophisticated business people...." [FN34]

FN32. *Emergent Capital,* 165 F.Supp.2d at 619.

FN33. *Id.* at 622-23.

FN34. *Id.* at 622; *see also In re Cinar Corp. Sec. Litig.,* 186 F.Supp.2d at 314 (citing *Emergent Capital* for an exception to the general rule articulated in *Mfrs. Hanover Trust* and *Danann Realty Corp.*).

The exception to the general *Danann* rule provided in *Emergent Capital* applies to the transactions at issue in the current dispute. The Stock Purchase and Unit Purchase Agreements were multi-million dollar transactions negotiated at length by sophisticated parties that were represented by counsel. The Stock Purchase Agreement between Ellipso and Sahagen Satellite Technology Group, LLC was for the sale of 20,000 shares of Ellipso common stock for $4.2 million. Similarly, the Unit

Purchase Agreement between Virtual Geo and Sahagen Satellite Technology Group, LLC was for the sale of 260 common units of Virtual Geo for $5.2 million. Moreover, Sahagen Satellite Technology Group, LLC warranted its " Sophistication" as an "accredited investor." [FN35] SST Global's own 30(b)(6) representative has admitted that Sahagen "is a very prolific investor," [FN36] and this court has found Sahagen to be "an aggressive and apparently successful venture capitalist." [FN37] Finally, Sahagen was represented by sophisticated counsel, and also admittedly engaged in extensive due diligence, including the hiring of a "technical expert" and the consultation of Ellipso employees. [FN38]

FN35. *See* Castiel Parties Reply Br., Ex. A. § 3.08; Castiel Parties Reply Br., Ex. B. § 3.08.

FN36. SST Global Dep. at 116.

FN37. *VGS, Inc.,* 2000 WL 1277372, at *1.

FN38. SST Global Dep. at 75-78; 32-35.

*2. The Sahagen Parties Had An Opportunity To Discover Information That Would Make Reliance On The "Fraudulent" Representations Unreasonable*

When a complaining party has the opportunity to discover information that would make reliance on the alleged representations unreasonable, that party cannot thereafter take advantage of the *Danann* rule. [FN39] In *Belin,* when confronted with a disclaimer clause similar to the ones at issue in this litigation, the court held that where a representation about the amount of an insurance policy was allegedly fraudulent, the allegedly fraudulent information did not amount to an actionable claim because the correct information "was readily ascertainable had [plaintiff] asked to see the insurance policy prior to closing on his investment." [FN40] The current litigation is highly analogous to the facts and issues of *Belin.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN39. *Belin v. Weissler,* 1998 WL 391114, at *5-7 (S.D.N.Y.1998); *Emergent Capital,* 165 F.Supp.2d at 623 (holding that a sophisticated investor " must show that he or she has made an independent inquiry into all available information").

FN40. *Id.,* at *7. *But cf. In re Cinar,* 186 F.Supp. at 285, 314 (holding that a general disclaimer clause was insufficient to defeat a fraud claim based on inflated estimates of the company's financial position as a result of improperly claimed tax credits because there was no way plaintiff could have discovered the improper tax credit).

*9 Here, it is undisputed that before entering into the Agreements Sahagen possessed information, or access to information, that demonstrated that the alleged oral representations made by Castiel were false. SST Global's Rule 30(b)(6) witness testified that Sahagen was well aware, before investing in Ellipso or Virtual Geo, that there were problems with the antenna technology and that Castiel would not seek new management, both in direct contradiction to alleged oral representations that underlie the Sahagen Parties' fraud claims. [FN41]

FN41. *See* SST Global Dep. at 77-79; 60; 63; 68-69. *Cf. C.P. Kelco U.S., Inc. v. Pharmacia Corp.,* 2002 WL 31230816, at *9-10 (D.Del.2002) (holding that a disclaimer did not preclude claims of fraud between highly sophisticated parties because the plaintiff had no opportunity to discover the alleged fraud before entering into the agreement).

Additionally, in *Belin,* the court held that the plaintiff could not pursue his fraud claim partly because he warranted that he had an opportunity to verify the representations given and could obtain whatever additional information he required. The court held that, "[h]aving explicitly represented that he had an opportunity to verify the accuracy of information provided to him, Belin cannot now be heard to complain that he relied on information that

he declined to verify, although he could have determined the amount of [the insurance policy] simply be asking for a copy of the policy." [FN42] Similarly, SST Global warranted in both Agreements that it "conducted a reasonable investigation" of Ellipso and Virtual Geo, and had " received such information ... and ha[d] been given such opportunity to ask such questions of, and receive answers from, representatives of [Ellipso and Virtual Geo], as [SST Global] deems sufficient to make an informed investment decision with respect to the Stock." [FN43] Therefore, like the plaintiffs in *Belin* and *Emergent Capital,* the Sahagen Parties cannot take advantage of the *Danann* rule and summary judgment must be granted in favor of the Castiel Parties with regard to fraud claims stemming from statements or omissions that were not warranted in the Agreements. [FN44]

FN42. *Belin,* 1998 WL 391114, at *8. *See also Emergent Capital,* 165 F.Supp.2d at 623 (finding it relevant that the plaintiff had access to information and executed a warranty that it had the opportunity to ask questions and receive answers from the defendant and to obtain any additional information it thought necessary before entering into the transaction).

FN43. Castiel Parties Reply Br., Ex. A. § 3.09; Castiel Parties Reply Br., Ex. B. § 3.09.

FN44. For the same reasons, the court will enter summary judgment in favor of the Castiel Parties on Counts II and XI of the Sahagen Parties' counterclaims to the extent they allege negligent misrepresentations not warranted in the Agreements. These Counts allege that the same misrepresentations discussed above give rise to a claim for negligent misrepresentation. This is essentially a lesser-included offense of fraud. As already discussed, the integration and merger clauses of the Agreements, in connection with the actions of Castiel and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                        Page 12

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Sahagen prior to executing the Agreements, make Counts I and X untenable as a matter of law and must also make Counts II and XI invalid as a matter of law.

Summary judgment must also be granted in favor of the Castiel Parties with respect to Count V (civil conspiracy) of the Sahagen Parties' counterclaim. Since the Sahagen Parties are unable to survive a summary judgment motion based on their underlying claims, a claim for civil conspiracy must fail as well.

### 3. *The Undisputed Facts Show That The Warranties Provided Regarding The Status Of The FCC License Were Correct When Sahagen Entered Into The Stock Purchase Agreement*

The Sahagen Parties argue that Castiel made several material misrepresentations regarding the status of Ellipso's FCC license. Specifically, the Sahagen Parties argue that Castiel misrepresented that (1) the license was in full force and effect; (2) that MCHI was in full compliance with the construction and certification schedules established by the FCC; (3) that the license was not subject to any limitations that could subject it to cancellation or revocation; and (4) that Ellipso was in full compliance and no further requirements needed to be meet.

The FCC required that construction begin on at least two satellites by July 1998, and that construction of the remaining satellites begin by July 2000. The FCC also required MCHI to report when those goals were achieved. MCHI entered into a non-contingent contract with Boeing in June 1998 for the construction of two satellites. This contract was subsequently amended in November 1998, February 1999, and June 1999. MCHI reported to the FCC in June 1998 that it was in compliance with the July 1998 milestone.

**\*10** The crux of the Sahagen Parties' claims that relate to the FCC license is the fact that the FCC revoked Ellipso's license in May 2001. The Sahagen Parties argue the FCC found that MCHI abrogated its contract with Boeing when the November 1998 amendment was executed, resulting in MCHI being out of compliance with the FCC license and subjecting its license to revocation. Since this all occurred before the Sahagen Parties invested in Ellipso, the argument goes, the Castiel Parties breached the specific warranties provided in the Stock Purchase Agreement.

The facts as plainly found by the FCC, however, do not support the Sahagen Parties' claims. It is true that the FCC found that the November 1998 amendment required Boeing to develop and submit a proposal for a re-negotiated contract and forbade it from performing any other tasks without prior authorization from MCHI. [FN45] The FCC did not determine, however, that this amendment resulted in an abrogation of MCHI's contract with Boeing. Rather, the FCC determined that *as of June 30, 1999* -approximately six months after the Sahagen Parties invested in Ellipso and Virtual Geo-the Boeing contract was abrogated by amendment. [FN46]

> FN45. *In re Mobile Communications Holdings, Inc., Inc.,* DA 01-1315, at 3.
>
> FN46. *See id.* at 3 ("It thus appears that between June 30, 1999 and October 12, 2000 Boeing was under no contractual duty to perform satellite construction for MCHI"); *see also id.* at 4 ("[MCHI's] contract with Boeing for construction of two satellites was essentially abrogated on June 30, 1999").

A plain reading of the FCC order demonstrates that there are no genuine issues of material fact related to Ellipso's warranties of the validity of its FCC license. The undisputed facts actually support the conclusion that MCHI and Ellipso were in compliance with the FCC's milestone and construction schedule at the time Sahagen invested in Ellipso and Virtual Geo. [FN47] There being no genuine issue of material fact, summary judgment in favor of the Castiel Parties on Counts I and X is appropriate as no misrepresentations regarding the FCC license can be shown. [FN48]

> FN47. *See id* at 2 ("MCHI did, in fact,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

enter into a two-satellite construction contract with Boeing prior to the first milestone deadline").

FN48. The same misrepresentations are relied on to allege both fraud (Counts I and X) and negligent misrepresentation (II and XI). Because this court has determined there were no misrepresentations whatsoever with respect to the FCC license, summary judgment must be granted as to both the Sahagen Parties' fraud claim and negligent misrepresentation claim to the extent they rely on the FCC license. Because there are no litigable claims based on the FCC license, the Sahagen Parties' civil conspiracy claims (Count V) must fail as well.

### B. The Castiel Parties' Fiduciary Duty Claims Are Derivative And There Is No Evidence That Demand Would Have Been Futile

#### 1. The Sahagen Parties' Direct Claims For Breach Of Fiduciary Duty (Counts III And IV) Are Actually Derivative Claims

In Count III of their cross-counterclaim, the Sahagen Parties allege a direct claim for breach of the fiduciary duty of loyalty against Castiel. [FN49] This Count alleges as follows:

FN49. Count IV asserts alleges that Ellipso and MCHI aided and abetted this breach of fiduciary duty.

Castiel breached his fiduciary duties to SST Global by, among other things, diverting company funds (including SST Global's investments) to his own use, causing the company to pay for expenses which had no relationship to company business, engaging in acts of misfeasance and nonfeasance constituting gross negligence, wasting and depleting the cash and other assets of the company, and misrepresenting or failing to disclose material facts regarding Virtual Geo LLC's business and finances.

FN50

FN50. Second Amended Reply, Answer, and Counterclaims of Peter D. Sahagen and SST Global, LLC at ¶ 79.

Essentially, the Sahagen Parties' claim appears to be nothing more than a claim for waste, mismanagement, and self-dealing. Such a claim is clearly derivative in nature and not a direct claim as the Sahagen Parties maintain. In deciding whether a claim is derivative or individual, a court looks to the "nature of the wrong alleged [not] the plaintiff's characterization of the claim in the complaint ." [FN51] To maintain a direct lawsuit, the injury alleged must affect a stockholder alone or affect a particular stockholder right "such as his preemptive rights as a stockholder, rights involving control of the corporation, or a wrong affecting the stockholders and not the corporation." [FN52] For these reasons, "claims of waste and self-dealing ... have been held to be derivative and not individual." [FN53] Thus, it is clear that the "individual" claims the Sahagen Parties assert are more appropriately characterized as derivative claims that are brought on Virtual Geo's behalf.

FN51. *Kramer v. Western Pac. Indus., Inc.,* 546 A.2d 348, 352 (Del.1988).

FN52. *In re Paxon Comm. Corp. S'holders. Litig.,* 2001 WL 812028, at *3 (Del.Ch. July 12, 2001).

FN53. *In re Rexene Corp. S'holders. Litig.,* 1991 WL 77529, at *3 (Del.Ch. May 8, 1991); *Kramer,* 546 A.2d at 353 ("A claim of mismanagement resulting in corporate waste, if proven, represents a direct wrong to the corporation that is indirectly experienced by all shareholders.... Thus, the wrong alleged is entirely derivative in nature.").

**\*11** Responding to the Castiel Parties' arguments that Count III alleges solely derivative claims, the Sahagen Parties attempt in their answering brief to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                        Page 14

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

assert new breach of fiduciary duty claims that are more individual in nature. [FN54] These new claims are permitted, according to the Sahagen Parties, because "[i]n his Counterclaims, Sahagen expressly states that Castiel's breaches include but are not limited to the breaches expressly enumerated therein." [FN55] In fact, this argument is based solely on the fact that Count III contains the words "among other things" when describing Castiel's alleged breaches of fiduciary duty. The court cannot permit a party, upon recognition that its original allegation standing alone cannot survive summary judgment as a direct claim, to assert for the first time in its answering brief new claims based solely on a clause containing the phrase "among other things." Therefore, the court will consider Count III, and the allegations set forth therein, as derivative in nature, requiring proof that demand would have been futile before permitting an individual stockholder to bring such a claim. The same is true for Count VIII, which explicitly alleges against the Castiel Parties a derivative claim for breach of fiduciary duty on behalf of Virtual Geo.

> FN54. *See* Sahagen Parties Ans. Br. at 38 ( "Castiel also breached their [sic] fiduciary duties to keep Sahagen adequately informed about the business of Virtual Geo, failed to provide him with books and records, failed to hold meetings, and failed to protect the value of his investment").

> FN55. *Id.*

### 2. *The Sahagen Parties Have Failed To Establish A Genuine Issue Of Material Fact As To Whether Demand Would Have Been Futile*

The right of a member of a Delaware LLC to bring a derivative claim is governed by 6 *Del. C.* § 18-1000, which provides:
A member or an assignee of a limited liability company interest may bring an action in the Court of Chancery in the right of a limited liability company to recover a judgment in its favor if managers or members with authority to do so have refused to bring the action *or if an effort to cause those managers or members to bring the action is*

*not likely to succeed.* [FN56]

> FN56. Emphasis added.

This provision originates from the well-developed body of Delaware law governing derivative suits by stockholders of a corporation. Accordingly, case law governing corporate derivative suits is equally applicable to suits on behalf of an LLC. [FN57]

> FN57. *See Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.,* 1998 WL 832631, at *5 n. 14 (Del.Ch. Nov.10, 1998) ("The derivative suit is a corporate action grafted onto the limited partnership form, and I look to corporate precedent to distinguish between limited partnership derivative actions and direct limited partner claims").

The Sahagen Parties concede that no demand was made of Virtual Geo's board. [FN58] Under Delaware law, an individual plaintiff can only bring a derivative claim against an LLC without first making a demand of the board if such demand would have been futile. [FN59] A demand is considered futile when a reasonable doubt exists as to whether "(a) the [managers] were disinterested or independent, [or] (b) the challenged transaction was the product of a valid exercise of business judgment. " [FN60] The presence of either situation excuses the lack of a demand. [FN61]

> FN58. *See* Sahagen Parties Ans. Br. at 34.

> FN59. *See* 6 *Del. C.* § 18-1001; *Rales v. Blasband,* 634 A.2d 927, 932 (Del.1993) (" Because directors are empowered to manage, or direct the management of, the business and affairs of a corporation, the right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have refused or where demand is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 15

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

excused because the directors are incapable of making an impartial decision regarding such litigation").

FN60. *Aronson v. Lewis,* 473 A.2d 805, 814 (Del.1984).

FN61. *See Brehm v. Eisner,* 749 A.2d 244, 256 (Del.2000) ("These prongs [of the *Aronson* test for determining whether demand is excused] are in the disjunctive. Therefore if either prong is satisfied, demand is excused.").

Both the Castiel Parties and the Sahagen Parties concede that the sole issue relating to whether demand on the Virtual Geo board would have been futile depends on whether Ambassador (Ret.) Gerald Helman would be disinterested and independent in a demand made by Sahagen to pursue litigation against Castiel for breach of fiduciary duty. This is because Castiel and Sahagen are the other two members of Virtual Geo's three-person Board of Managers. To support their argument that Helman was not disinterested or independent, the Sahagen Parties argue that Helman "is entirely dependent upon Castiel because his only other employment is as an officer in Ellipso, which Castiel controls." [FN62] The Sahagen parties also allege beholdeness on the part of Helman because he and Castiel are close friends. [FN63] In the same breath, however, the Sahagen Parties argue that Helman is beholden to Castiel because Helman once before acted to remove Castiel from a position of authority at Ellipso and Castiel terminated Helman. Helman is now allegedly afraid of similar reprisals. These arguments are all insufficient to satisfy the requirement that individual plaintiffs demonstrate futility before bringing a derivative claim on behalf of an LLC.

FN62. Sahagen Parties Ans. Br. at 36.

FN63. *Id.* at 37.

**\*12** It may be true that Helman's sole *employment* is as an officer of Ellipso, but this misses the point that Helman has other substantial sources of *income.*

In his sworn affidavit, Helman stated that "I am not dependent on my Ellipso salary. My Ellipso salary is a supplement to my chief source of income. I am retired from a senior position in the Foreign Service of the Department of State and am receiving a full annuity that includes medical and other benefits." [FN64] The Sahagen Parties' second claim that because they are friends Helman is incapable of initiating a suit against Castiel, is defeated by their third claim that argues Helman has opposed Castiel, to the point that Castiel chose to fire Helman, at times prior to this litigation. Clearly their friendship has not stood in the way of their past business dealings and there is no reason to think that it should in the future. Finally, the Sahagen Parties' third contention does not prove that Helman is beholden to Castiel. If anything, this argument supports an inference that Helman is not beholden to Castiel. The very fact that Helman supposedly was willing to risk his job to vote his conscience, and against Castiel, in the past demonstrates that he is not beholden to Castiel and is willing to vote against him again should the situation call for it.

FN64. Helman Aff. ¶ 2.

For all these reasons, the court will grant summary judgment in favor of the Castiel Parties on Counts III, IV, and VIII of the Sahagen Parties' counterclaim for failure to seek demand and an inability to demonstrate that such demand would have been futile. [FN65]

FN65. The court will allow the Sahgen Parties to re-file their derivative action if demand is made and it is wrongfully refused.

*C. Summary Judgment Should Be Entered Against Sahagen And Quinn For Breach Of Their Duty Of Loyalty*

Count II of the complaint of Virtual Geo and Count II of the Castiel Parties' counterclaims allege that Sahagen and Quinn breached their duty of loyalty when, in the context of a merger, they attempted to wrest control of Virtual Geo from Castiel without

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 16

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

his consent. Then-Vice Chancellor Steele, in a trial on a corporate governance issue, has already held that Sahagen and Quinn "owed a duty of loyalty to [Virtual Geo], its investors and Castiel, their fellow manager," and "that the actions of Sahagen and Quinn, in their capacity as managers constituted a breach of their duty of loyalty." [FN66] This holding, according to the Castiel Parties, is the "law of the case" and, consequently, summary judgment should be entered in favor of the Castiel Parties on Count II of their counterclaims. [FN67]

> FN66. *VGS, Inc. v. Castiel,* 2000 WL 1277372, at \*4, \*5. *See also VGS, Inc. v. Castiel,* 2001 WL 1154430, at \*1 (Del.Ch. Sept.25, 2001) ("In his August 31, 2000 decision, then Vice Chancellor Steele found that Peter Sahagen and Tom Quinn breached their duty of loyalty when they secretly executed a written consent to the merger of [Virtual Geo] with and into VGS, Inc., for the purpose of eliminating the majority control over the enterprise of the third manager, David Castiel").

> FN67. *See Kenton v. Kenton,* 571 A.2d 778, 784 (Del.1990) ("The 'law of the case ' is established when a specific legal principle is applied to an issue presented by facts which remain constant throughout the subsequent course of the same litigation ") (citation omitted).

The doctrine of "law of the case" is not a hard and fast rule, however. [FN68] The Delaware Supreme Court has stated that "[t]he law of the case doctrine is not inflexible in that, unlike *res judicata,* it is not an absolute bar to reconsideration of a prior decision that is clearly wrong, produces an injustice, or should be revisited because of changed circumstances." [FN69] The Sahagen Parties urge this court not to apply the "law of the case" doctrine because to do so would "create an injustice." [FN70]

> FN68. *See Gannett Co., Inc. v. Kanaga,* 750 A.2d 1174, 1181 (Del.2000).

> FN69. *Id.* (citations omitted).

> FN70. Sahagen Parties Ans. Br. at 39.

**\*13** The court does find that any such injustice would occur if the "law of the case" doctrine were applied only with respect to whether or not a breach of the duty of loyalty occurred. There have been no changed circumstances since then-Vice Chancellor Steele issued his opinion. It also was not clearly wrong since the Delaware Supreme Court has subsequently affirmed the decision. [FN71] Thus, the court concludes that the "law of the case" doctrine does apply to the current facts, and Sahagen and Quinn will be held to have breached their duty of loyalty. The Castiel Parties would be forced to call witnesses to testify about what happened with respect to the attempted merger-testimony with which this court is all too familiar. Any such requirement would be redundant and serve to waste this court's time.

> FN71. *VGS, Inc.,* 781 A.2d 696 (Del.2001).

The Sahagen Parties argue that even if the "law of the case" is applied to Sahagen's and Quinn's breaches, important issues remain for trial as to questions of cause in fact, proximate cause, damages, setoff, comparative fault, estoppel, unclean hands, and contribution. The Castiel Parties do not disagree. [FN72] Accordingly, the court will only grant summary judgment on Count II of the Castiel Parties' complaints to the extent that the "law of the case" doctrine instructs this court to find that Sahagen and Quinn breached their fiduciary duty of loyalty.

> FN72. *See* Castiel Parties Reply Br. at 9-10.

## VI.

For the foregoing reasons, summary judgment is granted in favor of the Castiel Parties on the Sahagen Parties' cross-counterclaim, except as to Count IX of that counterclaim. Summary judgment is granted in part in favor of the Castiel Parties on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 17

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Count II of its counterclaim to the extent that the
court finds that Quinn and Sahagen breached their
duty of loyalty. The parties shall consult and present
a conforming order within 10 days of this opinion.

Del.Ch.,2003.
VGS, Inc. v. Castiel
Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 17

Westlaw.

Not Reported in A.2d                                                                 Page 1

Not Reported in A.2d, 1989 WL 40916 (Del.Super.), 44 UCC Rep.Serv.2d 470
**(Cite as: Not Reported in A.2d)**

▷

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware, New Castle County.
WANG LABORATORIES, INC., Plaintiff,
v.
Kalmun LEE d/b/a Professional Computer Systems,
Defendant.
Submitted: March 15, 1989.
Decided: April 19, 1989.

Upon plaintiff's motion for summary judgment
(C.A. No. 88C-MY-283). Denied. Upon plaintiff's
motion for summary judgment (C.A. No.
85C-OC-124). Granted. Upon defendant PCS's
motion for summary judgment. Denied.

Henry E. Gallagher, Jr., Connolly, Bove, Lodge &
Hutz, Wilmington, and H. Thomas Hunt, Pincus,
Bressler, Hahn, Reich & Weinberg, P.C.,
Philadelphia, Pa., for plaintiff.
James B. Ropp, Tomar, Seliger, Simonoff,
Adourian & O'Brien, Wilmington, for defendant.

### MEMORANDUM OPINION

GEBELEIN, Judge.
*1 This is an action by Wang Laboratories, Inc. ("
Wang") against Kalmun Lee d/b/a Professional
Computer Systems ("PCS") for breach of contract
and includes a counterclaim by PCS against Wang.

### PROCEDURAL HISTORY

First, Wang filed an action in 1985 against PCS, a
former dealer, because PCS has not paid for some
computer equipment which Wang sold to PCS
under a dealership agreement in 1983. Second,
Wang filed an action in 1988 against PCS to
recover discounts which Wang gave to PCS
contingent upon PCS purchasing a specified number

of computers; PCS did not purchase the specified
number.

PCS filed a counterclaim against Wang alleging
various counts of fraud, misrepresentation, and
breaches of warranty regarding both the equipment
for which PCS has not paid and the dealership
agreement.

Wang has moved for summary judgment, arguing
that no issue of fact exists which would preclude the
Court from granting judgment in its favor as to
either of its actions. PCS has moved for summary
judgment on the basis of the statute of limitations
regarding the claim for the discounts.

### WANG'S MOTION

On a motion for summary judgment the facts must
be read by the Court in a light most favorable to the
non-moving party. Super.Ct.Civ.R. 56; *Oliver B.
Cannon & Sons v. Dorr-Oliver, Inc.,* Del.Super.,
312 A.2d 322 (1973); *Sweetman v. Strescon
Indus., Inc.,* Del.Super., 389 A.2d 1319 (1978).
Therefore, for the purposes of Wang's motions for
summary judgment the Court reads the facts as
follows.

In 1983, PCS and Wang entered into a dealership
agreement by which PCS would purchase computer
equipment from Wang and then PCS would sell the
equipment. When PCS entered into the agreement,
it ordered ten "Professional Computers" along with
related equipment and software. Wang delivered
the order in September of 1983. The total purchase
price for PCS, taking into account its volume
discount, came to $35,529.77. In January 1984,
PCS paid $27,591.55, leaving a balance of
$7,938.22. Wang claims that it made an
adjustment and that PCS purchased some other
items and the balance became $8,569.95. PCS
argues that this amount is in dispute, because the
invoices do not add up to the latter figure. Counsel

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1989 WL 40916 (Del.Super.), 44 UCC Rep.Serv.2d 470
**(Cite as: Not Reported in A.2d)**

for Wang indicates that Wang would accept $7,938.22 as being the amount due for purposes of this motion. PCS, in a letter from Kalmun Lee to Wang dated September 16, 1984, admitted liability as to $7,938.22. Since PCS has not argued that $7,938.22 is an amount in dispute, for the purposes of this motion $7,938.22 is the amount which PCS owes to Wang for equipment which Wang delivered and for which PCS has not paid. This equipment is basically two of the original ten "Professional Computers" which Wang delivered to PCS.

In late 1984, PCS attempted to return the two computers to Wang in full satisfaction of the debt. Wang refused to accept the equipment. At some time in late 1984, PCS found that a cable on one of the two computers was defective. Wang had previously suspended PCS's credit, and PCS could not get a replacement cable from Wang. PCS eventually had a cable manufactured for $50. PCS then sold both computers. PCS is now arguing that the $50 defect in one of the computers absolves it from paying for the computers which it has sold.

*2 Wang has moved for summary judgment on its claim for goods sold and delivered. No question exists that the goods were delivered and that PCS has not paid for them. PCS has asserted several defenses under Massachusetts law which is applicable by the terms of the contract to this claim.

First, PCS asserts affirmative defenses of breach of express warranty, implied warranty of fitness for use, and implied warranty of merchantability. These defenses are based primarily upon the claim that one of the two computers had a defective cable and that Wang would not repair or replace the cable. The computers are valued at over $8,000. The cable cost PCS $50 to replace. The Court is hard-pressed to find any case which permits a buyer to withhold payment for goods for a defect which impairs the value of the goods by less than one percent. The basis of the warranty, and, in fact, of all the defenses, is that Wang's hindrance of performance or misrepresentations have discharged PCS's duty to pay.

The general obligations of parties to a contract are stated in U.C.C. § 2-301 as follows: "[t]he

obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract." For the purpose of deciding this motion, the Court assumes that the computers for which PCS has not paid are defective.

The U.C.C. states at § 2-601 the rights of a buyer upon a wrongful delivery by a seller. Section 2-601 states that the buyer may reject the whole delivery, accept the whole delivery, or accept any commercial unit or units and reject the rest. The dealership agreement states in paragraph 10.1 that products are deemed accepted unless PCS notifies Wang in writing within 60 days of shipment of a defect and Wang agrees that the defect exists. Paragraph 10.1 reserves Wang the right to cure the defect by repair or replacement. The U.C.C. is in general terms a "gap-filler", so that when a contract is silent to certain issues, the U.C.C. fills in the gaps. Parties to a contract may always modify the contract so that certain U.C.C. rights and remedies are not available to one party or the other. *See,* U.C.C. § 2-719. In this case the contract mandates acceptance of non-conforming goods unless PCS takes some action to prevent acceptance: notification of Wang within 60 days of the non-conformity. The facts are undisputed that PCS did not notify Wang of any non-conformity within 60 days of the date of shipment. Wang shipped the computers in September of 1983; PCS notified Wang of the non-conformity, the problem with the cable, well after the beginning of 1984. Therefore, under the terms of the agreement PCS accepted the computers, and it had a duty to pay for them according to the terms of the contract.

Even if the Court finds that the parties did not modify the actions that PCS may take regarding non-conforming goods, PCS has by its failure to notify Wang within a reasonable time of the non-conformity, accepted the goods. Section 2-602 states that rejection of goods must be within a reasonable time after their delivery or tender and that the buyer must seasonably notify the seller. PCS did not seasonably notify Wang of any rejection of goods. Section 2-606 defines acceptance of goods:

*3 (1) Acceptance of goods occurs when the buyer

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1989 WL 40916 (Del.Super.), 44 UCC Rep.Serv.2d 470
**(Cite as: Not Reported in A.2d)**

(a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or

(b) fails to make an effective rejection (subsection (1) of Section 2-602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

No question exists that PCS has not made an effective rejection. Therefore, PCS accepted the goods.

PCS may, however, have revoked acceptance of the goods. Section 2-608 reads as follows:

(1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it

(a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or

(b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurance.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

PCS attempted to revoke acceptance more than one year after Wang shipped the goods. Such a revocation is not effective. The effect of

acceptance is stated by § 2-607(1): "The buyer must pay at the contract rate for any goods accepted. " Under the U.C.C., PCS is responsible to Wang for the contract price. A dispute exists as to the contract price of the goods, but Wang has represented that the price of goods which PCS claims it has not paid is the amount it will accept. That amount is $7,938.22. Wang has also represented that since the cable cost PCS $50 to replace, Wang will accept the cost of goods quoted by PCS less $50.

PCS argues that since Massachusetts law recognizes the defense of hinderance or prevention of performance, that PCS's duty to pay Wang is excused by Wang's actions. The cases which PCS cites are distinguishable from the case at the bar.

In *Frank Fitzgerald, Inc. v. Pacella Bros., Inc.,* Mass.App., 310 N.E.2d 379 (1974), a subcontractor filed a claim against the general contractor for the value of work done on a project. The general contractor had told the subcontractor to leave the worksite. The general contractor defended on the grounds that the subcontractor's non-performance precluded recovery. The Court stated that the contractor could not defend on the basis of the non-performance which it caused.

*4 In *Celluci v. Sun Oil Co.,* Mass.App., 320 N.E.2d 919 (1974), the plaintiff was a property-owner whose property Sun Oil wanted to purchase. The contract stated that Sun Oil would not purchase the plaintiff's property unless it could purchase the property next door. The plaintiff paid his neighbor $5,000 to sell his property to Sun Oil, and then Sun Oil decided not to go through with the deal. The plaintiff sued for specific performance, and Sun Oil defended by stating that a condition for its performance was its purchase of the neighboring property, and since it had not purchased that property, it had no duty to purchase the plaintiff's property. The Court decided that Sun Oil was estopped from asserting the defense that the condition precedent was not satisfied, because Sun Oil itself prevented the satisfaction of the condition.

In *Quintin Vespa Co., Inc. v. Construction Service Co.,* Mass.Supr., 179 N.E.2d 895 (1962), Vespa,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1989 WL 40916 (Del.Super.), 44 UCC Rep.Serv.2d 470
**(Cite as: Not Reported in A.2d)**

the general contractor, had by covenant agreed to keep the worksite so that the subcontractor, Construction Service Co., could do its work. Vespa did not maintain the worksite, and then it dismissed Construction Service Co. from the job and sued for non-performance. The Court found that Vespa's failure to perform excused construction Service Co.'s non-performance.

The case at bar is not at all similar to these three cases. Nothing in the record shows that Wang prevented or hindered PCS's performance to the extent of these cases. In all three cases, one party to the contract actively prevented the other party or itself from performing. There is no allegation here that Wang actively prevented PCS from selling the computers. These cases are simply inapposite to this case.

PCS argues further that Wang made numerous misrepresentations to induce PCS to enter into the contract. Under Massachusetts law, fraud and misrepresentation are defenses to an action for price of goods or services.

PCS cites two cases for this proposition. In *Finn v. Romanos*, Mass.Supr., 163 N.E.2d 926 (1959), a heating contractor contracted with a homeowner to fix the heating system for $4,000. The contractor fraudulently gave this amount as the price. Once the contractor took the heating system apart in the cold weather, he told the homeowner that the job would cost $6,000, and that the job would not get done unless the homeowner agreed to pay. The trial court found that the work was done shoddily or was not done at all. The contractor attempted to recover the balance up to $6,000 that the homeowner did not pay. The Court found that the contractor could not recover either the contract price or the value of its work because of the fraud throughout its dealings with the homeowner. *Finn* is distinguishable from this case because in *Finn*, the finder of fact found that the plaintiff contractor had not even completed its contract. Here, Wang delivered the computers which PCS accepted. At that point PCS owed Wang for the computers.

*5 In *Cherry v. Crispin*, Mass.Supr., 190 N.E.2d 93 (1963), the plaintiffs purchased a house from the

defendant. Before the plaintiffs could obtain a loan for the purchase, the defendants had to present an exterminator's certificate. The exterminator, an agent of the defendant, executed a certificate without inspecting the house well enough to discover what the plaintiff discovered three days after he moved in: the house was termite-ridden. The plaintiff sued for rescission of the sales contract on the basis of fraud. *Cherry* is distinguishable from the case at bar because in *Cherry*, the Court's decision granting rescission required the plaintiff to return the house and credited the fair rental value of it for the time the plaintiff resided in the house to the amount the defendant had to repay. PCS does not possess the computers (it sold them), and it could not return them to Wang. In addition, PCS has not offered to pay the fair rental value of the computers. Finally, this Court could not grant the equitable remedy of rescission even if PCS possessed the computers and was willing to pay the fair rental value of them.

Wang cites *C.R. Bard, Inc. v. Medical Elec. Corp.*, D.Mass., 529 F.Supp. 1382 (1982), as standing for the proposition that a counterclaim or affirmative defense of breach of a distributorship agreement does not operate as a set-off to an action for the price of goods sold. PCS counters with the assertion that the wrongs it is claiming go to both the actual goods themselves and to the dealership agreement. However, the Court has considered PCS's arguments regarding the action for the price of goods and determined that PCS's defenses are not viable. The claim for the price of goods is different than the claim for the breach of the dealership agreement or fraud or misrepresentation. Therefore, Wang's motion for summary judgment on the claim for the price of goods sold, C.A. No. 85C-OC-124, is GRANTED in the amount of $7,938.22 less $50 or $7,888.22; plus the Massachusetts statutory rate of interest of 12% from October 30, 1983, the date the money owed was due. *See*, Mass.Gen.Laws Ann., Ch. 231 § 6C.

The local law of the state selected by the contract is the law whose statutory interest rate should apply. *Restatement (Second) of Conflict of Laws* § 207, comment e; *see also, Morris v. Watso, Inc.*, Mass.Supr., 433 N.E.2d 886, 889 (1982). The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 5

Not Reported in A.2d, 1989 WL 40916 (Del.Super.), 44 UCC Rep.Serv.2d 470
**(Cite as: Not Reported in A.2d)**

agreement between Wang and PCS states at ¶ 29.5 that Massachusetts law governs the contract.

Wang has moved for summary judgment on C.A. No. 88C-MY-283-1-CV, the claim for the discounts credited to PCS's account. PCS's defenses are to the dealership agreement which called for delivery of 100 units. Wang delivered only ten units and this fact, standing alone, might require the Court to grant summary judgment. However, PCS has raised issues of material fact regarding the conduct of Wang in administering the contract. The Court finds that genuine issues of material fact exist as to this claim such that summary judgment is not proper.

*6 Therefore, Wang's motion for summary judgment on C.A. No. 88C-MY-283-1-CV is DENIED.

### PCS'S MOTION

The dealership agreement requires that Massachusetts law applies to this case. The initial issue, and the one which will decide PCS's motion for summary judgment, is whether the agreement is a contract for the sale of goods covered by the U.C.C.. Massachusetts has enacted the U.C.C., *Mass.Gen.Laws Ann., Ch. 106*.

PCS argues that the U.C.C. does not apply to the dealership agreement. If the Court determines that the U.C.C. does not apply to the dealership agreement, then Wang's claim for the discounts may be barred by the statute of limitations. Under Delaware law, the period in which a plaintiff may file a claim on a non-U.C.C. contract is limited by 10 *Del.C.* § 8106 to three years from the date of the occurring of the cause of action. Under Massachusetts law, the limitation period is six years. Ten *Del.C.* § 8121 provides that when a cause of action which arises outside of this State is brought in a Court in this State, the Court must choose the shorter limitation period between Delaware and the State in which the cause of action arises. The major purpose of 10 *Del.C.* § 8121 is to prevent forum shopping so that a plaintiff may not benefit if the limitations period in Delaware is longer than the limitation period in the State where

the cause of action arises. *Pack v. Beech Aircraft Corp.,* Del.Supr., 132 A.2d 54 (1957). This purpose is of no import in this case, because the limitation period for non-U.C.C. contracts in Massachusetts is actually *longer* than the period in Delaware, and the limitation period for contracts within the U.C.C. is the same, four years. *Compare,* 6 *Del.C.* § 2-725 *with* Mass.Gen.Laws Ann., Ch. 106, § 2-725. The Court finds that if the dealership agreement is within the U.C.C., then the limitation period is four years. If the agreement is without the U.C.C., the limitation period is three years. PCS argues that the agreement dealt with many aspects of the manufacturer-dealer relationship; for example, marketing territories, sales quotas, marketing support, promotional materials, confidentiality, patents, trademarks, and service and support are aspects of the relationship which are addressed in the agreement. In determining whether an agreement is encompassed by the U.C.C., Massachusetts courts have adopted the "predominant factor" test. *See, Zapatha v. Dairy Mart, Inc.,* Mass.Supr., 408 N.E.2d 1370 (1980). At footnote eight, the Court in *Zapatha* states,

[w]here agreements have involved "goods", as defined in the Code, as well as other property or services, courts have attempted to ascertain whether the sale of goods was "their predominant factor, their thrust, their purpose, reasonably stated" ( *Bonebrake v. Cox,* 499 F.2d 951, 960 [8th Cir.1974] ), and, if so, to apply the Code to the agreements.... Accordingly, courts have applied the Uniform Commercial Code to distributorship agreements even though such agreements have concerned more than the sale of goods. [Citations omitted.]

*7 *Id.* at 1374-75. Therefore, in accordance with Massachusetts law, this Court must determine if the predominant factor of the dealership agreement is the sale of goods within the purview of the U.C.C.

PCS argues that the thrust of the dealership agreement was to establish a manufacture-dealer [sic] relationship whereby Wang could market its products. PCS argues that the predominant factor in the agreement was not the sale of the computers, but the overall relationship. PCS argues that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1989 WL 40916 (Del.Super.), 44 UCC Rep.Serv.2d 470
**(Cite as: Not Reported in A.2d)**

because the agreement provides for, *inter alia* marketing territories, sales quotas, Delaware performance standards, marketing support, promotional materials, confidentiality, trademarks, patents, and service and support, that the predominant factor is not the sale of the computers. The decision in *Zapatha* that the franchise agreement in dispute was not a contract for the sale of goods was based on large part that "70% of the goods the plaintiffs sold were not purchased from Dairy mart. Dairy Mart's profit was intended to come from the franchise fee and not from the sale of items to its franchisees." *Zapatha,* 408 N.E.2d at 1374-75. The Court in *Zapatha* stated at footnote nine:

The essential thrust of the transaction was an exchange of intangible rights, obligations and services. Viewed in a realistic economic light, the franchise agreement contemplated the licensing by Dairy Mart of an entire "business format", including a trademark, a system of doing business, and the right to occupy a fully equipped store, in return for which it was to receive a franchise fee and the expectations that the Zapathas' efforts, in keeping with their obligations under the agreement, would enhance the goodwill of the Dairy Mart franchise as a whole. *Id.* at 1375.

The facts of *Zapatha* are thus distinguishable from the facts of the present case. When the agreement in this case is "viewed in a realistic economic light," the dealership agreement contemplated that PCS would sell to the public computers which it purchased from Wang, and that in return for PCS's selling Wang computers, Wang would receive the purchase price of the computers. Wang had no expectation of receiving franchise fees, because its entire income under the contract was from the sale of computers to PCS.

Wang argues that *Data General Corp. v. Communications Diversified, Inc.,* N.M.Supr., 728 P.2d 469 (1986) is a case which is directly on point, and *Data General* held that the dominant objective of a contract similar to the Wang/PCS agreement was not for the sale of goods. This Court finds that *Data General* is a departure from the clear majority of cases and declines to follow it.

The overwhelming majority of courts which have considered this issue have decided that franchise and dealership agreements fall within the U.C.C. *See, e.g., Kirby v. Chrysler Corp.,* D.Md., 554 F.Supp. 743, 749-50 (1982) (citing over a dozen cases); 1A R. Anderson, The Uniform Commercial Code, § 2-101:13 (3d ed. 1985); U.C.C. Case Dig. ¶ 2102.4. Generally "where the purpose of the relationship is selling to the public goods manufactured by the franchisor, the relationship between the manufacturer and the franchisee is a sale of goods and is governed by Article 2." 1A Anderson, *supra,* § 2-101:13, at 487. This case does not involve a franchise relationship, but the thrust of the agreement is that PCS was to order computers and related supplies from Wang for the purpose of reselling the computers and supplies to the public. The Court can arrive at but one conclusion: this dealership agreement is a contract for the sale of goods encompassed by the U.C.C., so the U.C.C. statute of limitations, 6 *Del.C.* § 725, applies to this case. This limitation period is four years. Therefore, Wang's action, filed May 30, 1988, for recovery of the discounts is not time-barred if the cause of action occurred on May 31, 1984 or later.

**\*8** PCS argues, in regard to the four-year period, that it breached the contract, if at all, at the end of the first quarter of the year of the contract, which would be in September of 1983. The agreement contains a section entitled, "Milestones" which states in relevant part that within the first three months of the contract, PCS must accept shipments of fifteen percent of its Annual Unit Quota. PCS's Annual Unit Quota is contained in Exhibit A of the contract, and the quota is 100 units per year. PCS ordered only ten units from Wang, and PCS argues that if it breached the contract, the breach occurred in September of 1983, not June of 1984. Wang argues in response that the Annual Unit Quota was just that: an *annual* quota. Wang argues that the contract was breached on June 1, 1984, because up until May 31, 1983, PCS could have ordered the remaining 90 units and complied with the 100 unit quota.

The Court finds Wang's arguments more persuasive. The Annual Unit Quota represents the quantity

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1989 WL 40916 (Del.Super.), 44 UCC Rep.Serv.2d 470
**(Cite as: Not Reported in A.2d)**

term of the agreement. If PCS did not order the specified quantity under the annual quota, PCS would be responsible for repaying to Wang the discount that Wang credited to PCS based upon the annual quota. The conclusion that the contract was breached at the end of the year is supported by the terms of the Annual Unit Quota which would have granted different discount rates to different quantity levels purchased by PCS. For example, if PCS would have ordered a total of 14 units in the year, it would have received a discount of 31%, and it would have owed Wang 6% of the U.S. Dealer Price because PCS's discount level was 37% based upon sales of more than 100 units. Since PCS ordered only 10 units, it should have received no discount, and the entire discount credited to its account became due at the end of the year to which the annual quota applied. That date is May 31, 1984. Since the claim for the discounts was filed May 30, 1988, it is not time-barred. Therefore, PCS's motion for summary judgment is DENIED.

IT IS SO ORDERED.

Del.Super.,1989.
Wang Laboratories, Inc. v, Lee
Not Reported in A.2d, 1989 WL 40916 (Del.Super.), 44 UCC Rep.Serv.2d 470

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.