# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| LAWRENCE P. ORGAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | C.A. No. 05-867 JJF |
| MARC BYRON, BEN KAAK and | ) | |
| CATHERINE BARBARO, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S COMPENDIUM OF UNREPORTED DECISIONS AND OTHER AUTHORITIES CITED IN ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

ROSENTHAL, MONHAIT & GODDESS, P.A.
Jeffrey S. Goddess (Del. Bar No. 630)
919 Market Street, Suite 1401
Wilmington, DE 19801
(302) 656-4433
jgoddess@rmgglaw.com
    Attorneys for Plaintiff

Of Counsel:

SHAHEEN, NOVOSELSKY, STAAT, FILIPOWSKI & ECCLESTON, P.C.,
Jack L. Haan
Henry N. Novoselsky, #2070006
20 North Wacker Drive
Suite 2900
Chicago, IL 60606
Telephone (312) 621-4400
Facsimile (312) 621-0268
jhaan@snsfe-law.com

Dated: March 21, 2006

# INDEX

69A Am. Jur. 2d *Securities Regulation – State* § 18 (2005) ..............................1

*VGS, Inc. v. Castiel*,
   No. C.A. 17995, 2003 WL 723285 (Del. Ch. Feb. 28, 2003) .....................2

12 Blue Sky L. Rep. (CCH) 4:55 (Nov. 2005) .........................................3

Restatement (2d) of Conflicts of Laws § 187 (2)(b) (1971)..............................4

*Alberts v. Davis*,
   No. C75-2483A, 1978 U.S. Dist. LEXIS 15207 (N.D. Ga. Sept. 29, 1978) ..........5

Restatement (2d) of Conflicts of Laws § 188 (2) (1971) ...............................6

*In the Matter of Linder, Bilotti & Co.*,
   42 SEC Decisions, pp. 407, 408 (1964) ........ ................................7

*B. Lewis Productions v. Bean*,
   No. 02-93-KAJ, 2005 WL 273298 at 3 (D. Del. Jan. 28 2005) ...................8

# EXHIBIT 1

Westlaw.

69A Am. Jur. 2d Securities Regulation—State § 18

American Jurisprudence, Second Edition
Database updated August 2005

Securities Regulation—State
Lora C. Siegler, J.D.
I. In General [§§ 1-18]
D. Jurisdiction [§§ 15-18]

Topic Summary   Correlation Table   References

§ 18. Conflict of laws; applicability of multiple blue sky laws

Where transactions cross jurisdictional boundaries, the issue of which blue sky laws apply is raised. Traditionally, in certain areas of the law, the courts would apply an analysis of the jurisdictional conflicts in order to determine which jurisdiction's law to apply. In the area of securities transactions, however, no conflict of law analysis applies and all of the blue sky laws of all of the jurisdictions apply to the transactions which are within the bounds of the statute.[FN39]

> Observation:
> At least one court has disagreed with this proposition and has applied a conflict of laws analysis, criticizing the leading case.[FN40] However, a later decision has stated that, in ruling that application of more than one state's securities laws to a single transaction presents a conflict of laws, the court relied on a decision which was later reconsidered by the court and reversed,[FN41] thus raising the issue of the validity of the decision relying on the first opinion.[FN42] Thus, the issue presented is not a conflict of laws issue, but a matter of the election by the plaintiff of the desired remedy from one of the applicable statutes.[FN43]

The understanding of the parties to a transaction whether it falls within the purview of a particular blue sky law is not determinative of its legal effect, it being necessary for the court to establish such effect through consideration of the acts of the parties in light of the language of the particular law concerned,[FN44] and a contractual choice of law provision is not binding on the court.[FN45] Further, the provisions of the Uniform Commercial Code do not operate to restrict the court's decision in this respect.[FN46]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69A Am. Jur. 2d Securities Regulation—State § 18

[FN39] Chrysler Capital Corp. v Century Power Corp. (SD NY) 1992 US Dist
LEXIS 9187, adhered to, on reh (SD NY) 800 F Supp 1189 (applying Arizona,
Connecticut, Iowa, and Oregon law); Barnebey v E.F. Hutton & Co. (MD Fla)
715 F Supp 1512, CCH Fed Secur L Rep ¶94987, 109 ALR Fed 377 (applying
Florida and Oklahoma law); Lintz v Carey Manor, Ltd. (WD Va) 613 F Supp 543
(applying Florida, New Jersey and Virginia law).

[FN40] McInnis v Merrill Lynch, Pierce, Fenner & Smith, Inc. (MD Tenn) 706 F
Supp 1355, CCH Fed Secur L Rep ¶95369, dismd (MD Tenn) 821 F Supp 1243
(applying Alabama and Florida law), criticizing Lintz v Carey Manor, Ltd.
(WD Va) 613 F Supp 543.

[FN41] Simms Invest. Co. v E.F. Hutton & Co. (MD NC) 688 F Supp 193,
reconsidered 699 F Supp 543.

[FN42]

Legal Encyclopedias

See also 16 Am. Jur. 2d, Conflict of Laws §§ 74 et seq.
McClard, The Applicability of Local Securities Acts to Multi-State
Securities Transactions, 20 U Rich L Rev 139 (1985) (authored by co-counsel
in the Lintz case).

[FN43] Simms Invest. Co. v E.F. Hutton & Co. (MD NC) 699 F Supp 543
(applying Colorado and North Carolina law).

[FN44] People v Sidwell, 27 Cal 2d 121, 162 P2d 913.

[FN45] Hall v Superior Court (4th Dist) 150 Cal App 3d 411, 197 Cal Rptr 757
; McInnis v Merrill Lynch, Pierce, Fenner & Smith, Inc. (MD Tenn) 706 F Supp
1355, CCH Fed Secur L Rep ¶95369, dismd (MD Tenn) 821 F Supp 1243; State ex
rel. Geil v Corcoran (Mo App) 623 SW2d 557 (applying Florida and Alabama law)
; Boehnen v Walston & Co. (DC SD) 358 F Supp 537 (applying South Dakota law
where contract stipulated New York law).

[FN46] Illinois Nat. Bank & Trust Co. v Gulf States Energy Corp. (2d Dist)
102 Ill App 3d 1113, 57 Ill Dec 938, 429 NE2d 1301, 72 OGR 33.

© 2005 Thomson/West

AMJUR SECREGS § 18

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2

Westlaw.

Not Reported in A.2d                                                          Page 1

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
(Cite as: Not Reported in A.2d)

▷

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
VGS, INC.'s, Plaintiff,
v.
David CASTIEL, Virtual Geosatellite Holdings,
Inc., and Ellipso, Inc., Defendants,
VIRTUAL GEOSATELLITE HOLDINGS, INC.,
and Ellipso, Inc., Counterclaim Plaintiffs,
andVIRTUAL GEOSATELLITE, LLC,
Counterclaim Plaintiff-Intervenor,
v.
VGS, INC., Peter D. Sahagen, Thomas Quinn, Neel
Howard, and Sahagen Satellite Technology Group,
LLC, Counterclaim Defendants.
No. C.A. 17795.

Submitted Jan. 21, 2003.
Decided Feb. 28, 2003.
As Revised March 10, 2003.

Thomas R. Hunt, Jr., Morris, Nichols, Arsht &
Tunnell, Wilmington, Delaware; William H.
Jeffress, Jr., Jamie Steven Kilbergi, Baker Botts,
L.L.P., Washington, D.C., for
Defendant-Counterclaim Plaintiffs David Castiel,
Virtual Geosatellite Holdings, Inc. and Ellipso, Inc.,
and Counterclaim Plaintiff-Intervenor Virtual
Geosatellite LLC.
Brian A. Sullivan, Werb & Sullivan, Wilmington,
Delaware; William A. Brewer, III, Daniel F. Perez,
Thomas M. Corea, Bickel & Brewer, Dallas, Texas,
for Counterclaim Defendants and
Reply-Counterclaim Plaintiffs SST Global
Technology LLC and Peter D. Sahagen.

*MEMORANDUM OPINION*

LAMB, Vice Chancellor.

I.

*1 This action arises out of a long-standing dispute
principally between two people, and the companies
they control. This tale first began when Peter
Sahagen attempted to wrest control of a limited
liability company, through the effectuation of
merger, from David Castiel, the company's founder.
Sahagen then sought a declaratory judgment from
this court that the merger was valid. In June 2000,
the court held a trial which resulted in the merger
being rescinded. Castiel and his affiliates filed a
counterclaim against Sahagen and Tom Quinn in
that action alleging a breach of their duty of loyalty.
Sahagen and his affiliates then filed an eleven count
cross-counterclaim against Castiel and his affiliates
alleging, among other things, that Castiel
fraudulently induced Sahagen into investing with
Castiel, and that Sahagen and his affiliates have
breached several fiduciary duties that were owed
directly to Sahagen or to the companies he invested
in. The first trial did not resolve the counterclaim or
the cross-counterclaim.

Summary judgment must be granted in favor of
Castiel and his affiliates on all but one of the
cross-counterclaims. Claims for fraudulent
inducement and negligent misrepresentation (as
well as claims of aiding and abetting those
violations) are precluded for two reasons. First, an
integration clause in the agreements at issue,
combined with the sophistication of the parties and
opportunities to conduct due diligence, precludes
Sahagen from arguing that non-warranted
statements can amount to fraudulent inducement or
negligent misrepresentation. Second, the one
statement that was warranted in the agreements at
issue was true and accurate when it was made. Thus
there can be no fraud or negligent misrepresentation.

All but one of Sahagen's claims that Castiel and
various of his affiliates breached their fiduciary
duties must fail. These fiduciary duty claims are
derivative in nature and there has been no demand
made on the board of the limited liability company.
Further, Sahagen has failed to demonstrate how

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
(Cite as: Not Reported in A.2d)

demand would have been futile.

Finally, summary judgment must be granted, in part, in favor of Castiel and his affiliates on their counterclaim that Sahagen and Quinn breached their fiduciary duty of loyalty. This result is dictated by the "law of the case" doctrine, and it will avoid the need to re-litigate previously litigated issues.

## II.

### A. *Background*

On January 6, 1999, David Castiel formed Virtual Geosatellite, LLC ("Virtual Geo") pursuant to the Delaware Limited Liability Company Act. As originally constituted, the sole member of Virtual Geo was Virtual Geosatellite Holdings, Inc. ("VGHI"). On January 8, 1999, Ellipso, Inc. joined Virtual Geo as a member. Finally, on January 29, 1999, Sahagen Satellite Technology Group, LLC (now known as Sahagen Satellite Technology Global, LLC or "SST Global") was added as a third member. [FN1]

> FN1. The relations between these various parties have been contentious for some time. In particular, there has already been a trial in the Court of Chancery to litigate claims related to a purported merger that was intended to wrest control of Virtual Geo from Castiel. For a more thorough discussion of those events *see VGS, Inc. v. Castiel,* 2000 WL 1277372 (Del.Ch. Aug.31, 2000), *aff'd,* 781 A.2d 696 (Del.2001) (TABLE).

Pursuant to Virtual Geo's Second Amended and Restated Limited Liability Company Agreement (the "LLC Agreement"), VGHI received 660 LLC units (representing 63.46% of the total equity in Virtual Geo), SST Global received 260 LLC units (representing 25%), and Ellipso received 120 LLC units (representing 11.54%). SST Global, which is controlled by Peter Sahagen, contributed the only cash received by Virtual Geo-$5 million. VGHI and

Ellipso, both of which are controlled by Castiel, contributed certain licensed intellectual property.

*2 Virtual Geo's stated purpose was "to construct, launch and operate a global fixed satellite service system employing nongeostationary satellites in subgeosynchronous elliptical orbits, developing the related [ground] segment and offering the related communication services." [FN2] That system, known as "Virtual Geo," was intended to provide technological advantages believed to be unique among its competitors in the broadband satellite market. Nonetheless, Virtual Geo was a high-risk business venture.

> FN2. LLC Agreement § 4.01(a).

Management of Virtual Geo was vested in a Board of Managers. The LLC Agreement established a three-person Board of Managers consisting of Castiel (the Chairman, appointed by VGHI), Sahagen (the Vice Chairman of Finance, appointed by SST Global), and Tom Quinn (the Secretary, appointed by VGHI).

### B. *Sahagen's Investment In Ellipso And Virtual Geo*

Sahagen is a "prolific investor" in the technology sector. Sahagen met Castiel through Sahagen's attorney, and after a series of meetings with Castiel and Ellipso's in-house counsel, Sahagen was invited to invest in Virtual Geo and Ellipso. Sahagen then conducted due diligence on Virtual Geo and Ellipso, including hiring a "technical expert" and consulting with his lawyers. Sahagen, through Neel Howard (SST Global's Rule 30(b)(6) representative), had extensive discussions with employees of Ellipso.

Castiel allegedly made several representations to Sahagen during the course of negotiations. Specifically, Castiel allegedly represented that:
• Ellipso had the antenna technology and capability to employ a worldwide two-way television system;
• Ellipso was in full compliance with the FCC regarding its license, and that no further requirements needed to be met;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
(Cite as: Not Reported in A.2d)

• Ellipso's license with the FCC was in full force and effect;

• Ellipso's license with the FCC was not subject to any limitations, defenses, or contingencies which might subject it to revocation or cancellation;

• one of Castiel's affiliated entities, Mobile Communications Holdings, Inc. ("MCHI"), had entered into a binding contract with Boeing Company for construction of the first two satellite systems that were to be part of Ellipso's system;

• MCHI and Ellipso were in full compliance with the construction progress milestones and certification schedules established by the FCC in issuing the license;

• MCHI had made substantial progress with respect to the deployment of its satellite system and, in connection therewith, MCHI had received a commitment from Boeing to invest $300 million of its own funds in deploying the system;

• SST Global's investment was going to be used only as a bridge until Ellipso and Virtual Geo received a substantial investment from Boeing;

• any funds invested in Virtual GEO would be used for, and devoted exclusively to, the business of Virtual Geo;

• Sahagen's investments would be used prudently, economically, efficiently, and in a manner designed to best achieve Ellipso's and Virtual Geo's business objectives; and

*3 • Castiel would hire a number of persons with impeccable credentials in the satellite and communications industries to manage and operate Virtual Geo.

Neel Howard testified, however, that he was aware of an antenna problem at Ellipso prior to Sahagen's investment in Ellipso. [FN3] Howard also testified that Castiel had a long history of promising investors that he would bring in new management and then refusing to do so. [FN4] Howard told Sahagen about this prior to Sahagen's investment. [FN5]

FN3. Castiel Parties Op. Br., Ex. B ("SST Global Dep.") at 78.

FN4. *Id.* at 60, 63, 68-70.

FN5. *Id.*

### C. *Ellipso's Financial Condition Deteriorates*

During its existence, Ellipso raised between $75 million and $100 million in investment capital, over $60 million of which had been contributed before the formation of Virtual Geo. By January 1, 1999, Ellipso still had over $15 million in cash on its balance sheet. By December 31, 1999, however, Ellipso and its subsidiary, MCHI had just over $2 million in cash. As of March 31, 2000, Ellipso's financial condition had further deteriorated and its cash had declined to under $350,000 while its liabilities totaled over $360,000. Moreover, Ellipso was losing employees at a rapid rate during this period.

### D. *Castiel Uses Virtual Geo's Cash For Ellipso*

On May 4, 1999, Virtual Geo's Board of Managers approved a cost-sharing arrangement with Ellipso. At that meeting, the Board authorized an agreement whereby Ellipso would "loan" employees to Virtual Geo at the cost of $50,000 per month for six months.

On June 11, 1999, Castiel, acting in his capacity as CEO of both Ellipso and Virtual Geo, executed a cost-sharing Services Agreement between Ellipso and Virtual Geo. The Services Agreement provided for monthly payments from Virtual Geo to Ellipso of $48,748 through December 31, 1999. Essentially, the Services Agreement extended the previously approved cost-sharing arrangement for an additional six months.

On April 19, 2000, Castiel, in his capacity as CEO of Ellipso and Virtual Geo, executed Amendment No. 1 to the Services Agreement. The Amendment was backdated to December 17, 1999. Amendment No. 1 retroactively increased the fees to $100,000 per month for the period January 1 through May 31, 1999. It also retroactively increased to $130,000 per month the fee for the period June 1 through December 31, 1999. Finally, the Amendment increased the fee for the period January 1, 2000 going forward to $156,145 per month. Although the Ellipso Board was presented with, and then

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

approved, a resolution to extend the Services Agreement into 2000, neither the extension to, nor amendment of, the Services Agreement was presented to Virtual Geo's Board for consideration.

In addition to amending the cost-sharing arrangement on a number of occasions, Castiel also determined the salary allocations for Ellipso's employees. A number of witnesses (all of whom are former or current employees of Ellipso/MCHI), testified that Castiel misallocated the time they actually spent working on Virtual Geo matters. [FN6] Further, Castiel may have charged Virtual Geo for Ellipso employees who never worked on Virtual Geo matters. [FN7]

> FN6. *See* Tr. 82-84, 87-89 (Naughton); Tr. 171-72 (Incidardi); Tr. 690 (Howard); and Tr. 1296-97 (Blott). Citations to "Tr. ___" refer to transcripts from the trial held before then-Vice Chancellor Steele on June 15 through June 23, 2000 that resulted in the opinion referred to in note 1, *supra*.

> FN7. *See* Tr. 690 (Howard) ("I can't imagine that you're talking more than four or five employees, six, maybe, at the most, that would be doing any kind of work on Virtual Geo"); Tr. 125 (Lincoln) ("What he gave me was a list of probably 20 people that were working on Virtual Geo, at least according to the list; and there were only five, six people that had done anything for the project").

### E. *Virtual Geo Struggles From Its Inception*

\*4 As of December 31, 1999, Virtual Geo's current assets amounted to approximately \$3 million, and losses for the year ended December 31, 1999 totaled almost \$2.2 million. Four months later, Virtual Geo's current assets had declined by almost \$500,000. Losses for the four months ended April 30, 2000 were approximately \$1.5 million. Further, during the four months ended April 30, 2000, the " amounts due Ellipso" purportedly rose from \$78,275 to \$1,108,230, and "member's capital" fell

from \$2,969,316 to \$1,497,351.

As Virtual Geo was expending cash at a rapid rate, prospects for obtaining additional capital became increasingly dim. Virtual Geo's last draft business plan, dated January 20, 2000, stated that SST Global's initial \$5 million investment in the first quarter of 1999 was merely "seed capital." Such " seed capital" was not expected to carry Virtual Geo through the year 2000. The business plan, therefore, called for a pre-licensing round of venture capital financing in the amount of \$25 million sometime between the fourth quarter of 1999 and year-end 2000. Virtual Geo was unsuccessful in obtaining this financing.

### F. *Castiel Reneges On His Agreement To Secure Professional Management*

Castiel represented on several occasions that he would hire a number of persons with impeccable credentials in the satellite and communications industries to run Virtual Geo. [FN8] In the fall of 1999, Sahagen introduced a highly qualified management team to Virtual Geo. It became known as the "Dream Team" and consisted primarily of Air Force Lieutenant General Kenneth Minihan, a former director of the National Security Agency and the Defense Intelligence Agency, and Alf Andreassen, who was the former director of Bell Labs and President of AT & T Global Solutions. Virtual Geo's Board of Managers was optimistic about the prospects of hiring such qualified individuals.

> FN8. *See* Tr. 848-49 (Sahagen) ("Q. Did Mr.-Doctor Castiel make any promises with respect to what he would do in that regard, concerning the management? A. Absolutely.... He said that he would go about locating just what I said, experienced management in the satellite business. He used the word [sic] 'big names,' meaning people who were accomplished, who had the contacts, had the credibility, had the background to raise billions of dollars for this kind of project);

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 5

*see also* Tr. 651 (Howard).

After some negotiations, Castiel and Minihan reached agreement on almost every issue, including Castiel's plan for transitioning management control from Castiel to Minihan's team as it accomplished certain milestones, such as bringing a "major" investor to Virtual Geo. Castiel, however, subsequently began to have second thoughts about giving up control of Virtual Geo's operations. Jill Stern, General Counsel for Ellipso and Virtual Geo, drafted a contract so as not to include the progressive change of control issue that Castiel and Stern knew was a condition precedent to the Minihan team's agreement to join Virtual Geo. Unwilling to join Virtual Geo without such a provision in the contract, Minihan chose not to become part of Virtual Geo's management team.

### G. *The FCC Declares Ellipso's License To Be Null And Void*

On or about June 30, 1997, Ellipso, through MHCI, became fully licensed by the FCC to launch and operate a complex satellite system (the "1997 License"). Based on the 1997 License, Ellipso was authorized to launch and operate a 16-satellite "Big LEO" system to provide two-way voice and data communications to customers equipped with mobile earth-station transceivers.

*5 The International Bureau granted the license over objections from several petitioners who argued that MCHI's license application should be denied for failure to show that it had access to funds sufficient to cover the cost of constructing the proposed system and operating it. The International Bureau granted MCHI's request for a waiver of such a requirement, but stressed that the license was conditioned on adherence to a construction progress-milestone schedule requiring that the system be constructed and put into service in a timely manner. The International Bureau stated that it would "carefully monitor [MCHI's] progress toward implementation," and would "not hesitate to cancel the license should it fail without justification to meet the milestone schedule." FN9

FN9. *In re Mobile Communications Holdings, Inc.*, DA 01-1315, at 1 (F.C.C. May 31, 2001).

The license order prescribed the following milestone schedule: begin construction of at least two of MCHI's authorized satellites by July 1998; begin construction of the other satellites by July 2000; complete construction of the first two satellites by July 2001; and complete a fully operational system by July 2003. The license order provided that unless the schedule is extended for good cause, "this authorization will become null and void in the event that the licensee fails to meet [this] progress schedule." FN10

FN10. *Id.* at 2.

Under the FCC's rules, each Big LEO licensee must file a statement within ten days of a progress milestone date specified in its license, either certifying that it has met the milestone requirement or giving notice that it has failed to meet it. To comply with this requirement, MCHI filed an affidavit on June 22, 1998, stating that it had met its July 1998 milestone by entering into a non-contingent contract with Boeing for construction of two satellites. In an affidavit filed on July 31, 2000, MCHI stated that "MCHI has entered into a binding, non-contingent contract with Teledyne Brown Engineering, Inc. relating to the construction of the satellites consistent with the milestones and technical specifications set forth in MCHI's [license order]." FN11

FN11. *Id.*

By Memorandum Opinion and Order dated May 31, 2001, the FCC rendered null and void the 1997 License. FN12 The FCC concluded that Ellipso did not meet the milestone requirement to commence construction of all 16 satellites by the end of July 2000. The FCC found that the Boeing contract was not a non-contingent construction contract because the parties had adopted amendments that essentially nullified the contract. Specifically, on June 30, 1999, MCHI executed a third amendment to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 6

Boeing contract, providing that Boeing could not perform any work thereafter except as subsequently authorized in writing by MCHI. [FN13] The FCC found that MCHI did not issue any work authorizations between then and October 12, 2000. The FCC then determined that between June 30, 1999 and October 12, 2000 Boeing was under no contractual duty to perform satellite construction for MCHI. [FN14]

> FN12. *Id.* at 2-3.
>
> FN13. *Id.*
>
> FN14. *See id.* at 3.

Based in part on these facts, the FCC concluded that MCHI did not meet the milestone requirement to commence construction of all of its proposed satellites by the end of July 2000. [FN15] The FCC stated that to meet a milestone deadline for commencement of satellite construction, a licensee relying on others to perform the required work must enter into a binding contract for construction of the satellites that is not subject to material contingencies that remain unresolved as of the deadline. [FN16] The FCC found that MCHI was not a party to a non-contingent contract for construction of 16 satellites at the end of July 2000 or at any other times prior to October 12, 2000. [FN17] In fact, the FCC found that MCHI's "contract with Boeing for construction of two satellites was essentially abrogated on June 30, 1999." [FN18]

> FN15. The FCC also determined that the contract with Teledyne Brown on which MCHI predicated its second milestone certification did not require Teledyne Brown to build or deliver satellites for MCHI. Although Teledyne Brown is involved in the aerospace industry, it does not manufacture or construct satellites. The FCC determined that the contract only engaged Teledyne Brown to provide consulting and managerial services in three successive phases. Further, the FCC found that the work schedule specified in the

contract with Teledyne Brown was merely tentative because MCHI reserved the right to add to, change, or delete the work to be performed by Teledyne Brown and alter the times for performance. The FCC also noted that Teledyne Brown was to consult with MCHI in advance of each calendar quarter as to what work to perform in that period, and MCHI would not be liable for payment for any work performed without such prior approval. *See id.* All of these events, however, occurred well after Sahagen's investment in Ellipso.

> FN16. *Id.* at 4.
>
> FN17. *Id.*
>
> FN18. *Id.*

### III.

\*6 The original complaint in this action was brought by VGS, Inc. against Castiel, Ellipso, and VGHI seeking a declaratory judgment that a purported merger between VGS, Inc. and Virtual Geo was valid. Ellipso and VGHI then filed a counterclaim against VGS, Inc., Sahagen, Howard, Quinn and SST Global that alleged, among other things, that Sahagen and Quinn breached their fiduciary duty of loyalty. [FN19]

> FN19. *See, e.g., VGS, Inc.,* 2000 WL 1277372 for more details surrounding this transaction.

Ellipso, VGHI and counterclaim-plaintiff-intervener Virtual Geo (together with Castiel and MCHI, the " Castiel Parties") have moved for summary judgment on Count II of their original counterclaim, which seeks a finding that Sahagen and Quinn have breached their fiduciary duty of loyalty. [FN20]

> FN20. Although this court has previously entered judgment in favor of Castiel, VGHI, Ellipso and Virtual Geo, that trial only resolved the corporate governance

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 7

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
(Cite as: Not Reported in A.2d)

issue. *See generally VGS, Inc.*, 2000 WL 1277372. The Castiel Parties still maintained duty of loyalty claims against Sahagen and Quinn.

Peter Sahagen and SST Global (collectively the " Sahagen Parties") then filed a cross-counterclaim against the Castiel Parties to recover their investment and to obtain an award of damages on behalf of Virtual Geo. FN21 The Castiel Parties moved for summary judgment in their favor on the cross-counterclaims of the Sahagen Parties.

> FN21. The Sahagen Parties moved to amend, for a second time, their complaint in October of 2000. This court granted in part and denied in part their motion on October 26, 2001. Since that time, the Sahagen Parties have not re-filed the Second Amended Complaint in its approved form. Rather, the Sahagen Parties have filed Second Amended Counterclaims. For the sake of this motion, this court will treat the Second Amended Counterclaims as the most current set of claims against the Castiel Parties. In addition, although this opinion refers to the parties collectively as the Sahagen Parties and the Castiel Parties, it should be noted that the Sahagen Parties' "counterclaims" are not being asserted against Virtual Geo.
> The Sahagen Parties also previously filed many of these same claims under a different caption on April 19, 2000 (the " 17997 action"). This court has taken the position that the 17997 action has been consolidated with the 17995 action.

There are eleven separate cross-counterclaims asserted by the Sahagen Parties. Counts I and X (which essentially replicate each other) allege common law fraud against the Castiel Parties based on statements and omissions made by Castiel, Ellipso, and VGHI. Counts II and XI (which essentially replicate each other) allege negligent misrepresentation against the Castiel Parties based on the same alleged statements and omissions in Counts I and X. Count V is a claim of civil

conspiracy against the Castiel Parties based on the same fraud alleged in Counts I and X.

Count III of the Sahagen Parties' cross-counterclaims attempts to allege a direct claim against Castiel for a breach of his fiduciary duties of loyalty and care. This claim is largely based on an assertion of waste and mismanagement. Count IV alleges that the remaining Castiel Parties aided and abetted Castiel's breach of fiduciary duties. Count VIII asserts a derivative claim by the Sahagen Parties on behalf of Virtual Geo for breaches of fiduciary duties by the Castiel Parties. Count IX alleges a derivative claim by the Sahagen Parties on behalf of Ellipso against Castiel for breaches of fiduciary duty. The Castiel Parties have not briefed Count IX, yet they still move for summary judgment on that Count. Due to this lack of briefing, however, the court will not grant the Castiel Parties' motion for summary judgment on Count IX.

The final two Counts of the Sahagen Parties' cross-counterclaim are for a "constructive trust" (Count VI) and injunctive relief against the Castiel Parties (Count VII). These "Counts" are remedies, not causes of action, and thus do not provide an independent basis for recovery. Moreover, the Sahagen Parties already attempted to enjoin the Castiel Parties from expending any of Virtual Geo's funds, and this court denied that motion. FN22 Thus the court will grant summary judgment in favor of the Castiel Parties on these Counts.

> FN22. *See* Ruling on Pls.' Mot. For Prelim. Injunction, Lamb, V.C ., (Sept. 13, 2000).

IV.

*7 Under Delaware law, summary judgment may be granted only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FN23 When considering a motion for summary judgment, the facts must be viewed in the light most favorable to the non-moving party, and the moving party has the burden of demonstrating that no material question of fact exists. FN24 "When a moving party has properly supported its motion, however, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 8

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
(Cite as: Not Reported in A.2d)

non-moving party must submit admissible evidence
sufficient to generate a factual issue for trial or
suffer an adverse judgment." [FN25]

> FN23. *See Burkhart v. Davies*, 602 A.2d
> 56, 59 (Del.1991), *cert. denied*, 504 U.S.
> 912, 112 S.Ct. 1946, 118 L.Ed.2d 551
> (1992).

> FN24. *See Tanzer v. Int'l General Indus.,
> Inc.*, 402 A.2d 382, 385 (Del.1979).

> FN25. *Id.;* Ch. Ct. R. 56(e).

### V.

#### A. *The Sahagen Parties Are Not Entitled To A Trial On Their Fraud And Misrepresentation Claims*

In Counts 1 and X of their cross-counterclaims
(which essentially replicate each other), the
Sahagen Parties allege that they were fraudulently
induced into investing in Virtual Geo and Ellipso
based on several representations made by Castiel,
Ellipso, and MCHI. Specifically, Castiel
purportedly induced Sahagen's investment by: (1)
representing that he would hire new management if
Sahagen invested in Ellipso and Virtual Geo; (2)
representing that there were no problems with
Ellipso's antenna technology; (3) misrepresenting
the status of Ellipso's FCC license; and (4)
misrepresenting his intentions with respect to how
he planned to use the money Sahagen invested in
Virtual Geo. To establish a claim for fraud, the
Sahagen Parties must demonstrate the following: "a
material, false representation, an intent to defraud
thereby, and reasonable reliance on the
representation, causing damage to the plaintiff." [FN26]

> FN26. *Katara v. D.E. Jones Commodities,
> Inc.*, 835 F.2d 966, 970-71 (2d Cir.1987).
> The court will apply New York law to the
> Sahagen Parties' substantive claims made
> in connection with a Unit Purchase
> Agreement and Stock Purchase Agreement

that are at issue in this suit. *See* note 29,
*infra.*

On January 29, 1999, Sahagen, on behalf of SST
Global, entered into a Stock Purchase Agreement
with Ellipso. That same day, Sahagen, on behalf of
SST Global, entered into a Unit Purchase
Agreement with Virtual Geo. The Castiel Parties
argue that the explicit language of those
Agreements prevents the Sahagen Parties from
pursuing a fraud in the inducement allegation as a
matter of law. [FN27] For example, as part of the
Stock Purchase Agreement, Ellipso made numerous
representations and warranties to Sahagen.
Moreover, Section 2.14 of that Agreement states:

> FN27. This argument applies to all of the
> alleged fraudulent statements except for
> those relating to Ellipso's FCC license,
> which was specifically warranted in the
> Stock Purchase Agreement. *See* Castiel
> Parties Reply Br., Ex. A. § 2.07.

[Ellipso] makes and has made no representations or
warranties, express or implied, except as set forth in
this Agreement. No representation or warranty of
[Ellipso] shall be deemed to be made or enlarged as
a result of disclosures made or information
provided by [Ellipso] to [Sahagen] during the
course of [Sahagen's] "due diligence" investigation
of [Ellipso] or the Subsidiaries. [FN28]

> FN28. *Id.* at § 2.14. Identical language is
> contained in the January 29, 1999 Unit
> Purchase Agreement between SST Global
> and Virtual Geo. *See* Castiel Parties Reply
> Br., Ex. B. § 2.14.

Finally, Section 10.03 is an integration clause
whereby Sahagen agreed that the terms of the
written Agreement constituted the sole
understandings of the parties. Specifically, the
provision states:
This Agreement (including the Disclosure Schedule,
which is incorporated herein by this reference) and
the Related Agreements constitute the sole
understanding of the parties with respect to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
(Cite as: Not Reported in A.2d)

subject matter thereof. Matters disclosed by Seller to Buyer pursuant to any Section of this Agreement shall be deemed to be disclosed with respect to all sections of this Agreement. [FN29]

> FN29. *Id.* at § 10.03. Identical language is contained in the January 29, 1999 Unit Purchase Agreement between SST Global and Virtual Geo. *See* Castiel Parties Reply Br., Ex. B. § 10.03. Section 10.11 of both Agreements provides that New York law is the controlling law "for any litigation arising out of or relating to this Agreement and transactions contemplated hereby...." In addition, New York has a substantial relationship to the Agreements because Sahagen resided in New York at the time he negotiated and executed the Agreements. Moreover, aspects of the Agreements were actually negotiated in New York. Because under Delaware law the parties' choice of law governing their contract should be respected as long as the law of that state and the parties have some relation to that state, New York law must govern the interpretation of the Agreements. *See Wilmington Trust Co. v. Wilmington Trust Co.,* 24 A.2d 309, 313 (Del.1942).

The law governing the Agreements also governs the effect, if any, that the Agreements may have on claims for fraud and negligent misrepresentation. *See* Restatement (Second) of Conflicts of Laws § 201 cmt. (a), (c) (1971) ("(a) Under the rule of this section, questions involving the effect of a misrepresentation, duress, undue influence and mistake upon a contract are determined by the law chosen by the parties, if they have made an effective choice .... (c) The fact that a contract was entered into by reason of misrepresentation, undue influence or mistake does not necessarily means [sic] that a choice-of-law provision contained therein will be denied effect. This will be done if the misrepresentation, undue influence or mistake was responsible for the complainant's adherence to the provision"); *see also Turtur v. Rothschild Registry Int'l, Inc.,* 26 F.3d 304, 309 (2d Cir.1994) (holding that a choice of law clause applying New York law was sufficiently broad to encompass tort and contract claims when the agreement covered any controversy "arising out of or relating to" that agreement); *Woodling v. The Garrett Corp.,* 813 F.2d 543, 552 (2d Cir.1987) (applying section 201 of the Restatement (Second) of Conflicts of Laws in recognizing that the validity and enforceability of a release are matters of substance).

*8 Usually under New York law, general provisions such as the ones at issue in this case do not preclude claims for fraud in the inducement. [FN30] This general law, however, does not apply when (1) the transaction at issue is a multi-million dollar transaction executed following negotiations with sophisticated parties and, (2) the complaining party has the opportunity to discover information that would make reliance on such representations unreasonable. [FN31]

> FN30. *See Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597, 598-99 (N.Y.1959) (holding that "the parol evidence rule is not a bar to showing the fraud ... despite an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made"); *Mfrs. Hanover Trust Co. v. Yanakas,* 7 F.3d 310, 315 (2d Cir.1993) (holding that when a contract specifically disclaims existence of or reliance upon certain representations, plaintiff cannot later claim fraudulent inducement based on reliance on those representations).

> FN31. *In re Cinar Corp. Sec. Litig.,* 186 F.Supp.2d 279, 314 (E.D.N.Y.2002); *Emergent Capital Inv. Mgt., LLC v. Stonepath Group, Inc.,* 165 F.Supp.2d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 10

615, 622-23 (S.D.N.Y.2001).

*1. The Parties To The Stock Purchase Agreement
And Unit Purchase Agreement Were Sophisticated
Parties Engaged In A Multi-Million Dollar
Transaction*

The general rule articulated by *Danann Realty Corp.*
does not apply to multi-million dollar transactions
involving sophisticated parties. In *Emergent Capital,*
the plaintiff claimed fraud, following a $2 million
stock purchase, with respect to an oral
representation about the size of a future stock
offering. The plaintiff was a limited liability
company, 90% of which was owned by two
individuals employed by Wall Street firms and
familiar with the securities market. [FN32] Despite
the use of a general integration clause and a
representations and warranties clause that did not
specifically mention the future offering, the court
found that the fraud claim was barred. [FN33] The
court specifically relied on the "sophistication and
knowledge of the parties" and noted that the
plaintiff's initial investment was "a multi-million
dollar transaction executed following negotiations
between sophisticated business people...." [FN34]

> FN32. *Emergent Capital,* 165 F.Supp.2d at
> 619.

FN33. *Id.* at 622-23.

> FN34. *Id.* at 622; *see also In re Cinar
> Corp. Sec. Litig.,* 186 F.Supp.2d at 314
> (citing *Emergent Capital* for an exception
> to the general rule articulated in *Mfrs.
> Hanover Trust* and *Danann Realty Corp.*).

The exception to the general *Danann* rule provided
in *Emergent Capital* applies to the transactions at
issue in the current dispute. The Stock Purchase and
Unit Purchase Agreements were multi-million
dollar transactions negotiated at length by
sophisticated parties that were represented by
counsel. The Stock Purchase Agreement between
Ellipso and Sahagen Satellite Technology Group,
LLC was for the sale of 20,000 shares of Ellipso
common stock for $4.2 million. Similarly, the Unit

Purchase Agreement between Virtual Geo and
Sahagen Satellite Technology Group, LLC was for
the sale of 260 common units of Virtual Geo for
$5.2 million. Moreover, Sahagen Satellite
Technology Group, LLC warranted its "
Sophistication" as an "accredited investor." [FN35]
SST Global's own 30(b)(6) representative has
admitted that Sahagen "is a very prolific investor,"
[FN36] and this court has found Sahagen to be "an
aggressive and apparently successful venture
capitalist." [FN37] Finally, Sahagen was represented
by sophisticated counsel, and also admittedly
engaged in extensive due diligence, including the
hiring of a "technical expert" and the consultation
of Ellipso employees. [FN38]

> FN35. *See* Castiel Parties Reply Br., Ex.
> A. § 3.08; Castiel Parties Reply Br., Ex. B.
> § 3.08.

FN36. SST Global Dep. at 116.

FN37. *VGS, Inc.,* 2000 WL 1277372, at *1.

FN38. SST Global Dep. at 75-78; 32-35.

*2. The Sahagen Parties Had An Opportunity To
Discover Information That Would Make Reliance
On The "Fraudulent" Representations
Unreasonable*

When a complaining party has the opportunity to
discover information that would make reliance on
the alleged representations unreasonable, that party
cannot thereafter take advantage of the *Danann*
rule. [FN39] In *Belin,* when confronted with a
disclaimer clause similar to the ones at issue in this
litigation, the court held that where a representation
about the amount of an insurance policy was
allegedly fraudulent, the allegedly fraudulent
information did not amount to an actionable claim
because the correct information "was readily
ascertainable had [plaintiff] asked to see the
insurance policy prior to closing on his investment ."
[FN40] The current litigation is highly analogous to
the facts and issues of *Belin.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
(Cite as: Not Reported in A.2d)

FN39. *Belin v. Weissler*, 1998 WL 391114, at *5-7 (S.D.N.Y.1998); *Emergent Capital*, 165 F.Supp.2d at 623 (holding that a sophisticated investor " must show that he or she has made an independent inquiry into all available information").

FN40. *Id.*, at *7. *But cf. In re Cinar*, 186 F.Supp. at 285, 314 (holding that a general disclaimer clause was insufficient to defeat a fraud claim based on inflated estimates of the company's financial position as a result of improperly claimed tax credits because there was no way plaintiff could have discovered the improper tax credit).

*9 Here, it is undisputed that before entering into the Agreements Sahagen possessed information, or access to information, that demonstrated that the alleged oral representations made by Castiel were false. SST Global's Rule 30(b)(6) witness testified that Sahagen was well aware, before investing in Ellipso or Virtual Geo, that there were problems with the antenna technology and that Castiel would not seek new management, both in direct contradiction to alleged oral representations that underlie the Sahagen Parties' fraud claims. FN41

FN41. *See* SST Global Dep. at 77-79; 60; 63; 68-69. *Cf. C.P. Kelco U.S., Inc. v. Pharmacia Corp.*, 2002 WL 31230816, at *9-10 (D.Del.2002) (holding that a disclaimer did not preclude claims of fraud between highly sophisticated parties because the plaintiff had no opportunity to discover the alleged fraud before entering into the agreement).

Additionally, in *Belin*, the court held that the plaintiff could not pursue his fraud claim partly because he warranted that he had an opportunity to verify the representations given and could obtain whatever additional information he required. The court held that, "[h]aving explicitly represented that he had an opportunity to verify the accuracy of information provided to him, Belin cannot now be heard to complain that he relied on information that

he declined to verify, although he could have determined the amount of [the insurance policy] simply be asking for a copy of the policy." FN42 Similarly, SST Global warranted in both Agreements that it "conducted a reasonable investigation" of Ellipso and Virtual Geo, and had " received such information ... and ha[d] been given such opportunity to ask such questions of, and receive answers from, representatives of [Ellipso and Virtual Geo], as [SST Global] deems sufficient to make an informed investment decision with respect to the Stock." FN43 Therefore, like the plaintiffs in *Belin* and *Emergent Capital*, the Sahagen Parties cannot take advantage of the *Danann* rule and summary judgment must be granted in favor of the Castiel Parties with regard to fraud claims stemming from statements or omissions that were not warranted in the Agreements. FN44

FN42. *Belin*, 1998 WL 391114, at *8. *See also Emergent Capital*, 165 F.Supp.2d at 623 (finding it relevant that the plaintiff had access to information and executed a warranty that it had the opportunity to ask questions and receive answers from the defendant and to obtain any additional information it thought necessary before entering into the transaction).

FN43. Castiel Parties Reply Br., Ex. A. § 3.09; Castiel Parties Reply Br., Ex. B. § 3.09.

FN44. For the same reasons, the court will enter summary judgment in favor of the Castiel Parties on Counts II and XI of the Sahagen Parties' counterclaims to the extent they allege negligent misrepresentations not warranted in the Agreements. These Counts allege that the same misrepresentations discussed above give rise to a claim for negligent misrepresentation. This is essentially a lesser-included offense of fraud. As already discussed, the integration and merger clauses of the Agreements, in connection with the actions of Castiel and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
(Cite as: Not Reported in A.2d)

> Sahagen prior to executing the
> Agreements, make Counts I and X
> untenable as a matter of law and must also
> make Counts II and XI invalid as a matter
> of law.
>
> Summary judgment must also be granted in
> favor of the Castiel Parties with respect to
> Count V (civil conspiracy) of the Sahagen
> Parties' counterclaim. Since the Sahagen
> Parties are unable to survive a summary
> judgment motion based on their underlying
> claims, a claim for civil conspiracy must
> fail as well.

3. *The Undisputed Facts Show That The Warranties
Provided Regarding The Status Of The FCC
License Were Correct When Sahagen Entered Into
The Stock Purchase Agreement*

The Sahagen Parties argue that Castiel made several
material misrepresentations regarding the status of
Ellipso's FCC license. Specifically, the Sahagen
Parties argue that Castiel misrepresented that (1) the
license was in full force and effect; (2) that MCHI
was in full compliance with the construction and
certification schedules established by the FCC; (3)
that the license was not subject to any limitations
that could subject it to cancellation or revocation;
and (4) that Ellipso was in full compliance and no
further requirements needed to be meet.

The FCC required that construction begin on at
least two satellites by July 1998, and that
construction of the remaining satellites begin by
July 2000. The FCC also required MCHI to report
when those goals were achieved. MCHI entered into
a non-contingent contract with Boeing in June 1998
for the construction of two satellites. This contract
was subsequently amended in November 1998,
February 1999, and June 1999. MCHI reported to
the FCC in June 1998 that it was in compliance with
the July 1998 milestone.

*10 The crux of the Sahagen Parties' claims that
relate to the FCC license is the fact that the FCC
revoked Ellipso's license in May 2001. The Sahagen
Parties argue the FCC found that MCHI abrogated
its contract with Boeing when the November 1998
amendment was executed, resulting in MCHI being

out of compliance with the FCC license and
subjecting its license to revocation. Since this all
occurred before the Sahagen Parties invested in
Ellipso, the argument goes, the Castiel Parties
breached the specific warranties provided in the
Stock Purchase Agreement.

The facts as plainly found by the FCC, however, do
not support the Sahagen Parties' claims. It is true
that the FCC found that the November 1998
amendment required Boeing to develop and submit
a proposal for a re-negotiated contract and forbade
it from performing any other tasks without prior
authorization from MCHI. [FN45] The FCC did not
determine, however, that this amendment resulted in
an abrogation of MCHI's contract with Boeing.
Rather, the FCC determined that *as of June 30, 1999*
-approximately six months after the Sahagen Parties
invested in Ellipso and Virtual Geo-the Boeing
contract was abrogated by amendment. [FN46]

> FN45. *In re Mobile Communications
> Holdings, Inc.,* DA 01-1315, at 3.
>
> FN46. *See id.* at 3 ("It thus appears that
> between June 30, 1999 and October 12,
> 2000 Boeing was under no contractual
> duty to perform satellite construction for
> MCHI"); *see also id.* at 4 ("[MCHI's]
> contract with Boeing for construction of
> two satellites was essentially abrogated on
> June 30, 1999").

A plain reading of the FCC order demonstrates that
there are no genuine issues of material fact related
to Ellipso's warranties of the validity of its FCC
license. The undisputed facts actually support the
conclusion that MCHI and Ellipso were in
compliance with the FCC's milestone and
construction schedule at the time Sahagen invested
in Ellipso and Virtual Geo. [FN47] There being no
genuine issue of material fact, summary judgment in
favor of the Castiel Parties on Counts I and X is
appropriate as no misrepresentations regarding the
FCC license can be shown. [FN48]

> FN47. *See id* at 2 ("MCHI did, in fact,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 13

enter into a two-satellite construction contract with Boeing prior to the first milestone deadline").

FN48. The same misrepresentations are relied on to allege both fraud (Counts I and X) and negligent misrepresentation (II and XI). Because this court has determined there were no misrepresentations whatsoever with respect to the FCC license, summary judgment must be granted as to both the Sahagen Parties' fraud claim and negligent misrepresentation claim to the extent they rely on the FCC license. Because there are no litigable claims based on the FCC license, the Sahagen Parties' civil conspiracy claims (Count V) must fail as well.

B. *The Castiel Parties' Fiduciary Duty Claims Are Derivative And There Is No Evidence That Demand Would Have Been Futile*

1. *The Sahagen Parties' Direct Claims For Breach Of Fiduciary Duty (Counts III And IV) Are Actually Derivative Claims*

In Count III of their cross-counterclaim, the Sahagen Parties allege a direct claim for breach of the fiduciary duty of loyalty against Castiel. [FN49] This Count alleges as follows:

> FN49. Count IV asserts alleges that Ellipso and MCHI aided and abetted this breach of fiduciary duty.

Castiel breached his fiduciary duties to SST Global by, among other things, diverting company funds (including SST Global's investments) to his own use, causing the company to pay for expenses which had no relationship to company business, engaging in acts of misfeasance and nonfeasance constituting gross negligence, wasting and depleting the cash and other assets of the company, and misrepresenting or failing to disclose material facts regarding Virtual Geo LLC's business and finances.

FN50

> FN50. Second Amended Reply, Answer, and Counterclaims of Peter D. Sahagen and SST Global, LLC at ¶ 79.

Essentially, the Sahagen Parties' claim appears to be nothing more than a claim for waste, mismanagement, and self-dealing. Such a claim is clearly derivative in nature and not a direct claim as the Sahagen Parties maintain. In deciding whether a claim is derivative or individual, a court looks to the "nature of the wrong alleged [not] the plaintiff's characterization of the claim in the complaint ." [FN51] To maintain a direct lawsuit, the injury alleged must affect a stockholder alone or affect a particular stockholder right "such as his preemptive rights as a stockholder, rights involving control of the corporation, or a wrong affecting the stockholders and not the corporation." [FN52] For these reasons, "claims of waste and self-dealing ... have been held to be derivative and not individual." [FN53] Thus, it is clear that the "individual" claims the Sahagen Parties assert are more appropriately characterized as derivative claims that are brought on Virtual Geo's behalf.

> FN51. *Kramer v. Western Pac. Indus., Inc.*, 546 A.2d 348, 352 (Del.1988).
>
> FN52. *In re Paxon Comm. Corp. S'holders. Litig.*, 2001 WL 812028, at *3 (Del.Ch. July 12, 2001).
>
> FN53. *In re Rexene Corp. S'holders. Litig.*, 1991 WL 77529, at *3 (Del.Ch. May 8, 1991); *Kramer*, 546 A.2d at 353 ("A claim of mismanagement resulting in corporate waste, if proven, represents a direct wrong to the corporation that is indirectly experienced by all shareholders.... Thus, the wrong alleged is entirely derivative in nature.").

*11 Responding to the Castiel Parties' arguments that Count III alleges solely derivative claims, the Sahagen Parties attempt in their answering brief to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
(Cite as: Not Reported in A.2d)

assert new breach of fiduciary duty claims that are more individual in nature. [FN54] These new claims are permitted, according to the Sahagen Parties, because "[i]n his Counterclaims, Sahagen expressly states that Castiel's breaches include but are not limited to the breaches expressly enumerated therein." [FN55] In fact, this argument is based solely on the fact that Count III contains the words " among other things" when describing Castiel's alleged breaches of fiduciary duty. The court cannot permit a party, upon recognition that its original allegation standing alone cannot survive summary judgment as a direct claim, to assert for the first time in its answering brief new claims based solely on a clause containing the phrase "among other things." Therefore, the court will consider Count III, and the allegations set forth therein, as derivative in nature, requiring proof that demand would have been futile before permitting an individual stockholder to bring such a claim. The same is true for Count VIII, which explicitly alleges against the Castiel Parties a derivative claim for breach of fiduciary duty on behalf of Virtual Geo.

> FN54. See Sahagen Parties Ans. Br. at 38 ( "Castiel also breached their [sic] fiduciary duties to keep Sahagen adequately informed about the business of Virtual Geo, failed to provide him with books and records, failed to hold meetings, and failed to protect the value of his investment").

FN55. Id.

2. The Sahagen Parties Have Failed To Establish A Genuine Issue Of Material Fact As To Whether Demand Would Have Been Futile

The right of a member of a Delaware LLC to bring a derivative claim is governed by 6 Del. C. § 18-1000, which provides:
A member or an assignee of a limited liability company interest may bring an action in the Court of Chancery in the right of a limited liability company to recover a judgment in its favor if managers or members with authority to do so have refused to bring the action or if an effort to cause those managers or members to bring the action is

not likely to succeed. [FN56]

> FN56. Emphasis added.

This provision originates from the well-developed body of Delaware law governing derivative suits by stockholders of a corporation. Accordingly, case law governing corporate derivative suits is equally applicable to suits on behalf of an LLC. [FN57]

> FN57. See Gotham Partners, L.P. v. Hallwood Realty Partners, L.P., 1998 WL 832631, at *5 n. 14 (Del.Ch. Nov.10, 1998) ("The derivative suit is a corporate action grafted onto the limited partnership form, and I look to corporate precedent to distinguish between limited partnership derivative actions and direct limited partner claims").

The Sahagen Parties concede that no demand was made of Virtual Geo's board. [FN58] Under Delaware law, an individual plaintiff can only bring a derivative claim against an LLC without first making a demand of the board if such demand would have been futile. [FN59] A demand is considered futile when a reasonable doubt exists as to whether "(a) the [managers] were disinterested or independent, [or] (b) the challenged transaction was the product of a valid exercise of business judgment. " [FN60] The presence of either situation excuses the lack of a demand. [FN61]

> FN58. See Sahagen Parties Ans. Br. at 34.

> FN59. See 6 Del. C. § 18-1001; Rales v. Blasband, 634 A.2d 927, 932 (Del.1993) (" Because directors are empowered to manage, or direct the management of, the business and affairs of a corporation, the right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have refused or where demand is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 15

excused because the directors are
incapable of making an impartial decision
regarding such litigation").

FN60. *Aronson v. Lewis,* 473 A.2d 805,
814 (Del.1984).

FN61. *See Brehm v. Eisner,* 749 A.2d 244,
256 (Del.2000) ("These prongs [of the
*Aronson* test for determining whether
demand is excused] are in the disjunctive.
Therefore if either prong is satisfied,
demand is excused.").

Both the Castiel Parties and the Sahagen Parties
concede that the sole issue relating to whether
demand on the Virtual Geo board would have been
futile depends on whether Ambassador (Ret.)
Gerald Helman would be disinterested and
independent in a demand made by. Sahagen to
pursue litigation against Castiel for breach of
fiduciary duty. This is because Castiel and Sahagen
are the other two members of Virtual Geo's
three-person Board of Managers. To support their
argument that Helman was not disinterested or
independent, the Sahagen Parties argue that Helman
"is entirely dependent upon Castiel because his only
other employment is as an officer in Ellipso, which
Castiel controls." FN62 The Sahagen parties also
allege beholdeness on the part of Helman because
he and Castiel are close friends. FN63 In the same
breath, however, the Sahagen Parties argue that
Helman is beholden to Castiel because Helman
once before acted to remove Castiel from a position
of authority at Ellipso and Castiel terminated
Helman. Helman is now allegedly afraid of similar
reprisals. These arguments are all insufficient to
satisfy the requirement that individual plaintiffs
demonstrate futility before bringing a derivative
claim on behalf of an LLC.

FN62. Sahagen Parties Ans. Br. at 36.

FN63. *Id.* at 37.

*12 It may be true that Helman's sole *employment* is
as an officer of Ellipso, but this misses the point
that Helman has other substantial sources of *income.*

In his sworn affidavit, Helman stated that "I am not
dependent on my Ellipso salary. My Ellipso salary
is a supplement to my chief source of income. I am
retired from a senior position in the Foreign Service
of the Department of State and am receiving a full
annuity that includes medical and other benefits."
FN64 The Sahagen Parties' second claim that
because they are friends Helman is incapable of
initiating a suit against Castiel, is defeated by their
third claim that argues Helman has opposed Castiel,
to the point that Castiel chose to fire Helman, at
times prior to this litigation. Clearly their friendship
has not stood in the way of their past business
dealings and there is no reason to think that it
should in the future. Finally, the Sahagen Parties'
third contention does not prove that Helman is
beholden to Castiel. If anything, this argument
supports an inference that Helman is not beholden
to Castiel. The very fact that Helman supposedly
was willing to risk his job to vote his conscience,
and against Castiel, in the past demonstrates that he
is not beholden to Castiel and is willing to vote
against him again should the situation call for it.

FN64. Helman Aff. ¶ 2.

For all these reasons, the court will grant summary
judgment in favor of the Castiel Parties on Counts
III, IV, and VIII of the Sahagen Parties'
counterclaim for failure to seek demand and an
inability to demonstrate that such demand would
have been futile. FN65

FN65. The court will allow the Sahgen
Parties to re-file their derivative action if
demand is made and it is wrongfully
refused.

*C. Summary Judgment Should Be Entered Against
Sahagen And Quinn For Breach Of Their Duty Of
Loyalty*

Count II of the complaint of Virtual Geo and Count
II of the Castiel Parties' counterclaims allege that
Sahagen and Quinn breached their duty of loyalty
when, in the context of a merger, they attempted to
wrest control of Virtual Geo from Castiel without

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00867-JJF   Document 34   Filed 03/21/2006   Page 22 of 61

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
(Cite as: Not Reported in A.2d)

his consent. Then-Vice Chancellor Steele, in a trial
on a corporate governance issue, has already held
that Sahagen and Quinn "owed a duty of loyalty to
[Virtual Geo], its investors and Castiel, their fellow
manager," and "that the actions of Sahagen and
Quinn, in their capacity as managers constituted a
breach of their duty of loyalty." FN66 This
holding, according to the Castiel Parties, is the "law
of the case" and, consequently, summary judgment
should be entered in favor of the Castiel Parties on
Count II of their counterclaims. FN67

> FN66. *VGS, Inc. v. Castiel,* 2000 WL
> 1277372, at *4, *5. *See also VGS, Inc. v.
> Castiel,* 2001 WL 1154430, at *1 (Del.Ch.
> Sept.25, 2001) ("In his August 31, 2000
> decision, then Vice Chancellor Steele
> found that Peter Sahagen and Tom Quinn
> breached their duty of loyalty when they
> secretly executed a written consent to the
> merger of [Virtual Geo] with and into
> VGS, Inc., for the purpose of eliminating
> the majority control over the enterprise of
> the third manager, David Castiel").

> FN67. *See Kenton v. Kenton,* 571 A.2d
> 778, 784 (Del.1990) ("The 'law of the case
> ' is established when a specific legal
> principle is applied to an issue presented
> by facts which remain constant throughout
> the subsequent course of the same litigation
> ") (citation omitted).

The doctrine of "law of the case" is not a hard and
fast rule, however. FN68 The Delaware Supreme
Court has stated that "[t]he law of the case doctrine
is not inflexible in that, unlike *res judicata,* it is not
an absolute bar to reconsideration of a prior
decision that is clearly wrong, produces an injustice,
or should be revisited because of changed
circumstances." FN69 The Sahagen Parties urge
this court not to apply the "law of the case" doctrine
because to do so would "create an injustice." FN70

> FN68. *See Gannett Co., Inc. v. Kanaga,*
> 750 A.2d 1174, 1181 (Del.2000).

FN69. *Id.* (citations omitted).

FN70. Sahagen Parties Ans. Br. at 39.

*13 The court does find that any such injustice
would occur if the "law of the case" doctrine were
applied only with respect to whether or not a breach
of the duty of loyalty occurred. There have been no
changed circumstances since then-Vice Chancellor
Steele issued his opinion. It also was not clearly
wrong since the Delaware Supreme Court has
subsequently affirmed the decision. FN71 Thus,
the court concludes that the "law of the case"
doctrine does apply to the current facts, and
Sahagen and Quinn will be held to have breached
their duty of loyalty. Otherwise, the Castiel Parties
would be forced to call witnesses to testify about
what happened with respect to the attempted
merger-testimony with which this court is all too
familiar. Any such requirement would be redundant
and serve to waste this court's time.

FN71. *VGS, Inc.,* 781 A.2d 696 (Del.2001).

The Sahagen Parties argue that even if the "law of
the case" is applied to Sahagen's and Quinn's
breaches, important issues remain for trial as to
questions of cause in fact, proximate cause,
damages, setoff, comparative fault, estoppel,
unclean hands, and contribution. The Castiel Parties
do not disagree. FN72 Accordingly, the court will
only grant summary judgment on Count II of the
Castiel Parties' complaints to the extent that the "
law of the case" doctrine instructs this court to find
that Sahagen and Quinn breached their fiduciary
duty of loyalty.

> FN72. *See* Castiel Parties Reply Br. at
> 9-10.

## VI.

For the foregoing reasons, summary judgment is
granted in favor of the Castiel Parties on the
Sahagen Parties' cross-counterclaim, except as to
Count IX of that counterclaim. Summary judgment
is granted in part in favor of the Castiel Parties on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Count II of its counterclaim to the extent that the
court finds that Quinn and Sahagen breached their
duty of loyalty. The parties shall consult and present
a conforming order within 10 days of this opinion.

Del.Ch.,2003.
VGS, Inc. v. Castiel
Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3

Case 1:05-cv-00867-JJF    Document 34    Filed 03/21/2006    Page 25 of 61

Westlaw.

Page 1

Blue Sky Law
Database updated November 2005

Joseph C. Long
Chapter 4 Conflict of Laws Or, When Does a Transaction Take Place in This State?
VI Choice of Laws Clauses

References

§ 4:55 Generally--Clauses are void--Clauses void as against public policy

It is generally recognized that the courts will honor a choice of laws clause.[FN1] However, the power of the parties to select a particular state's laws to govern is not absolute.[FN2] The Restatement (Second), Conflict of Laws recognizes two limitations on this power. First, the state whose law is selected must have a substantial relationship to the parties.[FN3] Second, the application of the law of the selected state may not be "contrary to a fundamental policy of a state which has a materially greater interest" than the state selected.[FN4] In support of this position, the Restatement states:

Fulfillment of the parties' expectation is not the only value in contract law; regard must also be had for state interest and state regulation. The chosen law should not be applied without regard for the interests of the state which would be the state of the applicable law ... in absence of an effective choice by the parties. ... Application of the chosen law will be refused ... to protect a fundamental policy of the state which ... would be the otherwise applicable law. ...[FN5]

Some seven cases[FN6] have considered the public policy issue in connec tion with the state securities acts.[FN7] All have concluded that the public policy of the state where the investor was located at the time of either the offer or the sale as expressed in its securities act invalidates any choice of laws clause.

The trend here was established in Boehnen v. Walston & Co., Inc.[FN8] The facts of Boehnen are typical of most of these cases. Boehnen claimed the stocks purchased from Walston & Co. were not registered in South Dakota, where he was located at the time of sale.[FN9] The broker's standard customer agreement provided that New York law should govern.[FN10] In rejecting the defendants' argument that New York law controlled, the court stated:

[A]stipulation by which the parties select the law to govern the contact is valid and will be given effect only if it is not contrary to public policy generally, or to the public policy of the forum, ... or in violation of a statute of the forum enacted for the protection of its citizens ...

The purpose of the South Dakota Blue Sky Laws is to protect the public.[FN11] To permit the choice of law stipulation in question to control the determination of whether or not South Dakota law will apply, would be to provide an effective means of circumventing legislation designed to protect the citizens of South Dakota. This would clearly be against public policy.[FN12]

Shortly after Boehnen, the Iowa federal district court in Getler v. R. G. Dickinson Co.,[FN13] addressed the same issue under the Iowa statute. It concluded:

Ordinarily, choice of laws provisions in contracts are valid except where they are contrary to State public policy. In the present case, we have a protective statute for purchasers of securities in the State of Iowa. This Court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

concludes as a matter of law that under the circumstance of this cause of action that the plaintiffs did not waive the protection of the Iowa Securities Act.[FN14]

Most recently the Kansas court in Benner v. Oppenheimer & Co., Inc.,[FN15] the court invalidated a New York choice of laws clause as violating Kansas public policy. It said:

It seems clear to this court that a strong public policy in favor of rigid governmental regulation of the sale of securities and the protection of investors exists and has been thoroughly established in both statutory and case law.[FN16]

[FN1] See e.g., Brenner v. Oppenheimer & Co., Inc., 44 P.3d 364 (Kan.Apr. 19, 2002). Rest.(2d) Conflict of Laws § 187(1) (1969) states:

The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

See also,Wehe v. Montgomery, 711 F.Supp. 1035, Fed. Sec. L. Rep. (CCH) ¶94,527, (D.Ore. 1989) (court assumes without discussion that New York choice of law clause is valid).

[FN2] Rest. (2d) Conflict of Laws § 187(2) (1969).

[FN3] Rest. (2d) Conflict of Laws § 187(2)(a) (1969).

[FN4] Rest. (2d) Conflict of Laws § 187(2)(b) (1969). See also, State ex re. Geil v. Corcoran, 623 S.W.2d 557 (Mo. App. 1981).

[FN5] Rest. (2d) Conflict of Laws § 187, Comment g (1967). The comment makes clear that the reaching of a contrary result is not of itself a violation of a state's fundamental policy. But it is a factor to consider whether there is a conflict between the laws of two states, so that the court has to go through a conflict of laws analysis. Brenner v. Oppenheimer & Co., Inc., 44 P.3d 364 (Kan.Apr. 19, 2002).

[FN6] In re Infocure Securities Litigation, 210 F. Supp. 2d 1331 (N.D. Ga. 2002); Getter v. R.G. Dickinson & Co., 366 F.Supp. 559 (S.D. Iowa 1973); Boehnen v. Walston & Co., Inc., 358 F.Supp. 537, Blue Sky L. Rep. (CCH) ¶71,098 (D.S.D. 1973); Alberts v. Davis, 1978 U.S. Dist. LEXIS 15207 (N.D. Ga. 1978); Hall v. Superior Court, 150 Cal. App.3d 411, 197 Cal.Rptr. 757, Blue Sky L. Rep. (CCH) ¶71,929 (4th Dist.1983); Brenner v. Oppenheimer & Co., Inc., 44 P.3d 364 (Kan. 2002); Ito Corp. v. Prescott, Inc., 83 Wash.App. 282, 921 P.2d 566, Blue Sky L. Rep. (CCH) ¶74,127 (1996).

[FN7] This may present a problem when the issue is presented to a federal rather than a state court. A federal court, when sitting in diversity of citizenship or exercising pendent jurisdiction over state law claims, must apply the conflict rules of the jurisdiction wherein the court sits. Klaxon Co. v. Stentor Electric Mfg., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Shearson Lehman Bros., Inc. v. M&L Investments, 10 F.3d 1510, Fed. Sec. L. Rep. (CCH) ¶98,050 (10th Cir. 1993). If, under the local conflicts rule, the state courts would determine which state had the primary interest in the transaction and apply that state's conflict rule and public policy as to when such rule could be voided, then the federal court should follow the lead of the state court. Shearson Lehman Bros. Inc. v. M&L

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Investments, 10 F.3d 1510, Fed. Sec. L. Rep. (CCH) ¶98,050 (10th Cir. 1993). Thus, in Shearson Bros., the court should have looked to Utah for its basic conflicts rule and not at Utah's substantive law as to whether a choice of laws clause would be voided. Utah's conflict rule indicated that law of the state with the greatest interest should control. Then the substantive law of that state would determine whether the choice of laws clause was valid.

The court in WTM, Inc. v. Henneck, 125 F.Supp.2d 864 (N.D. Ill. 2000), missed this two step process. It correctly held that it must follow the Illinois law. Rather than determining under the Illinois conflict rule which state's substantive law should apply, it incorrectly applied Illinois substantive law. It reached the obvious conclusion that it did not offend Illinois' public policy not to enforce the non-waiver provision of the Minnesota Securities Act. Assuming that Minnesota was the state with the greatest interest in the transaction, Minnesota law should have controlled whether the choice of laws clause would be recognized. The non-waiver provision in its securities act clearly established that such clause should not be enforced.

[FN8] Boehnen v. Walston & Co., Inc., 358 F.Supp. 537, Blue Sky L. Rep. (CCH) ¶71,098 (D.S.D. 1973).

[FN9] It was also his state of residence.

[FN10] The agreement provided in part: "The provisions of this agreement shall in all respects be construed according to, and the rights and liabilities of the parties hereto shall in all respects be governed by, the laws of the State of New York."

[FN11] [Author's note] Citation omitted.

[FN12] Boehnen v. Walston & Co., Inc., 358 F.Supp. 537, at 540-541, Blue Sky L. Rep. (CCH) ¶71,098 (D.S.D. 1973). See also Alberts v. Davis, 1978 U.S. Dist. LEXIS 15207 at *19 (N.D. Ga. 1978).

[FN13] Getter v. R.G. Dickinson & Co., 366 F.Supp. 559 (S.D. Iowa 1973). See also, Paracor Fin., Inc. v. General Electric Capital Corp., 96 F.3d 1151, Blue Sky L. Rep. (CCH) ¶74,088, Fed. Sec. L. Rep. (CCH) ¶99,315 (9th Cir. 1996).

[FN14] Getter v. R.G. Dickinson & Co., 366 F.Supp. 559, at 575 (S.D. Iowa 1973). See also, In re Infocure Securities Litigation, 210 F. Supp. 2d 1331 (N.D. Ga. 2002); Hall v. Superior Court, 150 Cal. App.3d 411, 197 Cal.Rptr. 757, Blue Sky L. Rep. (CCH) ¶71,929 (4th Dist.1983).

[FN15] Brenner v. Oppenheimer & Co., Inc., 44 P.3d 364 (Kan. 2002).

[FN16] Brenner v. Oppenheimer & Co., Inc., 44 P.3d 364 (Kan. 2002).

© 2005 Thomson/West

SECBLUE § 4:55

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

Next Part

REST 2d CONFL s 187
Restatement (Second) of Conflict of Laws § 187 (1971)

Restatement of the Law -- Conflict of Laws
Restatement (Second) of Conflict of Laws
Current through June 2005
Copyright © 1971-2006 by the American Law Institute

Chapter 8. Contracts
Topic 1. Validity Of Contracts And Rights Created Thereby
Title A. General Principles

§ 187. Law Of The State Chosen By The Parties

1988 Revision
Link to Case Citations

**(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement**
**directed to that issue.**

**(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either**

**(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or**

**(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.**

**(3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.**

#### Comment:

*a. Scope of section.* The rule of this Section is applicable only in situations where it is established to the satisfaction of the forum that the parties have chosen the state of the applicable law. When the parties have made such a

choice, they will usually refer expressly to the state of the chosen law in their contract, and this is the best way of insuring that their desires will be given effect. But even when the contract does not refer to any state, the forum may nevertheless be able to conclude from its provisions that the parties did wish to have the law of a particular state applied. So the fact that the contract contains legal expressions, or makes reference to legal doctrines, that are peculiar to the local law of a particular state may provide persuasive evidence that the parties wished to have this law applied.

On the other hand, the rule of this Section is inapplicable unless it can be established that the parties have chosen the state of the applicable law. It does not suffice to demonstrate that the parties, if they had thought about the matter, would have wished to have the law of a particular state applied.

#### Illustration:

1. A contract, by its terms to be performed in state Y, is entered into in state X between A, a domiciliary of X, and B, a domiciliary of Y. The contract recites that the parties "waive restitution in integrum in case of laesio enormis." These notions are foreign to X local law. They exist, on the

other hand, in Y local law which furthermore empowers the parties to waive such
right of restitution. A court could properly find on these facts that the parties wished to have Y
local law applied.

## Comment:

*b. Impropriety or mistake.* A choice-of-law provision, like any other contractual provision, will not
be given effect if the consent of one of the parties to its inclusion in the contract was obtained by
improper means, such as by misrepresentation, duress, or undue influence, or by mistake. Whether
such consent was in fact obtained by improper means or by mistake will be determined by the forum
in accordance with its own legal principles. A factor which the forum may consider is whether the
choice-of-law provision is contained in an "adhesion" contract, namely one that is drafted unilaterally
by the dominant party and then presented on a "take-it-or-leave-it" basis to the weaker party who
has no real opportunity to bargain about its terms. Such contracts are usually prepared in printed
form, and frequently at least some of their provisions are in extremely small print. Common examples
are tickets of various kinds and insurance policies. Choice-of-law provisions contained in such
contracts are usually respected. Nevertheless, the forum will scrutinize such contracts with care and
will refuse to apply any choice-of-law provision

they may contain if to do so would result in substantial injustice to the adherent.

## Illustrations:

2. A presents to B for signature a contract which embodies the terms of their prior agreement
but which also provides that the rights of the parties under the contract shall be governed by the
law of state X. A does not wish B to know of the provision calling for application of X law and
therefore says that there is no reason for B to read the contract since it does no more than set
forth their earlier agreement. B signs the contract without reading it in reliance upon A's word.
The forum will not give effect to the provision calling for application of X law.

3. In state X, A buys from the B company a ticket on one of B's steamships for transportation
from X to state Y. The ticket recites that it shall be governed by Y law and also contains a
provision stating that B shall not be liable for injuries resulting from the negligence of its servants.
The latter provision is valid under Y local law, but invalid under that of X. In the course of the
voyage, A is injured through the negligence of B's servants. A brings suit to recover for his
injuries against B in state Z. In determining whether or not to

give effect to the choice-of-law provision, the Z court will give consideration to the fact that
the contract was drafted unilaterally by B, the dominant party, and then presented to A on a
"take-it-or-leave-it" basis.

## Comment on Subsection (1):

*c.* Issues the parties could have determined by explicit agreement directed to particular issue. The
rule of this Subsection is a rule providing for incorporation by reference and is not a rule of choice of
law. The parties, generally speaking, have power to determine the terms of their contractual
engagements. They may spell out these terms in the contract. In the alternative, they may
incorporate into the contract by reference extrinsic material which may, among other things, be the
provisions of some foreign law. In such instances, the forum will apply the applicable provisions of the
law of the designated state in order to effectuate the intentions of the parties. So much has never
been doubted. The point deserves emphasis nevertheless because most rules of contract law are
designed to fill gaps in a contract which the parties could themselves have filled with express
provisions. This is generally true, for example, of rules relating to construction, to conditions
precedent and subsequent, to sufficiency of performance and to excuse for nonperformance,

including questions of frustration and impossibility. As to all such matters, the forum will apply the
provisions of the chosen law.

Whether the parties could have determined a particular issue by explicit agreement directed to
that issue is a question to be determined by the local law of the state selected by application of the
rule of § 188. Usually, however, this will be a question that would be decided the same way by the
relevant local law rules of all the potentially interested states. On such occasions, there is no need for
the forum to determine the state of the applicable law.

**Illustrations:**

4. In State X, A establishes a trust and provides that B, the trustee, shall be paid commissions at the highest rate permissible under the local law of state Y. A and B are both domiciled in X, and the trust has no relation to any state but X. In X, the highest permissible rate of commissions for trustees is 5 per cent. In Y, the highest permissible rate is 4 per cent. The choice-of-law provision will be given effect, and B will be held entitled to commissions at the rate of 4 per cent.

5. Same facts as in Illustration 4 except that the highest permissible rate of
commissions in X is 4 per cent and in Y is 5 per cent. Effect will not be given to the choice-of-law provision since under X local law the parties lacked power to provide for a rate of commissions in excess of 4 per cent and Y, the state of the chosen law, has no relation to the parties or the trust.

**Comment on Subsection (2):**

*d.* Issues the parties could not have determined by explicit agreement directed to particular issue. The rule of this Subsection applies only when two or more states have an interest in the determination of the particular issue. The rule does not apply when all contacts are located in a single state and when, as a consequence, there is only one interested state. Subject to this qualification, the rule of this Subsection applies when it is sought to have the chosen law determine issues which the parties could not have determined by explicit agreement directed to the particular issue. Examples of such questions are those involving capacity, formalities and substantial validity. A person cannot vest himself with contractual capacity by stating in the contract that he has such capacity. He cannot dispense with formal requirements, such as that of a writing, by agreeing with the other party that the contract shall be binding without them. Nor can he by a similar device avoid issues of substantial

validity, such as whether the contract is illegal. Usually, however, the local law of the state chosen by the parties will be applied to regulate matters of this sort. And it will usually be applied even when to do so would require disregard of some local provision of the state which would otherwise be the state of the applicable law.

Permitting the parties in the usual case to choose the applicable law is not, of course, tantamount to giving them complete freedom to contract as they will. Their power to choose the applicable law is subject to the two qualifications set forth in this Subsection (see Comments *f-g*).

*e. Rationale.* Prime objectives of contract law are to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract. These objectives may best be attained in multistate transactions by letting the parties choose the law to govern the validity of the contract and the rights created thereby. In this way, certainty and predictability of result are most likely to be secured. Giving parties this power of choice is also consistent with the fact that, in contrast to other areas of the law, persons are free within broad limits to determine the nature of their contractual obligations.

An objection sometimes made in the past was that to give the parties this power of choice would be tantamount to making legislators of them. It was argued

that, since it is for the law to determine the validity of a contract, the parties may have no effective voice in the choice of law governing validity unless there has been an actual delegation to them of legislative power. This view is now obsolete and, in any event, falls wide of the mark. The forum in each case selects the applicable law by application of its own choice-of-law rules. There is nothing to prevent the forum from employing a choice-of-law rule which provides that, subject to stated exceptions, the law of the state chosen by the parties shall be applied to determine the validity of a contract and the rights created thereby. The law of the state chosen by the parties is applied, not because the parties themselves are legislators, but simply because this is the result demanded by the choice-of-law rule of the forum.

It may likewise be objected that, if given this power of choice, the parties will be enabled to escape prohibitions prevailing in the state which would otherwise be the state of theempplicable law. Nevertheless, the demands of certainty, predictability and convenience dictate that, subject to some limitations, the parties should have power to choose the applicable law.

On occasion, the parties may choose a law that would declare the contract invalid. In such situations, the chosen law will not be applied by reason of the parties' choice. To do so would defeat the expectations of the parties which it is the purpose of the present rule to protect. The parties can

be

assumed to have intended that the provisions of the contract would be binding upon them (cf. §
188, Comment *b*). If the parties have chosen a law that would invalidate the contract, it can be
assumed that they did so by mistake. If, however, the chosen law is that of the state of the otherwise
applicable law under the rule of § 188, this law will be applied even when it invalidates the contract.
Such application will be by reason of the rule of § 188, and not by reason of the fact that this was the
law chosen by the parties.

## Illustrations:

6. In state X, P and D initial an agreement which calls for performance in state Y. The contract
states that the rights of the parties thereunder shall be determined by Y law. In X, P sues D for
breach of the contract, and D defends on the ground that the contract is void under the X statute
of frauds, since it was not signed by him. The contract, however, is valid under Y local law. The X
court will find for P.

7. H and W, husband and wife, are domiciled in state X. In state Y, W enters into a contract
with C, who is domiciled and doing business in that state, in which C agrees to sell goods to H on
credit in return for a guaranty from W in

the amount of $1,000.00. The contract recites that it shall be governed by X law. Under the
local law of X, married women have full contractual capacity. Under the local law of Y, however,
they lack capacity to bind themselves as sureties for their husbands. In an action by C against W,
the contract will not be held invalid for lack of contractual capacity on the part of W.

8. A executes and delivers to B in state X an instrument in which A agrees to indemnify B
against all losses arising from B's liability on a certain appeal bond on behalf of C, against whom a
judgment has been rendered in state Y. The instrument recites that it shall be governed by the
law of Y. It is valid and enforceable under the local law of Y but is unenforceable for lack of
consideration under the local law of X. In an action by B against A, the instrument will not be held
invalid for lack of consideration.

## Comment:

*f. Requirement of reasonable basis for parties' choice.* The forum will not apply the chosen law to
determine issues the parties could not have determined by explicit agreement directed to the
particular issue if the parties had no reasonable basis for choosing this law. The forum will not, for
example, apply a foreign law which has been chosen by the parties in the spirit of adventure

or to provide mental exercise for the judge. Situations of this sort do not arise in practice.
Contracts are entered into for serious purposes and rarely, if ever, will the parties choose a law
without good reason for doing so.

When the state of the chosen law has some substantial relationship to the parties or the contract,
the parties will be held to have had a reasonable basis for their choice. This will be the case, for
example, when this state is that where performance by one of the parties is to take place or where
one of the parties is domiciled or has his principal place of business. The same will also be the case
when this state is the place of contracting except, perhaps, in the unusual situation where this place
is wholly fortuitous and bears no real relation either to the contract or to the parties. These situations
are mentioned only for purposes of example. There are undoubtedly still other situations where the
state of the chosen law will have a sufficiently close relationship to the parties and the contract to
make the parties' choice reasonable.

The parties to a multistate contract may have a reasonable basis for choosing a state with which
the contract has no substantial relationship. For example, when contracting in countries whose legal
systems are strange to them as well as relatively immature, the parties should be able to choose a
law on the ground that they know it well and that it is sufficiently developed. For

only in this way can they be sure of knowing accurately the extent of their rights and duties under
the contract. So parties to a contract for the transportation of goods by sea between two countries
with relatively undeveloped legal systems should be permitted to submit their contract to some well-
known and highly elaborated commercial law.

*g.* When application of chosen law would be contrary to fundamental policy of state of otherwise
applicable law. Fulfillment of the parties' expectations is not the only value in contract law; regard
must also be had for state interest and for state regulation. The chosen law should not be applied

without regard for the interests of the state which would be the state of the applicable law with respect to the particular issue involved in the absence of an effective choice by the parties. The forum will not refrain from applying the chosen law merely because this would lead to a different result than would be obtained under the local law of the state of the otherwise applicable law. Application of the chosen law will be refused only (1) to protect a fundamental policy of the state which, under the rule of § 188, would be the state of the otherwise applicable law, provided (2) that this state has a materially greater interest than the state of the chosen law in the determination of the particular issue. The forum will apply its own legal principles in determining whether a given policy is a fundamental one within the meaning of the present

rule and whether the other state has a materially greater interest than the state of the chosen law in the determination of the particular issue. The parties' power to choose the applicable law is subject to least restriction in situations where the significant contacts are so widely dispersed that determination of the state of the applicable law without regard to the parties' choice would present real difficulties.

No detailed statement can be made of the situations where a "fundamental" policy of the state of the otherwise applicable law will be found to exist. An important consideration is the extent to which the significant contacts are grouped in this state. For the forum will be more inclined to defer to the policy of a state which is closely related to the contract and the parties than to the policy of a state where few contacts are grouped but which, because of the wide dispersion of contacts among several states, would be the state of the applicable law if effect were to be denied the choice-of-law provision. Another important consideration is the extent to which the significant contacts are grouped in the state of the chosen law. The more closely this state is related to the contract and to the parties, the more likely it is that the choice-of-law provision will be given effect. The more closely the state of the chosen law is related to the contract and the parties, the more fundamental must be the policy of the state of the otherwise applicable law to justify denying

effect to the choice-of-law provision.

To be "fundamental," a policy must in any event be a substantial one. Except perhaps in the case of contracts relating to wills, a policy of this sort will rarely be found in a requirement, such as the statute of frauds, that relates to formalities (see Illustration 6). Nor is such policy likely to be represented by a rule tending to become obsolete, such as a rule concerned with the capacity of married women (see Illustration 7), or by general rules of contract law, such as those concerned with the need for consideration (see Illustration 8). On the other hand, a fundamental policy may be embodied in a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power. Statutes involving the rights of an individual insured as against an insurance company are an example of this sort (see §§ 192-193). To be "fundamental" within the meaning of the present rule, a policy need not be as strong as would be required to justify the forum in refusing to entertain suit upon a foreign cause of action under the rule of § 90.

**Illustrations:**

9. In state X, A and B, who are both domiciled in that state, negotiate the
terms of a contract which is to be performed in X. The contract provides that it shall be governed by the law of state Y; it is signed first by A in X and then by B in Y. A suit involving the validity of the contract is brought before a court of state Z. The court will be more inclined to deny effect to the choice-of-law provision in deference to X policy than it would have been if the elements had not been massed to so great an extent in X.

10. In state X, the A insurance company issues a life insurance policy insuring the life of B. A is incorporated and has its "home office" in X while B is domiciled in state Y. The policy contains a provision stating that the rights of the parties thereunder shall be determined by X law. In his application for the policy, given by B to A's agent in Y, B made a misstatement which under the local law of X would serve as a complete defense to the insurer in a suit on the policy, but would not have this effect under a statute of Y. B brings suit on the policy in a court in state Z. Under the rule of § 192, Y is the state whose local law would govern the validity of the contract in the absence of an effective choice of law by the parties. The Z court will deny effect to the choice-of-law provision.

**Comment on Subsection (3):**

# EXHIBIT 5

LEXSEE 1978 U.S. DIST. LEXIS 15207

NETTIE ALBERTS and MURRAY ALBERTS, Plaintiffs, v. BRUCE R. DAVIS,
SECURITY MANAGEMENT CO., INC., SECURITY INVESTMENT PROPERTIES,
INC., WILLARD SECURITIES, INC., WILLARD PROPERTIES CORPORATION, AL
WILLARD, WILLARD MALKAN and GREENGATE PARTNERS ASSOCIATES,
Defendants and Third-Party Plaintiffs, v. GEORGE BERENSON, Third-Party
Defendant

CIVIL ACTION No. C75-2483A

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
GEORGIA, ATLANTA DIVISION

*1978 U.S. Dist. LEXIS 15207*

September 29, 1978, Decided

September 29, 1978, Filed

**CORE TERMS:** summary judgment, third-party, seller, exemption, partnership, investor, resident, misrepresentations, purchaser, omission, lawsuit, materiality, prevail, notice, matter of law, registered, blue-sky, discover, general partner, partner, purchasing, signature, Securities Act, present claim, federal claim, diligence, exercise of reasonable care, notice requirement, leave to withdraw, motion to compel

**JUDGES:** [*1] EDENFIELD

**OPINIONBY:** NEWELL EDENFIELD

**OPINION:**

ORDER

This securities action is before the court on plaintiffs' motion for summary judgment, defendants Willard Malkan, Willard Securities, Inc. and Willard Properties' cross-motion for summary judgment and motion for leave to amend their answer, third-party defendant's motions to dismiss and for summary judgment, defendants Davis, Security Management Co., Inc., and Greengate Partners Associates' motion for leave to amend their answer, defendants Davis and Security Management Co., Inc.'s motion to compel defendant Willard to respond to a request for production of documents, and attorney John A. Irwin's request for leave to withdraw as counsel for defendant Willard. Inasmuch as the motions to amend and to compel are unopposed, Local Rule 91.2, they are hereby GRANTED. The request for fees incurred in connection with the motion to compel is also GRANTED, and defendants are ALLOWED ten (10) days in which to substantiate the expenses which they wish to claim. Attorney Irwin's request for leave to withdraw has been consented to by his client, so that it too is GRANTED. Defendant Willard is DIRECTED to inform the court within ten (10) days of [*2] the arrangements which he has made to secure substitute counsel.

1. Plaintiffs, who are Massachusetts residents, state that they are purchasers of interests issued by defendant Greengate Partners Associates (Greengate) and transferred to plaintiffs by defendant Security Management Co., Inc. (Security Management). Defendant Greengate is a limited partnership conceived by defendant Davis and Malkan and initially formed by defendants Security Management and Malkan; its primary purpose was to own and operate the Greengate Apartments in Marietta, Georgia. Security Management, an affiliate of defendant Davis, became Greengate's general partner, while

defendant Willard Properties Corporation (Willard Properties), an affiliate of defendant Malkan, was a Class B limited partner. Defendant Willard Securities, Inc. (Willard Securities), another Malkan affiliate, arranged for investor participation in Greengate and sold units of interest of the sort which plaintiffs purchased.

In furtherance of their plan, Davis and Security Management provided Malkan with information about Greengate Apartments. Malkan then devised an investment memorandum which was used to solicit purchasers for the [*3] units of interest. Davis and Security Management also completed documents to register the offering of the interests with the state of New York and received various drafts of other documents related to Greengate. These latter documents were discussed with Malkan, as well as others.

In December, 1973, defendant Willard, a salesman of the interests acting on behalf of either Malkan or Willard Securities, "contacted Plaintiffs or their representatives regarding a potential investment in Units of Interest in" Greengate. Plaintiffs' Brief, at 4. This was done through the mail, and plaintiffs or their representatives were provided in Massachusetts with written information about a potential purchase. They were advised that Davis and Security Management were respected real estate developers, that Greengate would operate an apartment project in the Atlanta area, that Security Management would be the general partner in Greengate and manage and operate the apartment complex, and that Security Management, with a $ 750,000 net worth, would loan funds to Greengate if necessary and would subordinate payment of management fees and repayment of its loans for several years to permit a priority [*4] return to purchasers of units of interest. In addition, they were told that Davis had a net worth in excess of $ 3,000,000, either was or would become a Greengate general partner, and would personally guarantee against cash flow deficits of Greengate.

Each plaintiff thereupon decided to invest in the project. They state that they -- or their representatives -- relied heavily upon the representations made about the integrity, expertise, abilities and prior experience of Security Management and Davis and that both of these latter parties were financially stable, had substantial net worths, and had personally guaranteed to lend or contribute necessary funds to Greengate and to subordinate certain fees and loans owed to them. Plaintiffs believed these statements to be true and had received no indication that they were not.

On December 27, 1973, plaintiff Nettie Alberts, acting on the advice of her representative, Emanuel Alberts, delivered $ 10,000 to Willard Securities in partial payment for one unit of interest and executed certain documents relating to her purchase, including promissory notes, a subscription agreement, and a power of attorney and signature page of some sort. [*5] Plaintiff Murray Alberts followed suit the next day. Thereafter Davis, acting on behalf of Security Management, executed an "Assignment of Partnership Interest" for each plaintiff. Defendant Willard received a commission for his efforts, and during 1974 and 1975 each plaintiff delivered additional payments of $ 20,460 to Greengate for their interests.

Unknown to the plaintiffs at the time of their purchase, defendant Davis had been sued in the Fulton County Superior Court. The state court complaint alleged that Davis had "willfully, intentionally and fraudulently converted monies to his own use and was guilty of willful, wrongful and fraudulent misconduct." Plaintiffs' Brief at 3. Plaintiffs contend that had this information been available to them, they would not have invested in Greengate. Further, in 1974 or 1975, Security Management stopped funding Greengate's "Phase III Land Loan" and abandoned the Phase III land owned by Greengate. This decision was based upon Greengate's unilateral determination that the land loan was not economically feasible and is said to be in contravention of the limited partnership agreement and of representations made to plaintiffs. Finally, [*6] in both 1974 and 1975, Security Management was either repaid loans by Greengate or collected management fees. Plaintiffs, by contrast, have yet to receive any cash distribution from Greengate.

Plaintiffs contend, and defendants do not contest, that securities were sold to them. Further, the United States mail was sufficiently used in connection with the purchase to meet the federal jurisdictional prerequisite under the Securities Act of 1933 (1933 Act), *15 U.S.C. § § 77a*, et seq. Plaintiffs seek summary judgment under the 1933 Act on the ground that section 12(2) of the Act, *15 U.S.C. § 771*(2), has been violated. All defendants are said to be liable on the theory that "liability rests with all persons 'but for' whose acts the sale would not have been consummated." Plaintiffs' Brief, at 20. In addition, defendants Davis and Malkan are thought to be liable as controlling persons under section 15 of the 1933 Act, *15 U.S.C. § 77o*. Plaintiffs also ask for summary judgment under the Massachusetts blue-sky law, contending that the interests which they purchased were required to be registered under that law. As they were not so registered, all defendants are thought to be [*7] be subject to liability.

a. The federal securities claim presently before the court is, as noted, based upon section 12(2) of the 1933 Act, *15 U.S.C. § 771*(2), which provides:

    Any person who --

(2) Offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known of such untruth or omission,

shall be liable to the person purchasing such security from him. . . .

Defendants assert that the court cannot conclude that the omission and misrepresentations outlined above are material as a matter of law within the meaning of the statute. They further rely on the statute of limitations provided by § 13 of the 1933 Act, *15 U.S.C.* [*8] *§ 77m*, for the proposition that plaintiffs must have exercised reasonable diligence to discover the facts on which their claim is based; if plaintiffs have not done so, and defendants contend that there is a serious question presented, defendants state that the federal claim is time-barred. n1 In addition, defendants Davis and Security Management argue that they are not "sellers" of securities to plaintiffs and thus do not meet a threshold requirement of section 12(2); defendant Davis also takes issue with plaintiffs' position that he is a controlling person. In a further attempt to stymie plaintiffs' federal claim, defendants Malkan, Willard Securities and Willard Properties have addressed a major portion of their memorandum to the Georgia law of fraud. This last, however, is of little or no assistance in deciding a question of federal securities law. See *SEC v. Variable Annuity Life Insurance Co., 359 U.S. 65, 69 (1959); Wolf v. Frank, 477 F.2d 467, 479* (5th Cir.), cert. denied *414 U.S. 975 (1973).*

n1 Only defendants Davis and Security Management have specifically raised these questions. As they are applicable across the board, however, the court will treat them as raised by all defendants.

[*9]

(1) As to materiality, plaintiffs point primarily to the failure to disclose that defendant Davis, relied upon as a prime backer of the Greengate project, had been sued for fraudulent conversion of funds. His financial integrity and business acumen were both pointed out to plaintiffs as factors operating in Greengate's favor; no party has disputed that plaintiffs were told this or that they -- or any other investor -- would consider such information both relevant and important. In addition to the omission, plaintiffs point to the misrepresentations outlined above with respect to financial backing by both Security Management and Davis as to specific needs of the project. Plaintiffs contend that neither Security Management nor Davis ever intended to carry out these commitments, so that there can be no argument that the promises were true when made.

The standard of materiality to be employed is set forth in *TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976):* n2

An omitted fact is material if there is substantial likelihood that a reasonable shareholder would consider it important. . . . Put another way, there must be a substantial likelihood that the [*10] disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

Defendants argue that the question of materiality in this case is for the jury and suggest that the conclusion that failure to disclose the lawsuit was a material omission would require that any lawsuit against a promoter must be disclosed. Defendants also attack plaintiffs' reliance on the misrepresentations, contending that predictions as to future events do not provide a basis for recovery unless there initially was no intent to carry through. See *Ferland v. Orange Groves of Florida, Inc., 377 F.Supp. 690, 705-06 (M.D. Fla. 1974).* They then suggest that there are "necessarily" factual issues remaining with respect to their intent to perform in the future in this case. Defendants Davis, Security Management and Greengate Partners Associates' Supplemental Brief, at 3.

n2 TSC Industries was decided under section 14(a) of the Securities Exchange Act of 1934, *15 U.S.C. § 78n*(a). The definition is applicable to other sections of the securities statutes in which the term appears, however. See *Woolf v. S.D. Cohen & Co., 546 F.2d 1252, 1253* (5th Cir.), cert. denied *434 U.S. 831 (1977).*

[*11]

While it is true that the Supreme Court in TSC Industries cautioned against findings of materiality as a matter of law except in clear cases, *426 U.S. at 450,* the court must conclude that this is such a case. The question of misrepresentations and intent to perform or not to perform in the future need not be addressed, as plaintiffs' initial argument is correct. Defendant Davis was represented to them as a supporter of the project who would play an important role in its future success. Davis himself recognized the crucial role which was his on the project by executing a document which began "WHEREAS, the investors [plaintiffs and others] would be unwilling to execute the Subscription Agreement and the Amended Partnership Agreement and to make the capital contribution required of them thereunder unless the Undersigned [Davis] executes and delivers to the Partnership [Greengate] this guaranty. . . ." Given this position, a lawsuit which challenged Davis' honesty and integrity -- while not having reached judgment -- would be considered important to a reasonable investor. The suit was not one for simple payment of an account, as to which materiality would in all probability [*12] be a question for the jury. Instead, intentional and fraudulent conduct was charged. Such information was obviously material and should have been disclosed so that a prospective investor could consider the information and undertake further investigation if he chose.

(2) The next question presented is the statute of limitations set forth in § 13 of the 1933 Act, *15 U.S.C. § 77m:*

> No action shall be maintained to enforce any liability created under section 77k or 771(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence. . . . In no event shall any such action be brought to enforce a liability created . . . under section 771(2) of this title more than three years after the sale.

Defendants point out the sales in this case occurred in December, 1973 while the complaint itself was not filed until December, 1975. Although the absolute three-year bar is not implicated, see generally *Cowsar v. Regional Recreations, Inc., 65 F.R.D. 394, 397 (M.D. La. 1974),* the two dates do raise a question under the one-year statute, which [*13] question is whether plaintiffs exercised reasonable diligence to discover the facts on which their claim is based. Pointing out that the lawsuit against defendant Davis was a matter of public record which was available to plaintiffs at all times, defendants argue that if plaintiffs had any question about actions against Davis, they could have checked court records in Fulton County, where the promoter resides. The suggestion is then made that plaintiffs have not been reasonably diligent as a matter of law and thus are barred from asserting the present claim; alternatively, a jury question is thought to be presented.

Plaintiffs state that there is no question but that they instituted this suit within one year of learning the facts, as they actually did not know of the action against Davis when they filed their complaint. Although this initial assertion does not go to the question of diligence, plaintiffs also point out that defendants have made no showing that they should have discovered the facts more than one year prior to filing of suit.

It appears to the court that defendants' statute of limitations argument cannot prevail at this time as an absolute matter. If, as the court [*14] has held, defendants had an obligation to disclose the existence of the action against Davis, then plaintiffs cannot be faulted for having failed to ferret out the truth before they purchased their Greengate interests. However, this does not resolve the question of whether plaintiffs, in the exercise of reasonable diligence, ought thereafter to have learned the facts before they actually did. The court notes plaintiffs' statements that no return on their investment has been received; they thus obtained no income from Greengate in 1974. Further, Security Management's failure to comply with the promises represented to plaintiffs began in 1974 or 1975; viewing the facts most favorably to the nonmoving party, the court must assume that 1974 is the proper year. The court is thus faced with a situation in which the investment was not operating properly virtually from the beginning; further, plaintiffs had easy access to the fraud suit information if they chose to look into their purchases. Yet suit was not filed for almost two years. The court is not unaware that plaintiffs are elderly residents of Massachusetts, and may find travel to and contacts with persons in Georgia difficult, [*15] but nevertheless concludes that the present record raises a question -- albeit slight -- of their diligence. Their motion for summary judgment under the Securities Act of 1933 must therefore be DENIED. n3

> n3 This ruling makes it unnecessary to address Davis and Security Management's contentions under federal law that they are not sellers and that Davis is not a controlling person. Similar questions remain pertinent at this time, of course, to the state law claim.

b. The initial question presented by the Massachusetts blue-sky law is whether or not it applies to this case. The parties' briefs indicate agreement that this issue must be resolved by resort to Georgia conflicts law, as the claim presented under the Massachusetts act concerns only state law questions and this court must apply the law of the state in which it sits in deciding non-federal issues, including state choice of law rules. See *Pecheur Lozenge Co. v. National Candy Co., 315 U.S. 666, 667 (1942);* see generally *Day & Zimmerman, Inc.* [*16] *v. Challoner, 423 U.S. 3, 4 (1975).*

The applicable Georgia law is found in *Allen v. Smith & Medford, Inc., 129 Ga. App. 538 (1973)*. The question there presented was whether the securities transaction in question was governed by the Georgia Securities Act or whether its contacts with the state of Florida were such that the sale occurred there rather than in Georgia. The place where any one specific event occurred did not determine the issue; rather, the Court of Appeals examined all the facts and found that, although certain events had taken place in Florida, plaintiff was a Georgia resident, had executed the contract in Georgia, and has received his stock there. Further, a lending agreement which was said to concern a Florida loan set forth that it was entered into in Atlanta, Georgia. On rehearing, the court pointed out that "it should be reiterated that the question here is not limited to the location of the contractual situs but concerns whether the sale within the meaning of the Georgia Securities Act took place in Georgia or Florida". *Id. at 543*. The standard adopted in Allen to determine whether the securities sale was governed by Georgia or Florida law thus [*17] is one of "'grouping of contacts'". *Eldon Industries, Inc. v. Paradies & Co., 397 F.Supp. 535, 538 (N.D. Ga. 1975)*. Under this rule, the court must examine the instant transactions to determine whether Massachusetts or Georgia may most appropriately be regarded as their "'center of gravity'". Id. n4

> n4 The court notes defendants Davis, Security Management and Greengate's assertion that New York law should be applied if Georgia's law is rejected. This is based solely on the statement that the "actual closing of the transaction took place in New York." Supplemental Brief, at 4. Such a position is little short of groundless under Allen.

In this regard, it appears that the apartment complex to be operated by Greengate was located in Georgia, as were the parties responsible for that operation. In addition, the Amended Partnership Agreement states: "GOVERNING LAW. This agreement shall, except as herein expressly provided, be governed and construed in accordance with the laws of the State of [*18] Georgia." Defendants Malkan, Willard Securities and Willard Properties also point out that plaintiffs' payments were made to corporate offices in Georgia and that, following the initial $ 10,000 payments, the general partner of Greengate executed assignments of partnership interests there.

On the other side of the balance are plaintiffs' residence in Massachusetts, their solicitation in Massachusetts, and execution in Massachusetts of all documents which required their signatures. The assignments of their interests were also delivered to plaintiffs in their home state. Recognizing that other theories than contact counting have been employed in the past to determine what law applies, see *Allen, supra, at 541*, plaintiffs reiterate that Massachusetts was the place of solicitation and that they performed all acts required of them there. They also assert that defendants consented to the sale of interests to them on or before December 22, 1973 so that the contract was complete when their purchase documents were subsequently executed in Massachusetts later that month.

It appears to the court that plaintiffs must prevail. The factors which carried the day in Allen and are relevant [*19] here -- where the purchaser resided, where he executed the sales contract, and where he received the security -- all point to Massachusetts. The location of the venture and of the parties who were to operate it is of little assistance in determining whether the instant sales occurred in Georgia or elsewhere. Furthermore, the contract clause purporting to choose Georgia law to govern the relationship between the parties has no effect on the application of securities statutes, as such statutes are intended to protect the investor and it has been found to be against public policy to permit use of choice of law clauses to circumvent this legislatively created shield. See *Getter v. R.G. Dickinson & Co., 366 F.Supp. 559, 574-76 (S.D. Iowa 1973); Boehnen v. Walston & Co., 358 F.Supp. 537, 540-41 (D.S.D. 1973)*. The court simply fails to see the instant transactions as Georgia sales; were the Georgia courts confronted with this case, the court concludes that they would turn to the Massachusetts blue-sky law. n5 And given the broad scope of that statute, plaintiffs' purchases clearly fall within its purview. See *DuPont v. Becker, 375 F.Supp. 959, 962, n.2 (D. Mass.), aff'd [*20] 508 F.2d 834 (1st Cir. 1974)*.

> n5 This result is not to be read as precluding resort by other differently situated plaintiffs to Georgia law or even that of some other state, should there be other parties who are dissatisfied with defendants' conduct.

Having reached this conclusion, the court is confronted with a series of defenses to liability for failure to register the interests sold in Massachusetts. Defendants first put forward section 402(b)(9) of the Massachusetts statute, which exempts from registration

> Any transaction pursuant to an offer directed by the offeror to not more than twenty-five persons if (A) the seller reasonably believes that all the buyers in the commonwealth are purchasing for investment, and (B) insofar as an offer involves the payment directly or indirectly of any commission or other remuneration for soliciting any prospective buyer in the commonwealth a notice is filed with the secretary at least five full business days before the offer, and the secretary does not by order [*21] disallow the exemption within the next five full business days.

Defendants recognize that the exemption's notice requirement was triggered by payment of a commission in this case. They also recognize that no notice was given. This apparent obstacle is said to have no effect on the availability of the exemption, however, as the requirement is thought to be technical only. According to defendants Malkan, Willard Properties and Willard Securities, the offers made here clearly fell within the exemption, so that had notice been given "exemption would necessarily have been granted." Defendants Davis, Security Management and Greengate also assert that they were not aware that any commission was involved so that failure to notify Massachusetts officials should not be used to deprive them of the exemption.

As plaintiffs point out, the notice requirement is not the mere technicality which defendants suggest it to be. Defendants themselves have indicated that Massachusetts regulations require that the notice include information as to the offeror, the issuer, the number of persons in the state to whom the offer will be directed, the terms, the persons to receive a commission, [*22] information from which the propriety of the commission can be determined, sales literature, and "additional information or documents which the director may request within five full business days after the notice is filed." Defendants Davis, Security Management and Greengate's Supplemental Brief, at 4. This procedure has the purpose of permitting the state to act as a buffer between an offeror and Massachusetts citizens; it does not appear on its face to be simply a rubber stamp. Indeed, the state may require additional information from those who seek an exemption; to suggest that plaintiffs had before them all of the information which would have been supplied to the state is to ignore this provision. Further, to conclude that an exemption would "necessarily" have been granted is to ignore the procedure used and the purpose of the notice requirement. The court therefore finds that failure to file the required notice prevents assertion of this particular exemption.

The next exemption presented is that provided by § 402(b)(1) for isolated nonissuer transactions. Defendants Davis, Security Management and Greengate assert that the involvement of defendant Willard and third-party [*23] defendant Berenson n6 in the transaction made the plaintiffs' purchases nonissuer transactions. Willard and Berenson are said to have placed the interests with plaintiffs without either the knowledge or approval of these other three defendants.

n6 See part 2(b) of this order, infra.

Aside from the fact that this statement appears to conflict with plaintiffs' assertion that defendants approved their purchases prior to the time any documents were executed by plaintiffs in December, 1973, the court is at a loss to understand defendants' argument. They do not contest that the interests which plaintiffs ultimately received came directly from Security Management; nor do they suggest that Willard or Berenson acted entirely on their own behalf or that the issuer derived no benefit from the sales. And plaintiffs state that section 401(g) of the Massachusetts act defines a nonissuer situation to mean "not directly or indirectly for the benefit of the issuer". It appears that assertion of this particular defense [*24] is simply frivolous.

Defendants also suggest that section 410(f) and some variation of the doctrines of ratification or laches should bar plaintiffs' present claim. The relevant provision states:

No person who has made or engaged in the performance of any contract in violation of any provision of this chapter or any rule or order hereunder, or has acquired any purported right under such contract with knowledge of the facts by reason of its making or performance was in violation may base any suit on the contract.

This statute on its face has no application here. No party has suggested at any time that plaintiffs were aware of the facts giving rise to their present claim when they entered into the transactions in December, 1973. In addition, it appears that the statute is directed against parties in defendants' and not plaintiffs' shoes. See *Kreeland v. Emerton, 183 N.E. 155 (1932)*.

As for undue delay, defendants point out that almost two years passed between plaintiffs' purchases and the time when they registered concern with the situation. Even then, general economic conditions rather than partnership matters raised questions for them. Defendants suggest [*25] that plaintiffs' failure to act in the meantime to discover that their securities were not registered requires the conclusion that they "had affirmed the transaction in every respect." Defendants Davis, Security Management and Greengate's Supplemental Brief, at 5. Defendants also point out that plaintiffs authorized their continuation as limited partners after February 15, 1974. The case of *Commissioner of Banks v. Chase Securities Corp., 10 N.E.2d 472, 494-95 (1937)*, is said to stand for the proposition "that a plaintiff may not rescind if he continues to hold the security after acquiring sufficient information to realize that there may have been violations of the Massachusetts Blue Sky Law." Defendants' Supplemental Brief, supra.

The facts before the court do not present the issue framed by defendants, however. It has nowhere been asserted that plaintiffs rested on their rights after they learned the facts on which their claim is based; indeed, they have claimed that they did not learn all of them until after suit was filed. To suggest ratification or something similar when the facts giving rise to a right to rescind are unknown appears to the court to fall wide [*26] of the mark. As stated in Chase Securities, under Massachusetts law "until reason to the contrary appeared the plaintiffs were entitled to assume that the defendant was not violating the law. . . . They had no primary duty to use diligence to discover a possible violation of the statute." *10 N.E. 2d at 497.* Contrary to the situation discussed earlier with regard to plaintiffs' federal claim, defendants do not suggest that plaintiffs had any reason to think that the securities were unregistered under state law. Further, there is no indication of prejudice flowing from the delay, if there was a delay. Under these circumstances, the court fails to see any merit to contentions based in somewhat confused fashion on notions of ratification, laches or waiver.

The next question presented is defendant Security Management's assertion that it is not a seller under the Massachusetts statute. In a similar vein, the court is told by defendant Davis that he is neither a seller nor a controlling person. As to Security Management, the court can only point out that the defendant was the party who actually transferred plaintiffs' interests to them and which reaped a benefit from their purchase. [*27] In addition, Security Management must be charged with partial responsibility for having placed the interests on the market. To conclude that the only sellers in this case were defendant Willard and third-party defendant Berenson -- the parties who personally dealt with plaintiffs -- as defendants suggest, would ignore the substance of the instant transactions and produce an absurd result. Quite simply, the fact of the matter is that Security Management was a seller.

Defendant Davis fares no better. Section 410(b) of the Massachusetts statute provides:

> Every person who directly or indirectly controls a seller liable under subsection (a), every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller, unless the non-seller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability [*28] is alleged to exist.

At the relevant time, defendant Davis owned sixty-five percent of defendant Security Management; according to plaintiffs, he has indicated that he had the power to control the corporation. Plaintiffs' Brief, at 21. Further, he was chairman of the board when plaintiffs purchased their interests and took an active role in the business, as evidenced by his signature on the subscription agreement for the new limited partners. While defendants state that Davis was not Security Management's president, that there were other directors, and that Davis was not involved in the corporation's day-to-day operations, this cannot carry the day for him. The above statute imposes liability on directors, and it appears that Davis as board chairman held such status. More importantly, the court has no doubt that he was a controlling person, despite his assertion that a complex factual question is presented. See generally *SEC v. Coffey, 493 F.2d 1304, 1318 (6th Cir. 1974)*, cert. denied *420 U.S. 908 (1975)*. n7

> n7 The statute also appears to be broad enough to encompass defendant Malkan and his corporations as broker-dealers or agents who materially aided in the sales, given the facts on which plaintiffs' motion is predicated. In any case, Malkan, Willard Securities and Willard Properties have not contended that they do not fall within the class of persons who may be held liable under section 410(b).

[*29]

The final issues which the court must consider are those arising from the ending clause of the statute set forth above, which provides a defense for a party who "did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Defendants assert that the relevant facts would be "the selling of securities in Massachusetts without giving notice to the Secretary." Defendants Davis, Security Management and Greengate's Supplemental Brief, at 7. Defendants Davis and Security Management state that they were insulated from the Massachusetts transactions, as marketing had been turned over to defendant Malkan in New York and the party who actually placed the interests with plaintiffs was defendant Willard. Defendant Davis asserts that he understood that the New York law firm of Dreyer & Traub would do the necessary securities work so that all applicable laws would be complied with. Finally, Davis has stated that he did not know that plaintiffs were acquiring Greengate partnership interests, that he was not aware that Massachusetts residents would be purchasers and did not know where the interests would [*30] be placed by defendant Malkan.

Plaintiffs first point out that the reasonable lack of knowledge defense is available only under § 410(b) and thus is inapplicable to actual sellers such as defendant Security Management. As for defendant Davis, plaintiffs point out that the subscription agreement executed by Davis, which recites a December, 1973 date, and the Greengate signature pages and powers of attorney executed by plaintiffs the same month show on their faces that Massachusetts residents were making purchases. Defendant's asserted ignorance of this fact is thus not seen to be reasonable, as this information was before him prior to closing of the transactions. From this imputed knowledge follows the conclusion that Davis should have known that Massachusetts law was applicable to the transactions.

The court must agree with plaintiffs that, even assuming that defendant Davis did not have actual knowledge that Massachusetts residents were purchasing the Greengate interests, his lack of knowledge was not reasonable as a matter of law under the circumstances. Likewise, he should have known that Massachusetts law was implicated. But one additional fact is of importance, which [*31] is his lack of knowledge that there had been no registration. Given Davis' asserted reliance on Malkan and his attorneys, the court cannot say on the present record that his ignorance was unreasonable. Accordingly, plaintiffs cannot prevail against him at this time. As plaintiffs' statement with respect to the inapplicability of this defense to Security Management is correct, however, its liability would appear to be established.

Defendants Malkan, Willard Securities and Willard Properties have not specifically raised the defense of reasonable ignorance. In connection with a discussion of state-law fraud, however, the assertion appears that defendant Willard was an independent contractor and not an agent. Even were this the case, however, the court does not see its relevance to the instant securities claim, as this last group of defendants do not contend that they were not responsible for the sales under section 410 (b), that they did not know that plaintiffs were purchasing interests or that Massachusetts's law had not been complied with. Defendant Willard's status itself thus does not provide ground for a lack of knowledge defense. The court therefore sees no obstacle to [*32] a grant of summary judgment against these parties.

For these reasons, plaintiffs' motion for summary judgment on their Massachusetts state law securities claim is GRANTED as to defendants Security Management, Malkan, Willard Securities and Willard Properties, and DENIED as to defendant Davis. n8

> n8 Although defendant Greengate has been frequently referred to in this order and appears with defendants Davis and Security Management on certain responsive briefs, plaintiffs have not sought summary judgment against it at this time.

2. Third-party defendant Berenson was brought into the case by defendants Davis, Security Management and Greengate for purposes of indemnification or contribution should plaintiffs prevail in the main action. Berenson is said to have been involved in plaintiffs' purchases of the Greengate interests and in any misrepresentations or omissions which occurred in connection with the purchases. He is thus seen as a co-violator of federal law, should defendants be held liable. Third-party [*33] defendant has now moved to dismiss on the ground that he is not subject to the personal jurisdiction of the court; he requests summary judgment on the merits of his involvement in the sales.

a. Berenson's motion to dismiss is grounded on his asserted lack of contact with Georgia and the resulting inability of defendants to reach him through the Georgia long-arm statute, GA. CODE ANN. § 24-113.1. However, as defendants point out, both section 22(a) of the Securities Act of 1933, *15 U.S.C. § 77v*(a), and section 27 of the Securities Exchange Act of 1934, *15 U.S.C. § 77aa*, are involved in this case and provide for nationwide service of process. As Berenson makes no challenge to the manner of service and it appears that he was served within the boundaries of the United States, the court has personal jurisdiction over him pursuant to the above statutes. *Hilgeman v. National Ins. Co. of America, 547 F.2d 298, 301 (5th Cir. 1977);* see also *Black v. Acme Markets, Inc., 564 F.2d 681, 683-84 (5th Cir. 1977).* The fact that a third-party rather than an original complaint is involved does not require a different result. *Lyons v. Marrud,Inc., 46 F.R.D. 451, 455 (S.D. N.Y. 1968).* [*34] The motion to dismiss is therefore without merit and is hereby DENIED.

b. Turning to the summary judgment motion, third-party defendant Berenson is a certified public accountant and a resident of Massachusetts. He states by way of affidavit that plaintiff Murray Alberts is a client for whom he performs accounting services and that he first learned of Greengate from defendant Willard in November or December, 1973. He subsequently informed Murray Alberts that a limited partnership in Greengate might be available and "told him to look into it." Affidavit of George Berenson, P6, dated May 30, 1978. After rendering this advice,

At no time did I make any representations to plaintiff concerning the principals or parties involved in Greengate Partners Associates nor did I at any time attempt to advise the plaintiffs concerning the merits of their proposed purchase of limited partnership interests in Greengate Partners Associates.

I was not involved in any way in transacting the purchase by the plaintiffs or any other parties of limited partnership interests in Greengate Partners Associates. At no time have I actively solicited purchases for or engaged in the business of Greengate [*35] Partners Associates.

Id., PP7, 8.

Third-party defendant thus contends that his only role in the sales to plaintiffs was to refer them to defendant Willard. He takes the position that he neither offered nor sold any securities to plaintiffs and was not responsible for the actions of anyone who did. As he has done nothing for which he could be held liable to plaintiffs, Berenson suggests that he cannot be liable to defendants on theories of contribution or indemnity.

Defendants in response contend that third-party defendant's role in the transaction was more expansive than Berenson himself has stated. They state that Emanuel Alberts, acting on behalf of plaintiff Nettie Alberts, consummated her acquisition of the Greengate interest through third-party defendant. Both Berenson and defendant Willard are said to have made the alleged oral misrepresentations on which much of this lawsuit is based, and Murray Alberts is said to have talked his purchase over with third-party defendant. Finally, the commission for the sale was split between Berenson and Willard. This information is drawn in large part from responses to interrogatories.

While the evidence of Berenson's [*36] direct involvement in the sales in issue is not strong, it is not the function of the court to weigh the evidence when deciding a motion under *Rule 56, Fed.R.Civ.P.* As there clearly are disputes as to third-party defendant's role, and those disputes are material as to what that role was, Berenson cannot prevail at this time. His motion for summary judgment is therefore DENIED.

In summary, plaintiffs' motion for summary judgment as to their federal securities claim under the 1933 Act is DENIED. Their motion is GRANTED as to the Massachusetts blue-sky claim against defendants Security Management, Malkan, Willard Securities and Willard Properties but is DENIED against defendant Davis. Defendants Malkan, Willard Securities and Willard Properties' cross-motion for summary judgment against plaintiffs is also DENIED, as are third-party defendant Berenson's motions to dismiss and for summary judgment. Defendants Davis, Security Management, Greengate, Malkan, Willard Securities and Willard Properties' motions to amend their answers and defendants Davis and Security Management's motion to compel are GRANTED. Expenses are AWARDED in connection with the latter motion, and defendants are [*37] ALLOWED ten (10) days in which to substantiate those expenses. Attorney John A. Irwin's request for leave to withdraw as counsel for defendant Willard is also GRANTED, and defendant Willard is DIRECTED to inform the court within ten (10) days of the arrangements which he has made to secure substitute counsel. The clerk is DIRECTED to resubmit this action in ten (10) days.

So ORDERED, this 29th day of September, 1978.

NEWELL EDENFIELD

UNITED STATES DISTRICT JUDGE

102K1R

********** Print Completed **********

Time of Request:    March 07, 2006   12:05 PM EST

Print Number:       1821:87498780

Number of Lines:    441

Number of Pages:

Send To:  CUNEO, KATHLEEN

          LOYOLA UNIVERSITY - CHICAGO

          25 E PEARSON ST

          CHICAGO, IL 60611-2001

# EXHIBIT 6

Next Part

REST 2d CONFL s 188
Restatement (Second) of Conflict of Laws § 188 (1971)

Restatement of the Law -- Conflict of Laws
Restatement (Second) of Conflict of Laws
Current through June 2005
Copyright © 1971-2006 by the American Law Institute

Chapter 8. Contracts
Topic 1. Validity Of Contracts And Rights Created Thereby
Title A. General Principles

§ 188. Law Governing In Absence Of Effective Choice By The Parties

Link to Case Citations

**(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.**

**(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:**

**(a) the place of contracting,**

**(b) the place of negotiation of the contract,**

**(c) the place of performance,**

**(d) the location of the subject matter of the contract, and**

**(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.**

**These contacts are to be evaluated according to their relative importance with respect to the particular issue.**

**(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189-199 and 203.**

### Comment:

*a. Scope of section.* The rule of this Section applies in all situations where there has not been an effective choice of the applicable law by the parties (see § 187).

### Comment on Subsection (1):

*b. Rationale.* The principles stated in § 6 underlie all rules of choice of law and are used in evaluating the significance of a relationship, with respect to the particular issue, to the potentially interested states, the transaction and the parties. The factors listed in Subsection (2) of the rule of § 6 can be divided into five groups. One group is concerned with the fact that in multistate cases it is essential that the rules of decision promote mutually harmonious and beneficial relationships in the interdependent community, federal or international. The second group focuses upon the purposes, policies, aims and objectives of each of the competing local law rules urged to govern and upon the concern of the potentially interested states in having their rules applied. The factors in this second group are at times referred to as "state interests" or as appertaining to an "interested state." The third group involves the needs of the parties, namely the protection of their justified expectations and certainty and predictability of result. The fourth group is directed to implementation of the basic policy underlying the particular field of law, such as torts or contracts, and the fifth group is concerned with the needs of judicial administration, namely with ease in the determination and

application of the law to be applied.

The factors listed in Subsection (2) of the rule of § 6 vary somewhat in importance from field to field and from issue to issue. Thus, the protection of the justified expectations of the parties is of considerable importance in contracts whereas it is of relatively little importance in torts (see § 145, Comment b). In the torts area, it is the rare case where the parties give advance thought to the law that may be applied to determine the legal consequences of their actions. On the other hand, parties enter into contracts with forethought and are likely to consult a lawyer before doing so. Sometimes, they will intend that their rights and obligations under the contract should be determined by the local law of a particular state. In this event, the local law of this state will be applied, subject to the qualifications stated in the rule of § 187. In situations where the parties did not give advance thought to the question of which should be the state of the applicable law, or where their intentions in this regard cannot be ascertained, it may at least be said, subject perhaps to rare exceptions, that they expected that the provisions of the contract would be binding upon them.

The need for protecting the expectations of the parties gives importance in turn to the values of certainty, predictability and uniformity of result. For unless these values are attained, the expectations of the parties are likely to

be disappointed.

Protection of the justified expectations of the parties by choice-of-law rules in the field of contracts is supported both by those factors in Subsection (2) of § 6 which are directed to the furtherance of the needs of the parties and by those factors which are directed to implementation of the basic policy underlying the particular field of law. Protection of the justified expectations of the parties is the basic policy underlying the field of contracts.

Protection of the justified expectations of the parties is a factor which varies somewhat in importance from issue to issue. As indicated above, this factor is of considerable importance with respect to issues involving the validity of a contract, such as capacity, formalities and substantial validity. Parties entering a contract will expect at the very least, subject perhaps to rare exceptions, that the provisions of the contract will be binding upon them. Their expectations should not be disappointed by application of the local law rule of a state which would strike down the contract or a provision thereof unless the value of protecting the expectations of the parties is substantially outweighed in the particular case by the interest of the state with the invalidating rule in having this rule applied. The extent of the interest of a state in having its rule applied should be determined in the light of the

purpose sought to be achieved by the rule and by the relation of the transaction and the parties to that state (see Comment c).

Protection of justified expectations plays a less significant role in the choice-of-law process with respect to issues that involve the nature of the obligations imposed by a contract upon the parties rather than the validity of the contract or of some provision thereof. By and large, it is for the parties themselves to determine the nature of their contractual obligations. They can spell out these obligations in the contract or, as a short-hand device, they can provide that these obligations shall be determined by the local law of a given state (see § 187, Comment c). If the parties do neither of these two things with respect to an issue involving the nature of their obligations, as, for example, the time of performance, the resulting gap in their contract must be filled by application of the relevant rule of contract law of a particular state. All states have gap-filling rules of this sort, and indeed such rules comprise the major content of contract law. What is important for present purposes is that a gap in a contract usually results from the fact that the parties never gave thought to the issue involved. In such a situation, the expectations of the parties with respect to that issue are unlikely to be disappointed by application of the gap-filling rule of one state rather than of the rule of another state. Hence with respect to issues of this sort,

protection of the justified expectations of the parties is unlikely to play so significant a role in the choice-of-law process. As a result, greater emphasis in fashioning choice-of-law rules in this area must be given to the other choice-of-law principles mentioned in the rule of § 6.

c. Purpose of contract rule. The purpose sought to be achieved by the contract rules of the potentially interested states, and the relation of these states to the transaction and the parties, are important factors to be considered in determining the state of most significant relationship. This is because the interest of a state in having its contract rule applied in the determination of a particular issue will depend upon the purpose sought to be achieved by that rule and upon the relation of the state to the transaction and the parties. So the state where a party to the contract is domiciled has an obvious interest in the application of its contract rule designed to protect that party against the unfair

use of superior bargaining power. And a state where a contract provides that a given business practice is to be pursued has an obvious interest in the application of its rule designed to regulate or to deter that business practice. On the other hand, the purpose of a rule and the relation of a state to the transaction and the parties may indicate that the state has little or no interest in the application of that rule in the particular case. So a state may have little interest in the application of a rule designed to protect a party

against the unfair use of superior bargaining power if the contract is to be performed in another state which is the domicil of the person seeking the rule's protection. And a state may have little interest in the application of a statute designed to regulate or to deter a certain business practice if the conduct complained of is to take place in another state.

Whether an invalidating rule should be applied will depend, among other things, upon whether the interest of the state in having its rule applied to strike down the contract outweighs in the particular case the value of protecting the justified expectations of the parties and upon whether some other state has a greater interest in the application of its own rule.

Frequently, it will be possible to decide a question of choice of law in contract without paying deliberate attention to the purpose sought to be achieved by the relevant contract rules of the interested states. This will be so whenever by reason of the particular circumstances one state is obviously that of the applicable law.

*d. The issue involved.* The courts have long recognized that they are not bound to decide all issues under the local law of a single state. Thus, in an action on a contract made and to be performed in a foreign state by parties domiciled there, a court under traditional and prevailing practice applies its own state's rules to issues involving process, pleadings, joinder of parties, and

the administration of the trial (see Chapter 6), while deciding other issues-- such as whether the defendant had capacity to bind himself by contract--by reference to the law selected by application of the rules stated in this Chapter. The rule of this Section makes explicit that selective approach to choice of the law governing particular issues.

Each issue is to receive separate consideration if it is one which would be resolved differently under the local law rule of two or more of the potentially interested states.

## Comment on Subsection (2):

*e. Important contacts in determining state of most significant relationship.* In the absence of an effective choice of law by the parties (see § 187), the forum, in applying the principles of § 6 to determine the state of most significant relationship, should give consideration to the relevant policies of all potentially interested states and the relative interests of those states in the decision of the particular issue. The states which are most likely to be interested are those which have one or more of the following contacts with the transaction or the parties. Some of these contacts also figure prominently in the formulation of the applicable rules of choice of law.

The place of contracting. As used in the Restatement of this Subject, the place of contracting is the place where occurred the last act necessary, under the forum's rules of offer and acceptance, to give the contract binding effect, assuming, hypothetically, that the local law of the state where the act occurred rendered the contract binding.

Standing alone, the place of contracting is a relatively insignificant contact. To be sure, in the absence of an effective choice of law by the parties, issues involving the validity of a contract will, in perhaps the majority of situations, be determined in accordance with the local law of the state of contracting. In such situations, however, this state will be the state of the applicable law for reasons additional to the fact that it happens to be the place where occurred the last act necessary to give the contract binding effect. The place of contracting, in other words, rarely stands alone and, almost invariably, is but one of several contacts in the state. Usually, this state will be the state where the parties conducted the negotiations which preceded the making of the contract. Likewise, this state will often be the state of the parties' common domicil as well. By way of contrast, the place of contracting will have little significance, if any, when it is purely fortuitous and bears no relation to the parties and the contract, such as when a letter of acceptance is mailed in a railroad station in the course of an interstate trip.

The place of negotiation. The place where the parties negotiate and agree on the terms of their contract is a significant contact. Such a state has an obvious interest in the conduct of the negotiations and in the agreement reached. This contact is of less importance when there is no one single place of negotiation and agreement, as, for example, when the parties do not meet but rather

conduct their negotiations from separate states by mail or telephone.

The place of performance. The state where performance is to occur under a contract has an obvious interest in the nature of the performance and in the party who is to perform. So the state where performance is to occur has an obvious interest in the question whether this performance would be illegal (see § 202). When both parties are to perform in the state, this state will have so close a relationship to the transaction and the parties that it will often be the state of the applicable law even with respect to issues that do not relate strictly to performance. And this is even more likely to be so if, in addition, both parties are domiciled in the state.

On the other hand, the place of performance can bear little weight in the choice of the applicable law when (1) at the time of contracting it is either uncertain or unknown, or when (2) performance by a party is to be divided more or less equally among two or more states with different local law rules on the particular issue.

It is clear that the local law of the place of performance will be applied to govern all questions relating to details of performance see § 206).

Situs of the subject matter of the contract. When the contract deals with a specific physical thing, such as land or a chattel, or affords protection against a localized risk, such as the dishonesty of an employee in a fixed place of employment, the location of the thing or of the risk is significant (see §§ 189-193). The state where the thing or the risk is located will have a natural interest in transactions affecting it. Also the parties will regard the location of the thing or of the risk as important. Indeed, when the thing or the risk is the principal subject of the contract, it can often be assumed that the parties, to the extent that they thought about the matter at all, would expect that the local law of the state where the thing or risk was located would be applied to determine many of the issues arising under the contract.

Domicil, residence, nationality, place of incorporation, and place of business of the parties. These are all places of enduring relationship to the parties. Their significance depends largely upon the issue involved and upon the extent to which they are grouped with other contacts. So, for example, when a person has capacity to bind himself to the particular contract under the local law of the state of his domicil, there may be little reason to strike down the

contract because that person lacked capacity under the local law of the state of contracting or of performance (see § 198). The fact that one of the parties is domiciled or does business in a particular state assumes greater importance when combined with other contacts, such as that this state is the place of contracting or of performance or the place where the other party to the contract is domiciled or does business. As stated in § 192, the domicil of the insured is a contact of particular importance in the case of life insurance contracts. At least with respect to most issues, a corporation's principal place of business is a more important contact than the place of incorporation, and this is particularly true in situations where the corporation does little, or no, business in the latter state.

### Illustrations:

1. A, who is domiciled in state X, is declared a spendthrift by an X court. Thereafter, A borrows money in state Y from B, a Y domiciliary, who lends the money in ignorance of A's spendthrift status. Under the terms of the loan, the money is to be repaid in Y. A does not pay, and B brings suit in state Z. A would not be liable under X local law because he has been declared a spendthrift; he would, however, be liable under the local law of Y. The first

question for the Z court to determine is whether the interests of both X and Y would be furthered by application of their respective local law rules. This is a question that can only be determined in the light of the respective purposes of these rules (see Comment c). The purpose of the X local law rule is obviously to protect X domiciliaries and their families. Hence the interests of X would be furthered by application of the X spendthrift rule. On the other hand, Y's interests would be furthered by the application of its own rule, which presumably was intended for the protection of Y creditors and also to encourage persons to enter into contractual relationships in Y. Since the interests of X and Y would each be furthered by application of their respective rules, the Z court must choose between them. Among the questions for the Z court to determine are whether the value of protecting the justified expectations of the parties and the interest of Y in the application of its rule outweigh X's interest in the application of its invalidating rule. Factors which would support an affirmative answer to this question, and which indicate the degree of Y's interest in the application of its rule, are that A sought out B in Y, that B is domiciled in Y, that the loan was negotiated and made in Y and that the contract called for repayment in Y (see § 195). If

it is found that an X court would not have applied its rule to the facts of the present case, the argument for applying the Y rule would be even stronger. For

it would then appear that, even in the eyes of the X court, X interests were not sufficiently involved to require application of the X rule (see § 8, Comment *k*).

2. A, a married woman, who is domiciled in state X, comes to state Y and there borrows money from B. The loan contract provides that the money is to be repaid in Y. A does not pay, and B brings suit in state Z. A defends on the ground that under Y local law married women lack capacity to bind themselves by contract; they do have such capacity, however, under the local law of X. It is questionable in this case whether the interests of either X or Y would be furthered by application of their respective rules. Y's rule of incapacity was presumably designed to protect Y married women. On the other hand, X's rule of capacity was presumably designed, at least primarily, to protect X transactions. It seems clear in any event that the value of protecting the justified expectations of the parties is not outweighed in this case by any interest Y may have in the application of its rule of incapacity. Under the circumstances, the contract should be upheld on the issue of A's capacity by application of the X rule.

## Comment on Subsection (3):

*f.* When place of negotiation and place of performance are in the same state. When the place of negotiation and the place of performance are in the same state, the local law of this state will usually be applied to govern issues arising under the contract, except as stated in §§ 189-199 and 203. A state having these contacts will usually be the state that has the greatest interest in the determination of issues arising under the contract. The local law of this state should be applied except when the principles stated in § 6 require application of some other law. As stated in Comment *c*, the extent of a state's interest in having its contract rule applied will depend upon the purpose sought to be achieved by that rule.

*g.* For reasons stated in § 186, Comment *b*, the reference is to the "local law" of the state of the applicable law and not to that state's "law" which means the totality of its law including its choice-of-law rules.

*h.* As to the situation where the local law rule of two or more states is the same, see § 186, Comment *c*.

## REPORTER'S NOTE

See Rungee v. Allied Van Lines, Inc., 92 Idaho 718, 449 P.2d 378 (1968) (quoting and applying rule of Section).

See generally Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 161-162 (1946) (a case involving the validity of a covenant contained in a mortgage indenture where the Court said: "In determining which contract is the most significant in a particular transaction, courts can seldom find a complete solution in the mechanical formulae of the conflicts of law. Determination requires the exercise of an informed judgment in the balancing of all the interests of the states with the most significant contacts in order best to accommodate the equities among the parties to the policies of those states."); Rutas Aereas Nacionales, S.A. v. Robinson, 339 F.2d 265 (5th Cir.1964); Whitman v. Green, 289 F.2d 566 (9th Cir.1961) (note executed in Idaho by Idaho resident and secured by Idaho realty upheld against charge of usury by application of local law of Washington where note was delivered and payable. "In the case at bar the lender did not seek out the borrower in the State of Idaho, nor sit in wait for him in that state. Rather, the borrower sought out the lender in the State of Washington."); Perrin v. Pearlstein, 314 F.2d 863 (2d Cir.1963); Teas v. Kimball, 257 F.2d 817, 824 (5th Cir.1958) ( "... the focus of the contract was so centered in Texas that its validity should be determined by the laws of contract of that state"); Global Commerce Corp. v. Clark-Babbitt Industries, 239 F.2d 716 (2d Cir.1956); Alaska Airlines, Inc. v. Stephenson, 217 F.2d 295 (9th Cir.1954); Grace

v. Livingstone, 195 F.Supp. 933, 935 (D.Mass.1961), aff'd per curiam 297 F.2d 836 (1962), cert. den. sub. nom. 369 U.S. 871 (1962) ("In the silence of the parties, Massachusetts law governs for reasons well explained in the notes accompanying the April 22, 1960, amendments to the Second Restatement of Conflict of Laws, Tentative Draft No. 6."); Metzenbaum v. Golwynne Chemicals Corp., 159 F.Supp. 648 (S.D.N.Y.1958); Mutual Life Ins. Co. v. Simon, 151 F.Supp. 408 (S.D.N.Y.1957); Fricke v. Isbrandtsen Co., Inc., 151 F.Supp. 465, 467 (S.D.N.Y.1957) ("Ordinarily the federal courts

# EXHIBIT 7



42 S.E.C. 407, Release No. 7460, Release No. 34-7460, 1964 WL 66508 (S.E.C. Release No.)

(Cite as: 1964 WL 66508 (S.E.C. Release No.))

H

Securities and Exchange Commission (S.E.C.)
*1 Securities Exchange Act of 1934 - Sections 15(b) and 15A

IN THE MATTER OF
LINDER, BILOTTI & CO., INC.
File No. 8-9570
Promulgated November 13, 1964

BROKER-DEALER REGISTRATION

Suspension of Registration

Public Interest

In proceedings to determine whether broker-dealer's registration should be suspended pending final determination of issue of revocation, where evidence showed that broker-dealer made false and misleading statements in offer and sale of affiliated company's stock and of its own subordinated notes, held, sufficient showing to require suspension of registration in public interest and for protection of investors.

APPEARANCES:

William Lerner, John P. Cione, Roberta S. Karmel, and Arthur R. Mathews, for the Division of Trading and Markets of the Commission.

Davis J. Stolzar, of Kaufman, Stolzar & Kaufman, for Linder, Bilotti & Co., Inc., Hyman S. Linder, and Armand Bilotti.

FINDINGS, OPINION AND ORDER

The sole issue now before us in these proceedings is whether, under Section 15(b) of the Securities Exchange Act of 1934 ('Exchange Act'), it is necessary or appropriate in the public interest or for the protection of investors to suspend the registration as a broker and dealer of Linder, Bilotti & Co. ('registrant') pending final determination of whether such registration should be revoked. [FN1]

Following hearings on the issue of suspension, our Division of Trading and Markets and registrant and its principal officers, Hyman S. Linder and Armand Bilotti, submitted proposed findings and briefs and the hearing examiner recommended that registrant's registration be suspended. Respondents filed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

42 S.E.C. 407, Release No. 7460, Release No. 34-7460, 1964 WL 66508 (S.E.C. Release No.)

(Cite as: 1964 WL 66508 (S.E.C. Release No.))

exceptions and a supporting brief, and the Division filed a memorandum in support of the examiner's decision and a brief in reply to respondents' exceptions.

  We have independently reviewed the record on the suspension issue and find that it indicates the following:
     1. During the period June through September 1963, Linder and Bilotti made materially false and misleading statements and predictions in the offer and sale of the Class A common stock of Elite Theatrical Productions Ltd. ('Elite'), which was organized by them in May 1963 to engage in ventures in the theatrical and entertainment fields. They variously represented, among other things, that the price of the stock, which was being offered at $2 per share, would increases soon, would double or go to $4 or $5, or would go to $5 when a registration statement, filed or to be filed by Elite with respect to a proposed public offering of the stock ast $5 per share, was cleared by this Commission; [FN2] that the stock would be offered in September at $10; that Elite was a very good or safe investment, would do well and make up for some of the customers' previous losses, had a great future and in time might go on the Board and had good possibilities of earning very good money; and that there would be big capital gains.
     *2 The hearing examiner found on the record before him that there was no reasonable basis for the representations made by respondents. Linder and Bioltti, who were the officers of Elite, had no previous experience in any phase of the theatrical business. Elite's few ventures and investments in the theatrical and motion picture field during the period were unsuccessful, it never had any income, and it sustained losses. No disclosure was made to the customers of Elite's lack of an experienced management, its adverse financial condition, the substantial risk of loss involved in investments in theatrical enterprises, and the speculative nature of the entertainment business. We have repeatedly noted that in our experience predictions of substantial price rises to named figures with respect to a promotional and speculative security of an unseasoned company have been a 'hallmark of fraud.' [FN3]
  Respondents assert that the purchasers of Elite stock did not rely on any oral representations made to them prior to their purchases, and point out that the purchasers signed subscription agreements provided them by registrant which contained a conservative description of Elite's proposed business and concluded, 'I . . . acknowledge that no representations were made to me other than those contained herein.' In our opinion, the quoted statement is not sufficient to overcome the evidence in the record that false and misleading representations were made to them. [FN4] Furthermore, reliance on fraudulent representations need not be shown to establish violations of the anti-fraud provisions of the Securities Acts. [FN5] Respondents also advance the wholly spurious and irrelevant argument that it is general public knowledge that newly formed companies donot immediately operate at a profit and that the theatrical business is speculative. Aside from the fact that some new companies do immediately operate at a profit, any such general knowledge, if it exists, could not excuse the conduct of respondents in making false and misleading statements. [FN6]
     2. In August 1962 and September 1963, in attempts to remedy its deficient capital position, [FN7] registrant sold its own subordinated 12 percent notes

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

42 S.E.C. 407                                                                    Page 3

42 S.E.C. 407, Release No. 7460, Release No. 34-7460, 1964 WL 66508 (S.E.C. Release
No.)

(Cite as: 1964 WL 66508 (S.E.C. Release No.))

totaling $55,000 to three of its customers who were elderly women, two of whom
were widows, and who the evidence showed relied upon registrant for guidance a
renewal of dling of their accounts. Registrant also obtained a renewal of the
August 1962 note when it became due in September 1963. In inducing the sales and
the renewal, false and misleading statements of material facts were made to the
lenders. Linder and Bioltti represented to them that an investment in registrant
was safe, that it was a good investment, that such investment was better than
anything on the market and no risker than any other business investment, and that
the loans were being sought primarily to permit registrant to expand its
operations and increase its volume of business. In fact registrant had sustained
large operating losses and had accumulated and was increasing a substantial
operating deficit, [FN8] in September 1963 was unable to repay the $20,000 shortly
due on the first subordinated note, and the investment in registrant was highly
speculative in nature.
    *3 In the case of the subordinated loans obtained in September 1963 and the
renewal of the $20,000 subordinated loan, respondents had each of the three
lenders sign a copy of a purported blance sheet of registrant as of June 30, 1963.
However, the balance sheet was incomplete and unaudited, and the lenders were
told that signing the balance sheet was a mere formality. None of them read or
appeared to understand the balance sheet or to have had any experience in
analyzing balance sheets, nor could registrant's financial condition be determined
from the one that was exhibited to them.
    3.  In view of the foregoing, it is unnecessary to address ourselves to the
other allegations and issues discussed in the recommended decision of the hearing
examiner. We note that the hearing examiner specifically found that respondents
had willfully violated Section 17(a) of the Securities Act and Sections 10(b) and
15(c)(1) of the Exchange Act and Rules 17 CFR 240.10b-5 and 15c1-2 thereunder in
making the false and misleading statements and predictions described in paragraph
1, above. It is not necessary, however, for that issue to be resolved in
determining whether registrant should be suspended. We therefore reserve judgment
on this issue until the question of revocation is before us. We are satisfied
that there has been a sufficient showing of misconduct to make it necessary and
appropriate in the public interest and for the protection of investors to suspend
registrant's broker-dealer registration pending final determination on the
question of revocation of such registration. [FN9]

    Accordingly, IT IS ORDERED that the registration as a broker and dealer of
Linder, Bilotti & Co., Inc. be, and it hereby is, suspended pending final
determination whether such registration shall be revoked.

By the Commission (Chairman COHEN and Commissioners WOODSIDE, OWENS, BUDGE, and
WHEAT).

FN1  Section 15(b) of the Exchange Act provides:
    'Pending final determination whether the registration of a registered broker
or dealer shall be revoked, the Commission shall by order suspend such
registration if, after appropriate notice and opportunity for hearing, such

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

42 S.E.C. 407                                                                Page 4

42 S.E.C. 407, Release No. 7460, Release No. 34-7460, 1964 WL 66508 (S.E.C. Release No.)

**(Cite as: 1964 WL 66508 (S.E.C. Release No.))**

suspension shall appear to the Commission to be necessary or appropriate in the public interest or for the protection of investors.'

FN2  Elite filed a registration statement with us on September 26, 1963, with respect to a proposed public offering of 400,000 shares of Class A stock at $5 per share, naming registrant as underwriter, which has not yet become effective.

FN3  See e. g. Alexander Reid & Co. Inc., 40 S.E.C. 986, 991 (1962); Mac Robbins & Co., Inc., 41 S.E.C. 116, 131 (1962); aff'd sub non. Berko v. S.E.C., 316 F.2d 137 (C.A. 2, 1963); Equity General Investment Corporation, 42 S.E.C. 209, 212 (1964).

FN4  To the extent that this provision in the subscription agreement purported to bind any person to waive any rights he might have under the anti-fraud provisions of the Securities Acts based on the oral or other masrepresentations, the provision is void. Securities Act of 1933, Section 14; Exchange Act, Section 29(a).  We note further that the inclusion of such a statement in the subscription agreement might result in deception when the seller has knowingly made material misrepresentations, and would itself constitute a violation of the anti-fraud provisions.  Cf. Securities Act Release No. 3411 (April 10, 1951).

FN5  N. Sims Organ & Co., Inc., 40 S.E.C. 573, 575 (1961), aff'd 293 F.2d 78 (C,.A 2, 1961), Cert. denied 368 U.S. 968; Aircraft Dynamics International Corp., 41 S.E.C. 566, 594-70 (1963).

FN6  No registration statement had been filed or was in effect with respect to the Elite stock which respondents offered, sold, and delivered, and the use of the mails is conceded.  Respondents have claimed but failed to show the availability of the nonpublic offering exemption under Section 4 of the Securities Act of 1933. The offerees included persons who did not have a close relationship to or any knowledge of Elite and were uninformed investors who obviously 'need the protection of the Act.' S.E.C. v. Ralston Purina Company, 346 U.S. 119, 124-25 (1953).  Moreover, the record shows that respondents could not reasonably have relied on the subscription agreement signed by each of the 10 purchasers of Elite stock stating that he was 'purchasing these shares for investment and not with a view to distribution.' See Elliott & Company, 38 S.E.C. 381, 384-85 (1958); Securities Act Release No. 4552 (November 6, 1962).  The testimony of several purchasers indicated that they did not understand the meaning of the term 'purchasing for investment,' and a number of the purchasers were told by Linder and Bilotti that Elite would shortly make a 'public offering' or that it would obtain Commission clearance, at which time they could sell their stock at a profit.

FN7  Registrant had net capital deficiencies, as computed pursuant to Rule  17 CFR 240.15c3-1 under Section 15(c)(3) of the Exchange Act, of $1,369, and $3,920, as of July 31, 1962, November 9, 1962, and May 31, 1963, respectively.

FN8  As of September 30, 1962, registrant had a net operating deficit of about $27,700, which by December 1963 had increased to over $60,000.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

42 S.E.C. 407                                                                              Page 5

42 S.E.C. 407, Release No. 7460, Release No. 34-7460, 1964 WL 66508 (S.E.C. Release
No.)

**(Cite as: 1964 WL 66508 (S.E.C. Release No.))**


FN9   To whatever extent the exceptions to the recommended decision of the hearing
examiner involved issues which are relevant and material to the decision, we have
by our findings and opinion sustained or overruled such exceptions to the extent
that they are in accord or inconsistent with the views herein.

 42 S.E.C. 407, Release No. 7460, Release No. 34-7460, 1964 WL 66508 (S.E.C.
Release No.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 8

Westlaw.

Not Reported in F.Supp.2d                                                                Page 1

Not Reported in F.Supp.2d, 2005 WL 273298 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

---

Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
B. LEWIS PRODUCTIONS, INC., Plaintiff,
v.
Vaughn BEAN, Defendant.
**No. 02-93-KAJ.**

Jan. 28, 2005.

*MEMORANDUM ORDER*

JORDAN, J.

*1 This is a breach of contract and fraud action, brought under the diversity jurisdiction of this court. (*See* Docket Item ["D.I."] 1.) Plaintiff and counterclaim defendant B. Lewis Productions, Inc. ( "BLP"), a New York corporation with its principal place of business in New York, and third-party defendant Butch Lewis ("Lewis"), a citizen of Delaware, filed a motion *in limine* (D.I. 62 at 18-23; the "Motion") seeking to prevent the defendant, Vaughn Bean ("Bean"), a citizen of Illinois, (D.I. 35 at ¶¶ 14-16) from introducing at trial any evidence of damages predating February 4, 1999, because "Bean's counterclaims and third-party claims are barred by the applicable statute of limitations...." [FN1] The case is scheduled to go to trial next week. As I indicated during the pretrial conference last week (1/18/05 Tr. at 14-15), the Motion is nothing less than a motion for partial summary judgment and, therefore, should have been raised by BLP and Lewis no later than the dispositive motion deadline set in the scheduling order.

> FN1. BLP and Bean are parties to a contract pursuant to which BLP was to provide services promoting Bean as a heavyweight boxer. As originally filed, BLP's and Lewis's motion *in limine* sought to prevent any evidence of damages predating July 11, 2000, three years prior

to Bean's filing of his counterclaims and third-party claims. (*See* D.I. 62 at 18.) In a follow-up letter to the court, Plaintiff amended the requested date to preclude evidence of damages prior to February 4, 1999, three years prior to the filing of the Complaint. (*See* D.I. 66 at 4-5.)

Bean has rightly complained of the dereliction of BLP and Lewis in this regard. (D.I.72.) He asserts that their affirmative statement in a stipulated scheduling order in this case that "the parties agree that neither will make a case-dispositive motion" (D.I. 51 at 3) should be taken as effecting a waiver of the statute of limitations defense that they now seek to raise. BLP and Lewis counter that they are not bound by a decision to forego an earlier dispositive motion and that, having raised the affirmative defense in their replies to the counterclaims and third-party claims, they should be free to raise the statute of limitations defense as late as a motion for judgment as a matter of law under Rule 50. [FN2]

> FN2. The cases they cite, however, are not enlightening, since they merely note that a statute of limitations defense was addressed in the context of a Rule 50 motion and they say nothing of whether the movant had ignored a specific scheduling order. Nor do they address the circumstance where a party affirmatively represents that no dispositive motions will be made.

Bean has a serious argument that, under the circumstances, the earlier representations and litigation of conduct of BLP and Lewis should constitute a waiver of their statute of limitations defense. Ultimately, however, the substantive rights of the parties in this case ought not turn on a procedural failure when there is a dispositive legal issue that both sides have been on notice of from

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the pleadings and on which no one has been deprived of the opportunity to take discovery or to present argument. I therefore decline to hold that there has been a waiver of the statute of limitations defense or a procedural default warranting a sanction akin to waiver.

As to the substance of the Motion, the parties agree, it seems, that if Delaware's three year statute of limitations applies, then Bean has no counterclaim or third-party claim for damages flowing from events that occurred prior to February 4, 1999. The parties also apparently agree that New York law applies to the substantive claims in the case and that, if New York's six year statute of limitations also applies, the counterclaims and third-party claims will reach back to February of 1996. (*See* D.I. 62 at 18-23.) The dispute, of course, is over which statute of limitations applies. BLP and Lewis argue that, under Delaware's borrowing statute, Delaware's three year statute must apply. (*Id.* at 18-21.) Bean argues that the Delaware Supreme Court's recent interpretation of the borrowing statute means that New York's lengthier statute of limitations applies. (*Id.* at 21-23.) Bean's view is the correct one.

*2 Bean's argument includes the assertion that critical aspects of his counterclaims and third-party claims would not be time barred under the longer New York statute of limitations and that it would be manifestly unfair to allow BLP and Lewis to bring this case in Delaware, forcing Bean to bring his compulsory counterclaims, and thereby deprive him of the longer statute of limitations that would have applied had he been permitted to bring his action in New York.

Delaware's borrowing statute states as follows:
Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action. Where the cause of action originally accrued in favor of a person who at the time of such accrual was a resident of this State, the time limited by the

law of this State shall apply.

10 *Del. C.* § 8121.

Counterclaims are "actions" for statue of limitations purposes. *See Delaware Chemicals, Inc. v. Reichhold Chemicals, Inc.,* 121 A .2d 913, 918 (Del. Ch.1956) ("a counterclaim seeking affirmative relief is an 'action' within the meaning of the statute [of limitations]"). But that does not necessarily mean that they are "actions" for purposes of the borrowing statute. On the contrary, two weeks ago, the Delaware Supreme Court issued its *en banc* decision in *Saudi Basic Industries Corp. v. Mobil Yanbu Petrochemical Co., Inc.,* 2005 WL 120789 (Del. Jan. 14, 2005), in which it held, in circumstances with similarities to those here, that a " literal construction of the borrowing statute, if adopted, would subvert the statute's underlying purpose[,]" which is to discourage forum shopping. *Id.* at *9. The court observed that,
[b]orrowing statutes such as [Delaware's] are typically designed to address a specific kind of forum shopping scenario-cases where a plaintiff brings a claim in a Delaware court that (i) arises under the law of a jurisdiction other than Delaware and (ii) is barred by that jurisdiction's statute of limitations but would not be time-barred in Delaware, which has a longer statute of limitations. Under that 'standard scenario,' the borrowing statute operates to prevent the plaintiff from circumventing the shorter limitations period mandated by the jurisdiction where the cause of action arose.

*Id.* However, the court noted, a literal application of the statute cannot be countenanced when it would circumvent the purpose of the statute, as is the case when a plaintiff can be seen to be taking advantage of the shorter Delaware statute of limitations to deprive a defendant of claims he would otherwise have. *Id.* at *10 (holding that literal application of borrowing statute would subvert the statute by allowing plaintiff "to prevail on a limitations defense that would never have been available to it had the [defendants'] ... claims been brought in the jurisdiction where the cause of action arose").

*3 Delaware's connection to this matter appears to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 273298 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

be far less significant than New York, which BLP and Lewis have themselves conceded is the jurisdiction whose substantive law applies. (D.I. 62 at 3 n. 1.) While the contract was executed in Delaware, neither of the parties to the contract, BLP and Bean, are citizens of this state, nor does it appear that performance of the contractual obligations was anticipated to take place in this state. The tort claims too appear to be wholly unrelated to this jurisdiction. Indeed, BLP and Lewis acknowledge that "Bean was not a Delaware resident and his claims arose outside of Delaware." (D.I. 66 at 4.)

Thus, the same kinds of considerations that operated to make the literal application of Delaware's borrowing statute inappropriate in *Saudi Basic* appear to be applicable here. Allowing BLP and Lewis to bring suit here and have the advantage of the shorter statute of limitations would effectively encourage the forum shopping denounced by the Delaware Supreme Court, and it would unfairly deprive Bean of rights to which he may otherwise be entitled. [FN3] Consequently, I hold that Delaware's borrowing statute does not apply and, therefore, neither does Delaware's three year statute of limitations. *See Saudi Basic,* 2005 WL 120789 at *10 ("because the Superior Court properly ruled that the borrowing statute did not apply, it follows that that court also correctly held that [the defendants'] counterclaims ... were not time-barred.") The Motion is DENIED.

> FN3. I emphasize that, on a more developed record, my conclusions about the locus of the disputes would perhaps be different, but the lack of record support for BLP's and Lewis's late-filed Motion is a problem of their own creation. I also reiterate that this is not a case where discovery had closed without an opportunity to explore facts and legal theories pertinent to the Motion, nor is it a case where significant expense had been invested by either side in reliance on positions taken during discovery or motions practice. On the contrary, this case has been notable chiefly for the absence of

pretrial engagement by the parties. Hence, considering the Motion on its merits is unfair to neither party, and the outcome is not influenced by factors which might exist in the context of a more developed record. If, for any reason, a higher court should disagree with my ruling on this issue, the trial record should be sufficiently clear, both in the presentation of the evidence and in the form of the verdict, to permit damages predating February 4, 1999 to be backed out of the verdict without the necessity of a retrial. The parties are instructed to prepare their proofs accordingly and to confer on an appropriate form of verdict.

D.Del.,2005.

B. Lewis Productions, Inc. v. Bean

Not Reported in F.Supp.2d, 2005 WL 273298 (D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Jeffrey S. Goddess, do hereby certify that on March 21, 2006, I electronically filed

the foregoing COMPENDIUM OF UNREPORTED DECISIONS with the Clerk of the Court using

CM/ECF which will send notification of such filing to all registered participant(s), including:

> James L. Holzman, Esquire
> J. Clayton Athey, Esquire
> Prickett, Jones & Elliott, P.A.
> 1310 King Street
> Wilmington, DE 19801

Jeffrey S. Goddess (Del. Bar No. 630)
ROSENTHAL, MONHAIT, GROSS
& GODDESS, P.A.
(302) 656-4433
jgoddess@rmgglaw.com