EXHIBIT 5

Westlaw.

Not Reported in F.Supp.                                                                                      Page 1

Not Reported in F.Supp., 1992 WL 226912 (W.D.Mich.), Blue Sky L. Rep. P 73,640, Fed. Sec. L. Rep. P 96,939

**(Cite as: 1992 WL 226912 (W.D.Mich.))**

**H**

**Motions, Pleadings and Filings**


United States District Court, W.D. Michigan.
IN RE ROSPATCH SECURITIES LITIGATION;
ATLANTIS GROUP, INC.
v.
ROSPATCH CORPORATION, et al.;
FREBERG, et al.
v.
ROSPATCH CORPORATION, et al.
**Nos. 1:90-CV-805, 1:90-CV-806.**

July 8, 1992.

HILLMAN, Senior District Judge.

**\*1** Before the court are motions for summary judgment in these consolidated securities fraud cases. These lawsuits center on alleged fraud in the public financial statements and stock sales of Rospatch Corporation ("Rospatch"), [FN1] a Michigan corporation headquartered in Grand Rapids. The lawsuits allege violations of federal and state securities laws.

Two lawsuits have been filed against Rospatch and its former accountants and lawyers. One was filed by Atlantis Group, Inc., a major Rospatch shareholder (Case No. 1:90-cv-805). The other is a class action lawsuit filed on behalf of those who purchased Rospatch stock between March 30, 1987 and March 14, 1990 (Case No. 1:90-cv-806). [FN2] Rospatch Corporation is no longer an active defendant in either of these lawsuits, having settled all claims against it. *See In Re Rospatch Secur. Litig.,* Case Nos. 1:90-cv-805/1:90- cv-806, Opinion Approving Partial Class Settlement and Granting Motion for Bar Order (W.D.Mich. April 3, 1992). The lawsuits remain pending only against Rospatch's former accountants and law firm.

INTRODUCTION
1. Identification of Parties.

Plaintiff Atlantis Group, Inc. ("Atlantis") is a Delaware corporation with its base of operations in Florida. From October 8, 1987 to November 18, 1988, Atlantis purchased 476,100 shares of Rospatch common stock, comprising about 20 percent of Rospatch's outstanding stock. From July 1989 to December 1991, Atlantis also controlled two seats on the Rospatch Board of Directors. Those seats were held by Earl Powell and William Rogers. Powell is the Chief Executive Officer and a member of the Board of Directors of Atlantis. Rogers is a senior vice president of Trivest, Atlantis' parent company. The plaintiff Class is the certified class of purchasers of Rospatch stock during the period from March 30, 1987 through March 14, 1990. The Class is represented by Alan Freberg.

Defendant Warner Norcross & Judd ("WNJ") became Rospatch's outside legal counsel in 1965. WNJ served as Rospatch's primary source of outside legal advice for over 25 years until it was terminated as the company's law firm in October 1990. Defendant Paul K. Gaston ("Gaston") was the WNJ attorney primarily responsible for handling the Rospatch account from 1974 until 1990. In addition, Gaston served as a member of the Rospatch Board of Directors beginning in April 1985. [FN3] Defendant Arthur Andersen & Co. ("Andersen") was Rospatch's accounting firm and independent auditor at all times relevant to this lawsuit.

Further background about the identity of the parties is contained in this court's opinion on the motions to dismiss. *See In re Rospatch Secur. Litig.,* 760 F.Supp. 1239 (W.D.Mich.1991).

II. Claims on which summary judgment is sought.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2

Not Reported in F.Supp., 1992 WL 226912 (W.D.Mich.), Blue Sky L. Rep. P 73,640, Fed. Sec. L. Rep. P 96,939

**(Cite as: 1992 WL 226912 (W.D.Mich.))**

Plaintiff Atlantis filed suit against Rospatch, WNJ and Gaston and other defendants on March 14, 1990. Andersen was added as a defendant by virtue of Atlantis' Second Amended Complaint of October 30, 1990. The current complaint alleges the following violations by Andersen, WNJ and Gaston:

**\*2** 1. Primary violation of Section 10/Rule 10b-5 of the 1934 Securities Exchange Act;

2. Aider and abettor liability for violation of Section 10/Rule 10b-5 of the 1934 Act;

3. Control person liability under Section 20 of the 1934 Act (against WNJ and Gaston only);

4. Violation of the Florida Blue Sky Law;

5. Violation of the Florida Civil Remedies for Criminal Practices ("RICO") statute; and

6. Violation of Michigan common law fraud.

The certified class of purchasers of Rospatch stock, now represented by Alan Freberg, filed suit against Rospatch, WNJ and Gaston, and other defendants on April 3, 1990. Andersen was added as a defendant on November 8, 1990. The Class complaint contains nearly identical factual allegations against these defendants as those in the Atlantis complaint. The Class complaint charges Andersen, WNJ and Gaston with primary and aider and abettor liability under 10b-5. It also alleges violations of Michigan common law fraud.

Defendants WNJ and Gaston move for summary judgment on all of plaintiffs' federal and state securities claims. In short, WNJ and Gaston maintain they owed no duty to purchasers of Rospatch stock under either federal or state securities law. In addition, WNJ and Gaston claim the Florida Blue Sky and RICO statutes do not apply to this action.

Defendant Andersen moves for partial summary judgment on claims under the Florida Blue Sky and RICO acts, and on certain damages issues. Andersen does not seek summary judgment on the 10b-5 claims against it. Both Andersen and WNJ join in each other's summary judgment motions.

Class plaintiffs and plaintiff Atlantis move for summary judgment on defendants' affirmative

defenses raised in their answers to the current complaints. Plaintiffs maintain that these affirmative defenses are unfounded, moot, and redundant.

All motions have been extensively briefed by the parties. Oral argument was heard on June 4, 1992.

After summarizing the factual background to this lawsuit, I will address the motions in the following sequence:

1. WNJ's motion for summary judgment as to all federal securities claims;

2. WNJ and Andersen's motions for summary judgment as to state law claims;

3. Andersen's motion for partial summary judgment as to post-purchase events and attorneys' fees;

4. Plaintiffs' motion for summary judgment as to defendants' affirmative defenses.

FACTUAL BACKGROUND

In June 1980, Joseph Parini became Rospatch's executive officer. In addition to the company's traditional wood and label products, Parini encouraged Rospatch to form a Technical Products Group ("TPG") with emphasis in the defense electronics and aerospace businesses. From 1982 to 1986, Rospatch acquired or purchased substantial interests in a number of such companies for the TPG. These included EDMAC Corp. (later "RESD"), Guidance Technology, Inc. ("GTI"), Israeli-based Metratron Ltd. and Atir Ltd., Infrared Industries, Inc. ("IRI"), and Santa Barbara Applied Optics ("SBAO"). WNJ acted as counsel to Rospatch for these acquisitions.

**\*3** During and after these acquisitions, a variety of financial and accounting problems surfaced concerning the TPG companies. Rospatch began to question the net worth and book value of some of the acquired subsidiaries, including Infrared, SBAO and RESD. See Analysis, part II.B.2., *infra*. Weak accounting controls were discovered. Internal audits were deficient. Questions arose about calculation of goodwill and the improper release of reserves. Cost overruns with RESD's 99-channel receiver program were so serious that the SEC

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 3

Not Reported in F.Supp., 1992 WL 226912 (W.D.Mich.), Blue Sky L. Rep. P 73,640, Fed. Sec. L. Rep. P 96,939

**(Cite as: 1992 WL 226912 (W.D.Mich.))**

launched an inquiry into Rospatch's 1987 Form 10-K.

Numerous public documents were filed during this period which failed to mention the financial problem at the TPG. These documents included: proxy statements and notices of annual shareholders meetings, Rospatch's 1987 annual report, and Rospatch's SEC filings beginning with the company's 1986 Form 10-K dated March 30, 1987. *See* Atlantis' Third Amended Complaint, ¶ 32-34; Second Consolidated Amended Class Complaint, ¶ 37. Defendants WNJ, Gaston, and Andersen had a substantial role in the preparation of these public documents. Some of the documents were signed by Andersen as auditors, and by Gaston as a director of Rospatch. None were signed by WNJ, but WNJ lawyers drafted portions of Rospatch's SEC filings for the company's management. *See e.g.* Gaston deposition at 20-21, 28-29; Waterbury deposition at 154-155. It is undisputed that WNJ worked on some of these documents. WNJ also acted as counsel to Rospatch in its acquisition of many of the TPG companies. From their professional experience, these defendants also knew the documents would be released to the public and undoubtedly would be relied upon by stock purchasers.

Rather than publicly decrease the book value of the TPG during this 1986-1988 period, Rospatch made optimistic public statements about the TPG's financial outlook. On December 5, 1988, the Rospatch board decided to pursue a sale of the TPG. According to the financial statement for the year-end 1988, the book value of the TPG at that time was $30.259 million. *See* Rospatch 1988 Form 10- K, filed March 31, 1989 at 39. At that time, Rospatch stated:

> The Company currently estimates that the Technical Products Group will be sold at an amount in excess of book value after considering selling and other expenses related to the disposition. In addition, the group is expected to be profitable in 1989.
> *Id.* at 38.

The anticipated profitability never materialized.

In 1989, Rospatch "wrote down" fifty-nine percent of the TPG's net asset value. On May 22, 1989, Rospatch wrote off at TPG a loss of $7.25 million. *See* Rospatch 1989 First Quarter Form 10-Q at 3, 8. Rospatch stated that the write down "revised" its estimated selling price of the TPG. *Id.* Again, on November 10, 1989, Rospatch wrote down TPG asserts by $3.25 million. *See* Rospatch 1989 Third Quarter Form 10-Q, filed November 16, 1989, at 3, 9-10. By December 1989, Rospatch had written off 16.875 million in the TPG's value since the previous year (59% of the TPG's value, and 36% of Rospatch's net worth). *See* Rospatch 1989 Form 10-K, filed March 30, 1990, at 55. *See also* Report of Disinterested Person Professor Joel Seligman ("Seligman Report") at 159-160. [FN4]

*4 No specific event or economic downturn happened in 1989 to cause the TPG to lose almost 60 percent of its value. Plaintiffs maintain that Rospatch and its co-defendants knew the TPG was experiencing financial problems in 1986 to 1988, and failed to timely disclose those financial problems to the investing public, thereby committing securities fraud.

A dispute exists why Rospatch waited until 1989 to take the write downs at TPG. Defendants allege Rospatch had a sound basis for its financial optimism surrounding the TPG. Plaintiffs maintain information was omitted to avoid a drop in the stock price and thwart a possible hostile takeover. [FN5]

It is undisputed that Rospatch attracted strong takeover interest beginning on January 19, 1987. The company received several takeover offers in 1987 and 1988, including takeover offers from Atlantis which management viewed as hostile. As early as 1985, the Rospatch Board of Directors adopted a number of "shark repellent measures" to discourage hostile takeover attempts. These included the adoption of a shareholder rights plan on December 9, 1985. WNJ and Gaston were active in helping create these anti-takeover measures. *See, e.g.,* Atlantis' Brief in Response to WNJ motion for Summary Judgment, Exhibits 12, 1413 and 1416.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                 Page 4

Not Reported in F.Supp., 1992 WL 226912 (W.D.Mich.), Blue Sky L. Rep. P 73,640, Fed. Sec. L. Rep. P 96,939

**(Cite as: 1992 WL 226912 (W.D.Mich.))**

In December 1988, Rospatch's board decided to sell the TPG and by the spring of that year made plans to sell the entire company. By May 31, 1989, the Rospatch board had received offers from Atlantis, Dynascan, National Home Products, and a management group for purchase of the entire company. After a sale to National Home Products fell through, the Rospatch board declared its intent to sell Rospatch to Atlantis. *See* 6/20/89 Minutes of Rospatch board meeting. In anticipation of Atlantis' purchase of the company, Powell and Rogers were elected to the Rospatch board on July 31, 1989. By September 18, 1989, Atlantis announced that it was not going to follow through with its proposed purchase of Rospatch, citing accounting and other problems at Rospatch uncovered during Atlantis' due diligence review of the company. In late 1989, the TPG was ultimately sold in three separate transactions.

LEGAL ANALYSIS
I. Standard for summary judgment.

Summary judgment is appropriate where the pleadings, discovery materials, and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Partial summary judgment is appropriate to narrow the disputed issues for trial. *See* Fed.R.Civ.P. 56(d).
In ruling on summary judgment, the court should look beyond the pleadings to examine the record as a whole, drawing all justifiable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

In a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issues of material fact remain in dispute. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1989). If the moving party meets this burden, the party opposing the motion must come forward with specific facts to show a genuine issue for trial. *Matsushita,* 475 U.S. at 587; *Kramer v. Bachan Aerospace Corp,* 912 F.2d 151, 153-54 (6th Cir.1990). To sustain this burden, the non-movant cannot rest on the pleadings. *Celotex,* 477 U.S. at

324. Rather, the non-movant must come forward with specific facts or affidavits to support its claims and show the existence of a genuine, material issue in dispute. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50, 106 S.Ct. 2505 (1986).

**\*5** The same substantive standards apply to a motion for partial summary judgment under Rule 56(d). Partial summary judgment is designed to "salvage some results from the judicial effort involved in the denial of a motion for summary judgment." *See Warner v. United States,* 698 F.Supp. 877, 879 (S.D.Fla.1988).

II. Federal Securities Claims.

Defendant WNJ moves for summary judgment on all federal securities claims raised under § 10(b) and Rule 10b-5 (collectively 10b-5) and under § 20 of the Securities Exchange Act of 1934. Defendant Andersen does not seek summary judgment on the merits of these federal securities claims. In plaintiffs' complaints, WNJ is charged with two types of liability under 10b-5: as a primary violator, and as a secondary violator for aiding and abetting a primary violations. These issues will be addressed in turn.

A. WNJ's liability as a primary violator under 10b-5.

Rule 10b-5 provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or the mails, or of any facility of any national securities exchange,
(1) to employ any device, scheme, or artifice to defraud,
(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase of sale of any security.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 5

Not Reported in F.Supp., 1992 WL 226912 (W.D.Mich.), Blue Sky L. Rep. P 73,640, Fed. Sec. L. Rep. P 96,939

**(Cite as: 1992 WL 226912 (W.D.Mich.))**

Rule 10b-5, 17 CFR § 240.10b-5 (1983). *See* § 10(b) of the SEC Act of 1934, 15 U.S.C. § 78j(b).

WNJ's motion for summary judgment as a primary violator of 10b-5 focuses on these elements. WNJ maintains that it is entitled to summary judgment because it owed no duty to disclose material facts to plaintiffs and because it did not make any independent material misstatements to plaintiffs. WNJ's position is that it had no duty to disclose because it had no direct dealings with the purchasers of Rospatch stock and was not in a fiduciary relationship with them.

1. Duty to Disclose

Where as here liability under 10b-5 is based on failure to disclose material misstatements, the Sixth Circuit has held that a person is not primarily liable unless he had a duty to disclose the information. *SEC v. Washington County Utility Dist.,* 676 F.2d 218, 223 (6th Cir.1982). The Sixth Circuit applies a "direct contact" test for determining when such a duty to disclose exists. *Id.; SEC v. Coffey,* 493 F.2d 1304, 1315 (6th Cir.1974), *cert. denied,* 420 U.S. 908 (1975).

In *Washington County,* the Sixth Circuit explained the type of "direct contacts" required for primary liability. This may include direct dealing with "the other side"--in this case, direct dealing with the purchasers of Rospatch stock. 676 F.2d at 223. However, "direct contact between the parties is but *one* type of circumstance which will give rise to a duty to disclose." *Id.* at n. 9. In addition, a "person undertaking to furnish information which is misleading because of a failure to disclose a material fact is a primary participant." *Id.* at 223.

*6 The Sixth Circuit recently applied this standard in *Molecular Technology Corp. v. Valentine,* 925 F.2d 910 (6th Cir.1991). In that case, the court reversed a grant of summary judgment for defendants in circumstances similar to this case. The Sixth Circuit held that a jury question existed whether an attorney who drafted documents and edited marketing information in connection with a securities offering had violated section 10(b). *Id.* at

918. In that case, attorney Snyder knew that the company at issue had substantial debts and other problems but did not disclose any of that information in offering circulars. The court held "a reasonable jury could find that Snyder knew certain information in the amended offering circular was misleading and that Snyder had a duty to disclose that information to investors such as the plaintiffs under 10(b)/rule 10b-5." *Id.*

Applying this "direct contacts" test, summary judgment is inappropriate. Attorneys at WNJ, especially Paul Gaston, were intimately involved with the operation and financial condition of Rospatch Corporation. Gaston was a director with close ties to management and virtually unlimited access to information about the company. Rospatch relied on WNJ for almost all of its legal services. WNJ attorneys assisted in preparation of Rospatch's press releases and its SEC Forms 10-K and 10-Q. *See e.g.* Gaston deposition at 20- 21, 28-29; Waterbury deposition at 154-155. Many of those documents, including narrative portions, were drafted by WNJ. *Id.* This direct participation in preparation of documents constitutes "direct contacts" under the law of the Sixth Circuit. Accordingly, WNJ had a legal duty to disclose material omissions in those documents.

WNJ takes the position that a lawyer has a duty of disclosure only where a fiduciary relationship exists between the lawyer and the stock purchasers. Citing cases such as *Schatz v. Rosenberg,* 943 F.2d 485 (4th Cir.1991), *cert. denied* 112 S.Ct. 1475 (1992), WNJ maintains the Sixth Circuit test is contrary to the trend in other circuits. *See also Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490 (7th Cir.1986) (law firm has no duty to disclose absent some fiduciary duty); *Abell v. Potomac Ins. Co.,* 858 F.2d 1104 (5th Cir.1988), *vacated on other grounds,* 492 U.S. 914 (1989) (underwriter's counsel owed no duty to disclose inaccuracies in offering statements to bondholders).

First and most important, these cases conflict with the law of the Sixth Circuit, which is binding on this court. The Sixth Circuit view is not only logical, but consistent with other circuits which hold that a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                        Page 6

Not Reported in F.Supp., 1992 WL 226912 (W.D.Mich.), Blue Sky L. Rep. P 73,640, Fed. Sec. L. Rep. P 96,939

**(Cite as: 1992 WL 226912 (W.D.Mich.))**

duty to disclose may arise from a special relationship like that between WNJ and Rospatch, even absent a fiduciary relationship. *See Arthur Young & Co. v. Reves,* 937 F.2d 1310, 1330 (8th Cir.1991), *cert. denied,* 112 S.Ct. 1165 (1992). *Roberts v. Peat, Marwick, Mitchell & Co.,* 857 F.2d 646, 653 (9th Cir.1988) (duty to disclose is fact-specific inquiry).

*7 Second, none of the cases cited by WNJ involve a key player such as Gaston, who held a pivotal role in the target company. *See, e.g.,* Gaston, Waterbury, Berg and Wade depositions. Gaston was a dominating director on the board with a wide range of duties and ready access to financial and other corporate information. Evidence submitted by plaintiffs reveals knowledge by Gaston of accounting and financial problems at Rospatch and some knowledge of those problems by others at WNJ, like Waterbury. In these circumstances, Gaston's knowledge as a director cannot be separated from the knowledge of his law firm. [FN6] In addition, the lawyer/director may also be held to a higher standard of care. *See Blakely v. Lisac,* 357 F.Supp. 255, 266 (D.Ore.1972) (lawyer/director's role goes "beyond a lawyer's normal one.")

Third, WNJ's services to Rospatch were more than the "daily grist of the mill." In addition to Gaston's activities, WNJ lawyers had detailed knowledge of Rospatch's business and legal affairs. WNJ had over 50 separate accounts in its representation of Rospatch. None of the cases cited by WNJ involve as direct and close a relationship between lawyers and the target company as exists in this case. *Barker* and *Schatz* were pure "tattling" cases; the lawyers did not review materials released to the public which stock purchasers could be expected to read. By contrast, WNJ reviewed and drafted Rospatch public documents relating to the securities. Lawyers in *Abell* were somewhat more involved than those in *Barker* and *Schatz,* but did not sign any offering statements or documents used in the offering statements. 858 F.2d at 1126. Moreover, *Abell* has since been vacated.

Finally, *Schatz* has been criticized on ethical grounds. The *National Law Journal* criticized

*Schatz* for concluding that lawyers "have a special immunity" from the responsibility not to assist a client in making a representation the lawyer knows is fraudulent. *See* Hazard, "Schatz Ruling Errs on Legal, Moral Basis," *National Law Journal,* Jan. 20, 1992, p. 17. Hazard concludes that *Schatz* gives lawyers a "license to steal." *Id.*

In conclusion, WNJ satisfies the "direct contacts" test of the Sixth Circuit. The law firm and its partner, Paul Gaston, had an extremely close relationship with Rospatch. Among other involvement, they prepared public documents which they knew would be made available to purchasers of Rospatch stock. Under all these circumstances, WNJ was not, as a matter of law, free from a duty to disclose material omissions.

2. Independent Misstatements.

WNJ contends that it did not make any independent misstatements of fact. It supports this statement with affidavits by Gaston and the law firm. I agree that plaintiffs have not produced specific evidence pointing to WNJ as the origin of a specific misstatement. But plaintiffs have pointed to specific SEC forms, e.g., Rospatch's 1988 Form 10-K, which contain potentially material misstatements. Since the record is clear that WNJ attorneys drafted portions of Rospatch's public SEC Forms and press releases, a material issue of fact exists as to whether WNJ made the alleged misstatements in those documents. [FN7]

*8 Moreover, plaintiffs have produced evidence from which a jury could conclude that WNJ omitted material information from documents prepared prior to Atlantis' purchase of Rospatch stock. This also precludes a grant of summary judgment for WNJ since an independent omission can also produce primary liability under 10b-5.

WNJ's position that its work for Rospatch was not done for the purpose of selling securities does not negate a genuine issue of fact as to its liability under 10b-5. The forms WNJ drafted were issued to the public with knowledge that they would be read by purchasers of Rospatch stock. That is enough to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1992 WL 226912 (W.D.Mich.), Blue Sky L. Rep. P 73,640, Fed. Sec. L. Rep. P 96,939

**(Cite as: 1992 WL 226912 (W.D.Mich.))**

meet the requirement that the misstatements occur "in connection with" the purchase or sale of security. *See generally Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723 (1975); *Cammer v. Bloom,* 711 F.Supp. 1264, 1283-85 (D.N.J.1989).

For all these reasons, I conclude that there is a genuine issue of fact concerning WNJ's liability as a primary violator under 10b-5.

B Secondary liability as an aider and abettor.

According to the Sixth Circuit, the elements of a secondary violation of 10b-5 are a primary violation by another; a "general awareness" by the defendant that his role was part of an overall activity that was improper; and "knowing" and "substantial assistance" in the violation. *See SEC v. Coffey,* 493 F.2d at 1316. Courts often read these last two requirements together, finding that the greater the assistance in the violation, the less awareness is required (and vice versa). *See* 4 Alan Bromberg and Lewis Lowenfels, *Securities Fraud & Commodities Fraud* § 8.5(654) (1988) (discussing cases).

1. Primary violation by another.

For purposes of this motion, WNJ does not dispute that there is evidence of a primary violation sufficient to preclude summary judgment. WNJ Brief in Support of Motion for Summary Judgment at 48. Rather WNJ maintains that it did not have a general awareness of the fraud, and provided no knowing and substantial assistance in the violation.

2. WNJ's awareness of the alleged fraud.

With regard to WNJ's general awareness of its role in an improper activity, plaintiffs have submitted numerous documents, which reveal that WNJ lawyers were aware of some of the problems at the TPB companies central to the alleged fraud. In particular, the following exhibits to Atlantis' motion for summary judgment exemplify the nature of these problems and WNJ's knowledge:

1. *Exhibit 897,* A memorandum from WNJ's

Stephen Waterbury to Gaston, dated June 3, 1986 prepared at Gaston's request. This memorandum raises a number of concerns about Rospatch's acquisition of Infrared/SBAO. Waterbury was particularly concerned that he had no assurance Infrared's net book value would not decline significantly. *See id.,* at 12. Waterbury noted that Infrared had other significant problems, including:

--litigation liability
--inadequate product warranties
**\*9** --turnover of key personnel
--low quality financial and accounting personnel, controls & reporting
--questionable net worth & calculation of 1986 earnings
--environmental liabilities
--failure of other potential suitors to consummate purchases
--tax liability re: bad debt deduction of over $380,000.

Thus, WNJ knew of potential problems at Infrared and understood the accounting, financial and internal control concepts which form the basis of many of the allegations of securities fraud. *See also* Exhibits 896, 989 and Waterbury deposition.

2. *Exhibit 1092,* Minutes of Rospatch board meeting on 2/23/87 attended by Gaston. At this meeting, the board received a report about financial and accounting problems at the Electronic Systems Division (RESD) and with RESD's 99-channel receiver project. Gaston stated in deposition that he knew the auditors were uncomfortable with RESD's weak accounting controls. He further stated that he knew the division had taken an apparently unjustified, large write-off ("a million dollars and a half or perhaps two million.") *See* Gaston deposition at 289-302.

3. *Exhibit 992,* a November 9, 1987 Gaston memorandum to the file, and *Exhibit 7,* a November 16, 1987 report by Stern Stewart & Company. Exhibit 992 is a memorandum in which Gaston reports management interest in a leveraged buyout to "emasculate Atlantis." Gaston alleges that one potential buyer of Rospatch might be willing to sell back the TPG to management for $12 million. At the same time, the Stern Stewart Report notes that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 8

Not Reported in F.Supp., 1992 WL 226912 (W.D.Mich.), Blue Sky L. Rep. P 73,640, Fed. Sec. L. Rep. P 96,939

**(Cite as: 1992 WL 226912 (W.D.Mich.))**

the TPG was valued at $29.9 million on Rospatch's books. This combination of circumstances supports the conclusion that Gaston knew the TPG companies were overvalued. In addition, WNJ's Tracy Larsen and Waterbury had access to other documents showing the TPG's accounting problems and lack of internal controls. *See, e.g.,* Atlantis Exhs. 786, 1072 (discussing lack of audits and inventories at GTI, RESD).

In response, WNJ offers exhibits and affidavits of Gaston and the law firm. These exhibits support WNJ's contention that it had reason to believe the TPG had a high value despite poor performance, and that the law firm did not knowingly misstate Rospatch's value. On a motion for summary judgment, however, the court must draw all reasonable inferences in favor of the non-movant. WNJ's evidence as to its knowledge fails to negate disputed issues of fact. Instead, WNJ's evidence reveals a classic dispute of material fact, incapable of resolution on summary judgment.

In sum, WNJ's role in preparation of Rospatch public documents was such that it knew the material could be relied on by stock purchasers. Evidence exists from which a jury could conclude that WNJ knew the public documents omitted material financial information about the TPG. As a result, a jury could conclude WNJ was aware it was involved in improper activity.

3. WNJ's knowing and substantial assistance.

**\*10** Similar evidence exists of WNJ's knowing and substantial assistance in the alleged fraud. A jury could find that WNJ's role was substantial. Gaston's extensive involvement with the company has already been discussed in detail, along with WNJ's role in acquiring the TPG companies and assisting in business decisions. In addition, WNJ drafted portions of the SEC documents on behalf of Rospatch management. The Sixth Circuit has held that similar conduct constitutes substantial assistance. *See Molecular Tech,* 925 F.2d at 918; *Washington County,* 676 F.2d at 226-27.

WNJ maintains that because its alleged liability is based on omissions, plaintiffs must prove more than knowledge of the violation, but rather a "high conscious intent" to violate the securities laws. *Coffey,* 493 F.2d at 1317. I disagree. *Coffey* required high conscious intent only to insure that "a person who is not primarily liable for a violation" was not held liable as an aider and abettor "for an innocent omission." *Id.* In this case, by contrast, evidence exists from which a jury could conclude that WNJ was aware of the alleged failure to disclose material information. Without an innocent omission, no "high conscious intent" is required.

Instead, knowing assistance in the violation is enough. A factual dispute exists whether WNJ knowingly assisted in the violation. WNJ takes the position that, at worst, it was mistaken in believing Rospatch's rosy forecasts concerning the TPG's outlook, goodwill, value, inventory, and other issues. *See* Gaston Aff. at ¶¶ 37-39; WNJ Aff. at ¶¶ 19-21. Similarly, WNJ states it relied on Andersen to compile accurate financial statements. Thus, WNJ claims it had no actual knowledge of the alleged fraud on purchasers of Rospatch stock but was merely relying on the statements of others. On the other hand, there is evidence from which a jury could find that Gaston and other WNJ lawyers knew the TPG was worth less than its public book value. As already discussed, WNJ also knew the public documents it helped to draft would be released to potential purchasers. Such knowledge of the alleged fraud will suffice in these circumstances to create a genuine factual issue as to the "general awareness" and "knowing and substantial assistance" WNJ gave to Rospatch.

For all these reasons, a material question of fact remains as to WNJ's liability for federal securities fraud under 10b-5.

C. Control Person Liability under Section 20.

Section 20(a) provides for joint and several control person liability for "every person who, directly or indirectly controls any person" who violates federal securities laws. In ruling on the motion to dismiss, I held that the elements of a federal section 20 violation are defendant's power to influence the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 9

Not Reported in F.Supp., 1992 WL 226912 (W.D.Mich.), Blue Sky L. Rep. P 73,640, Fed. Sec. L. Rep. P 96,939

(Cite as: 1992 WL 226912 (W.D.Mich.))

corporation and culpable participation in the alleged fraud. 760 F.Supp. at 1248. The parties agree that this is the correct standard. They disagree as to whether WNJ/Gaston had power to influence the corporation within the meaning of Section 20.

*11 In support of its position that WNJ/Gaston exercised "control" Atlantis refers the court to the previous evidence of WNJ/Gaston's long, extensive relationship with Rospatch. Atlantis' expert Professor Theodore Fiflis testified at his deposition that Gaston's position in the company and access to information, along with the special relationship between WNJ/Gaston and Rospatch, gave Gaston a position as a controlling director. Fiflis deposition at 58. Atlantis also cites others outside the company who perceived that Gaston was a controlling influence on Rospatch and its management. *See* Wade deposition at 131 ("My impression was that Paul (Gaston) had more influence than anyone else on the company and the management...."); Berg deposition at 22 (Paul Gaston was "the dominant factor in the control of that company [Rospatch].")

In response, WNJ maintains that its ability to persuade Rospatch to pursue a course of action does not constitute control within the meaning of the statute. *See Barker,* 797 F.2d at 494. Despite this claim--and WNJ's rather convincing argument that Steven Berg has Gaston confused with Gordon Quist--a material question of fact nonetheless remains which precludes dismissing this count on summary judgment. *Compare Sheinkopf v. Stone,* 927 F.2d 1259, 1270 (1st Cir.1991) (attorney may be controlling person under section 20, but law firm is not); *Seidel v. Public Service Co.,* 616 F.Supp. 1342, 1362 (D.N.H.1985) (attorney is "controlling person" under section 20 because corporation will follow his advice). A jury could reasonably conclude that WNJ/Gaston--in their role as lawyers--exercised effective control of Rospatch for purposes of Section 20.

III. State Law Claims.

Plaintiff Atlantis' complaint seeks damages under federal securities statutes, Michigan common law,

the Florida "Blue Sky" statute, Fla.Stat. § 517.301 *et. seq.,* and Florida's Civil Remedies for Criminal Practices statute, Fla.Stat. § 772.101 *et. seq.* (Florida "RICO"). The Florida RICO claims derive from the alleged Blue Sky crimes because a RICO claim requires proof of "a pattern of criminal activity" under Florida law. Fla.Stat. § 772.103. The Florida statutory claims are hotly disputed because in some circumstances they authorize attorneys' fees. [FN8]

Both Andersen and WNJ move for summary judgment on plaintiff's state law claims. Andersen's motion seeks an order that attorneys' fees and treble damages are unavailable to Atlantis under its state law claims. WNJ challenges application of the Florida statutes on choice of law grounds, and also attacks the merits of all state law claims.

A. Which state's law applies?

Defendant WNJ maintains that Florida's Blue Sky statute cannot provide a basis for relief in Atlantis' action against WNJ. Furthermore, according to WNJ, because Florida's Blue Sky statute is inapplicable, defendants cannot establish a Florida RICO claim which must be based on a violation of the Florida Blue Sky statute. WNJ's argument is based on this court's earlier ruling that the Florida conflict of law rules require application of Michigan common law to this case, not Florida common law.

*12 In ruling on the Motions to Dismiss, I concluded that this court is required to apply the state law of the transferor court in resolving a choice of law question. *See Van Dusen v. Barrack,* 376 U.S. 612, 639 (1964). I concluded that a Florida court would apply the "significant relationships test" found in *Bishop v. Florida Specialty Paint Co.,* 389 So.2d 999 (Fla.1980) and the test set forth in the Restatement (2d) of Conflict of Laws, § 145 (1971). *See In Re Rospatch Secur. Litig.,* 760 F.Supp. at 1258-59. Applying that test, I concluded that Michigan had the most significant relationship to this action:
    The case involves the public sale of stock of a
    business located in Michigan, incorporated under

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 10

Not Reported in F.Supp., 1992 WL 226912 (W.D.Mich.), Blue Sky L. Rep. P 73,640, Fed. Sec. L. Rep. P 96,939

**(Cite as: 1992 WL 226912 (W.D.Mich.))**

its laws. Further, the lawsuit concerns the internal affairs of a Michigan corporation. The Restatement of Conflict of Laws states that:
When a court entertains a suit involving the internal affairs of a foreign corporation, it will ... usually apply the local law of the state of incorporation....
Restatement (2d) of Conflict of Laws, § 313E (1971). Finally the alleged fraud occurred in Michigan by individuals who are mostly Michigan residents.
760 F.Supp. at 1259.

Defendant WNJ now moves to dismiss plaintiff Atlantis' Florida Blue Sky claims and RICO claims based on the same reasoning. Atlantis, on the other hand, requests the court reconsider its earlier decision applying Michigan law to Atlantis' common law claims. According to Atlantis, the significant relationship test mandates application of Florida common law and Florida statutory law.

1. Governing standard.

All parties agree that Florida choice of law rules apply to the issue presented. *See* Atlantis' Reply Memorandum in Support of Its Motion For Summary Judgment on Defendants' Affirmative Defenses at page 7, citing *State Farm Mut. Auto. Ins. Co. v. Olsen*, 406 So.2d 1109, 1111 (Fla.1981); Reply Memorandum in support of WNJ and Paul Gaston's Motions for Summary Judgment at page 39. *See also* Defendant Andersen's Reply Memorandum in Support of Its Motion for Partial Summary Judgment at page 15. (Andersen does not specifically state that Florida choice of law rules apply, but argues that there is no error in the court's earlier decision applying Florida choice of law to the common law claims.) Further support for the conclusion that Florida choice of law rules apply to the question of which state's common law and statutory law should apply to plaintiff's claims is found in the case of *Tinwood N.V. v. Sun Banks, Inc.*, 570 So.2d 955 at n. 3 (Fla.App.1990), disapproved of on other grounds in *State v. Lucas*, 1992 W.L. 74900.

Plaintiff relies on *State Farm v. Olsen, supra*, as

defining the Florida conflict of law provision which should apply in this case. That court explained:
Pursuant to that question, we abandoned the inflexible lex loci doctrine in favor of the more rational "significant relationships test" as set forth in the Restatement (Second) of Conflict of Laws, subsections 145-146 (1971):
***13** § 145. The General Principle
(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in Section 6.
(2) Contacts to be taken into account in applying the principles of Section 6 to determine the law applicable to an issue include:
(a) the place where the injury occurred,
(b) the place where the conduct causing the injury occurred,
(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
(d) the place where the relationship, if any, between the parties is centered.
These contacts are to be evaluated according to their relative importance with respect to the particular issue.
§ 146. Personal Injuries
In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in Section 6 to the occurrence and the parties, in which event local law of the other state will be applied.
However, as we explained in *Bishop:*
The conflicts theory set out in the Restatement does not reject the "place of injury" rule completely. The state where the injury occurred would, under most circumstances, be the decisive consideration in determining the applicable choice of law. Indeed, the rationale for a strict lex loci delicti rule is also reflected in the same Restatement's Section 6, where "certainty, predictability and uniformity of result," and "ease in the determination and application of the law to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 11

Not Reported in F.Supp., 1992 WL 226912 (W.D.Mich.), Blue Sky L. Rep. P 73,640, Fed. Sec. L. Rep. P 96,939

**(Cite as: 1992 WL 226912 (W.D.Mich.))**

be applied" are cited as major factors in determining the proper choice of law....
389 So.2d at 1001.
Additionally, the other principles set out in the Restatement, Section 6, are:
(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,....
Restatement (2nd) of Conflict of Laws, § 6 (1971)
.
*Id.* at 1110-11.

2. Application of these factors to the instant case.

According to plaintiff, applying these factors, the court should reconsider its decision to apply Michigan common law to plaintiff's claims. Defendants, on the other hand, maintain that the court's decision to apply Michigan common law was correct and, therefore, plaintiff's Florida statutory claims should be dismissed.

After reviewing the relevant case law and factors to be considered in resolving this choice of law question, particularly in light of the circumstances presented in this case, I am convinced that Michigan statutory and common law governs plaintiff's claims. [FN9] Therefore, the Florida statutory claims will be dismissed.

**\*14** The *State Farm* case, *supra,* states that in the typical personal injury action, the "place of injury" is the decisive consideration in determining the applicable choice of law. This makes sense in a personal injury action such as a car accident, assault, or medical malpractice claim. *See Nat'l Union Fire Ins. Co. v. Watts,* 963 F.2d 148 (6th Cir.1992). In a claim such as the instant case, however, it is more difficult to determine where, in fact, the injury occurred. Plaintiff maintains the place of injury occurs where the stock was purchased in reliance on material misrepresentations. Without specifically deciding

where this injury occurred, the relevant factors discussed by the case law clearly establish that Michigan has a much more significant relationship to this case than does Florida.

The place of the conduct causing the injury in this case is unquestionably Michigan. That is where the defendant Michigan lawyers were representing a Michigan corporation and allegedly failed to disclose material information in public documents. The claims against the defendant accountants also relate to accounting work done for a Michigan corporation in Michigan, and at other locations as requested by the Michigan corporation. No evidence exists of any significant conduct by defendants occurring in Florida which forms the basis of plaintiff's state claims.

Another factor to be considered is the place of incorporation or place of business of the parties. WNJ is a Michigan law firm located in Grand Rapids, Michigan. Andersen, a national accounting firm, was providing services to Rospatch through its Michigan office, specifically through its Grand Rapids office. Rospatch Corporation, which is at the center of this litigation, is headquartered in Grand Rapids, Michigan and maintained its principal place of business in Grand Rapids for many years. Rospatch is incorporated under the laws of the State of Michigan. Atlantis is incorporated in Delaware, but does business in Florida.

The next factor to consider is where the relationship is centered which gives rise to this cause of action. Atlantis' relationship with Rospatch as a major shareholder and potential purchaser is the central relationship in this lawsuit. That relationship was centered in Michigan. The record demonstrates that neither WNJ nor Andersen had any significant contacts with Florida with respect to the claims made by plaintiff. Nor did they have any independent relationship with plaintiffs. Defendant WNJ is a law firm practicing in Michigan made up of attorneys licensed to practice in Michigan, who must conduct themselves in a manner consistent with Michigan law and the requirements of the State Bar of Michigan. WNJ is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 12

Not Reported in F.Supp., 1992 WL 226912 (W.D.Mich.), Blue Sky L. Rep. P 73,640, Fed. Sec. L. Rep. P 96,939

**(Cite as: 1992 WL 226912 (W.D.Mich.))**

subject to the disciplinary arm of the State Bar of Michigan, not of Florida. Defendant Andersen is an accounting firm performing services for a Michigan corporation in Michigan.

The most important of the additional factors identified in *State Farm, supra,* is "the protection of justified expectations." Plaintiff Atlantis cannot legitimately claim that it expected a Michigan law firm performing work for a Michigan corporation in Michigan to have anticipated liability under Florida statutory law. Defendant WNJ, however, has a justified expectation that when performing work for a Michigan corporation in Michigan, its conduct will be governed by Michigan and federal law.

**\*15** It is important that the court also consider the interest of the states involved. Florida does not have a significant interest in applying its securities law to Michigan lawyers performing work for a Michigan corporation in Michigan. Florida obviously has a strong interest in regulating sales by Florida corporations of securities to Florida residents. Florida, likewise, has a strong interest in regulating the sales of securities to Florida residents which occur in Florida through active solicitation in Florida. Although not as strong, Florida retains an interest when an out-of-state corporation sells securities to Florida residents--even where that out-of-state corporation is not actively soliciting sales in Florida. These are the interests that the Florida statute was intended to protect. I am convinced Florida has only a relatively minor interest in regulating the activities of Michigan lawyers and accountants performing services in Michigan for Michigan corporations. On the other hand, Michigan has a very strong interest in regulating the conduct of lawyers and accountants performing work for Michigan corporations within Michigan.

Considering all the factors identified in the relevant case law and the unique circumstances of this case, I conclude that Michigan statutory and common law should apply to plaintiff Atlantis' claims against WNJ and Andersen. Florida law shall not apply because Michigan has the most significant relationship to this case.

3. Choice of law analysis applies.

Before concluding, I note that there is some dispute as to whether a court should apply the choice of law doctrine when a plaintiff seeks to assert a claim under state Blue Sky statutes. [FN10] In my judgment this issue is best resolved through a traditional conflicts analysis. I find it impractical, confusing and unfair to apply more than one state statutory law to a claim such as that presented in this case. This could require both plaintiff and defendants to deal with conflicting theories of liability or defenses. It would undoubtedly promote jury confusion. Suppose there were six plaintiffs from six different states all with conflicting Blue Sky laws? Application of several different state's Blue Sky laws is also in conflict with the trend toward uniformity implied in the Supreme Court's recent *Lampf* decision. Rather than draw upon mutually inconsistent state statutes of limitations, *Lampf* established a uniform statute of limitations for all federal securities claims. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 111 S.Ct. 2773 (1991). Finally, plaintiffs' have presented no basis for distinguishing this case from the conflicts of law rules which apply to all other personal injury actions and contracts actions. [FN11] Accordingly, plaintiff Atlantis' Florida statutory claims will be dismissed.

B. Analysis of claims under Michigan law.

1. Michigan Blue Sky Law.

Michigan's Blue Sky Law does not authorize a private right of action comparable to that afforded by Rule 10b-5. *IDS Progressive Fund, Inc. v. First of Michigan Corp.,* 533 F.2d 340 (6th Cir.1976). Moreover, Atlantis has not pleaded an action under the Michigan Blue Sky law. Accordingly, the court's decision on choice of law negates plaintiffs' Blue Sky claims.

2. Michigan common law fraud.

**\*16** Much as disputed issues remain as to the federal securities fraud claims, similar disputed issues of misrepresentation and duty exist

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 13

Not Reported in F.Supp., 1992 WL 226912 (W.D.Mich.), Blue Sky L. Rep. P 73,640, Fed. Sec. L. Rep. P 96,939

**(Cite as: 1992 WL 226912 (W.D.Mich.))**

concerning elements of Michigan common law fraud. [FN12] *See U.S. Fidelity & Guaranty Co. v. Black,* 412 Mich. 99, 313 N.W.2d 77, 82 (1981) (setting forth elements of Michigan common law fraud). In addition, the release given in conjunction with the Rospatch settlement explicitly does not cover Atlantis' claim for common law fraud. As a result, this claim will survive the motions for summary judgment.

However, Atlantis is not entitled to exemplary or punitive damages on this claim. Exemplary damages are awarded to compensate plaintiff for intentional, malicious damage to feelings. *Veselenak v. Smith,* 414 Mich. 567, 572-74, 327 N.W.2d 261, 264 (1982). Such damages are not recoverable to punish a defendant. *Kerwin v. Massachusetts Mut. life Ins. Co.,* 409 Mich. 401, 419, 295 N.W.2d 50, 55 (1980). Exemplary damages are not necessary where plaintiffs' injuries can be adequately compensated in other ways. *Jackson Printing Co., Inc. v. Mitan,* 169 Mich.App. 334, 341, 425 N.W.2d 791, 794 (1988). Finally, plaintiffs must specifically plead exemplary damages. *Law Offices of Lawrence J. Stockler, P.C. v. Rose,* 174 Mich.App. 14, 45, 436 N.W.2d 70, 86 (1989).

Plaintiffs have failed to demonstrate eligibility for exemplary or punitive damages under Michigan law. They have not specifically pled these damages. They have failed to show intentional emotional harm. They have failed to demonstrate damage to feelings which cannot be adequately compensated with monetary damages. For these reasons, Plaintiffs' common law claims for punitive and exemplary damages are dismissed.

IV. Andersen's motion re: post-purchase events & attorney's fees.

In addition to the state law issues, Andersen's motion for partial summary judgment asks that the court:

  3. determine that Atlantis cannot utilize events or omissions occurring in 1988 or 1989 to support its claims that its 1987 and earlier 1988 purchases of Rospatch stock were fraudulently induced;

  4. strike those claims of Atlantis and Class Representative Plato/Freberg with respect to which no supporting evidence has been proffered from either their accounting or damage expert....; and
  6. determine that Atlantis is not entitled to attorneys' fees.
I will address these issues in sequence.

A. Post-purchase events cannot form basis of 10b-5 action.

Atlantis' last purchase of Rospatch stock occurred on November 18, 1988. Andersen asks the court to rule that Atlantis cannot use events occurring after its last purchase of stock as a basis for its federal and state securities claims.

A claim for federal securities fraud requires that plaintiff rely on a material misstatement or omission in connection with the purchase or sale of securities. *See, e.g., Blue Chip Stamps,* 421 U.S. at 731; Rule 10b-5, *supra.* Andersen correctly contends that any misstatement which occurred after November 18, 1988 cannot have been relied on by Atlantis in connection with its purchase of stock. Accordingly, a post-purchase misstatement cannot serve as the basis of Atlantis' 10b-5 claims. *See Griffin v. McNiff,* 744 F.Supp. 1237, 1252 (S.D.N.Y.1990). The 1989 payment to Continental Bank is such a post-purchase event and may not be used as the basis of a 10b-5 claim against defendants.

**\*17** Post-purchase events may, however, serve as evidence about what was *omitted* at an earlier date. In this case, Atlantis claims Rospatch omitted facts about the declining value of the TPG during the 1986-1988 period when Atlantis purchased stock. As I ruled on the motion to dismiss, "the *Blue Chip Stamps* doctrine does not apply to Atlantis' claims because it purchased its stock during the time that allegedly material information was missing from the public documents." 760 F.Supp. at 1249. Post-purchase events are therefore relevant as evidence of earlier omissions. Events surrounding the release of TPG reserves and the 1988 financial statements, may be relevant to actionable omissions

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 14

Not Reported in F.Supp., 1992 WL 226912 (W.D.Mich.), Blue Sky L. Rep. P 73,640, Fed. Sec. L. Rep. P 96,939

**(Cite as: 1992 WL 226912 (W.D.Mich.))**

which occurred in connection with Atlantis' earlier purchases of stock.

B. Requests to strike specific facts.

Andersen requests the court to strike certain other specific facts as a basis of plaintiffs' federal securities claims. These events are:

1. Andersen's right to rely on the 1989 letter re: Infrared tax liability;

2. The need to disclose potential GTI gyroscope liability prior to November 1988;

3. The need to disclose the 1986 pension fund distribution;

4. The SBAO land sale.
Andersen requests that these events be stricken because plaintiffs failed to submit expert proof in support of these claims, or because those events post-dated Atlantis' purchases.

Andersen's request must be denied because Andersen has failed to meet its burden of demonstrating that these events could not form the basis of a federal 10b-5 claim. Atlantis' failure to establish these issues by expert proof is not dispositive, because expert proof is not the only form of proof which precludes summary judgment. Moreover, Andersen failed to show that these events are not connected with possible omissions in the 1986-1988 period. Each of the four events could clearly relate back to prior activity by Rospatch which might provide evidence of a material omission in the 1986-1988 period. Accordingly, the events will not be stricken from the complaint.

In sum, Andersen's motion to strike proof of certain post-purchase events is granted in part and denied in part. The motion to strike is granted as to the 1989 Continental Illinois Bank fee, and denied in all other respects.

C. Atlantis is not entitled to attorneys' fees.

As a result of the court's rulings elsewhere in this opinion, Atlantis' claims for attorneys' fees are dismissed. My ruling on choice of law negates Atlantis' claims for attorneys' fees and treble damages under Florida RICO law and Florida Blue Sky law. Both of those claims were dismissed because the law of Michigan, not Florida, applies to this action.

Attorneys' fees are also unavailable under Michigan common law or the federal securities statutes. Atlantis concedes it is not seeking attorneys' fees under federal securities law. *See* Atlantis' Brief in response to Andersen's Motion for Summary Judgment at 18. Under Michigan law, attorneys' fees are not available for the same reason that punitive and exemplary damages are unavailable. See part III.B.2., *supra.* In addition, Atlantis has shown no reason why this court should deviate from the "American Rule" that each party must pay its own attorneys' fees. *See Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240 (1975). Michigan follows this rule and does not ordinarily allow recovery of attorneys' fees at common law. *Matras v. Amoco Oil Co.,* 424 Mich. 675, 695, 385 N.W.2d 586, 595 (1986).

**\*18** Accordingly, Atlantis is not entitled to attorneys' fees.

V. Plaintiffs' motion concerning affirmative defenses.

Both class plaintiffs and Atlantis move for summary judgment as to the affirmative defenses raised by defendants Andersen and WNJ/Gaston. Andersen has raised 31 separate affirmative defenses against Atlantis (hereafter Andersen Defense #). WNJ has raised 10 affirmative defenses against Atlantis (hereinafter WNJ Defense #). Eight of the ten defenses raised by WNJ were also raised by Andersen; only WNJ Defenses # 4 (failure to make demand on board) and # 10 (lack of subject matter jurisdiction) are uniquely raised by WNJ. [FN13] In addition to those defenses asserted against Atlantis, a few defenses were raised against only the Class and not against Atlantis. Those defenses which apply only against the Class

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 15

Not Reported in F.Supp., 1992 WL 226912 (W.D.Mich.), Blue Sky L. Rep. P 73,640, Fed. Sec. L. Rep. P 96,939

**(Cite as: 1992 WL 226912 (W.D.Mich.))**

are:
   Andersen Class Defense # 20 (improper class action)
   WNJ Class Defense # 8 (failure to join parties)
   WNJ Class Defense # 9 (claims subject of another lawsuit).
These three defenses will be referred to as Class Defenses.

A. Standards for dismissal of affirmative defenses.

The defenses at issue in the current motion fall into two categories. One set of defenses includes defenses dismissed by agreement, defenses dismissed as moot, and defenses already at issue such that they are unnecessary to plead as affirmative defenses. Dismissal of these defenses is governed generally by the standard for a motion to strike defenses as insufficient, pursuant to Rule 12(f) of the Federal Rules of Civil Procedure. That standard requires that a motion is proper where it may make the trial less complicated or otherwise streamline ultimate resolution of the action. *See Kelley v. Thomas Solvent Co.,* 714 F.Supp. 1439, 1442 (W.D.Mich.1989) (Enslen J.). Such a motion should be considered carefully and not freely granted. *Id.* However, dismissal of a defense is appropriate where it would save time and money by avoiding litigation of spurious issues. *Id.*

The second set of defenses includes contested defenses which raise unique issues independent of the issues in plaintiffs' complaints. Those defenses include:
   1. Statute of Limitations (Andersen # 2; WNJ # 2)
   2. Various Estoppel, Waiver, & Laches Defenses (Andersen # 4, 5, 7-9, 18 & 29; WNJ # 9); and
   3. Failure to Mitigate (Andersen # 19; WNJ # 6).
In the context of the current motions, these contested defenses are governed by the standard for a motion for summary judgment, discussed *supra.*

B. Dismissal of uncontested, moot or redundant defenses.

1. WNJ's defenses.

WNJ does not contest the motion for summary judgment on the following of its affirmative defenses:
   # 7. Failure to comply with Fed.R.Civ.P. 11;
   # 10. Right to add affirmative defenses;
   # 8 Class Defense. Failure to join necessary parties.
   # 9 Class Defense. Claims subject of another lawsuit.
Also, WNJ agrees that the narrowing of plaintiffs' tort claims to include only intentional torts of fraud and securities fraud makes the following defenses moot:
   **\*19** # 4. Failure to make demand on board;
   # 5. Contributory or comparative negligence;
   # 8. Lack of subject-matter jurisdiction. [FN14]
Finally, the court's rulings *supra* on choice of law make WNJ Defense # 3 moot. The court's rulings on the merits, *supra,* and on the motion to dismiss also make it clear that WNJ's Defense # 1 (Failure to State a Claim) is moot.

2. Andersen's defenses.

Andersen also does not contest plaintiffs' motion for summary judgment as to some of its affirmative defenses, those being:
   # 1. Failure to state a claim;
   # 6. Failure to comply with Rule 11; [FN15]
   # 26. Lack of particularity under Rule 9(b);
   # 28. Incorporation of motion to dismiss.
In addition, other Andersen defenses are now moot. Those include:

   #  30.  Comparative/contributory  negligence, because plaintiffs are now pursuing only intentional torts; and

   # 20 Class Defense, because of the court's opinions on class certification.

Andersen's defense # 27, dismissal of pendent state law claims, is a jurisdictional issue which can be raised on motion should the federal claims be dismissed. In light of the remainder of this opinion, such a defense is now unnecessary and will be dismissed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 16

Not Reported in F.Supp., 1992 WL 226912 (W.D.Mich.), Blue Sky L. Rep. P 73,640, Fed. Sec. L. Rep. P 96,939

**(Cite as: 1992 WL 226912 (W.D.Mich.))**

Andersen's standing arguments relevant to defense # 3 have been addressed in other portions of this opinion dealing with post-purchase events and choice of law. Those rulings apply equally here, leaving no unique standing questions to be addressed on this defense. As a result, this defense will be dismissed.

Andersen's "defense" # 31 (right to add affirmative defenses) is not a defense at all, but rather, a reservation of rights. This affirmative defense will also be stricken. If Andersen has reason to add affirmative defenses at this late date, it must do so with leave of the court, provided it complies with the applicable Federal Rules of Civil Procedure.

3. Repetitious affirmative defenses.

Andersen's defenses 10-17 and 20-25 raise issues of causation, reliance, scienter, materiality and damages which are already in issue because they are elements of the state and federal securities claims which must be proven by plaintiffs in order to prevail. *See generally In re Control Data Corp. Secur. Litig.,* 933 F.2d 616, 618 (8th Cir.1991). Andersen has raised these as affirmative defenses to protect itself from charges that it has waived the right to contest these elements. [FN16]

Raising these issues as affirmative defenses is unnecessary, however, because they have already been put in issue by plaintiffs' complaints. As the court stated in *Federal Deposit Insur. Corp. v. Renda,* 692 F.Supp. 128 (D.Kan.1988):

Matters which are in issue from the complaint's inception need not be pleaded as affirmative defenses, *see Rochholz v. Farrar,* 547 F.2d 63, 65 n. 3 (8th Cir.1976) as such matters will not take the plaintiff by surprise if later raised by the defendant ... [Certain affirmative defenses] allege that no action or inaction by the defendants caused the plaintiff's damages. These assertions are not avoidances or affirmative defenses; rather, they are assertions that the plaintiffs cannot establish a prima facie case. As such, they are already in issue because of the complaint ... Thus, for the purposes of simplicity, the court will strike these affirmative defenses.

*20 *Id.* at 133. Unlike some decisions on a motion to strike, the dismissal of these defenses does not preclude defendants from offering evidence on these issues at trial. *Compare Kelley v. Thomas Solvent Co., supra.* Defendants may still offer evidence on these issues because the issues remain part of plaintiffs' prima facie case of securities fraud, subject to plaintiffs' burden of proof.

Accordingly, Andersen defenses # 10-17 and 20-25 are dismissed.

4. Summary of dismissed defenses.

In sum, WNJ defenses # 1, 3, 4, 5, 7, 8, 10 and WNJ Class Defenses # 8 & 9 are dismissed as moot. Andersen defenses # 1, 3, 6, 26-28, 30 and Andersen Class Defense # 20 are dismissed as moot or improper. Andersen defenses # 10-17 and 20-25 are dismissed as redundant.

C. Contested defenses which survive this motion.

1. WNJ defenses.

WNJ defenses # 2, 6, & 9 involve unique issues of law or fact which remain contested and will not be struck on this motion. Questions of fact exist regarding knowledge and the timing of that knowledge which preclude summary judgment on WNJ defense # 2 re: statute of limitations. Questions of fact remain about Atlantis' conduct in its takeover attempts and continued purchases of Rospatch stock which preclude summary judgment on WNJ defenses # 6 re: failure to mitigate, and # 9 re: waiver, estoppel and laches. These defenses cannot be struck on this motion for summary judgment.

2. Andersen defenses.

Like WNJ's estoppel defenses, Andersen's equitable estoppel defenses are hotly contested. Andersen's defenses # 4, 5, 7-9, 18 and 29 allege that Atlantis should be estopped from pursuing this lawsuit based on its own conduct.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                   Page 17

Not Reported in F.Supp., 1992 WL 226912 (W.D.Mich.), Blue Sky L. Rep. P 73,640, Fed. Sec. L. Rep. P 96,939

**(Cite as: 1992 WL 226912 (W.D.Mich.))**

On a motion for summary judgment, it is the movant's burden to show the absence of any genuine issue of fact under the applicable substantive law. Atlantis has failed to meet this burden. Defendants maintain that they relied on Atlantis' continued interest in acquiring Rospatch and believed, based on Atlantis' actions, that Atlantis was not damaged. On May 5, 1989 and June 20, 1989, Atlantis confirmed its agreement to acquire Rospatch. Such interest continued even after disclosure of financial problems at the TPG, such as write-downs in the 1989 Form 10-Q released May 22, 1989. Atlantis has failed to counter these and similar facts which raise disputed issues as to the estoppel defenses. Moreover, the Sixth Circuit has stated that "estoppel and waiver involve questions of fact which should be submitted to the jury." *Apponi v. Sunshine Biscuits, Inc.,* 809 F.2d 1210, 1216 (6th Cir.1987). For these reasons, plaintiffs' motion for summary judgment as to the affirmative estoppel defenses is denied.

In addition, Andersen defenses 2 (statute of limitations) and 19 (failure to mitigate) are the same as WNJ defenses 2 and 6 and will not be dismissed because of remaining factual disputes, as discussed above.

CONCLUSION

The court grants defendants' motions for summary judgment on the Florida statutory claims and denies their motions for summary judgment on the federal claims and the Michigan common law fraud claim. Atlantis' claim for attorneys' fees is dismissed and plaintiffs' claims for punitive and exemplary damages are dismissed. In addition, all affirmative defenses have been struck as moot, unsupported, or redundant except for the estoppel defenses, the statute of limitations defense, and the defense of failure to mitigate.

ORDER

**\*21** For the reasons stated in this opinion,

IT IS ORDERED that Defendant Warner, Norcross & Judd/Paul Gaston's motion for summary judgment (docket # 746) is GRANTED IN PART and DENIED IN PART. The motion is

GRANTED as to Plaintiff Atlantis' claims under the Florida Blue Sky and Civil Remedies for Criminal Practices Statutes. The motion is DENIED as to all federal claims and Michigan common law fraud claims.

IT IS FURTHER ORDERED that Defendant Arthur Andersen's motion for partial summary judgment (docket # 754) is GRANTED IN PART and DENIED IN PART as follows:

1. Andersen's motion is GRANTED with regard to Plaintiff Atlantis' claims under the Florida Blue Sky and Civil Remedies for Criminal Practices Statutes.

2. Andersen's motion is also GRANTED with regard to the type of damages plaintiffs may seek. Atlantis is not entitled to attorneys' fees under Florida, Michigan, or federal law. Neither Atlantis nor Class Plaintiffs' are entitled to punitive or exemplary damages under Michigan common law.

3. Evidence which post-dates Atlantis purchases of Rospatch stock may not serve as the basis of Atlantis' 10b-5 claim. Evidence regarding post-purchase events may be offered for admission concerning the federal securities claims only if relevant to the existence of a material omission prior to Atlantis' last purchase of Rospatch stock.

4. Andersen's motion is DENIED in all other respects.

IT IS FURTHER ORDERED that Plaintiffs' motions for summary judgment on affirmative defenses (docket # 752, 753) are GRANTED IN PART and DENIED IN PART. All affirmative defenses are struck from the complaints and dismissed except for the estoppel defenses, the statute of limitations defense, and the defense of failure to mitigate. Those affirmative defenses which are not dismissed and which remain are WNJ defenses # 2, 6, and 9 and Andersen defenses # 2, 4, 5, 7-9, 18, 19, and 29.

IT IS FURTHER ORDERED that Atlantis' claims under the Florida Blue Sky and Civil Remedies for Criminal Practices Statutes and all its claims for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 18

Not Reported in F.Supp., 1992 WL 226912 (W.D.Mich.), Blue Sky L. Rep. P 73,640, Fed. Sec. L. Rep. P 96,939

**(Cite as: 1992 WL 226912 (W.D.Mich.))**

attorneys' fees are DISMISSED.

IT IS FURTHER ORDERED that Atlantis' and Class Plaintiffs' claims for punitive and exemplary damages under Michigan common law are DISMISSED.

> FN1. In 1991, Rospatch changed its name to Ameriwood Industries International.

> FN2. Class claims against Andersen are limited to the period from November 8, 1987 to March 14, 1990. *See* Amended Opinion on Renewed Motions to Dismiss based on Federal Statute of Limitations, Case Nos. 1:90-CV-805/806 (W.D.Mich. October 17, 1991) at 8.

> FN3. Paul Gaston & Warner, Norcross and Judd are represented jointly in this lawsuit. They will be referred to collectively as WNJ, unless otherwise specified.

> FN4. While the Seligman Report itself will not be before the jury, it discusses issues surrounding the 1988 10-K similar to those likely to be presented to the jury. For example, the Report stated that after-tax earnings at the GTI division were not accounted for properly in 1988 and should have been reduced by approximately $1.65 million. Seligman concluded that:
> investors bought Rospatch stock beginning after the 1988 Form 10-K was filed in March 1989 on the erroneous assumption that Rospatch earned $3.341 million in 1988 when, in fact, the actual earnings were only approximately one-half of that amount solely because of this misrepresenation at GTI.
> Seligman Report at 311. Professor Seligman also identified problems concerning the release of RESD and SBAO reserves, prior to the filing of Rospatch's 1988 Form 10-K. *Id.* at 142. Mistakes in accounting for goodwill were not investigated by Professor Seligman. *Id.* at 161-63.

> FN5. In addition, Atlantis charges WNJ and Gaston with conflict of interest, conspiring with management to pay excessive bonuses, and an improper role in the termination of Rospatch executives Joseph Parini and William Malpass. With one exception Atlantis does not directly connect these events to any material misstatement or omission in Rospatch's public documents. The exception is the May 15, 1987 Memo from Gaston to Waterbury (Atlantis Exh. 1423) asking when Rospatch should file director indemnity agreements with the SEC.

> FN6. Drawing all inferences in favor of plaintiffs, as the court must on defendant's motion for summary judgment, Gaston's knowledge raises a factual issue as to the corresponding knowledge and liability of the law firm. *See also* part II.B.2. of this section, *infra;* and Opinion on Motion to Dismiss, 760 F.Supp. at 1250.

> FN7. Plaintiffs must still satisfy the requirement that they relied on the 1988 Form 10-K in purchasing stock. Since Atlantis' last purchase of stock occurred in 1988, before the 1988 10-K was filed, it is unlikely that these alleged misstatements can serve as the basis of Atlantis' 10b-5 claims.

> FN8. Florida Blue Sky Law § 517.211 authorizes attorneys fees. Florida Blue Sky Law § 517.241(3) does not authorize attorneys' fees. Because neither Andersen nor WNJ are the seller or purchaser of the securities at issue, Atlantis must proceed under § 517.241(3) and not under § 517.211. *See* Hanzman, Civil Remedies under FSIPA, Fla.Bar.J. (October 1990), pp. 36-41. Florida's RICO law authorizes treble damages, as well as attorneys fees. Fla.Stat. § 772.104.

> FN9. Florida's relationship to the facts of this case was stronger when Rospatch was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 19

Not Reported in F.Supp., 1992 WL 226912 (W.D.Mich.), Blue Sky L. Rep. P 73,640, Fed. Sec. L. Rep. P 96,939

**(Cite as: 1992 WL 226912 (W.D.Mich.))**

still an active defendant. This choice of law question may have been more difficult then, but the most significant relationships clearly favor Michigan now that Rospatch has been dismissed.

FN10. Federal courts have split on this issue. Some courts have held that the court is not faced with a choice of law issue in such a situation and plaintiff may assert state statutory Blue Sky claims under more than one state's law. *See Barnebey v. E.F. Hutton & Co.,* 715 F.Supp. 1512 (M.D.Fla.1989); *Simms Investment Co. v. E.F. Hutton & Co.,* 699 F.Supp. 543 (M.D.N.C.1988) and *Lintz v. Carey Manor Ltd.,* 613 F.Supp. 543 (W.D.Va.1985). On the other hand, precedent within this circuit recognizes that the foreign court may not apply the laws of more than one state in a securities case. *See McInnis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 706 F.Supp. 1355 (M.D.Tenn.1989). *See also Brocalsa Chemical Co. v. Langsenkamp,* 32 F.2d 725 (6th Cir.1929), approved of in *Mahalsky v. Salem Tool Co.,* 461 F.2d 581 (6th Cir.1972).

FN11. Atlantis did not argue it should be permitted to rely on more than one state's statutory claims and conceded that the court was required to apply the Florida choice of law doctrine to this case. This position is supported by Florida case law. *See Tinwood N.V. v. Sun Banks, Inc., supra, State Farm v. Olsen, supra.* Had this court been presented with the argument, it would have refused to follow those cases which allow a plaintiff to rely on the state statutory laws of more than one state in pursuing securities claims.

FN12. On June 18, 1992, counsel brought to the court's attention the case of *Lunar Industries Inc. v. Lewin,* Case No. 130312 (Mich.Ct.App. May 7, 1992). While relevant, *Lewin* is factually distinguishable

from the instant case. The court in *Lewin* held that any possible duty owed to appellants as third parties was not properly preserved for appeal. *Lewin* also discusses only the question of breach of fiduciary duty. As discussed regarding the federal claims, defendants here owed a duty because of the depth of their involvement with Rospatch and their role in the preparation of the documents at issue, regardless of the existence of a fiduciary duty.

FN13. For purposes of this opinion and order, defendants' affirmative defenses will be referred to based on the list of affirmative defenses asserted against Atlantis provided in Exhibit A to Atlantis' motion for summary judgment on affirmative defenses. Affirmative defenses asserted against the Class are resolved by this opinion in the same way as the corresponding defense asserted against Atlantis. *See, e.g.,* WNJ Opposition to Motion for Summary Judgment on Affirmative Defenses, Exh. A.

FN14. It is the court's understanding that Atlantis has dropped its independent breach of fiduciary duty claims and that only intentional torts for fraud are being asserted by plaintiffs. *See* Atlantis Reply Brief at 7.

FN15. Withdrawal of the affirmative defenses under Rule 11 in no way waives the right of either defendant to move for Rule 11 sanctions in later proceedings or at another time.

FN16. Likewise many of defendants' affirmative defenses are raised out of such well-placed caution. *See Bobbitt v. Victorian House, Inc.,* 532 F.Supp. 734 (N.D.Ill.1982). Even though the court is dismissing many affirmative defenses in the interest of economy and clarity of trial issues, the court recognizes that these

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 20

Not Reported in F.Supp., 1992 WL 226912 (W.D.Mich.), Blue Sky L. Rep. P 73,640, Fed. Sec. L. Rep. P 96,939

**(Cite as: 1992 WL 226912 (W.D.Mich.))**

   issues have not been waived for failure to
   plead them as affirmative defenses.

Not Reported in F.Supp., 1992 WL 226912 (W.D.Mich.), Blue Sky L. Rep. P 73,640, Fed. Sec. L. Rep. P 96,939

   **Motions, Pleadings and Filings (Back to top)**

• 1:90cv00806 (Docket) (Sep. 25, 1990)

• 1:90cv00805 (Docket) (Sep. 25, 1990)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 6

Westlaw.

Not Reported in A.2d                                                                 Page 1

Not Reported in A.2d, 1993 WL 10871 (Del.Ch.), Fed. Sec. L. Rep. P 97,437

**(Cite as: 1993 WL 10871 (Del.Ch.))**

▷

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County
Gerald KATELL and Desert Equities, Inc.,
Plaintiffs,
v.
MORGAN STANLEY GROUP, INC.; Morgan
Stanley & Co. Incorporated; Cigna Corp.;
Morgan Stanley Leveraged Equity Fund, L.P.;
Cigna Capital Advisors, Inc.;
Cigna Leveraged Capital Fund, Inc.; Morgan
Stanley Leveraged Capital Fund,
Inc.; SIBV/MS Holdings, Inc.; Jefferson Smurfit
Corp.; Container Corporation
of America; Silgan Holdings Inc.; Silgan
Corporation; Donald P. Brennan and
Alan E. Goldberg, Defendants.
**CIV.A. No. 12343.**

Submitted: Nov. 2, 1992.
Decided Jan. 14, 1993.

Joseph A. Rosenthal of Rosenthal, Monhait, Gross
& Goddess, P.A., Wilmington, Harold E. Kohn, and
Joanne Zack of Kohn, Nast & Graf, P.C.,
Philadelphia, PA, (Elwood S. Kendrick, Law Office
of Elwood S. Kendrick, Inc., and Nancy Miller
Bennett, Los Angeles, of Counsel), for plaintiffs.

A. Gilchrist Sparks, III, and David G. Thunhorst of
Morris, Nichols, Arsht & Tunnell, Wilmington
(Lewis A. Kaplan, Allan J. Arffa, and John N.
Gevertz of Paul, Weiss, Rifkind, Wharton &
Garrison, New York City, of Counsel), for
defendants Morgan Stanley Group Inc., Morgan
Stanley & Co. Inc., Morgan Stanley Leveraged
Capital Fund, Inc., The Morgan Stanley Leveraged
Equity Fund, L.P., Donald P. Brennan and Alan E.
Goldberg.

Peter J. Walsh, of Bayard, Handelman & Murdoch,

P.A., Wilmington (Marc P. Cherno, and Jane
Wasman of Fried, Frank, Shriver & Jacobson, New
York City, of Counsel), for defendants CIGNA
Corporation, CIGNA Capital Advisers, Inc. and
CIGNA Leveraged Capital Fund, Inc.

Kevin G. Abrams of Richards, Layton & Finger,
Wilmington (Thomas A. Reynolds III, David B.
Love, and Frank H. Langrock of Winston & Strawn,
Chicago, Il., of Counsel), for defendants SIBV/MS
Holdings, Inc., Jefferson Smurfit Corp. and
Container Corp. of America.

Allen M. Terrell, Jr. of Richards, Layton & Finger,
Wilmington (Kenneth M. Kramer, Michael W.
Jahnke and James R. Warnot, Jr. of Shearman &
Sterling, New York City, of Counsel), for
defendants Silgan Holdings, Inc. and Silgan Corp.

MEMORANDUM OPINION

CHANDLER, Vice Chancellor.

**\*1** The plaintiffs, Gerald Katell and Desert
Equities, Inc., are two limited partners in the
Morgan Stanley Leveraged Equity Fund, L.P., ("the
Fund" or "the Partnership"), a Delaware limited
partnership involved in leveraged buyouts. They
allege that the defendants, Morgan Stanley Group,
Inc. ("Morgan Stanley Group"), the CIGNA
Corporation ("CIGNA"), and certain others
involved in the Fund, acted improperly by allowing
the Partnership to sell off investments in Container
Corporations of America ("CCA") and Silgan
Corporation ("Silgan") at unfairly low prices. The
plaintiffs bring these claims individually or, in the
event that the Court determines such claims must be
brought derivatively, for all limited partners in the
Fund. Defendants have moved to dismiss the
amended complaint under Chancery Court Rule
12(b)(6) for failure to state a claim. This is my
decision on defendants' motion.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 2

Not Reported in A.2d, 1993 WL 10871 (Del.Ch.), Fed. Sec. L. Rep. P 97,437

**(Cite as: 1993 WL 10871 (Del.Ch.))**

## I. BACKGROUND

Both plaintiffs became limited partners of the Fund in 1985. Gerald L. Katell ("Katell"), a resident and citizen of California, became a limited partner by committing to invest $2 million in leveraged investments in the Partnership. At about the same time, Duane Roberts ("Roberts") made a $2.5 million capital commitment to the Fund, which he later increased to $3 million. He has assigned his interest to plaintiff Desert Equities, Inc. ("Desert Equities"). Plaintiff Desert Equities has its principal place of business in California and is incorporated in Nevada. Roberts is its sole owner.

The Fund was organized in 1985 under Delaware law as a partnership involved in equity investments, especially in acquiring leveraged investment transactions (leveraged buy-outs or LBOs). The Fund has two general partners: defendant Morgan Stanley Leveraged Capital Fund, Inc. ("Morgan Capital"), a wholly-owned subsidiary of defendant Morgan Stanley Group, the managing general partner; and defendant CIGNA Leveraged Capital Fund, Inc. ("CIGNA Capital"), an affiliate of defendant CIGNA. [FN1] All Partnership investment decisions require the agreement of both general partners. Defendants' Exhibit ("Def.Exh.") 1 at 20.

> FN1. CIGNA Capital is a wholly-owned subsidiary of CIGNA Capital Advisors, Inc., which is in turn a wholly-owned subsidiary of defendant CIGNA.

The Fund acquired interests in seven corporations and has sold its interests in five of them. Plaintiffs' charges involve the investments sold in two of the corporations, the Silgan and CCA interests. Plaintiffs charge that defendant Morgan Stanley Group stood on both sides of the transactions and received fees as middleman as well.

## II. THE CHALLENGED TRANSACTIONS
A. *Silgan*

Silgan is a major manufacturer and distributor of steel, aluminum and plastic containers. In 1987, the Fund purchased over three million shares of Silgan Class B common stock, totalling approximately 23.6% ownership. Prior to the purchase, Katell and Roberts made capital contributions to the Fund, pursuant to instructions from the Fund, of $50,199 and $76,715 respectively.

In 1989, Silgan became a wholly-owned subsidiary of Silgan Holdings. All of the Class B stock of Silgan Holdings, representing 47.2% of the company, is owned by Morgan Stanley Leveraged Equity Fund II ("Fund II"), a Delaware limited partnership with one general partner. That one partner is a wholly-owned subsidiary of defendant Morgan Stanley Group.

**\*2** The Fund's Class B Silgan stock was sold for $6.50 per share, giving plaintiffs returns of approximately $598,000 for Katell and $914,000 for Roberts. Plaintiffs assert that $6.50 per share was grossly unfair and inadequate based on a number of analyses: 1) because the total purchase price ($88 million) was dwarfed by the amount of money Silgan Holdings raised in debentures by pledging Silgan's assets ($120 million); 2) because Morgan Stanley was acting with self-interest, generating fees from the transaction and from management; 3) because the equity was worth more than its valuation due to its continuing financial success; 4) because the merger was timed to occur before promising benefits and profits could come to plaintiffs; and 5) because a fairness opinion provided by the investment banking firm of William Blair & Co. ("Blair") was flawed. The fairness opinion, plaintiffs assert, did not consider Silgan's purchase of new businesses and, thus, underestimated Silgan's value.

It is evident that plaintiffs profited greatly from the Silgan sale. They assert, however, that they did not profit as much as they were entitled to, due to the actions of defendants.

B. *CCA*

The second transaction involved CCA and defendant Jefferson Smurfit Corporation ("JSC"). CCA and JSC are large producers of paperboard, packaging products and newsprint. In 1986, JSC

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1993 WL 10871 (Del.Ch.), Fed. Sec. L. Rep. P 97,437

**(Cite as: 1993 WL 10871 (Del.Ch.))**

was interested in CCA and wished to join with the Partnership to acquire CCA. JSC bought half of the common stock of CCA and the Fund invested $6 million for an additional 30% of the common stock. Katell and Roberts made capital contributions of $212,831 and $325,650 respectively, pursuant to instructions from the Fund, prior to this purchase.

The individual limited partners were then offered the opportunity to co-invest on a *pro rata* basis in an additional 10% of CCA stock, for $2 million. Katell and Roberts each accepted this opportunity, investing an additional $70,000 and $108,000 respectively, to obtain these *pro rata* shares.

Plaintiffs argue that they were denied the opportunity to purchase their *pro rata* shares of the remaining 10% controlled by the Morgan Stanley Group. Defendants claim the remaining 10% was set aside for "the Lenders," or "parties who were providing debt financing for the transaction," and that Morgan Stanley retained any shares offered to, but rejected by, the partners or the Lenders.

In 1989, a new entity known as SIBV/MS Holdings, Inc. ("SIBV/MS") was formed, the equity ownership of which was divided equally between JSC's parent company, Smurfit International, B.V. ("SIBV") and an affiliate of Morgan Stanley. [FN2] SIBV/MS acquired the entire equity interest in JSC in this transaction. The CCA shares that had been controlled by Morgan Stanley were sold to SIBV/MS. These shares were the Fund's CCA stock, the CCA stock co-invested individually by the limited partners, and the CCA stock owned by the Lenders and/or the Morgan Stanley Group. Following the sale each plaintiff received distributions representing his share of the proceeds, $8,556,000 to Katell and $13,091,000 to Desert Equities, not including the proceeds from each plaintiff's co-investments. The plaintiffs claim the sales price for the 1989 CCA sale was unfair.

> FN2. The affiliate was the Morgan Stanley Leveraged Equity Fund II, L.P. ("Fund II").

**\*3** Prior to the 1989 sale, Smith, Barney, Harris

Upham & Co., Inc. ("Smith Barney") performed an analysis of the transaction and delivered a fairness opinion to the Fund. Smith Barney valued the CCA equity at $1 billion in an opinion dated August 30, 1989. Plaintiffs claim that this opinion was flawed. They argue that the equity value was based on the fair market value of a publicly traded stock rather than a *private market* value, which would have been higher, and that the cost included no acquisition premium. Plaintiffs also provide other instances of valuation which they claim demonstrates that Smith Barney's fairness opinion was flawed. [FN3]

> FN3. These instances included a 1986 asset liquidation value, an EDBIT percentage analysis, and a replacement values analysis, three factors sometimes used in valuations.

### III. THE PRESENT ACTION
As a result of these allegedly illegal transactions, plaintiffs have brought suit here against a number of defendants. [FN4] The defendants can be divided into five groups. They are:

> FN4. Plaintiffs have previously brought the claims asserted in the original complaint of this action in two actions begun in New York State courts in 1990. Those actions were consolidated and dismissed on the ground of *forum non conveniens*.

1. *The Morgan Stanley defendants*. They include the Morgan Stanley Group; its subsidiaries, Morgan Capital and Morgan Stanley; and Donald P. Brennan and Alan E. Goldberg, who are managing Directors of Morgan Stanley and who are alleged to have served in various roles with the Partnership;
2. *The CIGNA-related defendants*. They include CIGNA and its two subsidiaries, CIGNA Capital Advisors, Inc. and CIGNA Capital;
3. *The Smurfit defendants,* JSC and CCA;
4. *The Silgan defendants,* Silgan and Silgan Holdings;
5. *SIBV/MS*.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                        Page 4

Not Reported in A.2d, 1993 WL 10871 (Del.Ch.), Fed. Sec. L. Rep. P 97,437

**(Cite as: 1993 WL 10871 (Del.Ch.))**

Plaintiffs argue that a) as a result of breaches of fiduciary duty and negligence by the Fund and its General Partners and directors, and acts by their aiders and abettors, the amount received by plaintiffs on the sale of their Silgan and CCA stock owned through the Fund was grossly unfair and inadequate; b) as a result of breaches of fiduciary duty and negligence by the Fund and its General Partners and directors, and acts by their aiders and abettors, the amount received by plaintiffs on the sale of their CCA stock co-invested with the Morgan Stanley Group was grossly unfair and inadequate; and c) as a result of a breach by the General Partners of the section of the Partnership Agreement giving plaintiffs a right of first refusal to purchase excess CCA stock controlled by Morgan Stanley Group, plaintiffs individually suffered damages.

### IV. INDIVIDUAL CLAIMS

Under Delaware corporation law, to bring an individual action as a shareholder a plaintiff must allege either an injury separate and distinct from other shareholders or a wrong involving a contractual right. *Moran v. Household Int'l, Inc.,* Del.Ch., 490 A.2d 1059, *aff'd,* Del.Supr., 500 A.2d 1346 (1985). If a plaintiff cannot show either factor, his claims are derivative.

Partnership law similarly provides an express derivative remedy in 6 *Del.C.* § 17-1001 *et. seq.* (1990 Cum.Supp.). Therefore, it follows that the test for an individual claim under partnership law should follow *Moran.* This conclusion was articulated recently in *Litman v. Prudential-Bache Properties, Inc.,* Del.Ch., C.A. No. 12137, Chandler, V.C., slip op. (Feb. 13, 1992). I stated in *Litman,* which concerned a partnership:

   **\*4** The distinction between derivative and individual actions rests upon the party being *directly* injured by the alleged wrongdoing.... That is, "[f]or a plaintiff to bring an individual action, he must be injured *directly* or *independently* of the corporation [or partnership]."
*Id.* at 7, quoting *Kramer v. Western Pac. Indus., Inc.,* Del.Supr., 546 A.2d 348, 351 (1988) (emphasis in original).

Plaintiffs argue that because they made and received payments individually in their capital accounts, and the amount of their payments was directly related to the amount of money which they paid into the Fund (the payments are "directly traceable"), that they then must have an individual right of action. They insist that their claims are analogous to those of a client complaining about sales by its broker. I disagree. Actually, the wrongs of which the plaintiffs complain are not wrongs inflicted upon them alone. Nor do the wrongs affect any particular right that plaintiffs assert. Rather, the plaintiffs' claim, in my view, concerns an indirect injury visited upon them as well as all other limited partners as a result of the wrong done to the Partnership. *Cf. Elster v. American Airlines, Inc.,* Del.Ch., 100 A.2d 219, 222 (1958).

Plaintiffs rely mistakenly on *In re Radiology Associates, Inc.,* Del.Ch., C.A. No. 9001, Chandler, V.C., slip op. (May 16, 1990). They misinterpret a narrow holding that a loan to a controlling shareholder involving a decrease in dividends could be characterized as an individual action. *Id.,* slip op. at 35. However, the narrow holding in that case does not support plaintiffs' proposition; on the contrary, *In re Radiology* held that claims of breach of fiduciary duty (such as those here) were in fact *derivative.* "The record contains no evidence that either loan injured [the plaintiff] in a manner separate and distinct from any injury to Radiology and its shareholders." *Id.* at 33. The passage plaintiffs rely upon concerned decreased dividends to only *one* limited partner. That is not the case here; nor have plaintiffs alleged a similar situation.

Furthermore, I recently reaffirmed the rule that claims such as those raised by the plaintiffs here are derivative in nature. *See Litman,* slip op. at 8-9, Feb. 13, 1992. As in *Litman,* plaintiffs here assert that defendants directly injured their distribution rights, but "plaintiffs' true argument is that the alleged misconduct resulted in diminished income to the Partnership ..." *Litman,* slip op. at 8.

Plaintiffs attempt to distinguish this result by pointing out that limited partners may, in some

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 5

Not Reported in A.2d, 1993 WL 10871 (Del.Ch.), Fed. Sec. L. Rep. P 97,437

**(Cite as: 1993 WL 10871 (Del.Ch.))**

circumstances, be excused from particular investments. This argument also fails. The plaintiffs do not allege that any limited partner was in fact excused from investing in either the CCA or Silgan deal. Specific factual allegations are a necessary part of demonstrating the need to depart from the derivative remedy. Plaintiffs must demonstrate that a derivative claim will not serve the best interests of justice to all parties. Considerations of fairness and judicial economy require that an action to redress a wrong to a limited partnership be litigated derivatively, so that it may be resolved once and for all in a single lawsuit. The result is binding on the partnership and precludes any other limited partner from bringing the same claim. *See, e.g., Cramer v. Gen. Tel. & Elec. Corp.,* 582 F.2d 259, 267 (3d Cir.1978), *cert. denied,* 439 U.S. 1129 (1979). Here, plaintiffs' allegations do not sufficiently demonstrate the need for an individual right of action. Plaintiffs therefore have no individual claim for money damages where, as here, their complaint is that a general partner caused the Partnership to dispose of its assets at inadequate prices.

## V. DERIVATIVE CLAIMS

**\*5** Plaintiffs' amended complaint alternatively seeks to bring their claims of inadequate returns derivatively on behalf of the Partnership. In a derivative action, a plaintiff must either make a demand on the general partners to redress the alleged wrong or demonstrate that such demand would be futile. In that regard, a limited partner must "set forth with particularity the effort, if any, of the plaintiff to secure the initiation of the action by a general partner or the reasons for not making the effort." 6 *Del.C.* § 17- 1003 (1990 Cum.Supp.) A derivative action must be brought only "if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed." *Id.,* § 17-1001.

Plaintiffs claim that they are excused from making a demand upon the general partners due to the general partners' self-interest. Following the demand excused analysis in our corporation law, *see Litman v. Prudential-Bache Properties, Inc.,*

Del.Ch., C.A. No. 12137, Chandler, V.C. (Jan. 4, 1993), slip op. at 4-5, the test for determining demand futility is (1) whether threshold presumptions of director disinterest or independence are rebutted by well-pleaded facts; and, if not, (2) whether the complaint pleads particularized facts sufficient to create a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment. *Levine v. Smith,* Del.Supr., 591 A.2d 194, 205 (1991). *See also Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 815 (1984).

In regard to the first prong of the *Aronson* test, plaintiffs allege with particularity that the first partner, Morgan Stanley Group, cannot be presumed to be disinterested. Morgan Stanley Group was not only involved in the Silgan and CCA transaction as the seller, but had affiliates involved as buyers, namely the Fund II and Morgan Capital. Therefore, the Morgan Stanley Group is presumed interested, since it allegedly appeared on both sides of the transaction and collected middleman transaction fees.

Plaintiffs, however, do not allege that CIGNA was interested. They rather imply that CIGNA lacked independence. They imply CIGNA lacked independence because Morgan Stanley retained the power to veto any action of the Fund. The veto power is defined in the Fund Agreement:

> Notwithstanding anything to the contrary contained in this Agreement ... neither General Partner shall, except when acting together with the other General Partner, be deemed to control the Partnership or have the right to make determinations ... (vi) as to the initiation, conduct or settlement of legal actions on behalf of the Partnership ...

Def.Exh. 1 at 20. Thus, plaintiffs argue, even if CIGNA determined that a claim was meritorious, it could not prosecute the claim because it could not control the Partnership. Defendants, not surprisingly, argue that CIGNA is independent.

**\*6** Even assuming that CIGNA is independent, however, one of two partners (50% of the Partnership) does not satisfy the first prong of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 6

Not Reported in A.2d, 1993 WL 10871 (Del.Ch.), Fed. Sec. L. Rep. P 97,437

**(Cite as: 1993 WL 10871 (Del.Ch.))**

*Aronson* test. Consequently, neither the interested nor disinterested party could constitute a majority of the board. Both sides claim this fact helps their argument. Plaintiffs rely on a passage in *Aronson* stating a "majority consisting of disinterested directors" must approve a transaction to be presumed disinterested. *Aronson,* 473 A.2d at 812. Defendants, on the other hand, rely on the more recent *Levine* case, which holds that showing demand futility requires showing a lack of independence or financial interest of a majority of board members. *Levine v. Smith,* 591 A.2d at 205.

I adopt the former approach, considering that the supposedly independent partner is unable to act on claims made upon the general partners without the agreement of the interested one. Accordingly, demand is excused under the first prong of the *Aronson* test. Therefore I will not dismiss plaintiffs' derivative claims that the amounts received by the limited partners regarding the Silgan and CCA sales were grossly unfair and inadequate.

### VI. CLAIMS MADE AS CO-INVESTORS
The *pro rata* shares in which plaintiffs co-invested were offered to each individual limited partner, but were not purchased individually. Instead, the shares were purchased and held in a Delaware trust with the Morgan Stanley Group as trustee. (Amended Complaint ¶ 54). The trust was terminated in 1989 when the CCA stock was sold.

Plaintiffs allege that the trust was directly controlled by the Partnership, due to the trustee's obligation to vote its shares in the same manner as the Partnership and the Fund's Partnership Agreement. [FN5] Even assuming *arguendo* that direct control existed, this fact does not give rise to any duty owed by the trust to plaintiffs. Plaintiffs gave Morgan Capital "all rights and powers of an absolute owner and holder of such shares" in the trustee agreement. Def.Exh. 3 at 4. Therefore, plaintiffs contracted away their rights as to the shares held by the trustee. Plaintiffs argue in essence that this contract should be ignored because "the Fund defendants breached the duties they owed to plaintiffs through an abuse of their positions in the Fund." Plaintiffs fail to provide any convincing

rationale for overlooking the contractual rights which they, as sophisticated investors, agreed upon. Therefore, plaintiffs have failed to state a claim upon which relief may be granted with respect to the shares of CCA held in trust.

> FN5. The Voting Trust Agreement, reproduced as Def.Exh. 3 at 14, states "the Trustee shall vote the stock subject to this Agreement in the same manner as the stock held by MS Equity is voted."

### VII. RIGHT OF FIRST REFUSAL
Plaintiffs claim that the general partners breached a contractual obligation and a fiduciary duty to the limited partners by offering certain CCA stock to others without first offering this stock to the limited partners. Defendants argue that these claims are time barred and, alternatively, that the claims are precluded by explicit provisions in the Partnership Agreement.

*7 The stock in question is the remaining 10%, or 2000 shares, of CCA Class B common stock which defendants set aside for the Lenders in 1986. Morgan Stanley retained those shares not sold to Lenders. The Agreement states that each limited partner should receive a "right of first refusal to contribute a portion of the Excess Amount" over the aggregate amount to be invested by the Partnership in any leveraged investment. Def.Exh. 1 at 35, § 5.2(b).

Plaintiffs claim the failure to offer a right of first refusal was a breach of the Partnership Agreement and the general partners' fiduciary duty. Defendants, on the other hand, claim that plaintiffs' right of first refusal is discretionary. I cannot determine by the facts before me whether the right of first refusal is mandatory, and whether it was breached. Even assuming *arguendo* that the right exists however, the claim is time barred.

The events involved in the right of first refusal claims occurred in September 1986. Amended Complaint ¶¶ 42-44. The claims were first raised before the New York courts in 1990; the claims were alleged to have been served on Morgan

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 7

Not Reported in A.2d, 1993 WL 10871 (Del.Ch.), Fed. Sec. L. Rep. P 97,437

**(Cite as: 1993 WL 10871 (Del.Ch.))**

Stanley on September 25, 1990, and on CIGNA on October 2, 1990. Amended Complaint ¶ 91. The New York litigation was dismissed on *forum non conveniens* grounds. The present action was begun on November 6, 1991.

Delaware has a statute of limitations which applies to claims such as these which arose outside the State of Delaware. 10 *Del.C.* § 8121. (Claims which arise within the State are also subject to a three-year statute of limitations, as codified in 10 *Del.C.* § 8106.) Delaware's choice of law provision dictates that an action cannot be brought in a Delaware court "after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose ..." 10 *Del.C.* § 8121. This statute effectively limits the time period to three years at the longest, since a Delaware court must choose the shorter of either our own or another jurisdiction's law. Plaintiffs' first claims were asserted well after the three year time limit had expired. Plaintiffs' arguments that I should consider New York's six year limitation lack merit. Our statutory law expressly provides that Courts choose the *shorter* limit when such issues arise. Although this Court is one of equity, not required to strictly adhere to statutory limitation periods, these periods do provide guidance.

As plaintiffs note, in matters of equity statutes of limitation are not necessarily controlling, though in usual circumstances they are given great weight. *Adams v. Jankouskas,* Del.Supr, 452 A.2d 148, 157 (1982). Delaware courts have long recognized that legal statutes of limitations are not automatically applied in cases of equity. *Bovay v. H.M. Byllesby & Co.,* Del.Supr., 38 A.2d 808, 820 (1944). In cases of equity, courts apply a narrow exception to "extraordinary cases which involve, as a minimum, allegations of fraudulent self-dealing" which have personally benefitted the fiduciary. *Halpern v. Barran,* Del.Ch., 313 A.2d 139, 142 (1973). Plaintiffs claim that defendants committed a "serious breach of trust" by asserting the position that no right of first refusal exists. Whether this assertion rises to the level of a serious breach of trust or not, it certainly fails as an "extraordinary

case" involving "fraudulent self-dealing." *Id.*

*8 Plaintiffs further argue that I should not take guidance from Delaware's borrowing statute because doing so would confer an undeserved benefit on defendants. They contend that the New York case was dismissed because of the pendency of related litigation in Delaware. They state:

The purpose of Delaware's borrowing statute is to prevent non-resident plaintiffs from forum shopping for a longer Delaware statute of limitations. That interest is not implicated here since it was defendants that sought the Delaware forum. *See Pack v. Beech Aircraft Corp.,* Del.Supr., 132 A.2d 54, 57 (1957).

Plaintiffs' Brief at 35, n. 8. I do not agree that an inequity results from utilizing the Delaware statute guidelines in this case. On the contrary, if plaintiffs were able to avail themselves of a longer statute of limitations simply because they brought a previous case in another jurisdiction, inequity would arise in deferring to the longer statute. Furthermore, this holding could increase the threat of different plaintiffs filing suits in multiple jurisdictions in order to avail themselves of longer statutes of limitations. Plaintiffs' claims as to the right of first refusal are time barred.

VIII. AIDING AND ABETTING CLAIMS

A plaintiff must allege three elements, aside from damages, to state a claim for aiding and abetting a breach of fiduciary duty: 1) the existence of a fiduciary relationship, 2) a breach of the fiduciary's duty, and 3) a knowing participation in that breach by the defendants who are not fiduciaries. *Endervelt v. Nostalgia Network, Inc.,* Del.Ch., C.A. No. 11415, Chandler, V.C., slip op. at 10 (July 23, 1991); *Weinberger v. Rio Grande Indus., Inc.,* Del.Ch., 519 A.2d 116, 131 (1986). Here, it is admitted that the defendant Morgan Stanley had a fiduciary relationship with plaintiffs, and plaintiffs have alleged a breach of that duty in regard to the CCA and Silgan claims. The plaintiffs must now allege knowing participation by the non-fiduciary defendants.

The plaintiffs assert that I can infer knowledge that the participation was wrong to an alleged aider and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 8

Not Reported in A.2d, 1993 WL 10871 (Del.Ch.), Fed. Sec. L. Rep. P 97,437

**(Cite as: 1993 WL 10871 (Del.Ch.))**

abetter here. The standard, as I stated in *Lewis v. Leaseway Transportation Corp.,* Del.Ch., C.A. No. 8720, Chandler, V.C. (May 16, 1990), is that I will not infer knowledge "unless the action comprising the purported breach is 'inherently wrongful.' " *Lewis,* slip op. at 17. Plaintiffs' contentions that the Morgan defendants' acts of "using blatantly deficient fairness opinions to justify sales of assets in two transactions in which they stood on both sides" are not sufficient in this regard. Plaintiffs' allegations do state a claim against defendants; they do not allege, however, inherently wrongful conduct.

Furthermore, as stated earlier, plaintiffs were aware (at least constructively) that the Morgan defendants would be involved on both sides of many deals. Defendants were not even required to obtain fairness opinions in the transactions, deficient or otherwise. Therefore, the plaintiffs have failed to allege facts from which it can reasonably be inferred that any of the defendants other than the general partners of the Fund played any role in the general partners' decision to sell the CCA or Silgan assets. Consequently, the aiding and abetting claims fail, and will be dismissed.

IX. CONCLUSION

*9 Plaintiffs' individual claims are dismissed for failure to state a cognizable claim for which I can grant relief. Similarly, their claims as to aiding and abetting are dismissed. Plaintiffs' right of first refusal claims are also dismissed as time barred. Plaintiffs' derivative claims, on the other hand, are not dismissed since I have determined that plaintiffs' demand requirement is excused.

IT IS SO ORDERED.

Not Reported in A.2d, 1993 WL 10871 (Del.Ch.), Fed. Sec. L. Rep. P 97,437

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.