EXHIBIT 7

## Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 1998 WL 774123 (N.D.Ill.)

**(Cite as: 1998 WL 774123 (N.D.Ill.))**

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois.
MIDWAY HOME ENTERTAINMENT INC., f/k/a
Williams Entertainment Inc., Midway Games
Inc., and WMS Industries Inc., Plaintiffs,
v.
ATWOOD RICHARDS INC., Defendant.
**No. 98 C 2128.**

Oct. 29, 1998.

*MEMORANDUM OPINION AND ORDER*

HOLDERMAN, J.

**\*1** Defendant, Atwood Richards, Inc. ("Atwood"), has filed a Rule 12(b)(6) Motion to Dismiss plaintiffs' complaint on the grounds that it fails to state a claim upon which relief can be granted. In its motion to dismiss, defendant claims that plaintiffs' complaint fails for two reasons: (1) the contract contains two disclaimer of representations and warranties clauses that bar the claim in Court II which defendant alleges is a claim for fraudulent inducement; and (2) the Illinois Consumer Fraud Act claim in Count I fails on the grounds that the parties contractually agreed that New York law would govern the contract. Plaintiffs, however, claim that they have properly pled each count. For the following reasons, defendant's motion is granted as to Count I and denied as to Count II.

*STANDARD OF REVIEW*

In ruling on a motion to dismiss, the court must presume all of the well-pleaded allegations of the complaint to be true. *Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53

L.Ed.2d 557 (1977). The court must view those allegations in the light most favorable to the plaintiff. *Gomez v. Illinois State Bd. of Educ.,* 811 F.2d 1030, 1039 (7th Cir.1987). Dismissal under Rule 12(b)(6) is proper only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see also Panaras v. Liquid Carbonic Industries Corp.,* 74 F.3d 786, 791 (7th Cir.1996).

*ANALYSIS*

I. *Barter Contract Considered As Part of the Pleadings*

Initially, plaintiffs contend that the barter contract ("contract") attached to defendant's motion to dismiss is outside the pleadings and should not be considered at this time. In the alternative, plaintiffs argue that this court must convert the motion to one for summary judgment and afford the plaintiffs an opportunity to reply.

Under Rule 10(c), "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." While a plaintiff is under no obligation to attach documents to the complaint upon which the action is based, a defendant may introduce certain pertinent documents if the plaintiff failed to do so. *Venture Associates Corp. v. Zenith Data Systems Corp.,* 987 F.2d 429, 431 (7th Cir.1993). Generally, in regard to a Rule 12(b)(6) motion, when "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56...." Fed.R.Civ.P. 12(b). Nevertheless, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [his or] her claim." *Venture Associates,* 987 F.2d at 431.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 2

Not Reported in F.Supp.2d, 1998 WL 774123 (N.D.Ill.)

**(Cite as: 1998 WL 774123 (N.D.Ill.))**

Defendant has attached the contract that relates to its Rule 12(b)(6) motion to dismiss. The contract is at the core of the parties contractual relationship and the contract is at the heart of this dispute. Plaintiffs referred to the contract in paragraphs 23-26, 30-31, and 34-35 of their complaint. This contract is central to plaintiffs' claims that they were fraudulent misrepresented and induced into entering into this contract. As a result, this contract is considered to be part of the pleadings and this court may consider it in deciding this motion to dismiss.

II. *Choice-of-Law Provision and Illinois Consumer Fraud Act Claim*

**\*2** Defendant argues that because the parties contractually agreed that New York law governed the contract, plaintiffs cannot ignore their contractual agreement. Therefore, defendant claims that the alleged violation of the Illinois Consumer Fraud Act under Count I should be dismissed because New York law preempts plaintiffs' Illinois claim. In a diversity of citizenship action such as this, the court must apply the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), including the rules on whether a choice-of-law provision is enforceable. Under Illinois law, an express contractual choice-of-law provision will be enforced and "given effect ... unless it would both violate fundamental Illinois public policy and Illinois has a 'materially greater interest' in the litigation than the chosen State." *Maher & Associates, Inc. v.. Quality Cabinets,* 267 Ill.App.3d 69, 203 Ill.Dec. 850, 640 N.E.2d 1000, 1006 (1994) (citation omitted). In fact, "the public policy considerations must be strong and of a fundamental nature to justify overriding the chosen law of the parties." *Potomac Leasing Co. v. Chuck's Pub, Inc.,* 156 Ill.App.3d 755, 109 Ill.Dec. 90, 509 N.E.2d 751, 754 (1987).

Paragraph six of the contract attached to the defendant's motion to dismiss states that "[t]his agreement has been negotiated and executed in and shall be governed by the laws of the State of New York." (Def.'s Ex. 1 at ¶ 6). Plaintiffs do not dispute that it executed the contract containing this

term. Instead, plaintiffs claim that notwithstanding this contractual provision, the contract's choice-of-law provision is void and ineffective as against public policy. First, plaintiffs claim that the Illinois Consumer Fraud Act expresses a fundamental public policy because it allows a cause of action to any person who suffers damage as a result of unfair trade or commerce. Second, plaintiffs claim that New York does not have a corresponding broad consumer protection legislation and thus application of New York law would deprive Illinois citizens of protection guaranteed by their legislature. Finally, plaintiffs contend that Illinois has a materially greater interest in this matter than New York because nothing with regards to this contract occurred in New York and Illinois is the home of two of the injured plaintiffs. [FN1]

> FN1. Defendant argues that the status of two of the allegedly injured plaintiffs as Illinois residents is irrelevant because neither of these two plaintiffs are signatories to the contract nor recipients of the alleged fraudulent misrepresentations. This may have been significant had this court reached this prong of the test in evaluating the choice-of-law provision. However, this court finds that applying New York law does not violate a fundamental public policy of Illinois, therefore finding it unnecessary to reach the "materially greater interest" prong.

The Illinois Supreme Court has specifically stated that the public policy of the State "must be sought in its constitution, legislative enactments and judicial decisions." *Roanoke Agency, Inc. v. Edgar,* 101 Ill.2d 315, 78 Ill.Dec. 258, 461 N.E.2d 1365, 1371 (Ill.1984). Plaintiffs merely claim that the Illinois Consumer Fraud Act expresses a fundamental public policy because it allows a cause of action to any person who suffers damage as a result of unfair trade or commerce. Plaintiffs provide no support for such a claim through a specific constitutional provision, legislative enactment or judicial decision.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1998 WL 774123 (N.D.Ill.)

**(Cite as: 1998 WL 774123 (N.D.Ill.))**

**\*3** Moreover, there is no Illinois legislative enactment, judicial decision, or constitutional provision which articulates a public policy against applying New York's consumer fraud laws. Plaintiffs argue that New York would deprive Illinois citizens of protection from the alleged harm is sufficient of a public policy. However, Illinois courts themselves have enforced parties' choice-of-law provision even though a foreign state's consumer fraud statute left the Illinois residents no recourse. *See Potomac Leasing Co.,* 109 Ill.Dec. 90, 509 N.E.2d at 753-54. In fact, the Illinois court stated, " '[a] court should not refuse to apply the law of a foreign State, however unlike its own, unless it is contrary to pure morals and abstract justice, or unless the enforcement would be of evil example and harmful to its people." ' *Id.* at 754 (quoting *Champagnie v. W.E. O'Neil Constr. Co.,* 77 Ill.App.3d 136, 32 Ill.Dec. 609, 395 N.E.2d 990 (Ill.App.Ct.1979)); *see also Demitropoulos v. Bank One Milwaukee, N.A.,* 915 F.Supp. 1399, 1414 (N.D.Ill.1996) (finding that the differences in scope of two state's consumer fraud acts did not sufficiently implicate public policy concerns; *Amaro v. Capital One Bank,* No. 97 C 4638, 1998 WL 299396 (N.D.Ill. May 21, 1998) (same). This court finds that the plaintiffs have failed to demonstrated how New York law is contrary to pure morals or abstract justice. Therefore, this court finds that applying New York law would not violate a fundamental public policy of Illinois. [FN2]

> FN2. This court need not reach a decision on whether Illinois has a materially greater interest in this litigation than New York because it does not factor into the outcome of this case.

Accordingly, the choice-of-law provision requiring the application of New York law bars the Illinois Consumer Fraud Act claim under Count I. Therefore, this court grants defendant's motion to dismiss as to Count I of plaintiffs' complaint.

### III. *Count II--Fraudulent Misrepresentation Claim*

In order to state a claim for fraudulent misrepresentation under New York law, the plaintiff must allege: (1) the defendant made a material misrepresentation; (2) the defendant intended to defraud the plaintiff thereby; (3) the plaintiff reasonably relied upon the representation; (4) the plaintiff suffered damage as a result of their reliance. *Swersky v. Dreyer & Traub,* 219 A.D.2d 321, 643 N.Y.S.2d 33, 36 (1996) (citing *Banque Arabe et Internationale D'Investissement v. Maryland National Bank,* 57 F.3d 146, 153 (2d Cir.1995) (applying New York law)). Defendant contends that plaintiffs will be unable to establish the reliance element as a matter of law because, under New York law, when there is a conflict between an express provision in a written contract and a prior alleged oral representation, the conflict negates a claim of reasonable reliance on the oral representation.

Defendant bases its argument on the disclaimer of representations clause and the warranty clause set out in the contract which is attached to defendant's motion to dismiss. More specifically, the contract states that Atwood "makes no representations as to the obtainability of services or merchandise." (Contract at ¶ 4(a)). The contract further states "neither [party has] made any representations or warranties except as are expressly set forth herein." (Contract at ¶ 6). On the other hand, plaintiffs argue that defendant's fraudulent misrepresentations vitiate the contract, and in the alternative, a closer reading of the specific provisions in the contract reveal that the contract is silent as to defendant's alleged misrepresentations. The plaintiffs further argue that the general rule does not apply in this case.

**\*4** Generally, when there is a specific disclaimer of reliance in a contract, it destroys the allegations in a plaintiff's complaint that the agreement was executed in reliance upon these contrary oral representations. *Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597, 600 (1959). The *Danann* court and its progeny have applied one exception to this general rule which may be applicable to this case. The exception is allowed in factual situations where the facts represented were matters peculiarly within defendant's knowledge, warranting the ignorance of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 4

Not Reported in F.Supp.2d, 1998 WL 774123 (N.D.Ill.)

**(Cite as: 1998 WL 774123 (N.D.Ill.))**

the express disclaimer. *Id.* Furthermore, some New York courts do expound the view that fraud vitiates every agreement which it touches, in the inducement as well as in the performance. *Newmark & Co. Real Estate, Inc. v. C & A Trimming Corp.,* 134 Misc.2d 371, 511 N.Y.S.2d 205, 206 (Civ.Ct.1987). Thus, a person who perpetrates the fraud should not be protected by a covenant of immunity because it would be against public policy. *Id.* (*citing Industrial & General Trust, Lt. v. Tod,* 180 N.Y. 215, 73 N.E. 7 (1905)).

In reviewing the law in this area, this court realizes that this issue is a close one. This court is quite mindful that this is a motion to dismiss, not a summary judgment motion. Therefore, this court finds that plaintiffs have alleged sufficient facts to survive a motion to dismiss. There are a number of issues of fact in this case that cannot be resolved at this stage. Therefore, this court cannot say that under no set of facts could plaintiffs prevail on their fraudulent misrepresentation claim. Therefore, this court denies the defendant's motion to dismiss Count II.

### CONCLUSION

Accordingly, for the reasons set forth above, defendant's motion to dismiss plaintiffs' complaint is granted in part and denied in part. Count I of plaintiffs' complaint is dismissed, however, Count II remains. The parties are strongly urged to discuss settlement of this case and report on the status thereof at 10:00 a.m. on November 12 1998.

Not Reported in F.Supp.2d, 1998 WL 774123 (N.D.Ill.)

**Motions, Pleadings and Filings (Back to top)**

• 1:98CV02128 (Docket) (Apr. 07, 1998)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 8

Westlaw.

Not Reported in F.Supp.2d                                                                     Page 1

Not Reported in F.Supp.2d, 2002 WL 31819207 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,253

**(Cite as: 2002 WL 31819207 (S.D.N.Y.))**

**H**

**Motions, Pleadings and Filings**

United States District Court,
S.D. New York.
NANOPIERCE TECHNOLOGIES, INC., Plaintiff,
v.
SOUTHRIDGE CAPITAL MANAGEMENT LLC
et al., Defendants.
**No. 02 Civ.0767 LBS.**

Oct. 10, 2002.

Company asserted federal and state securities fraud claims against investor, which had allegedly manipulated stock price for its own benefit. On investor's motion to dismiss, the District Court, Sand , J., held that: (1) complaint adequately alleged market manipulation, and (2) all state law claims arising from parties transaction were governed by New York law.

Motion granted in part and denied in part.

West Headnotes

**[1] Securities Regulation ⟲60.48(1)**
349Bk60.48(1) Most Cited Cases
Company asserting securities fraud claim against investor was not precluded from alleging reliance on investor's oral representations, even though written investment agreement expressly gave investor right to make objected-to stock sales; substance of alleged misrepresentations, i.e., that investor would not engage in manipulative scheme to depress price of company's stock, was not explicitly addressed in agreement. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[2] Securities Regulation ⟲60.45(1)**

349Bk60.45(1) Most Cited Cases
Company alleging that investor falsely assured it that it would not engage in manipulative scheme to depress price of company's stock in order to trigger "reset" rights which would allow it to obtain more stock, adequately alleged scienter; there was evidence that investor stood to profit from short term price depression. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(2), as amended, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

**[3] Securities Regulation ⟲60.52**
349Bk60.52 Most Cited Cases
Allegation that investor falsely assured company that it would not engage in manipulative scheme to depress price of company's stock in order to trigger "reset" rights which would allow it to obtain more stock, was sufficient to state claim for misrepresentation in connection with sale of security; misrepresentation did not have to be about value of particular security. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[4] Securities Regulation ⟲60.25**
349Bk60.25 Most Cited Cases
Company suing investor for intentionally depressing price of stock adequately alleged impermissible market manipulation; complaint alleged (1) subjective intent to depress stock price, based on financing agreement that provided motive, (2) suspicious timing of sales, (3) dominant or near-dominant trading volume throughout six month period, (4) significant amounts of trading conducted through non-market maker, and (5) extensive pattern of similar investments and subsequent stock price drops in other companies. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[5] Securities Regulation ⟲60.40**
349Bk60.40 Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                  Page 2

Not Reported in F.Supp.2d, 2002 WL 31819207 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,253

**(Cite as: 2002 WL 31819207 (S.D.N.Y.))**

Allegations concerning role of investment company's principal in negotiations over terms of investment in corporation were sufficient to assert "control" element, in corporation's control person liability suit based on third party's manipulative sales of corporation's stock Securities Exchange Act of 1934, § 20(a), as amended, 15 U.S.C.A. § 78t(a).

**[6] Securities Regulation ☞60.51**
349Bk60.51 Most Cited Cases
Control person claim in securities fraud suit is subject to heightened pleading requirements applicable to fraud claims where controlled person's primary violation is alleged to be fraudulent. Securities Exchange Act of 1934, § 20(a), as amended, 15 U.S.C.A. § 78t(a); Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[7] Contracts ☞206**
95k206 Most Cited Cases
Choice of law provision in investment agreement, mandating application of New York law to disputes under contract and use of New York courts for any disputes between parties, was sufficiently broad to mandate application of New York law to all claims, including fraud claims, arising out of agreement.

**[8] Conspiracy ☞1.1**
91k1.1 Most Cited Cases
There is no substantive tort of civil conspiracy under New York law.

*OPINION AND ORDER*

SAND, J.

*1 Plaintiff Nanopierce ("NPCT" or "Plaintiff") brings nine claims in various combinations against Defendants Southridge Capital Management LLC ("Southridge"), Dan Pickett ("Pickett"), Patricia Singer ("Singer"), Thomson Kernaghan & Co. ("TK"), and Harvest Court LLC ("Harvest Court") (collectively "Defendants"). The claims allege (1) misrepresentation under § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5, C.F.R. § 240.10b-

5, promulgated thereunder; (2) stock manipulation under § 10(b) and Rule 10b-5; (3) control person liability on the basis of the aforementioned § 10(b) claims under § 20(a) of the Exchange Act; (4) securities fraud under Colorado law; (5) control person liability on the basis of the Colorado securities violation; (6) aiding and abetting the Colorado securities violation; (7) common law fraud; (8) civil conspiracy; and (9) breach of contract. Claims 2, 4, 6, and 8 are asserted against all Defendants; claims 1 and 7 are asserted against Southridge, Pickett, and Singer; claims 3 and 5 are asserted against Southridge, Pickett, and TK; and claim 9 is asserted solely against Harvest Court. (First Amended Complaint ("Complaint") at 21-27.) Defendants move to dismiss all claims pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim, and to dismiss the fraud claims pursuant to Fed.R.Civ.P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") for failure to plead with the requisite particularity.

*I. Allegations*

On a motion to dismiss, the Court must accept as true all allegations in the Complaint, and draw all inferences therefrom in favor of the plaintiff. *Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir.1998). The following facts are therefore drawn from the Complaint.

At the end of 1999, NPCT obtained financing from a company called Equinox Investors, LLC ("Equinox"), not a party in this action. Under the financing agreement, Equinox received what are known as convertible debentures, which means that Equinox could convert its notes into a certain number of shares of NPCT stock depending on the stock's current trading price. NPCT alleges that, heeding its economic self-interest, Equinox proceeded artificially to depress the price of NPCT stock through short sales and other methods, and thereafter to convert its notes into a large number of NPCT shares. (Complaint at 7.)

Due in part to the fallout from the Equinox affair, NPCT sought additional financing from Defendant Southridge. In a September 26, 2000, meeting at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 3

Not Reported in F.Supp.2d, 2002 WL 31819207 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,253

**(Cite as: 2002 WL 31819207 (S.D.N.Y.))**

Southridge's Connecticut office, NPCT's president Paul Metzinger ("Metzinger") negotiated an agreement with Southridge employees Defendants Singer and Pickett. Metzinger informed Singer of NPCT's problems with Equinox, in response to which "Singer assured Nanopierce that Southridge would not engage in these practices" or "behave as Equinox had." (Complaint at 8.) Defendant Pickett affirmed as well that "Southridge was no Equinox" and that "Southridge did not make its money that way." (Complaint at 9.) Nonetheless, Pickett insisted that the financing agreement between NPCT and Southridge contain so-called reset rights. Reset rights entitle the lender to additional shares of common stock in the event the stock price declines; they function similarly to convertible debentures in that the number of additional shares issued depends on the stock's current trading price. Pickett asserted that Southridge sought reset rights "only to 'protect its investors' ' in case the stock declined due to "normal market forces," and that Nanopierce " 'did not have to worry' about Southridge exhibiting behavior like that of Equinox." (Complaint at 9-10.)

**\*2** NPCT and Southridge closed the new financing agreement (Annex A to Affirmation of Caryn G. Mazin in Support of Motion to Dismiss First Amended Complaint ("the Agreement")) on October 20, 2000. The Agreement called for $7.5 million in initial financing in exchange for 4,531,613 shares of NPCT stock. (Complaint at 13.) The reset clause included three reset dates (65, 130, and 195 days after the closing) at which times additional shares would be issued (without additional consideration [FN1]) if the stock was trading below the initial purchase price. The number of shares to be issued was determined by a formula taking into account the lowest bid prices over the 65 days preceding each reset date. (Agreement at 7.) The Agreement also provided for an additional $7.5 million in financing at a future date, on the condition that NPCT's stock met certain price and volume thresholds. (Agreement at 9.) Additionally, just before the closing Defendants substituted as signatory a Cayman Islands entity. Defendant Harvest Court, which NPCT alleges was merely a "straw man" for Southridge. (Complaint at 13.)

FN1. The portion of the contract setting forth the terms of the reset warrant was not included in any of the documents submitted to the Court. But NPCT asserts that the shares were issued without additional consideration (Transcript of Oral Argument, September 12, 2002 ("Oral Argument"), at 20), and Defendants do not dispute this assertion.

At this point, according to the Complaint, Defendants began to execute a scheme to enrich themselves by driving down the price of NPCT stock and exploiting the reset rights. On October 23, 2000, the first trading day after the closing, Defendant TK. "purportedly acting on behalf of Harvest Court," commenced a sequence of large sales of NPCT stock. For approximately six months, until May 9, 2001 (when Defendants allegedly liquidated their position in NPCT), TK sold NPCT stock nearly every day, accounting for an average of 36.5% of the daily traded volume and 22.7% of the traded volume over the entire period. On 47 trading days within this period, TK accounted for over half of the volume of NPCT trades. The stock price, which had closed at $2.63 on October 23, 2000, dropped steadily, reaching a low of $0.32 in April 2001, and closing at $0.51 on May 9, 2001. (Complaint at 14-18.) NPCT asserts that "[n]o material adverse information had been disclosed about Nanopierce that would ... account for the decline." (Complaint at 20.) After the first reset date, TK requested, and NPCT issued, 2,143,975 reset shares pursuant to the formula. (Complaint at 21.)

Beyond this unusual timing and pattern of sales, NPCT also alleges that TK acted suspiciously by conducting a large amount of its trading through non-party Jeffries & Co Jeffries & Co. is apparently not a market maker in NPCT stock, which Plaintiff suggests means that TK was interested in something other than receiving the best price for its stock. (Complaint at 20.) Finally, NPCT alleges that Defendants' manipulation of NPCT stock was only one example of an extensive "unlawful scheme," by which Defendants insert conversion and reset provisions into financing agreements with other

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 4

Not Reported in F.Supp.2d, 2002 WL 31819207 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,253

**(Cite as: 2002 WL 31819207 (S.D.N.Y.))**

companies, and then proceed to drive down the stock price via dumping, short sales, and other means. The Complaint includes a list of 27 other companies alleged to be victims of Defendants' scheme. (Complaint at 4-6.)

*II. Standard of Review*

**\*3** "Dismissal of the complaint is proper only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.,* 155 F.3d 59, 67 (2d Cir.1998) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)) (footnote, citation, and quotation marks omitted). The Court may take into account documents incorporated by reference in the Complaint, or documents of which Plaintiff had notice or on which Plaintiff relied in bringing suit. *Cortec Indus. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991).

*III. Claim I-Misrepresentation in violation of § 10(b) and Rule 10b-5 (Pickett, Singer, and Southridge)*

NPCT alleges that during the negotiations Defendants made misrepresentations and omissions that amounted to securities fraud in violation of § 10(b) and Rule 10b-5 Specifically, NPCT charges both Pickett and Singer with their statements assuring Metzinger that the Southridge Agreement would not be a repeat of the Equinox experience, and that the reset rights were intended merely to protect Southridge against "normal market forces." NPCT also charges Pickett with misrepresenting that a total of $15 million in financing would be available, when in fact only $7.5 million was provided. [FN2] Additionally, NPCT labels omissions the failure of Pickett and Singer to disclose (1) their intention to manipulate NPCT stock; (2) their intention to avoid the second $7.5 million in financing; (3) their intention to "attempt to take control over Nanopierce"; (4) their "pattern and practice" of manipulating the stock of other companies; (5) a jury verdict against a company allegedly associated with Defendants for

manipulating the stock of a company called DG Jewellery [sic]; and (6) testimony by Pickett that Southridge clients tend to "liquidate their stock positions before the expiration of the initial reset period." (Complaint at 8-12.) Southridge is alleged to be liable on the basis of these statements and omissions by its employees.

> FN2. NPCT also labels a misrepresentation assertions by Pickett and Singer that "Southridge had been in business since 1993, managed over four hundred million dollars in assets, and owned the building in which they were meeting."

To allege a misrepresentation claim under § 10(b) and Rule 10b-5, "a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." *Kalnit v.. Eichler,* 264 F.3d 131, 138 (2d Cir.2001). In addition, the misrepresentation or omission underlying the claim must be made "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b); 17 CFR 240.10b-5. Claims alleging fraud must be pleaded with particularity, Fed.R.Civ.P. 9(b), and "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were made." *Shields v. Citytrust Bancorp,* 25 F.3d 1124, 1128 (2d Cir.1994).

Defendants object to these allegations on a variety of grounds. First, Defendants argue that NPCT has failed to allege facts demonstrating that the alleged misrepresentations were false. (Memorandum of Law in Support of Motion To Dismiss First Amended Complaint ("Def.Mem.") at 9-10.) Although the Court agrees that Plaintiff has erred on the side of alleging more misrepresentations than facts demonstrating falsehood, [FN3] it nonetheless finds that the description of the manipulative scheme alleged in this case amply supports the crux of Plaintiff's misrepresentation claim, which is that Defendants represented that they would not manipulate NPCT's stock. *See Internet Law Library*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 5

Not Reported in F.Supp.2d, 2002 WL 31819207 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,253

**(Cite as: 2002 WL 31819207 (S.D.N.Y.))**

*v. Southridge Capital Mgmt.,* 2002 U.S. Dist. LEXIS 13172, *16--*17 (S.D.N.Y. July 18, 2002) (Carter, J.).

> FN3. For example, NPCT's charge that Defendants omitted to mention the jury verdict finding manipulation of D.G. Jewellery's stock comes despite the fact that, as Defendants note, the trial court in that case immediately set the jury's verdict aside. *See Haymarket LLC v. D.G. Jewellery [sic] of Canada Ltd.,* 290 A.D.2d 318, 319, 736 N.Y.S.2d 356 (1st Dept.2002) (affirming the trial court's vacatur of the jury verdict). Nor does the Court find that Plaintiff has alleged any facts supporting an inference that Defendants schemed to take control over NPCT, or that any of the representations about Southridge's business history, *see* fn.2, *supra* were false.

*4 [1] Next, Defendants argue that because the written terms of the Agreement fully explain the operation of the reset rights without restricting Harvest Court's right to sell its shares of NPCT stock, Plaintiff could not reasonably rely upon any prior oral statements to the contrary. (Def. Mem. at 9; Reply to Opposition to Motion To Dismiss First Amended Complaint ("Def. Reply Mem.") at 7.) The Court is mindful that a written agreement can preclude reliance on contrary oral representations. *See, e.g., Global Intellicom v. Thomson Kernaghan & Co.,* 1999 U.S. Dist. LEXIS 11378, *31--*34 (S .D.N.Y. July 27, 1999) (Cote, J.) (finding it unreasonable to rely on an oral representation that defendants would not engage in short selling when defendants specifically refused to insert such language in the written contract and the contract expressly permitted all legal sales). Nonetheless, the Court finds that in this case the substance of the alleged misrepresentations-that Defendants would not engage in a manipulative scheme to depress the price of NPCT stock-was not explicitly addressed in the Agreement here. *See Internet Law Library,* 2002 U.S. Dist. LEXIS 13172, at *25--*28.

[2] Defendants next attack NPCT's pleading of

scienter. Under the PSLRA, which "raised pleading requirements to a level commensurate with those long in place in the Second Circuit," *see id.* at *20, Plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2). The required state of mind is "an intent to deceive, manipulate, or defraud," *Kalnit,* 264 F.3d at 138, and Plaintiff may carry this burden "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness," *id.* at 138-39 (quoting *Acito v. Imcera Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995). In the Complaint, NPCT takes the first road, alleging that the economic structure of the Agreement gave Defendants "both the motive and the opportunity to defraud Nanopierce." (Complaint at 21-22.) [FN4]

> FN4. NPCT subsequently argues that it has sufficiently alleged scienter via the "conscious misbehavior or recklessness" avenue as well (Plaintiff's Memorandum of Law in Support of its Opposition to Defendants' Motion To Dimiss ("Pl.Mem.") at 3-4), but because the Court is satisfied with the pleading of scienter on the basis of "motive and opportunity," it does not address this argument.

Defendants' major scienter argument is that they lacked any motive to manipulate downward the price of NPCT stock, because as stockholders (and holders of warrants to purchase additional shares) they stood to profit if the stock price went up. (Def. Mem. at 7-8; Def. Reply Mem. at 5-6.) This argument has been urged on this Court without success on more than one occasion in the past. *See, e.g., Internet Law Library,* 2002 U.S. Dist. LEXIS 13172, at *22--* 24 ("[D]efendants' contention that they stood to profit from an increase in the stock price of ITIS shares ... does not foreclose the possibility that they stood to gain even more from a decline in the price of ITIS stock."); *Global Intellicom,* 1999 U.S. Dist. LEXIS 11378, at *28; *SEC v. Parnes,* 2001 U.S. Dist. LEXIS 21722,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 6

Not Reported in F.Supp.2d, 2002 WL 31819207 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,253

**(Cite as: 2002 WL 31819207 (S.D.N.Y.))**

*17--*18 (S.D.N.Y. Dec. 26, 2001) (Stanton, J.). [FN5] Defendants correctly point out that this case is somewhat more complicated than the cases cited above because Plaintiff here does not allege that Defendants engaged in short sales as the stock price declined. (Def. Reply Mem. at 6.) [FN6] The import of this distinction is that as a stockholder Harvest Court stood to lose money from the stock decline at the same time as it made money through the additional (but devalued) reset shares. A financial loss for Harvest Court was therefore one possible outcome of declining stock prices; but it was not the only possible outcome, and it is not the outcome that NPCT alleges. Under the Agreement, the net economic effect on Defendants of a drop in NPCT stock price depended on a complex interaction of the rate of the price drop, the rate of liquidation by Harvest Court, and any potential upturn in stock price while Harvest Court still owned, or was owed, shares. Indeed, according to Plaintiff, after the delivery of the first reset at 2,143,975 shares, the second reset (which was never honored) "purportedly entitled the defendants to 7,247,871 shares; and the third [also never honored] would have entitled the defendants to 4,552,455 shares of stock. The total value of these reset shares would have been $11,510,514." (Plaintiff's Memorandum of Law in Support of its Opposition to Defendants' Motion To Dismiss ("Pl.Mem.") at 6.) Any remaining questions are for discovery and trial: even in the absence of short selling, the allegations of motive here are more than sufficient to survive a motion to dismiss. [FN7]

> FN5. Although the cases cited above involved convertible debentures rather than reset rights, the Court is not persuaded that there is any difference between the two for these purposes. The function of the reset provision, just like the function of a convertible debenture, is to provide the lender with a greater number of shares, each of lesser value, as the stock price declines.

> FN6. The Complaint suggests that manipulation occurred via "pre-arranged sales, covering short positions, and

painting the tape," but NPCT appears to have dropped any allegations of painting the tape, as well as any allegations of short-selling beyond the first three days of sales. (Oral Argument at 17.)

> FN7. Even if it turns out that Defendants ultimately lost money on their investment, that fact might not be dispositive to a finding of scienter. *Cf. Markowski v. SEC,* 274 F.3d 525, 529 (D.C.Cir.2001) ("Just because a manipulator loses money doesn't mean he wasn't trying.").
> NPCT suggests that Defendants also stood to gain from depressing the stock price by avoiding their obligation to provide the additional $7.5 million in financing. (Pl. Mem. at 5.) The Court is not persuaded by this argument: if the additional financing were required it would have been a consequence of the shares held by Defendant having appreciated in value.

*5 [3] Finally, Defendants argue that any misrepresentations and omissions were not made "in connection with the purchase and sale of any security" within the definition of § 10(b) because they did not "go to the value of the securities or the value of the consideration for the securities." (Def. Mem. at 12-13.) This interpretation is too restrictive. *See SEC v. Zandford,* 535 U.S. 813, 122 S.Ct. 1899, 1903, 153 L.Ed.2d 1 (2002) ("[N]either the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of the Act."); *id.* at 1904 ("It is enough that the scheme to defraud and the sale of securities coincide.").

*IV. Claim 2-Manipulation in violation of § 10(b) and Rule 10b-5 (all Defendants)*

Defendants next attack NPCT's manipulation claim on two fronts. Defendants argue first that the Complaint lacks the specificity requisite under Rule 9(b) because it does not distinguish which of the various defendants performed which manipulative acts, and because it does not allege specific examples of pre-arranged sales or "painting the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 31819207 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,253

**(Cite as: 2002 WL 31819207 (S.D.N.Y.))**

tape." [FN8] (Def. Mem. at 14-15.) This argument is rejected. "In market manipulation claims, courts have more relaxed pleading requirements, since market manipulation claims present circumstances in which the mechanism of the scheme is likely to be unknown to the plaintiffs. In such situations, courts have only required the plaintiff to lay out the nature, purpose, and effect of the fraudulent conduct and the roles of the defendant without requiring specific instances of the conduct." *Global Intellicom,* 1999 U.S. Dist. LEXIS 11378, at *23--*24. The Complaint amply lays out the nature and purpose of the manipulation alleged here, and provides a detailed chart of the sales by TK alleged to underlie the scheme (Complaint at 14-18).

> FN8. "Painting the tape" signifies creating an appearance of trading activity without an actual change in beneficial ownership.

More cogently, Defendants argue that their alleged behavior, essentially just selling NPCT stock, does not amount to impermissible manipulation:

> [S]imply because sales affect the price of stock does not mean that the sales are manipulative. NPCT included no restrictions on the sale of these shares.... NPCT fails to allege that any specific inaccurate information was injected into the market, the litmus test for a market manipulation claim. NPCT thus fails to allege any cognizable claim of stock manipulation. (Def. Mem. at 16.)

Defendants contend that a rule holding traders liable for mere "intent to depress the price of a stock" would have the consequence that "any person who sells large quantities of stock on the open market would have to fear being hailed [sic] into court to face a manipulation claim." (Def. Reply Mem. at 5.) NPCT, for its part, responds that "[t]he law forbids all techniques, both old and new, of artificially affecting the price of securities." (Pl. Mem. at 11.)

According to the Supreme Court, the word "manipulative" "was virtually a term of art when used in connection with securities markets. It connotes intentional or willful conduct designed to deceive or defraud investors by controlling or

artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 198, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Stock manipulation is proscribed by, *inter alia,* § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), which prohibits the use "in connection with the purchase or sale of any security" of "any manipulative or deceptive device or contrivance" as defined by the SEC. Rule 10b-5, C.F.R. § 240.10b-5, promulgated pursuant to § 10(b), makes it unlawful:

> *6 (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. [FN9]

> FN9. Additionally, § 9(a)(1) of the Exchange Act prohibits two specific species of manipulation known as matched orders and wash orders. 15 U.S.C. § 78i(a)(1)(A-C). § 9(a)(2) generally prohibits "creating actual or apparent active trading" in, or "raising or depressing the price" of a security listed on a national exchange, "for the purpose of inducing the purchase or sale of such security by others." 15 U.S.C. § 78i(a)(2).

A plaintiff claiming market manipulation under Rule 10b-5 must plead the following elements: "(1) damage, (2) caused by reliance on defendants' misrepresentations or omissions of material fact, or on a scheme by the defendants to defraud, (3) scienter, (4) in connection with the purchase or sale of securities, (5) furthered by the defendants' use of the mails or any facility of a national securities exchange." *Schnell v. Conseco, Inc.,* 43 F.Supp.2d 438, 448 (S.D.N.Y.1999) (Parker, J.).

The Court acknowledges that the law of the Second Circuit on so-called open-market manipulation-where the alleged manipulator has

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 8

Not Reported in F.Supp.2d, 2002 WL 31819207 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,253

**(Cite as: 2002 WL 31819207 (S.D.N.Y.))**

made otherwise legitimate trades, yet with the subjective intent to affect the stock price thereby-is not yet fully settled. The analysis must begin with *United States v. Mulheren,* 938 F.2d 363 (2d Cir.1991). Mulheren was an acquaintance of Ivan Boesky and was convicted of Rule 10b-5 manipulation for trading in Gulf & Western stock with the purpose of driving its price up to $45, which had the effect of triggering a prior agreement under which Boesky stood to make a significant amount of money. According to the government's theory, the Court of Appeals explained,

> when an investor, who is neither a fiduciary nor an insider, engages in securities transactions in the open market with the sole intent to affect the price of the security, the transaction is manipulative and violates Rule 10b-5.... When the transaction is effected for an investment purpose, the theory continues, there is no manipulation, even if an increase or diminution in price was a foreseeable consequence of the investment ... Although we have misgivings about the government's view of the law, we will assume, without deciding on this appeal, that an investor may lawfully be convicted under Rule 10b-5 where the purpose of his transaction is solely to affect the price of a security.

*Id.* at 368.

The court proceeded to overturn the conviction on the ground that the evidence adduced at trial did not support a finding of manipulative intent. Among the relevant factors were (1) the paucity of evidence as to intent (essentially one cryptic phone conversation), *id.* at 367-69; (2) that Mulheren himself lost money on the deal, *id.* at 370; and (3) Mulheren's domination of the market for only a brief portion of one day, *id.* at 371. The court added, however, that "[w]hen domination is sustained over ... an extended period of time, evidence of manipulation is strong." *Id.* at 371. [FN10]

> FN10. *See also In re College Bound Consolidated Litigation,* 1995 U.S. Dist. LEXIS 10684 (S.D.N.Y. July 31, 1995) (Mukasey, J.). The *College Bound* court similarly declined to decide the issue left open by *Mulheren,* finding that plaintiffs

had not pleaded the necessary elements of a manipulation scheme to inflate a stock price by making large purchases at the end of the day. The court identified the "elements of an open-market manipulation claim outlined in *Mulheren*" as: "1) profit or personal gain to the alleged manipulator; 2) deceptive intent; 3) market domination; and 4) economic reasonableness of the alleged manipulation." *College Bound,* 1995 U.S. Dist. LEXIS 10684, at *15 (quotation marks omitted).

*7 In a Second Circuit case decided two weeks prior to *Mulheren,* but which the *Mulheren* court did not discuss, the court affirmed the manipulation conviction of a Drexel Burnham Lambert trader. *See United States v. Regan,* 937 F.2d 823, 829 (2d Cir.1991). The trader had arranged with another firm to sell a security short, without disclosing either the true seller or Drexel's involvement in the deal, in order to reduce the price of the security. The court found that this behavior "artificially depressed" the market price, and fit "comfortably within this full range of wrongful acts" proscribed by § 10(b). *Id.* (quotation marks omitted). [FN11]

> FN11. Plaintiff also invokes the Second Circuit's decision in *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374 (2d Cir.1974) , as evidence that liability for open-market manipulation is in fact not as open a question as *Mulheren* represents. It is true that the *Schlick* court reversed the dismissal under Rule 12(b)(6) of a manipulation claim which alleged that the defendants had arranged the purchase of common stock "in order to create a higher price for the shares." *Id.* at 379. But the scheme as pleaded also involved a host of other deceptive actions including the looting of another company's assets and various accounting irregularities. *Schlick* does not stand for the proposition that open-market purchases alone can support a manipulation claim under § 10(b). An earlier Second Circuit case, *Crane Co.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 9

Not Reported in F.Supp.2d, 2002 WL 31819207 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,253

**(Cite as: 2002 WL 31819207 (S.D.N.Y.))**

*v. Westinghouse Air Brake Co.,* 419 F.2d 787, 795 (2d Cir.1969), found the possibility of manipulation, and therefore reversed the dismissal of a 10b-5 claim, where a company sought to inflate a stock price and thereby influence a tender offer, by purchasing a large volume of shares on the open market while secretly selling them at a significant loss at the same time. *Cf. Crane Co. v. American Standard, Inc.,* 603 F.2d 244, 249 (2d Cir.1979) (finding on the basis of an intervening Supreme Court case that, contrary to its earlier holding, the plaintiff in *Crane* lacked standing to assert the manipulation claim).

In addition to invoking *Regan,* NPCT points to *Markowski v. SEC,* 274 F.3d 525 (D.C.Cir.2001). *Markowski* involved an underwriter and a trader who were disciplined by the National Association of Securities Dealers for manipulating the price of a security by "(1) maintain[ing] high bid prices ..., and (2) absorb[ing] all unwanted securities into inventory, thereby preventing sales from depressing market prices." *Id.* at 527. The defendants argued that because their "bids and trades in this case were 'real'-they involved real customers, real transactions, and real money-the trades cannot be classified as an unlawful manipulation." *Id.* at 528. The Court of Appeals considered the issue:

Liability for manipulation wholly independent of fictitious transactions in fact raises interesting questions. Without such transactions, the core of the offense can be obscure. It may be hard to separate a 'manipulative' investor from one who is simply overenthusiastic, a true believer in the object of investment.... Legality would thus depend entirely on whether the investor's intent was an investment purpose or solely to affect the price of the security.

*Id.* (punctuation omitted).

The court acknowledged these "practical concerns," but nonetheless deferred to the SEC's interpretation of Rule 10b-5, holding that "we cannot find the Commission's interpretation to be unreasonable in light of what appears to be Congress's determination that 'manipulation' can be illegal solely because of the actor's purpose." *Id.* at

529. [FN12] In Markowski's case, admissions of manipulative intent by firm personnel were sufficient to sustain liability.

> FN12. The court reasoned that because § 9(a)(2) of the Exchange Act prohibits some stock manipulation on the basis of intent, it was reasonable for the SEC to interpret § 10(b)'s prohibition on manipulation as doing so as well.

The Third Circuit, in examining a similar 10b-5 claim involving convertible debentures and short sales, agreed with the *Markowski* court that it might be difficult to "distinguish between legitimate trading strategies intended to anticipate and respond to prevailing market forces and those designed to manipulate prices and deceive purchasers and sellers." *GFL Advantage Fund Ltd. v. Colkitt,* 272 F.3d 189, 205 (3d Cir.2001). The *Colkitt* court therefore supplemented *Markowski'* s subjective intent requirement with an additional prong asking whether the alleged manipulator "engaged in deceptive or manipulative conduct by injecting inaccurate information into the marketplace or creating a false impression of supply and demand for the security." *Id.* at 207. The court further found that short sales alone could not meet this conduct threshold, but that "some other deceptive practice" was necessary to comprise manipulation. *Id.* at 207-8 (listing examples such as "unauthorized placements and parking of stock"; secret sales without disclosing the real party in interest; encouraging others to sell short by guaranteeing profits; fraudulently low appraisals; painting the tape; and matched sales); *see also id.* at 209 (noting that large volume alone would not qualify short selling as manipulation). [FN13]

> FN13. *See also Pagel v. SEC,* 803 F.2d 942, 946 (8th Cir.1986) (affirming a finding of manipulation on the basis of stock purchases, market domination, use of nominee accounts, and the timing of bulk trades); *Alabama Farm Bureau Mut. Cas. Co. v. American Fid. Life Ins. Co.,* 606 F.2d 602, 611-12 (5th Cir.1979) (finding issues of material fact as to whether a stock

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 10

Not Reported in F.Supp.2d, 2002 WL 31819207 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,253

**(Cite as: 2002 WL 31819207 (S.D.N.Y.))**

repurchase scheme was manipulative where it was alleged to be undertaken with the purpose of artificially inflating the market price).

**\*8** Several other manipulative schemes similar to that alleged here, some involving similar defendants, have come before this Court with differing results. The most similar case is *Internet Law Library,* which involved a sale of convertible preferred stock, after which the defendant purchasers allegedly engaged in immediate and large-scale short sales, as well as "hitting the bids," dumping, and painting the tape in order to drive down the stock price. The defendants subsequently converted over three million shares to cover their short position. *Id.* at \*7. The court rejected the defendants' motion to dismiss, finding that the plaintiffs had "adequately detailed what manipulative acts the defendants have undertaken against them" and "described the effect that such activity has had on the market for ITIS stock, namely that it has artificially depressed the price of ITIS stock." *Id.* at \*30 (citations and quotation marks omitted). *See also Parnes,* 2001 U.S. Dist. LEXIS 21722, \*18--\* 19 (declining to dismiss a claim involving a similar scheme featuring convertible debentures and short sales as well as allegations of multiple regulatory violations); *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 2001 U.S. Dist. LEXIS 20374, \*29--\*30 (S.D.N.Y. Dec. 10, 2001) (Berman, J.) (dismissing a claim involving a similar scheme featuring convertible preferred stock and short sales because "Defendants' alleged and conclusory scheme to 'manipulate downward the stock price' is insufficient"); *Global Intellicom,* 1999 U.S. Dist. LEXIS 11378, \*25--\*26 (dismissing on standing grounds a claim involving a similar scheme featuring convertible preferred stock and debentures and "massive" short sales). [FN14]

FN14. Defendants also invoke a state court case involving some of the same parties as this action (and the subject of one of the misrepresentations alleged in this action). *Haymarket LLC v. D.G. Jewellery [sic] of Canada Ltd.,* 290 A.D.2d 318, 736

N.Y.S.2d 356 (1st Dept.2002), involved a stock purchase agreement with reset rights and the alleged manipulation by Haymarket of D.G. Jewellery's stock price D.G. Jewellery refused to honor a reset request, Haymarket sued for breach of contract, and D.G. Jewellery interposed the manipulative scheme as an affirmative defense. The jury agreed that there had been manipulation, but the trial judge set aside the verdict as unsupported by the evidence, and the Appellate Division affirmed. 290 A.D.2d at 318-19. *Haymarket* presents two difficulties for Defendants: First, neither the Appellate Division's published opinion nor the excerpts from the trial court's oral decision (reprinted in *Southridge Capital Mgmt., LLC v. Lowry,* 188 F.Supp.2d 388 (S.D.N.Y.2002)) reveal what legal standard either court employed in its definition of stock manipulation. Second, both courts were largely elliptical as to whether their rulings were based on legal concepts or, like those in *Mulheren* and *College Bound,* merely evidentiary. *See, e. g., Lowry,* 188 F.Supp.2d at 392-93; *Haymarket,* 290 A.D.2d at 318- 19, 736 N.Y.S.2d 356.

[4] In applying the principles gleaned from the cases discussed above to the facts at had, this Court is drawn ineluctably to the opinion that NPCT has adequately alleged that Defendants have "engaged in deceptive or manipulative conduct by ... creating a false impression of supply and demand for the security." Although NPCT does not currently allege significant short sales, it does allege 1) subjective intent to depress the value of NPCT stock, based on a financing agreement that provides a motive for manipulation; 2) timing of sales beginning the first trading day after closing and continuing until liquidation; 3) dominant or near-dominant trading volume throughout a six month period; 4) significant amounts of trading conducted through a non-market maker; and 5) an extensive pattern of similar investments and subsequent stock price drops in other companies.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 31819207 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,253

**(Cite as: 2002 WL 31819207 (S.D.N.Y.))**

Recognizing the closeness of the issue, the Court finds that this combination of subjective intent and deceptive conduct is sufficient to state a claim for market manipulation in violation of § 10(b) and Rule 10b-5. First, Defendants are unable to distinguish *Markowski,* and eventually rest on the argument that it is not binding precedent on courts within the Second Circuit. (Def. Mem. at 14 n. 7.) [FN15] Second, the behavior alleged here is of a different character than that found wanting in *Mulheren,* in which the court expressed "misgivings" about whether intent alone could establish manipulation but also remarked that market dominance over an extended period of time was "strong evidence" thereof. [FN16] Moreover, the Court finds that both *Mulheren* and *Regan* are consistent with the Third Circuit's framework requiring "some other deceptive practice" beyond mere sales-a framework satisfied in this case via timing, volume, selling through a non-market maker, and a pattern of prior manipulation. [FN17] Finally, the Court notes that a similar conclusion was reached by the *Internet Law Library* court on a similar fact pattern (with the addition of short sales). *But see Log On America,* 2001 U.S. Dist. LEXIS 20374, at *29--*30.

FN15. Defendants suggest, *inter alia,* that unlike in *Markowski,* "NPCT does not allege any sales at anything other than the market price." (Def. Reply Mem. at 4 n. 1.) This distinction is specious: once they were accepted the high bid prices in *Markowski* became the "market price" in the same manner that the allegedly low sale prices of NPCT stock became the market price here. Defendants also note that the SEC is not a party to this case, but it is not clear why that should affect our interpretation of Rule 10b-5. In their first brief, Defendants argued that *Markowski* involved § 9(a)(2) of the Exchange Act rather than § 10(b). which was simply incorrect. (Def. Mem. at 14 n. 7.)

FN16. *Mulheren* itself, as noted above, involved domination for only 6 minutes on one day. The *Mulheren* court cited two cases for the proposition that "[w]hen domination is sustained over such an extended period of time, evidence of manipulation is strong": one case in which the manipulator's trading constituted more than 50% of the overall trading over a year, and one case in which the manipulator accounted for 28.8% of the "daily exchange volume" over four months. *Mulheren,* 938 F.2d at 371. Defendants accounted for an average of 36.5% of the daily traded volume and 22.7% of the total traded volume over six months, and therefore fall much closer to the manipulative range than to the *Mulheren* range.

FN17. The Court also finds that the allegations here satisfy the "elements of an open-market manipulation claim" as distilled by *College Bound,* namely 1) profit to the manipulator; 2) deceptive intent; 3) market domination; and 4) economic reasonableness of the scheme. *See* fn. 10, *supra.*

*V. Third Claim--Control Person Liability Under § 20(a) (Pickett, Southridge, and TK)*

*9 [5] NPCT alleges further that Pickett is liable under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), for controlling Southridge and Harvest Court in their securities violations, and that Southridge and TK are liable for controlling Harvest Court. (Complaint at 23-24 .) "In order to establish a prima facie case of liability under § 20(a), a plaintiff must show: (i) a primary violation by a controlled person; (ii) control of the primary violator by the defendant; and (iii) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998) (citing *SEC v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1472 (2d Cir.1996)) (internal quotation marks omitted). Because the Court has already found sufficient allegations of primary violations by those alleged to be controlled, and sufficient allegations of culpable conduct by those alleged to be controllers, its focus

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 12

Not Reported in F.Supp.2d, 2002 WL 31819207 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,253

**(Cite as: 2002 WL 31819207 (S.D.N.Y.))**

rests on the second (control) prong. "[C]ontrol of the primary violator may be established by showing that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. At the motion to dismiss stage, plaintiffs need only plead facts supporting a reasonable inference of control." *In re Emex Securities Litigation,* 2002 U.S. Dist. LEXIS 17528, *27--*28 (S.D.N.Y. Sept. 18, 2002) (Kram, J.) (citations and internal quotation marks omitted).

Defendants object that the allegations in the Complaint are "vague and conclusory," and that they fail to allege facts "demonstrating that that [sic] Pickett is liable for the conduct of Southridge and Harvest Court or that Southridge is liable for the conduct of Harvest Court." (Def. Mem. at 17.) [FN18] The Court finds that the Complaint contains sufficient allegations of the facts surrounding the negotiation and closing of the Agreement, as described above, to infer that Southridge had the power to control Harvest Court, and that Pickett had the power to control Southridge (and by extension Harvest Court as well). The Court finds, however, that there are insufficient allegations in the Complaint to support a reasonable inference that TK controlled Harvest Court. The only allegations on that point are that the funding for the Agreement came from Southridge *or* from two employees of TK, and that TK executed the sales at issue.

> FN18. Defendants object in their brief that Plaintiff failed to incorporate by reference the other paragraphs in the Complaint, leaving the allegations in their control person claim purely conclusory. The court in *Internet Law Library* dismissed a similar § 20(a) claim on that basis, with leave to amend. *Internet Law Library,* 2002 U.S. Dist. LEXIS 13172, at * 10. Here, however, Defendants appeared to abandon at oral argument any objections based on lack of incorporation by reference, the objection being readily curable in an amended complaint. (Oral Argument at 9.)

[6] NPCT argues that "[b]ecause a control person claim is not one of the claims listed in Rule 9(b)," any requirement of fact pleading is improper. (Pl. Mem. at 17 (citing *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) .) This Court joins *Internet Law Library,* 2002 U.S. Dist. LEXIS 13172, at * 10, in finding that this argument stretches *Swierkiewicz* (which dealt with an employment discrimination claim) too far. The control person claim is therefore dismissed to the extent that it is directed at Defendant TK.

*VI. Fourth, Fifth, and Sixth Claims-Colorado Securities Fraud (all Defendants). Colorado Control Person Liability (Southridge, Pickett, and TK), and Colorado Aiding and Abetting (all Defendants)*

*10 [7] Next, NPCT alleges that the acts and omissions constituting securities fraud under § 10(b) constitute violations of multiple provisions of Colorado law. (Complaint at 24-26.) Defendants counter that all of the Colorado claims should be dismissed pursuant to the following term in the Agreement:

> (e) Governing Law. The corporate laws of the State of Nevada shall govern all issues concerning the relative rights of the Company and its stockholders. All other questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein."
> (Def. Mem. at 17 (citing Agreement at § 6(e)).)

Plaintiff responds that although this provision mandates the application of New York law to disputes under the contract, it does not mandate the application of New York law to causes of action, such as fraud, that sound in tort. (Pl. Mem. at 18-19.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 31819207 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,253

**(Cite as: 2002 WL 31819207 (S.D.N.Y.))**

Page 13

It is true that the express terms of the provision invoke New York *law* for "questions concerning the construction, validity, enforcement and interpretation" of the Agreement, and only New York *courts* for "any dispute hereunder or in connection herewith." Nonetheless, courts in the Second Circuit have interpreted the broad language of similar choice-of-law-cum-forum-selection clauses to mandate application of New York law to all claims, including fraud claims, arising out of a transaction. *See, e.g., Turtur v. Rothschild Registry Int'l Inc.,* 26 F.3d 304, 309-10 (2d Cir.1994) (holding that "this language is sufficiently broad to cover tort claims as well as contract claims 'arising out of or relating to' the subscription"); *About.com, Inc. v. Targetfirst, Inc.,* 2002 U.S. Dist. LEXIS 7770, *4--*6 (S.D.N.Y. Apr. 30, 2002) (Daniels, J.) (finding dispositive the presence of a forum selection clause); *Internet Law Library,* 2002 U.S. Dist. LEXIS 13172, *36--*38 (same). By contrast, the choice of law clause in the case cited by NPCT did not include a similar forum selection clause. *Krock v. Lipsay,* 97 F.3d 640, 643-45 (2d Cir.1996).

*VII. Seventh Claim-Common law Fraud (Pickett, Singer, and Southridge)*

Defendants object to NPCT's allegations of common law fraud on many of the same grounds that they object to the federal securities fraud claims. The Court therefore declines to dismiss this count for many of the same reasons it declined to dismiss the federal claims. "Since plaintiffs have satisfied the elements for pleading a § 10(b) and Rule 10b-5 violation, they have also fulfilled the requirements for pleading common law fraud, as they are basically identical." *Internet Law Library,* 2002 U.S. Dist. LEXIS 13172, *39. Defendants also object that the fraud claim is essentially duplicative of the contract claim, but the Court finds that the alleged misrepresentations were "collateral" to the Agreement rather than subsumed by it. *Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.,* 68 N.Y.2d 954, 956, 502 N.E.2d 1003, 510 N.Y.S.2d 88 (1986). *Cf. Global Intellicom,* 1999 U.S. Dist. LEXIS 11378, *53 (finding a fraud claim duplicative because it rested on breach of a contractual term); *Log On America,*

2001 U.S. Dist. LEXIS 20374, *41--*42 (same).

*VIII. Eighth Claim-Civil Conspiracy*

*11 [8] Defendants move to dismiss NPCT's eighth claim, for "civil conspiracy," on the wholly reasonable ground that "there is no substantive tort of civil conspiracy under New York law." (Def. Mem. at 23.) Defendants' statement of the law is correct, and the claim is dismissed. *See Internet Law Library,* 2002 U.S. Dist. LEXIS 13172, *40; *Global Intellicom,* 1999 U.S. Dist. LEXIS 11378, *54--*55; *Briarpatch Ltd. v. Pate,* 81 F.Supp.2d 509, 516 (S.D.N.Y.2000) (Sweet, J.).

*IX. Ninth Claim-Breach of Contract (Harvest Court)*

Finally, NPCT claims that by "failing and refusing to honor its financing obligations and by violating the securities laws," Harvest Court breached the Agreement. (Complaint at 27.) Defendants object that not honoring the financing agreement could not constitute breach given that the conditions giving rise to the obligation were never met (Def. Mem. at 23-24), but NPCT pleads that it has "performed its obligations under [the] agreement, or is excused from performing because of Harvest Court's breach" (Complaint at 27), and no more is required at the pleading stage. *See Internet Law Library,* 2002 U.S. Dist. LEXIS 13172, *41--*42; *ICD Holdings S.A v. Frankel,* 976 F.Supp. 234, 243 (S.D.N.Y.1997). Accordingly, the Court need not address NPCT's contract claim insofar as it relies on the violation of securities laws. *See Internet Law Library,* 2002 U.S. Dist. LEXIS 13172, *43.

*X. Conclusion*

The Motion To Dismiss is GRANTED on claims 4, 5, 6, and 8; GRANTED on claim 3 insofar as that claim is directed against Defendant TK and otherwise DENIED; and DENIED on claims 1, 2, 7, and 9.

The Court will hold a telephone conference to address scheduling in this matter at 10:00 a.m. on October 31, 2002.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 14

Not Reported in F.Supp.2d, 2002 WL 31819207 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,253

**(Cite as: 2002 WL 31819207 (S.D.N.Y.))**

SO ORDERED.

Not Reported in F.Supp.2d, 2002 WL 31819207
(S.D.N.Y.), Fed. Sec. L. Rep. P 92,253

   **Motions, Pleadings and Filings (Back to top)**

• 1:02cv00767 (Docket) (Jan. 31, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 9

Westlaw.

Not Reported in A.2d                                                                    Page 1

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)

**(Cite as: 2003 WL 723285 (Del.Ch.))**

▷
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
VGS, INC., Plaintiff,
v.
David CASTIEL, Virtual Geosatellite Holdings,
Inc., and Ellipso, Inc.,
Defendants,
VIRTUAL GEOSATELLITE HOLDINGS, INC.,
and Ellipso, Inc., Counterclaim
Plaintiffs,
and
VIRTUAL GEOSATELLITE, LLC, Counterclaim
Plaintiff-Intervenor,
v.
VGS, INC., Peter D. Sahagen, Thomas Quinn, Neel
Howard, and Sahagen Satellite
Technology Group, LLC, Counterclaim Defendants.
**No. C.A. 17995.**

Submitted Jan. 21, 2003.
Decided Feb. 28, 2003.
As Revised March 10, 2003.
Thomas R. Hunt, Jr., Morris, Nichols, Arsht &
Tunnell, Wilmington, Delaware; William H.
Jeffress, Jr., Jamie Steven Kilbergi, Baker Botts,
L.L.P., Washington, D.C., for
Defendant-Counterclaim Plaintiffs David Castiel,
Virtual Geosatellite Holdings, Inc. and Ellipso, Inc.,
and Counterclaim Plaintiff-Intervenor Virtual
Geosatellite LLC.

Brian A. Sullivan, Werb & Sullivan, Wilmington,
Delaware; William A. Brewer, III, Daniel F. Perez,
Thomas M. Corea, Bickel & Brewer, Dallas, Texas,
for Counterclaim Defendants and
Reply-Counterclaim Plaintiffs SST Global
Technology LLC and Peter D. Sahagen.

*MEMORANDUM OPINION*

LAMB, Vice Chancellor.

I.

*1 This action arises out of a long-standing dispute
principally between two people, and the companies
they control. This tale first began when Peter
Sahagen attempted to wrest control of a limited
liability company, through the effectuation of
merger, from David Castiel, the company's founder.
Sahagen then sought a declaratory judgment from
this court that the merger was valid. In June 2000,
the court held a trial which resulted in the merger
being rescinded. Castiel and his affiliates filed a
counterclaim against Sahagen and Tom Quinn in
that action alleging a breach of their duty of loyalty.
Sahagen and his affiliates then filed an eleven count
cross-counterclaim against Castiel and his affiliates
alleging, among other things, that Castiel
fraudulently induced Sahagen into investing with
Castiel, and that Sahagen and his affiliates have
breached several fiduciary duties that were owed
directly to Sahagen or to the companies he invested
in. The first trial did not resolve the counterclaim or
the cross-counterclaim.

Summary judgment must be granted in favor of
Castiel and his affiliates on all but one of the
cross-counterclaims. Claims for fraudulent
inducement and negligent misrepresentation (as
well as claims of aiding and abetting those
violations) are precluded for two reasons. First, an
integration clause in the agreements at issue,
combined with the sophistication of the parties and
opportunities to conduct due diligence, precludes
Sahagen from arguing that non-warranted
statements can amount to fraudulent inducement or
negligent misrepresentation. Second, the one
statement that was warranted in the agreements at
issue was true and accurate when it was made. Thus
there can be no fraud or negligent misrepresentation.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)

(Cite as: 2003 WL 723285 (Del.Ch.))

All but one of Sahagen's claims that Castiel and various of his affiliates breached their fiduciary duties must fail. These fiduciary duty claims are derivative in nature and there has been no demand made on the board of the limited liability company. Further, Sahagen has failed to demonstrate how demand would have been futile.

Finally, summary judgment must be granted, in part, in favor of Castiel and his affiliates on their counterclaim that Sahagen and Quinn breached their fiduciary duty of loyalty. This result is dictated by the "law of the case" doctrine, and it will avoid the need to re-litigate previously litigated issues.

II.

A. *Background*

On January 6, 1999, David Castiel formed Virtual Geosatellite, LLC ("Virtual Geo") pursuant to the Delaware Limited Liability Company Act. As originally constituted, the sole member of Virtual Geo was Virtual Geosatellite Holdings, Inc. ("VGHI"). On January 8, 1999, Ellipso, Inc. joined Virtual Geo as a member. Finally, on January 29, 1999, Sahagen Satellite Technology Group, LLC (now known as Sahagen Satellite Technology Global, LLC or "SST Global") was added as a third member. [FN1]

> FN1. The relations between these various parties have been contentious for some time. In particular, there has already been a trial in the Court of Chancery to litigate claims related to a purported merger that was intended to wrest control of Virtual Geo from Castiel. For a more thorough discussion of those events *see VGS, Inc. v. Castiel,* 2000 WL 1277372 (Del.Ch. Aug.31, 2000), *aff'd,* 781 A.2d 696 (Del.2001) (TABLE).

Pursuant to Virtual Geo's Second Amended and Restated Limited Liability Company Agreement (the "LLC Agreement"), VGHI received 660 LLC units (representing 63.46% of the total equity in Virtual Geo), SST Global received 260 LLC units (representing 25%), and Ellipso received 120 LLC

units (representing 11.54%). SST Global, which is controlled by Peter Sahagen, contributed the only cash received by Virtual Geo-$5 million. VGHI and Ellipso, both of which are controlled by Castiel, contributed certain licensed intellectual property.

**\*2** Virtual Geo's stated purpose was "to construct, launch and operate a global fixed satellite service system employing nongeostationary satellites in subgeosynchronous elliptical orbits, developing the related [ground] segment and offering the related communication services." [FN2] That system, known as "Virtual Geo," was intended to provide technological advantages believed to be unique among its competitors in the broadband satellite market. Nonetheless, Virtual Geo was a high-risk business venture.

FN2. LLC Agreement § 4.01(a).

Management of Virtual Geo was vested in a Board of Managers. The LLC Agreement established a three-person Board of Managers consisting of Castiel (the Chairman, appointed by VGHI), Sahagen (the Vice Chairman of Finance, appointed by SST Global), and Tom Quinn (the Secretary, appointed by VGHI).

B. *Sahagen's Investment In Ellipso And Virtual Geo*

Sahagen is a "prolific investor" in the technology sector. Sahagen met Castiel through Sahagen's attorney, and after a series of meetings with Castiel and Ellipso's in-house counsel, Sahagen was invited to invest in Virtual Geo and Ellipso. Sahagen then conducted due diligence on Virtual Geo and Ellipso, including hiring a "technical expert" and consulting with his lawyers. Sahagen, through Neel Howard (SST Global's Rule 30(b)(6) representative), had extensive discussions with employees of Ellipso.

Castiel allegedly made several representations to Sahagen during the course of negotiations. Specifically, Castiel allegedly represented that:
• Ellipso had the antenna technology and capability to employ a worldwide two-way television system;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)

**(Cite as: 2003 WL 723285 (Del.Ch.))**

• Ellipso was in full compliance with the FCC regarding its license, and that no further requirements needed to be met;
• Ellipso's license with the FCC was in full force and effect;
• Ellipso's license with the FCC was not subject to any limitations, defenses, or contingencies which might subject it to revocation or cancellation;
• one of Castiel's affiliated entities, Mobile Communications Holdings, Inc. ("MCHI"), had entered into a binding contract with Boeing Company for construction of the first two satellite systems that were to be part of Ellipso's system;
• MCHI and Ellipso were in full compliance with the construction progress milestones and certification schedules established by the FCC in issuing the license;
• MCHI had made substantial progress with respect to the deployment of its satellite system and, in connection therewith, MCHI had received a commitment from Boeing to invest $300 million of its own funds in deploying the system;
• SST Global's investment was going to be used only as a bridge until Ellipso and Virtual Geo received a substantial investment from Boeing;
• any funds invested in Virtual GEO would be used for, and devoted exclusively to, the business of Virtual Geo;
• Sahagen's investments would be used prudently, economically, efficiently, and in a manner designed to best achieve Ellipso's and Virtual Geo's business objectives; and
**\*3** • Castiel would hire a number of persons with impeccable credentials in the satellite and communications industries to manage and operate Virtual Geo.

Neel Howard testified, however, that he was aware of an antenna problem at Ellipso prior to Sahagen's investment in Ellipso. [FN3] Howard also testified that Castiel had a long history of promising investors that he would bring in new management and then refusing to do so. [FN4] Howard told Sahagen about this prior to Sahagen's investment. [FN5]

FN3. Castiel Parties Op. Br., Ex. B ("SST Global Dep.") at 78.

FN4. *Id.* at 60, 63, 68-70.

FN5. *Id.*

C. *Ellipso's Financial Condition Deteriorates*

During its existence, Ellipso raised between $75 million and $100 million in investment capital, over $60 million of which had been contributed before the formation of Virtual Geo. By January 1, 1999, Ellipso still had over $15 million in cash on its balance sheet. By December 31, 1999, however, Ellipso and its subsidiary, MCHI had just over $2 million in cash. As of March 31, 2000, Ellipso's financial condition had further deteriorated and its cash had declined to under $350,000 while its liabilities totaled over $360,000. Moreover, Ellipso was losing employees at a rapid rate during this period.

D. *Castiel Uses Virtual Geo's Cash For Ellipso*

On May 4, 1999, Virtual Geo's Board of Managers approved a cost-sharing arrangement with Ellipso. At that meeting, the Board authorized an agreement whereby Ellipso would "loan" employees to Virtual Geo at the cost of $50,000 per month for six months.

On June 11, 1999, Castiel, acting in his capacity as CEO of both Ellipso and Virtual Geo, executed a cost-sharing Services Agreement between Ellipso and Virtual Geo. The Services Agreement provided for monthly payments from Virtual Geo to Ellipso of $48,748 through December 31, 1999. Essentially, the Services Agreement extended the previously approved cost-sharing arrangement for an additional six months.

On April 19, 2000, Castiel, in his capacity as CEO of Ellipso and Virtual Geo, executed Amendment No. 1 to the Services Agreement. The Amendment was backdated to December 17, 1999. Amendment No. 1 retroactively increased the fees to $100,000 per month for the period January 1 through May 31, 1999. It also retroactively increased to $130,000 per month the fee for the period June 1 through December 31, 1999. Finally, the Amendment increased the fee for the period January 1, 2000

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)

**(Cite as: 2003 WL 723285 (Del.Ch.))**

going forward to $156,145 per month. Although the Ellipso Board was presented with, and then approved, a resolution to extend the Services Agreement into 2000, neither the extension to, nor amendment of, the Services Agreement was presented to Virtual Geo's Board for consideration.

In addition to amending the cost-sharing arrangement on a number of occasions, Castiel also determined the salary allocations for Ellipso's employees. A number of witnesses (all of whom are former or current employees of Ellipso/MCHI), testified that Castiel misallocated the time they actually spent working on Virtual Geo matters. [FN6] Further, Castiel may have charged Virtual Geo for Ellipso employees who never worked on Virtual Geo matters. [FN7]

> FN6. *See* Tr. 82-84, 87-89 (Naughton); Tr. 171-72 (Incidardi); Tr. 690 (Howard); and Tr. 1296-97 (Blott). Citations to "Tr. __" refer to transcripts from the trial held before then-Vice Chancellor Steele on June 15 through June 23, 2000 that resulted in the opinion referred to in note 1, *supra.*

> FN7. *See* Tr. 690 (Howard) ("I can't imagine that you're talking more than four or five employees, six, maybe, at the most, that would be doing any kind of work on Virtual Geo"); Tr. 125 (Lincoln) ("What he gave me was a list of probably 20 people that were working on Virtual Geo, at least according to the list; and there were only five, six people that had done anything for the project").

E. *Virtual Geo Struggles From Its Inception*

*4 As of December 31, 1999, Virtual Geo's current assets amounted to approximately $3 million, and losses for the year ended December 31, 1999 totaled almost $2.2 million. Four months later, Virtual Geo's current assets had declined by almost $500,000. Losses for the four months ended April 30, 2000 were approximately $1.5 million. Further, during the four months ended April 30, 2000, the

"amounts due Ellipso" purportedly rose from $78,275 to $1,108,230, and "member's capital" fell from $2,969,316 to $1,497,351.

As Virtual Geo was expending cash at a rapid rate, prospects for obtaining additional capital became increasingly dim. Virtual Geo's last draft business plan, dated January 20, 2000, stated that SST Global's initial $5 million investment in the first quarter of 1999 was merely "seed capital." Such "seed capital" was not expected to carry Virtual Geo through the year 2000. The business plan, therefore, called for a pre-licensing round of venture capital financing in the amount of $25 million sometime between the fourth quarter of 1999 and year-end 2000. Virtual Geo was unsuccessful in obtaining this financing.

F. *Castiel Reneges On His Agreement To Secure Professional Management*

Castiel represented on several occasions that he would hire a number of persons with impeccable credentials in the satellite and communications industries to run Virtual Geo. [FN8] In the fall of 1999, Sahagen introduced a highly qualified management team to Virtual Geo. It became known as the "Dream Team" and consisted primarily of Air Force Lieutenant General Kenneth Minihan, a former director of the National Security Agency and the Defense Intelligence Agency, and Alf Andreassen, who was the former director of Bell Labs and President of AT & T Global Solutions. Virtual Geo's Board of Managers was optimistic about the prospects of hiring such qualified individuals.

> FN8. *See* Tr. 848-49 (Sahagen) ("Q. Did Mr.--Doctor Castiel make any promises with respect to what he would do in that regard, concerning the management? A. Absolutely.... He said that he would go about locating just what I said, experienced management in the satellite business. He used the word [sic] 'big names,' meaning people who were accomplished, who had the contacts, had the credibility, had the background to raise

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)

(Cite as: 2003 WL 723285 (Del.Ch.))

Page 5

billions of dollars for this kind of project); *see also* Tr. 651 (Howard).

After some negotiations, Castiel and Minihan reached agreement on almost every issue, including Castiel's plan for transitioning management control from Castiel to Minihan's team as it accomplished certain milestones, such as bringing a "major" investor to Virtual Geo. Castiel, however, subsequently began to have second thoughts about giving up control of Virtual Geo's operations. Jill Stern, General Counsel for Ellipso and Virtual Geo, drafted a contract so as not to include the progressive change of control issue that Castiel and Stern knew was a condition precedent to the Minihan team's agreement to join Virtual Geo. Unwilling to join Virtual Geo without such a provision in the contract, Minihan chose not to become part of Virtual Geo's management team.

G. *The FCC Declares Ellipso's License To Be Null And Void*

On or about June 30, 1997, Ellipso, through MHCI, became fully licensed by the FCC to launch and operate a complex satellite system (the "1997 License"). Based on the 1997 License, Ellipso was authorized to launch and operate a 16- satellite "Big LEO" system to provide two-way voice and data communications to customers equipped with mobile earth-station transceivers.

*5 The International Bureau granted the license over objections from several petitioners who argued that MCHI's license application should be denied for failure to show that it had access to funds sufficient to cover the cost of constructing the proposed system and operating it. The International Bureau granted MCHI's request for a waiver of such a requirement, but stressed that the license was conditioned on adherence to a construction progress-milestone schedule requiring that the system be constructed and put into service in a timely manner. The International Bureau stated that it would "carefully monitor [MCHI's] progress toward implementation," and would "not hesitate to cancel the license should it fail without justification to meet the milestone schedule." [FN9]

FN9. *In re Mobile Communications Holdings, Inc.,* DA 01-1315, at 1 (F.C.C. May 31, 2001).

The license order prescribed the following milestone schedule: begin construction of at least two of MCHI's authorized satellites by July 1998; begin construction of the other satellites by July 2000; complete construction of the first two satellites by July 2001; and complete a fully operational system by July 2003. The license order provided that unless the schedule is extended for good cause, "this authorization will become null and void in the event that the licensee fails to meet [this] progress schedule." [FN10]

FN10. *Id.* at 2.

Under the FCC's rules, each Big LEO licensee must file a statement within ten days of a progress milestone date specified in its license, either certifying that it has met the milestone requirement or giving notice that it has failed to meet it. To comply with this requirement, MCHI filed an affidavit on June 22, 1998, stating that it had met its July 1998 milestone by entering into a non-contingent contract with Boeing for construction of two satellites. In an affidavit filed on July 31, 2000, MCHI stated that "MCHI has entered into a binding, non-contingent contract with Teledyne Brown Engineering, Inc. relating to the construction of the satellites consistent with the milestones and technical specifications set forth in MCHI's [license order]." [FN11]

FN11. *Id.*

By Memorandum Opinion and Order dated May 31, 2001, the FCC rendered null and void the 1997 License. [FN12] The FCC concluded that Ellipso did not meet the milestone requirement to commence construction of all 16 satellites by the end of July 2000. The FCC found that the Boeing contract was not a non-contingent construction contract because the parties had adopted amendments that essentially nullified the contract. Specifically, on June 30, 1999, MCHI executed a third amendment to the Boeing contract, providing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                        Page 6

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)

**(Cite as: 2003 WL 723285 (Del.Ch.))**

that Boeing could not perform any work thereafter except as subsequently authorized in writing by MCHI. [FN13] The FCC found that MCHI did not issue any work authorizations between then and October 12, 2000. The FCC then determined that between June 30, 1999 and October 12, 2000 Boeing was under no contractual duty to perform satellite construction for MCHI. [FN14]

> FN12. *Id.* at 2-3.

> FN13. *Id.*

> FN14. *See id.* at 3.

Based in part on these facts, the FCC concluded that MCHI did not meet the milestone requirement to commence construction of all of its proposed satellites by the end of July 2000. [FN15] The FCC stated that to meet a milestone deadline for commencement of satellite construction, a licensee relying on others to perform the required work must enter into a binding contract for construction of the satellites that is not subject to material contingencies that remain unresolved as of the deadline. [FN16] The FCC found that MCHI was not a party to a non-contingent contract for construction of 16 satellites at the end of July 2000 or at any other times prior to October 12, 2000. [FN17] In fact, the FCC found that MCHI's "contract with Boeing for construction of two satellites was essentially abrogated on June 30, 1999." [FN18]

> FN15. The FCC also determined that the contract with Teledyne Brown on which MCHI predicated its second milestone certification did not require Teledyne Brown to build or deliver satellites for MCHI. Although Teledyne Brown is involved in the aerospace industry, it does not manufacture or construct satellites. The FCC determined that the contract only engaged Teledyne Brown to provide consulting and managerial services in three successive phases. Further, the FCC found that the work schedule specified in the contract with Teledyne Brown was merely

tentative because MCHI reserved the right to add to, change, or delete the work to be performed by Teledyne Brown and alter the times for performance. The FCC also noted that Teledyne Brown was to consult with MCHI in advance of each calendar quarter as to what work to perform in that period, and MCHI would not be liable for payment for any work performed without such prior approval. *See id.* All of these events, however, occurred well after Sahagen's investment in Ellipso.

> FN16. *Id.* at 4.

> FN17. *Id.*

> FN18. *Id.*

### III.

\*6 The original complaint in this action was brought by VGS, Inc. against Castiel, Ellipso, and VGHI seeking a declaratory judgment that a purported merger between VGS, Inc. and Virtual Geo was valid. Ellipso and VGHI then filed a counterclaim against VGS, Inc., Sahagen, Howard, Quinn and SST Global that alleged, among other things, that Sahagen and Quinn breached their fiduciary duty of loyalty. [FN19]

> FN19. *See, e.g., VGS, Inc.,* 2000 WL 1277372 for more details surrounding this transaction.

Ellipso, VGHI and counterclaim-plaintiff-intervener Virtual Geo (together with Castiel and MCHI, the "Castiel Parties") have moved for summary judgment on Count II of their original counterclaim, which seeks a finding that Sahagen and Quinn have breached their fiduciary duty of loyalty. [FN20]

> FN20. Although this court has previously entered judgment in favor of Castiel, VGHI, Ellipso and Virtual Geo, that trial only resolved the corporate governance issue. *See generally VGS, Inc.,* 2000 WL 1277372. The Castiel Parties still

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                        Page 7

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)

(Cite as: 2003 WL 723285 (Del.Ch.))

maintained duty of loyalty claims against Sahagen and Quinn.

Peter Sahagen and SST Global (collectively the "Sahagen Parties") then filed a cross-counterclaim against the Castiel Parties to recover their investment and to obtain an award of damages on behalf of Virtual Geo. [FN21] The Castiel Parties moved for summary judgment in their favor on the cross-counterclaims of the Sahagen Parties.

> FN21. The Sahagen Parties moved to amend, for a second time, their complaint in October of 2000. This court granted in part and denied in part their motion on October 26, 2001. Since that time, the Sahagen Parties have not re-filed the Second Amended Complaint in its approved form. Rather, the Sahagen Parties have filed Second Amended Counterclaims. For the sake of this motion, this court will treat the Second Amended Counterclaims as the most current set of claims against the Castiel Parties. In addition, although this opinion refers to the parties collectively as the Sahagen Parties and the Castiel Parties, it should be noted that the Sahagen Parties' "counterclaims" are not being asserted against Virtual Geo.
> The Sahagen Parties also previously filed many of these same claims under a different caption on April 19, 2000 (the "17997 action"). This court has taken the position that the 17997 action has been consolidated with the 17995 action.

There are eleven separate cross-counterclaims asserted by the Sahagen Parties. Counts I and X (which essentially replicate each other) allege common law fraud against the Castiel Parties based on statements and omissions made by Castiel, Ellipso, and VGHI. Counts II and XI (which essentially replicate each other) allege negligent misrepresentation against the Castiel Parties based on the same alleged statements and omissions in Counts I and X. Count V is a claim of civil conspiracy against the Castiel Parties based on the same fraud alleged in Counts I and X.

Count III of the Sahagen Parties' cross-counterclaims attempts to allege a direct claim against Castiel for a breach of his fiduciary duties of loyalty and care. This claim is largely based on an assertion of waste and mismanagement. Count IV alleges that the remaining Castiel Parties aided and abetted Castiel's breach of fiduciary duties. Count VIII asserts a derivative claim by the Sahagen Parties on behalf of Virtual Geo for breaches of fiduciary duties by the Castiel Parties. Count IX alleges a derivative claim by the Sahagen Parties on behalf of Ellipso against Castiel for breaches of fiduciary duty. The Castiel Parties have not briefed Count IX, yet they still move for summary judgment on that Count. Due to this lack of briefing, however, the court will not grant the Castiel Parties' motion for summary judgment on Count IX.

The final two Counts of the Sahagen Parties' cross-counterclaim are for a "constructive trust" (Count VI) and injunctive relief against the Castiel Parties (Count VII). These "Counts" are remedies, not causes of action, and thus do not provide an independent basis for recovery. Moreover, the Sahagen Parties already attempted to enjoin the Castiel Parties from expending any of Virtual Geo's funds, and this court denied that motion. [FN22] Thus the court will grant summary judgment in favor of the Castiel Parties on these Counts.

> FN22. *See* Ruling on Pls.' Mot. For Prelim. Injunction, Lamb, V.C ., (Sept. 13, 2000).

IV.

*7 Under Delaware law, summary judgment may be granted only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. [FN23] When considering a motion for summary judgment, the facts must be viewed in the light most favorable to the non-moving party, and the moving party has the burden of demonstrating that no material question of fact exists. [FN24] "When a moving party has properly supported its motion, however, the non-moving party must submit admissible evidence sufficient to generate a factual issue for trial or suffer an adverse judgment." [FN25]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                 Page 8

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)

**(Cite as: 2003 WL 723285 (Del.Ch.))**

FN23. *See Burkhart v. Davies,* 602 A.2d 56, 59 (Del.1991), *cert. denied,* 504 U.S. 912, 112 S.Ct. 1946, 118 L.Ed.2d 551 (1992).

FN24. *See Tanzer v. Int'l General Indus., Inc.,* 402 A.2d 382, 385 (Del.1979).

FN25. *Id.;* Ch. Ct. R. 56(e).

V.

A. *The Sahagen Parties Are Not Entitled To A Trial On Their Fraud And Misrepresentation Claims*

In Counts I and X of their cross-counterclaims (which essentially replicate each other), the Sahagen Parties allege that they were fraudulently induced into investing in Virtual Geo and Ellipso based on several representations made by Castiel, Ellipso, and MCHI. Specifically, Castiel purportedly induced Sahagen's investment by: (1) representing that he would hire new management if Sahagen invested in Ellipso and Virtual Geo; (2) representing that there were no problems with Ellipso's antenna technology; (3) misrepresenting the status of Ellipso's FCC license; and (4) misrepresenting his intentions with respect to how he planned to use the money Sahagen invested in Virtual Geo. To establish a claim for fraud, the Sahagen Parties must demonstrate the following: "a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." [FN26]

FN26. *Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970- 71 (2d Cir.1987). The court will apply New York law to the Sahagen Parties' substantive claims made in connection with a Unit Purchase Agreement and Stock Purchase Agreement that are at issue in this suit. *See* note 29, *infra.*

On January 29, 1999, Sahagen, on behalf of SST Global, entered into a Stock Purchase Agreement with Ellipso. That same day, Sahagen, on behalf of SST Global, entered into a Unit Purchase Agreement with Virtual Geo. The Castiel Parties argue that the explicit language of those Agreements prevents the Sahagen Parties from pursuing a fraud in the inducement allegation as a matter of law. [FN27] For example, as part of the Stock Purchase Agreement, Ellipso made numerous representations and warranties to Sahagen. Moreover, Section 2.14 of that Agreement states:

FN27. This argument applies to all of the alleged fraudulent statements except for those relating to Ellipso's FCC license, which was specifically warranted in the Stock Purchase Agreement. *See* Castiel Parties Reply Br., Ex. A. § 2.07.

[Ellipso] makes and has made no representations or warranties, express or implied, except as set forth in this Agreement. No representation or warranty of [Ellipso] shall be deemed to be made or enlarged as a result of disclosures made or information provided by [Ellipso] to [Sahagen] during the course of [Sahagen's] "due diligence" investigation of [Ellipso] or the Subsidiaries. [FN28]

FN28. *Id.* at § 2.14. Identical language is contained in the January 29, 1999 Unit Purchase Agreement between SST Global and Virtual Geo. *See* Castiel Parties Reply Br., Ex. B. § 2.14.

Finally, Section 10.03 is an integration clause whereby Sahagen agreed that the terms of the written Agreement constituted the sole understandings of the parties. Specifically, the provision states:
This Agreement (including the Disclosure Schedule, which is incorporated herein by this reference) and the Related Agreements constitute the sole understanding of the parties with respect to the subject matter thereof. Matters disclosed by Seller to Buyer pursuant to any Section of this Agreement shall be deemed to be disclosed with respect to all sections of this Agreement. [FN29]

FN29. *Id.* at § 10.03. Identical language is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)

**(Cite as: 2003 WL 723285 (Del.Ch.))**

contained in the January 29, 1999 Unit Purchase Agreement between SST Global and Virtual Geo. *See* Castiel Parties Reply Br., Ex. B. § 10.03. Section 10.11 of both Agreements provides that New York law is the controlling law "for any litigation arising out of or relating to thus Agreement and transactions contemplated hereby...." In addition, New York has a substantial relationship to the Agreements because Sahagen resided in New York at the time he negotiated and executed the Agreements. Moreover, aspects of the Agreements were actually negotiated in New York. Because under Delaware law the parties' choice of law governing their contract should be respected as long as the law of that state and the parties have some relation to that state, New York law must govern the interpretation of the Agreements. *See Wilmington Trust Co. v. Wilmington Trust Co.,* 24 A.2d 309, 313 (Del.1942).

The law governing the Agreements also governs the effect, if any, that the Agreements may have on claims for fraud and negligent misrepresentation. *See* Restatement (Second) of Conflicts of Laws § 201 cmt. (a), (c) (1971) ("(a) Under the rule of this section, questions involving the effect of a misrepresentation, duress, undue influence and mistake upon a contract are determined by the law chosen by the parties, if they have made an effective choice .... (c) The fact that a contract was entered into by reason of misrepresentation, undue influence or mistake does not necessarily means [sic] that a choice-of-law provision contained therein will be denied effect. This will be done if the misrepresentation, undue influence or mistake was responsible for the complainant's adherence to the provision"); *see also Turtur v. Rothschild Registry Int'l, Inc.,* 26 F.3d 304, 309 (2d Cir.1994) (holding that a choice of law clause applying New York law was sufficiently broad to encompass tort and

contract claims when the agreement covered any controversy "arising out of or relating to" that agreement); *Woodling v. The Garrett Corp.,* 813 F.2d 543, 552 (2d Cir.1987) (applying section 201 of the Restatement (Second) of Conflicts of Laws in recognizing that the validity and enforceability of a release are matters of substance).

**\*8** Usually under New York law, general provisions such as the ones at issue in this case do not preclude claims for fraud in the inducement. [FN30] This general law, however, does not apply when (1) the transaction at issue is a multi-million dollar transaction executed following negotiations with sophisticated parties and, (2) the complaining party has the opportunity to discover information that would make reliance on such representations unreasonable. [FN31]

FN30. *See Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597, 598-99 (N.Y.1959) (holding that "the parol evidence rule is not a bar to showing the fraud ... despite an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made"); *Mfrs. Hanover Trust Co. v. Yanakas,* 7 F.3d 310, 315 (2d Cir.1993) (holding that when a contract specifically disclaims existence of or reliance upon certain representations, plaintiff cannot later claim fraudulent inducement based on reliance on those representations).

FN31. *In re Cinar Corp. Sec. Litig.,* 186 F.Supp.2d 279, 314 (E.D.N.Y.2002); *Emergent Capital Inv. Mgt., LLC v. Stonepath Group, Inc.,* 165 F.Supp.2d 615, 622-23 (S.D.N.Y.2001).

1. *The Parties To The Stock Purchase Agreement And Unit Purchase Agreement Were Sophisticated Parties Engaged In A Multi-Million Dollar Transaction*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 10

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)

**(Cite as: 2003 WL 723285 (Del.Ch.))**

The general rule articulated by *Danann Realty Corp.* does not apply to multi-million dollar transactions involving sophisticated parties. In *Emergent Capital,* the plaintiff claimed fraud, following a $2 million stock purchase, with respect to an oral representation about the size of a future stock offering. The plaintiff was a limited liability company, 90% of which was owned by two individuals employed by Wall Street firms and familiar with the securities market. [FN32] Despite the use of a general integration clause and a representations and warranties clause that did not specifically mention the future offering, the court found that the fraud claim was barred. [FN33] The court specifically relied on the "sophistication and knowledge of the parties" and noted that the plaintiff's initial investment was "a multi-million dollar transaction executed following negotiations between sophisticated business people...." [FN34]

> FN32. *Emergent Capital,* 165 F.Supp.2d at 619.

> FN33. *Id.* at 622-23.

> FN34. *Id.* at 622; *see also In re Cinar Corp. Sec. Litig.,* 186 F.Supp.2d at 314 (citing *Emergent Capital* for an exception to the general rule articulated in *Mfrs. Hanover Trust* and *Danann Realty Corp.*).

The exception to the general *Danann* rule provided in *Emergent Capital* applies to the transactions at issue in the current dispute. The Stock Purchase and Unit Purchase Agreements were multi-million dollar transactions negotiated at length by sophisticated parties that were represented by counsel. The Stock Purchase Agreement between Ellipso and Sahagen Satellite Technology Group, LLC was for the sale of 20,000 shares of Ellipso common stock for $4.2 million. Similarly, the Unit Purchase Agreement between Virtual Geo and Sahagen Satellite Technology Group, LLC was for the sale of 260 common units of Virtual Geo for $5.2 million. Moreover, Sahagen Satellite Technology Group, LLC warranted its "Sophistication" as an "accredited investor." [FN35] SST Global's own 30(b)(6) representative

has admitted that Sahagen "is a very prolific investor," [FN36] and this court has found Sahagen to be "an aggressive and apparently successful venture capitalist." [FN37] Finally, Sahagen was represented by sophisticated counsel, and also admittedly engaged in extensive due diligence, including the hiring of a "technical expert" and the consultation of Ellipso employees. [FN38]

> FN35. *See* Castiel Parties Reply Br., Ex. A. § 3.08; Castiel Parties Reply Br., Ex. B. § 3.08.

> FN36. SST Global Dep. at 116.

> FN37. *VGS, Inc.,* 2000 WL 1277372, at *1.

> FN38. SST Global Dep. at 75-78; 32-35.

*2. The Sahagen Parties Had An Opportunity To Discover Information That Would Make Reliance On The "Fraudulent" Representations Unreasonable*

When a complaining party has the opportunity to discover information that would make reliance on the alleged representations unreasonable, that party cannot thereafter take advantage of the *Danann* rule. [FN39] In *Belin,* when confronted with a disclaimer clause similar to the ones at issue in this litigation, the court held that where a representation about the amount of an insurance policy was allegedly fraudulent, the allegedly fraudulent information did not amount to an actionable claim because the correct information "was readily ascertainable had [plaintiff] asked to see the insurance policy prior to closing on his investment ." [FN40] The current litigation is highly analogous to the facts and issues of *Belin.*

> FN39. *Belin v. Weissler,* 1998 WL 391114, at *5-7 (S.D.N.Y.1998); *Emergent Capital,* 165 F.Supp.2d at 623 (holding that a sophisticated investor "must show that he or she has made an independent inquiry into all available information").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)

**(Cite as: 2003 WL 723285 (Del.Ch.))**

Page 11

FN40. *Id.,* at *7. *But cf. In re Cinar,* 186 F.Supp. at 285, 314 (holding that a general disclaimer clause was insufficient to defeat a fraud claim based on inflated estimates of the company's financial position as a result of improperly claimed tax credits because there was no way plaintiff could have discovered the improper tax credit).

*9 Here, it is undisputed that before entering into the Agreements Sahagen possessed information, or access to information, that demonstrated that the alleged oral representations made by Castiel were false. SST Global's Rule 30(b)(6) witness testified that Sahagen was well aware, before investing in Ellipso or Virtual Geo, that there were problems with the antenna technology and that Castiel would not seek new management, both in direct contradiction to alleged oral representations that underlie the Sahagen Parties' fraud claims. [FN41]

FN41. *See* SST Global Dep. at 77-79; 60; 63; 68-69. *Cf. C.P. Kelco U.S., Inc. v. Pharmacia Corp.,* 2002 WL 31230816, at *9-10 (D.Del.2002) (holding that a disclaimer did not preclude claims of fraud between highly sophisticated parties because the plaintiff had no opportunity to discover the alleged fraud before entering into the agreement).

Additionally, in *Belin,* the court held that the plaintiff could not pursue his fraud claim partly because he warranted that he had an opportunity to verify the representations given and could obtain whatever additional information he required. The court held that, "[h]aving explicitly represented that he had an opportunity to verify the accuracy of information provided to him, Belin cannot now be heard to complain that he relied on information that he declined to verify, although he could have determined the amount of [the insurance policy] simply be asking for a copy of the policy." [FN42] Similarly, SST Global warranted in both Agreements that it "conducted a reasonable investigation" of Ellipso and Virtual Geo, and had "received such information ... and ha[d] been given such opportunity to ask such questions of, and

receive answers from, representatives of [Ellipso and Virtual Geo], as [SST Global] deems sufficient to make an informed investment decision with respect to the Stock." [FN43] Therefore, like the plaintiffs in *Belin* and *Emergent Capital,* the Sahagen Parties cannot take advantage of the *Danann* rule and summary judgment must be granted in favor of the Castiel Parties with regard to fraud claims stemming from statements or omissions that were not warranted in the Agreements. [FN44]

FN42. *Belin,* 1998 WL 391114, at *8. *See also Emergent Capital,* 165 F.Supp.2d at 623 (finding it relevant that the plaintiff had access to information and executed a warranty that it had the opportunity to ask questions and receive answers from the defendant and to obtain any additional information it thought necessary before entering into the transaction).

FN43. Castiel Parties Reply Br., Ex. A. § 3.09; Castiel Parties Reply Br., Ex. B. § 3.09.

FN44. For the same reasons, the court will enter summary judgment in favor of the Castiel Parties on Counts II and XI of the Sahagen Parties' counterclaims to the extent they allege negligent misrepresentations not warranted in the Agreements. These Counts allege that the same misrepresentations discussed above give rise to a claim for negligent misrepresentation. This is essentially a lesser-included offense of fraud. As already discussed, the integration and merger clauses of the Agreements, in connection with the actions of Castiel and Sahagen prior to executing the Agreements, make Counts I and X untenable as a matter of law and must also make Counts II and XI invalid as a matter of law.
Summary judgment must also be granted in favor of the Castiel Parties with respect to Count V (civil conspiracy) of the Sahagen

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)

**(Cite as: 2003 WL 723285 (Del.Ch.))**

Page 12

Parties' counterclaim. Since the Sahagen Parties are unable to survive a summary judgment motion based on their underlying claims, a claim for civil conspiracy must fail as well.

3. *The Undisputed Facts Show That The Warranties Provided Regarding The Status Of The FCC License Were Correct When Sahagen Entered Into The Stock Purchase Agreement*

The Sahagen Parties argue that Castiel made several material misrepresentations regarding the status of Ellipso's FCC license. Specifically, the Sahagen Parties argue that Castiel misrepresented that (1) the license was in full force and effect; (2) that MCHI was in full compliance with the construction and certification schedules established by the FCC; (3) that the license was not subject to any limitations that could subject it to cancellation or revocation; and (4) that Ellipso was in full compliance and no further requirements needed to be meet.

The FCC required that construction begin on at least two satellites by July 1998, and that construction of the remaining satellites begin by July 2000. The FCC also required MCHI to report when those goals were achieved. MCHI entered into a non-contingent contract with Boeing in June 1998 for the construction of two satellites. This contract was subsequently amended in November 1998, February 1999, and June 1999. MCHI reported to the FCC in June 1998 that it was in compliance with the July 1998 milestone.

**\*10** The crux of the Sahagen Parties' claims that relate to the FCC license is the fact that the FCC revoked Ellipso's license in May 2001. The Sahagen Parties argue the FCC found that MCHI abrogated its contract with Boeing when the November 1998 amendment was executed, resulting in MCHI being out of compliance with the FCC license and subjecting its license to revocation. Since this all occurred before the Sahagen Parties invested in Ellipso, the argument goes, the Castiel Parties breached the specific warranties provided in the Stock Purchase Agreement.

The facts as plainly found by the FCC, however, do not support the Sahagen Parties' claims. It is true that the FCC found that the November 1998 amendment required Boeing to develop and submit a proposal for a re-negotiated contract and forbade it from performing any other tasks without prior authorization from MCHI. [FN45] The FCC did not determine, however, that this amendment resulted in an abrogation of MCHI's contract with Boeing. Rather, the FCC determined that *as of June 30, 1999* -approximately six months after the Sahagen Parties invested in Ellipso and Virtual Geo-the Boeing contract was abrogated by amendment. [FN46]

> FN45. *In re Mobile Communications Holdings, Inc.,* DA 01-1315, at 3.
>
> FN46. *See id.* at 3 ("It thus appears that between June 30, 1999 and October 12, 2000 Boeing was under no contractual duty to perform satellite construction for MCHI"); *see also id.* at 4 ("[MCHI's] contract with Boeing for construction of two satellites was essentially abrogated on June 30, 1999").

A plain reading of the FCC order demonstrates that there are no genuine issues of material fact related to Ellipso's warranties of the validity of its FCC license. The undisputed facts actually support the conclusion that MCHI and Ellipso were in compliance with the FCC's milestone and construction schedule at the time Sahagen invested in Ellipso and Virtual Geo. [FN47] There being no genuine issue of material fact, summary judgment in favor of the Castiel Parties on Counts I and X is appropriate as no misrepresentations regarding the FCC license can be shown. [FN48]

> FN47. *See id* at 2 ("MCHI did, in fact, enter into a two-satellite construction contract with Boeing prior to the first milestone deadline").
>
> FN48. The same misrepresentations are relied on to allege both fraud (Counts I and X) and negligent misrepresentation (II and XI). Because this court has determined

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 13

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)

**(Cite as: 2003 WL 723285 (Del.Ch.))**

there were no misrepresentations whatsoever with respect to the FCC license, summary judgment must be granted as to both the Sahagen Parties' fraud claim and negligent misrepresentation claim to the extent they rely on the FCC license. Because there are no litigable claims based on the FCC license, the Sahagen Parties' civil conspiracy claims (Count V) must fail as well.

B. *The Castiel Parties' Fiduciary Duty Claims Are Derivative And There Is No Evidence That Demand Would Have Been Futile*

1. *The Sahagen Parties' Direct Claims For Breach Of Fiduciary Duty (Counts III And IV) Are Actually Derivative Claims*

In Count III of their cross-counterclaim, the Sahagen Parties allege a direct claim for breach of the fiduciary duty of loyalty against Castiel. [FN49] This Count alleges as follows:

> FN49. Count IV asserts alleges that Ellipso and MCHI aided and abetted this breach of fiduciary duty.

Castiel breached his fiduciary duties to SST Global by, among other things, diverting company funds (including SST Global's investments) to his own use, causing the company to pay for expenses which had no relationship to company business, engaging in acts of misfeasance and nonfeasance constituting gross negligence, wasting and depleting the cash and other assets of the company, and misrepresenting or failing to disclose material facts regarding Virtual Geo LLC's business and finances. [FN50]

> FN50. Second Amended Reply, Answer, and Counterclaims of Peter D. Sahagen and SST Global, LLC at ¶ 79.

Essentially, the Sahagen Parties' claim appears to be nothing more than a claim for waste, mismanagement, and self-dealing. Such a claim is

clearly derivative in nature and not a direct claim as the Sahagen Parties maintain. In deciding whether a claim is derivative or individual, a court looks to the "nature of the wrong alleged [not] the plaintiff's characterization of the claim in the complaint ." [FN51] To maintain a direct lawsuit, the injury alleged must affect a stockholder alone or affect a particular stockholder right "such as his preemptive rights as a stockholder, rights involving control of the corporation, or a wrong affecting the stockholders and not the corporation." [FN52] For these reasons, "claims of waste and self-dealing ... have been held to be derivative and not individual." [FN53] Thus, it is clear that the "individual" claims the Sahagen Parties assert are more appropriately characterized as derivative claims that are brought on Virtual Geo's behalf.

> FN51. *Kramer v. Western Pac. Indus., Inc.,* 546 A.2d 348, 352 (Del.1988).

> FN52. *In re Paxon Comm. Corp. S'holders. Litig.,* 2001 WL 812028, at *3 (Del.Ch. July 12, 2001).

> FN53. *In re Rexene Corp. S'holders. Litig.,* 1991 WL 77529, at *3 (Del.Ch. May 8, 1991); *Kramer,* 546 A.2d at 353 ("A claim of mismanagement resulting in corporate waste, if proven, represents a direct wrong to the corporation that is indirectly experienced by all shareholders.... Thus, the wrong alleged is entirely derivative in nature.").

**\*11** Responding to the Castiel Parties' arguments that Count III alleges solely derivative claims, the Sahagen Parties attempt in their answering brief to assert new breach of fiduciary duty claims that are more individual in nature. [FN54] These new claims are permitted, according to the Sahagen Parties, because "[i]n his Counterclaims, Sahagen expressly states that Castiel's breaches include but are not limited to the breaches expressly enumerated therein." [FN55] In fact, this argument is based solely on the fact that Count III contains the words "among other things" when describing Castiel's alleged breaches of fiduciary duty. The court cannot

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 14

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)

**(Cite as: 2003 WL 723285 (Del.Ch.))**

permit a party, upon recognition that its original allegation standing alone cannot survive summary judgment as a direct claim, to assert for the first time in its answering brief new claims based solely on a clause containing the phrase "among other things." Therefore, the court will consider Count III, and the allegations set forth therein, as derivative in nature, requiring proof that demand would have been futile before permitting an individual stockholder to bring such a claim. The same is true for Count VIII, which explicitly alleges against the Castiel Parties a derivative claim for breach of fiduciary duty on behalf of Virtual Geo.

> FN54. *See* Sahagen Parties Ans. Br. at 38 ("Castiel also breached their [sic] fiduciary duties to keep Sahagen adequately informed about the business of Virtual Geo, failed to provide him with books and records, failed to hold meetings, and failed to protect the value of his investment").

> FN55. *Id.*

*2. The Sahagen Parties Have Failed To Establish A Genuine Issue Of Material Fact As To Whether Demand Would Have Been Futile*

The right of a member of a Delaware LLC to bring a derivative claim is governed by 6 *Del. C.* § 18-1000, which provides:

> A member or an assignee of a limited liability company interest may bring an action in the Court of Chancery in the right of a limited liability company to recover a judgment in its favor if managers or members with authority to do so have refused to bring the action *or if an effort to cause those managers or members to bring the action is not likely to succeed.* [FN56]

> FN56. Emphasis added.

This provision originates from the well-developed body of Delaware law governing derivative suits by stockholders of a corporation. Accordingly, case law governing corporate derivative suits is equally applicable to suits on behalf of an LLC. [FN57]

> FN57. *See Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.,* 1998 WL 832631, at *5 n. 14 (Del.Ch. Nov.10, 1998) ("The derivative suit is a corporate action grafted onto the limited partnership form, and I look to corporate precedent to distinguish between limited partnership derivative actions and direct limited partner claims").

The Sahagen Parties concede that no demand was made of Virtual Geo's board. [FN58] Under Delaware law, an individual plaintiff can only bring a derivative claim against an LLC without first making a demand of the board if such demand would have been futile. [FN59] A demand is considered futile when a reasonable doubt exists as to whether "(a) the [managers] were disinterested or independent, [or] (b) the challenged transaction was the product of a valid exercise of business judgment." [FN60] The presence of either situation excuses the lack of a demand. [FN61]

> FN58. *See* Sahagen Parties Ans. Br. at 34.

> FN59. *See* 6 *Del. C.* § 18-1001; *Rales v. Blasband,* 634 A.2d 927, 932 (Del.1993) ("Because directors are empowered to manage, or direct the management of, the business and affairs of a corporation, the right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have refused or where demand is excused because the directors are incapable of making an impartial decision regarding such litigation").

> FN60. *Aronson v. Lewis,* 473 A.2d 805, 814 (Del.1984).

> FN61. *See Brehm v. Eisner,* 749 A.2d 244, 256 (Del.2000) ("These prongs [of the *Aronson* test for determining whether demand is excused] are in the disjunctive. Therefore if either prong is satisfied, demand is excused.").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)

**(Cite as: 2003 WL 723285 (Del.Ch.))**

Both the Castiel Parties and the Sahagen Parties concede that the sole issue relating to whether demand on the Virtual Geo board would have been futile depends on whether Ambassador (Ret.) Gerald Helman would be disinterested and independent in a demand made by Sahagen to pursue litigation against Castiel for breach of fiduciary duty. This is because Castiel and Sahagen are the other two members of Virtual Geo's three-person Board of Managers. To support their argument that Helman was not disinterested or independent, the Sahagen Parties argue that Helman "is entirely dependent upon Castiel because his only other employment is as an officer in Ellipso, which Castiel controls." [FN62] The Sahagen parties also allege beholdeness on the part of Helman because he and Castiel are close friends. [FN63] In the same breath, however, the Sahagen Parties argue that Helman is beholden to Castiel because Helman once before acted to remove Castiel from a position of authority at Ellipso and Castiel terminated Helman. Helman is now allegedly afraid of similar reprisals. These arguments are all insufficient to satisfy the requirement that individual plaintiffs demonstrate futility before bringing a derivative claim on behalf of an LLC.

FN62. Sahagen Parties Ans. Br. at 36.

FN63. *Id.* at 37.

**\*12** It may be true that Helman's sole *employment* is as an officer of Ellipso, but this misses the point that Helman has other substantial sources of *income*. In his sworn affidavit, Helman stated that "I am not dependent on my Ellipso salary. My Ellipso salary is a supplement to my chief source of income. I am retired from a senior position in the Foreign Service of the Department of State and am receiving a full annuity that includes medical and other benefits." [FN64] The Sahagen Parties' second claim that because they are friends Helman is incapable of initiating a suit against Castiel, is defeated by their third claim that argues Helman has opposed Castiel, to the point that Castiel chose to fire Helman, at times prior to this litigation. Clearly their friendship has not stood in the way of their past business dealings and there is no reason to think that it

should in the future. Finally, the Sahagen Parties' third contention does not prove that Helman is beholden to Castiel. If anything, this argument supports an inference that Helman is not beholden to Castiel. The very fact that Helman supposedly was willing to risk his job to vote his conscience, and against Castiel, in the past demonstrates that he is not beholden to Castiel and is willing to vote against him again should the situation call for it.

FN64. Helman Aff. ¶ 2.

For all these reasons, the court will grant summary judgment in favor of the Castiel Parties on Counts III, IV, and VIII of the Sahagen Parties' counterclaim for failure to seek demand and an inability to demonstrate that such demand would have been futile. [FN65]

FN65. The court will allow the Sahgen Parties to re-file their derivative action if demand is made and it is wrongfully refused.

### C. *Summary Judgment Should Be Entered Against Sahagen And Quinn For Breach Of Their Duty Of Loyalty*

Count II of the complaint of Virtual Geo and Count II of the Castiel Parties' counterclaims allege that Sahagen and Quinn breached their duty of loyalty when, in the context of a merger, they attempted to wrest control of Virtual Geo from Castiel without his consent. Then-Vice Chancellor Steele, in a trial on a corporate governance issue, has already held that Sahagen and Quinn "owed a duty of loyalty to [Virtual Geo], its investors and Castiel, their fellow manager," and "that the actions of Sahagen and Quinn, in their capacity as managers constituted a breach of their duty of loyalty." [FN66] This holding, according to the Castiel Parties, is the "law of the case" and, consequently, summary judgment should be entered in favor of the Castiel Parties on Count II of their counterclaims. [FN67]

FN66. *VGS, Inc. v. Castiel,* 2000 WL 1277372, at \*4, \*5. *See also VGS, Inc. v. Castiel,* 2001 WL 1154430, at \*1 (Del.Ch.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)

**(Cite as: 2003 WL 723285 (Del.Ch.))**

Page 16

Sept.25, 2001) ("In his August 31, 2000 decision, then Vice Chancellor Steele found that Peter Sahagen and Tom Quinn breached their duty of loyalty when they secretly executed a written consent to the merger of [Virtual Geo] with and into VGS, Inc., for the purpose of eliminating the majority control over the enterprise of the third manager, David Castiel").

FN67. *See Kenton v. Kenton,* 571 A.2d 778, 784 (Del.1990) ("The 'law of the case' is established when a specific legal principle is applied to an issue presented by facts which remain constant throughout the subsequent course of the same litigation") (citation omitted).

The doctrine of "law of the case" is not a hard and fast rule, however. [FN68] The Delaware Supreme Court has stated that "[t]he law of the case doctrine is not inflexible in that, unlike *res judicata,* it is not an absolute bar to reconsideration of a prior decision that is clearly wrong, produces an injustice, or should be revisited because of changed circumstances." [FN69] The Sahagen Parties urge this court not to apply the "law of the case" doctrine because to do so would "create an injustice." [FN70]

FN68. *See Gannett Co., Inc. v. Kanaga,* 750 A.2d 1174, 1181 (Del.2000).

FN69. *Id.* (citations omitted).

FN70. Sahagen Parties Ans. Br. at 39.

**\*13** The court does find that any such injustice would occur if the "law of the case" doctrine were applied only with respect to whether or not a breach of the duty of loyalty occurred. There have been no changed circumstances since then-Vice Chancellor Steele issued his opinion. It also was not clearly wrong since the Delaware Supreme Court has subsequently affirmed the decision. [FN71] Thus, the court concludes that the "law of the case" doctrine does apply to the current facts, and Sahagen and Quinn will be held to have breached

their duty of loyalty. Otherwise, the Castiel Parties would be forced to call witnesses to testify about what happened with respect to the attempted merger-testimony with which this court is all too familiar. Any such requirement would be redundant and serve to waste this court's time.

FN71. *VGS, Inc.,* 781 A.2d 696 (Del.2001).

The Sahagen Parties argue that even if the "law of the case" is applied to Sahagen's and Quinn's breaches, important issues remain for trial as to questions of cause in fact, proximate cause, damages, setoff, comparative fault, estoppel, unclean hands, and contribution. The Castiel Parties do not disagree. [FN72] Accordingly, the court will only grant summary judgment on Count II of the Castiel Parties' complaints to the extent that the "law of the case" doctrine instructs this court to find that Sahagen and Quinn breached their fiduciary duty of loyalty.

FN72. *See* Castiel Parties Reply Br. at 9-10.

VI.

For the foregoing reasons, summary judgment is granted in favor of the Castiel Parties on the Sahagen Parties' cross-counterclaim, except as to Count IX of that counterclaim. Summary judgment is granted in part in favor of the Castiel Parties on Count II of its counterclaim to the extent that the court finds that Quinn and Sahagen breached their duty of loyalty. The parties shall consult and present a conforming order within 10 days of this opinion.

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.